## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF CONNECTICUT

| | |
|---|---|
| JOSEPH VELLALI, NANCY S. LOWERS, JAN M. TASCHNER, RANAY P. CIRILLO, JAMES MANCINI, AND TARA HEARD, individually and as representatives of a class of participants and beneficiaries on behalf of the Yale University Retirement Account Plan, | Civil Action No. |
| | |
| *Plaintiffs*, | JURY TRIAL DEMANDED |
| v. | AUGUST 9, 2016 |
| YALE UNIVERSITY AND MICHAEL A. PEEL, | |
| *Defendants*. | |

## CLASS ACTION COMPLAINT

1.      Plaintiffs Joseph Vellali, Nancy S. Lowers, Jan M. Taschner, Ranay P. Cirillo, James Mancini and Tara Heard, individually and as representatives of a class of participants and beneficiaries in the Yale University Retirement Account Plan (the "Plan"), bring this action under 29 U.S.C. §1132(a)(2) and (3) on behalf of the Plan against Defendants Yale University and Michael A. Peel for breach of fiduciary duties under ERISA.[1]

2.      The duties of loyalty and prudence are "the highest known to the law" and require fiduciaries to have "an eye single to the interests of the participants and beneficiaries." *Donovan v. Bierwirth*, 680 F.2d 263, 271, 272 n.8 (2d Cir. 1982). As

---

[1] The Employee Retirement Income Security Act, 29 U.S.C. §§1001–1461.

fiduciaries to the Plan, Defendants are obligated to act for the exclusive benefit of participants and beneficiaries and to ensure that the Plan's expenses are reasonable and the Plan's investments are prudent. Because the marketplace for retirement plan services is established and competitive, and because the Plan has over $3 billion in assets, the Plan has tremendous bargaining power to demand low-cost administrative and investment management services. Instead of leveraging the Plan's massive bargaining power to benefit participants and beneficiaries, Defendants caused the Plan to pay unreasonable and excessive fees for recordkeeping, administrative, and investment services. Further, Defendants also selected and retained investment options for the Plan that historically and consistently underperformed their benchmarks and charged excessive investment management fees.

3.      To remedy these fiduciary breaches, Plaintiffs, individually and as representatives of a class of participants and beneficiaries in the Plan, bring this action on behalf of the Plan under 29 U.S.C. §1132(a)(2) and (3) to enforce Defendants' personal liability under 29 U.S.C. §1109(a) to restore to the Plan all losses resulting from each breach of fiduciary duty. In addition, Plaintiffs seek such other equitable or remedial relief for the Plan as the Court may deem appropriate.

## JURISDICTION AND VENUE

4.      This Court has exclusive jurisdiction over the subject matter of this action under 29 U.S.C. §1132(e)(1) and 28 U.S.C. §1331 because it is an action under 29 U.S.C. §1132(a)(2) and (3).

5.     This District is the proper venue for this action under 29 U.S.C. §1132(e)(2) and 28 U.S.C. §1391(b) because it is the district in which the Plan is administered, where at least one of the alleged breaches took place, and where all Defendants reside.

## PARTIES

### Yale University Retirement Account Plan

6.     The Yale University Retirement Account Plan is a defined contribution, individual account, employee pension benefit plan under 29 U.S.C. §1002(2)(A) and §1002(34).

7.     The Plan is established and maintained under a written document in accordance with 29 U.S.C. §1102(a), which was last amended and restated effective as of July 1, 2009.

8.     Faculty and staff members of Yale are eligible to participate in the Plan. The Plan provides the only source of retirement income for many employees of Yale, and is based upon deferrals of employee compensation, employer matching contributions, and performance of investment options—net of fees and expenses.

9.     As of June 30, 2014, the Plan held $3.6 billion in assets and had 16,487 participants with account balances. As such, it is one of the largest defined contribution plans in the United States, ranking in the top 1% of all defined contribution plans that filed a Form 5500 with the Department of Labor based on total plan assets.  Plans of such great size are commonly referred to as "jumbo plans."

3

**Plaintiffs**

10.     Joseph Vellali resides in East Haven, Connecticut, and is a participant in the Plan under 29 U.S.C. §1002(7) because he and his beneficiaries are or may become eligible to receive benefits under the Plan.

11.     Nancy S. Lowers resides in North Haven, Connecticut, and is a participant in the Plan under 29 U.S.C. §1002(7) because she and her beneficiaries are or may become eligible to receive benefits under the Plan.

12.     Jan M. Taschner resides in Madison, Connecticut, and is a participant in the Plan under 29 U.S.C. §1002(7) because she and her beneficiaries are or may become eligible to receive benefits under the Plan.

13.     Ranay P. Cirillo resides in New Haven, Connecticut, and is a participant in the Plan under 29 U.S.C. §1002(7) because she and her beneficiaries are or may become eligible to receive benefits under the Plan.

14.     James Mancini resides in Cheshire, Connecticut, and is a participant in the Plan under 29 U.S.C. §1002(7) because he and his beneficiaries are or may become eligible to receive benefits under the Plan.

15.     Tara Heard resides in Meriden, Connecticut, and is a participant in the Plan under 29 U.S.C. §1002(7) because she and her beneficiaries are or may become eligible to receive benefits under the Plan.

**Defendants**

16.     Yale University is a non-profit corporation organized under Connecticut law with its principal place of business in New Haven, Connecticut. Yale University is governed by the Yale Corporation, a body of Trustees including

4

the President, ten successor Trustees who are successors to the original Trustees, and six alumni fellows.

17.     Under Section 12.1 of the Plan, Yale University is designated as the Plan Administrator under 29 U.S.C. §1002(16)(A)(i) and is responsible for the management of the Plan. Yale University is also the named fiduciary within the meaning of 29 U.S.C. §1102(a)(2) and responsible for the control or management of Plan assets.

18.     Yale University acts through Yale Corporation and its executive leaders and administrators. In particular, the Plan document states that Yale University, acting through the Vice President for Human Resources and Administration, has fiduciary discretion over Plan administration but not over Plan assets. Yale University retains all discretionary authority and powers necessary to control and manage the assets of the Plan.

19.     Yale University delegated to the Vice President of Human Resources and Administration the authority to establish a committee and appoint members thereto, which may oversee the investment options provided under the Plan or otherwise administer the Plan.

20.     Michael Peel has served as Yale University's Vice President of Human Resources and Administration since 2008.

21.     Yale University and Michael Peel are ultimately responsible for selecting, retaining, and terminating the external investment managers and

5

investment vehicles for the Plan; monitoring those investments; and creating, implementing, and ensuring compliance with the Plan's investment policies.

22.     Because Michael Peel has acted as agent of Yale University, which acts as agent for Yale Corporation, all defendants are collectively referred to hereafter as Defendants.

## FACTS APPLICABLE TO ALL COUNTS

### I.     Plan investments

23.     Participants contribute to the Plan through payroll deductions. Yale University also makes contributions on behalf of participants, including matching contributions.

24.     Defendants exercised and continue to exercise sole discretionary authority over the investment options that are included in the Plan.

25.     Since 2010, Defendants provided over 90 different mutual funds or insurance company products from Teachers Insurance and Annuity Association of America and College Retirement Equities Fund and the Vanguard Group, Inc.[2] as investment options under the Plan. Defendants select investment options into which participants' investments are directed, and decide which investment options to remove from the Plan.

26.     For many years, the Plan had multiple recordkeepers to provide administrative and recordkeeping services, instead of a single recordkeeper, unlike most defined contribution plans. This resulted in dramatically excessive

---

[2] Teachers Insurance and Annuity Association of America and College Retirement Equities Fund are referred to collectively as "TIAA-CREF", and Vanguard Fiduciary Trust Company and the Vanguard Group, Inc. are referred to collectively as "Vanguard".

recordkeeping and investment fees. Only in April 2015 did Defendants consolidate the Plan's recordkeeping and administrative services with a single recordkeeper, TIAA-CREF. Also for many years, the Plan had higher-cost share classes of mutual funds despite the Plan's tremendous size and bargaining power to demand low-cost investments. In April 2015, Defendants moved some of the Plan's investments to lower-cost share classes of the same investments. These lower-cost share classes, *identical in every respect except for lower fees*, had been available since 2010. Plan participants could have and should have been paying far less for the same investment since that time. As a result, Plan participants lost millions of dollars of their retirement assets and the earnings those assets would have made.

27.     Despite Defendants' substitution of some lower-priced share classes in 2015, Defendants continued to include many other funds in far higher-priced share classes, which were otherwise identical. Defendants continue to include excessively high-priced investment options in the Plan and continue to allow excessive recordkeeping fees to be assessed against Plan participants, despite the April 2015 changes.

28.     As of the most recent Form 5500 filed with the Department of Labor dated June 30, 2014, Defendants included 115 investment options in the Plan. Among the available investments, 36 were TIAA-CREF options holding $2.7 billion in Plan assets and 79 were Vanguard options holding $824 million. The 115 options included retail and institutional share class mutual funds, insurance separate accounts, variable annuity options, and fixed annuity options. The retail share class

mutual funds are designed for small individual investors and are identical in every respect to institutional share classes, except for much higher fees.

29.     These investments are designated by Defendants as available investment alternatives offered under the Plan.

30.     The TIAA Traditional Annuity offered in the Plan is a fixed annuity contract that returns a contractually specified minimum interest rate. Assets invested in the TIAA Traditional Annuity are held in the general account of Teachers Insurance and Annuity Association of America and are dependent on the claims-paying ability of Teachers Insurance and Annuity Association of America.

31.     The TIAA Traditional Annuity has severe restrictions and penalties for withdrawal if participants wish to change their investments in the Plan. For example, some participants who invest in the TIAA Traditional Annuity must pay a 2.5% surrender charge if they withdraw their investment in a single lump sum within 120 days of termination of employment. Rather than being available to participants if they wish to liquidate their funds earlier, the only way for participants to withdraw or change their investment in the TIAA Traditional Annuity is to spread the withdrawal over a *ten-year period,* unless a substantial penalty is paid. Thus, participants who wish to withdraw their investment without penalty can only do so over ten years

32.     The Plan's CREF Stock Account, CREF Global Equities Account, CREF Equity Index Account, CREF Growth Account, CREF Social Choice Account, CREF Money Market Account, CREF Inflation-Linked Bond Account, and CREF

Bond Market Account are variable annuities that invest in underlying securities for a given investment style. The value of the Plan's investment in these variable annuities changes over time based on investment performance and expenses of the accounts.

33.     The expense ratio of the CREF variable annuity accounts is made up of multiple layers of expense charges consisting of the following:

     a.  "administrative expense" charge (24 bps);[3]

     b.  "distribution expense" charge (9.5 bps);

     c.  "mortality and expense risk" charge (0.5 bps); and

     d.  "investment advisory expense" charge (ranging from 4 to 12.5 bps).

34.     The TIAA Real Estate Account is an insurance separate account maintained by TIAA-CREF. An insurance separate account is an investment vehicle that aggregates assets from more than one retirement plan for a given investment strategy, but those assets are segregated from the insurance company's general account assets. Similar to the CREF variable annuity accounts, the expense ratio of the TIAA Real Estate Account is made up of multiple layers of expense charges. As of May 1, 2013, these charges consisted of the following:

     a.  "administrative expense" charge (26.5 bps);

     b.  "distribution expense" charge (8 bps);

     c.  "mortality and expense risk" charge (0.5 bps);

     d.  "liquidity guarantee "(18 bps); and

---

[3] One basis point is equal to 1/100th of one percent (or 0.01%). Expenses stated as of May 1, 2014.

e.   "investment management expense" charge (36.5 bps).

35.    The remaining TIAA-CREF funds are registered investment companies under the Investment Company Act of 1940, known as mutual funds. The TIAA-CREF mutual funds charge varying amounts for investment management, but also charge distribution, marketing, and other expenses, depending on the type of investment and share class.

36.    The Vanguard investment options offered to Plan participants are exclusively mutual funds that charge varying amounts for investment management, but also charge for distribution, marketing, and other expenses, depending on the type of investment and share class.

37.    Mutual funds have shareholders who are not participants in the Yale Plan, or any retirement plan, and who purchase shares as a result of marketing the fund. However, all shareholders in the mutual funds, including participants in the Yale Plan, pay the expenses set forth in ¶¶35–36.

38.    As of December 31, 2014, the Plan's $3.8 billion in net assets consisted of $2.7 billion invested in TIAA-CREF funds and $824 million invested in Vanguard funds.

## II.    Defendants' actions caused Plan participants to pay excessive administrative and recordkeeping fees in violation of ERISA's requirement that fees be reasonable.

39.    Recordkeeping is a necessary service for every defined contribution plan. The market for recordkeeping services is highly competitive. There are numerous recordkeepers in the marketplace who are equally capable of providing a high level of service to jumbo defined contribution plans, like this Plan. Competitive

recordkeepers compete vigorously for the business of jumbo plans by offering the best price because the services provided to plans are mostly standardized.

40.     ERISA requires that plan administrative and recordkeeping expenses, among others, are and remain reasonable for the services provided. To meet this standard, prudent fiduciaries of large defined contribution plans solicit competitive bids for the plan's recordkeeping and administrative services at regular intervals of approximately three years.

41.     The cost of recordkeeping and administrative services depends on the number of participants.  The cost does not depend on the asset balance of the plan or the amount of savings held in a participant's account. Thus, the cost of providing recordkeeping services to a plan with an average account balance of $50,000 is the same as the cost of recordkeeping for a plan with the same number of participants and a $5,000 average account balance. For this reason, prudent fiduciaries of defined contribution plans negotiate recordkeeping fees based on a fixed dollar amount per-participant rather than as a percentage of plan assets. Otherwise, as plan assets increase through participant contributions or investment gains, the recordkeeping revenue increases without any change in the services provided.

42.     Jumbo defined contribution plans, like this Plan, possess tremendous economies of scale for recordkeeping and administrative services. As the number of participants in the plan increases, the per-participant fee charged for recordkeeping and administrative services declines. These lower administrative expenses are readily available for plans with a greater number of participants.

11

43.     A practice called revenue sharing occurs when a mutual fund or other investment vehicle directs a portion of its asset-based expense ratio to the plan's recordkeeper putatively for providing recordkeeping and administrative services for the investment.

44.     Because revenue sharing arrangements provide asset-based compensation for the recordkeeper, prudent fiduciaries, if they choose to use revenue sharing, must monitor the total amount of revenue sharing a recordkeeper receives to ensure that the recordkeeper's compensation is reasonable for the services provided. A prudent fiduciary using revenue sharing must obtain agreement from the recordkeeper to ensure that all revenue sharing payments that exceed a reasonable participant-based recordkeeping fee are returned to the plan. Because revenue sharing payments are asset based, they often bear no relation to a reasonable recordkeeping fee and can provide excessive compensation, or may be used as kickbacks to induce recordkeepers to use their high-priced funds as plan investment options.

45.     Prudent fiduciaries of similarly sized defined contribution plans use a single recordkeeper rather than hiring multiple recordkeepers and custodians or trustees. This leverages plan assets to provide economies of scale and ensures that plan participants pay only reasonable recordkeeping fees, while also simplifying personnel and payroll data feeds, reducing electronic fund transfers, and avoiding duplication of services when more than one recordkeeper is used.

12

46.     According to a 2013 survey of 403(b) plans, more than 90% of plans use a single recordkeeper to provide administrative and recordkeeping services to participants. See LIMRA Retirement Research, *403(b) Plan Sponsor Research* (2013).[4]

47.     It is well known in the defined contribution industry that plans with dozens of choices and multiple recordkeepers "fail" based on two primary flaws:

>   **1. The choices are overwhelming**. Numerous studies have demonstrated that when people are given too many choices of anything, they lose confidence or make no decision.
>   **2. The multi-recordkeeper platform is inefficient**. It does not allow sponsors to leverage total plan assets and receive appropriate pricing based on aggregate assets.

The Standard Retirement Services, Inc., *Fixing Your 403(b) Plan: Adopting a Best Practices Approach,* at 2 (Nov. 2009)(emphasis in original).[5]

48.     The benefits of using a single recordkeeper are clear:

>   By selecting a single recordkeeper, plan sponsors can enhance their purchasing power and negotiate lower, transparent investment fees for participants. Participants will benefit from a more manageable number of institutional-quality investment options to choose from. Participants will also benefit from customized and consistent enrollment, education and ongoing communication materials.[6]

49.     In a study titled "How 403(b) Plans Are Wasting Nearly $10 Billion Annually, and What Can Be Done to Fix It", AonHewitt similarly recognized:

>   403(b) plan sponsors can dramatically reduce participant-borne costs while improving employees' retirement readiness by:

---

[4] Available at http://www.limra.com/uploadedFiles/limracom/LIMRA_Root/Secure_Retirement_Institute/News_Center/Reports/130329-01exec.pdf.

[5] Available at https://www.standard.com/pensions/publications/14883_1109.pdf.

[6] *Id.*

– Reducing the number of investment options, utilizing an "open architecture" investment menu, and packaging the options within a "tiered" structure.

– Consolidating recordkeepers to improve efficiencies and reduce compliance-related risks.

– Leveraging aggregate plan size and scale to negotiate competitive pricing.

AonHewitt, *How 403(b) Plans Are Wasting Nearly $10 Billion Annually, and What Can Be Done to Fix It* (Jan. 2016).[7]

50.     Another independent investment consultant, Towers Watson, also recognized that using multiple recordkeepers has caused:

high investment and administrative costs, and complex choices for plan participants in terms of the number of vendors and the array of investment options. Additionally, this complexity has made it difficult for employers to monitor available choices and provide ongoing oversight…Such designs typically are expensive and fail to leverage plan size. They can also be confusing to the average plan participant, who is likely to fall short of achieving retirement readiness and would benefit from more guidance.

Peter Grant and Gary Kilpatrick, *Higher Education's Response to a New Defined Contribution Environment*, TOWERS WATSON VIEWPOINTS, at 2 (2012).[8]

51.     Others in the industry agree. See, e.g., Kristen Heinzinger, *Paring Down Providers: A 403(b) Sponsor's Experience,* PLANSPONSOR (Dec. 6, 2012)("One advantage of consolidating to a single provider was an overall drop in

---

[7]Available at https://retirementandinvestmentblog.aon.com/getattachment/36ff81a4-db35-4bc0-aac1-1685d2a64078/How_403(b)_Plans_are_Wasting_Nearly_$10_Billion_Annually_Whitepaper_FINAL.pdf.aspx.

[8] Available at https://www.towerswatson.com/DownloadMedia.aspx?media=%7B08A2F366-14E3-4C52-BB78-8930F598FD26%7D.

administrative fees and expenses. Recordkeeping basis points returned to the plan sponsors rather than to the vendor. All plan money aggregated into a single platform, and participants were able to save on fee structure. This also eliminated the complications and confusion of having three different recordkeepers.");[9] Paul B. Lasiter, *Single Provider, Multiple Choices*, BUSINESS OFFICER (Mar. 2010) (identifying, among other things, the key disadvantages of maintaining a multi-provider platform including the fact that it is "cumbersome and costly to continue overseeing multiple vendors").[10]

52.    Use of a single recordkeeper is also less confusing to participants and results in their avoiding paying excessive recordkeeping fees. *Vendor Consolidation in Higher Education: Getting More from Less*, PLANSPONSOR (July 29, 2010) (recognizing the following benefits, among others: "The plan participant experience is better" because "employees are benefiting from less confusion as a result of fewer vendors in the mix"; "Administrative burden is lessened" by "bringing new efficiencies to the payroll"; and "Costs can be reduced" because "[w]ith a reduced number of vendors in the equation, plan sponsors are better able to negotiate fees" and many are "reporting lower overall cost resulting in an improved cost-per-participant ratio").[11]

---

[9] Available at http://www.plansponsor.com/paring-down-providers-a-403b-sponsors-experience/?fullstory=true.

[10] Available at http://www.nacubo.org/Business_Officer_Magazine/Magazine_Archives/March_2010/Single_Provider_Multiple_Choices.html.

[11] Available at http://www.plansponsor.com/vendor-consolidation-in-higher-education/?fullstory=true.

53.     Despite the long-recognized benefits of a single recordkeeper for a defined contribution plan, Defendants contracted with two recordkeepers (TIAA-CREF and Vanguard) until April 2015 to provide duplicative recordkeeping and administrative services. The inefficient and costly structure maintained by the fiduciaries has caused Plan participants to pay duplicative, excessive, and unreasonable fees for Plan recordkeeping and administrative services.

54.     Effective April 2015, Defendants retained TIAA-CREF as the single recordkeeper to the Plan. There was no loyal or prudent reason that Defendants failed to engage in such a process long before April 2015, and before 2009. Even after the change, the Plan continues to pay excessive fees for recordkeeping and administrative services.

55.     TIAA-CREF receives, and Vanguard previously received, compensation from revenue sharing payments and other sources of indirect and direct compensation from the Plan and its investments.

56.     Upon information and belief and industry experts, the amounts of revenue sharing kicked back to the TIAA-CREF recordkeeping entity for the Plan's TIAA-CREF investments are:

| TIAA-CREF Investment | Revenue Share |
|---|---|
| CREF variable annuity contracts | 24 bps |
| Premier class of TIAA-CREF mutual funds | 15 bps |
| Retirement class of TIAA-CREF mutual funds | 25 bps |
| TIAA Real Estate Account | 24–26.5 bps |
| TIAA Traditional Annuity | 15 bps |

57.     Upon information and belief, Vanguard was compensated for recordkeeping services based on internal revenue sharing it received from using higher-cost share classes of Vanguard's mutual funds as opposed to the institutional classes readily available to a jumbo plan such as the Plan.

58.     In addition, TIAA-CREF receives, and Vanguard has received, additional indirect compensation, including float, securities-lending revenue, distribution fees, mortality and expense charges, surrender charges, spread, and redemption fees.

59.     Based on information currently available to Plaintiffs regarding the Plan's features, the nature of the administrative services provided by the Plan's recordkeepers, the Plan's participant level (roughly 15,000), and the recordkeeping market, a reasonable recordkeeping fee for the Plan would have been a fixed amount between $500,000 and $575,000 (approximately $35 per participant with an account balance).

60.     Based on the direct and indirect compensation levels shown on the Plan's Form 5500s filed with the Department of Labor and upon information and belief regarding the internal revenue share allocated to each of the Plan's recordkeepers from their proprietary investment options, the Plan paid between $3.8 million and $4.3 million (or approximately $200–$300 per participant per year from 2010 to 2014), over 470% higher than a reasonable fee for these services, resulting in millions of dollars in excessive recordkeeping fees each year.

61.    The impact of excessive fees on employees' and retirees' retirement assets is dramatic. The U.S. Department of Labor has noted that a 1% higher level of fees over a 35-year period makes a 28% difference in retirement assets at the end of a participant's career. U.S. Dep't of Labor, *A Look at 401(k) Plan Fees,* at 1–2 (Aug. 2013).[12]

62.    Defendants failed to prudently monitor and control the compensation paid by the Plan for recordkeeping and administrative services, particularly the asset-based revenue sharing received by TIAA-CREF and Vanguard. Defendants' failures caused the Plan to pay unreasonable expenses for administering the Plan.

63.    Upon information and belief, Defendants also failed to conduct a competitive bidding process for the Plan's recordkeeping services. A competitive bidding process for the Plan's recordkeeping services would have produced a reasonable recordkeeping fee for the Plan. This competitive bidding process would have enabled Defendants to select a recordkeeper charging reasonable fees, obtain a substantial reduction in recordkeeping fees, and rebate any excess expenses paid by participants for recordkeeping services.

64.    Defendants failed to prudently monitor and control the compensation received by the Plan's recordkeepers to ensure that the Plan only paid reasonable fees for recordkeeping and administrative services.

65.    Had Defendants monitored the compensation paid to the Plan's recordkeepers and ensured that participants were only charged reasonable fees for

---

[12] Available at http://www.dol.gov/ebsa/pdf/401kfeesemployee.pdf.

administrative and recordkeeping services, Plan participants would not have lost in excess of $20 million of their retirement savings by paying unreasonable recordkeeping fees in the last six years alone.[13]

### III. Defendants failed to prudently consider or offer dramatically lower-cost investments that were available to the Plan, including identical mutual funds in lower-cost share classes.

66.    Nobel Prize winners in economics have concluded that virtually no investment manager consistently beats the market over time after fees are taken into account. "Properly measured, the average actively managed dollar must underperform the average passively managed dollar, net of costs." William F. Sharpe, *The Arithmetic of Active Management,* 47 FIN. ANALYSTS J. 7, 8 (Jan./Feb. 1991);[14] Eugene F. Fama & Kenneth R. French, *Luck Versus Skill in the Cross-Section of Mutual Fund Returns*, 65 J. FIN. 1915, 1915 (2010)("After costs…in terms of net returns to investors, active investment must be a negative sum game.").

67.    To the extent managers show any sustainable ability to beat the market, the outperformance is nearly always dwarfed by mutual fund expenses. Fama & French, *Luck Versus Skill in the Cross-Section of Mutual Fund Returns*, at 1931–34; see also Russ Wermers, *Mutual Fund Performance: An Empirical Decomposition into Stock-Picking Talent, Style, Transaction Costs, and Expenses*, 55

---

[13] Plan losses have been brought forward to the present value using the investment returns of the S&P 500 index to compensate participants who have not been reimbursed for their losses. This is because the excessive fees participants paid would have remained in Plan investments growing with the market.

[14] Available at http://www.cfapubs.org/doi/pdf/10.2469/faj.v47.n1.7.

J. Fin. 1655, 1690 (2000)("on a net-return level, the funds underperform broad market indexes by one percent per year").

68.     If an individual high-cost mutual fund exhibits market-beating performance over a short period of time, studies demonstrate that outperformance during a particular period is not predictive of whether a mutual fund will perform well in the future. Laurent Barras et al., *False Discoveries in Mutual Fund Performance: Measuring Luck in Estimated Alphas*, 65 J. Fin. 179, 181 (2010); Mark M. Carhart, *On Persistence in Mutual Fund Performance*, 52 J. Fin. 57, 57, 59 (1997)(measuring thirty-one years of mutual fund returns and concluding that "persistent differences in mutual fund expenses and transaction costs explain almost all of the predictability in mutual fund returns"). However, the *worst-performing* mutual funds show a strong, persistent tendency to continue their poor performance. Carhart, *On Persistence in Mutual Fund Performance*, at 57.

69.     Accordingly, investment costs are of paramount importance to prudent investment selection, and a prudent investor will not select higher-cost actively managed funds unless there has been a documented process leading to the realistic conclusion that the fund is likely to be that extremely rare exception, if one even exists, that will outperform its benchmark over time, net of investment expenses.

70.     Moreover, jumbo retirement plans have enormous bargaining power to obtain low fees for investment management services.

> The fiduciaries also must consider the size and purchasing power of their plan and select the share classes (or alternative investments) that a fiduciary who is knowledgeable about such matters would select under the circumstances. In other words, the "prevailing

circumstances"—such as the size of the plan—are a part of a prudent decision-making process. The failure to understand the concepts and to know about the alternatives could be a costly fiduciary breach.

Fred Reish, *Class-ifying Mutual Funds*, PLANSPONSOR (Jan. 2011).[15]

71.     Apart from the fact that a prudent fiduciary will carefully weigh whether an actively managed fund is likely to outperform an index over time, net of fees, academic and financial industry literature demonstrates that high expenses are not correlated with superior investment management. Indeed, funds with high fees on average perform worse than less expensive funds even on a *pre-fee basis*. Javier Gil-Bazo & Pablo Ruiz-Verdu, *When Cheaper is Better: Fee Determination in the Market for Equity Mutual Funds*, 67 J. ECON. BEHAV. & ORG. 871, 873 (2008); see also Jill E. Fisch, *Rethinking the Regulation of Securities Intermediaries*, 158 U. PA. L. REV. 1961, 1993 (2010)(summarizing numerous studies showing that "the most consistent predictor of a fund's return to investors is the fund's expense ratio").

> [T]he empirical evidence implies that superior management is not priced through higher expense ratios. On the contrary, it appears that the effect of expenses on after-expense performance (even after controlling for funds' observable characteristics) is more than one-to-one, which would imply that low-quality funds charge higher fees. Price and quality thus seem to be inversely related in the market for actively managed mutual funds.

Gil-Bazo & Ruiz-Verdu, *When Cheaper is Better*, at 883.

72.     Lower-cost institutional share classes of mutual funds compared to retail shares are available to institutional investors, and far lower-cost share classes are available to jumbo investors like the Plan. In addition, insurance

---

[15] Available at http://www.plansponsor.com/MagazineArticle.aspx?id=6442476537.

company pooled separate accounts are available that can significantly reduce investment fees charged on mutual fund investments to defined contribution plans.

73.     Minimum investment thresholds for institutional share classes are routinely waived by the investment provider if not reached by a single fund based on the retirement plan's total investment in the provider's platform. Therefore, it is commonly understood by investment managers of large pools of assets that, for a retirement plan of the Plan's size, if requested, the investment provider would make available lower-cost share classes for the Plan, if there were any fund that did not individually reach the threshold.

74.     Despite these far lower-cost options, Defendants selected and continue to retain Plan investment options with far higher costs than were and are available for the Plan based on its size. Moreover, for the *exact same mutual fund option*, Defendants selected and continue to offer much higher-cost share classes of identical mutual funds than were available to the Plan. The following table lists the significantly lower-cost share classes that were available to the Plan since 2010 but were not used:

| Plan Mutual Fund | Plan Fee | Identical Lower-Cost Mutual Fund | Identical Lower-Cost Mutual Fund Fee | Plan's Excess Cost |
|---|---|---|---|---|
| TIAA-CREF Equity Index (Ret) (TIQRX) | 33 bps | TIAA-CREF Equity Index (Inst) (TIEIX) | 9 bps | 266.67% |
| TIAA-CREF Growth & Income (Premier) (TRPGX) | 62 bps | TIAA-CREF Growth & Income (Inst) (TIGRX) | 47 bps | 31.91% |

| Plan Mutual Fund | Plan Fee | Identical Lower-Cost Mutual Fund | Identical Lower-Cost Mutual Fund Fee | Plan's Excess Cost |
|---|---|---|---|---|
| TIAA-CREF Growth & Income (Ret) (TRGIX) | 73 bps | TIAA-CREF Growth & Income (Inst) (TIGRX) | 52 bps | 40.38% |
| TIAA-CREF International Equity (Premier) (TREPX) | 68 bps | TIAA-CREF International Equity (Inst) (TIIEX) | 53 bps | 28.30% |
| TIAA-CREF International Equity (Ret) (TRERX) | 78 bps | TIAA-CREF International Equity (Inst) (TIIEX) | 57 bps | 36.84% |
| TIAA-CREF International Equity Index (Ret) (TRIEX) | 35 bps | TIAA-CREF International Equity Index (Inst) (TCIEX) | 10 bps | 250.00% |
| TIAA-CREF Large-Cap Growth Index (Ret) (TRIRX) | 34 bps | TIAA-CREF Large-Cap Growth Index (Inst) (TILIX) | 9 bps | 277.78% |
| TIAA-CREF Large-Cap Value (Premier) (TRCPX) | 62 bps | TIAA-CREF Large-Cap Value (Inst) (TRLIX) | 47 bps | 31.91% |
| TIAA-CREF Large-Cap Value (Ret) (TRLCX) | 74 bps | TIAA-CREF Large-Cap Value (Inst) (TRLIX) | 49 bps | 51.02% |
| TIAA-CREF Large-Cap Value Index (Ret) (TRCVX) | 34 bps | TIAA-CREF Large-Cap Value Index (Inst) (TILVX) | 9 bps | 277.78% |
| TIAA-CREF Lifecycle 2010 (Ret) (TCLEX) | 65 bps | TIAA-CREF Lifecycle 2010 (Inst) (TCTIX) | 40 bps | 62.50% |
| TIAA-CREF Lifecycle 2015 (Ret) (TCLIX) | 67 bps | TIAA-CREF Lifecycle 2015 (Inst) (TCNIX) | 42 bps | 59.52% |
| TIAA-CREF Lifecycle 2020 (Ret) (TCLTX) | 67 bps | TIAA-CREF Lifecycle 2020 (Inst) (TCWIX) | 42 bps | 59.52% |
| TIAA-CREF Lifecycle 2025 (Ret) (TCLFX) | 69 bps | TIAA-CREF Lifecycle 2025 (Inst) (TCYIX) | 44 bps | 56.82% |
| TIAA-CREF Lifecycle 2030 (Ret) (TCLNX) | 71 bps | TIAA-CREF Lifecycle 2030 (Inst) (TCRIX) | 46 bps | 54.35% |
| TIAA-CREF Lifecycle 2035 (Ret) (TCLRX) | 72 bps | TIAA-CREF Lifecycle 2035 (Inst) (TCIIX) | 47 bps | 53.19% |

| Plan Mutual Fund | Plan Fee | Identical Lower-Cost Mutual Fund | Identical Lower-Cost Mutual Fund Fee | Plan's Excess Cost |
|---|---|---|---|---|
| TIAA-CREF Lifecycle 2040 (Ret) (TCLOX) | 72 bps | TIAA-CREF Lifecycle 2040 (Inst) (TCOIX) | 47 bps | 53.19% |
| TIAA-CREF Lifecycle 2045 (Ret) (TTFRX) | 72 bps | TIAA-CREF Lifecycle 2045 (Inst) (TTFIX) | 47 bps | 53.19% |
| TIAA-CREF Lifecycle 2050 (Ret) (TLFRX) | 71 bps | TIAA-CREF Lifecycle 2050 (Inst) (TFTIX) | 46 bps | 54.35% |
| TIAA-CREF Lifecycle Retirement Income (Ret) (TLIRX) | 65 bps | TIAA-CREF Lifecycle Retirement Income (Inst) (TLRIX) | 40 bps | 62.50% |
| TIAA-CREF Mid-Cap Growth (Premier) (TRGPX) | 64 bps | TIAA-CREF Mid-Cap Growth (Inst) (TRPWX) | 49 bps | 30.61% |
| TIAA-CREF Mid-Cap Growth (Ret) (TRGMX) | 77 bps | TIAA-CREF Mid-Cap Growth (Inst) (TRPWX) | 52 bps | 48.08% |
| TIAA-CREF Mid-Cap Value (Premier) (TRVPX) | 61 bps | TIAA-CREF Mid-Cap Value (Inst) (TIMVX) | 46 bps | 32.61% |
| TIAA-CREF Mid-Cap Value (Ret) (TRVRX) | 74 bps | TIAA-CREF Mid-Cap Value (Inst) (TIMVX) | 49 bps | 51.02% |
| TIAA-CREF Real Estate Securities (Premier) (TRRPX) | 72 bps | TIAA-CREF Real Estate Securities (Inst) (TIREX) | 57 bps | 26.32% |
| TIAA-CREF Real Estate Securities (Ret) (TRRSX) | 81 bps | TIAA-CREF Real Estate Securities (Inst) (TIREX) | 56 bps | 44.64% |
| TIAA-CREF S&P 500 Index (Ret) (TRSPX) | 33 bps | TIAA-CREF S&P 500 Index (Inst) (TISPX) | 8 bps | 312.50% |
| TIAA-CREF Small-Cap Blend Index (Ret) (TRBIX) | 34 bps | TIAA-CREF Small-Cap Blend Index (Inst) (TISBX) | 9 bps | 277.78% |
| TIAA-CREF Small-Cap Equity (Premier) (TSRPX) | 73 bps | TIAA-CREF Small-Cap Equity (Inst) (TISEX) | 57 bps | 28.07% |

| Plan Mutual Fund | Plan Fee | Identical Lower-Cost Mutual Fund | Identical Lower-Cost Mutual Fund Fee | Plan's Excess Cost |
|---|---|---|---|---|
| TIAA-CREF Small-Cap Equity (Ret) (TRSEX) | 80 bps | TIAA-CREF Small-Cap Equity (Inst) (TISEX) | 55 bps | 45.45% |
| TIAA-CREF Social Choice Equity (Premier) (TRPSX) | 34 bps | TIAA-CREF Social Choice Equity (Inst) (TISCX) | 19 bps | 78.95% |
| TIAA-CREF Social Choice Equity (Ret) (TRSCX) | 45 bps | TIAA-CREF Social Choice Equity (Inst) (TISCX) | 22 bps | 104.55% |
| Vanguard 500 Index (Inv) (VFINX) | 17 bps | Vanguard Institutional Index (Inst Pl) (VIIIX) | 2 bps | 750.00% |
| Vanguard Asset Allocation (Inv) (VAAPX) | 27 bps | Vanguard Asset Allocation (Adm) (VAARX) | 19 bps | 42.11% |
| Vanguard Balanced Index (Inv) (VBINX) | 26 bps | Vanguard Balanced Index (Inst) (VBAIX) | 8 bps | 225.00% |
| Vanguard Capital Opportunity (Inv) (VHCOX) | 48 bps | Vanguard Capital Opportunity (Adm) (VHCAX) | 41 bps | 17.07% |
| Vanguard Developed Markets Index (Inv) (VDMIX) | 20 bps | Vanguard Developed Markets Index (Inst Pl) (VDMPX) | 6 bps | 233.33% |
| Vanguard Emerging Markets Stock Index (Inv) (VEIEX) | 35 bps | Vanguard Emerging Markets Stock Index (Inst) (VEMIX) | 15 bps | 133.33% |
| Vanguard Emerging Markets Stock Index (Inv) (VEIEX) | 35 bps | Vanguard Emerging Markets Stock Index (Inst Pl) (VEMRX) | 10 bps | 250.00% |
| Vanguard Energy (Inv) (VGENX) | 38 bps | Vanguard Energy (Adm) (VGELX) | 31 bps | 22.58% |
| Vanguard Equity-Income (Inv) (VEIPX) | 31 bps | Vanguard Equity-Income (Adm) (VEIRX) | 22 bps | 40.91% |

| Plan Mutual Fund | Plan Fee | Identical Lower-Cost Mutual Fund | Identical Lower-Cost Mutual Fund Fee | Plan's Excess Cost |
|---|---|---|---|---|
| Vanguard European Stock Index (Inv) (VEURX) | 26 bps | Vanguard European Stock Index (Inst) (VESIX) | 10 bps | 160.00% |
| Vanguard Explorer (Inv) (VEXPX) | 49 bps | Vanguard Explorer (Adm) (VEXRX) | 32 bps | 53.13% |
| Vanguard Extended Market Index (Inv) (VEXMX) | 26 bps | Vanguard Extended Market Index (Inst) (VIEIX) | 8 bps | 225.00% |
| Vanguard Extended Market Index (Inv) (VEXMX) | 26 bps | Vanguard Extended Market Index (Inst Pl) (VEMPX) | 6 bps | 333.33% |
| Vanguard FTSE Social Index (Inv) (VFTSX) | 29 bps | Vanguard FTSE Social Index (Inst) (VFTNX) | 16 bps | 81.25% |
| Vanguard GNMA (Inv) (VFIIX) | 23 bps | Vanguard GNMA (Adm) (VFIJX) | 13 bps | 76.92% |
| Vanguard Growth & Income (Inv) (VQNPX) | 32 bps | Vanguard Growth & Income (Adm) (VGIAX) | 21 bps | 52.38% |
| Vanguard Growth Index (Inv) (VIGRX) | 26 bps | Vanguard Growth Index (Inst) (VIGIX) | 8 bps | 225.00% |
| Vanguard Health Care (Inv) (VGHCX) | 36 bps | Vanguard Health Care (Adm) (VGHAX) | 29 bps | 24.14% |
| Vanguard High-Yield Corporate (Inv) (VWEHX) | 28 bps | Vanguard High-Yield Corporate (Adm) (VWEAX) | 15 bps | 86.67% |
| Vanguard Inflation-Protected Securities (Inv) (VIPSX) | 22 bps | Vanguard Inflation-Protected Securities (Inst) (VIPIX) | 7 bps | 214.29% |
| Vanguard Institutional Index (Inst) (VINIX) | 4 bps | Vanguard Institutional Index (Inst Pl) (VIIIX) | 2 bps | 100.00% |

| Plan Mutual Fund | Plan Fee | Identical Lower-Cost Mutual Fund | Identical Lower-Cost Mutual Fund Fee | Plan's Excess Cost |
|---|---|---|---|---|
| Vanguard Intermediate-Term Bond Index (Inv) (VBIIX) | 22 bps | Vanguard Intermediate-Term Bond Index (Inst) (VBIMX) | 7 bps | 214.29% |
| Vanguard Intermediate-Term Bond Index (Inv) (VBIIX) | 22 bps | Vanguard Intermediate-Term Bond Index (Inst Pl) (VBIUX) | 5 bps | 340.00% |
| Vanguard Intermediate-Term Investment-Grade (Inv) (VFICX) | 24 bps | Vanguard Intermediate-Term Investment-Grade (Adm) (VFIDX) | 11 bps | 118.18% |
| Vanguard Intermediate-Term Treasury (Inv) (VFITX) | 25 bps | Vanguard Intermediate-Term Treasury (Adm) (VFIUX) | 12 bps | 108.33% |
| Vanguard International Growth (Inv) (VWIGX) | 49 bps | Vanguard International Growth (Adm) (VWILX) | 33 bps | 48.48% |
| Vanguard Large-Cap Index (Adm) (VLCAX) | 12 bps | Vanguard Large-Cap Index (Inst) (VLISX) | 8 bps | 50.00% |
| Vanguard Long-Term Bond Index (Inv) (VBLTX) | 22 bps | Vanguard Long-Term Bond Index (Inst) (VBLLX) | 7 bps | 214.29% |
| Vanguard Long-Term Bond Index (Inv) (VBLTX) | 22 bps | Vanguard Long-Term Bond Index (Inst Pl) (VBLIX) | 5 bps | 340.00% |
| Vanguard Long-Term Investment-Grade (Inv) (VWESX) | 26 bps | Vanguard Long-Term Investment-Grade (Adm) (VWETX) | 13 bps | 100.00% |
| Vanguard Long-Term Treasury (Inv) (VUSTX) | 25 bps | Vanguard Long-Term Treasury (Adm) (VUSUX) | 12 bps | 108.33% |

| Plan Mutual Fund | Plan Fee | Identical Lower-Cost Mutual Fund | Identical Lower-Cost Mutual Fund Fee | Plan's Excess Cost |
|---|---|---|---|---|
| Vanguard Mid Cap Index (Inst) (VMCIX) | 8 bps | Vanguard Mid Cap Index (Inst Pl) (VMCPX) | 6 bps | 33.33% |
| Vanguard Morgan Growth (Inv) (VMRGX) | 43 bps | Vanguard Morgan Growth (Adm) (VMRAX) | 29 bps | 48.28% |
| Vanguard Pacific Stock Index (Inv) (VPACX) | 26 bps | Vanguard Pacific Stock Index (Inst) (VPKIX) | 10 bps | 160.00% |
| Vanguard Prime Money Market (Inv) (VMMXX) | 23 bps | Vanguard Prime Money Market (Adm) (VMRXX) | 9 bps | 155.56% |
| Vanguard PRIMECAP (Inv) (VPMCX) | 45 bps | Vanguard PRIMECAP (Adm) (VPMAX) | 36 bps | 25.00% |
| Vanguard REIT Index (Inv) (VGSIX) | 26 bps | Vanguard REIT Index (Inst) (VGSNX) | 9 bps | 188.89% |
| Vanguard Short-Term Bond Index (Inv) (VBISX) | 22 bps | Vanguard Short-Term Bond Index (Adm) (VBIRX) | 11 bps | 100.00% |
| Vanguard Short-Term Bond Index (Inv) (VBISX) | 22 bps | Vanguard Short-Term Bond Index (Inst Pl) (VBIPX) | 5 bps | 340.00% |
| Vanguard Short-Term Federal (Inv) (VSGBX) | 22 bps | Vanguard Short-Term Federal (Adm) (VSGDX) | 12 bps | 83.33% |
| Vanguard Short-Term Investment-Grade (Inv) (VFSTX) | 24 bps | Vanguard Short-Term Investment-Grade (Inst) (VFSIX) | 9 bps | 166.67% |
| Vanguard Short-Term Treasury (Inv) (VFISX) | 22 bps | Vanguard Short-Term Treasury (Adm) (VFIRX) | 12 bps | 83.33% |
| Vanguard Small Cap Growth Index (Inv) (VISGX) | 26 bps | Vanguard Small Cap Growth Index (Inst) (VSGIX) | 8 bps | 225.00% |
| Vanguard Small Cap Index (Inv) (NAESX) | 26 bps | Vanguard Small Cap Index (Inst) (VSCIX) | 8 bps | 225.00% |

| Plan Mutual Fund | Plan Fee | Identical Lower-Cost Mutual Fund | Identical Lower-Cost Mutual Fund Fee | Plan's Excess Cost |
|---|---|---|---|---|
| Vanguard Small Cap Index (Inv) (NAESX) | 26 bps | Vanguard Small Cap Index (Inst Pl) (VSCPX) | 6 bps | 333.33% |
| Vanguard Small Cap Value Index (Inv) (VISVX) | 26 bps | Vanguard Small Cap Value Index (Inst) (VSIIX) | 8 bps | 225.00% |
| Vanguard Total Bond Market Index (Inv) (VBMFX) | 22 bps | Vanguard Total Bond Market Index (Inst) (VBTIX) | 7 bps | 214.29% |
| Vanguard Total Bond Market Index (Inv) (VBMFX) | 22 bps | Vanguard Total Bond Market Index (Inst Pl) (VBMPX) | 5 bps | 340.00% |
| Vanguard Total International Stock Index (Inv) (VGTSX) | 22 bps | Vanguard Total International Stock Index (Inst Pl) (VTPSX) | 10 bps | 120.00% |
| Vanguard Total Stock Market Index (Inv) (VTSMX) | 17 bps | Vanguard Institutional Total Stock Market Index (Inst Pl) (VITPX) | 2 bps | 750.00% |
| Vanguard U.S. Growth (Inv) (VWUSX) | 45 bps | Vanguard U.S. Growth (Adm) (VWUAX) | 29 bps | 55.17% |
| Vanguard Value Index (Inv) (VIVAX) | 26 bps | Vanguard Value Index (Inst) (VIVIX) | 8 bps | 225.00% |
| Vanguard Wellesley Income (Inv) (VWINX) | 28 bps | Vanguard Wellesley Income (Adm) (VWIAX) | 21 bps | 33.33% |
| Vanguard Wellington (Inv) (VWELX) | 30 bps | Vanguard Wellington (Adm) (VWENX) | 22 bps | 36.36% |
| Vanguard Windsor II (Inv) (VWNFX) | 35 bps | Vanguard Windsor II (Adm) (VWNAX) | 27 bps | 29.63% |
| Vanguard Windsor (Inv) (VWNDX) | 33 bps | Vanguard Windsor (Adm) (VWNEX) | 22 bps | 50.00% |

75.    These lower-cost share classes of the identical mutual funds for the Plan have been available for years, several dating back to the early 2000s and before.

76.    The failure to select far lower-cost share classes for the Plan's mutual fund options that are otherwise *identical in all respects* (portfolio manager, underlying investments, and asset allocation) *except for cost* demonstrates that Defendants failed to consider the size and purchasing power of this Plan when selecting share classes. Defendants failed to engage in a prudent process for the selection, monitoring, and retention of the mutual funds listed above.

77.    Had the amounts invested in the higher-cost share class mutual fund options instead been invested in the available lower-cost share class mutual fund options, the Plan and its participants would not have lost millions of dollars.

**IV.    Defendants selected and retained a large number of duplicative investment options, diluting the Plan's ability to pay lower fees, and confusing participants.**

78.    Defendants provided a dizzying array of duplicative funds in the same investment style, thereby depriving the Plan of its bargaining power associated with offering a single fund in each investment style, which significantly reduces investment fees, and leading to "decision paralysis" for participants. Defendants included *over 100* investment options for the following asset classes: target date and asset allocation funds, large cap domestic equities, mid cap domestic equities, small cap domestic equities, international equities, real estate, fixed income, money market, and stable value.

30

79.     In comparison, according to Callan Investments Institute's 2015
Defined Contribution Trends survey, defined contribution plans in 2014 had, on
average, 15 investment options, excluding target date funds. Callan Investments
Institute, *2015 Defined Contribution Trends* at 28 (2015).[16] This provides choice of
investment style to participants while maintaining a large pool of assets in each
investment style and avoiding confusion.

80.     A larger pool of assets in each investment style significantly reduces
fees paid by participants. By consolidating duplicative investments of the same
investment style into a single investment option, the Plan would then have the
ability to command lower-cost investments, such as a low-cost institutional share
class of the selected mutual fund option.

81.     Prudent fiduciaries of large defined contribution plans must engage in
a detailed due diligence process to select and retain investments for a plan based on
the risk, investment return, and expenses of available investment alternatives.
Overall, the investment lineup should provide participants with the ability to
diversify their portfolio appropriately while benefiting from the size of the pooled
assets of other employees and retirees.

82.     Within each asset class and investment style in the plan, prudent
fiduciaries must make a reasoned determination and select a prudent investment
option. Unlike Defendants, prudent fiduciaries do not select and retain numerous,
duplicative investment options for a single asset class and investment style. When

---

[16] Available at https://www.callan.com/research/files/990.pdf.

many investment options in a single investment style are made plan options, fiduciaries lose the bargaining power to obtain much lower investment management expenses for that style.

83.     In addition, providing multiple options in a single investment style adds unnecessary complexity to the investment lineup and leads to decision paralysis. See The Standard, *Fixing Your 403(b) Plan: Adopting a Best Practices Approach,* at 2 ("Numerous studies have demonstrated that when people are given too many choices of anything, they lose confidence or make no decision."); Michael Liersch, *Choice in Retirement Plans: How Participant Behavior Differs in Plans Offering Advice, Managed Accounts, and Target-Date Investments,* T. ROWE PRICE RETIREMENT RESEARCH, at 2 (Apr. 2009)("Offering too many choices to consumers can lead to decision paralysis, preventing consumers from making decisions.").[17]

84.     Moreover, having many actively managed funds in the Plan within the same investment style results in the Plan effectively having an index fund return, while paying much higher fees for active management than the fees of a passive index fund, which has much lower fees because there is no need for active management and its higher fees.

85.     From 2010 to the present, the Plan included and continues to include duplicative investments in every major asset class and investment style, including balanced/asset allocation (10–11 options), fixed income and high yield bond (17 options), international (12–13 options), large cap domestic equities (26–28 options),

---

[17] Available at http://www.behavioralresearch.com/Publications/Choice_in_Retirement_Plans_April_2009.pdf.

mid cap domestic equities (9–10 options), small cap domestic equities (6–7 options), real estate (3 options), money market (4 options), and target date investments (2 fund families). Such a dizzying array of duplicative funds in a single investment style violates the well-recognized industry principle that too many choices harm participants, and can lead to "decision paralysis".

86.     For illustration purposes, in the large cap blend investment style for the Plan, Defendants included *nine* actively managed or passively managed investment options for a combined asset amount of approximately $1 billion as of December 31, 2014. Those investments are summarized below and compared to a single lower-cost alternative that was available to the Plan: the Vanguard Institutional Index Fund (Inst Plus) (VIIIX), which mirrors the market and has an expense ratio of 2 bps.

| Investment | 2014 Plan Assets | Fee | Institutional Index Fund (VIIIX) | Percentage Excess Paid by Plan |
|---|---|---|---|---|
| CREF Equity Index | $61,147,707 | 37 bps | 2 bps | 1750% |
| CREF Stock | $780,008,064 | 46 bps | 2 bps | 2200% |
| TIAA-CREF Equity Index (Inst) | $9,928,946 | 5 bps | 2 bps | 150% |
| TIAA-CREF S&P 500 Index (Inst) | $9,842,370 | 6 bps | 2 bps | 200% |
| Vanguard Growth & Income (Inv) | $7,058,628 | 37 bps | 2 bps | 1750% |
| Vanguard Institutional Index (Inst) | $64,730,559 | 4 bps | 2 bps | 100% |
| Vanguard Large-Cap Index (Adm) | $1,793,675 | 9 bps | 2 bps | 350% |
| Vanguard PRIMECAP Core (Inv) | $2,279,227 | 50 bps | 2 bps | 2400% |

| Investment | 2014 Plan Assets | Fee | Institutional Index Fund (VIIIX) | Percentage Excess Paid by Plan |
|---|---|---|---|---|
| Vanguard Total Stock Market Index (Inst) | $52,531,654 | 17 bps | 2 bps | 750% |
| **Total Assets** | **$989,320,830** | | | |

87.    With over *$800 million* held in the CREF Stock Account and the CREF Equity Index Account, these large cap blend options were *23 and 18 times* more expensive than the lower-cost Vanguard option with an expense ratio of 2 bps.



88.    Many other large cap index funds are also available at far lower costs than the Plan's large cap blend funds. Had the amounts invested in the Plan's large cap blend options been consolidated into a single large cap blend investment such as the Vanguard Institutional Index Fund (Inst Plus), Plan participants would have avoided losing over $3 million in fees for 2014 alone, and many more millions since 2010.

34

89.     In addition, Defendants selected and continue to retain multiple passively managed index options in the same investment style. Rather than a fund whose investment manager actively selects stocks or bonds to hold and generate investment returns in excess of its benchmark, passively managed index funds hold a representative sample of securities in a specific index, such as the S&P 500 index. The sole investment strategy of an index fund is to track the performance of a specific market index. No stock selection or research is needed, unlike investing in actively managed funds. Thus, index fund fees are substantially lower.

90.     For example, in the large cap blend investment style, Defendants provided up to *eight* index funds that have similar investment strategies designed to generate investment results that correspond to the return of the U.S. equity market and do not involve stock selection.

91.     Since index funds merely hold the same securities in the same proportions as the index,[18] having multiple index funds in the Plan provides no benefit to participants. Instead, it hurts participants by diluting the Plan's ability to obtain lower rates for a single index fund of that style because the amount of assets in any one such fund is smaller than the aggregate would be in that investment style. Moreover, multiple managers holding stocks that mimic the S&P 500 or a similar index would pick the same stocks in the same proportions as the index. Thus, there is no value in offering separate index funds in the same investment style.

---

[18] Another example of an index is the Dow Jones Industrial Average.

92.    Had Defendants combined hundreds of millions of dollars from duplicative index funds into a single index fund, the Plan would have generated higher returns, net of fees, and participants would not have lost significant amounts of their retirement assets.

93.    Overall, had Defendants pooled the assets invested in duplicative investment options for the same investment style, set forth in ¶85, into a single investment option, Plan participants would not have had to pay millions of dollars in unreasonable investment expenses, thereby depleting their retirement assets.

## V.    Defendants imprudently retained historically underperforming Plan investments.

94.    Given the overlap in investment options in asset classes and investment styles based on Defendants' failure to conduct appropriate due diligence in selecting and retaining the Plan investments, numerous investment options underperformed lower-cost alternatives that were available to the Plan.

### A.    Defendants imprudently retained the CREF Stock Account.

95.    The CREF Stock Account is one of the largest, by asset size, investment options in the Plan with over $700 million in assets, and has been included in the Plan from 2010 to date. In its fund fact sheets and participant disclosures, TIAA-CREF classifies the CREF Stock Account as a domestic equity investment in the large cap blend Morningstar category. This option has, for years, historically underperformed and continues to underperform its benchmark and lower-cost actively and passively managed investments that were available to the Plan.

36

96.     TIAA-CREF imposed restrictive provisions on the specific annuities that *must* be provided in the Plan. Under these terms, TIAA-CREF required that the CREF Stock Account be offered to Plan participants, in addition to the TIAA Traditional and the CREF Money Market Account. Plan fiduciaries provided these mandatory offerings in the Plan without a prudent process to determine whether they were prudent alternatives and in the exclusive best interest of Plan participants and beneficiaries. TIAA-CREF required the CREF Stock Account to be included in the Plan to drive very substantial amounts of revenue sharing payments to TIAA-CREF for recordkeeping services. The CREF Stock Account paid 24 bps for revenue sharing, which exceeded other TIAA-CREF investments by over 50% (15 bps).

97.     As generally understood in the investment community, passively managed investment options should be used or, at a minimum, thoroughly analyzed and considered in efficient markets such as large capitalization U.S. stocks. This is because it is unheard of, or extremely unlikely, to find actively managed mutual funds that outperform a passive index, net of fees, particularly on a persistent basis, as set forth in ¶¶66–68. This extreme unlikelihood is even greater in the large cap market because such big companies are the subject of many analysts' coverage, unlike smaller stocks that are not covered by many analysts, leading to potential inefficiencies in pricing.

98.     The efficiencies of the large cap market hinder an active manager's ability to achieve excess returns for investors.

> [T]his study of mutual funds does not provide any reason to abandon a belief that securities markets are remarkably efficient. Most investors would be considerably better off by purchasing a low expense index fund, than by trying to select an active fund manager who appears to possess a "hot hand." Since active management generally fails to provide excess returns and tends to generate greater tax burdens for investors, the advantage of passive management holds, a fortiori.

Burton G. Malkiel, *Returns from Investing in Equity Mutual Funds 1971 to 1991*, 50

J. FIN. 549, 571 (1995).[19]

99.     Academic literature overwhelmingly concludes that active managers

consistently underperform the S&P 500 index.

> Active managers themselves provide perhaps the most persuasive case for passive investing. Dozens of studies have examined the performance of mutual funds and other professional-managed assets, and virtually all of them have concluded that, on average, active managers underperform passive benchmarks…The median active fund underperformed the passive index in 12 out of 18 years [for the large-cap fund universe]…The bottom line is that, over most periods, the majority of mutual fund investors would have been better off investing in an S&P 500 Index fund.
>
> ****
>
> Most of the dismal comparisons for active managers are for large-cap domestic managers versus the S&P 500 Index.

Robert C. Jones, *The Active Versus Passive Debate: Perspectives of an Active Quant*,

ACTIVE EQUITY PORTFOLIO MANAGEMENT, at 37, 40, 53 (Frank J. Fabozzi ed., 1998).

100.    Prudent fiduciaries of large defined contribution plans must conduct

an analysis to determine whether actively managed funds, particularly large cap,

will outperform their benchmark net of fees. Prudent fiduciaries then make a

reasoned decision as to whether it would be in the participants' best interest to offer

---

[19] Available at http://indeksirahastot.fi/resource/malkiel.pdf.

an actively managed large cap option for the particular investment style and asset class.

101.     Defendants failed to undertake such analysis when they selected and retained the actively managed CREF Stock Account, particularly due to TIAA-CREF's requirement that the CREF Stock Account be provided in the Plan in order to drive revenue to TIAA-CREF. Defendants also provided the fund option without conducting a prudent analysis despite the acceptance within the investment industry that the large cap domestic equity market is the most efficient market, and that active managers do not outperform passive managers net of fees in this investment style.

102.     Had such an analysis been conducted by Defendants, they would have determined that the CREF Stock Account would not be expected to outperform the large cap index after fees. That is in fact what occurred.

103.     Rather than poor performance in a single year or two, historical performance of the CREF Stock Account has been persistently poor for many years compared to both available lower-cost index funds and the index benchmark. In participant communications, Defendants and TIAA-CREF identified the Russell 3000 index as the appropriate benchmark to evaluate the fund's investment results. The following performance chart compares the investment returns of the CREF Stock Account to its benchmark and two other passively managed index funds in the same investment style, for the one-, five-, and ten-year periods ending December

31, 2014.[20] The passively managed index funds used for comparison purposes are the Vanguard Total Stock Market Index Fund (Inst Plus) (VITPX) and the Vanguard Institutional Index (Inst Plus) (VIIIX). Like the CREF Stock Account, these options are large cap blend investments. For each comparison, the CREF Stock Account dramatically underperformed the benchmark and index alternatives.



104. The CREF Stock Account, with an expense ratio of 46 bps as of December 31, 2014, was and is dramatically more expensive than far better

---

[20] Performance data provided as of December 31, 2014 to correspond to the most recent filing of the Plan's Form 5500 with the Department of Labor.

performing index alternatives: the Vanguard Total Stock Market Index Fund (Inst Plus) (2 bps) and the Vanguard Institutional Index (Inst Plus) (2 bps).

105.    Apart from underperforming passively managed index funds, the fund also significantly underperformed comparable actively managed funds over the one-, five-, and ten-year periods ending December 31, 2014. These large cap alternatives with similar underlying asset allocations to the CREF Stock Account include the Vanguard Diversified Equity (Inv) (VDEQX), the Vanguard PRIMECAP (Adm) (VPMAX), and the Vanguard Capital Opp. (Adm) (VHCAX).



106.    The CREF Stock Account also had a long history of substantial underperformance compared to these actively managed alternatives over the one-, five-, and ten-year periods ending December 31, 2009.[21]



---

[21] Because the Vanguard Diversified Equity Fund's inception date was June 10, 2006, it was excluded from the five- and ten-year periods. For the Vanguard PRIMECAP (Adm) and Vanguard Capital Opportunity Fund (Adm), the investment returns of the investor share class for ten-year performance were used because the admiral share class for each of these funds was not offered until November 12, 2001. The return since inception for the Vanguard PRIMECAP (Adm) was 3.23%, and for the Vanguard Capital Opportunity Fund (Adm), 5.89%.





107.    Despite the consistent underperformance, the CREF Stock Account, with an expense ratio of 46 bps as of December 31, 2014, was more expensive than better performing actively managed alternatives: the Vanguard Diversified Equity-Inv (40 bps), the Vanguard PRIMECAP-Adm (35 bps), and the Vanguard Capital Opp.-Adm (40 bps).

108.    Apart from the abysmal long-term underperformance of the CREF Stock Account compared to both index funds and actively managed funds, the fund was recognized as imprudent in the industry. In March 2012, an independent investment consultant, AonHewitt, recognized the imprudence of the CREF Stock Account and recommended to its clients that they remove this fund from their retirement plan. AonHewitt, *TIAA-CREF Asset Management*, INBRIEF, at 3 (July 2012).[22] This recommendation was made due to numerous factors, including the historical underperformance, high turnover of asset management executives and portfolio managers, and the fund's over 60 separate underlying investment strategies, greatly reducing the fund's ability to generate excess returns over any substantial length of time. *Id*. at 4–5.

109.    The Supreme Court has recently and unanimously ruled that ERISA fiduciaries have "a continuing duty to monitor investments and remove imprudent ones[.]" *Tibble v. Edison Int'l*, 135 S. Ct. 1823, 1829 (2015). In contrast to the conduct of prudent fiduciaries, Defendants failed to conduct a prudent process to monitor the CREF Stock Account and continue to retain the fund despite its

---

[22] Available at http://system.nevada.edu/Nshe/?LinkServID=82B25D1E-9128-6E45-1094320FC2037740.

continuing to underperform lower-cost investment alternatives that were readily available to the Plan.

110.   Prudent fiduciaries of defined contribution plans continuously monitor the investment performance of plan options against applicable benchmarks and peer groups to identify underperforming investments. Based on this process, prudent fiduciaries replace those imprudent investments with better performing and reasonably priced options. Under the standards used by prudent independent fiduciaries, the CREF Stock Account would have been removed from the Plan.

111.   Had Defendants removed the CREF Stock Account and the amounts been invested in any of the passively managed lower-cost alternatives identified in ¶104, or the actively managed lower-cost alternatives identified in ¶105, Plan participants would not have lost in excess of $225 million of their retirement savings from the fund being retained in the Plan.[23]

**B.    Defendants imprudently retained the TIAA Real Estate Account.**

112.   Defendants selected and continue to offer the TIAA Real Estate Account as a real estate investment option in the Plan. The fund has far greater fees than are reasonable, has historically underperformed, and continues to consistently underperform comparable real estate investment alternatives, including the Vanguard REIT Index (Inst) (VGSNX).

---

[23] Plan losses have been brought forward to the present value using the investment returns of the lower-cost alternatives to compensate participants who have not been reimbursed for their losses.

113.   With an expense ratio of 87 bps as of December 31, 2014, the TIAA

Real Estate Account is also over *10 times more expensive* than the Vanguard REIT

Index (Inst) with an expense ratio of 8 bps.



114.   The TIAA Real Estate Account had a long history of substantial

underperformance relative to the Vanguard REIT Index over the one-, five-, and

ten-year periods ending December 31, 2009.[24] Despite this, Defendants selected and

to this date retain it in the Plan.

---

[24] The return of the investor share class was used for ten-year performance because the institutional share class was not offered until December 2, 2003. The return since inception for the Vanguard REIT Index (Inst) was 5.49%.







115.   This underperformance occurred for years before 2009 and has continued after 2009. The TIAA Real Estate Account vastly underperformed the Vanguard REIT Index (Inst) over the one-, five-, and ten-year periods ending December 31, 2014.[25]

---

[25] Performance data provided as of December 31, 2014 to correspond to the most recent filing of the Plan's Form 5500 with the Department of Labor.



116.    As the Supreme Court unanimously ruled in *Tibble*, prudent fiduciaries of defined contribution plans continuously monitor plan investment options and replace imprudent investments. 135 S. Ct. at 1829. In contrast, Defendants failed to conduct such a process and continue to retain the TIAA Real Estate Account as a Plan investment option, despite its continued dramatic underperformance and far higher cost compared to available investment alternatives.

117.    Had the amounts invested in the TIAA Real Estate Account instead been invested in the far lower-cost and better-performing Vanguard REIT Index

(Inst), Plan participants would not have lost in excess of $40 million of their

retirement savings.[26]

## ERISA'S FIDUCIARY STANDARDS

118.    ERISA imposes strict fiduciary duties of loyalty and prudence upon

Defendants as fiduciaries of the Plan. 29 U.S.C. §1104(a)(1), states, in relevant part,

that:

> [A] fiduciary shall discharge his duties with respect to a plan solely in the
> interest of the participants and beneficiaries and –
>
> (A)     for the exclusive purpose of:
>
> > (i) providing benefits to participants and their
> > beneficiaries; and
> > (ii) defraying reasonable expenses of administering the
> > plan; [and]
>
> (B)     with the care, skill, prudence, and diligence under the
> circumstances then prevailing that a prudent man acting
> in a like capacity and familiar with such matters would
> use in the conduct of an enterprise of like character and
> with like aims.

119.    Under 29 U.S.C. §1103(c)(1), with certain exceptions not relevant here,

> the assets of a plan shall never inure to the benefit of any
> employer and shall be held for the exclusive purposes of
> providing benefits to participants in the plan and their
> beneficiaries and defraying reasonable expenses of
> administering the plan.

---

[26] Plan losses have been brought forward to the present value using the investment
returns of the Vanguard REIT Index (Inst) to compensate participants who have not been
reimbursed for their losses.

120.    Under ERISA, fiduciaries that exercise any authority or control over plan assets, including the selection of plan investments and service providers, must act prudently and solely in the interest of participants in the plan.

121.    ERISA also imposes explicit co-fiduciary liabilities on plan fiduciaries. 29 U.S.C. §1105(a) provides a cause of action against a fiduciary for knowingly participating in a breach by another fiduciary and knowingly failing to cure any breach of duty. The statute states, in relevant part, that:

> In addition to any liability which he may have under any other provisions of this part, a fiduciary with respect to a plan shall be liable for a breach of fiduciary responsibility of another fiduciary with respect to the same plan in the following circumstances:
>
> (1)    if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach; [or]
>
> (2)    if, by his failure to comply with section 1104(a)(1) of this title in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled such other fiduciary to commit a breach; or
>
> (3)    if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach.

122.    29 U.S.C. §1132(a)(2) authorizes a plan participant to bring a civil action to enforce a breaching fiduciary's liability to the plan under 29 U.S.C. §1109. Section 1109(a) provides in relevant part:

Any person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this subchapter shall be personally liable to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary.

## CLASS ACTION ALLEGATIONS

123.   29 U.S.C. §1132(a)(2) authorizes any participant or beneficiary of the Plan to bring an action individually on behalf of the Plan to enforce a breaching fiduciary's liability to the Plan under 29 U.S.C. §1109(a).

124.   In acting in this representative capacity and to enhance the due process protections of unnamed participants and beneficiaries of the Plan, as an alternative to direct individual actions on behalf of the Plan under 29 U.S.C. §1132(a)(2) and (3), Plaintiffs seek to certify this action as a class action on behalf of all participants and beneficiaries of the Plan. Plaintiffs seek to certify, and to be appointed as representatives of, the following class:

All participants and beneficiaries of the Yale University Retirement Account Plan from August 9, 2010, through the date of judgment, excluding the Defendants.

125.   This action meets the requirements of Rule 23 and is certifiable as a class action for the following reasons:

a.   The Class includes over 16,000 members and is so large that joinder of all its members is impracticable.

b.   There are questions of law and fact common to this Class because Defendants owed fiduciary duties to the Plan and to all participants

52

and beneficiaries and took the actions and omissions alleged herein as to the Plan and not as to any individual participant. Thus, common questions of law and fact include the following, without limitation: who are the fiduciaries liable for the remedies provided by 29 U.S.C. §1109(a); whether the fiduciaries of the Plan breached their fiduciary duties to the Plan; what are the losses to the Plan resulting from each breach of fiduciary duty; and what Plan-wide equitable and other relief the court should impose in light of Defendants' breach of duty.

c. Plaintiffs' claims are typical of the claims of the Class because each Plaintiff was a participant during the time period at issue in this action and all participants in the Plan were harmed by Defendants' misconduct.

d. Plaintiffs are adequate representatives of the Class because they were participants in the Plan during the Class period, have no interest that is in conflict with the Class, are committed to the vigorous representation of the Class, and have engaged experienced and competent attorneys to represent the Class.

e. Prosecution of separate actions for these breaches of fiduciary duties by individual participants and beneficiaries would create the risk of (A) inconsistent or varying adjudications that would establish incompatible standards of conduct for Defendants in respect to the discharge of their fiduciary duties to the Plan and personal liability to the Plan under 29 U.S.C. §1109(a), and (B) adjudications by individual participants and beneficiaries

53

regarding these breaches of fiduciary duties and remedies for the Plan would, as a practical matter, be dispositive of the interests of the participants and beneficiaries not parties to the adjudication or would substantially impair or impede those participants' and beneficiaries' ability to protect their interests. Therefore, this action should be certified as a class action under Rule 23(b)(1)(A) or (B).

126.   A class action is the superior method for the fair and efficient adjudication of this controversy because joinder of all participants and beneficiaries is impracticable, the losses suffered by individual participants and beneficiaries may be small and impracticable for individual members to enforce their rights through individual actions, and the common questions of law and fact predominate over individual questions. Given the nature of the allegations, no class member has an interest in individually controlling the prosecution of this matter, and Plaintiffs are aware of no difficulties likely to be encountered in the management of this matter as a class action. Alternatively, then, this action may be certified as a class under Rule 23(b)(3) if it is not certified under Rule 23(b)(1)(A) or (B).

127.   Plaintiffs' counsel, Schlichter, Bogard & Denton LLP, will fairly and adequately represent the interests of the Class and is best able to represent the interests of the Class under Rule 23(g).

a.   Schlichter, Bogard & Denton has been appointed as class counsel in 15 other ERISA class actions regarding excessive fees in large defined contribution plans. As a district court in one of those cases recently

observed: "the firm of Schlichter, Bogard & Denton ha[s] demonstrated its well-earned reputation as a pioneer and the leader in the field" of 401(k) plan excessive fee litigation. *Abbott v. Lockheed Martin Corp.*, No. 06-701, 2015 U.S.Dist.LEXIS 93206 at 4–5 (S.D. Ill. July 17, 2015). Other courts have made similar findings: "It is clear to the Court that the firm of Schlichter, Bogard & Denton is preeminent in the field" "and is the only firm which has invested such massive resources in this area." *George v. Kraft Foods Global, Inc.*, No. 08-3799, 2012 U.S.Dist.LEXIS 166816 at 8 (N.D. Ill. June 26, 2012). "As the preeminent firm in 401(k) fee litigation, Schlichter, Bogard & Denton has achieved unparalleled results on behalf of its clients." *Nolte v. Cigna Corp.*, No. 07-2046, 2013 U.S.Dist.LEXIS 184622 at 8 (C.D. Ill. Oct. 15, 2013). "Litigating this case against formidable defendants and their sophisticated attorneys required Class Counsel to demonstrate extraordinary skill and determination." *Beesley v. Int'l Paper Co.*, No. 06-703, 2014 U.S.Dist.LEXIS 12037 at 8 (S.D. Ill. Jan. 31, 2014).

b.      The U.S. District Court Judge G. Patrick Murphy recognized the work of Schlichter, Bogard & Denton as exceptional:

> Schlichter, Bogard & Denton's work throughout this litigation illustrates an exceptional example of a private attorney general risking large sums of money and investing many thousands of hours for the benefit of employees and retirees. No case had previously been brought by either the Department of Labor or private attorneys against large employers for excessive fees in a 401(k) plan. Class Counsel performed substantial work…, investigating the facts, examining documents, and consulting and paying experts to determine whether it was viable. This case has been pending since September 11, 2006. Litigating the

55

> case required Class Counsel to be of the highest caliber and
> committed to the interests of the participants and beneficiaries
> of the General Dynamics 401(k) Plan.

*Will v. General Dynamics Corp.*, No. 06-698, 2010 U.S.Dist.LEXIS 123349 at

8–9 (S.D. Ill. Nov. 22, 2010).

   c.  Schlichter, Bogard & Denton handled the only full trial of an ERISA

excessive fee case, resulting in a $36.9 million judgment for the plaintiffs that

was affirmed in part by the Eighth Circuit. *Tussey v. ABB, Inc.*, 746 F.3d 327

(8th Cir. 2014). In awarding attorney's fees after trial, the district court

concluded that "Plaintiffs' attorneys are clearly experts in ERISA litigation."

*Tussey v. ABB, Inc.*, No. 06-4305, 2012 U.S.Dist.LEXIS 157428 at 10 (W.D.

Mo. Nov. 2, 2012). Following remand, the district court again awarded

Plaintiffs' attorney's fees, emphasizing the significant contribution Plaintiffs'

attorneys have made to ERISA litigation, including educating the

Department of Labor and federal courts about the importance of monitoring

fees in retirement plans.

> Of special importance is the significant, national
> contribution made by the Plaintiffs whose litigation
> clarified ERISA standards in the context of investment
> fees. The litigation educated plan administrators, the
> Department of Labor, the courts and retirement plan
> participants about the importance of monitoring
> recordkeeping fees and separating a fiduciary's corporate
> interest from its fiduciary obligations.

*Tussey v. ABB, Inc.,* 2015 U.S.Dist.LEXIS 164818 at 7–8 (W.D. Mo. Dec. 9,

2015).

d.     Schlichter, Bogard & Denton is also class counsel in and handled, in which the Supreme Court held in a unanimous 9–0 decision that ERISA fiduciaries have "a continuing duty to monitor investments and remove imprudent ones[.]" Schlichter, Bogard & Denton successfully petitioned for a writ of certiorari, and obtained amicus support from the United States Solicitor General and AARP, among others. Given the Court's broad recognition of an ongoing fiduciary duty, the *Tibble* decision will affect all ERISA defined contribution plans.

e.     The firm's work in ERISA excessive fee class actions has been featured in the New York Times, Wall Street Journal, NPR, Reuters, and Bloomberg, among other media outlets. See, e.g., Anne Tergesen, *401(k) Fees, Already Low, Are Heading Lower*, WALL ST. J. (May 15, 2016);[27] Gretchen Morgenson, *A Lone Ranger of the 401(k)'s*, N.Y. TIMES (Mar. 29, 2014);[28] Liz Moyer, *High-Court Spotlight Put on 401(k) Plans*, WALL ST. J. (Feb. 23, 2015);[29] Floyd Norris, *What a 401(k) Plan Really Owes Employees*,  N.Y. TIMES (Oct. 16, 2014);[30] Sara Randazzo, *Plaintiffs' Lawyer Takes on Retirement Plans*, WALL ST. J. (Aug. 25, 2015);[31] Jess Bravin and Liz Moyer,

---

[27] Available at http://www.wsj.com/articles/401-k-fees-already-low-are-heading-lower-1463304601.

[28] Available at http://www.nytimes.com/2014/03/30/business/a-lone-ranger-of-the-401-k-s.html?_r=0.

[29] Available at http://www.wsj.com/articles/high-court-spotlight-put-on-401-k-plans-1424716527.

[30] Available at http://www.nytimes.com/2014/10/17/business/what-a-401-k-plan-really-owes-employees.html?_r=0.

[31] Available at http://blogs.wsj.com/law/2015/08/25/plaintiffs-lawyer-takes-on-retirement-plans/.

*High Court Ruling Adds Protections for Investors in 401(k) Plans*, WALL ST. J. (May 18, 2015); [32] Jim Zarroli, *Lockheed Martin Case Puts 401(k) Plans on Trial*, NPR (Dec. 15, 2014);[33] Mark Miller*, Are 401(k) Fees Too High? The High Court May Have an Opinion*, REUTERS (May 1, 2014);[34] *401(k) Fees at Issue as Court Takes Edison Worker Appeal*, BLOOMBERG (Oct. 2, 2014).[35]

## COUNT I

## Breach of Duties of Loyalty and Prudence—Unreasonable Administrative Fees

128.    Plaintiffs restate and incorporate herein the preceding allegations of this complaint.

129.    This Count alleges breach of fiduciary duties against both Defendants.

130.    The scope of the fiduciary duties and responsibilities of Defendants includes discharging their duties with respect to the Plan solely in the interest of, and for the exclusive purpose of providing benefits to, Plan participants and beneficiaries, defraying reasonable expenses of administering the Plan, and acting with the care, skill, prudence, and diligence required by ERISA.

131.    If a defined contribution plan overpays for recordkeeping services due to the fiduciaries' "failure to solicit bids" from other recordkeepers, the fiduciaries have breached their duty of prudence. See *George v. Kraft Foods Global, Inc.*, 641

---

[32] Available at http://www.wsj.com/articles/high-court-ruling-adds-protections-for-investors-in-401-k-plans-1431974139.

[33] Available at http://www.npr.org/2014/12/15/370794942/lockheed-martin-case-puts-401-k-plans-on-trial.

[34] Available at http://www.reuters.com/article/us-column-miller-401fees-idUSBREA400J220140501.

[35] Available at http://www.bloomberg.com/news/articles/2014-10-02/401-k-fees-at-issue-as-court-takes-edison-worker-appeal.

F.3d 786, 798–99 (7th Cir. 2011). Similarly, "us[ing] revenue sharing to benefit [the plan sponsor and recordkeeper] at the Plan's expense" while "failing to monitor and control recordkeeping fees" and "paying excessive revenue sharing" is a breach of fiduciary duties. *Tussey,* 746 F.3d at 336.

132.    Defendants failed to engage in a prudent and loyal process for selecting a recordkeeper. Rather than consolidating the Plan's administrative and recordkeeping services under a single service provider, Defendants retained two vendors to provide recordkeeping services. This failure to consolidate the recordkeeping services eliminated the Plan's ability to obtain the same services at a lower cost with a single recordkeeper. This conduct was a breach of the duties of loyalty and prudence.

133.    Moreover, Defendants failed to solicit competitive bids from vendors on a flat per-participant fee. Defendants allowed the Plan's recordkeepers to receive asset-based revenue sharing and hard dollar fees, but failed to monitor those payments to ensure that only reasonable compensation was received for the services provided to the Plan. As the amount of assets grew, the revenue sharing payments to the Plan's recordkeepers grew, even though the services provided by the recordkeepers remained the same. This caused the recordkeeping compensation paid to the recordkeepers to exceed a reasonable fee for the services provided. This conduct was a breach of the duties of loyalty and prudence.

134.    Total Plan losses will be determined at trial after complete discovery in this case and are continuing.

135.   Each Defendant is personally liable under 29 U.S.C. §1109(a) to make good to the Plan any losses to the Plan resulting from the breaches of fiduciary duties alleged in this Count and is subject to other equitable or remedial relief as appropriate.

136.   Each Defendant knowingly participated in the breach of the other Defendants, knowing that such acts were a breach, enabled the other Defendants to commit a breach by failing to lawfully discharge its own fiduciary duties, knew of the breach by the other Defendants and failed to make any reasonable effort under the circumstances to remedy the breach. Thus, each Defendant is liable for the losses caused by the breach of its co-fiduciary under 29 U.S.C. §1105(a).

## COUNT II

### Breach of Duties of Loyalty and Prudence—Unreasonable Investment Management Fees and Performance Losses

137.   Plaintiffs restate and incorporate the allegations contained in the preceding paragraphs as though fully set forth here.

138.   This Count alleges breach of fiduciary duties against both Defendants.

139.   The scope of the fiduciary duties and responsibilities of these Defendants includes managing the assets of the Plan for the sole and exclusive benefit of Plan participants and beneficiaries, defraying reasonable expenses of administering the Plan, and acting with the care, skill, diligence, and prudence required by ERISA. These Defendants are directly responsible for ensuring that the Plan's fees are reasonable, selecting prudent investment options, evaluating and monitoring the Plan's investments on an ongoing basis and eliminating imprudent

ones, and taking all necessary steps to ensure that the Plan's assets were invested prudently.

140.    As the Supreme Court recently confirmed, ERISA's "duty of prudence involves a continuing duty to monitor investments and remove imprudent ones[.]" *Tibble,* 135 S. Ct. at 1829.

141.    Defendants selected and retained as Plan investment options mutual funds and insurance company variable annuities with far high expenses and poor performance relative to other investment options that were readily available to the Plan at all relevant times.

142.    Rather than consolidating the Plan's over 100 investment options into a core investment lineup in which prudent investments were selected for a given asset class and investment style, as is the case with most defined contribution plans, Defendants retained duplicative investment options in each asset class and investment style, thereby depriving the Plan of its ability to qualify for lower-cost share classes of certain investments, while violating the well-known principle for fiduciaries that such a high number of investment options causes participant confusion.  In addition, Defendants, as fiduciaries charged with operating as prudent financial experts, *Katsaros v. Cody*, 744 F.2d 270, 279 (2d Cir. 1984), knew or should have known that providing numerous actively managed duplicative funds in the same investment style would produce a "shadow index" return before accounting for much higher fees than index fund fees, thereby resulting in significant underperformance. The Plan's investment offerings included the use of

mutual funds and variable annuities with expense ratios far in excess of other lower-cost options available to the Plan. These lower-cost options included lower-cost share class mutual funds with the identical investment manager and investments, lower-cost insurance company variable annuities and insurance company pooled separate accounts. In so doing, Defendants failed to make Plan investment decisions based solely on the merits of the investment funds and what was in the interest of participants. Defendants therefore failed to discharge their duties with respect to the Plan solely in the interest of the participants and beneficiaries and for the exclusive purpose of providing benefits to participants and their beneficiaries and defraying reasonable expenses of administering the Plan. Therefore, Defendants breached their fiduciary duty of loyalty under 29 U.S.C. §1104(a)(1)(A).

143.   The same conduct by Defendants shows a failure to discharge their duties with respect to the Plan with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims. Defendants therefore breached their fiduciary duty of prudence under 29 U.S.C. §1104(a)(1)(B).

144.   Defendants failed to engage in a prudent process for the selection and retention of Plan investment options. Rather, Defendants used more expensive funds with inferior historical performance compared to investments that were available to the Plan.

145.   <u>CREF Stock Account</u>: Defendants selected and retained the CREF Stock Account despite its excessive cost and historical underperformance compared to both passively managed investments and actively managed investments with similar underlying asset allocations.

146.   <u>TIAA Real Estate Account</u>: Defendants selected and retained the TIAA Real Estate Account for the real estate investment in the Plan despite its excessive fees and historical underperformance compared to lower-cost real estate investments.

147.   Had a prudent and loyal fiduciary conducted a prudent process for the retention of investment options, it would have concluded that the Plan's investment options were retained for reasons other than the best interest of the Plan and their participants, and were causing the Plan to lose tens of millions of dollars of participants' retirement savings in excessive and unreasonable fees and underperformance relative to prudent investment options available to the Plan.

148.   Total Plan losses will be determined at trial after complete discovery in this case and are continuing.

149.   Each Defendant is personally liable under 29 U.S.C. §1109(a) to make good to the Plan any losses to the Plan resulting from the breaches of fiduciary duties alleged in this Count and is subject to other equitable or remedial relief as appropriate.

150.   Each Defendant knowingly participated in the breach of the other Defendants, knowing that such acts were a breach, enabled the other Defendants to

commit a breach by failing to lawfully discharge its own fiduciary duties, knew of the breach by the other Defendants and failed to make any reasonable effort under the circumstances to remedy the breach. Thus, each Defendant is liable for the losses caused by the breach of its co-fiduciary under 29 U.S.C. §1105(a).

## COUNT III

## Failure to Monitor Fiduciaries

151. Plaintiffs restate and incorporate the allegations contained in the preceding paragraphs as though fully set forth here.

152. This Count alleges breach of fiduciary duties against Defendant Yale University.

153. Defendant Yale University is the named fiduciary under Plan §12.1 with the overall responsibility for the control, management and administration of the Plan, in accordance with 29 U.S.C. §1102(a). Yale University is the Plan Administrator of the Plan under Plan §12.1 and 29 U.S.C. §1002(16)(A)(i) with exclusive responsibility and complete discretionary authority to control the operation, management and administration of the Plan, with all powers necessary to enable it to properly carry out such responsibilities, including the selection and compensation of the providers of administrative services to the Plan and the selection, monitoring, and removal of the investment options made available to participants for the investment of their contributions and provision of their retirement income.

154.    Defendant Yale University, acting through its Vice President of Human Resources and Administration, is authorized to designate a person or a committee to act on behalf of Yale with respect to the Plan.

155.    Given that Defendant Yale University had the overall responsibility for the oversight of the Plan, Defendant Yale University had a fiduciary responsibility to monitor the performance of the other fiduciaries, including those delegated fiduciary responsibility to administer and manage Plan assets.

156.    A monitoring fiduciary must ensure that its monitored fiduciaries are performing their fiduciary obligations, including those with respect to the investment and holding of plan assets, and must take prompt and effective action to protect the plan and participants when they are not.

157.    Defendant Yale University breached its fiduciary monitoring duties by, among other things:

a.    Failing to monitor its appointees, to evaluate their performance, or to have a system in place for doing so, and standing idly by as the Plan suffered enormous losses as a result of its appointees' imprudent actions and omissions with respect to the Plan;

b.    Failing to monitor its appointees' fiduciary process, which would have alerted any prudent fiduciary to the potential breach because of the excessive administrative and investment management fees and consistent underperformance of Plan investments in violation of ERISA;

   c. Failing to ensure that the monitored fiduciaries had a prudent process in place for evaluating the Plan's administrative fees and ensuring that the fees were competitive, including a process to identify and determine the amount of all sources of compensation to the Plan's recordkeeper and the amount of any revenue sharing payments; a process to prevent the recordkeeper from receiving revenue sharing that would increase the recordkeeper's compensation to unreasonable levels even though the services provided remained the same; and a process to periodically obtain competitive bids to determine the market rate for the services provided to the Plan;

   d. Failing to ensure that the monitored fiduciaries considered the ready availability of comparable and better performing investment options that charged significantly lower fees and expenses than the Plan's mutual fund and insurance company variable annuity options; and

   e. Failing to remove appointees whose performance was inadequate in that they continued to maintain imprudent, excessive cost, and poorly performing investments, all to the detriment of Plan participants' retirement savings.

158. Had Defendant Yale University discharged its fiduciary monitoring duties prudently as described above, the losses suffered by the Plan would have been minimized or avoided. Therefore, as a direct result of the breaches of fiduciary duty alleged herein, the Plan, the Plaintiffs, and the other Class members, lost tens of millions of dollars of retirement savings.

159.    Defendant Yale University is personally liable under 29 U.S.C. §1109(a) to make good to the Plan any losses to the Plan resulting from the breaches of fiduciary duties alleged in this Count and is subject to other equitable or remedial relief as appropriate.

## JURY TRIAL DEMANDED

160.    Pursuant to Fed.R.Civ.P. 38 and the Constitution of the United States, Plaintiffs demand a trial by jury.

## PRAYER FOR RELIEF

For these reasons, Plaintiffs, on behalf of the Plan and all similarly situated Plan participants and beneficiaries, respectfully request that the Court:

- Find and declare that Defendants have breached their fiduciary duties as described above;

- Find and adjudge that Defendants are personally liable to make good to the Plan all losses to the Plan resulting from each breach of fiduciary duty, and to otherwise restore the Plan to the position it would have occupied but for the breaches of fiduciary duty;

- Determine the method by which Plan losses under 29 U.S.C. §1109(a) should be calculated;

- Order Defendants to provide all accountings necessary to determine the amounts Defendants must make good to the Plan under §1109(a);

- Remove the fiduciaries who have breached their fiduciary duties and enjoin them from future ERISA violations;

- Surcharge against Defendants and in favor of the Plan all amounts involved in any transactions which such accounting reveals were improper, excessive and/or in violation of ERISA;

- Reform the Plan to include only prudent investments;

- Reform the Plan to obtain bids for recordkeeping and to pay only reasonable recordkeeping expenses;

- Certify the Class, appoint each of the Plaintiffs as a class representative, and appoint Schlichter, Bogard & Denton LLP as Class Counsel;

- Award to the Plaintiffs and the Class their attorney's fees and costs under 29 U.S.C. §1132(g)(1) and the common fund doctrine;

- Order the payment of interest to the extent it is allowed by law; and

- Grant other equitable or remedial relief as the Court deems appropriate.

**THE PLAINTIFFS**,
JOSEPH VELLALI, NANCY S. LOWERS,
JAN M. TASCHNER, RANAY P. CIRILLO,
JAMES MANCINI, AND TARA HEARD

By: /s/ Stuart M. Katz
    Stuart M. Katz (ct12088)
    Cohen and Wolf, P.C.
    1115 Broad Street
    Bridgeport, CT 06604
    Tel. (203) 368-0211
    Fax (203) 337-5505
    E-Mail: skatz@cohenandwolf.com

    Jerome J. Schlichter, Esq.
    Michael W. Wolf, Esq.
    Troy A. Doles, Esq.
    Heather Lea, Esq.
    Kurt C. Struckhoff, Esq.
    Sean E. Soyars, Esq.
    SCHLICHTER, BOGARD &
      DENTON, LLP
    100 South Fourth Street; Suite 1200
    St. Louis, Missouri 63102
    Telephone: (314) 621-6115
    Facsimile: (314) 621-5934
    jschlichter@uselaws.com
    mwolff@uselaws.com
    tdoles@uselaws.com
    hlea@uselaws.com
    kstruckhoff@uselaws.com
    ssoyars@uselaws.com
    *Pro Hac Vice Admission Forthcoming*