# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF CONNECTICUT

| | |
|---|---|
| JOSEPH VELLALI, NANCY S. LOWERS, JAN M. TASCHNER, RANAY P. CIRILLO, JAMES MANCINI, and TARA HEARD, individually and as representatives of a class of participants and beneficiaries on behalf of the Yale University Retirement Account Plan, <br><br> *Plaintiffs,* <br><br> v. <br><br> YALE UNIVERSITY and MICHAEL A. PEEL, <br><br> *Defendants.* | Civil Action No. 3:16-cv-01345-AWT <br><br><br><br> Hon. Alvin W. Thompson |

# MEMORANDUM OF LAW IN SUPPORT OF
## DEFENDANTS' MOTION TO DISMISS

Nancy G. Ross (ct14373)
James C. Williams (ct23292)
MAYER BROWN LLP
71 South Wacker Drive
Chicago, Illinois 60606-4637
Telephone: (312) 782-0600
Facsimile: (312) 701-7711

Brian D. Netter (phv08476)
  bnetter@mayerbrown.com
Michelle N. Webster (phv08475)
Travis Crum (phv08550)
Matthew A. Waring (phv08551)
MAYER BROWN LLP
1999 K Street NW
Washington, DC 20006-1101
Telephone: (202) 263-3000
Facsimile: (202) 263-3300

*Attorneys for Defendants*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................... ii

INTRODUCTION ............................................................................................... 1

    A.    Tax-Deferred Annuity Plans Under I.R.C ............................................. 2

    B.    The Yale University Retirement Account Plan ..................................... 4

    C.    Plaintiffs' Complaint ............................................................................ 7

ARGUMENT ..................................................................................................... 8

I.    Plaintiffs Lack Standing Because They Fail To Allege Individualized Harm ............................................................................................................ 10

II.    Plaintiffs Have Failed To State A Claim For Breach Of The Duty Of Prudence. ...................................................................................................... 13

    A.    Plaintiffs' Recordkeeping Fees Claim Fails. ...................................... 14

        1.    Revenue sharing is a common industry practice that has survived numerous legal challenges by Plaintiffs' counsel ...... 15

        2.    Defendants' use of multiple recordkeepers also fails to support an inference of a flawed decision-making process. ...... 16

        3.    Plaintiffs' allegation that the fees were too high is disproven by the disclosure on which they purport to rely ...... 18

    B.    Plaintiffs' Investment-Option Claims Fail .......................................... 20

        1.    Plaintiffs do not adequately allege that the University failed to monitor investment fees ............................................... 21

        2.    Plaintiffs' allegation that the Plan offered too many options fails to state a claim ..................................................... 24

        3.    Plaintiffs' underperformance claims fail. ................................. 25

III.    Plaintiffs Have Failed To State A Claim For Breach Of The Duty Of Loyalty. ........................................................................................................ 32

IV.    Plaintiffs Have Failed To State A Claim For Breach Of The Duty To Monitor. ........................................................................................................ 33

CONCLUSION ................................................................................................... 34

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*American Psychiatric Ass'n v. Anthem Health Plans, Inc.,*
821 F.3d 352 (2d Cir. 2016) .................................................................. 11

*Ashcroft v. Iqbal,*
556 U.S. 662 (2009) .................................................................. 8, 9, 20

*Braden v. Wal-Mart Stores, Inc.,*
588 F.3d 585 (8th Cir. 2009) .......................................................... 14, 22

*Caputo v. Pfizer, Inc.,*
267 F.3d 181 (2d Cir. 2001) .................................................................. 24

*Cassell v. Vanderbilt Univ.,*
No. 3:16-cv-02086 (M.D. Tenn.) ............................................................. 7

*Cates v. Trs. of Columbia Univ.,*
No. 1:16-cv-06524-AT (S.D.N.Y.) ............................................................ 7

*Central States Se. & Sw. Areas Health & Welfare Fund v. Merck-Medco
Managed Care, LLC,* 433 F.3d 181 (2d Cir. 2005) ................................. 10

*Chao v. Merino,*
452 F.3d 174 (2d Cir. 2006) .......................................................... 13, 26

*Clark v. Duke Univ.,*
No. 1:16-cv-01044 (M.D.N.C.) .............................................................. 7

*Cunningham v. Cornell Univ.,*
No. 1:16-cv-06525-PKC (S.D.N.Y.) ......................................................... 7

*Davis v. FEC,*
554 U.S. 724 (2008) ......................................................................... 11

*DeBruyne v. Equitable Life Assur. Soc'y of U.S.,*
920 F.2d 457 (7th Cir. 1990) .............................................................. 27

*Divane v. Nw. Univ.,*
No. 1:16-cv-08157 (N.D. Ill.) ............................................................... 7

*Fifth Third Bancorp. v. Dudenhoeffer,*
134 S. Ct. 2459 (2014) ...........................................................*passim*

*Forte v. U.S. Pension Committee,*
No. 15-cv-4936 (S.D.N.Y. Sept. 30, 2016), ECF No. 35 ......................... 12

*Friends of the Earth, Inc. v. Laidlaw Environmental Services (TOC),
Inc.,* 528 U.S. 167 (2000) .................................................................. 11

*Gartenberg v. Merrill Lynch Asset Mgmt.,*
694 F.2d 923 (2d Cir. 1982) .............................................................. 19

*Hecker v. Deere & Co.*,
   556 F.3d 575 (7th Cir. 2009) ................................................................ 15, 22, 25

*Henderson v. Emory Univ.*,
   No. 1:16-cv02920-MHC (N.D. Ga.) ..................................................................... 7

*Jenkins v. Yager*,
   444 F.3d 916 (7th Cir. 2006) ................................................................... 26, 27

*Jones v. Harris Assocs. L.P.*,
   559 U.S. 335 (2010) ................................................................................... 19

*Kelly v. Johns Hopkins Univ.*,
   No. 1:16-cv-02835-GLR (D. Md.) ..................................................................... 7

*Kendall v. Emps. Ret. Plan of Avon Prods.*,
   561 F.3d 112 (2d Cir. 2009) ............................................................ 11, 12, 13

*Kramer v. Time Warner, Inc.*,
   937 F.2d 767 (2d Cir. 1991) ........................................................................ 9

*Laboy v. Bd. of Trs. of Building Serv. 32 BJ SRSP*,
   2012 WL 701397 (S.D.N.Y. Mar. 6, 2012) ................................................... 23

*Laboy v. Bd. of Trs. of Building Service 32 BJ SRSP*,
   2012 WL 3191961 (S.D.N.Y. Aug. 7, 2012), *aff'd*, 513 F. App'x 78 (2d
   Cir. 2013) ................................................................................................ 18

*Lander v. Hartford Life & Annuity Ins. Co.*,
   251 F.3d 101 (2d Cir. 2001) ........................................................................ 5

*LaRue v. DeWolff, Boberg & Assocs.*,
   552 U.S. 248 (2008) .................................................................................. 11

*Loomis v. Exelon Corp.*,
   658 F.3d 667 (7th Cir. 2011) .................................................................. 22, 23, 25

*Lujan v. Defenders of Wildlife*,
   504 U.S. 555 (1992) .............................................................................. 10, 11

*Mass. Mut. Life Ins. Co. v. Russell*,
   473 U.S. 134 (1985) .................................................................................. 11

*Munro v. Univ. of S. Cal.*,
   No. 2:16-cv-06191 (C.D. Cal.) ...................................................................... 7

*Newman-Green, Inc. v. Alfonzo-Larrain*,
   490 U.S. 826 (1989) .................................................................................. 11

*O'Shea v. Littleton*,
   414 U.S. 488 (1974) .................................................................................. 11

*Pegram v. Herdrich*,
   530 U.S. 211 (2000) .................................................................................. 32

*Renfro v. Unisys Corp.*,
  671 F.3d 314 (3d Cir. 2011) ........................................................... 15, 21, 22

*Rinehart v. Akers*,
  722 F.3d 137 (2d Cir. 2013), *vacated on other grounds*, 134 S. Ct.
  2900 (2014), *and reaff'd sub nom. Rinehart v. Lehman Bros.
  Holdings, Inc.*, 817 F.3d 56 (2d Cir. 2016) ............................................ 34

*Rinehart v. Lehman Bros. Holdings Inc.*,
  817 F.3d 56 (2d Cir. 2016) (per curiam) ............................................... 26

*Sacerdote v. N.Y. Univ.*,
  No. 1:16-cv-06284 (S.D.N.Y.) .............................................................. 7

*Spokeo, Inc. v. Robins*,
  136 S. Ct. 1540 (2016) ...................................................................... 10

*PBGC ex rel. St. Vincent Catholic Med. Ctrs. Ret. Plan v. Morgan
  Stanley Inv. Mgmt. Inc.*, 712 F.3d 705 (2d Cir. 2013) ................................*passim*

*Sweda v. Univ. of Pa.*,
  No. 2:16-cv-04329-GEKP (E.D. Pa.) ....................................................... 7

*Taveras v. UBS AG*,
  612 F. App'x 27 (2d Cir. 2015) ....................................................... 12, 13

*Tibble v. Edison Int'l*,
  729 F.3d 1110 (9th Cir. 2013), *vacated and remanded on other
  grounds*, 135 S. Ct. 1823 (2015) ...................................................... 25, 28

*Tracey v. Mass. Inst. of Tech.*,
  No. 16-cv-11620 (D. Mass.) ................................................................ 7

*Tussey v. ABB, Inc.*,
  746 F.3d 327 (8th Cir. 2014) ............................................................. 15

*In re UBS ERISA Litig.*,
  2014 WL 4812387 (S.D.N.Y. Sept. 29, 2014), *aff'd sub nom. Taveras
  v. UBS AG*, 612 F. App'x 27 (2d Cir. 2015) ............................................. 12

*White v. Chevron Corp.*,
  2016 WL 4502808 (N.D. Cal. Aug. 29, 2016) ...........................................*passim*

*Winfield v. Citibank, N.A.*,
  842 F. Supp. 2d 560 (S.D.N.Y. 2012) ..................................................... 9

*In re WorldCom, Inc.*,
  263 F. Supp. 2d 745 (S.D.N.Y. 2003) .................................................... 32

*In re Xerox Corp. ERISA Litig.*,
  483 F. Supp. 2d 206 (D. Conn. 2007) ................................................... 32

*Young v. GM Inv. Mgmt. Corp.*,
  325 F. App'x 31 (2d Cir. 2009) ...................................................... 18, 19

## Statutes and Rules

15 U.S.C. § 80a-35(b) .................................................................................. 18

I.R.C. § 403(b) .................................................................................... *passim*

I.R.C. § 403(b)(7) ........................................................................................ 3

29 U.S.C. § 1104(a)(1)(B) ................................................................ 1, 13, 14, 17

29 U.S.C. § 1113 ........................................................................................ 24

Revenue Act of 1942,
    ch. 619, 56 Stat. 798 .............................................................................. 3

Revenue Act of 1978,
    Pub. L. No. 95-600, 92 Stat. 2763 ............................................................ 3

Fed. R. Evid. 201 ........................................................................................ 9

## Other Authorities

2011 ERISA Advisory Council, *Current Challenges and Best Practices
    for ERISA Compliance for 403(b) Plan Sponsors* 1 (2011),
    https://www.dol.gov/ebsa/pdf/2011ACIssuePaper2.pdf ........................... 29

A. SCOTT & W. FRATCHER, TRUSTS (4th ed. 1987) ....................................... 32

Adv. Council on Emp. Welfare & Pension Benefit Plans, *Current
    Challenges and Best Practices for ERISA Compliance for 403(b)
    Plan Sponsors* 5, 17, 20 (2011), https://www.dol.gov/sites/default/
    files/ebsa/about-ebsa/about-us/erisa-advisory-
    council/2011ACReport1.pdf .................................................... 2, 3, 4, 14

AonHewitt, *How 403(b) Plans Are Wasting Nearly $10 Billion
    Annually, and What Can Be Done to Fix It* (Jan. 2016),
    http://www.aon.com/attachments/human-capital-consulting/how-
    403b-plans-are-wasting-nearly-10billion-annually-whitepaper.pdf ............. 16, 17

BOGERT & BOGERT, THE LAW OF TRUSTS AND TRUSTEES (3d ed. 2016) ...................... 32

Internal Revenue Serv., *Publication 571: Tax-Sheltered Annuity Plans
    (403(b) Plans)* 2 (Nov. 9, 2015), https://www.irs.gov/pub/irs-
    pdf/p571.pdf ......................................................................................... 3

Morningstar, *2015 Fee Study: Investors Are Driving Expense Ratios
    Down* (2015), https://news.morningstar.com/pdfs/
    2015_fee_study.pdf ................................................................................ 6

Morningstar, *TIAA Real Estate Account (QREARX)*, http://
    quote.morningstar.com/fund/chart.aspx?t=QREARX ............................... 31

SEC, *Variable Annuities: What You Should Know*, https://www.sec.gov/
    investor/pubs/varannty.htm .................................................................. 28

Standard Retirement Servs., Inc., *Fixing Your 403(b) Plan: Adopting a Best Practices Approach*, at 2 (Nov. 2009), https://www.standard.com/pensions/ publications/fixing_your_403b.pdf ........................................................................ 17

Tara Siegel Bernard, *M.I.T., N.Y.U. and Yale Are Sued Over Retirement Plan Fees*, N.Y. TIMES, Aug. 9, 2016 ...................................................... 1

Teresa Hassara, *The 403(b) Lifetime Income Lesson for 401(k) Plans*, PENSIONS & INVESTMENTS, Nov. 30, 2015, http://www.pionline.com/ article/20151130/PRINT/311309998/the-403b-lifetime-income-lesson-for-401k-plans .............................................................................................. 3

TIAA, *Company History*, http://www1.tiaa-cref.org/public/about/ identity/get_to_know_us/company-history/index.html .............................................. 2

TIAA, *Created To Serve. Built To Perform* (2016), https://www.tiaa.org/ public/pdf/about-tiaa/fast-stats.pdf ........................................................................ 5

TIAA, *CREF Retirement Annuity Accounts: CREF Stock Account, Class R3* (June 30, 2016), https://www.tiaa.org/public/pdf/ffs/ 194408126.pdf ...................................................................................................... 29

TIAA, *Is TIAA-CREF a Nonprofit Organization?*, http://www1.tiaa-cref.org/public/support/help/ask_tc/is_tiaa_cref_a_nonprofit.html ...................... 2

TIAA, *Prospectus: College Retirement Equities Fund* (May 1, 2016), http://www.tiaa.org/public/prospectuses/cref_prospectus.pdf?fundcla ss=RPVA ........................................................................................................ 27, 28

TIAA, *TIAA Real Estate Account*, https://www.tiaa.org/public/offer/ products/annuities/retirement-plan-annuities/tiaa-real-estate-account ........................................................................................................................ 30

TIAA, *TIAA Real Estate Account Prospectus* (May 1, 2016), https:// www.tiaa.org/public/pdf/realestate_prosp.pdf .............................................. 30, 31

Vanguard, *Vanguard Institutional Index Fund Prospectus* (2016), http://www.vanguard.com/pub/Pdf/i854.pdf ........................................................ 23

Vanguard, *Vanguard REIT Index Fund Prospectus* (May 25, 2016), https://www.vanguard.com/pub/Pdf/i3123.pdf .............................................. 30, 31

*Vendor Consolidation in Higher Education: Getting More from Less*, PLANSPONSOR (July 29, 2010), http://www.plansponsor.com/Vendor-Consolidation-in-Higher-Education ........................................................................ 17

Yale Univ., *Financial Wellness*, http://your.yale.edu/work-yale/benefits/ financial-wellness ................................................................................................ 7

## INTRODUCTION

The Employee Retirement Income Security Act of 1974 ("ERISA") directs fiduciaries who administer retirement plans to act as would prudent individuals in like circumstances. 29 U.S.C. § 1104(a)(1)(B). That duty obligates fiduciaries to make informed decisions by learning from their peers.

Against that backdrop, in August 2016, Plaintiffs' counsel filed twelve lawsuits, including this one, alleging that prominent universities had breached fiduciary duties to their retirement plans. But instead of alleging that these universities were outliers that had disregarded industry norms, these cookie-cutter complaints allege that the universities breached their duties by doing *the exact same things* as their peer institutions.

Plaintiffs' Complaint fails at every turn. At the outset, Plaintiffs have failed to invoke this Court's jurisdiction. Despite clear Second Circuit precedents directing ERISA plaintiffs to allege injuries to their individual interests—and not just to retirement plans in which they participate—Plaintiffs make no allegations of individual injury. As a result, they have failed to allege standing.

On the merits, Plaintiffs are not shy about their objective—as their counsel told the *New York Times*, they want 403(b) plans offered by non-profit institutions of higher learning to be the "same" as 401(k) plans offered by "for-profit companies."[1] But ERISA does not require 401(k) plans and 403(b) plans—which have different historical origins, are subject to different regulations, and serve

---

[1]     Tara Siegel Bernard, *M.I.T., N.Y.U. and Yale Are Sued Over Retirement Plan Fees*, N.Y. TIMES, Aug. 9, 2016 (quoting Jerome J. Schlichter, counsel for Plaintiffs).

1

participants in different industries—to be treated as if they were the same. And even if the universities were for-profit companies offering 401(k) plans, the changes sought by Plaintiffs would not be required by ERISA.

## BACKGROUND

### A.     Tax-Deferred Annuity Plans Under I.R.C. § 403(b)

Annuities have formed the backbone of the retirement system for universities for nearly a century. In 1918, the Carnegie Foundation for the Advancement of Teaching founded the Teachers Insurance and Annuity Association, a non-profit organization now known as TIAA.[2]

From its founding, TIAA has assured retirement security for university faculties by providing annuities. An annuity is effectively an insurance policy; the issuer agrees to make periodic payments for the life of the policyholder, thereby assuming the risk that the policyholder will outlive her financial resources. In 403(b) plans, annuities have traditionally been structured as agreements between an issuer and a policyholder, which means that the sponsoring institution does not have the right to change the annuity's terms.[3]

---

[2]      TIAA, *Company History*, http://www1.tiaa-cref.org/public/about/ identity/get_to_know_us/company-history/index.html; TIAA, *Is TIAA-CREF a Nonprofit Organization?*, http://www1.tiaa-cref.org/public/support/help/ask_tc/ is_tiaa_cref_a_nonprofit.html.

[3]      Adv. Council on Emp. Welfare & Pension Benefit Plans, *Current Challenges and Best Practices for ERISA Compliance for 403(b) Plan Sponsors* 5, 17, 20 (2011), https://www.dol.gov/sites/default/files/ebsa/about-ebsa/about-us/erisa-advisory-council/2011ACReport1.pdf.

Contributions by charitable organizations toward their employees' annuities were given tax-preferred status by Congress in 1942.[4] And in 1958, Congress introduced Section 403(b), which defined the amounts that could be contributed to so-called "tax-sheltered annuities."

At that time, many for-profit companies provided defined-benefit pensions for their employees, who were expected to remain with a single company for their entire career. Employees of non-profit organizations, such as universities, needed the flexibility to move between organizations. Annuities offered the guaranteed lifetime income of a pension but with the added benefit of portability, so that non-profit employees could switch institutions without imperiling their retirement.[5]

It was not until 1974 that Congress permitted investments other than annuities, expanding Section 403(b) to permit custodial accounts containing registered mutual funds, in addition to annuities.[6] To this day, however, the prominence of annuities is a defining characteristic of 403(b) plans.[7]

Although both are authorized by the Internal Revenue Code, 403(b) plans differ markedly from 401(k) plans. The latter were authorized only in 1978.[8] In a

---

[4]    Revenue Act of 1942, ch. 619, § 162, 56 Stat. 798, 862.

[5]    *See, e.g.*, Teresa Hassara, *The 403(b) Lifetime Income Lesson for 401(k) Plans*, PENSIONS & INVESTMENTS, Nov. 30, 2015, http://www.pionline.com/article/20151130/PRINT/311309998/the-403b-lifetime-income-lesson-for-401k-plans (noting that "[t]he most important distinguishing feature of 403(b) plans is that they were designed to provide lifetime income for people in retirement.").

[6]    I.R.C. § 403(b)(7).

[7]    *See* Internal Revenue Serv., *Publication 571: Tax-Sheltered Annuity Plans (403(b) Plans)* 2 (Nov. 9, 2015), https://www.irs.gov/pub/irs-pdf/p571.pdf; Adv. Council, *supra* note 3, at 17, 20.

[8]    Revenue Act of 1978, Pub. L. No. 95-600, 92 Stat. 2763.

401(k) plan, most plan assets must be held in a trust.[9] A 401(k) trust can contain investments not permitted in 403(b) plans, such as separate accounts (investment funds designed exclusively for a single plan) and commingled funds (which are designed for multiple plans but are not registered mutual funds).[10] And 401(k) plans are *not* centered around annuities, which bring administrative and contractual complexities.[11] Given the regulatory and historical differences between 403(b) and 401(k) plans, the U.S. Secretary of Labor's Advisory Council on Employee Welfare and Pension Benefit Plans has explained that "the 403(b) plan marketplace is unique."[12]

### B.   The Yale University Retirement Account Plan

Yale University (the "University") offers a generous array of benefits to its employees. Among the programs available to eligible employees is the Yale University Retirement Account Plan (the "Plan"). The Plan was created in 1976 (as the Yale University Retirement Annuity Plan) to provide retirement income benefits to the University's faculty and managerial and professional staff.[13] Pursuant to the terms of the Plan, both the University and its Vice President of Human Resources and Administration (currently, defendant Michael A. Peel) are named as fiduciaries.

Each participant in the Plan has an individual account. The University makes contributions equal to 5% of the participant's eligible salary up to the Social-

---

[9]     Adv. Council, *supra* note 3, at 39.
[10]    *Id.* at 10.
[11]    *Id.* at 17, 20, 22.
[12]    *Id.* at 5.
[13]    Penney Decl. Ex. A, § 1.1 (Plan Document).

Security Wage Base (currently $118,500), and 7.5% of eligible salary exceeding that threshold, up to the statutory maximum. If participants make additional contributions, the University matches those contributions dollar-for-dollar, up to an additional 5% of the participant's eligible earnings.[14]  Participants may choose among three types of investments for their individual accounts:

Fixed Annuity. Fixed annuities are "typically thought of as insurance products." *Lander v. Hartford Life & Annuity Ins. Co.*, 251 F.3d 101, 104 (2d Cir. 2001). These are the products in which "the annuitant receives a guaranteed stream of income for life," *id.*, and the insurer assumes the risk that the annuitant will outlive her life expectancy. The Plan offers fixed annuities through TIAA, the industry leader that provides annuities to more than 16,000 institutions.[15]

Variable Annuity. "Variable annuities are typically characterized as 'hybrid products,' possessing characteristics of both insurance products and investment securities." *Lander*, 251 F.3d at 105. In a variable annuity, the annuitant chooses an investment strategy by choosing from a set of portfolios; the annuitant bears the investment risk of the chosen portfolio, which dictates the size of the payment during the annuity's pay-out phase. During the pay-out phase, the annuity provider again bears the risk that the annuitant will outlive her life expectancy. Variable annuities with nine underlying investment strategies are offered to Plan participants through TIAA.

---

[14]    Penney Decl. Ex. B, at 19 (Summary Plan Description).
[15]    TIAA, *Created To Serve. Built To Perform* (2016), https://www.tiaa.org/public/pdf/about-tiaa/fast-stats.pdf.

Mutual Funds. The Plan also offers 104 mutual funds, covering a range of asset classes, investment styles, and strategies. The mutual fund offerings include Target Date funds, which provide diversified portfolios with an asset allocation that becomes more conservative as the targeted retirement date approaches, as well as funds that focus on broad and specific investment sectors. The Plan offers mutual funds provided by TIAA and Vanguard, both of which are recognized industry leaders.

As with investments outside the retirement context, investment options within 403(b) plans charge certain fees to plan participants, for investment management and plan administration. Under the Plan, expenses are satisfied through fees that are deducted from the value of the investment options. Nationwide, the average mutual fund charges 0.64% in fees, expressed as an asset-weighted expense ratio.[16] All of the Plan's mutual funds have lower fees than that average—and Plan participants can choose among 31 investment options that charge fees of 0.10% or less, and as low as 0.04%. At a fee level of 0.04%, a participant with a $50,000 account would pay $20 per year in total fees.

Those fees cover the advisory services of the investment managers, as well as the administrative costs of managing the Plan and providing statements and disclosures. Those fees also cover the Plan's dedicated call center and on-campus

---

[16]    Morningstar, *2015 Fee Study: Investors Are Driving Expense Ratios Down* (2015), https://news.morningstar.com/pdfs/2015_fee_study.pdf.

financial planners, who are available every day to provide one-on-one retirement guidance to Plan participants.[17]

Until 2015, TIAA and Vanguard maintained their own records for Plan participants who invested in their respective products. In 2015, the University completed a process of consolidating the recordkeeping function. TIAA now maintains the records for all investments, including those offered by Vanguard.

## C.    Plaintiffs' Complaint

Plaintiffs Joseph Vellali et al. ("Plaintiffs") filed this action on August 9, 2016, within 10 days of similar filings by the same lawyers against Columbia University, Cornell University, Duke University, Emory University, Johns Hopkins University, the Massachusetts Institute of Technology, New York University, Northwestern University, the University of Pennsylvania, the University of Southern California, and Vanderbilt University.[18]

As in the other cases, Plaintiffs here allege three counts of breach of fiduciary duty under ERISA:

---

[17]    Yale Univ., *Financial Wellness*, http://your.yale.edu/work-yale/benefits/financial-wellness.

[18]    *See Cates v. Trs. of Columbia Univ.*, No. 1:16-cv-06524-AT (S.D.N.Y.); *Cunningham v. Cornell Univ.*, No. 1:16-cv-06525-PKC (S.D.N.Y.); *Clark v. Duke Univ.*, No. 1:16-cv-01044 (M.D.N.C.); *Henderson v. Emory Univ.,* No. 1:16-cv02920-MHC (N.D. Ga.); *Kelly v. Johns Hopkins Univ.*, No. 1:16-cv-02835-GLR (D. Md.); *Tracey v. Mass. Inst. of Tech.,* No. 16-cv-11620 (D. Mass.); *Sacerdote v. N.Y. Univ.*, No. 1:16-cv-06284 (S.D.N.Y.); *Divane v. Nw. Univ.*, No. 1:16-cv-08157 (N.D. Ill.); *Munro v. Univ. of S. Cal.*, No. 2:16-cv-06191 (C.D. Cal.); *Sweda v. Univ. of Pa.*, No. 2:16-cv-04329-GEKP (E.D. Pa.); *Cassell v. Vanderbilt Univ.*, No. 3:16-cv-02086 (M.D. Tenn.).

*First*, Plaintiffs allege that the University[19] breached its duties of loyalty and prudence by permitting unreasonable administrative fees to be assessed against the accounts of plan participants. Compl. ¶¶ 128-36.

*Second*, Plaintiffs allege that the University breached its duties of loyalty and prudence by offering investment options with excessive fees and by offering two investment funds—the CREF Stock Account and the TIAA Real Estate Account—that supposedly underperformed. Compl. ¶¶ 137-50.

*Third*, Plaintiffs allege that the University (but not Mr. Peel) breached its fiduciary duties by failing to monitor individuals who had been appointed to administer the Plan. Compl. ¶¶ 151-59.

Beyond alleging that they are participants in the Plan—which is true only as to four of the six named Plaintiffs[20]—Plaintiffs do not allege anything about their individual circumstances. In particular, the Complaint does not allege whether Plaintiffs elected the investment options they are now challenging.

## ARGUMENT

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). The "plausibility" standard is satisfied only if a complaint alleges "factual content that allows the court to draw the reasonable inference that

---

[19]    Except where indicated, references herein to the University include Mr. Peel as well.

[20]    According to the University's records, two of the Plaintiffs—Ranay P. Cirillo and Tara Heard—are not even participants in the Plan. *See* Penney Decl. ¶¶ 2-4. Plaintiffs have now moved to withdraw those two individuals. ECF No. 51.

the defendant is liable for the misconduct alleged." *Id.* "[T]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.*

In ruling on a motion to dismiss, a court may consider "facts stated in the complaint," materials "incorporated in the complaint by reference," or "matters of which judicial notice may be taken under Fed. R. Evid. 201." *Kramer v. Time Warner, Inc.*, 937 F.2d 767, 773 (2d Cir. 1991). As relevant here, the Court may consider documents integral to the Plan and public disclosure documents required by law. *See, e.g.*, *id.* at 773-74 (permitting consideration of public disclosures); *Winfield v. Citibank, N.A.*, 842 F. Supp. 2d 560, 568 n.3 (S.D.N.Y. 2012) (plan and summary plan description are integral to ERISA cases).

Under those standards, dismissal of the Complaint is warranted as to each of the Complaint's claims. As explained herein, Plaintiffs lack Article III standing because they have not alleged how their individual interests are implicated by their allegations of fiduciary breach, as required by Second Circuit precedents. Plaintiffs' claims likewise fail on the merits. Under binding precedents, the Complaint must plausibly allege a breakdown of fiduciary process. But Plaintiffs allege nothing about fiduciary process, and their allegations about fiduciary actions only serve to confirm that Plan fiduciaries hewed to industry standards and had procedures in place to evaluate and to adapt to market and industry developments. Such is the case with the Plan's recordkeeping arrangement, which used a revenue-sharing model that has been endorsed by many courts; and with the Plan's investment

lineup, which offered a wide array of low-cost investments from which Plan participants could formulate a retirement portfolio that matched their personal objectives.

## I.   Plaintiffs Lack Standing Because They Fail To Allege Individualized Harm.

The Complaint fails at the outset because it fails to satisfy the constitutional prerequisites of Article III standing.

"Under Article III of the Constitution, federal courts have jurisdiction only over 'Cases' and 'Controversies.'" *Central States Se. & Sw. Areas Health & Welfare Fund v. Merck-Medco Managed Care, LLC*, 433 F.3d 181, 198 (2d Cir. 2005). "Standing to sue is a doctrine rooted in the traditional understanding of a case or controversy." *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016). That doctrine "limits the category of litigants empowered to maintain a lawsuit in federal court to seek redress for a legal wrong" and "ensure[s] that federal courts do not exceed their authority as it has been traditionally understood." *Id.*

"[T]he irreducible constitutional minimum of standing contains three elements." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). As the Second Circuit has explained:

> Constitutional standing requires (1) that the plaintiff have suffered an 'injury in fact'—that is, 'an invasion of a legally protected interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical'; (2) that there is 'a causal connection between the injury and the conduct' of which the plaintiff complains' and (3) that it is 'likely … that the injury will be redressed by a favorable decision.

10

*American Psychiatric Ass'n v. Anthem Health Plans, Inc.*, 821 F.3d 352, 358 (2d Cir. 2016) (quoting *Lujan*, 504 U.S. at 560-61); *see also Friends of the Earth, Inc. v. Laidlaw Environmental Services (TOC), Inc.*, 528 U.S. 167, 180 (2000). Plaintiffs must demonstrate standing for "'each claim'" and "'for each form of relief that is sought.'" *Davis v. FEC,* 554 U.S. 724, 734 (2008) (quoting *DaimlerChrysler v. Cuno,* 547 U.S. 332, 352 (2006)). In a class action, the *named* plaintiffs must demonstrate that they have constitutional standing (*O'Shea v. Littleton,* 414 U.S. 488, 494 (1974)), measured at the time the complaint was filed (*Newman-Green, Inc. v. Alfonzo-Larrain,* 490 U.S. 826, 830 (1989)). "The party invoking federal jurisdiction bears the burden of establishing these elements … with the manner and degree of evidence required at the successive stages of the litigation." *Lujan*, 504 U.S. at 561.

In an ERISA breach-of-fiduciary-duty action, plaintiffs "cannot claim that either an alleged breach of fiduciary duty to comply with ERISA, or a deprivation of an entitlement to that fiduciary duty, in and of themselves constitutes an injury-in-fact sufficient for constitutional standing." *Kendall v. Emps. Ret. Plan of Avon Prods.*, 561 F.3d 112, 121 (2d Cir. 2009). In a case involving a plan with a defined *benefit*, plan participants share a "common interest … in the financial integrity of the plan" (*Mass. Mut. Life Ins. Co. v. Russell*, 473 U.S. 134, 142 n.9 (1985)) that can be injured by a fiduciary breach that "creates or enhances the risk of default by the entire plan" (*LaRue v. DeWolff, Boberg & Assocs.*, 552 U.S. 248, 255 (2008)). In a defined *contribution* plan, by contrast, the interests of plan participants are not always aligned. Where, as here, participants "direct[] their own investment choices

11

from a menu of options selected by [plan] fiduciaries," a fiduciary misstep might have no impact on a participant's individual interests (*Taveras v. UBS AG*, 612 F. App'x 27, 29 (2d Cir. 2015) (summary order)), as when a plan participant alleges a fiduciary breach respecting an investment fund he did not elect. Thus, in an ERISA action for breach of fiduciary duty, "[f]ailure to allege individualized harm goes directly to constitutional standing and is fatal to [a] Complaint." *Id.*

Here, the Complaint plainly does not satisfy the requirements for standing outlined in *Kendall* and *Taveras*. The Complaint alleges only that Plaintiffs are participants in the Plan. Compl. ¶¶ 10-15. The Complaint fails to allege anything concerning Plaintiffs' individual investments. For instance, although the Complaint contends that 88 of the mutual funds offered to Plan participants were imprudent (*id.* ¶ 74), it does not allege that Plaintiffs actually invested in any of those investment options. *See In re UBS ERISA Litig.*, 2014 WL 4812387, at *6 (S.D.N.Y. Sept. 29, 2014) ("Plaintiff can only demonstrate a constitutionally sufficient injury by pointing to her *individual account's specific losses*."), *aff'd sub nom. Taveras*, 612 F. App'x 27; *cf.* Memorandum and Order, *Forte v. U.S. Pension Committee*, No. 15-cv-4936 (S.D.N.Y. Sept. 30, 2016), ECF No. 35 (dismissing complaint on standing grounds where plaintiff failed to allege that he purchased artificially inflated stock and where plaintiff suffered no constitutionally cognizable harm for holding that stock during relevant time period).

12

The Complaint thus commits the same sin that doomed the complaints in *Kendall* and *Taveras* and must be dismissed for failing to allege facts sufficient to establish Article III standing.

## II.   Plaintiffs Have Failed To State A Claim For Breach Of The Duty Of Prudence.

The Complaint likewise fails to state a claim on the merits for breach of the duty of prudence. Motions to dismiss duty-of-prudence claims are a crucial "mechanism for weeding out meritless [ERISA] claims," requiring "careful judicial consideration of whether the complaint states a claim that the defendant has acted imprudently." *Fifth Third Bancorp. v. Dudenhoeffer*, 134 S. Ct. 2459, 2471 (2014). "'Prudence,' as required by ERISA, 'is measured according to the objective prudent person standard developed in the common law of trusts.'" *Chao v. Merino*, 452 F.3d 174, 182 (2d Cir. 2006). The duty looks to what "a prudent man acting in a *like capacity* and familiar with such matters would [do] in the conduct of an *enterprise of a like character and with like aims*." 29 U.S.C. § 1104(a)(1)(B) (emphases added). Thus, "the appropriate inquiry will necessarily be context specific." *Dudenhoeffer*, 134 S. Ct. at 2471.

ERISA's duty of prudence "'focus[es] on a fiduciary's conduct in arriving at an investment decision, not on its results, and ask[s] whether a fiduciary employed the appropriate *methods* to investigate and determine the merits of a particular investment.'" *PBGC ex rel. St. Vincent Catholic Med. Ctrs. Ret. Plan v. Morgan Stanley Inv. Mgmt. Inc.*, 712 F.3d 705, 716 (2d Cir. 2013) (emphasis added) (quoting *In re Unisys Sav. Plan Litig.*, 74 F.3d 420, 434 (3d Cir. 1996)).

13

Ordinarily, then, a claim for breach of fiduciary duty must allege shortcomings in the fiduciary's *processes* that led the fiduciary to deviate from industry customs. A complaint that lacks "allegations relating directly to the methods employed by the ERISA fiduciary" may survive a motion to dismiss only "if the court, based on circumstantial factual allegations, may reasonably 'infer from what is alleged that the process was flawed.'" *St. Vincent*, 712 F.3d at 718, 727 (quoting *Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 596 (8th Cir. 2009)).

The Complaint does not contain any allegations about the University's fiduciary process. Nor, for that matter, do Plaintiffs invite an inference of inferior process by alleging that similarly situated fiduciaries made different decisions. Rather, given that Plaintiffs' counsel have made the same allegations against virtually an entire peer group, they have effectively conceded the absence of any breach of fiduciary duty under ERISA. Their allegations that fiduciaries to university 403(b) plans should have made certain decisions supposedly favored by fiduciaries to corporate 401(k) plans fail to state a claim for fiduciary breach as a threshold matter. *See* 29 U.S.C. § 1104(a)(1)(B) (requiring fiduciaries to act as would others acting in an "enterprise of a like character and with like aims"); Adv. Council, *supra* note 3 (cataloging the differences between 403(b) and 401(k) plans). And each of Plaintiffs' individual theories fails for separate reasons, as well.

## A.    Plaintiffs' Recordkeeping Fees Claim Fails.

In Count I, Plaintiffs allege that the University breached its fiduciary duty by overpaying for recordkeeping services. This count encompasses three related allegations: (1) that the Plan should not have permitted recordkeepers to be paid

14

through revenue sharing: (2) that the Plan should not have permitted TIAA and Vanguard to maintain separate records for their own accounts; and (3) that the overall costs of recordkeeping were excessive. But none of these allegations raises any inference of fiduciary misconduct. On the contrary, Plaintiffs' claims show that Defendants' practices were in line with common industry practices.

> ### 1. Revenue sharing is a common industry practice that has survived numerous legal challenges by Plaintiffs' counsel.

Plaintiffs first allege that the University acted imprudently by using a revenue-sharing arrangement to compensate the Plan's recordkeepers.

As the Complaint alleges, "revenue sharing occurs when a mutual fund or other investment vehicle directs a portion of its asset-based expense ratio to the plan's recordkeeper putatively for providing recordkeeping and administrative services for the investment." Compl. ¶ 43. Plaintiffs' theory is that prudent "fiduciaries of defined contribution plans negotiate recordkeeping fees based on a fixed dollar amount per-participant rather than as a percentage of plan assets." *Id.* ¶ 44.

Revenue sharing, however, is a "common and 'acceptable' investment industry practice[] that frequently inure[s] to the benefit of ERISA plans." *Tussey v. ABB, Inc.*, 746 F.3d 327, 336 (8th Cir. 2014). Courts have held repeatedly that revenue sharing in retirement plans "violates no statute or regulation" (*Hecker v. Deere & Co.*, 556 F.3d 575, 585 (7th Cir. 2009)) and that a plaintiff cannot state a claim by alleging that the plan should have paid its recordkeepers a per-participant fee rather than a revenue-sharing fee (*Renfro v. Unisys Corp.*, 671 F.3d 314, 326-28

15

(3d Cir. 2011)). *See also White v. Chevron Corp.*, 2016 WL 4502808, at *14 (N.D. Cal. Aug. 29, 2016) ("[P]laintiffs' conclusory assertion that fees under a revenue-sharing arrangement are necessarily excessive and unreasonable[] … is without support.").

Plaintiffs' claim here is no different, and their previously rejected challenge to a common industry funding mechanism does not support an inference that Plan fiduciaries employed an inadequate process.[21]

> ## 2. Defendants' use of multiple recordkeepers also fails to support an inference of a flawed decision-making process.

Plaintiffs also allege that the Plan overpaid for recordkeeping services because, until 2015, it permitted TIAA and Vanguard to maintain separate records for their own funds. Plaintiffs allege, categorically, that "[p]rudent fiduciaries of similarly sized defined contribution plans use a single recordkeeper" because this yields economies of scale and "ensures that plan participants pay only reasonable recordkeeping fees." Compl. ¶ 45.

Once again, however, Plaintiffs assail a common industry practice—as even the authorities invoked by Plaintiffs themselves in the Complaint confirm. "The traditional 403(b) plan has historically been implemented through a multi-provider recordkeeper platform."[22] That arrangement remains "[t]he most prevalent model

---

[21]    Plaintiffs' counsel brought each of the cited cases in which the court rejected a claim that revenue sharing was imprudent *per se*.

[22]    AonHewitt, *How 403(b) Plans Are Wasting Nearly $10 Billion Annually, and What Can Be Done to Fix It*, at 1 (Jan. 2016), http://www.aon.com/attachments/human-capital-consulting/how-403b-plans-are-wasting-nearly-10billion-annually-whitepaper.pdf.

by far."[23] Moreover, as Plaintiffs' sources explain, there are often good reasons to offer participants two or more choices of recordkeeper, because achieving economies of scale and offering participants a choice of providers are not mutually exclusive goals. On the contrary, "[a] move to **two vendors** can allow for centralized remitting of participant data and contributions, integrated communications and education programs, simplified investment offerings, 403(b) audit support, and integrated compliance services while still providing participants with the choice they value."[24] Thus, although Plaintiffs have identified one way in which 401(k) plans and 403(b) plans differ,[25] the use of two recordkeeping platforms does not support a reasonable inference that the fiduciaries' "process was flawed." *St. Vincent*, 712 F.3d at 718, 727. Instead of alleging how individuals act "in the conduct of an enterprise of a like character and with like aims" (29 U.S.C. § 1104(a)(1)(B)), Plaintiffs allege how "defined contribution" fiduciaries act (Compl. ¶ 45), no doubt an allusion to 401(k) plans. But Plaintiffs cannot state a claim by conflating the different types of plans.

In any event, Plaintiffs' other allegations demonstrate that Plan fiduciaries had a process in place for evaluating and managing recordkeeping expenses. As the Complaint alleges, the University ultimately did decide to transition to a single

---

[23]     Standard Retirement Servs., Inc., *Fixing Your 403(b) Plan: Adopting a Best Practices Approach*, at 2 (Nov. 2009), https://www.standard.com/pensions/publications/fixing_your_403b.pdf.

[24]     *Vendor Consolidation in Higher Education: Getting More from Less*, PLANSPONSOR (July 29, 2010), http://www.plansponsor.com/Vendor-Consolidation-in-Higher-Education (emphasis added).

[25]     AonHewitt, *supra* note 22, at 1 ("Many [403(b)] plans are structured differently from the defined contribution (DC) plans of for-profit entities in that they … [e]ndorse multiple administrative recordkeepers.").

recordkeeper. Compl. ¶ 26. This change demonstrates that the University had appropriate processes in place to evaluate the advantages and disadvantages of different recordkeeping arrangements. *Cf. Chevron*, 2016 WL 4502808, at *14 (changes to recordkeeping arrangement "suggest[ed] that [fiduciaries] were monitoring recordkeeping fees to ensure that they did not become unreasonable"); *Laboy v. Bd. of Trs. of Building Service 32 BJ SRSP*, 2012 WL 3191961, at *3 (S.D.N.Y. Aug. 7, 2012) ("[A] decision to change … will not sustain allegations that the [previous arrangement] was an imprudent choice."), *aff'd*, 513 F. App'x 78 (2d Cir. 2013) (summary order).

### 3.   Plaintiffs' allegation that the fees were too high is disproven by the disclosure on which they purport to rely.

Because neither the Plan's use of revenue sharing nor its use of two recordkeepers suggests impropriety, the real gist of Plaintiffs' recordkeeping claim is that recordkeeping costs were too high.

In view of the parallels between ERISA's fiduciary duty to monitor fees and the fiduciary obligations prescribed by the Investment Company Act when investment advisers set mutual fund fees (15 U.S.C. § 80a-35(b)), in considering a motion to dismiss, courts within the Second Circuit "consider the standard for excessive fee claims articulated in the context of the Investment Company Act ('ICA') useful for reviewing [a] claim that excessive fees violated ERISA." *Young v. GM Inv. Mgmt. Corp.*, 325 F. App'x 31, 33 (2d Cir. 2009) (Sotomayor, J.). Under the ICA standard, to give rise to an excessive fees claim, "the adviser-manager must charge a fee that is so disproportionately large that it bears no reasonable

relationship to the services rendered and could not have been the product of arm's-length bargaining." *Gartenberg v. Merrill Lynch Asset Mgmt.*, 694 F.2d 923, 928 (2d Cir. 1982); *see Jones v. Harris Assocs. L.P.*, 559 U.S. 335, 345-46 (2010) (endorsing *Gartenberg*).

Nothing in the Complaint plausibly alleges such a disconnect between the services that the Plan received and what it paid for those services. For one thing, the Complaint does not allege what services the Plan received. Plaintiffs acknowledge that they have "information currently available to [them] regarding the Plan's features," but they do not allege what that information is. Compl. ¶ 59. They plainly cannot "allege that the fees were excessive *relative 'to the services rendered*,'" as they must (*Young*, 325 F. App'x at 33), without identifying the services.

On the costs side of the ledger, Plaintiffs allege that "the Plan paid between $3.8 million and $4.3 million" for recordkeeping services each year, "[b]ased on the direct and indirect compensation levels shown on the Plan's Forms 5500 filed with the Department of Labor and upon information and belief regarding the internal revenue share allocated to each of the Plan's recordkeepers from their proprietary investment options." Compl. ¶ 60. But the Forms 5500 demonstrate that Plaintiffs are mistaken. *First*, the Forms 5500 confirm that the Plan paid nothing in direct expenses for recordkeeping services.[26] *Second*, the Forms 5500 do not disclose indirect compensation levels, because such disclosures are not required when a

---

[26]   *E.g.*, Penney Decl., Ex. C, at C-7 (Form 5500).

service provider receives only indirect compensation.[27] *Third*, the Forms 5500 contradict Plaintiffs' supposed calculations of revenue sharing. Plaintiffs purport to be calculating revenue sharing based on the investment options offered by the Plan, but the Forms 5500 show that Plaintiffs are mistaken even about which investment options were available to plan participants.[28] *Finally*, contrary to Plaintiffs' allegation that the University failed to negotiate a "rebate [of] any excess expenses paid by participants for recordkeeping services" (Compl. ¶ 63), the Forms 5500 demonstrate that the University *did* negotiate millions of dollars worth of rebates:

> As a result of the University's negotiations with TIAA CREF regarding its fees, $1.9 million and $3.7 million was returned to the Plan as deposits into the [Revenue Credit Account] for the year ended June 30, 2014 and June 30, 2013, respectively.[29]

Far from demonstrating that recordkeeping costs were "so disproportionately large" that one can plausibly infer a breakdown of process, the Forms 5500 support only the opposite inference—that the University had appropriate processes in place to monitor fees. Allegations made based on Plaintiffs' sloppy due diligence do not "unlock the doors of discovery." *Iqbal*, 556 U.S. at 678.

### B.   Plaintiffs' Investment-Option Claims Fail.

In Count II, Plaintiffs allege that the University breached its fiduciary duties (1) by offering investment options that were too expensive; (2) by offering too many

---

[27]   *Id.*

[28]   *Compare, e.g.*, Compl. ¶¶ 56, 74 (asserting that the Plan offered retail-class TIAA mutual funds that contained up to 0.25% in revenue sharing), *with* Penney Decl. Ex. C, at C-36 (Form 5500) (showing that the Plan offered only the institutional class funds that Plaintiffs allege they should have offered).

[29]   Penney Decl. Ex. C, at C-30 (Form 5500).

investment options; and (3) by offering the CREF Stock Account and the TIAA Real-Estate Account, which they allege to have been underperformers. None of those allegations states a plausible claim of fiduciary breach.

### 1. Plaintiffs do not adequately allege that the University failed to monitor investment fees.

Plaintiffs seek to impose liability on the University for allegedly failing to include the lowest-fee options within the mutual-fund menu.

There should be little doubt, however, that the University was attentive to fees and offered low-cost options. Fiduciaries satisfy their duties by "offer[ing] participants meaningful choices about how to invest their retirement savings," a standard that accounts for "the range of investment options and the characteristics of those included options—including the risk profiles, investment strategies, and associated fees." *Renfro*, 671 F.3d at 327. The standard is thus whether a fiduciary has given "'appropriate consideration' to whether an investment 'is reasonably designed, as part of the portfolio … to further the purposes of the plan, taking into consideration the risk of loss and the opportunity for gain (or other return) associated with the investment.'" *St. Vincent*, 712 F.3d at 716 (quoting 29 C.F.R. § 2550.404a-1(b)(2)(i)).

Plaintiffs' price-only focus has been rejected by other courts, which have recognized that:

> where, as here, a plan offers a diversified array of investment options, the fact that some other funds might offer lower expense ratios is not relevant, as ERISA does not require fiduciaries to scour the market to find and offer the cheapest possible funds (which might, of course, be plagued by other problems).

21

*Chevron*, 2016 WL 4502808, at *10 (citations and internal quotation marks

omitted). Applying that standard, the Third Circuit affirmed the dismissal of a

claim challenging the inclusion of retail mutual funds because the expense ratios

ranged from 0.10% to 1.21%. *Renfro*, 671 F.3d at 319, 327-28. The Seventh Circuit

affirmed the dismissal of a similar claim, where the fees ranged from 0.07% to "just

over 1%." *Hecker*, 556 F.3d at 586; *accord Loomis v. Exelon Corp.*, 658 F.3d 667, 671

(7th Cir. 2011); *cf. Braden*, 588 F.3d at 596 (acknowledging that a fiduciary might

"have chosen funds with higher fees for any number of reasons, including potential

for higher return, lower financial risk, more services offered, or greater

management flexibility"). Here, the fees on the mutual-fund options range from

0.04% to 0.57%, with 31 options charging 0.10% or less. That alone guts Plaintiffs'

allegation that Defendants breached the duty of prudence by offering retail share

classes.

    Moreover, Plaintiffs' premise that fiduciaries can secure "identical"

investment options at lower cost simply by asking is not true. As Judge Easterbrook

has explained, there are price differences between retail and institutional

investments because different types of customers require different services:

> The expenses of retail funds derive in large measure from
> the need to deal with investors one at a time: to receive
> and mail small checks, to print and mail individual
> prospectuses and account statements, frequently to
> exchange modest sums from one fund to another, and so
> on. Expenses per dollar under management necessarily
> are higher if the average account is $100,000 than if it is
> $100,000,000. Hertz gets a fleet discount from General
> Motors when it orders 10,000 cars at a time, but Hertz
> does not secure fleet discounts for members of its #1 Club

> to buy their own GM cars; retail transactions occur at retail prices. So too with retail transactions in mutual funds.

*Loomis*, 658 F.3d at 672. Consistent with Judge Easterbrook's expectation, whereas Vanguard includes the costs of recordkeeping in its retail share classes, its prospectus explains that "Vanguard may charge additional recordkeeping fees for institutional clients whose accounts are recordkept by Vanguard."[30] Thus, merely alleging the *existence* of lower-cost institutional share classes does not suggest that Defendants' management processes were flawed: a fiduciary could easily conclude that offering retail share classes was a better option than offering institutional share classes that would have provided fewer services. *See, e.g.*, *Laboy v. Bd. of Trs. of Building Serv. 32 BJ SRSP*, 2012 WL 701397, at *2 (S.D.N.Y. Mar. 6, 2012) (dismissing claim that plan's default fund charged excessive fees because plaintiff "has … failed to allege facts indicating that the Default Fund fees were excessive in light of the services rendered").

In any event, as with their recordkeeping claim, Plaintiffs' share-class claims are disproven by Plan disclosures. Those disclosures demonstrate that Plaintiffs are simply wrong about the funds offered to Plan participants. Of the 88 alleged investment options with supposedly excessive fees, only six are actually offered to Plan participants—and Plaintiffs misstate the expense ratio for four of those six funds.[31] In many cases—*including the first 32 entries in Plaintiffs' spreadsheet*—the

---

[30]     Vanguard, *Vanguard Institutional Index Fund Prospectus* 21 (2016), http://www.vanguard.com/pub/Pdf/i854.pdf.

[31]     *Compare* Compl. ¶ 74, *with* Penney Decl. Ex. D (Plan and Investment Notice).

Plan actually offers a fund that is *less* expensive than the "Identical Lower-Cost Mutual Fund" proposed by Plaintiffs.[32]

Again, Plaintiffs' allegations do not plausibly support the inference that the University failed to employ adequate processes to monitor investment fees.

### 2. Plaintiffs' allegation that the Plan offered too many options fails to state a claim.

Next, Plaintiffs argue that the Plan offered participants too many options. They allege that if the Plan had offered participants fewer choices of funds, it could have lowered its costs (Compl. ¶ 80) and avoided "unnecessary complexity [in] the investment lineup," which they allege caused "decision paralysis" for Plan participants. *Id.* ¶ 83.

At the outset, it is difficult to fathom how Plaintiffs' too-much-choice claim could be timely. Fiduciary breach actions must be filed within "three years after the earliest date on which the plaintiff had actual knowledge of the breach or violation," and no more than six years after the alleged violation. 29 U.S.C. § 1113. If Plaintiffs' theory is that they—or, at least, some unspecified Plan participants—were "confus[ed]" by the number of choices on the investment menu (Compl. ¶ 142), then the people who were confused surely had knowledge of the number of choices on the investment menu. The same is true of Plaintiffs' claims generally. The three-year limitations period applies when a plaintiff has "knowledge of all material facts necessary to understand that an ERISA fiduciary has breached his or her duty." *Caputo v. Pfizer, Inc.*, 267 F.3d 181, 193 (2d Cir. 2001). Given the disclosures of fund

---

[32]     *Id.*

and fee information, it is hard to believe that Plan participants learned only recently about what the Plan was offering.

In any event, the suggestion that Plan participants would have benefited from *less* choice is anathema to the free-choice hallmark of these sorts of plans. "Because participant choice is the centerpiece of what ERISA envisions for defined-contribution plans, these sorts of paternalistic arguments have had little traction in the courts." *Tibble v. Edison Int'l*, 729 F.3d 1110, 1134-35 (9th Cir. 2013), *vacated and remanded on other grounds*, 135 S. Ct. 1823 (2015). Indeed, courts have *encouraged* rather than *penalized* increased choice. Choice is important because different investment vehicles have different features and characteristics that will make them attractive to different investors. *See id.* at 1135; *Loomis*, 658 F.3d at 671-72; *Hecker*, 556 F.3d at 586. Thus, the number of investment options offered by the Plan does not in any way suggest that Defendants' investment-management process was inadequate.

### 3.   Plaintiffs' underperformance claims fail.

Among more than one hundred investment options in the Plan, Plaintiffs allege that two should have been removed from the Plan for underperformance—the CREF Stock Account and the TIAA Real Estate Account. Plaintiffs do not state a claim for relief with respect to either.

A plaintiff faces a particularly high bar when alleging that public information should have prompted fiduciaries to remove an investment option that was available on the open market. The Supreme Court recognized in *Dudenhoeffer* that differences in performance between investment vehicles are the result of differences

in investment structures and risk profiles—not questions of prudence and imprudence. 134 S. Ct. at 2471-72. In so holding, the Court credited the efficient market hypothesis—the theory that investors vote with their feet, such that investments in securities reflect the consensus of the market that the securities have the prescribed value. *Id.*; *see also Rinehart v. Lehman Bros. Holdings Inc.*, 817 F.3d 56, 66 (2d Cir. 2016) (per curiam). The Court emphasized that a fiduciary need not "'outsmart a presumptively efficient market,'" in which the actions of other self-interested investors confirm the prudence and appropriate pricing of particular investment options. *Dudenhoeffer*, 134 S. Ct. at 2472 (quoting *White v. Marshall & Isley Corp.*, 714 F.3d 980, 992 (7th Cir. 2013)).

Moreover, looking after the fact at the performance of an investment as the measure of whether the fiduciary was prudent is inappropriate. "[A] fiduciary's obligation is to exercise care prudently and with diligence under the circumstances then prevailing"; thus, "his actions are not to be judged from the vantage point of hindsight." *Merino*, 452 F.3d at 182 (internal quotation marks and citations omitted). Put differently, "ERISA's 'fiduciary duty of care … requires prudence, not prescience.'" *Rinehart*, 817 F.3d at 63-64 (quoting *St. Vincent*, 712 F.3d at 716). Therefore, ERISA does not fault fiduciaries for failing to outguess the market or for retaining investments that underperformed the market. *Dudenhoeffer*, 134 S. Ct. at 2471-72.[33]

---

[33]    Indeed, as one court has noted, "a fiduciary may—and often does—retain investments through a period of underperformance as part of a long-range investment strategy." *Chevron*, 2016 WL 4502808, at *17; *see also, e.g., Jenkins v.*

Under this standard, claims against funds that have *lost* much of their principal are routinely dismissed. *E.g., St. Vincent*, 712 F.3d at 721; *Jenkins*, 444 F.3d at 926; *DeBruyne v. Equitable Life Assur. Soc'y of U.S.*, 920 F.2d 457, 465 (7th Cir. 1990) ("We cannot say that Equitable was imprudent merely because the Balanced Fund lost money."). Plaintiffs' challenges to the CREF Stock Account and the TIAA Real Estate Account likewise fail to state a claim.

   **a.    *The CREF Stock Account.*** The CREF Stock Account ("Stock Account") is a variable-annuity investment fund. According to its prospectus, the Stock Account seeks to achieve "[a] favorable long-term rate of return through capital appreciation and investment income by investing primarily in a broadly diversified portfolio of common stocks."[34] The Stock Account is globally diversified and "seeks to maintain the weightings of its holdings as approximately 70–75% domestic equities and 25–30% foreign equities."[35] Because of this blended strategy, the prospectus explains that no single benchmark appropriately gauges the Stock Account's performance:

> The benchmark for the Stock Account is a composite index composed of two unmanaged indices: the Russell 3000® Index and the MSCI All Country World ex-USA Investable Market Index ("MSCI ACWI ex-USA IMI"). The weights in the composite index change to reflect the relative sizes of the domestic and foreign segments of the

---

*Yager*, 444 F.3d 916, 926 (7th Cir. 2006) (defendant did not breach fiduciary duties by retaining the same mutual funds in 401(k) plan lineup even though those funds lost money over a three-year period, because it can be reasonable "to stay with … mutual funds even during years of lower performance").

[34]    TIAA, *Prospectus: College Retirement Equities Fund* 27 (May 1, 2016), http://www.tiaa.org/public/prospectuses/cref_prospectus.pdf?fundclass=RPVA.

[35]    *Id.* at 28.

> Account and to maintain its consistency with the
> Account's investment strategies.[36]

As Plaintiffs allege, all universities that offer certain TIAA fixed annuities are required to offer the Stock Account. Compl. ¶ 96. Plaintiffs contend that the Stock Account should have been removed as a Plan investment option because the "historical performance of the CREF Stock Account has been persistently poor for many years compared to both available lower-cost index funds and the index benchmark." Compl. ¶ 103.

This claim fails for numerous reasons:

*First*, Plaintiffs allege that the Stock Account could have been removed only if *all* TIAA annuities were discontinued (Compl. ¶ 96), but they do not allege that all TIAA annuities should have been discontinued. They cannot state a claim by seeking to unbundle a package deal.

*Second*, the Stock Account is a variable annuity. Plaintiffs assert that other investment vehicles performed better, but none of those investment vehicles are variable annuities. Plaintiffs' comparisons thus say nothing about whether the Stock Account was a well-performing variable annuity. *See Tibble*, 729 F.3d at 1134 (rejecting comparison between different types of investment products because "[m]utual funds … have a variety of unique regulatory and transparency features that make it an apples-to-oranges comparison").[37] Likewise, by making an apples-to-oranges comparison, Plaintiffs appear to presume, without basis, that Plan

---

[36]    *Id.* at 29.

[37]    *See also* SEC, *Variable Annuities: What You Should Know*, https://www.sec.gov/investor/pubs/varannty.htm ("variable annuities differ from mutual funds in several important ways").

28

fiduciaries had the *authority* to remove Plan investments from the Stock Account. Such may be the case in a mutual fund within a 401(k) trust, where participant holdings can be mapped to a new fund when an investment option is discontinued. But for a variable annuity—where the Plan participant holds the rights against the annuity issuer—Plan fiduciaries cannot simply redirect funds.[38]

*Third*, market forces establish that offering participants the opportunity to invest in this account was not imprudent. Across all investors, more than $110 *billion* is invested in the Stock Account.[39] Concluding that all of those investors were acting imprudently is, at the very least, implausible.

*Fourth*, Plaintiffs' argument is premised on a misunderstanding of the investment strategy of the Stock Account. Plaintiffs condemn the non-removal of the Stock Account based on performance comparisons to two passively managed index funds (the Vanguard Total Stock Market Index Fund and the Vanguard Institutional Index) and the Russell 3000 index. Plaintiffs assert that "[l]ike the CREF Stock Account, these options are large cap blend investments," conceding that only an apples-to-apples comparison could possibly have meaning. Compl. ¶ 103. Plaintiffs neglect, however, to mention that the "benchmarks" invest only in *domestic* equities, whereas the Stock Account is a 70/30 blend of domestic and *foreign* equities. So differences in performance are explained by differences in

---

[38]     *See, e.g.*, 2011 ERISA Advisory Council, *Current Challenges and Best Practices for ERISA Compliance for 403(b) Plan Sponsors* 1 (2011), https://www.dol.gov/ebsa/pdf/2011ACIssuePaper2.pdf.
[39]     TIAA, *CREF Retirement Annuity Accounts: CREF Stock Account, Class R3* (June 30, 2016), https://www.tiaa.org/public/pdf/ffs/194408126.pdf.

performance between domestic and foreign stocks. In other words, the Stock Account has a different risk profile from Plaintiffs' preferred comparators, which means that their comparisons do nothing to undermine the prudent processes employed here by Plan fiduciaries.

       **b.**    ***The TIAA Real Estate Account.*** Plaintiffs' challenge to the TIAA Real Estate Account fails for similar reasons. The Real Estate Account is a variable annuity account that "seeks favorable long-term returns primarily through rental income and appreciation of real estate and real estate-related investments."[40] In particular, the Real Estate Account "primarily invests directly in commercial real estate, an asset class not widely available to retail investors in a variable annuity or mutual fund."[41]

Plaintiffs allege that Defendants should have replaced the Real Estate Account with the Vanguard REIT Index mutual fund. Compl. ¶ 112. The Vanguard REIT Index "represent[s] a broadly diversified range of property types," and is not focused on commercial real estate.[42]

Again, the Vanguard REIT Index is a mutual fund; the Real Estate Account is not. Moreover, although both the Vanguard REIT Index and the Real Estate Account invest in real estate, they have different strategies. The Real Estate

---

[40]    TIAA, *TIAA Real Estate Account Prospectus* 3 (May 1, 2016), https://www.tiaa.org/public/pdf/realestate_prosp.pdf.

[41]    TIAA, *TIAA Real Estate Account*, https://www.tiaa.org/public/offer/products/annuities/retirement-plan-annuities/tiaa-real-estate-account.

[42]    Vanguard, *Vanguard REIT Index Fund Prospectus* 12 (May 25, 2016), https://www.vanguard.com/pub/Pdf/i3123.pdf.

Account focuses on commercial real estate, whereas the Vanguard REIT indexes the broader real-estate market.

As one might expect, the historical performance of these investment vehicles shows that they reflect different strategies with different investment objectives. In the past six years, the Real Estate Account has performed better than the Vanguard REIT Index three times, and the Vanguard REIT Index has performed better than the Real Estate Account three times.[43] Indeed, plotting the performance of these investment options against each other shows that Plaintiffs' proposed "better" option is far more volatile than the Real Estate Account:[44]



Plaintiffs' allegations establish that there are mutual funds with strategies that differ from the $22.4 billion Real Estate Account—not that the Real Estate Account is inferior; and certainly not that Plan fiduciaries lacked appropriate

---

[43]    *Compare id.* at 3, *with TIAA Real Estate Account Prospectus*, *supra* note 40, at 11.

[44]    Morningstar, *TIAA Real Estate Account (QREARX)*, http://quote.morningstar.com/fund/chart.aspx?t=QREARX (comparison with VGSNX).

processes for reviewing the Real Estate Account (a topic about which the Complaint says nothing at all).

## III.   Plaintiffs Have Failed To State A Claim For Breach Of The Duty Of Loyalty.

In the first two Counts, Plaintiffs also purport to state claims for breach of the duty of loyalty. But an ERISA fiduciary breaches the duty of loyalty only when he acts *dis*loyally, by acting in the interests of someone other than plan participants—and Plaintiffs have not alleged any way in which the University (or Mr. Peel) acted disloyally.

ERISA "charges fiduciaries with a duty of loyalty to guarantee beneficiaries' interests" by invoking a common law trustee's duty to "'administer the trust solely in the interest of the beneficiaries.'" *Pegram v. Herdrich*, 530 U.S. 211, 224 (2000) (quoting 2A A. SCOTT & W. FRATCHER, TRUSTS § 170, at 311 (4th ed. 1987)). Thus, in order to state a claim for breach of the duty of loyalty, Plaintiffs must allege that Defendants acted self-interestedly—or to further a third party's interests—and thereby failed to "act with an 'eye single' to the interests of the Plan beneficiaries." *In re WorldCom, Inc.*, 263 F. Supp. 2d 745, 768 (S.D.N.Y. 2003) (quoting *Donovan v. Bierwirth*, 680 F.2d 263, 271 (2d Cir. 1982)); *see also In re Xerox Corp. ERISA Litig.*, 483 F. Supp. 2d 206, 219 (D. Conn. 2007) (Thompson, J.) (explaining that the fiduciary's "primary loyalty to the fund is the *only* loyalty which may affect his judgment"); BOGERT & BOGERT, THE LAW OF TRUSTS AND TRUSTEES § 543 (3d ed. 2016) ("The trustee must exclude all self-interest, as well as the interest of a third party, in his administration of the trust solely for the benefit of the beneficiary.").

It follows that a plaintiff cannot plead a duty-of-loyalty violation *without* alleging that the fiduciary was acting to further the interest of some party other than plan beneficiaries. A plaintiff whose only complaint is that the fiduciary did not manage the plan's assets as well as he should have may present a question of prudence, but not a question regarding the duty of loyalty.

For that reason, the Complaint fails to state a claim for breach of the duty of loyalty. Nothing in the Complaint alleges that the University acted to further any interest other than the interest of plan participants; instead, Plaintiffs simply allege that the University's purportedly imprudent decisions were also violations of the duty of loyalty. *See, e.g.*, Compl. ¶¶ 54, 132-33, 147. But Plaintiffs cannot state a claim for breach of the duty of loyalty by conflating it with the duty of prudence. *See, e.g.*, *Chevron*, 2016 WL 4502808, at *4 (dismissing duty of loyalty claims because "Plaintiffs cite no authority in support of the proposition that causing an ERISA Plan to incur unreasonable expenses is a breach of the duty of loyalty, distinct from a breach of the duty of prudence"). Because none of Plaintiffs' allegations show the sort of disloyal behavior required for duty-of-loyalty claims, those claims must be dismissed.

## IV.    Plaintiffs Have Failed To State A Claim For Breach Of The Duty To Monitor.

Plaintiffs' remaining allegations claim that the University[45] breached its duty to monitor by failing to monitor: the fees paid to Plan recordkeepers (*e.g.*, Compl. ¶ 64), the investment options available, and the performance of those options. *E.g.*,

---

[45]    Count III refers to the University and not to Mr. Peel.

*id.* ¶¶ 76, 109-10, 116. Plaintiffs' duty-to-monitor claims are derivative of their other claims; accordingly, because their duty-of-loyalty and duty-of-prudence claims fail, their duty-to-monitor claims fail as well. *See, e.g.*, *Rinehart v. Akers*, 722 F.3d 137, 154 (2d Cir. 2013) ("Plaintiffs cannot maintain a claim for breach of the duty to monitor … absent an underlying breach of the duties imposed under ERISA" by the party being monitored), *vacated on other grounds*, 134 S. Ct. 2900 (2014), *and reaff'd sub nom. Rinehart v. Lehman Bros. Holdings, Inc.*, 817 F.3d 56 (2d Cir. 2016).

In any event, Plaintiffs once again fail to allege any facts about what the University's monitoring processes were—or what monitoring procedures it should have had in place. Absent such process allegations, a monitoring claim fails to state a plausible claim for breach of fiduciary duty. *See, e.g.*, *Chevron*, 2016 WL 4502808, at *19 (dismissing duty-to-monitor claim because "plaintiffs allege[d] no facts showing how the monitoring process was deficient").

## CONCLUSION

For the foregoing reasons, the Complaint should be dismissed.

Dated: October 17, 2016                     Respectfully submitted,

Nancy G. Ross (ct14373)                     */s/ Brian D. Netter*
James C. Williams (ct23292)                 Brian D. Netter (phv08476)
MAYER BROWN LLP                                bnetter@mayerbrown.com
71 South Wacker Drive                       Michelle N. Webster (phv08475)
Chicago, Illinois 60606-4637                Travis Crum (phv08550)
Telephone: (312) 782-0600                   Matthew A. Waring (phv08551)
Facsimile: (312) 701-7711                   MAYER BROWN LLP
                                            1999 K Street NW
                                            Washington, DC 20006-1101
                                            Telephone: (202) 263-3000
                                            Facsimile: (202) 263-3300

*Attorneys for Defendants*

35

## CERTIFICATE OF SERVICE

I hereby certify that, on October 17, 2016, a copy of the foregoing was filed electronically using the Court's CM/ECF system, which will provide notice of the filing to all counsel of record.

By: /s/ *Brian D. Netter*  
Brian D. Netter