# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF CONNECTICUT

| | |
|---|---|
| JOSEPH VELLALI, NANCY S. LOWERS, JAN M. TASCHNER, and JAMES MANCINI, individually and as representatives of a class of participants and beneficiaries on behalf of the Yale University Retirement Account Plan,<br><br>     *Plaintiffs*,<br><br>  v.<br><br>YALE UNIVERSITY, MICHAEL A. PEEL, and THE RETIREMENT PLAN FIDUCIARY COMMITTEE,<br><br>     *Defendants*. | Civil Action No. 3:16-cv-01345-AWT<br><br><br><br><br><br>Hon. Alvin W. Thompson |

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS PLAINTIFFS' AMENDED COMPLAINT

Nancy G. Ross (ct14373)
James C. Williams (ct23292)
MAYER BROWN LLP
71 South Wacker Drive
Chicago, Illinois 60606-4637
Telephone: (312) 782-0600
Facsimile: (312) 701-7711

Brian D. Netter (phv08476)
  bnetter@mayerbrown.com
Michelle N. Webster (phv08475)
Travis Crum (phv08550)
Matthew A. Waring (phv08551)
MAYER BROWN LLP
1999 K Street NW
Washington, DC 20006-1101
Telephone: (202) 263-3000
Facsimile: (202) 263-3300

*Attorneys for Defendants*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................... ii

INTRODUCTION .............................................................................................. 1

    A.    Tax-Deferred Annuity Plans Under I.R.C. § 403(b) ............................. 2

    B.    The Yale University Retirement Account Plan ..................................... 4

    C.    Plaintiffs' Complaint and Amended Complaint ................................... 8

ARGUMENT ..................................................................................................... 9

I.    Plaintiffs Have Failed To State A Claim For Breach Of Fiduciary Duty ...... 10

    A.    Plaintiffs' "Locking In" Claim Fails. ................................................. 12

    B.    Plaintiffs' Administrative Fees Claim Fails. ...................................... 14

        1.    Revenue sharing is a common industry practice that has survived numerous legal challenges by Plaintiffs' counsel. ...... 14

        2.    Defendants' use of multiple recordkeepers also fails to support an inference of a flawed decision-making process. ...... 15

        3.    Plaintiffs' allegation that the fees were too high is disproven by the disclosure on which they purport to rely. ...... 18

    C.    Plaintiffs' Investment Fees Claim Fails. ............................................ 21

        1.    Plaintiffs do not adequately allege that the University failed to monitor investment fees ............................................. 21

        2.    Plaintiffs' allegations regarding the "layers of fees" in CREF investments fail to state a claim. .................................. 25

        3.    Plaintiffs' allegation that the Plan offered too many options fails to state a claim .......................................... 26

        4.    Plaintiffs' underperformance claims fail. ................................ 27

II.    Plaintiffs Have Failed To State A Claim For Breach Of The Duty Of Loyalty. ....................................................................................................... 33

III.    Plaintiffs Have Failed To State A Claim That Defendants Engaged In Prohibited Transactions ................................................................................. 35

IV.    Plaintiffs Have Failed To State A Claim For Breach Of The Duty To Monitor. ...................................................................................................... 37

V.    Plaintiffs' Claims Are Time-Barred. .................................................... 38

CONCLUSION ................................................................................................ 40

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Ashcroft v. Iqbal,*
   556 U.S. 662 (2009) ................................................................................ 9, 10, 21

*Bell Atl. Corp. v. Twombly,*
   550 U.S. 544 (2007) ................................................................................ 10

*Braden v. Wal-Mart Stores, Inc.,*
   588 F.3d 585 (8th Cir. 2009) .......................................................... 11, 22

*Brown v. Owens Corning Inv. Review Cmte.,*
   622 F.3d 564 (6th Cir. 2010) ................................................................ 38

*Caputo v. Pfizer, Inc.,*
   267 F.3d 181 (2d Cir. 2001) .................................................................. 38

*Chao v. Merino,*
   452 F.3d 174 (2d Cir. 2006) ............................................................ 11, 28

*DeBruyne v. Equitable Life Assur. Soc'y of U.S.,*
   920 F.2d 457 (7th Cir. 1990) ................................................................ 28

*Donovan v. Bierwirth,*
   680 F.2d 263 (2d Cir. 1982) .................................................................. 34

*Fifth Third Bancorp. v. Dudenhoeffer,*
   134 S. Ct. 2459 (2014) ...................................................................*passim*

*Gartenberg v. Merrill Lynch Asset Mgmt.,*
   694 F.2d 923 (2d Cir. 1982) .................................................................. 19

*Hecker v. Deere & Co.,*
   556 F.3d 575 (7th Cir. 2009) .................................................. 15, 22, 27, 36

*In re Citigroup ERISA Litig.,*
   662 F.3d 128 (2d Cir. 2011) .................................................................. 27

*In re Unisys Sav. Plan Litig.,*
   74 F.3d 420 (3d Cir. 1996) .................................................................... 11

*In re WorldCom, Inc.,*
   263 F. Supp. 2d 745 (S.D.N.Y. 2003) ................................................. 34

*In re Xerox Corp. ERISA Litig.,*
   483 F. Supp. 2d 206 (D. Conn. 2007) ................................................. 34

*IATSE Local 33 Section 401(k) Plan v. Bullock,*
   2008 WL 4838490 (C.D. Cal. Nov. 5, 2008) ....................................... 36

ii

*Jenkins v. Yager,*
    444 F.3d 916 (7th Cir. 2006) ............................................................... 28

*Jones v. Harris Assocs. L.P.,*
    559 U.S. 335 (2010) ............................................................................ 19

*Kramer v. Time Warner, Inc.,*
    937 F.2d 767 (2d Cir. 1991) ............................................................... 10

*Laboy v. Bd. of Trs. of Building Serv. 32 BJ SRSP,*
    2012 WL 701397 (S.D.N.Y. Mar. 6, 2012) ....................................... 24

*Laboy v. Bd. of Trs. of Building Service 32 BJ SRSP,*
    2012 WL 3191961 (S.D.N.Y. Aug. 7, 2012), *aff'd*, 513 F. App'x 78 (2d
    Cir. 2013) .......................................................................................... 18

*Laboy v. Bd. of Trs. of Building Service 32 BJ SRSP,*
    513 F. App'x 78 (2d Cir. 2013) .................................................. 19, 27

*Lander v. Hartford Life & Annuity Ins. Co.,*
    251 F.3d 101 (2d Cir. 2001) ................................................................. 5

*Leber v. Citigroup, Inc.,*
    2010 WL 935442 (S.D.N.Y. Mar. 16, 2010) ...................................... 37

*Loomis v. Exelon Corp.,*
    658 F.3d 667 (7th Cir. 2011) .................................................. 22, 23, 27

*Muehlgay v. Citigroup Inc.,*
    649 F. App'x 110 (2d Cir. 2016) .................................................. 38, 39

*PBGC ex rel. St. Vincent Catholic Med. Ctrs. Ret. Plan v. Morgan
    Stanley Inv. Mgmt. Inc.,*
    712 F.3d 705 (2d Cir. 2013) .................................................. 11, 22, 28

*Pegram v. Herdrich,*
    530 U.S. 211 (2000) ............................................................................ 34

*Renfro v. Unisys Corp.,*
    671 F.3d 314 (3d Cir. 2011) ........................................................ 15, 22

*Rinehart v. Akers,*
    722 F.3d 137 (2d Cir. 2013),
    *vacated on other grounds,* 134 S. Ct. 2900 (2014) ............................. 37

*Rinehart v. Lehman Bros. Holdings Inc.,*
    817 F.3d 56 (2d Cir. 2016) (per curiam) ............................................ 28

*Rosen v. Prudential Ret. Ins. & Annuity Co.,*
    2016 WL 7494320 (D. Conn. Dec. 30, 2016) ...............................*passim*

*Skin Pathology Assocs. v. Morgan Stanley & Co.,*
    27 F. Supp. 3d 371 (S.D.N.Y. 2014) .................................................. 37

*Taylor v. United Techs. Corp.*,
  2009 WL 535779 (D. Conn.), *aff'd*, 354 F. App'x 525 (2d Cir. 2009).....................31

*Tibble v. Edison Int'l*,
  729 F.3d 1110 (9th Cir. 2013), *vacated and remanded on other
  grounds*, 135 S. Ct. 1823 (2015) .............................................................. 26, 27, 30

*Tussey v. ABB, Inc.*,
  746 F.3d 327 (8th Cir. 2014) ............................................................................ 13, 15

*White v. Chevron Corp.*,
  2016 WL 4502808 (N.D. Cal. Aug. 29, 2016)...............................................*passim*

*White v. Marshall & Isley Corp.*,
  714 F.3d 980 (7th Cir. 2013) .....................................................................................28

*Winfield v. Citibank, N.A.*,
  842 F. Supp. 2d 560 (S.D.N.Y. 2012) ......................................................................10

*Young v. Gen. Motors Inv. Mgmt. Corp.*,
  550 F. Supp. 2d 416 (S.D.N.Y. 2008), *aff'd on other grounds*, 325 F.
  App'x 31, 33 (2d Cir. 2009)..............................................................................38, 40

*Young v. GM Inv. Mgmt. Corp.*,
  325 F. App'x 31 (2d Cir. 2009)...............................................................................19

**Statutes**

15 U.S.C. § 80a-35(b) ................................................................................ 18, 19

29 U.S.C. § 1002(21)(B) .................................................................................... 35

29 U.S.C. § 1101(b)(1) ....................................................................................... 36

29 U.S.C. § 1104(a)(1) ................................................................................. 35, 36

29 U.S.C. § 1104(a)(1)(B) ......................................................................... 9, 11, 12

29 U.S.C. § 1106(a)(1)(A) ......................................................................... 9, 35, 36

29 U.S.C. § 1108(b)(2) ....................................................................................... 36

29 U.S.C. § 1113(1) ............................................................................................ 39

29 U.S.C. § 1113(2) ............................................................................................ 38

ERISA....................................................................................................*passim*

I.R.C. § 403(b) ................................................................................................ 2, 3

Revenue Act of 1942, ch. 619, § 162, 56 Stat. 798, 862 ..........................................2

Revenue Act of 1978, Pub. L. No. 95-600, 92 Stat. 2763............................................3

**Regulations**

26 C.F.R. § 1.408–3.................................................................................... 31, 39

29 C.F.R. § 2509.75–3 ................................................................... 36

29 C.F.R. § 2550.404a–1 ................................................................ 22

29 C.F.R. § 2550.404a–5 ............................................................. 8, 39

Amendment to Prohibited Transaction Exemption 84-24, 71 Fed. Reg.
5887 (Feb. 3, 2006) ................................................................ 36

**Other Authorities**

Adv. Council on Emp. Welfare & Pension Benefit Plans, *Current
Challenges and Best Practices for ERISA Compliance for 403(b)
Plan Sponsors* (2011),
https://www.dol.gov/sites/default/files/ebsa/about-ebsa/about-
us/erisa-advisory-council/2011ACReport1.pdf ........................... 2, 3, 4, 12

AonHewitt, *How 403(b) Plans Are Wasting Nearly $10 Billion
Annually, and What Can Be Done to Fix It* (Jan. 2016),
http://www.aon.com/attachments/human-capital-consulting/how-
403b-plans-are-wasting-nearly-10billion-annually-whitepaper.pdf ................... 16

2A Austin Scott & William Fratcher,
The Law of Trusts § 170 (4th ed. 1987) ................................................. 34

George G. Bogert & George T. Bogert,
The Law of Trusts and Trustees § 543 (3d ed. 2016) ......................... 34

CREF, *Statement of Additional Information* (May 1, 2016),
http://www.tiaa.org/public/prospectuses/
cref_sai.pdf?fundclass=RPVA ............................................................... 6

Fed. R. Evid. 201 ....................................................................................... 10

Hewitt EnnisKnupp, *403(b) Plan Redesign Working Paper: University
of Notre Dame* (Feb. 2014),
https://workplacecontent.fidelity.com/bin-public/070_NB_PreLogin_
Pages/documents/ND_403(b) Plan Redesign White Paper.pdf .......................... 18

Internal Revenue Serv., *Publication 571: Tax-Sheltered Annuity Plans
(403(b) Plans)* (Dec. 21, 2016),
https://www.irs.gov/pub/irs-pdf/p571.pdf ................................................... 3

James S. Almond, Purdue Univ., *403(b) Plan Redesign–Making a Good
Retirement Plan Better*, http://www.cacubo.org/wp-
content/uploads/2016/02/10_403b_Plan_Redesign_
Making_a_Good_Retirement_Plan_Better.docx .......................................... 17

Morningstar, *2015 Fee Study: Investors Are Driving Expense Ratios
Down* (2015),
https://news.morningstar.com/pdfs/2015_fee_study.pdf ............................... 7

Morningstar, *TIAA Real Estate Account (QREARX)*, http://quote.morningstar.com/fund/chart.aspx?t=QREARX ................................ 33

Standard Retirement Servs., Inc., *Fixing Your 403(b) Plan: Adopting a Best Practices Approach* (Nov. 2009), https://www.standard.com/ pensions/publications/fixing_your_403b.pdf ...................................... 16

SEC, CREF Notice of Application, ICA Release No. IC–31092, https://www.sec.gov/rules/ic/2014/ic-31092.pdf ..................................... 36

SEC, *Variable Annuities: What You Should Know*, https://www.sec.gov/ investor/pubs/varannty.htm ........................................................ 30

Tara Siegel Bernard, *M.I.T., N.Y.U. and Yale Are Sued Over Retirement Plan Fees*, N.Y. Times, Aug. 9, 2016 .................................... 1

Teresa Hassara, *The 403(b) Lifetime Income Lesson for 401(k) Plans*, Pensions & Investments, Nov. 30, 2015, http://www.pionline.com/ article/20151130/PRINT/311309998/the-403b-lifetime-income-lesson-for-401k-plans ....................................................... 3

TIAA, *Company History*, http://www1.tiaa-cref.org/public/about/ identity/get_to_know_us/company-history/index.html; ......................... 2

TIAA, *Created To Serve. Built To Perform* (2016), https://www.tiaa.org/ public/pdf/about-tiaa/fast-stats.pdf ................................................ 5

TIAA, *CREF Retirement Annuity Accounts: CREF Stock Account, Class R3* (Sept. 30, 2016), https://www.tiaa.org/public/pdf/ffs/194408126.pdf ............................. 31

TIAA, *Is TIAA-CREF a Nonprofit Organization?,* http://www1.tiaa-cref.org/public/support/help/ask_tc/is_tiaa_cref_a_nonprofit.html ..................... 6

TIAA, *Prospectus: College Retirement Equities Fund* (May 1, 2016), http://www.tiaa.org/public/prospectuses/cref_prospectus.pdf?fundcla ss=RPVA .......................................................... 29

TIAA, *TIAA Real Estate Account*, https://www.tiaa.org/public/offer/ products/annuities/retirement-plan-annuities/tiaa-real-estate-account ........................................................... 32

TIAA, *TIAA Real Estate Account Prospectus* (May 1, 2016), https:// www.tiaa.org/public/pdf/realestate_prosp.pdf .................................. 32, 33

TIAA, *Restated Charter of Teachers Insurance and Annuity Association of America,*  art. VIII, § 1, https://www.tiaa.org/public/ pdf/tiaa_charter.pdf ......................................... 6

U.S. Dep't of Educ., Nat'l Ctr. for Educ. Statistics, *Digest of Education Statistics, 2014* (2016), Table 105.50, https://perma.cc/9HJZ-B9T4 .................... 17

Vanguard, Vanguard Funds Multiple Class Plan,
    https://www.sec.gov/Archives/edgar/data/1409957/
    000093247113007109/multipleclassplanvanguardfun.pdf ............................ 24, 25

Vanguard, Vanguard Health Care Fund Prospectus (May 29, 2012),
    https://www.sec.gov/Archives/edgar/data/734383/0000932471120046
    45/specialized485b052012.htm ............................................................................ 40

Vanguard, *Vanguard Institutional Index Fund Prospectus* (2016),
    http://www.vanguard.com/pub/Pdf/i854.pdf.......................................................... 24

Vanguard, *Vanguard REIT Index Fund Prospectus* (May 25, 2016),
    https://www.vanguard.com/pub/Pdf/i3123.pdf ................................................. 32, 33

Vanguard, *Why Ownership Matters*, https://about.vanguard.com/what-
    sets-vanguard-apart/why-ownership-matters/..................................................... 6, 7

*Vendor Consolidation in Higher Education: Getting More from Less*,
    PLANSPONSOR (July 29, 2010), http://www.plansponsor.com/Vendor-
    Consolidation-in-Higher-Education...................................................................... 16

Yale Univ., *Financial Wellness*, http://your.yale.edu/work-yale/benefits/
    financial-wellness.................................................................................................... 7

## INTRODUCTION

In August 2016, Plaintiffs' counsel filed twelve lawsuits, including this one, alleging that prominent universities had breached the fiduciary duties that they owe to their retirement plans under the Employee Retirement Income Security Act ("ERISA").

Plaintiffs' counsel have not been shy about their objectives. In an interview published the day they filed this lawsuit, they told the *New York Times* that they want to force so-called 403(b) plans offered by non-profit institutions of higher learning to be the "same" as 401(k) plans offered by "for-profit companies."[1]

But, as Judge Bolden held in dismissing a 401(k) case last month, "ERISA protects plan participants' reasonable expectations *in the context of the market that exists.*" *Rosen v. Prudential Ret. Ins. & Annuity Co.*, 2016 WL 7494320, at *17 (D. Conn. Dec. 30, 2016) (emphasis added). The statute offers no relief to plaintiffs who "seek to transform the market itself." *Id.*

In our motion to dismiss Plaintiffs' original Complaint, we explained how Plaintiffs had failed to state a claim for breach of fiduciary duty because they had alleged neither failures in Defendants' fiduciary decisionmaking process nor facts from which failures of prudent process could plausibly be inferred. In lieu of an opposition, Plaintiffs amended their Complaint. But their amendments do virtually nothing to address the defects we identified in our original motion. The thrust of Plaintiffs' allegations remains that Yale University should have been among the pi-

---

[1]      Tara Siegel Bernard, *M.I.T., N.Y.U. and Yale Are Sued Over Retirement Plan Fees*, N.Y. TIMES, Aug. 9, 2016 (quoting Jerome J. Schlichter, counsel for Plaintiffs).

oneers of a paradigm shift in university retirement programs. But ERISA requires no such thing, so Plaintiffs' Amended Complaint should be dismissed with prejudice.

## BACKGROUND

### A.    Tax-Deferred Annuity Plans Under I.R.C. § 403(b)

Annuities have formed the backbone of the collegiate retirement system for nearly a century. In 1918, the Carnegie Foundation for the Advancement of Teaching founded the Teachers Insurance and Annuity Association, which is now known as TIAA.[2]

From its founding, TIAA has assured retirement security for university faculties by providing annuities. An annuity is effectively an insurance policy; the issuer agrees to make periodic payments for the life of the policyholder, thereby assuming the risk that the policyholder will outlive her financial resources. In 403(b) plans, annuities have traditionally been structured as agreements between an issuer and a policyholder, which means that the sponsoring institution lacks the right to change the terms after the annuity is funded.[3]

Contributions by charitable organizations toward their employees' annuities were given tax-preferred status by Congress in 1942.[4] In 1958, Congress introduced

---

[2]     TIAA, *Company History*, http://www1.tiaa-cref.org/public/about/identity/get_to_know_us/company-history/index.html.
[3]     Adv. Council on Emp. Welfare & Pension Benefit Plans, *Current Challenges and Best Practices for ERISA Compliance for 403(b) Plan Sponsors* 5, 17, 20 (2011), https://www.dol.gov/sites/default/files/ebsa/about-ebsa/about-us/erisa-advisory-council/2011ACReport1.pdf; *see, e.g.*, Penney Decl. Ex. A (Annuity Contract for Plaintiff Joseph Vellali).
[4]     Revenue Act of 1942, ch. 619, § 162, 56 Stat. 798, 862.

Section 403(b), which defined the amounts that could be contributed to so-called "tax-sheltered annuities."

At that time, many for-profit companies provided defined-benefit pensions for their employees, who were expected to remain with a single company for their entire career. Employees of non-profit organizations, such as universities, needed the flexibility to move between organizations. Annuities offered the guaranteed lifetime income of a pension but with the added benefit of portability, so that non-profit employees could switch institutions without imperiling their retirement.[5]

It was not until 1974 that Congress permitted investments other than annuities, expanding Section 403(b) to permit custodial accounts containing registered mutual funds, in addition to annuities.[6] To this day, however, the prominence of annuities is a defining characteristic of 403(b) plans.[7]

Although both are authorized by the Internal Revenue Code, 403(b) plans differ markedly from 401(k) plans. The latter were authorized only in 1978.[8] In a 401(k) plan, most plan assets must be held in a trust.[9] A 401(k) trust can contain investments not permitted in 403(b) plans, such as separate accounts (investment funds designed exclusively for a single plan) and commingled funds (which are de-

---

[5]     *See, e.g.*, Teresa Hassara, *The 403(b) Lifetime Income Lesson for 401(k) Plans*, PENSIONS & INVESTMENTS, Nov. 30, 2015, http://www.pionline.com/article/20151130/PRINT/311309998/the-403b-lifetime-income-lesson-for-401k-plans (noting that "[t]he most important distinguishing feature of 403(b) plans is that they were designed to provide lifetime income for people in retirement.").

[6]     I.R.C. § 403(b)(7).

[7]     *See* Internal Revenue Serv., *Publication 571: Tax-Sheltered Annuity Plans (403(b) Plans)* 2 (Dec. 21, 2016), https://www.irs.gov/pub/irs-pdf/p571.pdf; Adv. Council, *supra* note 3, at 17, 20.

[8]     Revenue Act of 1978, Pub. L. No. 95–600, 92 Stat. 2763.

[9]     Adv. Council, *supra* note 3, at 39.

3

signed for multiple plans but are not registered mutual funds).[10] And 401(k) plans are *not* centered around annuities, which bring administrative and contractual complexities.[11] Given the regulatory and historical differences between 403(b) and 401(k) plans, the U.S. Secretary of Labor's Advisory Council on Employee Welfare and Pension Benefit Plans has explained that "the 403(b) plan marketplace is unique."[12]

### B.    The Yale University Retirement Account Plan

Yale University (the "University") offers a generous array of benefits to its employees. Among the programs available to eligible employees is the Yale University Retirement Account Plan (the "Plan"). The Plan was created in 1920 (as the Yale University Retirement Annuity Plan) to provide retirement income benefits to the University's faculty and managerial and professional staff.[13] Pursuant to the terms of the Plan, both the University and its Vice President of Human Resources and Administration (currently, defendant Michael A. Peel) are named as fiduciaries. Those fiduciaries have delegated certain functions to other individuals and committees, including the Retirement Plan Fiduciary Committee, which is also named in the Amended Complaint as a Defendant.

Each participant in the Plan has an individual account. The University makes contributions equal to 5% of the participant's eligible salary up to the Social-Security Wage Base (currently $127,200), and 7.5% of eligible salary exceeding that

---

[10]      *Id.* at 10.
[11]      *Id.* at 17, 20, 22.
[12]      *Id.* at 5.
[13]      Penney Decl. Ex. B, at 1 (2009 Form 5500).

threshold, up to the statutory maximum. If participants make additional contributions, the University matches those contributions dollar-for-dollar, up to an additional 5% of the participant's eligible earnings.[14] Participants may choose among three types of investments for their individual accounts:

Fixed Annuity. Fixed annuities are "typically thought of as insurance products." *Lander v. Hartford Life & Annuity Ins. Co.*, 251 F.3d 101, 104 (2d Cir. 2001). These are the products in which "the annuitant receives a guaranteed stream of income for life," *id.*, and the insurer assumes the risk that the annuitant will outlive her life expectancy. The Plan offers fixed annuities through TIAA, the industry leader that provides annuities to more than 16,000 institutions.[15]

Variable Annuity. "Variable annuities are typically characterized as 'hybrid products,' possessing characteristics of both insurance products and investment securities." *Lander*, 251 F.3d at 105. In a variable annuity, the annuitant chooses an investment strategy by choosing from a set of portfolios; the annuitant bears the investment risk of the chosen portfolio, which dictates the size of the payment during the annuity's pay-out phase. During the pay-out phase, the annuity provider again bears the risk that the annuitant will outlive her life expectancy. Variable annuities with nine underlying investment strategies are offered to Plan participants through TIAA, which, in this context, was formerly known as the College Retirement Equities Fund, or CREF.

Mutual Funds. The Plan also offers 104 mutual funds, covering a range of as-

---

[14]     Penney Decl. Ex. C, at 19 (Summary Plan Description).
[15]     TIAA, *Created To Serve. Built To Perform* (2016),
https://www.tiaa.org/public/pdf/about-tiaa/fast-stats.pdf.

set classes, investment styles, and strategies. The mutual fund offerings include Target Date funds, which provide diversified portfolios with an asset allocation that becomes more conservative as the targeted retirement date approaches, as well as funds that focus on broad and specific investment sectors. The Plan offers mutual funds provided by TIAA and Vanguard.

TIAA and Vanguard are recognized industry leaders whose special corporate characteristics make them uniquely suited to serving the interests of Plan participants. TIAA is a wholly owned subsidiary of its Board of Overseers, which is organized as a nonprofit corporation.[16] TIAA is bound by its charter to provide annuities and other products to employees of client institutions "on terms as advantageous to the holders and beneficiaries of such contracts and policies as shall be practicable … *all without profit* to the corporation [TIAA] or its stockholders."[17] TIAA's companion organization, CREF is similarly organized as a nonprofit (Am. Compl. ¶ 72) and offers all of its variable annuity products on an exclusively "at cost" basis.[18]

Vanguard, meanwhile, is "structured as a 'mutual' mutual fund company."[19] Unlike most investment companies, which are owned by the public and thus must charge fees high enough to generate profits for their shareholders, Vanguard is owned by its own mutual funds (and hence by its clients, the investors in those

---

[16]     TIAA, *Is TIAA-CREF a Nonprofit Organization?,* http://www1.tiaa-cref.org/public/support/help/ask_tc/is_tiaa_cref_a_nonprofit.html.

[17]     TIAA, *Restated Charter of Teachers Insurance and Annuity Association of America,* art. VIII, § 1, https://www.tiaa.org/public/pdf/tiaa_charter.pdf (emphasis added).

[18]     CREF, *Statement of Additional Information* 2 (May 1, 2016), http://www.tiaa.org/public/prospectuses/cref_sai.pdf?fundclass=RPVA.

[19]     Vanguard, *Why Ownership Matters,* https://about.vanguard.com/what-sets-vanguard-apart/why-ownership-matters/.

funds). This arrangement "eliminates conflicting loyalties": "[u]nder its agreement with the funds, Vanguard must operate 'at-cost'—it can charge the funds only enough to cover its cost of operations."[20]

As with investments outside the retirement context, investment options within 403(b) plans charge certain fees to plan participants, for investment management and plan administration. Under the Plan, expenses are satisfied through fees that are deducted from the value of the investment options. Nationwide, the average mutual fund charges 0.64% in fees, expressed as an asset-weighted expense ratio.[21] All of the Plan's mutual funds have lower fees than that average—and Plan participants can choose among 32 investment options that charge fees of 0.10% or less, and as low as 0.04%. At a fee level of 0.04%, a participant with a $50,000 account would pay $20 per year in total fees.

Those fees cover the advisory services of the investment managers, as well as the administrative costs of managing the Plan and providing statements and disclosures. Those fees also cover the Plan's dedicated call center and on-campus financial planners, who are available every day to provide one-on-one retirement guidance to Plan participants at no cost.[22]

Plan participants receive detailed disclosures about the Plan and their individual accounts. Consistent with the requirements of ERISA, participants are provided with annual statements detailing the menu of investment options, including

---

[20]    *Id.*
[21]    Morningstar, *2015 Fee Study: Investors Are Driving Expense Ratios Down* (2015), https://news.morningstar.com/pdfs/2015_fee_study.pdf.
[22]    Yale Univ., *Financial Wellness*, https://your.yale.edu/work-yale/benefits/financial-wellness.

the fees associated with each investment option and its historical performance, along with instructions for accessing the prospectus for each investment option if they want even more information.[23] Whenever the characteristics of the Plan change, they receive supplemental notices.[24] And they receive quarterly statements with the details about their own individual portfolios. Until 2015, TIAA and Vanguard provided separate statements to Plan participants who invested in their respective products. Am. Compl. ¶ 103.  In 2015, the University completed a process of consolidating the recordkeeping function. TIAA now maintains the records for all investments, including those offered by Vanguard.

### C.    Plaintiffs' Complaint and Amended Complaint

Plaintiffs Joseph Vellali et al. ("Plaintiffs") filed this action on August 9, 2016, within 10 days of similar filings by the same lawyers against Columbia University, Cornell University, Duke University, Emory University, Johns Hopkins University, the Massachusetts Institute of Technology, New York University, Northwestern University, the University of Pennsylvania, the University of Southern California, and Vanderbilt University.[25] After Defendants moved to dismiss the Complaint, Plaintiffs amended their Complaint.

---

[23]     *See* 29 C.F.R. § 2550.404a–5(c); *see, e.g.*, Penney Decl. Ex. D (Plan and Investment Notice).

[24]     *See* 29 C.F.R. § 2550.404a–5(c)(1)(ii); *see, e.g.*, Penney Decl. Exs. E–H (Notices of Share Class Changes).

[25]     *See Cates v. Trs. of Columbia Univ.*, No. 1:16–cv–06524–AT (S.D.N.Y.); *Cunningham v. Cornell Univ.*, No. 1:16–cv–06525–PKC (S.D.N.Y.); *Clark v. Duke Univ.*, No. 1:16–cv–01044 (M.D.N.C.); *Henderson v. Emory Univ.,* No. 1:16–cv–02920–MHC (N.D. Ga.); *Kelly v. Johns Hopkins Univ.*, No. 1:16–cv–02835–GLR (D. Md.); *Tracey v. Mass. Inst. of Tech.,* No. 16–cv–11620 (D. Mass.); *Sacerdote v. N.Y. Univ.*, No. 1:16–cv–06284 (S.D.N.Y.); *Divane v. Nw. Univ.*, No. 1:16–cv–08157 (N.D. Ill.); *Munro v. Univ. of S. Cal.*, No. 2:16–cv–06191 (C.D. Cal.); *Sweda v. Univ. of Pa.*, No. 2:16–cv–04329–GEKP (E.D. Pa.); *Cassell v. Vanderbilt Univ.*, No. 3:16–cv–02086 (M.D. Tenn.).

The Amended Complaint alleges four improper practices by the University[26]:

*First*, Plaintiffs allege that the University's agreement with TIAA improperly bound the University to offer participants the opportunity to invest in two of TIAA's variable annuities and to use TIAA as a recordkeeper. Am. Compl. ¶¶ 111–21.

*Second*, Plaintiffs allege that the University permitted unreasonable administrative fees to be assessed against the accounts of plan participants. Am. Compl. ¶¶ 122–38.

*Third*, Plaintiffs allege that the University offered investment options with excessive fees, and that it offered two investment funds—the CREF Stock Account and the TIAA Real Estate Account—that supposedly underperformed. Am. Compl. ¶¶ 139–201.

*Fourth*, Plaintiffs allege that the University and Mr. Peel breached their fiduciary duties by failing to monitor individuals who had been appointed to administer the Plan. Am. Compl. ¶¶ 257–64.

Plaintiffs allege that the practices they describe (other than the alleged failure to monitor) both violated Defendants' fiduciary duty of prudence under Section 404 of ERISA (29 U.S.C. § 1104(a)(1)(B)) and constituted prohibited transactions under Section 406 (*id.* § 1106(a)(1)).

## ARGUMENT

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ash-*

---

[26]     Except where indicated, references herein to the University include Mr. Peel and the Retirement Plan Fiduciary Committee as well.

*croft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). The "plausibility" standard is satisfied only if a complaint alleges "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* "[T]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.*

In ruling on a motion to dismiss, a court may consider "facts stated in the complaint," materials "incorporated in the complaint by reference," or "matters of which judicial notice may be taken under Fed. R. Evid. 201." *Kramer v. Time Warner, Inc.*, 937 F.2d 767, 773 (2d Cir. 1991). As relevant here, the Court may consider documents integral to the Plan and public disclosure documents required by law. *See, e.g.*, *id.* at 773–74 (permitting consideration of public disclosures); *Winfield v. Citibank, N.A.*, 842 F. Supp. 2d 560, 568 n.3 (S.D.N.Y. 2012) (plan and summary plan description are integral to ERISA cases).

Plaintiffs' Amended Complaint demonstrates that, despite two tries, they cannot state a claim for a violation. What is more, Plaintiffs had knowledge of the facts underlying their claims more than three years before filing suit, so their claims are barred by ERISA's statute of limitations.

## I.   Plaintiffs Have Failed To State A Claim For Breach Of Fiduciary Duty.

To begin, the Complaint fails to state a claim on the merits for breach of the duty of prudence. Motions to dismiss duty-of-prudence claims are a crucial "mechanism for weeding out meritless [ERISA] claims," requiring "careful judicial consid-

10

eration of whether the complaint states a claim that the defendant has acted imprudently." *Fifth Third Bancorp. v. Dudenhoeffer*, 134 S. Ct. 2459, 2471 (2014). "'Prudence,' as required by ERISA, 'is measured according to the objective prudent person standard developed in the common law of trusts.'" *Chao v. Merino*, 452 F.3d 174, 182 (2d Cir. 2006). The duty looks to what "a prudent man acting in a *like capacity* and familiar with such matters would [do] in the conduct of an *enterprise of a like character and with like aims*." 29 U.S.C. § 1104(a)(1)(B) (emphases added). So long as the fiduciary's conduct is reasonable "under the circumstances then prevailing," "ERISA does not impose a duty to take any particular course of action if another approach seems preferable." *Merino*, 452 F.3d at 182.

ERISA's duty of prudence "'focus[es] on a fiduciary's conduct in arriving at an investment decision, not on its results, and ask[s] whether a fiduciary employed the appropriate *methods* to investigate and determine the merits of a particular investment.'" *PBGC ex rel. St. Vincent Catholic Med. Ctrs. Ret. Plan v. Morgan Stanley Inv. Mgmt. Inc.*, 712 F.3d 705, 716 (2d Cir. 2013) (emphasis added) (quoting *In re Unisys Sav. Plan Litig.*, 74 F.3d 420, 434 (3d Cir. 1996)).

Ordinarily, then, a claim for breach of fiduciary duty must allege shortcomings in the fiduciary's *processes* that led the fiduciary to deviate from industry customs. A complaint that lacks "allegations relating directly to the methods employed by the ERISA fiduciary" may survive a motion to dismiss only "if the court, based on circumstantial factual allegations, may reasonably 'infer from what is alleged that the process was flawed.'" *St. Vincent*, 712 F.3d at 718, 727 (quoting *Braden v. Wal-*

11

*Mart Stores, Inc.*, 588 F.3d 585, 596 (8th Cir. 2009)).

Like the original Complaint, the Amended Complaint contains no allegations about the University's fiduciary process. Nor, for that matter, do Plaintiffs plausibly allege an inference of inferior process: Plaintiffs' counsel have effectively conceded the absence of any breach of fiduciary duty under ERISA by making the same allegations against virtually an entire peer group of universities, thereby demonstrating "the context of the market that exists." *Rosen*, 2016 WL 7494320, at *17. Their allegations that fiduciaries to university 403(b) plans should have made certain decisions supposedly favored by fiduciaries to corporate 401(k) plans thus fail to state a claim for fiduciary breach as a threshold matter. *See* 29 U.S.C. § 1104(a)(1)(B) (requiring fiduciaries to act as would others acting in an "enterprise of a like character and with like aims"); Adv. Council, *supra* note 3 (cataloging the differences between 403(b) and 401(k) plans).[27] And each of Plaintiffs' individual theories fails for separate reasons, as well.

### A.  Plaintiffs' "Locking In" Claim Fails.

Plaintiffs first allege, in Count I, that the University breached its fiduciary duty by agreeing to include certain TIAA investments in the Plan and to employ

---

[27]  Plaintiffs acknowledge that 401(k) and 403(b) plans have "historical differences" and different "investment limitations," but argue that the fiduciary duties applicable to 401(k) and 403(b) administrators are the same because the two types of plans "have the same fundamental purpose." Am. Compl. ¶ 67. The question whether 403(b) administrators must act as would prudent 401(k) administrators in a different context presents a legal question that cannot be papered over with conclusory allegations. In any event, Congress has decided to specify different ground rules for the plans, and the Advisory Council on Employee Welfare and Pension Benefit Plans has characterized the "403(b) plan marketplace" as "unique." *See* note 3, *supra*. Those considerations disprove Plaintiffs' suggestion that they may disregard the differences between 401(k) and 403(b) plans.

TIAA as recordkeeper for those investments. According to Plaintiffs, this locked the Plan into an "imprudent arrangement" where the University could no longer remove the TIAA investments from the Plan and could not switch recordkeepers if it wished to do so. Am. Compl. ¶ 210.

Contrary to Plaintiffs' assertions, however, there is nothing imprudent about a plan's contracting with a vendor that bundles investment options together with recordkeeping services for those investments. Bundled arrangements are "common and acceptable investment industry practices that frequently inure to the benefit of ERISA plans." *Tussey v. ABB, Inc.*, 746 F.3d 327, 336 (8th Cir. 2014) (internal quotation marks omitted). The question is simply whether the overall decision to enter into the agreement is prudent—and Plaintiffs have not alleged any facts suggesting that the bundled arrangement here was imprudent. While Plaintiffs allege that the bundled agreement required the Plan to offer the CREF Stock Account as an investment (Am. Compl. ¶ 112), that does not suggest that the agreement was imprudent because, as we explain *infra* at pp. 29-31, they do not plausibly allege that the CREF Stock Account was an imprudent investment.

At bottom, Plaintiffs are simply taking issue with TIAA's decision to offer its investment products and recordkeeping services as a package deal. That is insufficient to support a breach of fiduciary duty claim: Plaintiffs cannot show that it was imprudent for the University to do business with TIAA on those terms, as countless other 403(b) plans did.[28]

---

[28]     Plaintiffs' allegation that the University "allowed TIAA's financial interest to dictate the Plan's investment selections" by agreeing to the bundled arrangement (Am. Compl.

### B.    Plaintiffs' Administrative Fees Claim Fails.

In Count III, Plaintiffs allege that the University breached its fiduciary duty by overpaying for recordkeeping services. This count encompasses three related allegations: (1) that the Plan should not have permitted its recordkeepers to be paid through revenue sharing: (2) that the Plan should not have permitted TIAA and Vanguard to maintain separate records for their own accounts; and (3) that the overall costs of recordkeeping were excessive. But none of these allegations raises any inference of fiduciary misconduct. On the contrary, Plaintiffs' allegations show that Defendants' practices were in line with common industry practices.

### 1.    Revenue sharing is a common industry practice that has survived numerous legal challenges by Plaintiffs' counsel.

Plaintiffs first allege that the University acted imprudently by using a revenue-sharing arrangement to compensate the Plan's recordkeepers.

As the Amended Complaint alleges, in a revenue-sharing arrangement, "a mutual fund pays a portion of its expense ratio to the entity providing administrative and recordkeeping services to a plan." Am. Compl. ¶ 46. In other words, instead of paying the fee in a separate transaction, revenue sharing permits a recordkeeper to be paid from the assets under management, traditionally as a percentage of its assets-under-management. Although Plaintiffs *say* that they are not claiming that revenue sharing is "a *per se* violation of ERISA" (*id.* ¶ 55), that is effectively what they are arguing. Their position is that, although they do not object to the use of

---

¶ 113) is implausible in light of TIAA's not-for-profit structure. As explained *supra*, at p. 6, TIAA earns no profit and operates on an "at cost" basis.

revenue sharing as a mechanism for paying expenses, a fiduciary violates ERISA by setting a price for recordkeeping on anything other than "a flat per-participant basis." *Id.* ¶ 57.

But Plaintiffs may not use ERISA to "transform the market itself by challenging the very framework of revenue sharing in this industry." *Rosen*, 2016 WL 7494320, at *17. "[C]ourts across the country have generally found that the practice of revenue-sharing does not, in principle, constitute an ERISA violation." *Id.* at *10. They have acknowledged that revenue sharing in retirement plans "violates no statute or regulation" (*Hecker v. Deere & Co.*, 556 F.3d 575, 585 (7th Cir. 2009)), but, rather, is a "common and 'acceptable' investment industry practice[] that frequently inure[s] to the benefit of ERISA plans" (*Tussey*, 746 F.3d at 336). Courts have likewise rejected Plaintiffs' particular theory that recordkeeping must be valued on a per-participant basis (rather than as a percentage of plan assets). *Renfro v. Unisys Corp.*, 671 F.3d 314, 326–28 (3d Cir. 2011); *White v. Chevron Corp.*, 2016 WL 4502808, at *14 (N.D. Cal. Aug. 29, 2016).

Plaintiffs' claim here is no different, and their previously rejected challenge to a common industry funding mechanism does not support an inference that Plan fiduciaries employed an inadequate process.

### 2. Defendants' use of multiple recordkeepers also fails to support an inference of a flawed decision-making process.

Plaintiffs also allege that the Plan overpaid for recordkeeping services because, until 2015, it permitted TIAA and Vanguard to maintain separate records for their own funds. Plaintiffs allege, categorically, that "multiple recordkeeper plat-

15

forms are inefficient and result in excessive fees." Am. Compl. ¶ 124.

Once again, however, Plaintiffs assail a common industry practice—as even the authorities cited by Plaintiffs confirm. "The traditional 403(b) plan has historically been implemented through a multi-provider recordkeeper platform."[29] That arrangement remains "[t]he most prevalent model by far."[30] Moreover, as Plaintiffs' own sources again explain, there are often good reasons to offer participants two or more choices of recordkeeper, because achieving economies of scale and offering participants a choice of providers are not mutually exclusive goals. On the contrary, "[a] move to **two vendors** can allow for centralized remitting of participant data and contributions, integrated communications and education programs, simplified investment offerings, 403(b) audit support, and integrated compliance services while still providing participants with the choice they value."[31]

Plaintiffs endeavor to show that other universities transitioned to using a single recordkeeper for their 403(b) plans earlier than Yale, but their efforts are unavailing. They rely primarily on the examples of four universities (Loyola Marymount, Pepperdine, Purdue, and Caltech) that consolidated to a single recordkeeper around 2009–2010. Am. Compl. ¶¶ 83–87. But citing four universities out of the

---

[29]     AonHewitt, *How 403(b) Plans Are Wasting Nearly $10 Billion Annually, and What Can Be Done to Fix It*, at 3 (Jan. 2016), https://retirementandinvestmentblog.aon.com/getattachment/36ff81a4-db35-4bc0-aac1-1685d2a64078/How_403(b)_Plans_are_Wasting_Nearly_$10_Billion_Annually_Whitep; *see* Am. Compl. ¶ 95.

[30]     Standard Retirement Servs., Inc., *Fixing Your 403(b) Plan: Adopting a Best Practices Approach*, at 2 (Nov. 2009), https://www.standard.com/pensions/publications/fixing_your_403b.pdf; *see* Am. Compl. ¶ 157.

[31]     *Vendor Consolidation in Higher Education: Getting More from Less*, PLANSPONSOR (July 29, 2010), http://www.plansponsor.com/Vendor-Consolidation-in-Higher-Education (emphasis added); *see* Am. Compl. ¶ 98.

more than *three thousand* four-year institutions in the United States[32] does next to nothing to meet Plaintiffs' burden of showing that the University acted differently from prudent plans of "like character"—particularly given that Plaintiffs' counsel is currently suing *eleven* other universities for also using multiple recordkeepers. *See* n.25, *supra*.

Moreover, Plaintiffs' examples themselves demonstrate that the four universities were outliers—and not part of an industry-wide trend that Yale had missed. Tellingly, in the review of Purdue's plan redesign cited by Plaintiffs, Purdue acknowledged that *"[n]o higher education institution of Purdue's size and level of assets ha[d] implemented a single service provider/open architecture structure."*[33] Purdue's plan and Yale's plan are almost exactly the same size.[34] *Ipso facto*, Yale was not an outlier.

Likewise, the AonHewitt study of university plan redesigns touted by Plaintiffs noted that, while Purdue and other universities had "implement[ed] a single recordkeeper model to make it easier to comply with [Section] 403(b) regulations," other universities, including the University of Texas, the University of Washington, and the University of Oklahoma, had retained multiple recordkeepers even after

---

[32]     U.S. Dep't of Educ., Nat'l Ctr. for Educ. Statistics, *Digest of Education Statistics, 2014* (2016), Table 105.50, https://perma.cc/9HJZ-B9T4.

[33]     James S. Almond, Purdue Univ., *403(b) Plan Redesign–Making a Good Retirement Plan Better* at 9, http://www.cacubo.org/wp-content/uploads/2016/02/10_403b_Plan_Redesign_Making_a_Good_Retirement_Plan_Better.docx; *see* Am. Compl. ¶ 86.

[34]     *Compare id.* at 2 (Purdue, circa 2008, served 15,000 participants with combined assets of $2 billion), *with* Penney Decl. Ex. B, at 2 & sch. H, (2009 Form 5500) (Yale, in June 2009, served 13,631 participants with combined assets of $1.95 billion).

17

taking some steps to consolidate their recordkeeping.[35]

In any event, Plaintiffs' other allegations demonstrate that fiduciaries to Yale's Plan had a process in place for evaluating and managing recordkeeping expenses. As the Complaint alleges, the University ultimately did decide to transition to a single recordkeeper. Am. Compl. ¶ 127. This change demonstrates that the University had appropriate processes in place to evaluate the advantages and disadvantages of different recordkeeping arrangements and to make changes as needed. *Cf. Chevron*, 2016 WL 4502808, at *14 (changes to recordkeeping arrangement "suggest[ed] that [fiduciaries] were monitoring recordkeeping fees to ensure that they did not become unreasonable"); *Laboy v. Bd. of Trs. of Building Serv. 32 BJ SRSP*, 2012 WL 3191961, at *3 (S.D.N.Y. Aug. 7, 2012) ("[A] decision to change … will not sustain allegations that the [previous arrangement] was an imprudent choice."), *aff'd*, 513 F. App'x 78 (2d Cir. 2013) (summary order).

### 3.   Plaintiffs' allegation that the fees were too high is disproven by the disclosure on which they purport to rely.

Because neither the Plan's use of revenue sharing nor its use of two recordkeepers suggests impropriety, the real gist of Plaintiffs' recordkeeping claim is that recordkeeping costs were too high.

In view of the parallels between ERISA's fiduciary duty to monitor fees and the fiduciary obligations prescribed by the Investment Company Act when investment advisers set mutual fund fees (15 U.S.C. § 80a–35(b)), in considering a motion

---

[35]   Hewitt EnnisKnupp, *403(b) Plan Redesign Working Paper: University of Notre Dame* at 4 (Feb. 2014), https://workplacecontent.fidelity.com/bin-public/070_NB_PreLogin_Pages/ documents/ND_403(b)%20Plan%20Redesign%20White%20Paper.pdf; *see* Am. Compl. ¶ 89.

to dismiss, courts within the Second Circuit "consider the standard for excessive fee claims articulated in the context of the Investment Company Act ('ICA') useful for reviewing [a] claim that excessive fees violated ERISA." *Young v. GM Inv. Mgmt. Corp.*, 325 F. App'x 31, 33 (2d Cir. 2009) (Sotomayor, J.); *accord Laboy*, 513 F. App'x at 80 n.4. Under the ICA standard, to give rise to an excessive fees claim, "the adviser-manager must charge a fee that is so disproportionately large that it bears no reasonable relationship to the services rendered and could not have been the product of arm's-length bargaining." *Gartenberg v. Merrill Lynch Asset Mgmt.*, 694 F.2d 923, 928 (2d Cir. 1982); *see Jones v. Harris Assocs. L.P.*, 559 U.S. 335, 345–46 (2010) (endorsing *Gartenberg*); *see also Laboy*, 513 F. App'x at 80 (suggesting that plausible allegations of self-dealing dictate whether a plaintiff can state a claim that a fiduciary exposed an ERISA plan to excessive fees).

Plaintiffs face a hefty burden to allege plausibly that Yale overpaid its non-profit-seeking service provider.  Yet, nothing in the Amended Complaint plausibly alleges such a disconnect between the services that the Plan received and what it paid for those services. For one thing, the Amended Complaint does not allege what services the Plan received. Plaintiffs acknowledge that they have "information currently available to [them] regarding the Plan's features," but they do not allege what that information is (Am. Compl. ¶ 133)—even though we identified this exact same defect in our motion to dismiss the original Complaint (ECF No. 52–1, at 19). They plainly cannot "allege that the fees were excessive *relative 'to the services rendered*,'" as they must (*Young*, 325 F. App'x at 33), without identifying the services.

19

On the costs side of the ledger, Plaintiffs allege that "the Plan paid between $3.8 million and $4.3 million" for recordkeeping services each year, "[b]ased on schedules regarding service provider compensation in the Plan's Forms 5500 filed with the Department of Labor, and upon information regarding the rate of internal revenue share allocated to each of the Plan's recordkeepers from their proprietary investment options." Am. Compl. ¶ 134. But the Forms 5500 demonstrate that Plaintiffs are mistaken. *First*, the Forms 5500 confirm that the Plan paid nothing in direct expenses for recordkeeping services.[36] *Second*, the Forms 5500 do not disclose indirect compensation levels, because such disclosures are not required when a service provider receives only indirect compensation.[37] *Third*, the Forms 5500 contradict Plaintiffs' supposed calculations of revenue sharing. Plaintiffs purport to be calculating revenue sharing based on the investment options offered by the Plan, but the Forms 5500 show that Plaintiffs are mistaken even about which investment options were available to plan participants.[38] *Finally*, contrary to Plaintiffs' allegation that the University failed to negotiate "'plan pricing' rebates … based on the Plan's economies of scale" (Am. Compl. ¶ 135), the Forms 5500 demonstrate that the University *did* negotiate millions of dollars worth of rebates:

> As a result of the University's negotiations with TIAA CREF regarding its fees, $1.9 million and $3.7 million was returned to the Plan as deposits into the [Revenue Credit Account] for the year ended June 30, 2014 and

---

[36]   *E.g.*, Penney Decl., Ex. B, at B–7 (Form 5500).

[37]   *Id.*

[38]   *Compare, e.g.*, Am. Compl. ¶¶ 130, 146 (asserting that the Plan offered retail-class TIAA mutual funds that contained up to 0.25% in revenue sharing), *with* Penney Decl. Ex. B, at B–36 (Form 5500) (showing that the Plan offered only the institutional class funds that Plaintiffs allege they should have offered).

June 30, 2013, respectively.[39]

Far from demonstrating that recordkeeping costs were "so disproportionately large" that one can plausibly infer a breakdown of process, the Forms 5500 support only the opposite inference—that the University had appropriate processes in place to monitor fees. Allegations made based on Plaintiffs' sloppy due diligence do not "unlock the doors of discovery." *Iqbal*, 556 U.S. at 678.[40]

### C.  Plaintiffs' Investment Fees Claim Fails.

In Count V, Plaintiffs allege that the University breached its fiduciary duties (1) by offering mutual funds that were too expensive; (2) by offering CREF variable annuities that charged fees they believe were unnecessary; (3) by offering too many investment options; and (4) by offering the CREF Stock Account and the TIAA Real-Estate Account, which they allege to have been underperformers. None of those allegations states a plausible claim of fiduciary breach.

### 1.  Plaintiffs do not adequately allege that the University failed to monitor investment fees.

Plaintiffs first seek to impose liability on the University for allegedly failing to include the lowest-fee options within the mutual-fund menu.

There should be little doubt, however, that the University was attentive to fees and offered low-cost options. Fiduciaries satisfy their duties under ERISA by

---

[39]     Penney Decl. Ex. B, at B–30 (Form 5500).

[40]     Hedging their bets, Plaintiffs allege that "[t]o the extent" that the University obtained rebates, it failed to determine "whether the rebates were reasonable" by pricing the services through "competitive bidding." Am. Compl. ¶ 135. But that allegation fails to state a claim: "nothing in ERISA compels periodic competitive bidding" (*White v. Chevron Corp.*, 2016 WL 4502808, at *14 (N.D. Cal. Aug. 29, 2016)), and Plaintiffs' other allegations show that the process the University did use was appropriately designed to track recordkeeping fees and keep them reasonable.

21

"offer[ing] participants meaningful choices about how to invest their retirement savings," a standard that accounts for "the range of investment options and the characteristics of those included options—including the risk profiles, investment strategies, and associated fees." *Renfro*, 671 F.3d at 327. The standard is thus whether a fiduciary has given "'appropriate consideration' to whether an investment 'is reasonably designed, as part of the portfolio … to further the purposes of the plan, taking into consideration the risk of loss and the opportunity for gain (or other return) associated with the investment.'" *St. Vincent*, 712 F.3d at 716 (quoting 29 C.F.R. § 2550.404a–1(b)(2)(i)).

Plaintiffs' myopic focus on price alone has been rejected by other courts, which have recognized that:

> where, as here, a plan offers a diversified array of investment options, the fact that some other funds might offer lower expense ratios is not relevant, as ERISA does not require fiduciaries to scour the market to find and offer the cheapest possible funds (which might, of course, be plagued by other problems).

*Chevron*, 2016 WL 4502808, at *10 (citations and internal quotation marks omitted). Applying that standard, the Third Circuit affirmed the dismissal of a claim challenging the inclusion of retail mutual funds because the expense ratios ranged from 0.10% to 1.21%. *Renfro*, 671 F.3d at 319, 327–28. The Seventh Circuit affirmed the dismissal of a similar claim, where the fees ranged from 0.07% to "just over 1%." *Hecker*, 556 F.3d at 586; *accord Loomis v. Exelon Corp.*, 658 F.3d 667, 671 (7th Cir. 2011); *cf. Braden*, 588 F.3d at 596 (acknowledging that a fiduciary might "have chosen funds with higher fees for any number of reasons, including potential for higher

return, lower financial risk, more services offered, or greater management flexibility"). Here, the fees on the mutual-fund options range from 0.04% to 0.81%, with 31 options charging 0.10% or less. That alone guts Plaintiffs' allegation that Defendants breached the duty of prudence by offering retail share classes. *See Rosen*, 2016 WL 7494320, at *15 (granting motion to dismiss excessive fees claim because, "[t]aken as a whole, the total menu of investment options resulted in expense ratios ranging from 0.04% to 1.02%.").

Moreover, Plaintiffs' premise that fiduciaries can secure "identical" investment options at lower cost simply by asking is not true. As Judge Easterbrook has explained, there are price differences between retail and institutional investments because different types of customers require different services:

> The expenses of retail funds derive in large measure from the need to deal with investors one at a time: to receive and mail small checks, to print and mail individual prospectuses and account statements, frequently to exchange modest sums from one fund to another, and so on. Expenses per dollar under management necessarily are higher if the average account is $100,000 than if it is $100,000,000. Hertz gets a fleet discount from General Motors when it orders 10,000 cars at a time, but Hertz does not secure fleet discounts for members of its #1 Club to buy their own GM cars; retail transactions occur at retail prices. So too with retail transactions in mutual funds.

*Loomis*, 658 F.3d at 672. Consistent with Judge Easterbrook's expectation, whereas Vanguard includes the costs of recordkeeping in its retail share classes, its prospectus explains that "Vanguard may charge additional recordkeeping fees for institu-

23

tional clients whose accounts are recordkept by Vanguard."[41] Thus, merely alleging the *existence* of lower-cost institutional share classes does not suggest that Defendants' management processes were flawed: a fiduciary could easily conclude that offering retail share classes was a better option than offering institutional share classes that would have provided fewer services. *See, e.g.*, *Laboy v. Bd. of Trs. of Building Service 32 BJ SRSP*, 2012 WL 701397, at *2 (S.D.N.Y. Mar. 6, 2012) (dismissing claim that plan's default fund charged excessive fees because plaintiff "has … failed to allege facts indicating that the Default Fund fees were excessive in light of the services rendered").[42]

In short, Plaintiffs' allegations say nothing to suggest that the University undertook an imprudent process in developing the menu of investment options. Moreover, when accounting for judicially noticeable documents, any suggestion of imprudent process is shown to be false. In 2011, 2013, 2014, and 2016, the University apprised plan participants that more than three dozen funds had been moved to

---

[41]    Vanguard, *Vanguard Institutional Index Fund Prospectus* 21 (2016), http://www.vanguard.com/pub/Pdf/i854.pdf.

[42]    Plaintiffs' allegation that the lower-cost share classes were "readily available to the Plan" (Am. Compl. ¶ 142) is therefore irrelevant. Even assuming Plaintiffs are correct that the Plan could have invested in institutional share classes at all relevant times, the Plan could have prudently concluded that retail share classes were a superior option.

That said, Plaintiffs' suggestion that the Plan could have obtained access to lower-cost share classes simply by demanding them from Vanguard is without foundation. Plaintiffs cite a Vanguard share class plan filed with the SEC to suggest that Vanguard would have allowed access to the lowest-cost share classes due to the "economies" of the Plan's size, but that quotation from the filing refers only to when Vanguard will aggregate multiple accounts owned by a single investor for purposes of determining eligibility for a share class. *See* Vanguard Funds Multiple Class Plan at 19, https://www.sec.gov/Archives/edgar/data/1409957/000093247113007109/ multipleclassplanvanguardfun.pdf. It does not imply that Vanguard will break the rules of its share classes for any client with large assets.

less-expensive share classes.[43] Indeed, by the time Plaintiffs filed their Amended Complaint, of the 88 alleged investment options with supposedly excessive fees, only six were actually offered to Plan participants—and Plaintiffs misstated the expense ratio for four of those six funds.[44] In many cases—*including the first 32 entries in Plaintiffs' spreadsheet*—the Plan actually offers a fund that is *less* expensive than the "Identical Lower-Cost Mutual Fund" proposed by Plaintiffs.[45]

Thus, Plaintiffs' empty accusations of inattentiveness are provably false, and their claim of excessive fees falls far short of their burden.[46]

### 2. Plaintiffs' allegations regarding the "layers of fees" in CREF investments fail to state a claim.

Plaintiffs relatedly allege that the CREF variable annuities offered by the Plan charged several "layers" of fees that they argue were either unreasonable or unnecessary. CREF's total fees are attributable to (a) recordkeeping, (b) distribution, (c) mortality and expense risk, and (d) investment management. Plaintiffs, in turn, have a grievance about each of those components. They allege (a) that the recordkeeping fees should have been per-participant instead of pro rata; (b) that distribution fees paid for marketing services they did not need; (c) that the mortality and expense risk fee—of 0.005% per year—does not benefit plan participants who

---

[43]    Penney Decl. Ex. E (2011); Ex. F (2013); Ex. G (2014); Ex. H (2016).

[44]    *Compare* Am. Compl. ¶ 146, *with* Penney Decl. Ex. D (Plan and Investment Notice).

[45]    *Id.*

[46]    One of the named Plaintiffs alleges that he remains invested in a fund that is available in a less expensive share class. Plaintiff Vellali claims that he was entitled to invest in the "institutional plus" share class of the Vanguard Developed Markets Index. But, as Vanguard has explained in SEC filings, "institutional plus" shares "generally require a minimum initial investment and ongoing account balance of $100,000,000," among other requirements. Vanguard Funds Multiple Class Plan, *supra* note 42, at 18. As of June 2015, the Plan had a balance of $9.1 million—a small fraction of the required minimum. *See* Penney Decl., Ex. I, at I-43 (2015 Form 5500).

ultimately opt for a lump-sum payment of their benefits; and (d) that investment management fees should have included tiered discounts for large accounts. Am. Compl. ¶ 117.

Plaintiffs notably do *not* allege that CREF offered equivalent products at a lower cost—or that any other annuity provider did, either. Again, Plaintiffs cannot state a claim by wishing that the market were more to their liking. They must demonstrate that fiduciaries to other, comparable plans—*i.e.*, plans offered by Yale's peer institutions—would have acted differently. But their lower-fees wish list has no basis in the real market; they thus cannot pursue market reforms on the shoulders of the universities they have chosen to target.

> ### 3.   Plaintiffs' allegation that the Plan offered too many options fails to state a claim.

Next, Plaintiffs argue that the Plan offered participants too many options. They allege that, if the Plan had offered participants fewer choices of funds, it could have lowered its costs (Am. Compl. ¶ 153) and avoided "unnecessary complexity [in] the investment lineup," which Plaintiffs allege caused "confusion" (*id.* ¶ 157) and "decision paralysis" (*id.* ¶ 159) for Plan participants.

But the suggestion that Plan participants would have benefited from *less* choice is anathema to the free choice that is the hallmark of ERISA plans. "Because participant choice is the centerpiece of what ERISA envisions for defined-contribution plans, these sorts of paternalistic arguments have had little traction in the courts." *Tibble v. Edison Int'l*, 729 F.3d 1110, 1134–35 (9th Cir. 2013), *vacated and remanded on other grounds*, 135 S. Ct. 1823 (2015). Indeed, courts have *en-*

26

*couraged* rather than *penalized* increased choice. Choice is important because different investment vehicles have different features and characteristics that will make them attractive to different investors. *See id.* at 1135; *Loomis*, 658 F.3d at 671–72; *Hecker*, 556 F.3d at 586. Thus, the number of investment options offered by the Plan does not in any way suggest that Defendants' investment-management process was inadequate.

### 4.    Plaintiffs' underperformance claims fail.

Among more than one hundred investment options in the Plan, Plaintiffs allege that two should have been removed from the Plan for underperformance—the CREF Stock Account and the TIAA Real Estate Account. Plaintiffs do not state a claim for relief with respect to either.

"It is well-established that allegations of poor results alone do not constitute allegations sufficient to state a claim for" breach of fiduciary duty. *Laboy*, 513 F. App'x at 80. That is because "[t]he test of prudence is … one of conduct rather than results." *In re Citigroup ERISA Litig.*, 662 F.3d 128, 140 (2d Cir. 2011).

A plaintiff faces a particularly high bar when alleging that public information should have prompted fiduciaries to remove an investment option that was available on the open market. As the Supreme Court recently recognized, differences in performance between investment vehicles are the result of differences in investment structures and risk profiles—not questions of prudence and imprudence. *Dudenhoeffer*, 134 S. Ct. at 2471–72. In so holding, the Court credited the efficient market hypothesis—the theory that investors vote with their feet, such that investments in securities reflect the consensus of the market that the securities have

27

the prescribed value. *Id.*; *see also Rinehart v. Lehman Bros. Holdings Inc.*, 817 F.3d 56, 66 (2d Cir. 2016) (per curiam). The Court emphasized that a fiduciary need not "'outsmart a presumptively efficient market,'" in which the actions of other self-interested investors confirm the prudence and appropriate pricing of particular investment options. *Dudenhoeffer*, 134 S. Ct. at 2472 (quoting *White v. Marshall & Isley Corp.*, 714 F.3d 980, 992 (7th Cir. 2013)).

Moreover, looking after the fact at the performance of an investment as the measure of whether the fiduciary was prudent is inappropriate. "[A] fiduciary's obligation is to exercise care prudently and with diligence under the circumstances then prevailing"; thus, "his actions are not to be judged from the vantage point of hindsight." *Merino*, 452 F.3d at 182 (internal quotation marks and citations omitted). Put differently, "ERISA's 'fiduciary duty of care ... requires prudence, not prescience.'" *Rinehart*, 817 F.3d at 63–64 (quoting *St. Vincent*, 712 F.3d at 716). Therefore, ERISA does not fault fiduciaries for failing to outguess the market or for retaining investments that underperformed the market. *Dudenhoeffer*, 134 S. Ct. at 2471–72.[47]

Under this standard, claims against funds that have *lost* much of their principal are routinely dismissed. *E.g., St. Vincent*, 712 F.3d at 721; *Jenkins*, 444 F.3d at 926; *DeBruyne v. Equitable Life Assur. Soc'y of U.S.*, 920 F.2d 457, 465 (7th Cir.

---

[47]    Indeed, as one court has noted, "a fiduciary may—and often does—retain investments through a period of underperformance as part of a long-range investment strategy." *Chevron*, 2016 WL 4502808, at *17; *see also, e.g., Jenkins v. Yager*, 444 F.3d 916, 926 (7th Cir. 2006) (defendant did not breach fiduciary duties by retaining the same mutual funds in 401(k) plan lineup even though those funds lost money over a three-year period, because it can be reasonable "to stay with ... mutual funds even during years of lower performance").

1990) ("We cannot say that Equitable was imprudent merely because the Balanced Fund lost money."). Plaintiffs' challenges to the CREF Stock Account and the TIAA Real Estate Account—both of which have appreciated considerably—likewise fail to state a claim.[48]

      *a.    **The CREF Stock Account.*** The CREF Stock Account ("Stock Account") is a variable-annuity investment fund. According to its prospectus, the Stock Account seeks to achieve "[a] favorable long-term rate of return through capital appreciation and investment income by investing primarily in a broadly diversified portfolio of common stocks."[49] The Stock Account is globally diversified and "seeks to maintain the weightings of its holdings as approximately 70–75% domestic equities and 25–30% foreign equities."[50] Because of this blended strategy, the prospectus explains that no single benchmark appropriately gauges the Stock Account's performance:

> The benchmark for the Stock Account is a composite index composed of two unmanaged indices: the Russell 3000® Index and the MSCI All Country World ex-USA Investable Market Index ("MSCI ACWI ex-USA IMI"). The weights in the composite index change to reflect the relative sizes of the domestic and foreign segments of the Account and to maintain its consistency with the Account's investment strategies.[51]

---

[48]     Plaintiffs also allege in passing that 55 other Plan funds "underperformed their benchmarks over [a] 5-year period" and thus should have been removed from the Plan. Am. Compl. ¶¶ 168-169. But that allegation should be rejected. It is based totally on hindsight, and as explained in the previous footnote, there is nothing imprudent about retaining an investment through a period of underperformance.

[49]     TIAA, *Prospectus: College Retirement Equities Fund* 27 (May 1, 2016), http://www.tiaa.org/public/prospectuses/cref_prospectus.pdf?fundclass=RPVA.

[50]     *Id.* at 28.

[51]     *Id.* at 28-29.

As Plaintiffs allege, all universities that offer certain TIAA fixed annuities are required to offer the Stock Account. Am. Compl. ¶ 78. Plaintiffs contend that the Stock Account should have been removed as a Plan investment option because "[i]ts historical performance has been persistently poor for many years compared to both available lower-cost index funds and the Russell 3000 index benchmark." Am. Compl. ¶ 183.

This claim fails for numerous reasons. *First*, as explained *supra* (at 16), Plaintiffs allege that the Stock Account could have been removed only if *all* TIAA annuities were discontinued (Am. Compl. ¶ 78), but they do not allege that all TIAA annuities should have been discontinued.

*Second*, the Stock Account is a variable annuity. Plaintiffs assert that other investment vehicles performed better, but none of those investment vehicles are variable annuities. *See Tibble*, 729 F.3d at 1134 (rejecting comparison between different types of investment products because "[m]utual funds … have a variety of unique regulatory and transparency features that make it an apples-to-oranges comparison").[52]

*Third*, Plaintiffs presume, without basis, that Plan fiduciaries had the *authority* to remove Plan investments from the Stock Account. Rather, "a retirement plan may not limit participation in the CREF Stock Account and the CREF Money

---

[52]    *See also* SEC, *Variable Annuities: What You Should Know*, https://www.sec.gov/investor/pubs/varannty.htm ("variable annuities differ from mutual funds in several important ways").

Market Account."[53]

*Third*, market forces establish that offering participants the opportunity to invest in this account was not imprudent. More than $110 *billion* is invested in the Stock Account[54]—which powerfully gives the lie to any claim that investing in the Stock Account is an imprudent decision.

*Fourth*, Plaintiffs' argument is premised on a misunderstanding of the investment strategy of the Stock Account. Plaintiffs condemn the non-removal of the Stock Account based on performance comparisons to two passively managed index funds (the Vanguard Total Stock Market Index Fund and the Vanguard Institutional Index) and the Russell 3000 index. Am. Compl. ¶ 185. Plaintiffs neglect, however, to mention that those "benchmarks" invest only in *domestic* equities, whereas the Stock Account is a 70/30 blend of domestic and *foreign* equities. So differences in performance are explained by differences in performance between domestic and foreign stocks. In other words, the Stock Account has a different risk profile from the proposed comparators, which means that their comparisons do nothing to discredit the processes employed here by Plan fiduciaries.[55]

> **b.** ***The TIAA Real Estate Account.*** Plaintiffs' challenge to the TIAA Real Estate Account fails for similar reasons. The Real Estate Account is a variable

---

[53]  Penney Decl. Ex. A, at E077 (Vellali Annuity Contract) (CREF's Rules of the Fund); *see* Am. Compl ¶¶ 106, 114 (incorporating the contract by reference); 26 C.F.R. § 1.408-3.

[54]  TIAA, *CREF Retirement Annuity Accounts: CREF Stock Account, Class R3* (Sept. 30, 2016), https://www.tiaa.org/public/pdf/ffs/194408126.pdf.

[55]  Plaintiffs also criticize the Stock Account's use of active management. Many other courts have rejected the theory that fiduciaries breached their fiduciary duty by offering actively managed funds. *See, e.g.*, *Rosen*, 2016 WL 7494320, at *13–15; *Taylor v. United Techs. Corp.*, 2009 WL 535779, at *10 (D. Conn.), *aff'd*, 354 F. App'x 525 (2d Cir. 2009).

annuity account that "seeks favorable long-term returns primarily through rental income and appreciation of real estate and real estate-related investments."[56] In particular, the Real Estate Account "primarily invests directly in commercial real estate, an asset class not widely available to retail investors in a variable annuity or mutual fund."[57]

Plaintiffs allege that Defendants should have replaced the Real Estate Account with the Vanguard REIT Index mutual fund. Am. Compl. ¶ 201. The Vanguard REIT Index "represent[s] a broadly diversified range of property types," and is not focused on commercial real estate.[58]

Again, the Vanguard REIT Index is a mutual fund; the Real Estate Account is not. Moreover, although both the Vanguard REIT Index and the Real Estate Account invest in real estate, they have different strategies. The Real Estate Account focuses on commercial real estate, whereas the Vanguard REIT indexes the broader real-estate market.

As one might expect, the historical performance of these investment vehicles shows that they reflect different strategies with different investment objectives. In the past six years, the Real Estate Account has performed better than the Vanguard REIT Index three times, and the Vanguard REIT Index has performed better than

---

[56]     TIAA, *TIAA Real Estate Account Prospectus* 3 (May 1, 2016), https://www.tiaa.org/public/pdf/realestate_prosp.pdf.

[57]     TIAA, *TIAA Real Estate Account*, https://www.tiaa.org/public/offer/products/annuities/retirement-plan-annuities/tiaa-real-estate-account.

[58]     Vanguard, *Vanguard REIT Index Fund Prospectus* 12 (May 25, 2016), https://www.vanguard.com/pub/Pdf/i3123.pdf.

the Real Estate Account three times.[59] Indeed, plotting the performance of these investment options against each other shows that Plaintiffs' proposed "better" option is far more volatile than the Real Estate Account:[60]



Plaintiffs' allegations establish that there are mutual funds with strategies that differ from the $22.4 billion Real Estate Account—not that the Real Estate Account is inferior; and certainly not that Plan fiduciaries lacked appropriate processes for reviewing the Real Estate Account (a topic about which the Amended Complaint says nothing at all).[61]

## II. Plaintiffs Have Failed To State A Claim For Breach Of The Duty Of Loyalty.

Plaintiffs also allege that the University's agreement to a bundled-services

---

[59]     *Compare id.* at 3, *with TIAA Real Estate Account Prospectus, supra* note 56, at 11.

[60]     Morningstar, *TIAA Real Estate Account (QREARX)*, http://quote.morningstar.com/ fund/chart.aspx?t=QREARX (comparison with VGSNX).

[61]     Plaintiffs allege, in passing, that the TIAA Real Estate Account charges a "liquidity guarantee" fee that the Vanguard REIT Index Fund does not. Am. Compl. ¶ 120. But this allegation is meaningless. Plaintiffs do not allege anything about what services TIAA provides in exchange for this fee, and without that information, they cannot plausibly allege that the fee is unreasonable or that the Vanguard REIT fund is superior simply because it does not charge the fee.

arrangement with TIAA constitutes a breach of the duty of loyalty. But this allegation is inadequately pled and utterly implausible.

ERISA "charges fiduciaries with a duty of loyalty to guarantee beneficiaries' interests" by invoking a common law trustee's duty to "'administer the trust solely in the interest of the beneficiaries.'" *Pegram v. Herdrich*, 530 U.S. 211, 224 (2000) (quoting 2A AUSTIN SCOTT & WILLIAM FRATCHER, THE LAW OF TRUSTS § 170, at 311 (4th ed. 1987)). Thus, in order to state a claim for breach of the duty of loyalty, Plaintiffs must allege that Defendants acted self-interestedly—or to further a third party's interests—and thereby failed to "act with an 'eye single' to the interests of the Plan beneficiaries." *In re WorldCom, Inc.*, 263 F. Supp. 2d 745, 768 (S.D.N.Y. 2003) (quoting *Donovan v. Bierwirth*, 680 F.2d 263, 271 (2d Cir. 1982)); see also *In re Xerox Corp. ERISA Litig.*, 483 F. Supp. 2d 206, 219 (D. Conn. 2007) (Thompson, J.) (explaining that the fiduciary's "primary loyalty to the fund is the *only* loyalty which may affect his judgment"); GEORGE G. BOGERT & GEORGE T. BOGERT, THE LAW OF TRUSTS AND TRUSTEES § 543 (3d ed. 2016) ("The trustee must exclude all self-interest, as well as the interest of a third party, in his administration of the trust solely for the benefit of the beneficiary.").

Plaintiffs attempt to carry this burden by alleging that the bundled-services arrangement furthered *TIAA's* interests rather than those of Plan participants, in that the inclusion of TIAA funds in the Plan benefited TIAA financially in the form of revenue-sharing payments. *E.g.*, Am. Compl. ¶¶ 112–13. But Plaintiffs allege *no* facts that support a plausible claim that the University agreed to this arrangement

34

*in order to* further TIAA's (nonprofit) interests; they are simply repackaging their duty-of-prudence claim that the fees paid through revenue sharing were too high. This is insufficient to state a claim for breach of the duty of loyalty. *See, e.g.*, *White*, 2016 WL 4502808, at *5 ("Because the complaint does not differentiate between breach of the duty of prudence and breach of the duty of loyalty, and includes no separate allegations to support the duty of loyalty claim, the court finds the allegations in the complaint insufficient to sustain the disloyalty claim.").

In any event, given TIAA's nonprofit character, any claim that the Plan acted to boost TIAA's nonexistent profitability is implausible.

## III.   Plaintiffs Have Failed To State A Claim That Defendants Engaged In Prohibited Transactions.

In addition to alleging that the practices they identify breached the University's fiduciary duties, Plaintiffs also allege that they constituted "prohibited transactions" under Section 406(a) of ERISA. As relevant here, Section 406 prohibits transactions between a plan and a "party in interest" that involve the "sale or exchange, or leasing, of any property" (29 U.S.C. § 1106(a)(1)(A)); the "furnishing of goods, services, or facilities" (*id.* § 1106(a)(1)(C)); and the "transfer to, or use by or for the benefit of a party in interest, of any assets of the plan" (*id.* § 1106(a)(1)(D)). Plaintiffs allege that the University engaged in each of these kinds of prohibited transactions (Am. Compl. ¶¶ 215–21, 231–36, 251–56), but they are wrong on all counts.

To begin with, neither TIAA nor Vanguard is a party in interest by virtue of the investment management services they provide to the Plan. *See* 29 U.S.C. § 1002(21)(B) (investment companies do not become parties-in-interest by providing

35

investment advisory services to mutual funds); *accord* 29 C.F.R. § 2509.75–3; *see also IATSE Local 33 Section 401(k) Plan v. Bullock*, 2008 WL 4838490, at *6 (C.D. Cal. Nov. 5, 2008); Amendment to Prohibited Transaction Exemption 84-24, 71 Fed. Reg. 5887, 5889 (Feb. 3, 2006) (providing that "[t]he purchase, with plan assets, of an insurance or annuity contract from an insurance company" is not a prohibited transaction).

With respect to recordkeeping, none of the alleged transactions with TIAA or Vanguard involved the "sale or exchange, or leasing, of any property" within the meaning of § 1106(a)(1)(A). Nor, for that matter, did any transactions involve "assets of the [P]lan" within the meaning of § 1106(a)(1)(D), because TIAA and Vanguard were compensated from assets held by the mutual funds and annuities in their possession, which are expressly excluded from the definition. *Id.* § 1101(b)(1).[62] *See Hecker*, 556 F.3d at 584 (holding that service provider fees "drawn from the assets of the mutual funds" did not involve plan assets).

Moreover, *all* of Plaintiffs' prohibited-transaction claims fail because the alleged transactions fall within the safe harbor of Section 408(b). Section 408(b) exempts certain categories of transactions from Section 406—including, as relevant here, payments for "services necessary for the establishment or operation of the plan," as long as "no more than reasonable compensation is paid therefor." 29 U.S.C. § 1108(b)(2). Because they have failed to allege *any* facts about the services that TIAA and Vanguard provided to the plan, Plaintiffs have failed plausibly to allege

---

[62]   *See* SEC, CREF Notice of Application, ICA Release No. IC–31092, https://www.sec.gov/rules/ic/2014/ic-31092.pdf (confirming that CREF is a registered investment company.)

that the payments to TIAA and Vanguard were unreasonable and thus have not stated a claim for any kind of prohibited transaction. *See, e.g., Leber v. Citigroup, Inc.*, 2010 WL 935442, at *10 (S.D.N.Y. Mar. 16, 2010) ("[W]here the complaint does not allege any basis for presuming that a defendant's conduct fell outside a statutory exemption—and therefore that a defendant's conduct might plausibly entitle plaintiff to relief—it is deficient."); *see also Skin Pathology Assocs. v. Morgan Stanley & Co.*, 27 F. Supp. 3d 371, 378 (S.D.N.Y. 2014) (dismissing complaint for failure to allege that § 408 exemption was not satisfied). As explained elsewhere, the compensation structure for the Plan's service providers was objectively reasonable.

## IV. Plaintiffs Have Failed To State A Claim For Breach Of The Duty To Monitor.

Plaintiffs' remaining allegations claim that Defendants breached their duty to monitor by failing to monitor: the fees paid to Plan recordkeepers (*e.g.*, Am. Compl. ¶ 263(c)), the investment options available (*id.* ¶ 263(d)), and the performance of those options. *E.g., id.* Plaintiffs' duty-to-monitor claims are derivative of their other claims; accordingly, because their duty-of-loyalty and duty-of-prudence claims fail, their duty-to-monitor claims fail as well. *See, e.g., Rinehart v. Akers*, 722 F.3d 137, 154 (2d Cir. 2013) ("Plaintiffs cannot maintain a claim for breach of the duty to monitor … absent an underlying breach of the duties imposed under ERISA" by the party being monitored), *vacated on other grounds*, 134 S. Ct. 2900 (2014), *and reaff'd sub nom. Rinehart v. Lehman Bros. Holdings, Inc.*, 817 F.3d 56 (2d Cir. 2016).

In any event, Plaintiffs once again fail to allege any facts about what the

37

University's monitoring processes were—or what monitoring procedures it should have had in place. Absent such process allegations, a monitoring claim fails to state a plausible claim for breach of fiduciary duty. *See, e.g.*, *Chevron*, 2016 WL 4502808, at *19 (dismissing duty-to-monitor claim because "plaintiffs allege[d] no facts showing how the monitoring process was deficient").

## V.    Plaintiffs' Claims Are Time-Barred.

Plaintiffs' claims also fail because they are time-barred. Under ERISA's statute of limitations, claims must be brought within "three years after the earliest date on which the plaintiff had actual knowledge of the breach or violation." 29 U.S.C. § 1113(2). "A plaintiff has 'actual knowledge' of a breach or violation 'when he has knowledge of all material facts necessary to understand that an ERISA fiduciary has breached his or her duty or otherwise violated the act." *Muehlgay v. Citigroup Inc.*, 649 F. App'x 110, 111 (2d Cir. 2016) (quoting *Caputo v. Pfizer, Inc.*, 267 F.3d 181, 193 (2d Cir. 2001)). In the ERISA context, a plaintiff has actual knowledge of the contents of all disclosures he has received, regardless of "whether individual Plaintiffs actually saw or read the documents." *Young v. Gen. Motors Inv. Mgmt. Corp.*, 550 F. Supp. 2d 416, 419 n.3 (S.D.N.Y. 2008), *aff'd on other grounds*, 325 F. App'x 31, 33 (2d Cir. 2009); *accord Brown v. Owens Corning Inv. Review Cmte.*, 622 F.3d 564, 571 (6th Cir. 2010).

Looking to the face of Plaintiffs' Amended Complaint and to participant disclosures mandated by law, which are subject to judicial notice, each of Plaintiffs' claims is time-barred:

Count I concerns whether the University breached its fiduciary duty by per-

mitting TIAA to require that the CREF Stock and Money Market Accounts be of-
fered to plan participants. Plaintiffs Vellali and Taschner allege that they invested
in those funds, which they contend should not have been bundled with other TIAA
services. But individuals who purchase annuities are entering into contractual
agreements. *See* 26 C.F.R. § 1.408–3. The annuity contracts governing Vellali's and
Taschner's annuity accounts (from 2008 and 1996, respectively) explain that the
University had no discretion to discontinue the Stock and Money Market Ac-
counts.[63] They therefore had knowledge that the challenged funds were mandatory
more than three years ago.[64]

In Counts III and V, Plaintiffs allege that they paid excessive fees, which
they say could have been reduced if they had been offered fewer choices with more
favorable share classes. But, as required by law (29 C.F.R. § 2550.404a–5), Plain-
tiffs received (1) annual disclosures detailing the options available, their fees, and
performance metrics; (2) notices whenever investment options were changed; and
(3) prospectuses for the investment options that they elected.[65] Those disclosures
plainly identify the *number* of options available and the *fees* associated with those
investment options. Thus, as another district court in this circuit concluded in an

---

[63]    *See* Penney Decl. Ex. A, at E057, E065 (Vellali) (May 1, 2008) ("Your employer plan
may limit your right to allocate premiums remitted under that plan to any account other
than the CREF Stock Account and the CREF Money Market Account."); Ex. J, at F069
(Taschner) (May 1, 1996, and May 1997 endorsement) (similar); *see* Am. Compl. ¶¶ 106, 114
(incorporating the contracts by reference).

[64]    Likewise, because the annuity contracts are more than six years old, these claims
are time-barred irrespective of Plaintiffs' knowledge, under ERISA's six-year statute of re-
pose. *See* 29 U.S.C. § 1113(1); *Muehlgay*, 649 F. App'x at 111.

[65]    Penney Decl. Ex. D (Plan and Investment Notice); *id.* at 3 (directing participants to
prospectuses); Exs.  E, F, G, and H (Notices of Share Class Changes).

analogous case, "[t]he allegedly excessive fees that form the central basis of this claim were readily apparent from the information provided to all Plan participants more than three years before Plaintiffs filed th[eir] suit" because "the quarterly performance summaries provided to Plan participants clearly disclosed the fees and expenses associated with [certain] [f]unds." *Young*, 550 F. Supp. 2d at 420.

Moreover, Plan disclosures explained when different share classes were available. For 6 of the 8 funds as to which Plaintiffs claim that they were offered the wrong share class, they received notices, more than three years before filing suit, that they had been moved into what they now allege was the correct share class.[66] For another, they received notice that the other share classes existed.[67]

Moreover, to the extent that Plaintiffs have re-packaged their breach-of-fiduciary duty claims as prohibited-transaction claims, these claims, too, are time-barred under Plaintiffs' theory of the case. The same disclosures amply demonstrated that TIAA and Vanguard were providing services to the Plan and that they were being compensated for those services.

## CONCLUSION

For the foregoing reasons, the Amended Complaint should be dismissed.

---

[66]    *Compare* Am. Compl. ¶ 8(d), *with* Penney Decl. Ex. F (providing notice in June 2013 that Vanguard's Emerging Markets Stock Index, PRIMECAP, Total Bond Market Index, Total Stock Market Index, and Total International Stock Funds were transitioning share classes), *and* Ex. E (providing notice in September 2011 that TIAA-CREF's Real Estate Securities Fund was transitioning share classes).

[67]    *See* Vanguard Health Care Fund Prospectus 7 (May 29, 2012), https://www.sec.gov/Archives/edgar/data/734383/000093247112004645/specialized485b052012.htm (compilation of prospectuses); *cf.* Am. Compl. p.71. That leaves only Plaintiffs' claim that Mr. Vellali was entitled to invest in the "institutional plus" share class of the Vanguard Developed Markets Index, which is wrong on the merits, *see supra* note 46.

Dated: January 23, 2017                    Respectfully submitted,

Nancy G. Ross (ct14373)                    */s/ Brian D. Netter*
James C. Williams (ct23292)                Brian D. Netter (phv08476)
MAYER BROWN LLP                              bnetter@mayerbrown.com
71 South Wacker Drive                      Michelle N. Webster (phv08475)
Chicago, Illinois 60606-4637               Travis Crum (phv08550)
Telephone: (312) 782-0600                  Matthew A. Waring (phv08551)
Facsimile: (312) 701-7711                  MAYER BROWN LLP
                                           1999 K Street NW
                                           Washington, DC 20006-1101
                                           Telephone: (202) 263-3000
                                           Facsimile: (202) 263-3300

                    *Attorneys for Defendants*

41

## CERTIFICATE OF SERVICE

I hereby certify that, on January 23, 2017, a copy of the foregoing was filed electronically using the Court's CM/ECF system, which will provide notice of the filing to all counsel of record.

By:  /s/ *Brian D. Netter*

Brian D. Netter