## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF CONNECTICUT

| | |
|---|---|
| JOSEPH VELLALI, NANCY S. LOWERS, JAN M. TASCHNER, AND JAMES MANCINI, individually and as representatives of a class of participants and beneficiaries on behalf of the Yale University Retirement Account Plan, | No. 3:16-cv-01345-AWT |
| *Plaintiffs*, | |
| v. | Hon. Alvin W. Thompson |
| YALE UNIVERSITY, MICHAEL A. PEEL, AND THE RETIREMENT PLAN FIDUCIARY COMMITTEE, | |
| *Defendants*. | |

## MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS PLAINTIFFS' AMENDED COMPLAINT [DOC. 62]

**ORAL ARGUMENT REQUESTED**

# CONTENTS

Authorities ........................................................................................................................ ii

Introduction..................................................................................................................... 1

Background ...................................................................................................................... 3

Standard of Review......................................................................................................... 6

Argument ....................................................................................................................... 10

    I.     Yale's conduct in managing the Plan is measured by the same prudent person standard that applies to all ERISA fiduciaries. ............................................... 10

    II.    Considered as a whole, the Amended Complaint states plausible claims for breaches of fiduciary duty.............................................................................. 14

    III.   Yale imprudently wasted participants' money on excessive fees (Count V). .............. 19

    IV.   Yale caused the Plan to pay excessive administrative fees (Count III). ..................... 26

    V.    Yale breached its duty to monitor the Plan's investments and fee arrangements on an ongoing basis (Counts I, V) .................................................................. 31

        A.  Yale imprudently locked the Plan into TIAA products and services ...................... 32

        B.   Yale retained funds with long histories of dramatic underperformance. ............... 32

        C.   Yale failed to make a reasoned decision whether to consolidate funds. ................ 35

    VI.   Plaintiffs state plausible prohibited transaction claims (Counts II, IV, VI)................... 37

    VII.  ERISA's three-year "actual knowledge" limitation is inapplicable. ............................ 39

Conclusion ..................................................................................................................... 40

## AUTHORITIES

### Cases

*Abbott v. Lockheed Martin Corp.*,
  No. 06-701, 2007 U.S.Dist.LEXIS 58920 (S.D.Ill. Aug. 13, 2007) ...................................... 10

*Allen v. GreatBanc Tr. Co.*,
  835 F.3d 670 (7th Cir. 2016) ............................................................................................. 8, 38

*Bd. of Trustees of S. California IBEW-NECA Defined Contribution Plan v. Bank of N.Y. Mellon Corp.*,
  No. 09-6273, 2011 U.S.Dist.LEXIS 142367 (S.D.N.Y. Dec. 9, 2011) ................................... 9

*Bell Atlantic Corp. v. Twombly*,
  550 U.S. 544 (2007) ............................................................................................................... 6

*Bell v. Pension Comm. of ATH. Holding Co.*,
  No. 15-02062-TWP-MPB, 2017 U.S.Dist.LEXIS 42107 (S.D.Ind. Mar. 23, 2017) .......... 9, 27

*Bowers v. BB&T Corp.*,
  No. 15-732 Doc. 58 (M.D.N.C. Apr. 18, 2016) ...................................................................... 9

*Braden v. Wal-Mart Stores, Inc.*,
  588 F.3d 585 (8th Cir. 2009) .................................... 2, 8, 15, 16, 17, 18, 21, 23, 24, 28, 34, 38

*Brotherston v. Putnam Invs., LLC*,
  No. 15-13825, 2016 U.S.Dist.LEXIS 50849 (D.Mass. Apr. 6, 2016) ..................................... 9

*Brown v. Owens Corning Inv. Review Comm.*,
  622 F.3d 564 (6th Cir. 2010) ............................................................................................... 39

*Caputo v. Pfizer, Inc.*,
  267 F.3d 181 (2d Cir. 2001) ................................................................................................ 39

*Chambers v. Time Warner, Inc.*,
  282 F.3d 147 (2d Cir. 2002) .............................................................................................. 6, 7

*Coburn v. Evercore Tr. Co., N.A.*,
  844 F.3d 965 (D.C. Cir. 2016) ............................................................................................ 33

*DiFelice v. U.S. Airways, Inc.*,
  497 F.3d 410 (4th Cir. 2007) ............................................................................... 5, 25, 31, 36

*Doe v. Columbia Univ.*,
  831 F.3d 46 (2d Cir. 2016) .................................................................................................... 6

*Donovan v. Bierwirth*,
  680 F.2d 263 (2d Cir. 1982) ................................................................................................ 10

*Donovan v. Bierwirth*,
  754 F.2d 1049 (2d Cir. 1985) .............................................................................................. 34

*Fifth Third Bancorp v. Dudenhoeffer*,
  134 S.Ct. 2459 (2014) .................................................................................... 11, 12, 18, 34

*Fish v. Greatbanc Trust Co.*,
   749 F.3d 671 (7th Cir. 2014)..................................................................... 39, 40

*George v. Kraft Foods Global, Inc.*,
   641 F.3d 786 (7th Cir. 2011).................... 2, 13, 16, 26, 27, 28, 29, 30, 31, 32

*George v. Kraft Foods Global, Inc.*,
   674 F.Supp.2d 1031 (N.D.Ill. 2009) ........................................................ 10

*George v. Kraft Foods Global, Inc.*,
   No. 06-798, 2007 U.S.Dist.LEXIS 18650 (S.D.Ill. Mar. 16, 2007) ........................ 10

*George v. Kraft Foods Global, Inc.*,
   674 F.Supp.2d 1031 (N.D. Ill. 2009) ........................................................ 24

*Global Network Commc'ns, Inc. v. City of N.Y.*,
   458 F.3d 150 (2d Cir. 2006)................................................................... 6, 7

*Goldenberg v. Indel, Inc.*,
   741 F.Supp.2d 618 (D.N.J. 2010) ............................................................ 22

*Haddock v. Nationwide Fin. Servs.*,
   419 F.Supp.2d 156 (D.Conn. 2006) ......................................................... 31, 38

*Harris Tr. & Sav. Bank v. Salomon Smith Barney Inc.*,
   530 U.S. 238 (2000)........................................................................... 10, 37

*Hecker v. Deere & Co. (Hecker II)*,
   569 F.3d 708 (7th Cir. 2009)................................................................. 22, 36

*Hecker v. Deere & Co.*,
   556 F.3d 575 (7th Cir. 2009)......................................................... 14, 15, 22, 32, 38

*Ideal Steel Supply Corp. v. Anza*,
   652 F.3d 310 (2d Cir. 2011)................................................................... 6

*In re Meridian Funds Grp. Sec & ERISA Litig.*,
   917 F.Supp.2d 231 (S.D.N.Y. 2013)......................................................... 12

*In re RCN Litig.*,
   No. 04-5068, 2006 U.S.Dist.LEXIS 12930 (D.N.J. Mar. 21, 2006)......................... 11

*In re Unisys Savings Plan Litig.*,
   74 F.3d 420 (3d Cir. 1996)............................................................ 18, 31, 32, 38

*Int'l Star Class Yacht Racing Ass'n v. Tommy Hilfiger U.S.A., Inc.*,
   146 F.3d 66 (2d Cir. 1998)................................................................... 7, 19

*Jenkins v. Yager*,
   444 F.3d 916 (7th Cir. 2006)................................................................. 33

*Jones v. Harris Assocs. L.P.*,
   559 U.S. 335 (2010) ............................................................................ 30

*Kanawi v. Bachtel Corp.*,
   590 F.Supp.2d 1213 (N.D. Cal. 2008) ..................................................... 37

*Kanawi v. Bechtel Corp.*,
   No. 06-5566, 2007 U.S.Dist.LEXIS 97994 (N.D.Cal. May 15, 2007) .................................. 10

*Katsaros v. Cody*,
   744 F.2d 270 (2d Cir. 1984).......................................................................................... 20, 36

*Keiler v. Harlequin Enters.*,
   751 F.3d 64 (2d Cir. 2014)............................................................................................... 6, 30

*Kouba v. Joyce*,
   No. 83-451, 1987 U.S.Dist.LEXIS 12334 (N.D.Ill. Dec. 29, 1987) ........................................ 37

*Kramer v. Time Warner Inc.*,
   937 F.2d 767 (2d Cir. 1991).................................................................................................. 8

*Krueger v. Ameriprise Fin., Inc.*,
   No. 11-2781, 2012 U.S.Dist.LEXIS 166191 (D.Minn. Nov. 20, 2012) ................. 2, 10, 21, 39

*Kruger v. Novant Health, Inc.*,
   131 F.Supp.3d 470 (M.D.N.C. 2015)........................................................ 2, 14, 17, 21, 26, 30

*L.I. Head Start Child Dev. Servs. Inc. v. Econ. Opportunity Council of Suffolk, Inc.*,
   710 F.3d 57 (2d Cir. 2013)................................................................................................... 39

*Lander v. Hartford Life & Annuity Ins. Co.*,
   251 F.3d 101 (2d Cir. 2001)............................................................................................... 5, 14

*Lau v. Metro. Life Ins. Co.*, No. 15-cv-09469 (PKC),
   2016 U.S.Dist.LEXIS 134681 (S.D.N.Y. Aug. 22, 2016) .................................................... 9, 30

*Leber v. Citigroup 401(k) Plan Inv. Comm.*,
   No. 07-9329, 2014 U.S.Dist.LEXIS 139001 (S.D.N.Y. Sep. 30, 2014 .................................. 40

*Leber v. Citigroup, Inc.*,
   No. 07-9329, 2010 U.S.Dist.LEXIS 25097 (S.D.N.Y. Mar. 16, 2010) .................................. 38

*Leimkuehler v. Am. United Life Ins. Co.*,
   713 F.3d 905 (7th Cir. 2013)................................................................................................... 4

*Loomis v. Exelon Corp.*,
   658 F.3d 667 (7th Cir. 2011)................................................................................... 15, 23, 24

*Lowen v. Tower Asset Mgmt., Inc.*,
   829 F.2d 1209 (2d Cir. 1987)................................................................................................ 38

*Marshall v. Northrop Grumman Corp.*,
   No 16-06794, Doc. 68 (C.D.Cal. Jan. 30, 2017).................................................. 9, 16, 27, 29

*Martin v. Caterpillar, Inc.*,
   No. 07-1009, 2008 U.S.Dist.LEXIS 99465 (C.D.Ill. Sep. 25, 2008)...................................... 10

*Martin v. Feilen*,
   965 F.2d 660 (8th Cir. 1992)................................................................................................ 18

*Matrixx Initiatives, Inc. v. Siracusano*,
   563 U.S. 27 (2011) ............................................................................................................... 14

*McCormack v. Cheers*,
  818 F.Supp.584 (S.D.N.Y. 1993) ....................................................................................... 7

*Moreno v. Deutsche Bank Ams. Holding Corp.*,
  No. 15-9936, 2016 U.S.Dist.LEXIS 142601 (S.D.N.Y. Oct. 13, 2016) ................. 9, 35, 36, 38

*Muehlgay v. Citigroup Inc.*,
  649 F.App'x 110 (2d Cir. 2016) ....................................................................................... 39

*N.J. Carpenters Health Fund v. Royal Bank of Scot. Grp., PLC*,
  709 F.3d 109 (2d Cir. 2013) ............................................................................................ 8

*Nakahata v. N.Y.-Presbyterian Healthcare Sys.*,
  723 F.3d 192 (2d Cir. 2013) ............................................................................................ 6

*Nolte v. Cigna Corp.*,
  No. 07-2046, 2013 U.S.Dist.LEXIS 184622 C.D.Ill. Oct. 15, 2013) ................................. 13

*PBGC ex rel. St. Vincent Catholic Med. Ctrs. Ret. Plan v. Morgan Stanley Inv. Mgmt.*
  *Co.*, 712 F.3d 705 (2d Cir. 2013) ............................................................ 8, 14, 18, 21, 33

*Pledger v. Reliance Trust Co.*,
  No. 15-4444, Doc. 65 (N.D.Ga. Mar. 7, 2017) .................................................................. 9

*Renfro v. Unisys Corp.*,
  671 F.3d 314 (3d Cir. 2011) ...................................................................................... 15, 22

*Rinehart v. Lehman Bros. Holdings, Inc.*,
  817 F.3d 56 (2d Cir. 2016) ............................................................................................. 34

*Rosen v. Prudential Ret. Ins. & Annuity Co.*,
  No. 15-1839, 2016 U.S.Dist.LEXIS 180567 (D.Conn. Dec. 30, 2016) .......................... 14, 16

*Roth v. Jennings*,
  489 F.3d 499 (2d Cir. 2007) ......................................................................................... 7, 8

*Shirk v. Fifth Third Bancorp*,
  No. 05-49, 2008 U.S.Dist.LEXIS 108089 (S.D.Ohio Sep. 26, 2008) ................................ 39

*Skin Pathology Assocs. v. Morgan Stanley & Co.*,
  27 F.Supp.3d 371 (S.D.N.Y. 2014) ................................................................................ 38

*Spano v. Boeing Co.*,
  125 F.Supp.3d 848 (S.D.Ill. 2014) ................................................................................. 24

*Spano v. Boeing Co.*,
  No. 06-743, 2007 U.S.Dist.LEXIS 28774 (S.D.Ill. Apr. 17, 2007) .................................. 10

*Tatum v. RJR Pension Inv. Comm.*,
  761 F.3d 346 (4th Cir. 2014) ........................................................................................... 9

*Taylor v. United Techs. Corp.*,
  No. 3:06cv1494 (WWE), 2007 U.S.Dist.LEXIS 57807 (D. Conn. Aug. 9, 2007) ............. 9, 13

*Terraza v. Safeway Inc.*,
  No. 16-3994, 2017 U.S.Dist.LEXIS 35732 (N.D.Cal. Mar. 13, 2017) ............. 9, 19, 22, 27, 30

*Tibble v. Edison Int'l (Tibble III)*,
  No. 07-5359, 2010 U.S.Dist.LEXIS 69119 (C.D.Cal. July 8, 2010) ...................... 4, 20, 21, 25

*Tibble v. Edison Int'l (Tibble V)*,
  135 S.Ct. 1823 (2015) ............................................................................... 1, 3, 12, 20, 32

*Tibble v. Edison Int'l (Tibble VI)*,
  843 F.3d 1187 (9th Cir. 2016)................................................ 1, 2, 19, 20, 21, 22, 26

*Tibble v. Edison Int'l*,
  729 F.3d 1110 (9th Cir. 2013),
  *vacated on other grounds*, 135 S. Ct. 1823 (2015) ........................................... 20, 40

*Tibble v. Edison Int'l*,
  No. 07-5359, Doc. 26 (C.D.Cal. July 16, 2008) ............................................. 10, 38

*Troudt v. Oracle Corp.*,
  No. 16-00175-REB-CBS, 2017 U.S.Dist.LEXIS 41344 (D.Colo. Mar. 22, 2017) ................... 9

*Tussey v. ABB, Inc.*,
  746 F.3d 327 (8th Cir. 2014).................................................. 2, 9, 15, 16, 26, 28, 31

*Tussey v. ABB, Inc.*,
  No. 06-4305, 2008 U.S.Dist.LEXIS 9806 (W.D.Mo. Feb. 11, 2008)..................................... 10

*Tussey v. ABB, Inc.*,
  No. 06-4305, 2012 U.S. Dist. LEXIS 45240 (W.D.Mo. Mar. 31, 2012), *aff'd in
  relevant part*, 746 F.3d 327 (8th Cir. 2014) ................................................ 2, 21, 29

*White v. Chevron Corp.*,
  No. 16-0793,  2016 U.S.Dist.LEXIS 115875 (N.D.Cal. Aug. 29, 2016) ............. 19, 20, 29, 33

*Young v. GM Inv. Mgmt. Corp.*,
  325 F.App'x 31 (2d Cir. 2009)................................................................................. 29

*Young v. GM Inv. Mgmt. Corp.*,
  550 F.Supp.2d 416 (S.D.N.Y. 2008)....................................................................... 39

**Statutes**

26 U.S.C. §401(k) ............................................................................................. 12

26 U.S.C. §403(b) ............................................................................................. 12

29 U.S.C. §1002(14)(B) ................................................................................... 37

29 U.S.C. §1002(2)(A).................................................................................... 12

29 U.S.C. §1002(21)(B).................................................................................... 37

29 U.S.C. §1002(34) ......................................................................................... 12

29 U.S.C. §1102(a) .............................................................................................. 3

29 U.S.C. §1103(c)(1)................................................................................. 10, 30

29 U.S.C. §1104(a)(1)......................................................................................... 2

29 U.S.C. §1104(a)(1)(A) .......................................................................... 10, 19

29 U.S.C. §1104(a)(1)(A)(ii) ................................................................. 30, 31

29 U.S.C. §1104(a)(1)(B) ........................................................................ 10

29 U.S.C. §1106 .................................................................................. 10, 37

29 U.S.C. §1106(a) .................................................................................. 38

29 U.S.C. §1106(a)(1)(C) ........................................................................ 30

29 U.S.C. §1106(b)(3) ............................................................................. 38

29 U.S.C. §1108(b)(2) ........................................................................ 30, 39

29 U.S.C. §1109(a) .................................................................................. 11

29 U.S.C. §1132(a)(2) ............................................................................... 6

**Rules**

2d Cir. R. 32.1.1(a) .................................................................................. 29

Fed.R.Civ.P. 12(b)(6) ................................................................................ 8

Fed.R.Civ.P. 12(d) .................................................................................... 6

Fed.R.Civ.P. 56 ......................................................................................... 6

Fed.R.Evid. 201(b) .................................................................................... 7

**Regulations**

29 C.F.R. § 2550.404a-1(b)(1) ................................................................... 9

29 C.F.R. §2550.404a-1(b)(i)-(ii) ............................................................. 36

29 C.F.R. §2550.408b-2(c)(3) .................................................................. 37

Reasonable Contract Or Arrangement Under Section 408(b)(2), 72 Fed.Reg. 70988 (Dec. 13, 2007) ....................................................................... 27

**Other**

Br. for the United States Supporting Petitioners, *Tibble v. Edison Int'l*, No. 13-550 (Dec. 9, 2014) ................................................................................ 21

DOL Adv. Op. 2013-03A (https://www.dol.gov/sites/default/files/ebsa/employers-and-advisers/guidance/advisory-opinions/AO2013-03A_0.pdf) ...................... 38

DOL Adv. Op. 97-15A (https://www.dol.gov/agencies/ebsa/employers-and-advisers/guidance/advisory-opinions/1997-15a) .......................................... 27, 29

Unif. Prudent Investor Act §7 ................................................................... 1

## INTRODUCTION

"Wasting beneficiaries' money is imprudent." *Tibble v. Edison Int'l (Tibble VI)*, 843 F.3d 1187, 1198 (9th Cir. 2016)(*en banc*)(quoting Unif. Prudent Investor Act §7). A fiduciary of a multi-billion dollar retirement plan "cannot ignore the power the trust wields to obtain favorable investment products, particularly *when those products are substantially identical*—other than their lower cost—to products the trustee has already selected." *Id*. at 1198 (emphasis added).

Plaintiffs' complaint identifies *74 instances* in which Yale University— in violation of the above principles and its duties as an ERISA fiduciary—wasted its employees' retirement savings by failing to obtain available institutional-class mutual fund shares that were identical in every way—other than their lower cost—to the more expensive retail-class shares that were already in the Plan. These higher-cost shares, which Yale included at the behest of the Plan's conflicted service providers, paid those providers millions more in asset-based revenue sharing than the institutional-class shares would have—resulting in the paying administrative fees that were *eight times higher* than reasonable market rates—thereby enriching the providers at the expense of Yale employees and retirees. As the Supreme Court recently described a nearly identical claim in the only ERISA excessive fee case it has taken: "[H]ow could [fiduciaries] have acted prudently in offering the six higher priced retail-class mutual funds when [fiduciaries] could have offered [employees] effectively the same six mutual funds at the lower price offered to institutional investors like the Plan?" *Tibble v. Edison Int'l (Tibble V)*, 135 S.Ct. 1823, 1826 (2015).[1]

Yale entirely fails to answer to this question. Using readily available institutional-class funds and limiting the recordkeepers' asset-based compensation to a reasonable market rate would not have required "transform[ing] the market" or a "paradigm shift" as Yale contends. Yale simply needed to be aware of the existing market and to act in the interest of the plan's participants and

---

[1] *Tibble* is being handled by undersigned counsel.

1

with the "care, skill, prudence, and diligence" required of *every* ERISA fiduciary. *See* 29 U.S.C. §1104(a)(1). Courts have repeatedly found similar facts sufficient both to state a claim and to prove that defined contribution fiduciaries breached their duties.[2]

Recognizing that the detailed allegations in Plaintiffs' 134-page complaint state plausible claims, Yale seeks to prematurely have a one-sided litigation of the merits by using a vast collection of outside materials that are not appropriately considered under Rule 12(b)(6), and admittedly attempting to "disprove" the truth of Plaintiffs' allegations. Doc. 62-1 at 20 n.27, p. 26.[3] Yale attaches *389 pages* of handpicked evidentiary materials and cites over 20 additional internet sources, and asks the Court to weigh the evidence to conclude that Yale fulfilled its duties. For example, the background facts section of Yale's brief contains *24 footnotes* citing outside sources, while referencing only *two* of the amended complaint's 265 paragraphs. *Id*. at 9–16. The very fact that Yale relies so heavily on outside evidence and asks the Court to disregard the alleged facts confirms that Plaintiffs' claims present fact-intensive issues that cannot be

---

[2] *See, e.g., Tibble VI*, 843 F.3d at 1191 (employer found liable at trial for "breach[ing] its fiduciary duties by offering 'higher priced retail-class mutual funds as Plan investments when materially identical lower priced institutional-class mutual funds were available'"); *Tussey v. ABB, Inc.*, 746 F.3d 327, 336 (8th Cir. 2014)(affirming trial judgment that defendants "breached their fiduciary duties by failing to monitor and control recordkeeping fees and for paying excessive revenue sharing from Plan assets"); *George v. Kraft Foods Global, Inc.*, 641 F.3d 786, 795–800 (7th Cir. 2011)(reversing summary judgment where plan overpaid due to fiduciaries' failures to solicit competitive recordkeeping bids and to "balance the relevant factors" and make a reasoned decision about plan investments); *Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 595–96 & n.5 (8th Cir. 2009)(reversing dismissal of claim that fiduciaries provided "retail class shares, which charge significantly higher fees than institutional shares for the same return on investment" and paid excessive revenue sharing to plan recordkeeper); *Kruger v. Novant Health, Inc.*, 131 F.Supp.3d 470, 477–79 (M.D.N.C. 2015)(plaintiffs stated plausible claim that 403(b) plan fiduciaries breached duties by "utilizing imprudently expensive … retail class funds when institutional class shares were available" and paying recordkeeping and administrative fees "at unreasonable and excessive levels"); *Krueger v. Ameriprise Fin., Inc.*, No. 11-2781, 2012 U.S.Dist.LEXIS 166191, at *29–30 (D.Minn. Nov. 20, 2012)(plaintiffs stated claim based on use of higher-cost share class instead of lower-cost share class which would have provided "identical investment management"); *Tussey v. ABB, Inc.*, No. 06-4305, 2012 U.S. Dist. LEXIS 45240, at *8–9, 109–11, 115–16 (W.D.Mo. Mar. 31, 2012)("Having tried this matter over a four-week period," court finds defendants "violated their fiduciary duties" by, *inter alia*, "*select[ing] more expensive share classes … when less expensive share classes were available[.]*")(emphasis added), *aff'd in relevant part*, 746 F.3d 327 (8th Cir. 2014).

[3] "Doc." page citations refer to the page numbers shown on the ECF header.

resolved without both parties being able to develop the facts. The Court should deny the motion.

## BACKGROUND

Plaintiffs are current or former employees of Yale University and participants in the Yale University Retirement Account Plan ("Plan"), an individual account, defined contribution retirement plan governed by ERISA. Amended Complaint (AC, Doc. 57), ¶¶9–11, 13–16; 29 U.S.C. §1002(34). As of June 30, 2015, the Plan had over 17,000 participants and $3.8 billion. AC ¶12. In terms of asset size, the Plan is among the largest *0.02%* of all defined contribution plans in the United States. *Id*. Defendants are the Plan's fiduciaries: Yale University, the Plan Administrator and named fiduciary under 29 U.S.C. §1102(a); the Retirement Plan Fiduciary Committee ("Committee"), which is responsible for certain investment and administrative matters; and Michael Peel, Yale's Vice President for Human Resources and Administration, to whom Yale delegated certain duties and who oversees the Committee. AC ¶¶18–23. Plaintiffs refer to the Defendants collectively as "Yale." AC ¶24.

In defined contribution plans, "participants' retirement benefits are limited to the value of their own individual investment accounts, which is determined by the market performance of employee and employer contributions, less expenses." *Tibble V*, 135 S.Ct. at 1826. "Expenses, such as management or administrative fees, can sometimes significantly reduce the value of an account in a defined-contribution plan." *Id*. As the Plan's fiduciary, Yale had the ability as well as the duty to control those expenses, by (1) determining the available investment options in which participants can invest (each of which charges various fees, expressed as an "expense ratio"), (2) hiring an administrative service provider, such as a trustee and recordkeeper, and determining and negotiating the method and amount of its compensation, and (3) selecting the investment options in which plan participants can invest. AC ¶¶34–35, 101–102.

Until April 2015, the Plan maintained not one, but two separate recordkeepers—TIAA and

Vanguard—and had 115 funds in the lineup comprised exclusively of those entities' proprietary investments. *Id*. ¶¶102–03, 105.[4] Many of these funds duplicated the investment style of others, and not a single fund was from an outside investment firm other than the Plan's recordkeepers. *Id*. ¶¶102, 150–66. As of June 30, 2015, 104 of those options were mutual funds managed by Vanguard Fiduciary Trust Company (79 options) and TIAA (35 options). AC ¶¶102, 105–110.

Since 2010, 74 of the Plan's mutual funds have been high-priced retail-class mutual fund shares designed for small individual investors, which Yale chose despite the ready availability of far lower-cost, but otherwise identical, institutional-class shares of the same funds designed for large retirement plans. *Id*. ¶¶45, 103, 146. These mutual funds engaged in "revenue sharing," meaning the funds paid a portion of their fees to the Plan's recordkeepers. *Id*. ¶¶46, 125–27, 129–32. Revenue sharing arrangements are opaque, to say the least. *See Leimkuehler v. Am. United Life Ins. Co.*, 713 F.3d 905, 907–08 (7th Cir. 2013)("very little about the mutual fund industry … can plausibly be described as transparent").

Because retail-class shares charge higher fees than institutional share class funds available to large investors, they also pay more in revenue sharing. AC ¶46; *see Tibble v. Edison Int'l (Tibble III)*, No. 07-5359, 2010 U.S. Dist. LEXIS 69119, at *26 (C.D. Cal. July 8, 2010)("The retail share classes of each of these funds had higher expense ratios than the institutional share classes; the higher fees were directly related to the fact that the retail share classes offered more revenue sharing."). Thus, the Plan's recordkeepers had an incentive to require or advocate for Yale to include the higher-cost share classes of their mutual funds in the Plan. AC ¶46.

In addition to mutual funds, the Plan includes insurance company annuity products from

---

[4] TIAA (formerly TIAA-CREF) includes two companion organizations: Teachers Insurance and Annuity Association of America, and College Retirement Equities Fund. AC ¶70. Vanguard refers to Vanguard Group, Inc. which, until April 2015, managed the Vanguard mutual funds in the Plan and provided recordkeeping services. *Id*. ¶102.

TIAA that charge multiple layers of fees, including the TIAA Traditional fixed annuity, eight CREF variable annuities in different investment styles, and the TIAA Real Estate Account, an insurance company separate account. AC ¶¶102, 105–09, 112–21. Because the value of participants' investments in the variable annuities depends on the performance of the underlying portfolio, the variable annuities do not provide any guaranteed level of benefits. *Id*. ¶107; *see Lander v. Hartford Life & Annuity Ins. Co.*, 251 F.3d 101, 104–05 (2d Cir. 2001). Although variable annuities outside of qualified retirement plans have certain tax advantages over mutual funds, that tax advantage "will not be realized if the funds used to purchase the policy are already tax deferred," such as through a tax deferred retirement plan. *Lander*, 251 F.3d at 106. Despite ERISA's strict requirement that *each* investment option must be individually evaluated before it can be placed in a plan,[5] and must be removed if it becomes imprudent,[6] in order to include the fixed TIAA Traditional Annuity in the Plan, Yale agreed to TIAA's conditions that the Plan was required to use TIAA as recordkeeper and to include and retain the variable annuity CREF Stock and Money Market Accounts as Plan investment options. AC ¶¶78, 112–13.

As of the beginning of the class period, the CREF Stock Account had a sustained track record of underperformance, which has continued to date as Yale has retained it in the Plan. The TIAA Real Estate Account has a similarly poor performance history. And the Plan's most recent performance report shows that *fifty-seven* percent of the Plan's investment options have underperformed their respective benchmarks over the previous five-year period. *Id*. ¶168.

As detailed in the Amended Complaint and described below, Plaintiffs contend that Yale breached its fiduciary duties by causing the Plan to pay excessive fees and providing imprudent investments, resulting in substantial losses of participants' retirement savings. Plaintiffs bring

---

[5] *DiFelice v. U.S. Airways, Inc.*, 497 F.3d 410, 423 (4th Cir. 2007).
[6] *Tibble V*, 135 S.Ct. at 1826–29.

this action on behalf of the Plan under 29 U.S.C. §1132(a)(2), and seek to represent a class of all participants and beneficiaries in the Plan since August 9, 2010. AC ¶¶1, 5, 202–03.

## STANDARD OF REVIEW

"[T]o survive a motion under Rule 12(b)(6), a complaint does not need to contain detailed or elaborate factual allegations, but only allegations sufficient to raise an entitlement to relief above the speculative level." *Keiler v. Harlequin Enters.*, 751 F.3d 64, 70 (2d Cir. 2014)(citing *Ideal Steel Supply Corp. v. Anza*, 652 F.3d 310, 323–24 (2d Cir. 2011)). "Asking for plausible grounds . . . does not impose a probability requirement at the pleading stage; it simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of illegal[ity]." *Ideal Steel*, 652 F.3d at 324 (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 550 (2007)). Thus, a plausible inference need not "be the *most plausible* explanation of the defendant's conduct." *Doe v. Columbia Univ.*, 831 F.3d 46, 57 (2d Cir. 2016). The court's role at this stage "is not in any way to evaluate the truth as to what really happened, but merely to determine whether the plaintiff's factual allegations are sufficient to allow the case to proceed." *Id.* at 59.

Courts "do not consider matters outside the pleadings in deciding a motion to dismiss for failure to state a claim." *Nakahata v. N.Y.-Presbyterian Healthcare Sys.*, 723 F.3d 192, 202 (2d Cir. 2013)(citing *Global Network Commc'ns, Inc. v. City of N.Y.*, 458 F.3d 150, 154–55 (2d Cir. 2006)). If "matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56." Fed.R.Civ.P. 12(d). Thus, a district court presented with outside matters has two options: exclude the extrinsic documents, or "convert the motion to one for summary judgment and give the parties an opportunity to conduct appropriate discovery and submit the additional supporting material contemplated by Rule 56." *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 154 (2d Cir. 2002). The conversion

requirement is "strictly enforce[d]" and "mandatory." *Global Network*, 458 F.3d at 155.

Limited exceptions to the conversion requirement include materials integral to the complaint and matters subject to judicial notice. *Id*. at 156. As to the former, "a necessary prerequisite … is that the 'plaintiff[] *rel[y]* on the terms and effect of [the] document in drafting the complaint . . .; mere notice or possession is not enough.'" *Id*. (quoting *Chambers*, 282 F.3d at 153). "In most instances … the incorporated material is a contract or other legal document containing obligations upon which the plaintiff's complaint stands or falls," but which the plaintiff declined to cite because it would have undermined his claim. *Id*. "[L]imited quotation" of outside materials is not "incorporation by reference." *Id*. (citation omitted). "Clearly, not every document referred to in a complaint may be considered incorporated by reference and thus introduced by the moving party in support of a motion to dismiss." *Id*. (citation omitted).

A court may take judicial notice of a fact only when the fact is "outside reasonable controversy"; "[a] high degree of indisputability is the essential prerequisite." *McCormack v. Cheers*, 818 F.Supp.584, 597 n.14 (S.D.N.Y. 1993)(quoting Fed.R.Evid. 201(a) advisory committee's note). Rule 201(b) contains two tests of indisputability: facts that are "usually common knowledge," or "derived from an unimpeachable source." *Int'l Star Class Yacht Racing Ass'n v. Tommy Hilfiger U.S.A., Inc.*, 146 F.3d 66, 70 (2d Cir. 1998).

In some circumstances, public disclosure documents such as SEC or DOL filings may be integral to a complaint or subject to judicial notice. *Roth v. Jennings*, 489 F.3d 499, 509 (2d Cir. 2007). In either instance, the documents "may properly be considered only for 'what' they contain, 'not to prove the truth' of their contents." *Id*. at 511. Such documents are properly considered with respect to fraud or misrepresentation claims, because the filings "are the very documents that are alleged to contain the various misrepresentations or omissions," and there can

7

be no reasonable dispute about "what statements [they] contained." *Kramer v. Time Warner Inc*., 937 F.2d 767, 774 (2d Cir. 1991); *Roth*, 489 F.3d at 509. If the complaint does not allege fraud, that reasoning is inapplicable. *See Roth*, 489 F.3d at 510 (SEC filings were "inappropriate for consideration" where complaint did not allege "a failure to disclose or of a factual misrepresentation."). Even when properly considered, a defendant's statements regarding its own conduct cannot be used to prove the truth of those statements. *See id*. at 510–11 (reversing where district court granted Rule 12(b)(6) motion based on view that "Defendants' statements, which have been submitted to a government  agency and made public, should not be contradicted or taken as perjurious simply because the Plaintiff, without evidence, says they are.").

Assessing the sufficiency of a complaint is "a context-specific task[.]" *N.J. Carpenters Health Fund v. Royal Bank of Scot. Grp., PLC*, 709 F.3d 109, 123 n.7 (2d Cir. 2013)(citation omitted). In the context of ERISA fiduciary breach claims, "ERISA plaintiffs generally lack the inside information necessary to make out their claims in detail unless and until discovery commences." *PBGC ex rel. St. Vincent Catholic Med. Ctrs. Ret. Plan v. Morgan Stanley Inv. Mgmt. Co*., 712 F.3d 705, 718 (2d Cir. 2013)(quoting *Braden*, 588 F.3d at 598). "[D]etails about a fiduciary's methods and actual knowledge tend to be 'in the sole possession of [that fiduciary].'" *Id.* at 719 (quoting *Braden*, 588 F.3d at 598);[7] *see also Allen v. GreatBanc Tr. Co*., 835 F.3d 670, 678 (7th Cir. 2016). Thus, even if a complaint does not "directly address[ ] the process by which the Plan was managed," a fiduciary breach claim is sufficient if the court "may reasonably 'infer from what is alleged that the process was flawed.'" *PBGC*, 712 F.3d at 718 (quoting *Braden*, 588 F.3d at 596). A complaint satisfies that standard by alleging, for example, that "a superior alternative investment was readily apparent such that an adequate investigation

---

[7] The lack of such "actual knowledge" is fatal to Yale's statute of limitations argument. *See* Part VII *infra*; *cf*. Doc. 62-1 at 46–48.

would have uncovered that alternative," or other facts that allow the court to reasonably infer that "a prudent fiduciary in like circumstances would have acted differently." *Id.* at 719–20.

Because determining whether a fiduciary has acted prudently "requires a totality-of-the-circumstances inquiry" (*Tatum v. RJR Pension Inv. Comm.*, 761 F.3d 346, 360 (4th Cir. 2014)(citing 29 C.F.R. § 2550.404a-1(b)(1))), ERISA fiduciary breach claims are inherently and "inevitably fact intensive" (*Tussey v. ABB, Inc.*, 746 F.3d 327, 336 (8th Cir. 2014)). Dismissal of such fact-intensive ERISA claims "is often inappropriate" until the record can be developed. *Brotherston v. Putnam Invs., LLC*, No. 15-13825, 2016 U.S.Dist.LEXIS 50849, at *3 (D.Mass. Apr. 6, 2016)(citing cases). And because claims over excessive fees "involve[] the application of a reasonableness standard, '[r]arely will such a determination be appropriate on a motion for summary judgment,' let alone a motion to dismiss." *Terraza v. Safeway Inc.*, No. 16-3994, 2017 U.S.Dist.LEXIS 35732, at *41–42 (N.D.Cal. Mar. 13, 2017)(quoting *Bd. of Trustees of S. California IBEW-NECA Defined Contribution Plan v. Bank of N.Y. Mellon Corp.*, No. 09-6273, 2011 U.S.Dist.LEXIS 142367, at *14 (S.D.N.Y. Dec. 9, 2011)); *Lau v. Metro. Life Ins. Co.*, No. 15-cv-09469 (PKC), 2016 U.S.Dist.LEXIS 134681, at *10, 16 (S.D.N.Y. Aug. 22, 2016) (denying motion to dismiss similar ERISA claims because the reasonableness of service provider's compensation could not be determined without discovery).  Accordingly, courts throughout the country, including this District, have overwhelmingly denied motions to dismiss ERISA fiduciary breach claims over excessive defined contribution plan fees.[8]

---

[8] *Taylor v. United Techs. Corp.*, No. 3:06cv1494 (WWE), 2007 U.S.Dist.LEXIS 57807 (D. Conn. Aug. 9, 2007); *Bell v. Pension Comm. of ATH. Holding Co.*, No. 15-02062-TWP-MPB, 2017 U.S.Dist.LEXIS 42107 (S.D.Ind. Mar. 23, 2017); *Troudt v. Oracle Corp.*, No. 16-00175-REB-CBS, 2017 U.S.Dist.LEXIS 41344 (D.Colo. Mar. 22, 2017); *Terraza*, 2017 U.S.Dist. LEXIS 35732, at *40; *Pledger v. Reliance Trust Co.*, No. 15-4444, Doc. 65 (N.D.Ga. Mar. 7, 2017); *Marshall v. Northrop Grumman Corp.*, No 16-06794, Doc. 68 (C.D.Cal. Jan. 30, 2017); *Moreno v. Deutsche Bank Ams. Holding Corp.*, No. 15-9936, 2016 U.S.Dist.LEXIS 142601, at *18 (S.D.N.Y. Oct. 13, 2016); *Lau v. Metro. Life Ins. Co.*, No. 15-9469, 2016 U.S.Dist.LEXIS 134681 (S.D.N.Y. Aug. 22, 2016); *Bowers v. BB&T Corp.*, No. 15-732, Doc. 58 (M.D.N.C. Apr. 18, 2016); *Kruger v. Novant Health, Inc.*, 131

## ARGUMENT

**I.      Yale's conduct in managing the Plan is measured by the same prudent person standard that applies to all ERISA fiduciaries.**

ERISA's fiduciary duties "are those of trustees of an express trust—*the highest known to the law*." *Donovan v. Bierwirth,* 680 F.2d 263, 271, 272 n.8 (2d Cir. 1982)(emphasis added); 29 U.S.C. §1104(a)(1). Fiduciaries are required to act "*solely* in the interest of the participants and beneficiaries and for the *exclusive* purpose of providing benefits to participants and their beneficiaries and defraying *reasonable* expenses of administering the plan[.]" 29 U.S.C. §1104(a)(1)(A)(emphasis added); *see also* 29 U.S.C. §1103(c)(1). The duty of prudence requires fiduciaries to use "the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims." 29 U.S.C. §1104(a)(1)(B).

To supplement the general fiduciary duties, Congress enacted §1106, which categorically bars, as prohibited transactions, "certain transactions deemed 'likely to injure'" a plan. *Harris Tr. & Sav. Bank v. Salomon Smith Barney Inc.*, 530 U.S. 238, 241–42 (2000)(citation omitted); 29 U.S.C. §1106. The Supreme Court in its watershed *Tibble* opinion has unequivocally and unanimously ruled that ERISA fiduciary duties are ongoing, meaning a fiduciary must remedy excessive fee arrangements, review and remove imprudent investments, and discontinue prohibited transactions, no matter how long ago those practices initially occurred. *Tibble V*, 135

---

F.Supp.3d 470, 477–79 (M.D.N.C. 2015); *Krueger v. Ameriprise Fin., Inc.*, No. 11-2781, 2012 U.S.Dist.LEXIS 166191 at *43–44 (D.Minn. Nov. 20, 2012); *George v. Kraft Foods Global, Inc.*, 674 F.Supp.2d 1031, 1047–49 (N.D.Ill. 2009); *Martin v. Caterpillar, Inc*., No. 07-1009, 2008 U.S.Dist.LEXIS 99465, at *16 (C.D.Ill. Sep. 25, 2008); *Tibble v. Edison Int'l*, No. 07-5359, Doc. 26 at 23–24, 27–28 (C.D.Cal. July 16, 2008); *Tussey v. ABB, Inc*., No. 06-4305, 2008 U.S. Dist.LEXIS 9806, at *27–28 (W.D.Mo. Feb. 11, 2008); *Abbott v. Lockheed Martin Corp.*, No. 06-701, 2007 U.S.Dist.LEXIS 58920, at *8 (S.D.Ill. Aug. 13, 2007); *Kanawi v. Bechtel Corp.*, No. 06-5566, 2007 U.S.Dist.LEXIS 97994, at *15–16 (N.D.Cal. May 15, 2007); *Spano v. Boeing Co.*, No. 06-743, 2007 U.S.Dist.LEXIS 28774, at *39 (S.D.Ill. Apr. 17, 2007); *George v. Kraft Foods Global, Inc.*, No. 06-798, 2007 U.S.Dist.LEXIS 18650, at *29–30 (S.D.Ill. Mar. 16, 2007).

S.Ct. at 1826–29. There, as here, plan fiduciaries allowed retail funds to be plan options when, as

here, identical institutional share class funds were available to the billion-dollar plan. *Id*. at 1826.

A fiduciary who breaches its duties or causes a prohibited transaction is "personally liable" for

"any losses to the plan resulting from [the] breach" and subject to disgorgement of profits and

"such other equitable or remedial relief as the court may deem appropriate." 29 U.S.C. §1109(a).

Throughout its brief, Yale references purported differences between 403(b) plans and 401(k)

plans, suggests that its "peer universities" comprise a unique market segment that cannot be

compared to other industries (or even other nonprofit employers), and refers to facts that are

legally irrelevant to its fiduciary conduct, such as the supposed "generosity" of its contributions

to the Plan.[9] Yale's apparent objective is to imply that fiduciaries of university 403(b) plans

should be held to a lesser standard than fiduciaries of 401(k) or non-university 403(b) plans.

This argument fails for many reasons. First, the Supreme Court has expressly rejected the

notion that certain types of plans have unique or "special" features that warrant a "loosened"

standard of conduct. *See Fifth Third Bancorp v. Dudenhoeffer*, 134 S.Ct. 2459, 2467–71

(2014)("In our view, the law does not create a special presumption favoring ESOP fiduciaries.").

"Rather, *the same standard of prudence applies to all ERISA fiduciaries*[.]" *Id*. at 2467

(emphasis added). This same duty applies to 401(k) plan fiduciaries, 403(b) plan fiduciaries, and

university 403(b) plan fiduciaries. *Id*.

Yale's suggestion that a university 403(b) plan is an enterprise of different "character" or

"aims" than other 403(b) plans or 401(k) plans is effectively the same argument rejected in

*Dudenhoeffer*. *See* 134 S.Ct. at 2467 (rejecting argument that ESOP had different "character"

---

[9] Determining the level of plan contributions "do[es] not implicate ERISA's fiduciary duties." *In re RCN Litig.*, No. 04-5068, 2006 U.S.Dist.LEXIS 12930, at *18 n.4 (D.N.J. Mar. 21, 2006). The match is not charity—Yale competes to attract and retain talent, and sets its compensation package accordingly. Just as an employer that pays "generous" wages must still comply with laws governing overtime and other employment practices, a supposedly "generous" match does not exempt an employer from complying with ERISA fiduciary duties.

and "aims" than an "ordinary retirement investment"). Yale's decision to qualify the Plan under 26 U.S.C. §403(b) instead of §401(k) is relevant only for *tax* purposes. For ERISA purposes, both 401(k) and 403(b) plans are "employee pension benefit plans" (29 U.S.C. §1002(2)(A)), and more specifically, defined contribution plans (29 U.S.C. §1002(34)). As the Supreme Court explained, all employee pension benefit plans have the same "character and aims," and "all ERISA fiduciaries" must pursue the same "exclusive purpose": accumulating "*financial* benefits (such as retirement income)" for participants, while "defraying reasonable expenses of administering the plan." *Dudenhoeffer*, 134 S. Ct. at 2468 (citation omitted). Just as excessive fees "significantly reduce the value" of a defined contribution account in a 401(k) plan, the same is true in a 403(b) plan. *Tibble*, 135 S.Ct. at 1826. Thus, fiduciaries in both types of plans must keep fees reasonable and include only prudent investments in their plans.

Second, ERISA does not differentiate fiduciary duties by industry. Just as the fiduciaries of manufacturing firms have the same fiduciary duties as service firms, hospitals do not have a separate fiduciary standard from educational facilities. Investment management principles are the same across all industries. One of these principles is that size matters greatly in the fees that can be obtained. Thus, a jumbo Plan such as Yale's can command far lower fees. AC ¶¶12, 39, 51, 58, 139. Yale assumes that virtually all universities have the same fiduciary approach. This is simply not true. *Id*. ¶¶82–98.

Accordingly, the question is not whether Yale simply followed what some universities or some 403(b) plan sponsors have done. Doc. 62-1 at 20, 34. The objective prudent person standard "does not require merely the level of care expected of a lay person," or for that matter, of a so-called peer in the same industry. *In re Meridian Funds Grp. Sec & ERISA Litig.*, 917 F.Supp.2d 231, 240 (S.D.N.Y. 2013). Instead, "prudence is measured against hypothetical

sophisticated and prudent investment professionals with experience" in like circumstances. *Id*. Thus, the proper inquiry is "whether a prudent, sophisticated investment professional with experience" in monitoring investments, fees, and service providers for a defined contribution plan, holding a comparable amount of assets, "and faced with the same facts, would have acted in a similar fashion as defendants." *Id*.

Yale's suggestion (at 20) that, because Plaintiffs' counsel has brought eleven other cases against universities with somewhat similar allegations this is enough to show the absence of any fiduciary breach here is absurd and relies on a deeply flawed understanding of ERISA. The fact that a supposed peer institution took a particular action says nothing about whether the decision was the result of a prudent and reasoned decisionmaking process. *See Taylor v. United Techs. Corp.*, No. 3:06cv1494 (WWE), 2007 U.S. Dist. LEXIS 57807, at *12 (D. Conn. Aug. 9, 2007)("The fact that plaintiffs allege that Revenue Sharing is a common industry practice does not curtail their ability to prove that, in this instance, it has resulted in unreasonable fees."); *George v. Kraft Foods Global, Inc.*, 641 F.3d 786, 796 & n.7 (7th Cir. 2011)("For all we know, Altria's decision to [modify a plan investment option] was imprudent."). If courts had accepted this defective logic, none of the cases brought by Plaintiffs' counsel since 2006, such as *Taylor*, involving similar allegations of excessive recordkeeping fees in 401(k) plans—the first cases alleging excessive fees in the history of ERISA—would have ever survived motions to dismiss (as the overwhelming percentage of them have done), or resulted in the only trials in history on such claims. *See* nn.2 & 9, *supra*; AC ¶206(e)("[F]ee reduction attributed to Schlichter, Bogard & Denton's fee litigation and the Department of Labor's fee disclosure regulations approach *$2.8 billion in annual savings* for American workers and retirees.")(quoting *Nolte v. Cigna Corp.*, No. 07-2046, 2013 U.S.Dist.LEXIS 184622 at *8 C.D.Ill. Oct. 15, 2013)(emphasis added)).

13

In discussing purported differences between 401(k) and 403(b) plans, Yale notes that 401(k) plans are not "centered around annuities" and can include separate accounts and commingled trusts, which are not permitted in 403(b) plans. Doc. 62-1 at 12. But 401(k) plans are not *barred* from investing in annuities (*see, e.g.*, *Lander*, 251 F.3d at 106), and Plaintiffs do not allege that Yale should have used separate accounts and commingled trusts. Accordingly, Yale fails to explain how any of the purported differences between 401(k) and 403(b) plans has any bearing on Plaintiffs' claims. Yale's position is undermined by its exclusive reliance on cases involving 401(k) plans, which would be inapposite if a different standard applied to 403(b) fiduciaries. Indeed, despite drawing these purported distinctions between 401(k) and 403(b) plans, Yale conspicuously fails to cite (let alone attempt to distinguish), *Kruger v. Novant Health, Inc.*, the only ruling to date that *actually involved a 403(b) plan* in the context of ERISA fiduciary breach claims based on excessive fees. 131 F.Supp.3d 470, 477–79 (M.D.N.C. 2015).

## II.   Considered as a whole, the Amended Complaint states plausible claims for breaches of fiduciary duty.

Applying the plausibility standard to an ERISA fiduciary breach claim "requires assessing 'the allegations of the complaint *as a whole.*'" *PBGC*, 712 F.3d at 719 (emphasis added) (quoting *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 47 (2011)). Yale takes the opposite approach, improperly "pars[ing] the complaint piece by piece" to argue that isolated allegations, standing alone, do not show a breach of fiduciary duty. *Cf. Braden*, 588 F.3d at 594. In so doing, Yale relies on cases (Doc. 62-1 at 23, 30), in which the plaintiffs alleged, "without more," that the fiduciaries "engaged in revenue sharing" or failed to offer "the cheapest possible fund." *See, e.g.*, *Rosen v. Prudential Ret. Ins. & Annuity Co.*, No. 15-1839, 2016 U.S.Dist.LEXIS 180567, at *32 (D.Conn. Dec. 30, 2016); *Hecker v. Deere & Co.*, 556 F.3d 575, 586 (7th Cir. 2009). In contrast, the complaint here does not allege only the presence of a revenue sharing arrangement,

and contains much more than "a bare allegation that cheaper alternative investments exist in the marketplace." *Braden*, 585 F.3d at 596 n.7 (distinguishing *Hecker*, 556 F.3d at 586).

Instructive is the Eighth Circuit decision in *Tussey*, the only full-trial of an ERISA excessive fee claim. After a four-week trial, the district court found that the defendants "breached their fiduciary duties by failing to monitor and control recordkeeping fees and for paying excessive revenue sharing from Plan assets[.]" *Tussey*, 746 F.3d at 336. On appeal, the defendants relied on *Hecker*, *Loomis v. Exelon Corp.*, 658 F.3d 667 (7th Cir. 2011), and *Renfro v. Unisys Corp.*, 671 F.3d 314, 327 (3d Cir. 2011), to argue that they could "not be liable for excessive fees" because the plan "offer[ed] many different investment options with a broad array of fees," allowing participants to "direct their contributions across different cost options as they see fit." *Id.* at 335–36. The defendants further argued that the district court's decision effectively condemned revenue sharing or "bundling of investment management and recordkeeping services through a single provider" as "automatically improper." *Id.* at 336. The Eighth Circuit rejected these arguments, finding that *Hecker* and its progeny "carefully limited their decisions to the facts presented," and that "[t]he district court did not condemn bundling services or revenue sharing," but rather found that the defendants "fail[ed] diligently to investigate Fidelity and monitor Plan recordkeeping costs based on the [defendants'] specific failings in this case." *Id.* Specifically, defendants failed to "(1) calculate the amount the Plan was paying Fidelity for recordkeeping through revenue sharing, (2) determine whether Fidelity's pricing was competitive, (3) adequately leverage the Plan's size to reduce fees, and (4) 'make a good faith effort to prevent the subsidization of administration costs of ABB corporate services[.]'" Taken together, these facts clearly established a breach of fiduciary duty. *Id.*

Plaintiffs' allegations here are similar to the facts in *Tussey*. Plaintiffs do not ask this Court

to condemn revenue sharing, and plainly acknowledge ERISA does not explicitly prohibit revenue sharing. AC ¶55. This alone distinguishes *Rosen*, because Plaintiffs do not allege *only* that Yale "engaged in revenue sharing, without more[.]" *Cf.* 2016 U.S.Dist.LEXIS 180567, at *32. Plaintiffs allege that Yale failed to monitor the *amount* the Plan was paying TIAA and Vanguard for recordkeeping through revenue sharing, *and* allowed the recordkeepers to collect revenue sharing in an amount that far exceeded the reasonable market rate by millions of dollars per year, *and* that Yale failed to conduct a bidding process to determine if TIAA's and Vanguard's pricing was competitive, which would have allowed Yale to obtain reasonable fees, *and* failed for many years to consider consolidating the number of recordkeepers in order to reduce fees dramatically, *and* that a prudent fiduciary in similar circumstances would have solicited bids and consolidated to one recordkeeper by at least 2010 if not many years earlier, *and* that as a result of this conduct, the Plan overpaid for recordkeeping by millions of dollars. Considered together, these facts raise a highly plausible inference of a defective process that failed to ensure the Plan's recordkeeping fees were reasonable. *See Tussey*, 746 F.3d at 336.[10]

Regarding investment management fees, Plaintiffs' allegations are almost the same as those in *Braden*. There, the plaintiff alleged that Wal-Mart's fund selection process was "tainted by [Wal-Mart's] failure to consider" trustee and recordkeeper Merrill Lynch's interest in including retail-class  mutual funds that paid it revenue sharing (the amount of which was undisclosed); that the plan offered "retail-class shares, which charge significantly higher fees … for the same return on investment" as available "institutional-class shares"; Wal-Mart included funds charging fees "from which participants derive no benefit;" and that Wal-Mart retained underperforming

---

[10] *See also George v. Kraft Foods Global, Inc.*, 641 F.3d 786, 798–99 (7th Cir. 2011)(reversing summary judgment based on evidence that fiduciaries' failure to obtain bids resulted in excessive recordkeeping fees); *Marshall v. Northrop Grumman Corp.*, No 16-06794, Doc. 68 at 20:16–21:7 (C.D.Cal. Jan. 30, 2017)(plaintiffs stated excessive recordkeeping fee claim based on allegations that defendants' failure to monitor fees resulted in plans paying an amount that exceeded market rate for similar plan).

funds, as shown by "specific comparisons … to an allegedly similar but more cost effective fund available in the market." *Id*. at 590, 595–596. "[C]onsidered as a whole," the complaint alleged that Wal-Mart chose a menu of inferior investment options "despite the ready availability of better options," and did so "to benefit the trustee at the expense of the participants." *Id*. at 594, 596. If proven, "the process by which [Wal-Mart] selected and managed the funds in the Plan would have been tainted by failure of effort, competence, or loyalty." *Id*. at 596.

Plaintiffs' allegations here raise an even more compelling inference. Instead of using "institutional-class shares of mutual funds" available to the massive $3.8 billion Plan, Yale used *74* retail-class mutual funds, which were included not based on an analysis of their merits, but because they paid more revenue sharing to the Plan's recordkeepers. AC ¶¶46, 102–105, 146.[11] Similar to the *Braden* plaintiff's "specific allegations about the relative cost of the institutional and retail shares in the funds actually included in the Plan" (588 F.3d at 595 n.5), Plaintiffs' chart compares the difference in fees between each of the 74 higher-cost shares actually included in the Plan and the available lower-cost shares of the same funds available to institutional asset holders, much less multi-billion dollar mega plans like Yale's. AC ¶146. Plaintiffs allege that certain Plan funds included layers of fees that enriched TIAA, provided excessive fees, and for two layers of fees, provided *no benefit* to participants. *Id.* ¶¶117, 121, 242.[12] Plaintiffs include specific comparisons showing that Yale retained options that drastically underperformed similar but more cost-effective funds that were readily available, and that *well over half* of the funds remaining in the Plan have underperformed their benchmarks over the previous five years. *Id*.

---

[11] While Plaintiffs' allegation that funds were selected based on revenue sharing is similar to the allegation in *Braden* that funds were selected due to "kickbacks" (588 F.3d at 590), the amended complaint would state a plausible claim even without such an allegation. *Kruger*, 131 F.Supp. 3d at 477 ("The *Braden* court did not require the kickback allegation to survive a motion to dismiss.")(citing *Braden*, 588 F.3d at 602).

[12] CREF variable annuities included *four layers* of expense charges—two of which were excessive for the services provided (administrative and investment management), and two of which provided no benefit at all to participants (distribution/12b-1 fees and "mortality and expense risk"), while the TIAA Real Estate Account included those same four layers of excessive fees and a fifth layer for "liquidity guarantee." *Id*. ¶¶116–20.

¶¶167–201. This demonstrates a failed fiduciary process or wholesale lack of any process. Considered as a whole, the complaint alleges that Yale included excessive cost and under-performing funds despite the ready availability of better options, and that the funds "were chosen to benefit" the recordkeepers "at the expense of participants." *See Braden*, 588 F.3d at 596.[13]

Indeed, the facts here are even more egregious because Yale locked the Plan into high-cost TIAA options that were not only placed in the Plan without the required evaluation, but also could not be removed *regardless of performance*, thus ensuring steady revenue streams to TIAA at participants' expense (AC ¶¶78, 210). This violates the "most basic" principle of investment management that investments be evaluated. *In re Unisys Savings Plan Litig.*, 74 F.3d 420, 435 (3d Cir. 1996). It raises an inference even stronger than that in *Braden* that Yale's process for managing the Plan was flawed and "tainted by failure of effort, competence, or loyalty."

Because Plaintiffs allege a plausible failure of prudence *or* loyalty, Yale's attempt to parse Plaintiffs' fiduciary breach claims into separate "prudence" and "loyalty" components (Doc. 62-1 at 41–43), should be rejected. The duties are not entirely distinct, but are "overlapping." *Martin v. Feilen*, 965 F.2d 660, 670 (8th Cir. 1992); *see Dudenhoeffer*, 134 S.Ct. at 2468 (language of §1104(a)(1)(A) informs interpretation of §1104(a)(1)(B)). Yale does not even cite, much less address, §1104(a)(1)(A). Plaintiffs allege that Yale allowed the recordkeepers to improperly influence the fund selection process, locked in TIAA as recordkeeper along with its proprietary funds, and failed to consider TIAA's and Vanguard's interests in including higher-cost shares that paid them more revenue sharing. AC ¶¶113, 133–34, 184, 211, 224. In so doing, Yale favored the recordkeepers' financial interests and failed to act "*solely* in the interest of the

---

[13] This combination of facts is completely unlike *PBGC*, cited by Yale. The plaintiff there was the fiduciary, not a participant (as Plaintiffs are here), and thus "was in a position to plead its claims with greater factual detail than is typically accessible to plaintiffs prior to discovery," yet still alleged no facts other than a decline in the price of the investment to raise a plausible inference that the investment was imprudent for a defined benefit plan, despite receiving two opportunities to amend its complaint. 712 F.3d at 709, 721–23, 727.

participants," "for the *exclusive* purpose of providing benefits to participants," and failed to defray only "*reasonable* expenses of administering the plan." 29 U.S.C. §1104(a)(1)(A). These allegations state a plausible breach of loyalty claim. *Terraza*, 2017 U.S.Dist.LEXIS 35732, at *22–23 (distinguishing *White v. Chevron Corp*., No. 16-0793, 2016 U.S.Dist.LEXIS 115875 (N.D.Cal. Aug. 29, 2016), and finding plausible disloyalty claim based on allegations that fiduciaries allowed recordkeeper to improperly "influence" investment decisions).

Yale's contention (at 42) that it is "utterly implausible" that TIAA sought to maximize its revenues from the Plan both ignores the alleged facts and improperly relies on outside materials to contest those facts. The court in a similar case rejected a request for judicial notice that TIAA and Vanguard were purported "low-cost" providers.[14] Even if the Court were to consider the supposed language which Yale claims is in TIAA's charter, it is contrary to the facts in the complaint. Plaintiffs allege, *inter alia*, that in 1998 Congress revoked TIAA's tax-exempt status because it "competed directly with for-profit insurance companies and mutual fund groups," it is organized as a stock life insurance company that "owns and controls" dozens of "for-profit subsidiaries, which send dividends to TIAA," its disclosures state that employees' compensation is tied to "profitability," and its CEO received $18 million in compensation in 2015, more than the CEOs of MetLife and Deutsche Bank, and comparable to the CEOs of J.P. Morgan Chase and Prudential. AC ¶¶70–77. Such salaries are made possible by lucrative arrangements with plans like Yale's. It is far from "indisputable" that TIAA and Vanguard had no incentive to maximize revenues. *Int'l Star Class*, 146 F.3d at 70 (judicial notice requires indisputability).

## III.     Yale imprudently wasted participants' money on excessive fees (Count V).

The trust law principles that inform ERISA provide that "cost-conscious management is fundamental to prudence in the investment function[.]" *Tibble VI*, 843 F.3d at 1197–98. Put

---

[14] Hearing Tr., 2/16/17, *Sacerdote v. NYU*, No. 16-6284, ECF No. 59 at 31:3–11 (S.D.N.Y. Mar. 8, 2017)(Ex. 1).

simply, "[w]asting beneficiaries' money is imprudent." *Id.* at 1198 (citation omitted). Fiduciaries are therefore "obliged to minimize costs," particularly when a plan has the bargaining power to "obtain favorable investment products" that "*are substantially identical*—other than their lower cost—to products the trustee has already selected." *Id.* at 1198 (emphasis added).

With the exception of fees, the different share classes of a given mutual fund are identical in all respects. *See Tibble V*, 135 S.Ct. at 1826; AC ¶¶45, 148. Prudent fiduciaries "review all available share classes and the relative costs for each when selecting a mutual fund[.]" *Tibble III*, 2010 U.S.Dist.LEXIS 69119, at *81. A fiduciary conducting even minimal diligence would "realize[] that the institutional share classes offer[] the exact same investment at a lower cost" and "the retail share classes would cost the Plan participants wholly unnecessary fees." *Id.* at *83 (citing, *inter alia, Katsaros v. Cody*, 744 F.2d 270, 279–80 (2d Cir. 1984)); AC ¶¶139–45.[15]

In *Tibble*, the Ninth Circuit affirmed the district court's finding at trial that the employer "breached its fiduciary duties by offering 'higher priced retail-class mutual funds as Plan investments when materially identical lower priced institutional-class mutual funds were available[.]'" *Tibble VI*, 843 F.3d at 1191–92 (citation omitted). The Supreme Court then unanimously ruled in favor of the participants' claim that the fiduciaries also had an ongoing duty to remove additional retail funds that were initially selected outside of the limitations period. *Tibble V*, 135 S.Ct. at 1828–29. In its amicus brief, the Solicitor General asserted that "it was imprudent to offer retail-class mutual funds to plan participants when the same funds were available as lower-cost, institutional-class funds." Br. for the United States Supporting

---

[15] Because the available share classes of a given mutual fund can be identified with a minimal investigation consisting of simply looking at a fee chart, fiduciaries do not have to "scour the market" to find them, and lower-cost shares cannot possibly be "plagued by other problems" because they invest in the same portfolio and are identical in all respects to retail-class shares. *Cf.* Doc. 62-1 at 30 (quoting *White*, 2016 U.S.Dist.LEXIS 115875, at *29). *White* erroneously believed *Tibble IV* had rejected a claim regarding retail-class shares (*id.* at *32; *cf. Tibble v. Edison Int'l (Tibble IV)*, 729 F.3d 1110, 1137–39 (9th Cir. 2013), *vacated on other grounds*, 135 S. Ct. 1823 (2015)), and was decided before its Court of Appeals sitting *en banc* reiterated that it is imprudent to waste participants' money on retail fees when lower-cost institutional shares are available. *Tibble VI*, 843 F.3d at 1198.

Petitioners 19, *Tibble v. Edison Int'l*, No. 13-550 (Dec. 9, 2014).[16]

Like the Ninth Circuit, other courts have repeatedly and consistently found that providing higher-cost shares instead of available lower-cost shares of the identical fund is a breach of fiduciary duty. *See* n.1, *supra*; *Braden*, 588 F.3d at 595–96 & n.5; *Terraza*, 2017 U.S.Dist. LEXIS 35732, at *39–40; *Kruger*, 131 F.Supp.3d at 477–78; *Krueger v. Ameriprise Fin., Inc.,* No. 11-2781, 2012 U.S.Dist.LEXIS 166191, at *29–30 (D.Minn. Nov. 20, 2012); *Tussey*, 2012 U.S. Dist. LEXIS 45240, at *8–9, 109–11, 115–16.

Here, Plaintiffs specifically identify *74* mutual funds—spanning *9 pages* of the complaint— for which Yale selected a higher-cost share class even though it could have obtained, because of its enormous size, lower-cost, but otherwise identical, institutional-class shares of the same funds. AC ¶146. This resulted in both excessive investment management fees and excessive recordkeeping fees paid from revenue sharing. Had Yale conducted even a minimal investigation, the superiority of the institutional-class shares would have been obvious. *Tibble III*, 2010 U.S.Dist.LEXIS 69119, at *83; AC ¶¶139–45. Although Yale suggests in a footnote that the Plan could not meet certain minimum investment requirements, Plaintiffs allege that Fund companies would have waived any such requirements if Yale had simply asked. AC ¶¶141–44.[17] Yale's use of 74 higher-cost mutual funds that provided vast revenue sharing to the Plan's recordkeepers instead of *identical* lower-cost shares of the *same* funds that were readily apparent raises a strong inference that Yale failed to conduct an adequate investigation (*PBGC*,

---

[16] AARP and other groups expressed the same view. Briefs available at: http://www.americanbar.org/publications/preview_home/13-550.html.

[17] Vanguard states in its SEC filings that it may establish "lower minimum amounts" based on a plan's "aggregate assets" invested with Vanguard; the Plan's *$948 million* in Vanguard investment easily would have qualified. AC ¶¶105, 143. And in *Tibble III*, "the district court amply documented that it is common knowledge in the financial industry" that such advertised minimums "will be waived for 'large 401(k) plans with over a billion dollars in total assets.'" *Tibble IV*, 729 F.3d at 1137 n.24; *see* AC ¶142 (quoting *Tibble III*). The company's *own* retained expert admitted that he had "personally obtained such waivers for plans as small as $50 million in total assets"—*i.e.*, about *1.4%* of the size of the $3.8 billion Yale Plan. *Id.;* AC ¶105.

712 F.3d at 719), and imprudently wasted participants' money on wholly unnecessary fees. *Tibble VI*, 843 F.3d at 1197–98.

Yale's pre-*Tibble* cases (*Hecker*, *Renfro*, *Loomis*), identify no trust law principle that would allow a fiduciary in Yale's position to avoid the duty of cost-conscious investing and to avoid wasting assets on unnecessary fees. Indeed, if the reasoning of those decisions were valid, there would have been no reason for the Supreme Court to take *Tibble* or to decide as it did.

The *Hecker* line of cases does not support Yale's position that fiduciaries automatically "satisfy their duties" by offering investment options with a particular "range" of fees. *Cf.* Doc. 62-1 at 30–31. As another court recently found in rejecting an identical argument, this argument "suffers from several infirmities." *Terraza*, 2017 U.S.Dist.LEXIS 35732, at *40–48. The plaintiffs in those cases challenged the "mix and range" of available options in "the plan as a whole," and "d[id] not challenge the prudence of the inclusion of any particular investment option." *Renfro*, 671 F.3d at 326; *Hecker*, 556 F.3d at 584–85 (plans "offered a sufficient mix of investments"); *Hecker v. Deere & Co. (Hecker II)*, 569 F.3d 708, 711 (7th Cir. 2009)(plaintiffs did not allege that any specific fund was "unsound or reckless"). Given the nature of the claims, "those courts held that the *range* of expense ratios offered was reasonable, not that a fiduciary's decision to include an investment option that has an expense ratio within that range is always reasonable as a matter of law." *Terraza*, 2017 U.S.Dist.LEXIS 35732, at *45.

Whether fees are excessive "depends on the alternatives available to the fiduciary," not a "categorical benchmark of whether the fees are above a certain amount." *Goldenberg v. Indel, Inc.,* 741 F.Supp.2d 618, 636 (D.N.J. 2010). It is imprudent to pay more when the same service is available for less. *See Tibble VI*, 843 F.3d at 1197–98. In *Tibble*, fiduciaries were liable even though the plan's fees were as low as 0.03% and within a range consistent with *Hecker*. *Id.* at

1198 n.4; *see also Braden*, 588 F.3d at 595 n.5 (imprudent to pay retail rate of 0.68% when institutional rate of 0.43% was available); *Terraza*, 2017 U.S.Dist.LEXIS 35732, at *39 (imprudent to use share class charging 0.45% instead of share classes charging 0.35% or 0.25%).

Even though the Supreme Court and Circuit courts have recognized that the institutional-class shares available to mega plans provide identical services to retail-class shares at lower cost,[18] Yale contends that this "is not true", and that a fiduciary "could" conclude retail shares were preferable. Doc. 62-1 at 31 (citing *Loomis*, 658 F.3d at 672). This argument fails for multiple reasons. First, it would require the Court to disregard the truth of Plaintiffs' allegations (and the Supreme Court's discussion in *Tibble V*). Second, even if a prudent fiduciary theoretically "could" decide to use retail funds due to more services, plaintiffs are not required "to rule out every possible lawful explanation" for Yale's conduct. *Braden*, 588 F.3d at 597.

Third, *Loomis* did not even address a claim that fiduciaries could have selected an *existing* institutional-class share of the *same* retail-class funds that were already in the plan. (Neither did *Hecker* or *Renfro*). Rather, the claim involved comparisons to non-mutual fund alternatives, such as "privately held trusts or commingled pools[.]" *Loomis*, 658 F.3d at 671–73. Plaintiffs do not allege that Yale should have used collective trusts or pools; Yale admits that such vehicles are not even permitted in 403(b) plans. Doc. 62-1 at 11–12. And in contrast to Plaintiffs' chart identifying *74* specific funds for which Yale could have selected a lower-cost institutional class share (AC ¶146), the complaints in *Loomis*, *Hecker*, and *Renfro* did not identify a single institutional share class that was available to those plans. [19]

---

[18] *Tibble V*, 135 S.Ct. at 1826; *Tibble VI*, 843 F.3d at 1198; *Braden*, 588 F.3d at

[19] *Loomis*, No. 06-4900, ECF No. 128 (N.D. Ill. Aug. 19, 2009); *see also* Br. of Defs–Appellees 16, *Loomis v. Exelon Corp.*, No. 09-4081 (7th Cir. June 9, 2010)("[P]laintiffs fail to identify … any situation where the Exelon Plan offered a 'retail' fund when an 'institutional' class of the same fund was available to the Plan"); *id.* 22–23 (noting *Braden* plaintiffs "specifically identified [institutional classes] in the complaint" (citing 588 F.3d at 595–96 & n.5), while *Loomis* plaintiffs "do not (and cannot) allege that institutional classes of the same funds were available to the Plan."); *Hecker*, No. 06-719, ECF No. 35 (W.D.Wis. Mar. 5, 2007); *Renfro*, No. 07-2098, ECF No. 98 (E.D.

Moreover, the *Hecker* line of cases did not separately analyze the reasonableness of the administrative component of a fund's expense ratio, as Plaintiffs do here. *Hecker* addressed only the *disclosure* of revenue sharing payments, not the *reasonableness* of recordkeeping fees based on revenue sharing. *See Spano v. Boeing Co*., 125 F.Supp.3d 848, 866 (S.D.Ill. 2014); *George v. Kraft Foods Global, Inc*., 674 F.Supp.2d 1031, 1048 n.17 (N.D.Ill. 2009)("at a fundamental level, *Hecker* says nothing regarding the duty a fiduciary holds with respect to a 401(k) investment plan's administrative services fees"). The court in *Loomis* viewed the claim as contending that the fund's *total* expense ratio, which includes both investment management and administrative fees, should be a flat fee, rather than a percentage of assets, and that mutual funds could not do that. 658 F.3d at 672 (addressing allegation that "Exelon could use its 'buying power' to insist that mutual funds charge a capitation fee (an annual flat price per investor) in lieu of expenses as a percentage of capital under management."). That is not in any way the claim here. Plaintiffs contend that the administrative recordkeeping component of the fee should be limited to a reasonable flat amount per participant out of the asset-based expense ratio. Flat per participant fees for recordkeeping are what the market and fiduciary practice provide because recordkeeping fees have nothing to do with the size of assets involved.

Further, all three decisions "carefully limited their decisions to the facts presented" (*Tussey*, 746 F.3d at 336), and *Hecker* makes clear that it is "tethered closely" to its facts (*Hecker II*, 569 F.3d at 711). They did not involve prohibited transaction claims (*see Renfro*, 671 F.3d at 325 n.6), nor allegations like those here that funds were selected to drive revenue to the recordkeeper. *See id*. at 327; *Loomis*, 658 F.3d at 671; *cf*. AC ¶¶99, 134, 171, 240; *Braden*, 588 F.3d at 596 (complaint alleged funds "were chosen to benefit the trustee at the expense of the participants.").

Yale relies on documents purportedly showing that by the time of the filing of Plaintiffs'

Pa. Nov. 23, 2009).

*Amended* Complaint—in December 2016—it had eventually switched most of the 74 retail-class

funds to institutional shares. Doc. 62-1 at 32–33. Yale claims that these documents render

Plaintiffs' allegations "provably false," and asks the Court to infer that Yale exercised the

appropriate diligence throughout the *entire* class period so as to conclude. *Id*. Yale's exhibits do

not even show that the switch was the result of Yale's investigation. It is also plausible that *TIAA*

and *Vanguard* offered certain changes in light of the recent court decisions in *Tibble* and *Tussey*,

the only two trials of excessive fee cases, finding fiduciaries liable for using retail-class funds

and excessive administrative fees from revenue sharing. Moreover, if the changes were made in

2015, they came far too late, and cost participants millions of dollars in retirement savings losses.

Even if Yale acted prudently in monitoring certain share classes, that is not a defense to

other imprudent funds, because fiduciaries must ensure that each available options is prudent.

*DiFelice*, 497 F.3d at 423–24. Thus, in *Tibble*, fiduciaries were liable even though only a subset

of the Plan's 40 mutual funds were retail-shares for which institutional shares were available—

*See Tibble III*, 2010 U.S.Dist.LEXIS 69119, at *8, 13. Yale's "decision" to switch certain funds

raises the question of why it failed to do so for all *74* funds for which lower-cost shares were

available. Yale's disclosure to participants that "as a result" of the Plan's consolidation to a

single recordkeeper in April 2015, *26* lower-cost Vanguard share classes would be offered,[20]

demonstrates that Yale's failure to consolidate recordkeepers and make share class changes by

2010 (or earlier) is a breach. AC ¶¶80–98. Yale would have this Court rule as a matter of law

that a fiduciary can immunize itself from liability for all years within the proposed class period in

---

[20] *See* Ex. 2. The Yale participant disclosure regarding the 2015 Plan share class changes resulting from consolidating recordkeepers makes this point clearly in the frequently asked questions section. "*Are the new share classes of funds managed any differently than the ones I have now? Do they earn more or less?* There is no difference in the investment strategy between the different share classes of the same fund. The investment expenses of the new share class are lower, thereby giving your portfolio more earning potential. *Are the new share classes actually a different fund than what I have now?* No."

which it imprudently retained high-cost shares instead of the *identical lower-cost shares of the exact same funds*— to entirely excuse Yale's *years* of delay in making those changes[21]—simply because it belatedly got around to making certain (albeit incomplete and untimely) share class changes. Nothing in ERISA permits this type of blatant end-run around the *ongoing* fiduciary duties the Supreme Court articulated in *Tibble V*—duties which rely on "cost-conscious management" being "fundamental to prudence" and which are grounded on the core principle that "[w]asting beneficiaries' money is imprudent." *Tibble VI*, 843 F.3d at 1198.

## IV.     Yale caused the Plan to pay excessive administrative fees (Count III).

ERISA provides "that plan administrative costs must be 'reasonable.'" *George*, 641 F.3d at 789 (citing 29 U.S.C. §1104(a)(1)). A failure to properly "monitor and control recordkeeping fees" is a fiduciary breach. *Tussey*, 746 F.3d at 336; *Kruger*, 131 F.Supp.3d at 479. Fiduciaries

---

[21] For example, despite Yale's purported share class changes (at 32–33 & n.43), and even assuming these extra-pleading documents are considered by the Court and are accurate, Yale only changed some retail funds. Between just 2010 and 2016 within the proposed class period, the Plan retained the following higher-cost share class for the following funds for between *2–6 years* despite a lower-cost share class of the *identical* fund being available: Vanguard 500 Index (VFINX)(3 years), Vanguard Balanced Index (VBINX)(4 years), Vanguard Capital Opportunity (VHCOX)(3 years), Vanguard Developed Markets Index (VDMIX/VDVIX)(2 years), Vanguard Emerging Markets Stock Index (VEIEX)(3 years), Vanguard Energy (VGENX)(4 years), Vanguard Equity-Income (VEIPX)(4 years), Vanguard European Stock Index (VEURX)(5 years), Vanguard Explorer (VEXPX)(4 years), Vanguard Extended Market Index (VEXMX)(2 years), Vanguard FTSE Social Index (VFTSX)(6 years), Vanguard GNMA (VFIIX)(4 years), Vanguard Growth & Income (VQNPX)(4 years), Vanguard Growth Index (VIGRX)(4 years), Vanguard Health Care (VGHCX)(4 years), Vanguard High-Yield Corporate (VWEHX)(4 years), Vanguard Inflation-Protected Securities (VIPSX)(3 years), Vanguard Intermediate-Term Bond Index (VBIIX)(4 years), Vanguard Intermediate-Term Investment-Grade (VFICX)(4 years), Vanguard Intermediate-Term Treasury (VFITX)(4 years), Vanguard International Growth (VWIGX)(4 years), Vanguard Large-Cap Index (VLCAX)(4 years), Vanguard Long-Term Bond Index (VBLTX)(6 years), Vanguard Long-Term Investment-Grade (VWESX)(4 years), Vanguard Long-Term Treasury (VUSTX)(4 years), Vanguard Mid Cap Index (VIMSX)(4 years), Vanguard Morgan Growth (VMRGX)(4 years), Vanguard Pacific Stock Index (VPACX)(4 years), Vanguard Prime Money Market (VMMXX)(4 years), Vanguard PRIMECAP (VPMCX)(3 years), Vanguard REIT Index (VGSIX)(4 years), Vanguard Short-Term Bond Index (VBISX)(6 years), Vanguard Short-Term Federal (VSGBX)(4 years), Vanguard Short-Term Investment-Grade (VFSTX)(4 years), Vanguard Short-Term Treasury (VFISX)(4 years), Vanguard Small Cap Growth Index (VISGX)(4 years), Vanguard Small Cap Index (NAESX)(4 years), Vanguard Small Cap Value Index (VISVX)(4 years), Vanguard Total Bond Market Index (VBMFX)(3 years), Vanguard Total International Stock Index (VGTSX)(2 years), Vanguard Total Stock Market Index (VTSMX)(3 years), Vanguard U.S. Growth (VWUSX)(4 years), Vanguard Value Index (VIVAX)(4 years), Vanguard Wellesley Income (VWINX)(4 years), Vanguard Wellington (VWELX)(3 years); Vanguard Windsor (VWNDX)(3 years), and Vanguard Windsor II (VWNFX)(3 years).

must assess whether the amount of a recordkeeper's compensation—including revenue sharing—is reasonable for the services provided. *Tussey*, 746 F.3d at 336; *Terraza*, 2017 U.S.Dist.LEXIS 35732, at *51–52 (citing DOL Adv. Op. 2013-03A at 4); Reasonable Contract Or Arrangement Under Section 408(b)(2), 72 Fed.Reg. 70988, 70989 (Dec. 13, 2007) ("fiduciaries need information concerning all [service provider] compensation"); DOL Adv. Op. 97-15A.[22]

The defined contribution recordkeeping market is highly competitive. AC ¶¶3, 38, 122.  A 17,000 participant plan can negotiate lower rates than a plan with half as many participants. *Id*. ¶¶51–54. The surest way to determine if a recordkeeper's compensation level is reasonable is to obtain competitive bids. *Id*. ¶¶58, 123; *see George*, 641 F.3d at 800 (denying summary judgment where consultant "could not comment on the competitiveness of [the recordkeeper's] fee" without "a bid from another service provider"). If a plan overpays for recordkeeping due to the fiduciaries' "failure to solicit bids" from other recordkeepers—under circumstances in which a prudent fiduciary would have done so—the fiduciaries have breached their duty of prudence. *See George*, 641 F.3d at 798–99; *see also Bell v. Pension Comm. of ATH Holding Co.*, 2017 U.S.Dist.LEXIS 42107, at *13 (S.D. Ind. Mar. 23, 2017); *Marshall v. Northrop Grumman Corp.*, No 16-06794, Doc. 68 at 20:1–21:24 (C.D.Cal. Jan. 30, 2017).

The complaint shows that the Plan grossly overpaid for recordkeeping compared to reasonable market rates. *First*, the Plan's *74* higher-cost share class mutual funds paid enormous amounts of uncapped, asset-based revenue sharing to the Plan's recordkeepers. AC ¶¶4, 55, 122–38. Yale failed to adequately monitor the amount of those payments to determine if they were reasonable compared to market rates, and failed to adequately negotiate for rebates of any excess. *Id*. ¶¶57, 128, 122–38, 225. *Second*, instead of using the Plan's full participant base to obtain favorable pricing from a single recordkeeper, Yale cut that leverage in half by needlessly

---

[22] Available at: https://www.dol.gov/agencies/ebsa/employers-and-advisers/guidance/advisory-opinions/1997-15a.

27

maintaining two recordkeepers, resulting in more complexity and dramatically higher costs. *Id*. ¶124, 137. While similarly situated fiduciaries in 401(k) and 403(b) plans used a single recordkeeper for years or moved to one recordkeeper after reviewing their plans, Yale failed to conduct a similar analysis for many years, only consolidating to a single recordkeeper in April 2015, nearly five years after the beginning of the statutory period herein. *Id*. ¶¶83–97, 127–28, 225, 227. *Third*, Yale failed to seek or obtain competitive bids, which would have allowed Yale to determine the market rate and to obtain much lower fees. *Id*. ¶¶58, 124, 133–38.

Based on consultation with experts in the recordkeeping industry, the Plan's features, the nature and type of administrative services actually provided by the TIAA and Vanguard, the Plan's participant level, and the market rates for similar plans, a reasonable annual administrative fee for the Plan would have been approximately between $500,000 and $575,000, or approximately $35 per participant. AC ¶¶130, 133. Yet, between 2010 and 2014 the Plan paid as much as $4.3 million *per year* (an average of as much as roughly $300 each year for each of the Plan's 17,000 participants) —over *eight times* higher than the market rate, resulting in excess of *$20 million in lost retirement savings. Id*. ¶¶134, 138. These facts plausibly show that Yale breached its duties to pay only reasonable administrative fees (*Tussey*, 746 F.3d at 336, *George*, 641 F.3d at 798–99), and that its process for monitoring and controlling such fees was "flawed" and "tainted by failure of effort, competence, or loyalty" (*Braden*, 588 F.3d at 596).

Yale relies on *Tussey* (at 23) for the point that revenue sharing is "common and acceptable," but ignores the court's holding that fiduciaries must "monitor and control" the *amount* of revenue sharing. 746 F.3d at 336. Although Yale claims that courts have "rejected" the theory that recordkeeping "must be valued on a per-participant basis," numerous courts have endorsed that approach where the facts show, as here, that a prudent fiduciary in like circumstances would

have reviewed the reasonableness of fees on a per-head basis. *See, e.g.*, *George*, 641 F.3d at 798–99; *Tussey*, 2012 U.S.Dist. LEXIS 45240, at *33 (finding fees excessive compared to per-participant rates), *aff'd in relevant part*, 746 F.3d 327 (8th Cir. 2014); *Marshall, supra*, C.D. Cal. No 16-06794, Doc. 68 at 20:1–21:7 (denying motion to dismiss where plaintiffs alleged recordkeeping fee should be negotiated on per-participant basis).[23] Asset-based revenue sharing can legally be used to pay for recordkeeping, but must not exceed the reasonable rate per participant. *See, e.g.*, *George*, 641 F.3d at 798–99; *Tussey*, 2012 U.S.Dist. LEXIS 45240, at *33; *see also* Br. for the Secretary of Labor Supporting Plaintiffs-Appellees, *Tussey v. ABB, Inc.*, No. 12-2056 (June 17, 2013). Yale's apparent theory that the amount of revenue sharing can never reach excessive levels ignores DOL's repeated statements that "the responsible Plan fiduciaries must assure that the compensation paid directly or indirectly [*i.e.*, through revenue sharing] by the Plan to [its service provider] is reasonable" for the services provided. *See, e.g.*, DOL Adv. Op. 97-15A; DOL Adv. Op. 97-16A.[24]

Yale relies heavily on an unreported summary order that has no precedential value in this Circuit. Doc. 62-1 at 26–27 (citing *Young v. GM Inv. Mgmt. Corp.*, 325 F.App'x 31 (2d Cir. 2009)); *see* 2d Cir. R. 32.1.1(a). Yet, as even Yale is forced to acknowledge (at 26–27), *Young* relies on the standard for excessive fee claims under §36(b) of the Investment Company Act, a wholly different law, which as the Supreme Court later explained, does "not permit a compensation agreement to be reviewed in court for 'reasonableness.'" *Jones v. Harris Assocs.*

---

[23] If the recordkeeper is paid under an asset-based arrangement, the fiduciary must negotiate a reasonable cap and obtain rebates of payments over that amount. *Tussey*, 2012 U.S.Dist.LEXIS 45240, at *30–31, 37–38; AC ¶57.

[24] Yale relies on *White* to support its argument that the Plan's ultimate transition to a single recordkeeper in April 2015 "demonstrates that the University had appropriate processes in place[.]" Doc. 62-1 at 26. Unlike *White*, where the court found the plan fiduciaries' renegotiation of an asset-based recordkeeping arrangement to a per-participant fee after just *two years* of asset-based revenue sharing plausibly suggested defendants were monitoring recordkeeping fees to ensure they did not become unreasonable, Plaintiffs here allege that the Plan paid excessive asset-based recordkeeping fees for every year between 2010 and when the Plan consolidated with TIAA in 2015, *and continue to pay excessive recordkeeping fees* even after this consolidation took place. AC ¶¶122–28.

29

*L.P.*, 559 U.S. 335, 341 (2010). ERISA, however, *explicitly requires* reasonableness. 29 U.S.C. §1103(c)(1), §1104(a)(1)(A)(ii), §1106(a)(1)(C), §1108(b)(2); *George*, 641 F.3d at 789.

Yale's assertion (at 27) that Plaintiffs have not alleged "what services the Plan received" at issue here is wrong—the complaint references "the nature of the administrative services" actually provided by TIAA and Vanguard, AC ¶133, and is consistent with the recordkeeping fee allegations in many cases in which motions to dismiss were denied. *See* n.9, *supra*. More "elaborate" or "detailed" facts are unnecessary. *Keiler*, 751 F.3d at 70. Determining whether fees are reasonable for the services rendered is a fact-intensive issue requiring discovery. *Lau*, 2016 U.S.Dist.LEXIS 134681, at *10, 16; *Terraza*, 2017 U.S. Dist. LEXIS 35732, at *41–42; *Kruger*, 131 F.Supp.3d at 479 (denying motion to dismiss because determining whether 403(b) plan fees were excessive for services provided were "the types of facts warranting discovery").

Yale accuses Plaintiffs of "sloppy due diligence" in having failed to account for certain purported rebates deposited into the Plan's "Revenue Credit Account" and discussed in notes to financial statements attached to the Plan's annual reports. Doc. 62-1 at 28–29. This accusation is not only baseless, but dead wrong—and it only highlights Yale's own failure to conduct the necessary fund-level fee calculations that must be done to evaluate how much the Plan was paying in recordkeeping fees. In fact, Plaintiffs' calculations *fully* accounted for the purported rebate figures when calculating that the Plan paid between $3.8 to $4.3 million per year from 2010 through 2014. Yale failed to get "*sufficient* rebates," in part because it imprudently locked the Plan into using TIAA, thereby sacrificing the Plan's negotiating leverage. AC ¶134; *id*. ¶¶126, 135, 225 (emphasis added). Notably, Yale does not claim that Plaintiffs' figures are inaccurate. For each year from 2010 to 2014, Plaintiffs calculated the amount of revenue sharing paid by *each* of the Plan's 100-plus investment options based on the asset levels shown on Form

5500, Schedule H for each option, the rates of revenue sharing applicable to each option, and included in these calculations the amounts of any rebates. *See, e.g.*, AC ¶130 (TIAA revenue sharing rates); Ex. 3 (Form 5500 excerpts with asset levels). Had Yale—the Plan *fiduciary*—itself made those calculations each year as it was required to do, it would have known that the Plan's fees were grossly excessive. Plaintiffs then deducted the disclosed rebates—a fraction of TIAA's total compensation—to get the net total. Even after that deduction, the Plan's fees were *still* many multiples higher than the market rate. AC ¶¶133–34. Rather than demonstrating "sloppy" diligence, Plaintiffs' calculations demonstrate the lack of any diligence by *Yale*.

In any event, Yale cannot rely on these documents to prove the truth of their contents, or to ask the Court draw the inference that Yale's own assertions about its conduct disprove Plaintiffs' allegations. *Roth*, 489 F.3d at 510–11. Even if Yale could do so, the mere fact that the Plan obtained certain rebates does not support an inference that there was no "breakdown of process." *Cf.* Doc. 62-1 at 29. A more likely explanation is that TIAA offered token rebates in light of ongoing litigation over revenue sharing practices. *See, e.g.*, *Tussey*, 746 F.3d at 336; *Haddock v. Nationwide Fin. Servs.*, 419 F.Supp.2d 156, 162 (D.Conn. 2006).

Finally, Yale's contention (at 29) that recordkeeping costs must be "so disproportionality large" in order to support a breach of prudence under ERISA is completely erroneous. ERISA expressly requires *reasonableness*. 29 U.S.C. §1104(a)(1)(A)(ii), *George*, 641 F.3d at 789.

## V. Yale breached its duty to monitor the Plan's investments and fee arrangements on an ongoing basis (Counts I, V)

"[A]n independent investigation into the merits of a particular investment" is "the most basic of ERISA's investment fiduciary duties." *Unisys*, 74 F.3d at 435. Yale was required to "initially determine, and continue to monitor, the prudence of *each* investment option available to plan participants." *DiFelice*, 497 F.3d at 423. Yale was also required to promptly remove imprudent

investments. *Tibble V*, 135 S.Ct. at 1828–29. Yale breached these obligations in several ways.

**A.  Yale imprudently locked the Plan into TIAA products and services**

Yale agreed to an arrangement that conditioned inclusion of TIAA's Traditional Annuity on locking the Plan into using TIAA as recordkeeper regardless of cost and including the CREF Stock and Money Market Accounts as Plan investment options regardless of fees or historical performance. AC ¶171. Because the CREF Stock and Money Market Accounts were not analyzed for prudence before placement in the Plan and could not be removed, Yale *could not* fulfill its ongoing duty to monitor *each* fund in the Plan. AC ¶¶113, 180, 210.

Yale asserts that there is nothing imprudent about "bundled" recordkeeping arrangements (Doc. 62-1 at 21), but a typical bundled arrangement does not mandate that any *particular* fund be permanently locked into a plan and not removed *even if it becomes imprudent*, like CREF Stock here. *Cf. Hecker*, 556 F.3d at 583 (describing bundled arrangement in which plan sponsor retained "final say on which investment options [would] be included"). While Yale asserts that a "lock in" arrangement is permissible as long as the overall decision was prudent (at 21),[25] Yale could not possibly have carried out its duty to monitor the fund and remove it if imprudent. AC ¶¶78, 99, 113, 180–82, 210–11. It is an egregious breach of the most fundamental fiduciary duty to place and retain funds in a plan without evaluation or investigation. *Unisys*, 74 F.3d at 435. Yale does not cite and cannot cite a single court decision or fiduciary practice suggesting otherwise. Yale's failure to make a reasoned decision about the prudence of this arrangement and to lock the Plan into it was a breach of duty. *George*, 641 F.3d at 796.

**B.  Yale retained funds with long histories of dramatic underperformance.**

As of the start of 2010, the first year of the proposed class period, the high-cost, actively

---

[25] Yale's bald contention (at 21) that "countless" other plans have the same arrangement has no factual support. Moreover, its suggestion that "following the crowd" shows an exercise of care is legally baseless.

managed CREF Stock and TIAA Real Estate accounts had already both drastically underperformed comparable lower-cost alternatives over one-, five-, and ten-year periods. *Id*. ¶¶188, 197.[26] Thus, the funds had consistent underperformance well *before* the limitations period, and their clear imprudence as of 2010 was not a matter of "hindsight" and did not require "prescience." *Cf*. Doc. 61-1 at 36.[27] Prudent managers who use actively managed funds must regularly analyze their historical performance. In March 2012, independent consultant AonHewitt recommended that its clients sell CREF Stock due to its historical underperformance and investment strategy which greatly reduced the fund's ability to generate excess returns. *Id*. ¶194. Instead of continuing to waste participants' retirement savings on abysmally performing high-cost funds, a prudent fiduciary would have placed the funds on a "watch list," and then removed the funds after a reasonable period once underperformance continued. AC ¶¶179–80, 192, 247. Yale did nothing and kept these funds in the Plan. *Id*. ¶¶170–71, 180, 193, 194, 201, 245–46. A fiduciary "who simply ignores changed circumstances that have increased the risk of loss to the trust's beneficiaries is imprudent." *PBGC*, 712 F.3d at 717 (citation omitted).[28]

The underperformance of these options continued after 2009,[29] resulting in tens of millions of dollars in losses to the Plan that would have been avoided if Yale had followed prudent

---

[26] The CREF Stock Account had underperformed those alternatives by *8% to 53%* over one year, *174% to 206%* over five years, and *3130% to 5790%* over ten years. *Id*. ¶188.

[27] The periods of underperformance in *Jenkins v. Yager*, 444 F.3d 916, 926 (7th Cir. 2006)(fund had three-years of underperformance) and *White*, 2016 U.S.Dist.LEXIS 115875, at *54–55 (fund had two-years of consistent underperformance before being removed), are far shorter than the *ten years* of consistently abysmal underperformance at issue here leading up to 2010. AC ¶188, 197; *cf*. Doc. 62-1 at 36 n.47. This case is also entirely unlike *PBGC*, which involved an unforeseeable decline in price of mortgage-backed securities in connection with the financial crisis, and because the plaintiff identified no facts suggesting imprudence other than a decline in price. 712 F.3d at 709, 722–23, 727.

[28] *See also Coburn v. Evercore Tr. Co., N.A.*, 844 F.3d 965, 976–77 (D.C. Cir. 2016)(Edwards, Sr. J., concurring)(allegations that fiduciaries "did absolutely nothing" as a fund's performance deteriorated "easily" state a failure-to-monitor claim under *Tibble*).

[29] For example, as of September 30, 2016, the CREF Stock Account underperformed prudent, lower-cost alternatives by 22% to 26% over one year, 48% to 58% over three years, 25% over five years, and 30% to 36% over ten years. *Id*. ¶185.

fiduciary practices by not having these funds in the Plan well before the beginning of the proposed class period. AC ¶¶180–201. Such "specific comparisons" showing that the fiduciary retained funds with "higher fees and lower returns" in order "to benefit the trustee at the expense of the participants" are sufficient to state a claim. *Braden*, 588 F.3d at 585, 590, 596. Yale's failure to consolidate or remove funds despite *well over half* of the Plan's lineup currently underperforming their benchmarks over the previous five years bolsters the inference of a flawed investment monitoring process. AC ¶168.

*Dudenhoeffer* and the efficient market hypothesis are irrelevant to this claim. *See* Doc. 62 at 35–36. Unlike *Dudenhoeffer* and *Rinehart v. Lehman Bros. Holdings, Inc.*, 817 F.3d 56, 66 (2d Cir. 2016), Plaintiffs do not allege that Yale should have "outsmarted a presumptively efficient market" by second-guessing the market price of individual stocks. *Cf*. Doc. 62-1 at 36. Plaintiffs claim that Yale had ample information, based on *a decade-long* track record of underperformance, to determine that these portfolio managers lacked the "stock-picking" ability to justify their higher fees, and that continuing to pay such fees was an imprudent waste.

Yale's bald assertion (at 37) that these funds "appreciated considerably" over some unspecified time period is irrelevant because the measure of plan losses is not whether the imprudent fund lost principal in certain years, but rather what a prudent alternative would have earned; *i.e.*, "what the Plan would have earned had the funds been available for other Plan purposes." *Donovan v. Bierwirth*, 754 F.2d 1049, 1056 (2d Cir. 1985); *cf. id*. at 1054–55 (measure in fraud cases). Plaintiffs show that the Plan's CREF Stock and Real Estate Account investments lost in excess of *$265 million* compared to such alternatives. AC ¶¶193, 201.

Yale's arguments (at 37–40) that different benchmarks are more appropriate "raise factual issues that cannot be resolved" at this stage. *Moreno v. Deutsche Bank Ams. Holding Corp.*, No.

34

15-9936, 2016 U.S.Dist.LEXIS 142601, at *18 (S.D.N.Y. Oct. 13, 2016)(denying motion to dismiss). Indeed, Yale and TIAA repeatedly informed participants that the Russell 3000 index cited in the complaint is the proper benchmark for CREF Stock. AC ¶¶183–84. As for Yale's contention that the Vanguard REIT Index mutual fund is not a proper benchmark for the TIAA Real Estate Account annuity (Doc. 62-1 at 40), Yale itself used the S&P 500 index as the benchmark. Doc. 62-6 at 20. This is also not an annuity and *is not even a real estate fund*. Plaintiffs' comparison to the Vanguard REIT Index is proper because this option was *already* in the Plan. *See* Ex. 3. The purportedly improved performance over isolated periods after 2009, outperforming in certain years while underperforming in others, does not negate the inference that Yale should have removed TIAA Real Estate by 2010 based on its enormous underperformance, excessive fees, and the information available to Yale as of 2010. AC ¶¶117, 119–120, 197, 199.[30] It merely affects the damages. Yale's attempt to show prudence based on mixed results after 2009 is itself an impermissible use of hindsight.[31]

### C. Yale failed to make a reasoned decision whether to consolidate funds.

The complaint raises a plausible inference that Yale did not analyze whether it was prudent to continue providing an investment lineup of 115 funds, or whether participants would benefit from consolidation. AC ¶¶150–66. In contrast to the Plan, the average defined contribution plan

---

[30] As of year-end 2009, Vanguard REIT Index outperformed TIAA Real Estate by *208%* over one year, *143%* over five years, and *239%* over ten years. *Id.* Regardless of whether TIAA Real Estate fortuitously outperformed in a single year after 2010, its overall abysmal performance continued to the present, trailing the Vanguard REIT Index by *253%* over one year, *63%* over three years and *69%* over five years, and *88%* over ten years as of September 30, 2016. *Id.* ¶198.

[31] Yale erroneously claims (at 41) that the complaint "says nothing at all" on the topic of Yale's inadequate process for reviewing the Real Estate Account. To the contrary, Plaintiffs sets forth extensive facts tending to show that Yale's process for reviewing *any* of the Plan's investment options, including the Real Estate Account, was inadequate or non-existent. AC ¶¶99, 113, 116–20, 158–95, 163–95, 200–01. Yale's conclusory assessment of Plaintiffs' allegations regarding the "liquidity guarantee" expense layer in the TIAA Real Estate Account (Doc 62-1 at 41 n.61), ignores Plaintiffs' detailed allegations describing the *four layers* of expenses the TIAA Real Estate Account charges *in addition* to the liquidity guarantee—two of which were excessive for the services provided (administrative and investment management), and two of which provided *no benefit at all* to the Plan's participants (distribution/12b-1 fees and "mortality and expense risk"). AC ¶115–20.

includes only 15 options, and the average 403(b) plan has 28 options. *Id*. ¶¶105, 152. The Plan

included many overlapping and duplicative options in each investment category, including, for

example, *17* fixed income, *28* large cap domestic equity, and *13* international funds. AC ¶159. It

is well-documented in industry literature that such a large number of options is detrimental and

causes investor confusion and "decision paralysis." *Id*. ¶¶150–51, 157, 159. As an ERISA

fiduciary, Yale is charged with being a prudent financial expert familiar with such industry

knowledge. *Katsaros*, 744 F. 2d. at 275, 279. Consolidating duplicative options would have

significantly reduced the Plan's fees. AC ¶¶160–66. Fiduciaries who reviewed their plans under

similar circumstances greatly reduced the number of options. *Id*. ¶¶79–88.

The cases Yale cites (at 34–35) do not support its suggested rule that more choice is

automatically prudent. In fact, the Seventh Circuit panel in *Hecker II* issued a supplemental

opinion to clarify that *Hecker I* should *not* "be read as a sweeping statement that any Plan

fiduciary can insulate itself from liability by the simple expedient of including a very large

number of investment alternatives" in a plan. 569 F.3d at 711. The court endorsed the Secretary

of Labor's view that such a strategy "could result in the inclusion of many alternatives that a

responsible fiduciary should exclude," while "plac[ing] an unreasonable burden on

unsophisticated plan participants who do not have the resources to pre-screen investment

alternatives." *Id*. Regardless of the number of choices, the fiduciary must make a "reasoned

decision" that *each* option is prudent. *DiFelice*, 497 F.3d at 420, 423–24; 29 C.F.R. §2550.404a-

1(b)(i)-(ii). The complaint raises a plausible inference that Yale failed to do so. AC ¶154.[32]

---

[32] Because Plaintiffs have sufficiently alleged breaches of fiduciary duties, Yale's argument for dismissal of the
failure-to-monitor claim fails. *Moreno*, 2016 U.S.Dist.LEXIS 142601, at *23–24; *cf*. Doc. 62-1 at 45–46.

## VI.   Plaintiffs state plausible prohibited transaction claims (Counts II, IV, VI) [33]

Section 1106(a) prohibits transactions between a plan and "parties in interest"— entities

such as service providers "that a fiduciary might be inclined to favor at the expense of the plan's

beneficiaries." *Harris Tr.*, 530 U.S. at 242*;* 29 U.S.C §1002(14)(B). Section §1106(a) "begins

with the premise that virtually all transactions *between a plan and a party in interest* are

prohibited, unless a statutory or administrative exemption applies." *Kanawi v. Bachtel Corp.*,

590 F.Supp.2d 1213, 1222 (N.D. Cal. 2008).

TIAA and Vanguard are "parties in interest" furnishing both investment management and

recordkeeping services to the Plan. 29 U.S.C. §1002(14)(B); AC ¶¶217, 232, 252. Plaintiffs'

complaint alleges in detail that Yale engaged in prohibited transactions constituting a direct or

indirect: "sale or exchange . . . of any property between the plan and a party in interest"

(§1106(a)(1)(A)); *or* "furnishing of goods, services, or facilities between a plan and a party in

interest" (§1106(a)(1)(C)); *or* "transfer to, or use by or for the benefit of, a party in interest, of

any assets of the plan" (§1106(a)(1)(D)). *See* 29 U.S.C. §1106; AC ¶¶217–18, 232–33, 252–53.

Yale contends that the Plan's *mutual funds* managed by these entities are exempt from party-

in-interest status under §1002(21)(B). Doc. 62-1 at 43–44. That section provides only that a

plan's investment of "money or other property" in a mutual fund "shall not by itself cause" the

mutual fund to be deemed to be a party in interest. 29 U.S.C. §1002(21)(B). In fact, Yale admits

in the Plan's annual Forms 5500 that the TIAA- and Vanguard-managed investments "qualify as

party-in-interest transactions." *See* Ex. 3. Moreover, a transfer of "property" is covered by

§1106(a)(1)*(A)*, not (a)(1)(C). The exemption says nothing about a mutual fund that furnishes

---

[33] Yale fails to address Count II. DOL regulations prohibit a "contract or arrangement" that "does not permit termination by the plan without penalty to the plan on reasonably short notice under the circumstances *to prevent the plan from becoming locked into an arrangement that has become disadvantageous.*" 29 C.F.R. §2550.408b-2(c)(3)(emphasis added); *Kouba v. Joyce*, No. 83-451, 1987 U.S.Dist. LEXIS 12334, at *18 n.21 (N.D.Ill. Dec. 29, 1987).

"services" to a plan. 29 U.S.C. §1106(a)(1)(C).

Yale's assertion that mutual fund revenue sharing payments are not "plan assets" under §1106(a)(1)(D), overlooks that §1106(a)(1) also includes "exchange of *any property*" (A) and furnishing of "services" (C). These provisions are read broadly. *Lowen v. Tower Asset Mgmt., Inc.*, 829 F.2d 1209, 1213 (2d Cir. 1987). A plaintiff states a §1106(a)(1)(C) claim by alleging that a recordkeeper received "revenue sharing payments in exchange for services rendered to the Plan." *Braden*, 588 F.3d at 601; AC ¶¶216–18, 232–33, 252–53. And payments from mutual funds made at the expense of participants *are* plan assets. *Tibble v. Edison Int'l (Tibble I)*, No. 07-5359, Doc. 26 at 26:4–28:2 (C.D.Cal. July 16, 2008); *Haddock*, 419 F.Supp.2d at 170;[34] DOL Adv. Op. 2013-03A at 2–3.[35] Even if revenue sharing were not a plan asset generally, the portion that exceeds a reasonable amount *is* because it rightfully belongs to the Plan.

Yale's attempt (at 44–45) to rely on a potential prohibited transaction exemption under §1108(b)(2) involves an affirmative defense (*Lowen*, 829 F.2d at 1215), that Yale bears the burden of pleading and proving. *Allen*, 835 F.3d at 676–77; *Braden*, 588 F.3d at 601–02; *Moreno*, 2016 U.S.Dist.LEXIS 142601, at *18–19.[36] For a fiduciary to assert a §1108(b)(2) exemption, the challenged transaction must: (1) be disclosed; (2) involve "services *necessary* for the Plan's establishment or operation";  and (3) involve the Plan paying only "*reasonable* compensation" for such services. 29 U.S.C. §1108(b)(2)(emphasis added). Moreover, even if

---

[34] *Hecker* did not address §1106(a). Its "plan asset" analysis addressed whether a mutual fund adviser was a fiduciary as to certain revenue sharing payments. 556 F.3d at 584.

[35] Available at: https://www.dol.gov/sites/default/files/ebsa/employers-and-advisers/guidance/advisory-opinions/AO2013-03A_0.pdf.

[36] Yale's district court citations (at 45) are unpersuasive. The ruling in *Skin Pathology Assocs. v. Morgan Stanley & Co.*, 27 F.Supp.3d 371, 378 (S.D.N.Y. 2014) improperly placed the burden for pleading the inapplicability of a §408 exemption on the plaintiffs—a ruling which is at odds with the Second Circuit's decision in *Lowen* establishing that it is the *defendant* that bears the burden of showing an exemption to §1106 applies. *Lowen*, 829 F.2d at 1215; *see also Moreno*, 2016 U.S. Dist. LEXIS 142601, at *18–19. *Leber v. Citigroup, Inc*., No. 07-9329, 2010 U.S.Dist.LEXIS 25097, at *29 (S.D.N.Y. Mar. 16, 2010) even acknowledges the fiduciary's burden to prove exemptions to §1106(b)(3) transactions. There is no basis for applying a different rule to §1106(a). *See also Unisys*, 74 F. 3d at 446 (3d Cir. 1996)(applying *Lowen* to another ERISA exemption).

Plaintiffs were required to refute this defense at the pleading stage, the complaint firmly negates any possible exemption because it alleges that two recordkeepers and 115 investment options were not "necessary" services and that the Plan paid TIAA and Vanguard excessive and unreasonable compensation. AC ¶¶4, 133–38; 223–27; 29 U.S.C. §1108(b)(2).[37]

## VII.   ERISA's three-year "actual knowledge" limitation is inapplicable.

ERISA's "actual knowledge" requirement is "strictly construed and constructive knowledge will not suffice." *L.I. Head Start Child Dev. Servs. Inc. v. Econ. Opportunity Council of Suffolk, Inc*., 710 F.3d 57, 67 (2d Cir. 2013).[38] It requires "knowledge of all facts necessary to constitute a claim," which may "include necessary opinions of experts, knowledge of a transaction's harmful consequences, or even actual harm." *Caputo v. Pfizer, Inc.*, 267 F.3d 181, 193 (2d Cir. 2001). "[D]isclosure of a transaction that is not inherently a statutory breach of fiduciary duty … cannot communicate the existence of an underlying breach." *Id.* (citation omitted). "Actual knowledge" of a breach requires more facts than a plaintiff would need "to plausibly allege that breach on information and belief." *Leber v. Citigroup 401(k) Plan Inv. Comm.*, No. 07-9329, 2014 U.S.Dist. LEXIS 139001, at *13–14 & n.5 (S.D.N.Y. Sep. 30, 2014)

Because Plaintiffs' claims are based on flaws in Yale's process for selecting and monitoring the Plan's fees and investments, "actual knowledge" requires knowledge of the process (or lack thereof) that Yale used to manage the Plan. *Fish v. Greatbanc Trust Co.*, 749 F.3d 671, 681 (7th Cir. 2014).[39] Plaintiffs lack actual knowledge here for several reasons. First, Yale is in sole

---

[37] *Krueger*, 2012 U.S.Dist.LEXIS 166191, at *48–49 (allegations that plan paid "unreasonable fees and expenses" defeated possible exemptions); *Shirk v. Fifth Third Bancorp*, No. 05-49, 2008 U.S.Dist.LEXIS 108089, at *45–46 (S.D.Ohio Sep. 26, 2008).

[38] Yale cites *Young v. GM Inv. Mgmt. Corp.*, 550 F.Supp.2d 416, 419–20 (S.D.N.Y. 2008), and *Brown v. Owens Corning Inv. Review Comm.*, 622 F.3d 564, 571 (6th Cir. 2010), (Doc 62-1 at 46) both apply a constructive knowledge standard to charge participants with "actual" knowledge even if they never "actually saw or read the documents." The Second Circuit declined to affirm *Young* on limitations grounds.

[39] *Muehlgay v. Citigroup Inc.*, 649 F.App'x 110, 111 (2d Cir. 2016), is inapposite because the plaintiffs pleaded that "the imprudence of investing in [the challenged investment] could be 'gleaned even from a cursory review of

possession of actual knowledge of the details regarding the process involved (if any) in managing the Plan's investments. *PBGC*, 712 F.3d at 719. Second, the documents that Yale cites provide only basic information about the Plan's investments and service providers, and no information about its flawed process. *Tibble IV*, 729 F.3d at 1121 (documents providing "mere notification that retail funds were in the Plan menu" did not provide actual knowledge), *vacated on other grounds*, 135 S.Ct. 1823. The documents do not disclose, *inter alia*, the failure of process that resulted in the Plan's inclusion of 74 retail mutual funds and Yale's failure to obtain institutional-class shares. Third, it was impossible for the Plan's participants to determine how much recordkeeping expenses the Plan was paying because the Plan's Forms 5500 fail to disclose the amount of this compensation. *See* Ex. 3, Schedule C (indicating TIAA and Vanguard are eligible to receive indirect compensation but failing to disclose the total amounts they received). Yale even admits this. *See* Doc. 62-1 at 28. Fourth, Plaintiffs also had no knowledge of the market rates for a multi-billion dollar plan for recordkeeping or investment management; or that the market rate for the Plan's recordkeeping services is $35 per participant and thus could not have known that the Plan paid greater than *eight times* more than a reasonable fee. *Id.* ¶¶133–134. Fifth, the documents also do not disclose the fees and performance of "comparable funds," *See Leber*, 2014 U.S.Dist.LEXIS 139001, at *15 ("Plaintiffs could not have known that the fees were excessive" without such a comparison).[40] Finally, the documents also provide no knowledge of prohibited transactions, which require information showing a claimed §1108 exemption "*does not apply*." *Fish*, 749 F.3d at 687 (emphasis added).

## CONCLUSION

For the above reasons, Defendants' motion to dismiss should be denied.

---

the omnipresent news stories[.]'" *Id.*

[40] As *Leber* notes, the court in *Young* "did not consider the significance of comparisons" to alternative funds in determining when participants obtained actual knowledge of a breach. *Id.*

March 27, 2017                          Respectfully submitted,

                                        By: /s/ Jerome J. Schlichter
                                            Jerome J. Schlichter (phv01476)
                                            SCHLICHTER BOGARD & DENTON, LLP
                                            Michael A. Wolff (phv08418)
                                            Troy A. Doles (phv02336)
                                            Heather Lea, (phv08416)
                                            Sean E. Soyars (phv08419)
                                            Kurt C. Struckhoff (phv08417)
                                            100 South Fourth Street, Suite 1200
                                            St. Louis, Missouri 63102
                                            Telephone: (314) 621-6115
                                            Facsimile: (314) 621-5934
                                            jschlichter@uselaws.com
                                            mwolff@uselaws.com
                                            tdoles@uselaws.com
                                            hlea@uselaws.com
                                            ssoyars@uselaws.com
                                            kstruckhoff@uselaws.com

                                            Stuart M. Katz (ct12088)
                                            Cohen and Wolf, P.C.
                                            1115 Broad Street
                                            Bridgeport, CT 06604
                                            Telephone: (203) 368-0211
                                            Facsimile: (203) 337-5505
                                            skatz@cohenandwolf.com

                                            *Attorneys for Plaintiffs*

**CERTIFICATE OF SERVICE**

I hereby certify that on March 27, 2017, a copy of foregoing was filed electronically using

the Court's CM/ECF system, which will provide notice of the filing to all counsel of record.


By: /s/ Jerome J. Schlichter
      Jerome J. Schlichter