# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
### CIVIL ACTION NO.: 1:16-CV-01044-CCE-LPA

DAVID CLARK, et al.,

        Plaintiffs,

v.

DUKE UNIVERSITY, et al.,

        Defendants.

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS PLAINTIFFS' AMENDED COMPLAINT**

Stacy K. Wood
N.C. State Bar No.: 21768
**PARKER POE ADAMS & BERNSTEIN LLP**
Three Wells Fargo Center
401 South Tryon Street, Suite 3000
Charlotte, NC 28202
Telephone: 704.335.9844
Facsimile: 704.335.9698
stacywood@parkerpoe.com

Jeremy P. Blumenfeld
**MORGAN, LEWIS & BOCKIUS LLP**
1701 Market Street
Philadelphia, PA 19103
Telephone: 215.963.5258
Facsimile: 215.963.5001
jeremy.blumenfeld@morganlewis.com

Donald L. Havermann
Christopher A. Weals
Abbey M. Glenn
**MORGAN, LEWIS & BOCKIUS LLP**
1111 Pennsylvania Avenue, NW
Washington, DC  20004
Telephone: 202.739.3000
Facsimile: 202.739.3001
donald.havermann@morganlewis.com
christopher.weals@morganlewis.com
abbey.glenn@morganlewis.com

*Counsel for Defendants*

**EXHIBIT 4**

# TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................ 1

FACTUAL BACKGROUND ............................................................................... 3

    I. Section 403(b) Retirement Plans. ................................................................. 3

    II. The Duke 403(b) Plan. ................................................................................ 4

STATEMENT OF THE QUESTIONS PRESENTED ......................................... 7

ARGUMENT ....................................................................................................... 7

    I. Standard of Review .......................................................................................7

    II. Plaintiffs' Prudence Claims Fail as a Matter of Law. .................................. 8

        A. Plaintiffs Fail to State a Plausible Claim That the Plan's Investment
            Management Fees Were Excessive (Count V)................................... 8

            1. The Plan's Investment Fees Fall Within a Range That is Comparable
               to What Courts Have Held to Be Prudent.................................. 8

            2. Plaintiffs Cannot State a Claim for Imprudence Based on the Use of
               Actively Managed Funds. ........................................................ 10

            3. Plaintiffs' Fee "Layering" Claim Fails as a Matter of Law........................ 11

        B. Plaintiffs Fail to Plausibly Allege That Duke Imprudently Retained
            Underperforming Funds (Count V)................................................ 11

            1. CREF Stock Account. .......................................................................... 13

            2. TIAA Real Estate Account. ................................................................. 14

        C. Plaintiffs' Claim That the Plan Paid Excessive Administrative Fees
            (Count III) Fails as a Matter of Law. ............................................ 15

            1. "Revenue Sharing" Is a Common and Accepted Practice. ..................... 16

            2. ERISA Does Not Require Fiduciaries to Utilize a Single
               Recordkeeper or Solicit Recordkeeping Bids. ....................... 16

        D. Plaintiffs' "Locking In" Claim (Count I) Fails as a Matter of Law and Is
            Time-Barred. ................................................................................. 17

        E. Any Alleged Fiduciary Breaches Prior to August 11, 2013, Are Time-
            Barred Under ERISA's Three-Year Statute of Limitations. ...................... 19

    III. The Prohibited Transaction Claims (Counts II, IV, VI) Fail as a Matter of
        Law. .......................................................................................................... 20

        A. The Prohibited Transaction Claims Are Untimely........................................ 21

-i-

**TABLE OF CONTENTS**
(continued)

**Page**

B. Plaintiffs Fail to Plausibly Allege Prohibited Transactions.............................22

IV. Plaintiffs' Remaining Claims Must Be Dismissed. ..............................................25

CONCLUSION ...............................................................................................................25

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Abbott v. Lockheed Martin Corp.*,
  No. 06-cv-0701-MJR, 2009 WL 839099 (S.D. Ill. Mar. 31, 2009) ............................ 21

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) ................................................................................. 7, 8, 13

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007) ...................................................................................... 7, 13

*Browning v. Tiger's Eye Benefits Consulting*,
  313 F. App'x 656 (4th Cir. 2009) ..................................................................... 19

*Curington v. UMG Recordings, Inc.*,
  No. 1:10-CV-890, 2011 WL 3568278 (M.D.N.C. Aug. 12, 2011), *aff'd*,
  468 F. App'x 304 (4th Cir. 2012) ....................................................................... 7

*David v. Alphin*,
  704 F.3d 327 (4th Cir. 2013) ........................................................... 19, 21, 22

*DiFelice v. U.S. Airways, Inc.*,
  436 F. Supp. 2d 756 (E.D. Va. 2006), *aff'd*, 497 F.3d 410 (4th Cir.
  2007) ......................................................................................................... 8

*DiFelice v. U.S. Airways, Inc.*,
  497 F.3d 410 (4th Cir. 2007) ......................................................................... 12

*Hecker v. Deere & Co.*,
  556 F.3d 575 (7th Cir. 2009) ................................................................... passim

*IATSE Local 33 Section 401(k) Plan Bd. of Trs. v. Bullock*,
  No. CV 08-3949 AHM, 2008 WL 4838490 (C.D. Cal. Nov. 5, 2008) ...................... 24

*In re McKesson HBOC, Inc. ERISA Litig.*,
  391 F. Supp. 2d 812 (N.D. Cal. 2005) ............................................................. 25

*In re PEC Sols., Inc. Sec. Litig.*,
  418 F.3d 379 (4th Cir. 2005) ............................................................................ 4

# TABLE OF AUTHORITIES
## continued

**Page(s)**

*Jenkins v. Yager*,
    444 F.3d 916 (7th Cir. 2006) ................................................................. 15

*Jordan v. Mich. Conference of Teamsters Welfare Fund*,
    207 F.3d 854 (6th Cir. 2000) ................................................................. 24

*Kanawi v. Bechtel Corp.*,
    590 F. Supp. 2d 1213 (N.D. Cal. 2008) ................................................. 22

*Leber v. Citigroup, Inc.*,
    No. 07 CIV. 9329 (SHS), 2010 WL 935442 (S.D.N.Y. Mar. 16, 2010) .................... 23

*Loomis v. Exelon Corp.*,
    658 F.3d 667 (7th Cir. 2011) ......................................................... passim

*Mehling v. N.Y. Life Ins. Co.*,
    163 F. Supp. 2d 502 (E.D. Pa. 2001) ....................................................... 23

*Pension Benefit Guar. Corp. v. Morgan Stanley Inv. Mgmt., Inc.*,
    712 F.3d 705 (2d Cir. 2013) .......................................................... passim

*Reich v. Compton*,
    57 F.3d 270 (3d Cir. 1995) ................................................................. 24

*Renfro v. Unisys Corp.*,
    671 F.3d 314 (3d Cir. 2011) .......................................................... passim

*Romero v. Nokia, Inc.*,
    No. C 12-6260 PJH, 2013 WL 5692324 (N.D. Cal. Oct. 15, 2013) .................... 25

*Rosen v. Prudential Ret. Ins. & Annuity Co.*,
    No. 3:15-cv-1839, 2016 WL 7494320 (D. Conn. Dec. 30, 2016) .................... 10

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007) ........................................................................... 4

*Tibble v. Edison Int'l*,
    729 F.3d 1110 (9th Cir. 2013), *vac'd on other grounds*, 135 S. Ct. 1823
    (2015) ................................................................................. 10, 14

-iv-

### <u>TABLE OF AUTHORITIES</u>
### <u>continued</u>

**Page(s)**

*Tibble v. Edison Int'l*,
    135 S. Ct. 1823 (2015) .................................................................................. 19

*Tussey v. ABB, Inc.*,
    746 F.3d 327 (8th Cir. 2014) ...................................................................... 18

*White v. Chevron Corp.*,
    No. 16-cv-0793, 2016 WL 4502808 (N.D. Cal. Aug. 29, 2016) ......................... passim

*Winburn v. Progress Energy Carolinas, Inc.*,
    No. 4:11-CV-03527-RBH, 2015 WL 505551 (D.S.C. Feb. 6, 2015) ...................... 19

*Wright v. Or. Metallurgical Corp.*,
    360 F.3d 1090 (9th Cir. 2004) .................................................................... 22

*Young v. Gen. Motors Inv. Mgmt. Corp.*,
    325 F. App'x 31 (2d Cir. 2009) ............................................................... 9, 11

*Young v. Gen. Motors Inv. Mgmt. Corp.*,
    550 F. Supp. 2d 416 (S.D.N.Y. 2008), *aff'd*, 325 F. App'x 31 (2d Cir. 2009) ........... 20

**STATUTES**

26 U.S.C. § 403(b)(7) ........................................................................................ 3

29 U.S.C. § 1002(14)(B), ERISA § 3(14)(B) ........................................................ 20

29 U.S.C. § 1002(21)(B), ERISA § 3(21)(B) ........................................................ 23

29 U.S.C. § 1104(a)(1)(B), ERISA § 404(a)(1)(B) ............................................. 8, 12

29 U.S.C. § 1104(c), ERISA § 404(c) .................................................................. 4

29 U.S.C. § 1106(a)(1), ERISA § 406(a)(1) ..................................................... 20, 24

29 U.S.C. § 1108(b)(2), ERISA § 408(b)(2) ........................................................ 23

29 U.S.C. § 1113, ERISA § 413 ......................................................................... 18

29 U.S.C. § 1113(1)(A), ERISA § 413(1)(A) ........................................................ 21

## TABLE OF AUTHORITIES
### continued

**Page(s)**

29 U.S.C. § 1113(2), ERISA § 413(2) ............................................................................. 19

Technical Amendments Act of 1958, Pub. L. No. 85-866, § 23, 72 Stat.
  1606 (1958) ................................................................................................................... 3

### OTHER AUTHORITIES

49 Fed. Reg. 13208 (Apr. 3, 1984), *as corrected*, 49 Fed. Reg. 24819 (June
  15, 1984) ...................................................................................................................... 24

81 Fed. Reg. 21147 (Apr. 8, 2016) ................................................................................. 24

# INTRODUCTION

This is one of twelve lawsuits filed by the same law firm challenging the retirement plans of major universities throughout the United States. Plaintiffs and their counsel seek to rewrite the fiduciary duty rules under the Employee Retirement Income Security Act ("ERISA") and impose a nationwide "one-size-fits-all" model on university retirement plans. Among other things, this approach would require fiduciaries to prioritize cost reduction over all other considerations, prohibit plans from offering participants meaningful choices about how to invest their retirement funds, and effectively mandate the same narrow investment options based solely on Plaintiffs' personal view about what is "best." Not only is this regime antithetical to ERISA's duty of prudence, it has been repeatedly rejected by courts and should be rejected here too.

In this case, Plaintiffs allege that Duke University and other defendants ("Duke") imprudently managed the Duke Faculty and Staff Retirement Plan ("Plan") by (1) allowing participants to select investment options that charged excessive fees; (2) causing Plan participants to pay unreasonable administrative fees and having multiple recordkeeping platforms; and (3) selecting TIAA as a service provider and "locking" the Plan into certain TIAA investment options. Plaintiffs then repackage those claims as ERISA prohibited transactions. All of Plaintiffs' claims fail as a matter of law.

*First*, courts have consistently rejected Plaintiffs' core contention—that ERISA fiduciaries must offer only the cheapest investment options possible. Instead, fiduciaries satisfy their duties by offering a broad array of investments—with different risks, in

different asset classes, and with a range of fees—that provide participants the ability to choose the funds that best suit their personal circumstances. *See Renfro v. Unisys Corp.*, 671 F.3d 314, 326-28 (3d Cir. 2011); *Loomis v. Exelon Corp.*, 658 F.3d 667, 671 (7th Cir. 2011); *Hecker v. Deere & Co.*, 556 F.3d 575, 586 (7th Cir. 2009); *White v. Chevron Corp.*, No. 16-cv-0793, 2016 WL 4502808, at *14 (N.D. Cal. Aug. 29, 2016). Here, the Plan offered participants very low-cost index fund options for the participants who wanted them. That the Plan also offered participants the choice (if they wanted) to invest in more expensive actively managed funds with different risks and potential returns is not a fiduciary breach as a matter of law.

*Second*, courts reject underperformance claims (like those asserted against the CREF Stock Account and TIAA Real Estate Account) where a complaint does not allege facts that show the challenged investment is too risky or that the fiduciary's selection process was flawed. *See Pension Benefit Guar. Corp. v. Morgan Stanley Inv. Mgmt., Inc.* ("*Morgan Stanley*"), 712 F.3d 705, 718 (2d Cir. 2013). The Amended Complaint ("AC") is devoid of such allegations. It focuses instead—with the benefit of hindsight—on other investments that performed better in certain years. As a matter of law, this is not enough to state a fiduciary breach.

*Third*, the allegation that Duke breached fiduciary duties by "locking" in TIAA as a recordkeeper and the CREF Stock and Money Market Accounts as investment options finds no support in the law. ERISA does not prohibit this type of arrangement, and the claim is time-barred.

*Finally*, the prohibited transaction claims simply repackage the flawed fiduciary-breach claims. They should be dismissed because the alleged transactions occurred outside ERISA's six-year statute of repose and because they are not plausible claims.

## FACTUAL BACKGROUND

### I.      Section 403(b) Retirement Plans.

Section 403(b) plans are tax-advantaged retirement savings plans offered by certain non-profit organizations, including universities. 403(b) plans are similar to 401(k) plans, but with important differences. Initially, 403(b) plans could offer only annuities.[1] An annuity provides a stream of monthly payments for life or for a fixed term of years, depending on the specific contract and individual choices.[2] In 1974, Congress amended § 403(b) to permit the offering of mutual funds. 26 U.S.C. § 403(b)(7).

In the typical 401(k) plan, participants must take their account balance at retirement in a lump sum. The participants then need to ensure that their funds are sufficient to last through retirement, *i.e.*, that they do not outlive their retirement nest eggs. By contrast, in a typical 403(b) plan, participants can elect to receive their benefits as an annuity by investing their funds in one or more annuity options available through the plan, as set forth in the contracts with the plan's annuity providers.[3]

TIAA (formerly TIAA-CREF) is one of the largest and most well-known annuity providers in the 403(b) retirement space. TIAA was rated the "Best Overall Large Fund

---

[1] Technical Amendments Act of 1958, Pub. L. No. 85-866, § 23, 72 Stat. 1606 (1958) (codified in 26 U.S.C. § 403(b)).
[2] *See generally* U.S. Securities and Exchange Commission, *Fast Answers: Annuities* (last modified Apr. 6, 2011), https://www.sec.gov/answers/annuity.htm ("Fast Answers").
[3] *See* Fast Answers.

3

Company" from 2013 to 2016,[4] and TIAA annuities have among the lowest costs in the industry.[5]

## II.  The Duke 403(b) Plan.

The Plan provides retirement benefits to Duke faculty and staff. (AC, Dkt. 24, ¶¶ 9, 11.) It is funded through employee contributions and a generous employer contribution from Duke. (AC ¶ 11.) As of December 31, 2014, the Plan had 37,939 participants and $4.7 billion in assets. (*Id.* ¶ 12.) Participants control the investment of all contributions. The Plan is designed to satisfy the safe harbor found in 29 U.S.C. § 1104(c), which relieves fiduciaries of liability for investment losses resulting from participants' exercise of control over their accounts. (Ex. 1 § 8.11.)[6]

The Plan offers a broad and diversified menu of over 400 investment options, including fixed and variable annuities offered through TIAA and a range of mutual funds from different fund families. (AC ¶ 104.) The TIAA fixed annuities pay a guaranteed rate of return, while the variable annuities invest in dedicated TIAA funds with different investment strategies, such as the CREF Money Market Account, the CREF Stock Account, and the TIAA Real Estate Account. TIAA requires that the Plan offer certain

---

[4] *See* TIAA, *Who We Are*, https://www.tiaa.org/public/why-tiaa/who-we-are (last visited Jan. 13, 2017).
[5] *See id.* 69% of TIAA funds and variable annuity accounts "received a[] Morningstar overall rating of 4 or 5 stars (44.00% 4 stars and 25.33% 5 stars), based on risk-adjusted returns as of September 30, 2016." *See* TIAA, *Annuities*, https://www.tiaa.org/public/offer/products/annuities (last visited Jan. 13, 2017).
[6] In ruling on a Rule 12(b)(6) motion, the Court may consider documents incorporated by reference or integral to the complaint and matters subject to judicial notice. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007); *In re PEC Sols., Inc. Sec. Litig.*, 418 F.3d 379, 388 n.7, 390 n.10 (4th Cir. 2005). Here, the Court may consider the written Plan document, the Plan's Forms 5500 and the Plan's legally mandated participant disclosures because they are expressly referenced in and central to the AC. (*See, e.g.*, AC ¶¶ 10, 12, 67, 84, 90, 143, 178 n.40, 180.)

4

variable annuity options—including the CREF Stock Account—if the Plan offers the

TIAA Traditional (fixed) Annuity to participants, but participants are not required to

invest in any of them.  (*Id.* ¶¶ 81, 118.) The TIAA variable annuity options charge annual

fees of between 0.38% and 0.895%. (*Id*. ¶¶ 122, 125.)

      The Plan also offers a diverse lineup of mutual funds from four vendors separated

into three "tiers": (1) Tier 1 asset allocation funds (*e.g.*, age-based target date funds); (2)

Tier 2 "core" funds that invest in equities, bonds, and fixed income investments; and (3)

Tier 3 funds selected by participants from the vendors' mutual fund platforms.[7] The

lineup includes both actively and passively managed funds[8] and covers a broad range of

asset classes, investment styles, and risk/reward profiles. The fees charged by the mutual

funds range from 0.05% to 1.55%.[9] (AC ¶ 156.) Among the options are low-cost index

funds in various asset classes—for instance, the Fidelity Spartan 500 Index fund with a

0.05% expense ratio, the Spartan U.S. Bond Index fund with a 0.07% expense ratio, and

---

[7] *See* Ex. 2 at 3; Duke Office of Human Resources, *Tiered Investment Choices*,
https://hr.duke.edu/benefits/retirement/tiered-investment-choices (last visited Jan. 13, 2017).

[8] Actively managed funds use fund managers to buy and sell stocks in an effort to outperform a specific index, such as the S&P 500. *Loomis*, 658 F.3d at 670; Investopedia, *What is the Difference Between Passive and Active Portfolio Management?* (June 14, 2016), http://www.investopedia.com/ask/answers /040315/what-difference-between-passive-and-active-portfolio-management.asp ("Portfolio Management"). Passively managed funds involve the creation of a portfolio allocation that is the same as a specific index, with the goal of generating a return that tracks the index instead of outperforming it. *See Loomis*, 658 F.3d at 669-70; Portfolio Management.

[9] Mutual funds charge an annual fee (referred to as the "expense ratio"), expressed as a percentage of fund assets, to cover fund expenses including investment management fees, administrative fees, operating costs, and other expenses. *See* Morningstar, *Morningstar Investing Glossary: Expense Ratio*, http://www.morningstar.com/InvGlossary/expense_ratio.aspx (last visited Jan. 13, 2017). For example, a fund with an expense ratio of 0.05% would charge a fee of $5.00 to manage a $10,000 investment (0.0005 x 10,000). Mutual funds may offer separate "share classes" that have different expense ratios. "Retail" share classes are offered to the general public and typically have higher expense ratios than "institutional" shares sold only to large investors that have less liquidity and may provide fewer administrative services than retail funds. *Id.*; *Loomis*, 658 F.3d at 670-71.

the Vanguard Mid Cap Index fund with a 0.09% expense ratio. (*Id.* ¶ 156.) Duke

discloses annually the investment performance and fees of each investment option

available through the Plan. (Exs. 2-3.)[10] At least 19 options in the Plan have an expense

ratio of 0.09% or lower. (Ex. 2.)

There are specific costs associated with administering a 403(b) plan, both at the

participant and plan levels, including maintaining account records; processing

contributions, rollovers, and transfers; generating account statements; executing fund

transfers and exchanges; and mailing communications to participants. (AC ¶ 42.) For the

Duke Plan and its participants (like Plaintiffs here), recordkeeping includes personalized

on-site investment advice, services, guidance, and education based on each participant's

financial circumstances, risk tolerances, and life plans.[11] Plan participants do not pay any

additional direct costs for the recordkeeping and advice services.  Instead, they pay a

single fee, based on the investment options they select (the expense ratio), for a bundle of

services that includes investment management, fund administration, recordkeeping, and

personalized services. Participants are free to choose the investment option(s) and

associated fees they prefer, depending on their individual risk/reward profiles, investment

horizons, preference for active or passive management, and other factors. Participants

choosing to invest in certain index funds, for instance, would pay only 0.05% in fees; a

---

[10] The Plan previously allowed participants to select annuities from the Variable Annuity Life Insurance
Company ("VALIC"). Duke closed the VALIC annuities to new participants in 2011, although
participants with legacy VALIC annuities may continue to contribute to their individual contracts.
[11] Representatives from Fidelity, TIAA, VALIC, and Vanguard are available for "one-on-one" retirement
counseling sessions with participants.  *See* Duke Office of Human Resources, *Investment Carriers*,
https://hr.duke.edu/benefits/retirement/investment-carriers (last visited Jan. 13, 2017).

participant with an account balance of $50,000 who selected those investments would pay $25 total per year in fees.[12] Participants are free to allocate their retirement savings across investments and vendors.

## STATEMENT OF THE QUESTIONS PRESENTED

Whether Plaintiffs' Amended Complaint states a plausible claim for breach of fiduciary duty or prohibited transactions where (1) the Duke 403(b) Plan offered participants a wide array of investment options with different fee levels, including low-cost index funds, and gave participants the ability to choose the funds (and associated fee levels) that were most appropriate to their circumstances; and (2) Plaintiffs do not allege facts that show the two allegedly underperforming funds (the CREF Stock Account and TIAA Real Estate Account) were too risky or were otherwise imprudent.

## ARGUMENT

### I.    Standard of Review.

Rule 12(b)(6) dismissal is warranted when a complaint fails to allege facts sufficient to establish each element of the plaintiffs' claims. *Ashcroft v. Iqbal*, 556 U.S. 662, 678-80 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555-56 (2007). To survive a motion to dismiss, Plaintiffs must allege "enough facts to state a claim to relief that is plausible on its face," and the allegations must rise above the "speculative" or "conceivable." *Twombly*, 550 U.S. at 555, 570; *Curington v. UMG Recordings, Inc.*, No. 1:10-CV-890, 2011 WL 3568278, at *3 (M.D.N.C. Aug. 12, 2011) (Eagles, J.), *aff'd*, 468

---

[12] That is, $50,000 multiplied by 0.0005 is $25.

F. App'x 304 (4th Cir. 2012). "[T]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678.

## II.     Plaintiffs' Prudence Claims Fail as a Matter of Law.

A claim of imprudence requires Plaintiffs to allege facts showing that the fiduciary failed to act "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would use." 29 U.S.C. § 1104(a)(1)(B). When evaluating an alleged breach of fiduciary duty, courts apply an objective standard focusing on whether the fiduciary employed appropriate methods to reach an investment decision. *DiFelice v. U.S. Airways, Inc.*, 436 F. Supp. 2d 756, 784 (E.D. Va. 2006), *aff'd*, 497 F.3d 410 (4th Cir. 2007). Where, as here, a complaint lacks allegations relating directly to the process employed by the fiduciary, it may survive a motion to dismiss only "if the court, based on circumstantial factual allegations, may reasonably infer from what is alleged that the process was flawed." *Morgan Stanley*, 712 F.3d at 718.

### A.     Plaintiffs Fail to State a Plausible Claim That the Plan's Investment Management Fees Were Excessive (Count V).

Plaintiffs' contention that the Plan charges excessive investment management fees runs contrary to ERISA fiduciary duties and ignores well-developed case law. Their claim fails because the Plan offered an array of investment options with a range of fees and gave participants the power to choose the investments best suited to them.

#### 1.     The Plan's Investment Fees Fall Within a Range That is Comparable to What Courts Have Held to Be Prudent.

8

ERISA does not require fiduciaries to choose the least expensive investment option. *See, e.g.*, *Hecker*, 556 F.3d at 586 ("nothing in ERISA requires [a] fiduciary to scour the market to find and offer the cheapest possible fund (which might, of course, be plagued by other problems)"); *Young v. Gen. Motors Inv. Mgmt. Corp.*, 325 F. App'x 31, 32-33 (2d Cir. 2009) (summarily affirming dismissal of claim based on allegation that plan investments had "fees and expenses [that] were . . . excessive as compared to alternative investments"). As one court explained in dismissing similar claims:

> Fiduciaries have latitude to value investment features other than price (and indeed, are required to do so), as recognized by the courts.  In particular where, as here, a plan offers a diversified array of investment options, the fact that some other funds might offer lower expense ratios is not relevant, as ERISA does not require fiduciaries to scour the market to find and offer the cheapest possible funds (which might, of course, be plagued by other problems).

*White*, 2016 WL 4502808, at *10 (citations and quotations omitted).

Rather, fiduciaries satisfy their duties by offering a diverse array of investment options with a range of fees. For example, the Third Circuit affirmed the dismissal of "excessive fee" claims where the plan offered 73 investment options with expense ratios ranging from 0.10% to 1.21%, reasoning that the duty of prudence simply requires offering "participants meaningful choices about how to invest their retirement savings" and a "reasonable mix and range of investment options." *Renfro*, 671 F.3d at 327. The Seventh Circuit reached the same conclusion in *Hecker*, where the plan offered funds with expense ratios ranging from .07% to "just over 1%," even though other funds with lower fees might have been available. 556 F.3d at 586. The Ninth Circuit rejected claims

9

challenging expense ratios ranging from .03% to 2.0%. *Tibble v. Edison Int'l ("Tibble I")*, 729 F.3d 1110, 1135 (9th Cir. 2013), *vac'd on other grounds*, 135 S. Ct. 1823 (2015). More recently, district courts dismissed similar excessive fee claims where the investment options had fees ranging from .05% to 1.24%, *White*, 2016 WL 4502808, at *11-12, and 0.04% to 1.02%. *Rosen v. Prudential Ret. Ins. & Annuity Co.*, No. 3:15-cv-1839, 2016 WL 7494320, at *15 (D. Conn. Dec. 30, 2016).

In this case, the Plan's mutual fund investment options had expense ratios between 0.05% to 1.55%. (AC ¶ 156.) These fees are comparable to the ranges that *Hecker*, *Renfro*, and *Tibble I* held reasonable as a matter of law.[13] Moreover, the central tenet of these cases applies equally here: fiduciaries satisfy their duties by "offer[ing] participants meaningful choices about how to invest their retirement savings," which includes evaluating "the range of investment options and the characteristics of those included options – including the risk profiles, investment strategies, and associated fees." *Renfro*, 671 F.3d at 327. The fund options in the Plan not only provide a range of fees, they span management styles, investment strategies, and asset classes. This diverse investment lineup satisfies Duke's fiduciary obligations.

### 2. Plaintiffs Cannot State a Claim for Imprudence Based on the Use of Actively Managed Funds.

Plaintiffs assert that Duke should have offered only passively managed index

---

[13] The contention that Duke breached fiduciary duties by offering retail share classes of mutual funds when less expensive institutional share classes were available is likewise deficient. (AC ¶¶ 102, 105, 136, 151-52.) Courts soundly reject the claim "that the mere inclusion of a fund with an expense ratio that is higher than that of the lowest share class violates the duty of prudence." *White*, 2016 WL 4502808, at *11; *accord Loomis*, 658 F.3d at 671-72; *Hecker*, 556 F.3d at 586; *Renfro*, 671 F.3d at 326-28.

10

funds (AC ¶¶ 182-89), but fiduciaries are not required "to include any particular mix of investment vehicles in their plan." *Hecker*, 556 F.3d at 586. Specifically, there is nothing improper about offering participants the choice of whether to invest in actively managed funds, passively managed index funds, or both. The plans in *Renfro*, *Hecker*, *Loomis*, *White*, and *Young* all did precisely that. Here, Plan participants may invest in at least 19 low-cost, passively managed index funds. (Ex. 2.) In other words, the Plan's fiduciaries

> offered participants a menu that includes high-expense, high-risk, and potentially high-return funds, together with low-expense index funds that track the market, and low-expense, low-risk, modest-return bond funds. [They have] left choice to the people who have the most interest in the outcome, and [they] cannot be faulted for doing this.

*Loomis*, 658 F.3d at 673-74.

### 3.    Plaintiffs' Fee "Layering" Claim Fails as a Matter of Law.

Plaintiffs allege that the annuities offered in the Plan had "multiple layers" of fees (AC ¶¶ 139-46, 278), yet do not claim that the *overall* fees charged on the annuities were excessive, nor could they. A study cited by Plaintiffs states that the average expense ratio of variable annuities is 2.25%.[14] By contrast, the TIAA variable annuities offered in the Plan have expense ratios ranging from 0.38% to 0.895%, well below the average. (AC ¶¶ 122, 125.) On the face of the AC, this claim fails as a matter of law. *E.g.*, *White*, 2016 WL 4502808, at *10.

### B.    Plaintiffs Fail to Plausibly Allege That Duke Imprudently Retained Underperforming Funds (Count V).

---

[14] *See* AonHewitt, *How 403(b) Plans Are Wasting Nearly $10 Billion Annually, and What Can Be Done to Fix It*, 6 (Jan. 2016), https://retirementandinvestmentblog.aon.com/getattachment/36ff81a4-db35-4bc0-aac1-1685d2a64078 (cited in AC ¶ 98.)

According to Plaintiffs, two of the Plan's 400-plus investment options were imprudent due to "underperformance"—the CREF Stock Account and TIAA Real Estate Account. (*E.g.*, AC ¶¶ 178-79.) Plaintiffs also allege that stable value funds would have been "prudent alternatives" to the TIAA fixed annuity. (*Id.* ¶ 82.)[15] But a fiduciary breach claim turns on the *process* fiduciaries used to select a particular investment, not how that investment performed. *DiFelice v. U.S. Airways, Inc.*, 497 F.3d 410, 420 (4th Cir. 2007). Thus, to state a claim, Plaintiffs must allege facts that suggest the investment decision-making process was deficient, and that a prudent process would have yielded a different result. *Morgan Stanley*, 712 F.3d at 718; 29 U.S.C. § 1104(a)(1)(B).

The AC contains no allegations from which the Court could plausibly conclude that Duke's investment selection and monitoring processes were deficient. Instead, Plaintiffs point to the "poor" performance of the two selected funds, but "underperformance" alone fails to state a claim as a matter of law. *Morgan Stanley*, 712 F.3d at 721 ("The allegation of a decline in price indicates only that the security turns out to have been, in hindsight, a bad investment. As we have explained, an allegation that an investment's price dropped, even precipitously, does not alone suffice to state a claim under ERISA."); *White*, 2016 WL 4502808, at *17 ("Poor performance, standing alone, is not sufficient to create a reasonable inference that [defendants] failed to conduct an adequate investigation[.]"). Plaintiffs also aver that "underperformance" *must* mean that Duke failed to follow a prudent process (AC ¶ 102), but this is the type of speculative

---

[15] Plaintiffs admit, however, that the Plan offered stable value investment options to participants. (*Id.* ¶ 160.) Thus, those who wanted to invest in a stable value fund could do so.

12

allegation rejected by *Iqbal* and *Twombly*, and by the Second Circuit in *Morgan Stanley*. In any event, Plaintiffs' challenge to just *two* funds out of hundreds simply underscores that the fiduciary process is working.[16]

### 1.    CREF Stock Account.

Plaintiffs allege, in hindsight, that the CREF Stock Account "dramatically underperformed" its benchmark (AC ¶¶ 193-95), but do not compare the Stock Account to its *actual* benchmark. The fund's prospectus makes clear that its performance benchmark is "a composite index that is a weighted average of two unmanaged indices," the Russell 3000 Index (domestic equities) and the MSCI ACWI ex-USA IMI (foreign equities).[17] In other words, the Stock Account invests in a combination of both domestic and foreign equities. Yet Plaintiffs compare the Stock Account to only the Russell 3000 holding domestic equities. In fact, the Stock Account did not materially underperform its benchmark:

|  | Total Return | | Average Annual Total Return[3] | | | | |
|---|---|---|---|---|---|---|---|
|  | 3 Months | YTD | 1 Year | 3 Years | 5 Years | 10 Years | Since Inception |
| CREF Stock Account | 1.51% | 1.60% | -2.60% | 7.86% | 7.71% | 5.50% | 9.69% |
| CREF Composite Benchmark | 1.65% | 2.27% | -1.50% | 8.25% | 8.18% | 5.71% | – |

---

[16] Plaintiffs allege that 40% of the Plans' funds underperformed their benchmarks, which is purportedly evidence of an imprudent process. (AC ¶ 178.) This is wrong for at least two reasons. First, Plaintiffs' analysis includes index funds. Yet, net of fees, index funds always underperform the index against which they are benchmarked because the index itself does not have fees. Second, in the marketplace generally, well over 60% of actively managed funds underperform their benchmarks. *See* Dumont, Chris, *Do Mutual Fund Benchmarks Matter?*, Mutual Funds (Oct. 10, 2014), http://mutualfunds.com/index-funds/do-mutual-fund-benchmarks-matter/. In other words, the Plan's investments performed better on average than those in the market as a whole, which supports the conclusion that Duke followed a prudent process.
[17] *See* TIAA, *Retirement Plan Variable Annuities: CREF Accounts Prospectus*, 62 (May 1, 2016) http://www.tiaa.org/public/prospectuses/crefprospectus.pdf?fundclass=RPVA.

Moreover, "underperformance" does not equal "imprudence." Plaintiffs do not allege that the Stock Account was too risky, or even that the Russell 3000 earned greater returns for the same level of risk. Absent such allegations, the mere fact that one investment outperformed another fails to state a claim of imprudence. *See Morgan Stanley*, 712 F.3d at 722.[18]

### 2.     TIAA Real Estate Account.

Plaintiffs' claim that the TIAA Real Estate Account underperformed derives from an even more egregious fund comparison. (AC ¶¶ 204-07.) The Real Estate Account is not a mutual fund; it is a separate account available *exclusively* to participants invested in TIAA variable annuities.[19] By contrast, Plaintiffs' chosen comparator—the Vanguard REIT Index—is a *mutual fund* not available through a TIAA annuity. The performance of the REIT Index is thus irrelevant. *Tibble I*, 729 F.3d at 1134 (rejecting comparison between separate account and mutual fund because a mutual fund has "a variety of unique regulatory and transparency features that make it an apples-to-oranges comparison"); *White*, 2016 WL 4502808, at *12 (same). Regardless, the Real Estate Account outperformed the REIT Index in three of the last six years:

---

[18] Plaintiffs' allegation in Count VII that Duke violated the Plan's investment policy statement ("IPS") by offering the CREF Stock Account fails for the same reasons. (AC ¶¶ 213, 270.) Moreover, although Plaintiffs assert that the IPS "mandated" specific performance parameters for Stock Account (*id.* ¶¶ 210-11), the IPS makes clear that those metrics apply only to the Plan's target date and core investments. (Ex. 4 at 4-5, 7.) The Stock Account is neither.

[19] *See* TIAA, *TIAA Real Estate Account Prospectus*, 12-14 (May 1, 2016), https://www.tiaa.org/public/pdf/realestate_prosp.pdf ("TIAA offers the Account as a variable option for the annuity contracts listed on the cover page of this prospectus" and describing the benefit options).

| Fund | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 |
|---|---|---|---|---|---|---|
| TIAA Real Estate Account[20] | 13.29 | 12.99 | 10.06 | 9.65 | 12.22 | 8.16 |
| Vanguard REIT Index[21] | 28.56 | 8.70 | 17.65 | 2.48 | 30.28 | 2.45 |
| Difference | -15.27 | 4.29 | -7.59 | 7.17 | -18.06 | 5.71 |

The Real Estate Account's consistent performance provides no plausible basis for concluding that Duke breached its fiduciary duties. *E.g.*, *Morgan Stanley*, 712 F.3d at 721; *Jenkins v. Yager*, 444 F.3d 916, 926 (7th Cir. 2006) (three years of losses alone "is not evidence that [defendant] violated his fiduciary duty"); *White*, 2016 WL 4502808, at *17 ("A fiduciary may – and often does – retain investments through a period of underperformance as part of a long-range investment strategy.").[22]

## C.   Plaintiffs' Claim That the Plan Paid Excessive Administrative Fees (Count III) Fails as a Matter of Law.

Plaintiffs do not complain about additional fees beyond the expense ratios of the mutual funds. Instead, their complaint is that some of the fund managers use the fees they are paid (*i.e.*, the expense ratios) to cover recordkeeping, personalized guidance, and

---

[20] *Id.* at 11.

[21] *See* Vanguard, *Vanguard REIT Index Fund Prospectus*, 3 (May 25, 2016), https://www.vanguard.com/pub/Pdf/i3123.pdf.

[22] Plaintiffs allege that stable value funds are "prudent alternatives" to the TIAA Traditional Annuity. (AC ¶ 82.) However, the Traditional Annuity outperformed stable value products during the relevant time period. Over the last 1, 3, 5 and 10 years, the Traditional Annuity provided a contractually guaranteed return of no less than 3% and actual annual returns of 4.37%, 4.38%, 4.38%, and 4.52%, respectively. *See* TIAA, *TIAA Traditional*, https://www.tiaa.org/public/offer/products/annuities/retirement-plan-annuities/tiaa-traditional-annuity (last visited Jan. 13, 2017). By contrast, the average returns of stable value funds were less than 2.0% over the last 1, 3, and 5 years, and under 3% over the past 10 years. *See* Galliard Capital Management. Inc., *How Do Stable Value Funds Compare with Money Market Funds?* (3rd Q. 2016), www.galliard.com/LiteratureRetrieve.aspx?ID=66271. And, Plaintiffs don't allege there was a stable value annuity option that was less risky or better performing than the Traditional Annuity. Therefore, this claim fails as a matter of law. *See White*, 2016 WL 4502808, at *5-8 (dismissing claim alleging that fiduciaries acted imprudently by selecting money market fund instead of stable value fund as a capital preservation option).

15

other services. In support, Plaintiffs raise two primary allegations that the Plan paid

"unreasonable" recordkeeping fees: (1) Duke should have negotiated a flat per-participant

fee rather than having recordkeeping included as part of the expense ratios; and (2) the

failure to consolidate to a single recordkeeper resulted in excessive fees. (AC ¶¶ 132-34,

239-40.) Neither allegation states a claim for breach of fiduciary duty.

### 1.    "Revenue Sharing" Is a Common and Accepted Practice.

Paying recordkeeping costs through expense ratios—sometimes called "revenue

sharing"—is a common industry practice. *Hecker*, 556 F.3d at 585; *White*, 2016 WL

4502808, at *14. With this type of asset-based fee arrangement, recordkeeping fees

decrease when plan assets decrease, whereas a per-participant fee remains fixed. As the

Seventh Circuit explained in dismissing similar claims:

> [I]t isn't clear to us why participants would view a [flat] fee as a gain. A
> flat-fee structure might be beneficial for participants with the largest
> balances, but, for younger employees and others with small investment
> balances, a [flat] fee could work out to more, per dollar under management,
> than a fee between 0.03% and 0.96% of the account balance.

*Loomis*, 658 F.3d at 672. Other courts agree. *See Renfro*, 671 F.3d at 327-28; *Hecker*, 556

F.3d at 586. Here, a participant with a $50,000 account can pay as little as $20 to $25 per

year in total fees (including recordkeeping and investment management fees). *See supra*,

pp. 6-7. Plaintiffs' claim that participants should have been paying $35 per person in

recordkeeping fees alone (not counting investment management fees) fails as a matter of

law.

### 2.    ERISA Does Not Require Fiduciaries to Utilize a Single Recordkeeper or Solicit Recordkeeping Bids.

16

Plaintiffs suggest that the Plan should have utilized a single vendor for all recordkeeping services, instead of allowing each vendor to recordkeep its own products, and that such an arrangement would have lowered recordkeeping fees. (AC ¶ 241.) But Plaintiffs do not allege that one vendor would have been willing or able to recordkeep all of the mutual funds and annuity investments in the Plan, or could have provided competent advice about all of the investment options. It is entirely reasonable to conclude that Fidelity, TIAA, VALIC, and Vanguard are best equipped to keep the records for their own products. Regardless, nothing in ERISA imposes the "consolidation" that Plaintiffs advocate. Plaintiffs' attempt to mandate a competitive bidding process for vendor services is also without merit. (*Id.* ¶¶ 145-47, 239.) "[N]othing in ERISA compels periodic competitive bidding." *White*, 2016 WL 4502808, at *14.

### D.     Plaintiffs' "Locking In" Claim (Count I) Fails as a Matter of Law and Is Time-Barred.

Plaintiffs allege that Duke "shackled the Plan" with the CREF Stock Account and Money Market Account by agreeing to offer those funds together with the TIAA Traditional Annuity, and "locked in" TIAA recordkeeping services, both in violation of ERISA. (AC ¶¶ 227-28.)[23] This claim is wholly derivative of Plaintiffs' core imprudence claim and, in any case, fails as a matter of law.

First, tying the CREF Stock and Money Market Accounts to the TIAA Traditional Annuity in no way suggests that Duke followed an imprudent process in selecting these

---

[23] Unlike the Stock Account, Plaintiffs do not allege that the CREF Money Market Account was an imprudent investment. Thus, "allowing" the Plan to be "locked in" to offering this fund cannot have been imprudent.

options or failing to prudently monitor them. While Plaintiffs attempt to show otherwise by alleging that the Stock Account was an "underperformer," its performance closely tracked its benchmark. *See supra*, pp. 13-14. Meanwhile, the Traditional Annuity rendered returns that exceeded those of stable value funds, *see supra*, p. 15 n.22, a clear indication that the Traditional Annuity is a valuable investment option in its own right.

Second, nothing prohibits the Plan's fiduciaries from agreeing to offer certain investments as part of a "bundled" recordkeeping arrangement. The plans at issue in both *Renfro* and *Hecker* involved similar arrangements whereby a single provider, Fidelity, supplied the plans with its own proprietary investment options and also served as the exclusive recordkeeper for those options. *See Renfro*, 671 F.3d at 318; *Hecker*, 556 F.3d at 579. Neither the Third nor Seventh Circuit found fault with these arrangements. This is not surprising, considering that bundling arrangements "are common and 'acceptable' investment industry practices that frequently inure to the benefit of ERISA plans." *Tussey v. ABB, Inc.*, 746 F.3d 327, 336 (8th Cir. 2014).

Finally, Plaintiffs' "locking in" claim is time-barred because they challenge actions that occurred more than six years prior to the filing of the Complaint. Under 29 U.S.C. § 1113, a plaintiff is limited by a general six-year limitations period, which is shortened to three years where the plaintiff had actual knowledge of the breach. Here, Plaintiffs contend that Duke breached its fiduciary duties by "committ[ing] the Plan to an imprudent arrangement" in which "certain investments had to be included and could not be removed" and "prevented the Plans from using alternative recordkeepers." (AC ¶ 227.)

However, the Plan's Form 5500 demonstrates that TIAA has provided services to the Plan and managed Plan investment options, including the CREF Stock and Money Market Accounts, since at least 2009. (Ex. 5 at 84, 86, 90-91, 100.) Any "locking in" thus occurred more than six years before Plaintiffs filed suit on August 10, 2016, barring their claim. *David v. Alphin*, 704 F.3d 327, 340 (4th Cir. 2013).[24]

E.    **Any Alleged Fiduciary Breaches Prior to August 11, 2013, Are Time-Barred Under ERISA's Three-Year Statute of Limitations.**

As noted above, a participant must bring suit within "three years after the earliest date on which the plaintiff had actual knowledge of the breach or violation." 29 U.S.C. § 1113(2). A plaintiff has actual knowledge when she "knows 'the essential facts of the transaction or conduct constituting the violation.'" *Browning v. Tiger's Eye Benefits Consulting*, 313 F. App'x 656, 660-61 (4th Cir. 2009) (citation omitted). In *Browning*, the Fourth Circuit concluded that the plaintiffs had actual knowledge of a breach upon being informed that the company in which the plan invested was placed into court-appointed receivership because, on that date, the plaintiffs "undoubtedly had knowledge of the transaction's harmful consequences, as well as notice of actual harm." *Id*. at 662; *see also Winburn v. Progress Energy Carolinas, Inc*., No. 4:11-CV-03527-RBH, 2015 WL 505551, at *8 (D.S.C. Feb. 6, 2015) (finding plaintiff had "actual knowledge"

---

[24] Plaintiffs may argue that *Tibble v. Edison Int'l ("Tibble II")*, 135 S. Ct. 1823 (2015), saves their claims, but that case is inapposite. In *Tibble II*, the Supreme Court rejected the Ninth Circuit's conclusion that ERISA's statute of repose bars a fiduciary breach claim that challenged investments that were added to a plan more than six years prior to filing the complaint, reasoning that "a fiduciary normally has a continuing duty of some kind to monitor investments and remove imprudent ones." *Id*. at 1828-29. "In such a case, so long as the alleged breach of the continuing duty occurred within six years of suit, the claim is timely." *Id*. at 1829. The alleged breach here, however, is not a failure of the duty to monitor, but instead agreeing to a contract that "locked in" the Stock Account and Money Market Account.

19

triggering statute of limitations when she received summary plan description by mail).

Plaintiffs allege fiduciary breaches going back at least to 2010, including that Duke caused the Plan to pay excessive investment and recordkeeping fees. (AC ¶¶ 143, 169, 172.) Yet, Plaintiffs had actual knowledge of these facts before August 10, 2013 (three years prior to filing suit) through the annual fee disclosures sent to Plan participants beginning in 2012. (*E.g.*, Ex. 3.) These disclosures set forth the expense ratios for each Plan investment option. (*Id.*) Plaintiffs further allege that the Plan's purportedly excessive recordkeeping costs were paid via revenue sharing (AC ¶ 134), but they had actual knowledge of this, too. The annual disclosures alerted Plaintiffs that asset-based fees were assessed and included as a portion of the funds' expense ratios. (Ex. 3 at 4, 9-10.) Thus, claims relating to the Plan's investment and recordkeeping fees arising prior to August 10, 2013 are time-barred. *Young v. Gen. Motors Inv. Mgmt. Corp.*, 550 F. Supp. 2d 416, 419-20 (S.D.N.Y. 2008), *aff'd*, 325 F. App'x 31 (2d Cir. 2009) (holding that excessive fees claims were time-barred because plaintiffs had actual knowledge through prospectuses and quarterly performance reports).

## III.   The Prohibited Transaction Claims (Counts II, IV, VI) Fail as a Matter of Law.

Plaintiffs simply repackage their deficient breach of fiduciary duty claims as "prohibited transactions" under 29 U.S.C. § 1106(a)(1).[25] Count II repeats the allegation

---

[25] Section 1106(a)(1) prohibits a fiduciary from knowingly causing a plan to engage in certain transactions with a "party in interest," including a sale or exchange of property (subsection (A)); furnishing of goods, services, or facilities (subsection (C)); or "transfer to, or use by or for the benefit of a party interest, of any assets of the plan" (subsection (D)). A "party in interest" is defined in 29 U.S.C. § 1002(14)(B) to include entities providing services to a plan.

in Count I that Duke "locked in" the CREF Stock Account, which purportedly constituted a prohibited transaction, and Counts IV and VI piggyback on the excessive fee claims in Counts III and V, alleging that the payment of such fees also constituted prohibited transactions. (AC ¶¶ 233, 246-47, 265-66.) These claims are time-barred and fail as a matter of law.

### A.    The Prohibited Transaction Claims Are Untimely.

Plaintiffs challenge the following transactions: "allowing the Plan to be locked into an unreasonable arrangement" with TIAA that required offering the Stock Account (Count II); "causing the Plan to use TIAA-CREF, Fidelity, VALIC, and Vanguard as the Plan's recordkeepers" (Count IV); and "placing investment options in the Plan in investment options [sic] managed by TIAA-CREF, VALIC, Fidelity, and Vanguard" (Count VI.  (AC ¶¶ 233, 247, 266.) These claims, too, are barred by ERISA's three-year "actual knowledge" limitations period because all of this information was communicated in the annual participant disclosures, which showed that these four vendors provided services to the Plan and managed Plan investment options. (Ex. 3.)[26]

Plaintiffs try to overcome this hurdle by invoking a "continuing violation" theory. (*E.g.*, AC ¶ 247.) However, courts have uniformly held that this theory does not apply to prohibited transaction claims, which are based on a discrete transaction. *See, e.g.*, *Alphin*,

---

[26] Plaintiffs' prohibited transaction claims and "locking in" prudence claim are also barred by ERISA's six-year statute of repose, 29 U.S.C. § 1113(1)(A), which begins running "when a specific event occurs, regardless of whether a cause of action has accrued or whether any injury has resulted." *Alphin*, 704 F.3d at 339. The Plan's 2009 Form 5500 establishes that the challenged transactions occurred more than six years before Plaintiffs filed suit because it disclosed all of the Plan's service providers and investment options. (Ex. 5 at 65-69, 84, 94-101.)

704 F.3d at 341; *Abbott v. Lockheed Martin Corp.*, No. 06-cv-0701-MJR, 2009 WL

839099, at *6 (S.D. Ill. Mar. 31, 2009); *Kanawi v. Bechtel Corp.*, 590 F. Supp. 2d 1213,

1225 (N.D. Cal. 2008). As the Fourth Circuit explained, "the common understanding of

the word 'transaction' implies an affirmative act is required." *Alphin*, 704 F.3d at 340.

Thus, "a decision to continue certain investments, or a defendant's failure to act, cannot

constitute a 'transaction'" under ERISA's prohibited transaction provisions. *Id.*; *accord*

*Wright v. Or. Metallurgical Corp.*, 360 F.3d 1090, 1101 (9th Cir. 2004) (concluding that

decision to continue holding employer stock was not a "transaction" under § 1106(a)(1)).

### B. Plaintiffs Fail to Plausibly Allege Prohibited Transactions.

Plaintiffs' prohibited transaction claims also suffer from a host of other flaws,

each warranting dismissal. *First*, the allegation in Count II that Duke committed a

prohibited transaction by agreeing to make the CREF Stock Account a mandatory

investment option suffers from the same fatal defect as Count I: ERISA does not prohibit

such an arrangement. In *Hecker*, the Seventh Circuit rejected a claim that fiduciaries

acted imprudently by agreeing to a bundled arrangement with Fidelity requiring that only

Fidelity mutual funds would be available to participants. 556 F.3d at 586-87. The court

found "no statute or regulation prohibiting a fiduciary from selecting funds from one

management company." *Id.* at 586. Plaintiffs point to no legal authority supporting their

position that the arrangement with TIAA, which is common in the retirement plan

industry, is a prohibited transaction.

*Second*, Counts IV and VI, which allege that the payment of recordkeeping and

investment fees are prohibited transactions, fail as a matter of law. ERISA has an exemption that expressly permits such payments. In particular, 29 U.S.C. § 1108(b)(2) exempts arrangements for plan services so long as not more than "reasonable compensation" is paid. Without this exemption, any entity providing services to a plan would automatically violate ERISA's prohibited transaction rules. It simply cannot be that a participant states a plausible claim merely by alleging that a plan paid fees to its service providers.

Duke has already demonstrated that the recordkeeping and investment fees paid by Plan participants are within the range that courts have found to be prudent, *i.e.*, "reasonable." *See supra*, p. 10. As Plaintiffs have not alleged any facts that would take their prohibited transaction claim out of the statutory exemption's safe harbor, the claims should be dismissed. *Leber v. Citigroup, Inc.*, No. 07 CIV. 9329 (SHS), 2010 WL 935442, at *10 (S.D.N.Y. Mar. 16, 2010) ("[W]here the complaint does not allege any basis for presuming that a defendant's conduct fell outside a statutory exemption . . . it is deficient."); *Mehling v. N.Y. Life Ins. Co.*, 163 F. Supp. 2d 502, 510-11 (E.D. Pa. 2001) (dismissing prohibited transaction claims where the conditions of an exemption were clearly satisfied).

*Third*, in Count VI, Plaintiffs claim that Duke violated §§ 1106(a)(1)(A) and (C) by causing the Plan to invest in mutual funds managed by TIAA, Fidelity, VALIC, and Vanguard. Those sections prohibit the sale or exchange of property, or the furnishing of goods and services, between a plan and a "party in interest." But, ERISA specifically

excludes mutual funds and their advisers from the definition of a party in interest, 29

U.S.C. § 1002(21)(B), and those vendors offered mutual funds to the Plan. (AC ¶¶ 110-

12.) When a plan invests in a mutual fund, it is not transacting with a party in interest.

*See, e.g.*, *IATSE Local 33 Section 401(k) Plan Bd. of Trs. v. Bullock*, No. CV 08-3949

AHM (SSx), 2008 WL 4838490, at *5-6 (C.D. Cal. Nov. 5, 2008) (mutual fund cannot be

held liable for prohibited transactions; Congress exempted mutual funds and their

advisers from ERISA's fiduciary and "party in interest" rules). The same is true for the

TIAA and VALIC annuities because the purchase of an annuity from an insurance

company does not constitute a prohibited transaction. *See* Prohibited Transaction

Exemption (PTE) 84-24, 49 Fed. Reg. 13208 (Apr. 3, 1984), *as corrected*, 49 Fed. Reg.

24819 (June 15, 1984) (stating that the restrictions in Sections 1106(a)(1)(A) through (D)

did not apply to "[t]he purchase, with plan assets, of an insurance or annuity contract

from an insurance company").[27] Thus, this claim fails as a matter of law.

    *Finally*, all of Plaintiffs' prohibited transaction claims are foreclosed to the extent

they are predicated on 29 U.S.C. § 1106(a)(1)(D). A fiduciary violates § 1106(a)(1)(D)

only if she subjectively intends to benefit a "party in interest." *See, e.g.*, *Jordan v. Mich.*

*Conference of Teamsters Welfare Fund*, 207 F.3d 854, 860-61 (6th Cir. 2000); *Reich v.*

*Compton*, 57 F.3d 270, 279 (3d Cir. 1995), *amended* (Sept. 8, 1995). Plaintiffs have not

plausibly alleged any such subjective intent here. In fact, the only reasonable inference

from Duke's conduct is that it entered into the transactions to obtain valuable services for

---

[27] PTE 84-24 was further amended in 2016, but the changes are prospective, applying only to transactions "occurring on or after April 10, 2017." 81 Fed. Reg. 21147 (Apr. 8, 2016).

the Plan and its participants, which does not violate § 1106(a)(1)(D).

## IV.   Plaintiffs' Remaining Claims Must Be Dismissed.

Courts routinely dismiss "disloyalty" claims like those here that merely piggyback on other fiduciary breach theories. *E.g.*, *Loomis*, 658 F.3d at 671; *White*, 2016 WL 4502808, at *5; *Romero v. Nokia, Inc.*, No. C 12-6260 PJH, 2013 WL 5692324, at *5 (N.D. Cal. Oct. 15, 2013). Plaintiffs have not pled any facts supporting an inference that Duke failed to act in the interests of Plan participants or had any personal financial incentives that diverged from the Plan's interests. *In re McKesson HBOC, Inc. ERISA Litig.*, 391 F. Supp. 2d 812, 838 (N.D. Cal. 2005) (dismissing claim that failed to "articulate[] a specific disloyal action").

Plaintiffs' claim that Duke breached its duty to monitor (Count VIII) fails as well. First, it is derivative of Plaintiffs' other fiduciary breach claims and requires an antecedent breach to be viable. *White*, 2016 WL 4502808, at *19. Plaintiffs cannot state an imprudence claim, so the monitoring claim must be dismissed. Second, the AC is devoid of facts about Duke's fiduciary monitoring process or how it was deficient. (AC ¶¶ 274-79.) The failure to allege whether or to whom Duke delegated fiduciary responsibility alone necessitates dismissal. *White*, 2016 WL 4502808, at *18-19.

## CONCLUSION

For the above reasons, the AC should be dismissed with prejudice.

Dated: January 17, 2017
    /s/ Jeremy P. Blumenfeld
Jeremy P. Blumenfeld
**MORGAN, LEWIS & BOCKIUS LLP**
1701 Market Street
Philadelphia, PA 19103-2921
Telephone: 215.963.5000
Facsimile: 215.963.5001
Email: jeremy.blumenfeld@morganlewis.com

Donald L. Havermann
Christopher A. Weals
Abbey M. Glenn
**MORGAN, LEWIS & BOCKIUS LLP**
1111 Pennsylvania Ave NW
Washington, DC 20004-2541
Telephone: 202.739.3000
Facsimile: 202.739.3001
Email: donald.havermann@morganlewis.com
Email: christopher.weals@morganlewis.com
Email: abbey.glenn@morganlewis.com

/s/ Stacy K. Wood
Stacy K. Wood (N.C. State Bar No.: 21768)
**PARKER POE ADAMS & BERNSTEIN LLP**
Three Wells Fargo Center
401 South Tryon Street, Suite 3000
Charlotte, NC 28202
Telephone: 704.335.9844
Facsimile: 704.335.9698
Email: stacywood@parkerpoe.com

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on January 17, 2017, I electronically filed the foregoing

Memorandum of Law in Support of Defendants' Motion to Dismiss Plaintiffs' Amended

Complaint with the Clerk of Court using the CM/ECF system which will send

notification of such filing and effectuate service to all counsel of record in this matter:

Jerome J. Schlichter
Michael A. Wolff
Troy A. Doles
Heather Lea
Sean E. Soyars
Kurt C. Struckhoff
**SCHLICHTER, BOGARD & DENTON, LLP**
100 South Fourth Street, Suite 1200
St. Louis, MO 63102
Phone: (314) 621-6115
Fax: (314) 621-5934
jschlichter@uselaws.com
mwolff@uselaws.com
tdoles@uselaws.com
hlea@uselaws.com
ssoyars@uselaws.com
kstruckhoff@uselaws.com

*Lead Counsel for Plaintiffs*

David B. Puryear, Jr.
**PURYEAR AND LINGLE, PLLC**
5501-E Adams Farm Lane
Greensboro, NC 27407
(336) 218-0227
puryear@puryearandlingle.com

*Local Counsel for Plaintiffs*

/s/ Jeremy P. Blumenfeld
Jeremy P. Blumenfeld
**MORGAN, LEWIS & BOCKIUS LLP**
1701 Market Street
Philadelphia, PA 19103-2921
Telephone: 215.963.5000
Facsimile: 215.963.5001
Email: jeremy.blumenfeld@morganlewis.com