**UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT**

```
------------------------------- x
JOSEPH VELLALI, NANCY S. LOWERS, :
JAN M. TASCHNER, and JAMES       :
MANCINI, individually and as     :
representatives of a class of    :
participants and beneficiaries   :
on behalf of Yale University     :
Retirement Account Plan,         :
                                 :
         Plaintiffs,             :  Civil No. 3:16-cv-1345(AWT)
                                 :
v.                               :
                                 :
YALE UNIVERSITY, MICHAEL A.      :
PEEL, and THE RETIREMENT PLAN    :
FIDUCIARY COMMITTEE,             :
                                 :
         Defendants.             :
------------------------------- x
```

<u>**RULING ON THE MOTION TO DISMISS THE AMENDED COMPLAINT**</u>

The plaintiffs, both individually and as representatives of a class of participants and beneficiaries in Yale's 403(b) Retirement Account Plan (the "Plan"), claim that defendants Yale University ("Yale"), Michael A. Peel ("Peel"), Yale's Vice President of Human Resources during the class period, and the Retirement Plan Fiduciary Committee (the "Committee") violated the Employee Retirement Income Security Act of 1974 ("ERISA") in three ways: (1) by breaching their fiduciary duties of prudence and loyalty under ERISA (Counts I, III and V), (2) by carrying out transactions prohibited by ERISA (Counts II, IV and VI) and (3) with respect to Yale and Peel, by failing to monitor

Committee members to ensure compliance with ERISA's standards
(Count VII).  The defendants move to dismiss all seven counts
for failure to state a claim under Federal Rule of Civil
Procedure 12(b)(6) and as time-barred.  For the reasons set
forth below, the defendants' motion to dismiss is being granted
in part and denied in part.

I.   **FACTUAL ALLEGATIONS**

For the purpose of deciding the motion to dismiss, the
court accepts the following allegations, taken from the Amended
Complaint (Doc. No. 57, "Am. Compl."), as true.

Yale offers to eligible employees the opportunity to
"participate" in a 403(b) defined-contribution plan.  Under such
a plan, they put a portion of their income into personal
retirement savings accounts and invest those savings in an array
of investment options.  Yale makes matching contributions under
certain conditions.

Two key aspects of maintaining a 403(b) plan are managing
the plan's investment options and providing recordkeeping for
plan participants.  Plan fiduciaries typically contract with
third-party vendors for both of these services.  The process of
selecting vendors and negotiating service fees can materially
affect an employee's retirement income because every dollar
spent on either recordkeeping or investment management is a
dollar that is not contributing to increasing the amount of the

employee's retirement savings.  Over time, excessive service
fees can erode an employee's retirement savings to the tune of
tens or hundreds of thousands of dollars.

**A. <u>Bundling of Services</u>**

Yale contracted with two investment management companies,
"Vanguard" (which refers collectively to the Vanguard Group,
Inc. and the Vanguard Fiduciary Trust) and "TIAA-CREF" (which
refers to the Teachers Insurance and Annuity Association of
America and College Retirement Equities Fund).  Each of these
companies provided both investment management and recordkeeping
services for the Plan, although in April 2015 the defendants
discontinued having Vanguard provide recordkeeping services.

With regard to TIAA-CREF, the plaintiffs allege that a
"bundled" services arrangement tethered TIAA-CREF's
recordkeeping services and investment products to one of its
premier products, the TIAA Traditional Annuity, such that if
Yale wished to include TIAA's Traditional Annuity as an
investment option in the Plan, Yale had to use TIAA's
recordkeeping services and include the CREF Stock Account and
the CREF Money Market Account in the Plan.  According to the
plaintiffs, this bundled services arrangement hurt Plan
participants and beneficiaries in three ways.

First, the plaintiffs allege that the defendants did not
initially scrutinize every investment that was included in the

bundled services arrangement, leading the Plan to take on unreasonably expensive or poor-performing investments.

Second, the plaintiffs allege that after agreeing to the bundled services arrangement, the defendants failed to consistently monitor the investments or the recordkeeping costs. The plaintiffs further allege that even if the defendants had identified underperforming investments and high recordkeeping costs, the bundled services arrangement prevented the defendants from remedying either deficiency.

As an example of the problem of poor investments, the plaintiffs point to two annuities, the CREF Stock Account and the TIAA Real Estate Account, that the defendants failed to remove from the Plan despite ten-year track records of poor performance, as measured against TIAA-CREF's chosen benchmark and several alternative investments. The plaintiffs claim that rather than accepting TIAA-CREF's offer of a bundled services arrangement, the defendants should have opted for an "open architecture" model, which would have allowed the defendants to monitor and freely reject imprudent investments or costly recordkeeping services.  (Am. Compl., at ¶ 60.)

Third, the plaintiffs allege that the fact that the higher-priced investments created more recordkeeping revenue for TIAA-CREF incentivized TIAA-CREF to pressure the defendants into taking on its recordkeeping services in tandem with the higher-

priced investments, even if the two were not in the interest of
Plan participants.  The plaintiffs further allege that by
allowing TIAA-CREF to get larger fees for higher-priced
investments, the defendants placed the financial interests of
TIAA-CREF above the interests of Plan participants and
beneficiaries.

### B. Cost of Recordkeeping

The plaintiffs also challenge the cost of the recordkeeping
services.  They allege that Yale grossly overpaid for TIAA-
CREF's recordkeeping services because it used a revenue-sharing
model rather than a flat annual fee approach.

Under a revenue-sharing model, the investment management
company takes a portion of the fees (the "expense ratio") it
receives for managing an investment and forwards it to a third-
party company that provides the administrative services, e.g.,
recordkeeping.  A 403(b) plan therefore pays for the cost of
recordkeeping indirectly, passing funds that will cover the
recordkeeping to the management investment firm, which then
passes payment on to the recordkeeper.  Because revenue-sharing
is charged as a percentage of the assets in a plan, the amount
of the expense for recordkeeping increases directly in
proportion to the amount of money invested in TIAA-CREF's
investment products, i.e. the higher the amount of money
invested in its products, the more TIAA-CREF receives for

recordkeeping.  The plaintiffs also allege that the use of two providers led to duplicative reporting for at least some Plan participants.

Flat fee arrangements, on the other hand, involve a fixed price based on the number of participants in a plan, rather than the total amount of assets invested.  Thus, a plan with 100 participants and assets of $1 million, would pay the same recordkeeping fee as a plan with the same number of participants and $100 million in assets.  The payment for the recordkeeping fee is made directly to the service provider, and any redundancies in service can be eliminated by selecting a single recordkeeper.

The plaintiffs allege that a flat fee arrangement is better than revenue sharing for participants and beneficiaries because a flat fee arrangement ties costs directly to the "actual services provided and does not grow based on matters that have nothing to do with the services provided, such as increase in plan assets due to market growth or greater plan contributions by employees." (Id. at ¶ 52.)  As proof of the superiority and popularity of flat fee arrangements, the plaintiffs highlight four universities that shifted to single-recordkeeper systems around 2009 and cite a 2013 survey showing that 90% of 403(b) plans used a single recordkeeper.  (The defendants eventually

followed suit, switching over to a single recordkeeper in April 2015.)

The plaintiffs also allege that the defendants' failure to negotiate a recordkeeping fee pegged to headcount (rather than total assets) led to excessive costs.  Although the plaintiffs acknowledge that revenue sharing does not per se violate ERISA, they contend that revenue-sharing agreements tend toward unreasonable fees if not monitored for ballooning costs, assessed against competitive bids from other recordkeeping providers, and renegotiated periodically to ensure the best available price.  The plaintiffs allege the defendants failed to follow any of these practices.

The plaintiffs also allege that the defendants failed to take advantage of the size of the Plan effectively when negotiating recordkeeping fees.  As of June 30, 2015, the Plan contained $3.8 billion in retirement assets and included 17,138 participants with active account balances.  This placed the Plan among the largest 0.02% of all defined contribution plans in the United States, and the plaintiffs refer to it as a "jumbo plan." The plaintiffs allege that the sheer size of the Plan should have resulted in reduced recordkeeping fees under either model, but did not.

C. **Quantity, Quality and Cost of Investment Options**

In addition to the bundling services arrangement and the recordkeeping, the plaintiffs attack the quantity, quality and cost of the investments in the Plan.

### 1.   Quantity

The plaintiffs allege that the defendants offered too many investment options in the Plan, resulting in decision paralysis, higher costs, and dilution of Yale's bargaining power.  With respect to decision paralysis, the plaintiffs allege that the overwhelming number of options in each asset class, e.g. as many as 28 options for at least one of the asset classes, "place[d] a monumental burden on the Plan participants in selecting options in which to invest."  (Id. at ¶ 151.)  Moreover, the plaintiffs allege, within asset classes, the various investment options were so similar in make-up that the only real difference between them was cost. The plaintiffs claim that the defendants therefore should have offered only the "best in class" investment option for each asset category.  (Id. at ¶ 152.)

The plaintiffs allege that because the best-in-class investments outperform and are cheaper than many of the options in which Plan participants are currently invested, participants would reap higher investment returns and save on management fees.  Reducing the number of investment options would also concentrate the $3.8 billion in assets into a handful of funds

-8-

and annuities, thereby increasing the defendants' ability to demand lower prices for those investments and meeting the minimum amount required to qualify for institutional shares.

### 2. Quality

The plaintiffs allege that the defendants imprudently retained poor-performing investments in the Plan, noting that 57 out of the 99 investment options with at least a five-year track record "underperformed their respective benchmarks over the previous five-year period." (Id. at ¶ 168.)  The plaintiffs allege that had the defendants "conducted a prudent investment review," many of these investments would have been eliminated or replaced.  (Id. at ¶ 169.)

The plaintiffs single out two investments to illustrate the kind of "historically underperforming" investment options placed in the Plan.  (Id. at 84.)  With respect to the CREF Stock Account, the plaintiffs allege that it underperformed both TIAA-CREF's chosen benchmark fund (the Russell 3000) and several alternative funds (e.g., the Vanguard Total Stock Market Index Fund (Institutional Plus) and the Vanguard PRIMECAP-Admiral) over the course of one, three, five, and ten years.  At least one industry analyst recommended removal of the CREF Stock Account from 403(b) plans.  Similarly, the TIAA Real Estate Account underachieved over a one-, three-, five-, and ten-year period when compared to a similar investment, the Vanguard Real

Estate Investment Trust (Institutional).  In addition to the lackluster performance, both funds charged higher investment fees than the alternatives, cutting into already low annual investment returns.

### 3.  Cost

The plaintiffs allege two missteps in the Plan's pricing of investments: a failure to obtain volume pricing and a failure to eliminate extraneous fees.

With respect to volume pricing, the plaintiffs allege that for 88 of the Plan's 115 investments, the defendants could have obtained exactly the same investment at a deeply discounted rate.  That is because Vanguard and TIAA-CREF offer two versions of those 88 investments: a "retail" version and an "institutional" version.  The plaintiffs allege the difference between the two is purely a matter of price: because large institutions generally purchase many more shares of an investment than an individual, they are given a steep discount on their purchases.  The plaintiffs allege that the Plan offered participants only the higher-priced retail shares, when, given the Plan's $3.8 billion in assets, it should have been able obtain the lower-priced institutional shares.

With respect to the extraneous fees, the plaintiffs criticize nine of the Plan's TIAA-CREF investments[1] for including unreasonable costs or unbeneficial services in the expense ratio.  The four layers of expenses break down into administrative expenses, distribution expenses (i.e., the 12b-1 fees), mortality and expense risk charges, and investment advisory expenses (a/k/a investment management fees).

The criticism of the administrative expenses mirrors that of the fees for recordkeeping (in part, because the administrative expense encompasses the recordkeeping fee): the growth in assets increases the amount of fees paid to TIAA-CREF, even if the basic administrative services do not change. Similarly, the criticism of the investment advisory expenses mirrors that with respect to retail shares versus institutional shares: the defendants should have negotiated for shares with lower advisory fees commensurate with the Plan's status as a "jumbo" plan.

With respect to the distribution expenses and the mortality and expense-risk charges, the plaintiffs allege that Plan participants derive no benefit from either.  The distribution fee covers marketing and distribution services, and the

---

[1] These nine investments are the TIAA Real Estate Account, CREF Stock Account, CREF Global Equities Account, CREF Equity Index Account, CREF Growth Account, CREF Social Choice Account, CREF Money Market Account, CREF Inflation-Linked Bond Account, and CREF Bond Market Account.

plaintiffs allege that because Yale selects the funds, neither service benefits the participants. The same goes for the mortality and expense-risk charges, which the plaintiffs allege "only benefit[] a [Plan] participant if she elects at the time of retirement to annuitize her holdings in the account to provide for periodic income," something that few participants do.  (Id. at ¶ 117c.)

With respect to the TIAA Real Estate Account, the plaintiffs allege that a fifth expense, a "liquidity guarantee" is not charged by comparable funds.

## II.  LEGAL STANDARD

When deciding a motion to dismiss under Rule 12(b)(6), the court must accept as true all factual allegations in the complaint and must draw inferences in a light most favorable to the plaintiff.  Scheuer v. Rhodes, 416 U.S. 232, 236 (1974). Although a complaint "does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do."  Bell Atlantic Corp. v. Twombly, 550 U.S. 550, 555 (2007) (citing Papasan v. Allain, 478 U.S. 265, 286 (1986)(on a motion to dismiss, courts "are not bound to accept as true a legal conclusion couched as a factual allegation")).  "Nor does a complaint suffice if it tenders

naked assertions devoid of further factual enhancement.
Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Twombly,
550 U.S. at 557).  "Factual allegations must be enough to raise
a right to relief above the speculative level, on the assumption
that all allegations in the complaint are true (even if doubtful
in fact)."  Id. (citations omitted).  However, the plaintiff
must plead "only enough facts to state a claim to relief that is
plausible on its face."  Twombly, 550 U.S. at 570.

     "The function of a motion to dismiss is 'merely to assess
the legal feasibility of the complaint, not to assay the weight
of the evidence which might be offered in support thereof.'"
Mytych v. May Dep't Store Co., 34 F. Supp. 2d 130, 131 (D. Conn.
1999), quoting Ryder Energy Distribution v. Merrill Lynch
Commodities, Inc., 748 F.2d 774, 779 (2d Cir. 1984).  "The issue
on a motion to dismiss is not whether the plaintiff will
prevail, but whether the plaintiff is entitled to offer evidence
to support his claims."  United States v. Yale New Haven Hosp.,
727 F. Supp. 784, 786 (D. Conn. 1990) (citing Scheuer, 416 U.S.
at 232).

     In its review of a motion to dismiss for failure to state a
claim, the court may consider "only the facts alleged in the
pleadings, documents attached as exhibits or incorporated by
reference in the pleadings and matters of which judicial notice

may be taken." <u>Samuels v. Air Transport Local 504</u>, 992 F.2d 12, 15 (2d Cir. 1993).

## III. DISCUSSION

### A. <u>Duties of Prudence and Loyalty (Counts I, II and V)</u>

Under ERISA, retirement-plan fiduciaries must adhere to the twin duties of loyalty and prudence.  As codified in 29 U.S.C. § 1104(a)(1)(A) and (a)(1)(B):

> [A] fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and—
>
> (A) for the exclusive purpose of:
>
> > (i) providing benefits to participants and their beneficiaries; and
> >
> > (ii) defraying reasonable expenses of administering the plan;
>
> (B) with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims . . . .

An ERISA fiduciary's duties have been described as "those of trustees of an express trust — the highest known to the law." <u>Donovan v. Bierwirth</u>, 680 F.2d 263, 272 n.8 (2d Cir. 1982).

### 1. The Duty of Prudence

> [The] fiduciary of a defined contribution, participant-driven, [403(b)] plan created to provide retirement income for employees who is given discretion to select and maintain specific investment options for participants . . . must exercise prudence in selecting and retaining available investment options.  In

> determining whether [a fiduciary] has done so . . . we
> examine the totality of the circumstances . . . .
>
> When deciding whether a plan fiduciary has acted
> prudently, a "[c]ourt must inquire whether the
> individual trustees, at the time they engaged in the
> challenged transactions, employed the appropriate
> methods to investigate the merits of the investment and
> to structure the investment." Flanigan v. Gen. Elec.
> Co., 242 F.3d 78, 86 (2d Cir. 2001) (internal quotation
> marks omitted). In other words, a court must ask whether
> the fiduciary engaged in a reasoned decisionmaking
> process, consistent with that of a "prudent man acting
> in like capacity," 29 U.S.C. § 1104(a)(1)(B).

DiFelice v. U.S. Airways, Inc., 497 F.3d 410, 418, 420 (4th Cir.

2007).  The analysis focuses on the decision-making process and

how a prudent decision maker would act in light of the

information available to the fiduciary at the time he or she

makes a decision:

> [W]hether a fiduciary's actions are prudent cannot be
> measured in hindsight, whether this hindsight would
> accrue to the fiduciary's detriment or benefit. See Roth
> v. Sawyer-Cleator Lumber Co., 16 F.3d 915, 917-18 (8th
> Cir. 1994) ("[T]he prudent person standard is not
> concerned with results; rather it is a test of how the
> fiduciary acted viewed from the perspective of the time
> of the challenged decision rather than from the vantage
> point of hindsight." (internal quotation marks
> omitted)). Put another way, an investment's diminution
> in value is neither necessary, nor sufficient, to
> demonstrate a violation of a fiduciary's ERISA duties.

Id. at 424.

Additionally, in Tibble v. Edison International, 135 S.

Ct. 1823 (2015), the Court held that a fiduciary's "duties apply

not only in making [the initial] investments but also in

monitoring and reviewing investments, which is to be done in a

-15-

manner that is reasonable and appropriate to the particular investments, courses of action, and strategies involved." 135 S. Ct. at 1828 (quoting The Restatement (Third) of Trusts § 90, cmt. b (Am. Law Inst. 2007)). Fiduciaries have "a continuing duty of some kind to monitor investments and remove imprudent ones." Id. at 1828-29; see DiFelice, 497 F.3d at 423 ("[A] fiduciary must initially determine, and continue to monitor, the prudence of each investment option available to plan participants.") A plan fiduciary cannot assume that an investment that began as a prudent one will remain so, particularly when the original circumstances change or the investment reveals itself to be deficient. See Tibble, 135 S. Ct. at 1829; Pension Ben. Guar. Corp. ex rel. St. Vincent Catholic Med. Ctrs. Ret. Plan v. Morgan Stanley Inv. Mgmt. Inc. (PBGC), 712 F.3d 705, 717 (2d Cir. 2013) ("An ERISA fiduciary's investment decisions also must account for changed circumstances and '[a] trustee who simply ignores changed circumstances that have increased the risk of loss to the trust's beneficiaries is imprudent.'" (quoting Armstrong v. LaSalle Bank Nat'l Ass'n, 446 F.3d 728, 734 (7th Cir. 2006))).

The plaintiffs allege violations of the duty of prudence in Counts I, III and V of the Amended Complaint.

### a) Count I: The Bundling Arrangement

In Count I, the plaintiffs allege that the defendants acted imprudently by "locking" the Plan into a bundling arrangement that prevented the defendants from removing imprudent investments or seeking a cost-effective recordkeeping service, even when the investments underperformed and the recordkeeping was too expensive.

With respect to the allegedly imprudent investments, the defendants contend that (i) bundling is a common practice that "frequently inure[s] to the benefit of ERISA plans," (ii) the plaintiffs fail to allege facts that demonstrate an imprudent decision-making process for arriving at the bundled arrangement, and (iii) the investments themselves are not imprudent. (Doc. No. 62-1, Defs.' Mem., at 21 (quoting Tussey v. ABB, Inc., 746 F.3d 327, 336 (8th Cir. 2014).)

None of these arguments defeats the plaintiffs' imprudence claim as it relates to monitoring and removing imprudent investments. Even if bundling arrangements generally benefit participants of other defined-contribution plans, that does not necessarily mean that, under the circumstances here, the defendants prudently concluded that the bundling arrangement would benefit the Plan's participants. The plaintiffs allege in the Amended Complaint that the bundling arrangement stymied the defendants' ability to remove investments and that "Yale agreed

-17-

to lock its employees into funds which Yale did not analyze."
(Am. Compl., at ¶ 113.)  Such conduct would violate the
requirement that plan fiduciaries continually monitor and remove
imprudent investments.  See Tibble, 135 S. Ct. at 1828;
DiFelice, 497 F.3d at 423.

The plaintiffs strengthen their claim with allegations that
the CREF Stock Account and the TIAA Real Estate Account, two
investments that displayed a multi-year record of subpar
performance prior to 2010, should have been removed.  The
defendants challenge the plaintiffs' benchmarks for measuring
the investments' performances, but this amounts to challenging a
fact that the court must accept as true at the motion to dismiss
stage.  See Sacerdote v. N.Y. Univ., No. 16-cv-6284, 2017 WL
3701482, at *10 (S.D.N.Y. Aug. 25, 2017); Henderson v. Emory
Univ., 252 F. Supp. 3d 1344, 1351-52 (N.D. Ga. 2017).

With respect to the plaintiffs' allegation that the
bundling agreement locked the Plan into unreasonable
recordkeeping fees, the defendants respond in similar fashion,
claiming that bundling agreements are commonplace for retirement
plans.  However, the plaintiffs allege that the unreasonable
fees persisted for so long, in part, because the defendants
opted for a bundled arrangement that excluded the possibility of
renegotiating recordkeeping fees or switching to more cost-
effective recordkeepers.

In light of <u>Tibble</u>'s explicit recognition of a fiduciary's ongoing responsibility to monitor and remove imprudent investments, and the fact that unreasonably high administrative expenses can make an investment imprudent, the plaintiffs have stated a claim that is plausible on its face that the defendants breached their duty of prudence with respect to a bundling arrangement under which they abdicated their responsibility to monitor and remove imprudent investments and reduce exorbitant fees.

### b) Count III: Excessive Administrative Fees

In Count III, the plaintiffs allege that the defendants breached their duty of prudence by failing to employ strategies that would lower recordkeeping fees, such as installing a system to monitor and control fees; periodically soliciting bids in order to compare cost and quality of recordkeeping services; leveraging the Plan's "jumbo" size to negotiate for cheaper recordkeeping fees; consolidating from two recordkeepers to one; and implementing a flat fee rather than a revenue-sharing structure.  Their failure was exemplified by a failure to even calculate the Plan's total recordkeeping fees.

The defendants contend that the plaintiffs fail to allege "that the fees were excessive relative to the services rendered" (Defs.' Mem., at 27 (quoting <u>Young v. G.M. Inv. Management Corp.</u>, 325 F. App'x 31, 33 (2d Cir. 2009) (Sotomayor, J.)

-19-

(internal quotation marks and citation omitted).)[2]  Thus, the defendants characterize the plaintiffs' claim as a claim that the "recordkeeping costs were too high."  (Defs.' Mem., at 26.)

The plaintiffs have certainly alleged unreasonably high fees, e.g. that the cost of recordkeeping under the shared-revenue system swelled out of proportion to the actual recordkeeping services provided, but they have also alleged more: a decision-making process that was deficient in terms of monitoring, soliciting competitive bids, negotiating, and selecting a reasonably priced recordkeeper, all of which led to the inflated revenue-sharing fees.  These alleged flaws are quintessential imprudence claims because they are rooted in the decision-making process.  See Nicholas v. Trs. Of Princeton Univ., No. 17-3695, 2017 WL 4455897, at *3-4 (D.N.J. Sept. 25,

---

[2]     The defendants, citing to Young, contend that the standard for determining excessive fees used under § 36 of the Investment Company Act of 1940 ("ICA"), 15 U.S.C. § 80a-35, is appropriate while plaintiffs argue for a "reasonableness" standard.

But Young, an unpublished decision, never explicitly adopts the ICA standard.  At most, it notes that the ICA standard is "useful" for reviewing excessive-fees claims in the context of ERISA and that the Young plaintiffs "allege[d] no facts concerning other factors relevant to determining whether a fee is excessive under the circumstances."  Id.

Additionally, the Supreme Court confirmed after Young that the ICA standard, under which "the adviser-manager must charge a fee that is so disproportionately large that it bears no reasonable relationship to the services rendered and could not have been the product of arm's-length bargaining," Gartenberg v. Merrill Lynch Asset Mgmt., Inc., 694 F.2d 923, 928 (2d Cir. 1982), and the meaning of "fiduciary duty" under that standard are tailored to the history, statutory scheme, and purposes of the ICA, which regulates investment advisers.  See Jones v. Harris Associates L.P., 559 U.S. 335, 339-41, 345-49 (2010).  Here, the plaintiffs have not sued investment advisers.  Rather, they have sued the ERISA-plan fiduciaries for failing to institute proper procedures to arrive at a reasonable fee arrangement, actions that fall squarely under ERISA's explicit standard of reasonableness.  See 29 U.S.C. § 1104(a)(1).

2017); Sacerdote, 2017 WL 3701482, at *8-10; Henderson, 252 F. Supp. 3d at 1352-53.

The defendants also characterize the plaintiffs' claims as making the commonplace practice of revenue-sharing a per se ERISA violation, i.e., attempting to "transform the market itself by challenging the very framework of revenue sharing in the industry." (Defs.' Mem., at 23 (quoting Rosen v. Prudential Ret. Ins. & Annuity Co., 2016 WL 7494320, at *17 (D. Conn. Dec. 30, 2016))).

But the claimed industry-wide prevalence of revenue-sharing or multiple recordkeepers does not negate the duty to ensure reasonable fees regardless of the fee structure. Moreover, defendants' arguments ignore the factual allegations in the Amended Complaint, which compares the general range of costs for a flat fee arrangement to estimates of the cost for the Plan's recordkeeping arrangement, highlights the competition among third-party recordkeepers, and quotes the advice of industry experts who recommend consolidation. See Tussey, 746 F.3d at 335 (noting that ERISA defined-contribution "cases are inevitably fact intensive"); Terraza v. Safeway Inc., 241 F. Supp. 3d 1057, 1077-78 (N.D. Cal. 2017). Taken together, these allegations plausibly state a claim for breach of the duty of prudence based on unreasonably high administrative fees.

The defendants also contend that their 2015 decision to consolidate the two recordkeepers to a single one demonstrates an adequate monitoring process.  However, whether the defendants implemented an adequate process in 2015 does not address whether they had an adequate process in place from 2010 to 2015, the other portion of the class period.

### c) Count V: Excessive Investment Fees

In Count V, the plaintiffs claim that four separate actions or omissions constituted breaches of the defendants' duty of prudence: failing to offer lower-priced institutional shares rather than the higher-priced retail shares; offering too many investment options; failing to reduce fees on several TIAA-CREF investments; and failing to remove underperforming investments such as the CREF Stock Account and TIAA Real Estate Account.

With respect to institutional versus retail shares, the defendants contend that the plaintiffs focus "myopically" on the lower price of institutional shares, and thus miss the legitimate reasons for the defendants preferring retail shares. The defendants point out that several cases have discussed the appropriate range of fees and investments to be offered in a defined-contribution plan, and that the fees for each of the Plan's investment options fall well within this range.  See, e.g., Renfro v. Unisys Corp., 671 F.3d 314 (3d Cir. 2011); Hecker v. Deere & Co., 556 F.3d 575 (7th Cir. 2009).

-22-

However, the question of whether the defendants did in fact reasonably weigh the benefits and burdens when selecting retail shares over institutional shares is more appropriately taken up at the summary judgment stage.  See Terraza, 241 F. Supp. 3d at 1077 ("Although Defendants may ultimately persuade the Court that they had legitimate reasons to select the [retail] investment options, . . . [Plaintiff] has satisfied her burden at this stage of the litigation by alleging facts from which the Court can reasonably infer that the defendants' decision-making process was flawed.").  The cases on which the defendants rely do not contradict Tibble's requirement that fiduciaries continue to monitor each investment in a defined-contribution plan, not just the range of investment fees for the plan as a whole, to ensure reasonableness.  See Cunningham v. Cornell Univ., No. 16-cv-6525, 2017 WL 4358769, at *7 (S.D.N.Y. Sept. 19, 2017) (distinguishing between a plan's "mix and range of investment options" and "the prudence of the inclusion of any particular investment option" (citing Renfro, 671 F.3d at 325-28)); Terraza, 241 F. Supp. 3d 1057, 1078-80 (distinguishing Renfro, Loomis, and Hecker "because they involved challenges to the overall range of investment options offered in the portfolio as a whole, rather than a challenge to the fiduciary's decision to include a particular investment option.").  Also, although Tibble did not define the scope of the continuing duty to

-23-

monitor, it explicitly recognized the issue of price disparities between "retail-class mutual funds" and "materially identical institutional-class mutual funds."  Tibble, 135 S. Ct. at 1826; Cunningham, 2017 WL 4358769, at *8 ("[T]o the extent the plaintiffs claim that defendants breached their fiduciary duties by selecting specific retail funds over lower-cost, but otherwise identical, institutional funds, these allegations are sufficient to survive the motion to dismiss." (citation omitted)); Terraza, 241 F. Supp. 3d at 1077 ("The Court can reasonably infer . . . that the Defendants acted imprudently by selecting the more expensive option, all else being equal."); but see Sacerdote, 2017 WL 3701482, at *11 (granting motion to dismiss on the issue of institutional shares because the court found possible legitimate reasons, including "higher liquidity," that a plan may offer retail rather than price alone).

Thus, the motion to dismiss is being denied with respect to the duty of prudence claim based on a failure to offer institutional shares.

With respect to offering too many investment options, the defendants argue that the plaintiffs have neither alleged that any participant experienced confusion nor stated a claim for relief.  The court agrees with both these points.  Although the plaintiffs discuss the behavioral economics of "decision paralysis," nowhere in the Amended Complaint do they allege a

theory of harm, let alone allege facts explaining how the "dizzying array" 100-plus investment choices harmed the plaintiffs.  See Sacerdote, 2017 WL 3701482, at *11 ("[P]laintiffs simply have not alleged any facts to suggest that the Plans' beneficiaries were harmed in an actionable way by [the university's] failure to consolidate the Plans' investment Options."); Sweda v. Univ. of Penn., No. 16-4329, 2017 WL 4179752, at *10-11 (E.D. Pa. Sept. 21, 2017) ("[P]laintiffs have not alleged any participant who was confused by the different options.").  Also, simply listing the number of investments in various asset categories does not mean that any particular investment is unreasonable in and of itself or in relation to other investments.

Nor does the possibility of lower fees resulting from the concentration of assets defeat the general presumption in favor of a broader range of options.  See Loomis v. Excelon Corp., 658 F.3d 667, 673-74 (7th Cir. 2011); Sacerdote, 2017 WL 3701482, at *11.  Thus, the duty of prudence claim is being dismissed to the extent that it is based on too many investment offerings.

With respect to failure to reduce fees, the defendants contend that the plaintiffs have not stated a claim with respect to the layers of fees charged by TIAA-CREF for the CREF Stock Account and the TIAA Real Estate Account.  The defendants argue that the plaintiffs fail to allege facts that show that an

alternative investment product with lower fees (or fewer layers
of fees) exists so that the plaintiffs could select it.  The
court agrees.  The plaintiffs have not alleged that any layer of
the fees (other than the recordkeeping portion) can be lowered
through negotiation or that an identical, lower-cost substitute
exists.  Thus, the plaintiffs' duty of prudence claim is being
dismissed to the extent that it is based on failing to reduce
fees on several TIAA-CREF investments.

Finally, with respect to the failure to remove
underperforming investments, the defendants contend that the
plaintiffs cannot state a claim with respect to failing to
remove the underperforming CREF Stock Account and the TIAA Real
Estate Account.  They cite Fifth Third Bancorp v. Dudenhoffer
for the proposition that "a fiduciary need not 'outsmart a
presumptively efficient market.'" (Defs.' Mem., at 36 (quoting
Dudenhoffer, 134 S. Ct. 2459, 2472 (2014)).  The defendants
argue that they could not have predicted the underperformance of
the Stock Account or the Real Estate Account at the time they
decided to include them in the Plan.

In Dudenhoffer, the plaintiffs alleged that the company's
401(k) fiduciaries acted imprudently when they chose not to sell
off or otherwise stop employee investment in company stock,
despite public information suggesting that the stock might
suffer great losses.  The Court held that absent special

-26-

circumstances, a fiduciary's reliance on the price of a company's publicly traded stock when deciding to maintain the company stock in the 401(k) plan is not imprudent, even if other public information suggests that the stock might tank in the near future. See id. at 2471.  However, here the plaintiffs allege that the defendants acted imprudently when, in 2010, they chose to retain several TIAA-CREF investments despite the investments' underperformance, as measured by the price of the investments over the preceding 10 years.

The defendants also argue that the stock indexes the plaintiffs used to benchmark the TIAA-CREF investments are not the proper ones to measure whether the two investments underperformed.  This point is not appropriately addressed at the motion to dismiss stage.  See Sacerdote, 2017 WL 3701482, at *10 ("Defendant's assertion that plaintiffs 'use patently inappropriate benchmarks over jury-rigged performance periods' raises factual questions that are not appropriately addressed at this time.").

Thus, the motion to dismiss is being denied with respect to the duty of prudence claim based on failure to remove underperforming investments.

### 2.  Duty of Loyalty

The plaintiffs also claim, in Counts I, III and V, breaches of the duty of loyalty.

-27-

When making a decision regarding an ERISA defined-contribution plan, a fiduciary must do so with "an eye single to the interests of the participants and beneficiaries." Bierwirth, 680 F.2d at 271 (quoting Restatement (Second) of Trusts § 170 (Am. Law Inst. 1959)).  Breaches of the "unwavering" duty of loyalty occur when a fiduciary deviates from that "single-minded devotion," placing its interests or the interests of a third party above that of plan participants or beneficiaries.  Berlin v. Mich. Bell Tel. Co., 858 F.2d 1154, 1162 (6th Cir. 1988) (quoting Morse v. Stanley, 732 F.2d 1139, 1145 (2d Cir. 1984)); see 29 U.S.C. § 1104(a)(1)(A).  To state a claim for breach of loyalty, "a plaintiff must allege facts that permit a plausible inference that the defendant 'engag[ed] in transactions involving self-dealing or otherwise involve or create a conflict between the trustee's fiduciary duties and personal interests.'" Sacerdote, 2017 WL 3701482, at *5 (alteration in original) (quoting Restatement (Third) of Trusts § 78 (2007)); see also George G. Bogert & George T. Bogert, The Law of Trusts & Trustees § 543 (3d ed. 2016) ("The trustee must exclude all self-interest, as well as the interest of a third party, in his administration of the trust solely for the benefit of the beneficiary.").

Here, the plaintiffs offer no plausible theory in any of the counts to suggest that the defendants' decisions favored

-28-

themselves or a third party at the expense of the Plan participants.  The plaintiffs have not alleged that the fiduciaries benefited directly or indirectly from the bundled arrangements, the accompanying transactions, or their relationship with TIAA-CREF or Vanguard, or even that the defendants intended to benefit anyone other than the Plan participants.  See Nicholas, 2017 WL 4455897, at *3 ("Plaintiff pleads no facts suggesting Defendant benefitted, financially or otherwise, from any decisions related to the Plans or engaged in disloyal conduct in order to benefit itself or someone other than the Plans' beneficiaries").  Rather, the plaintiffs attempt to couple repeated conclusory allegations that the defendants favored TIAA-CREF and Vanguard with the fact TIAA-CREF and Vanguard benefited from the bundling and fee arrangements.  But a theory of breach based on incidental benefit, without more, cannot support a breach of loyalty claim.  See Bierwirth, 680 F.2d at 271 ("[Plan fiduciaries] do not violate their duties as trustees by taking action which, after careful and impartial investigation, they reasonably conclude best to promote the interests of participants and beneficiaries simply because it incidentally benefits the corporation or, indeed, themselves . . . .").

        The plaintiffs argue that the court should not separate analysis of the loyalty claims from that of the prudence claims

because "[t]he duties are not entirely distinct, but are 'overlapping.'" (Doc. No. 69, Pls.' Opp., at 26 (quoting <u>Martin v. Feilen</u>, 965 F.2d 660, 670 (8th Cir. 1992)). But while analysis of the duty of loyalty may inform the analysis of the duty of prudence and vice versa, the two remain conceptually distinct from one another. That is apparent from Congress's codification of the two as separate subsections of ERISA.

Thus, the motion to dismiss is being granted as to the breach of the duty of loyalty claims in Count I, III and V.

**B.   Prohibited Transactions (Counts II, IV and VI)**

ERISA prohibits plan fiduciaries from engaging in various kinds of transactions with a "party in interest." Under the relevant portions of 29 U.S.C. § 1106(a),

Except as provided in section 1108 of this title:

(1)   A fiduciary with respect to a plan shall not cause the plan to engage in a transaction, if he knows or should know that such transaction constitutes a direct or indirect--

(A)   sale or exchange, or leasing, of any property between the plan and a party in interest;

. . .

(C)   furnishing of goods, services, or facilities between the plan and a party in interest;

(D)   transfer to, or use by or for the benefit of a party in interest, of any assets of the plan; . . .

The Amended Complaint alleges that TIAA-CREF (Counts II, IV and VI) and Vanguard (Counts IV and VI) are "parties in interest" furnishing both investment management and recordkeeping services to the Plan.

Count II, relating to "Locking the Plan into CREF Stock Account and TIAA Recordkeeping," alleges inter alia that

> [b]y allowing the Plan to be locked into an unreasonable arrangement that required the Plan to include the CREF Stock Account and to use TIAA as the recordkeeper for its proprietary products even though the fund was no longer a prudent option for the Plan due to its excessive fees and poor performance, and even though TIAA's recordkeeping fees were unreasonable for the services provided, Defendants caused the Plan to engage in transactions that it knew or should have known constituted an exchange of property between the Plan and TIAA-CREF prohibited by 29 U.S.C. §1106(a)(1)(A), a direct or indirect furnishing of services between the Plan and TIAA-CREF prohibited by 29 U.S.C. §1106(a)(1)(C), and a transfer of Plan assets to TIAA-CREF prohibited by 29 U.S.C. §1106(a)(1)(D). These transactions occurred each time the Plan paid fees to TIAA-CREF in connection with the Plan's investments in the CREF Stock Account and other proprietary options that paid revenue sharing to TIAA.

(Am. Comp., at ¶ 218.)

Count IV, relating to "Administrative Services and Fees," alleges inter alia that

> [b]y causing the Plan to use TIAA-CREF and Vanguard as the Plan's recordkeepers from year to year, Defendants caused the Plan to engage in transactions that Defendants knew or should have known constituted an exchange of property between the Plan and TIAA-CREF and Vanguard prohibited by 29 U.S.C. §1106(a)(1)(A), a direct or indirect furnishing of services between the Plan and TIAA-CREF and Vanguard prohibited by 29 U.S.C. §1106(a)(1)(C), and a transfer of Plan assets to, or use

-31-

by or for the benefit of TIAA-CREF and Vanguard
prohibited by 29 U.S.C. §1106(a)(1)(D). These
transactions occurred each time the Plan paid fees to
TIAA-CREF and Vanguard and in connection with the Plan's
investments in funds that paid revenue sharing to TIAA-
CREF and Vanguard.

(Am. Compl., at ¶ 233.)

Count VI, relating to "Investment Services and Fees,"

alleges <u>inter alia</u> that

[b]y placing investment options in the Plan managed by
TIAA-CREF, and Vanguard in which all of the Plan's $3.8
billion in assets were invested, Defendants caused the
Plan to engage in transactions that Defendants knew or
should have known constituted an exchange of property
between the Plan and TIAA-CREF and Vanguard prohibited
by 29 U.S.C. §1106(a)(1)(A); a direct or indirect
furnishing of services between the Plan and TIAA-CREF
and Vanguard prohibited by 29 U.S.C. §1106(a)(1)(C); and
transfers of the Plan's assets to, or use by or for the
benefit of TIAA-CREF and Vanguard prohibited by 29
U.S.C. §1106(a)(1)(D). These transactions occurred each
time the Plan paid fees to TIAA-CREF and Vanguard in
connection with the Plan's investments in TIAA-CREF and
Vanguard investment options.

(Am. Compl., at ¶ 253.)

Citing to 29 U.S.C. § 1002(21)(B), the defendants state

that "neither TIAA nor Vanguard is a party in interest by virtue

of the investment management services they provide to the Plan."

(Defs.' Mem., at 43.)  However, as the plaintiffs note "[§

1002(21)(B)] provides only that a plan's investment of 'money or

other property' in a mutual fund 'shall not by itself cause' the

mutual fund to be deemed a party in interest. . . . The

exemption says nothing about a mutual fund that furnishes

-32-

'services' to a plan. 29 U.S.C. § 1106(a)(1)(C)." (Pls.' Opp., at 45-46.)

The defendants assert that "Section [1108(b)] exempts certain categories of transactions from Section [1106] — including, as relevant here, payments for 'services necessary for the establishment or operation of the plan,' as long as 'no more than reasonable compensation is paid therefor.' 29 U.S.C. § 1108(b)(2)." (Defs.' Mem., at 44.)  The defendants argue that all of the plaintiffs' prohibited transaction claims fail because the transactions fall within the safe harbor of 29 U.S.C. § 1108(b)(2).  However, the plaintiffs correctly note that § 1108(b)(2) involves an affirmative defense that the defendants bear the burden of pleading and proving.  See Braden v. Wal-Mart Stores, Inc., 588 F.3d 585, 601-02 (8th Cir. 2009) ("The exemption for reasonable compensation is in a separate section of the statute, and it is a 'general rule of statutory construction that the burden of proving justification or exemption under a special exception to the prohibitions of a statute generally rests on one who claims its benefits.'" (citing FTC v. Morton Salt Co., 334 U.S. 37, 44-45 (1948))); Allen v. GreatBanc Tr. Co., 835 F.3d 670, 676-77 (7th Cir. 2016) ("[T]he exemptions from prohibited transactions do not provide alternative explanations; they assume that a transaction in the prohibited group occurred, and they add additional facts showing

-33-

why that particular one is acceptable.  That is how affirmative
defenses work.")

The defendants contend that none of the "transactions
involve[d] 'assets of the [P]lan' within the meaning of §
1106(a)(1)(D), because TIAA and Vanguard were compensated from
assets held by the mutual funds and annuities in their
possession, which are expressly excluded from the definition.
Id. § 1101(b)(1)." (Defs.' Mem., at 44 (footnote omitted).)  But
the theory of the plaintiffs' claim with respect to clause
(a)(1)(D) is that "payments from mutual funds made at the
expense of participants are plan assets [and . . . e]ven if
revenue sharing were not a plan asset generally, the portion
that exceeds a reasonable amount is because it rightfully
belongs to the Plan." (Pls.' Opp., at 46 (emphasis in
original).)  The plaintiffs argue with respect to clause
(a)(1)(C) that "[a] plaintiff states a § 1106(a)(1)(C) claim by
alleging that a recordkeeper received 'revenue sharing payments
in exchange for services rendered to the Plan.'" (Pls.' Opp.,
at 46 (citation omitted).); see Braden, 588 F.3d at 601 ("We
conclude that Braden has stated a claim under § 1106(a)(1)(C).
The complaint alleges that appellees caused the Plan to enter
into an arrangement with Merrill Lynch, a party in interest,
under which Merrill Lynch received undisclosed amounts of
revenue sharing payments in exchange for services rendered to

-34-

the Plan." (footnote omitted)).  The plaintiffs argue with respect to (a)(1)(A) that the language "exchange of <u>any</u> property" is to be read broadly, citing correctly to <u>Lowen v. Tower Asset Mgmt., Inc.</u>, 829 F.2d 1209, 1213 (2d Cir. 1987). (Pls.' Opp., at 46 (emphasis in original).) Accepting the factual allegations in the Amended Complaint as true and drawing inferences in a light most favorable to the plaintiffs, as the court must at the motion to dismiss stage, the court concludes that the defendants have failed to show that these counts should be dismissed.

Thus, the motion to dismiss is being denied with respect to Counts II, IV and VI.

C.  **<u>Failure to Monitor</u>**

"ERISA law imposes a duty to monitor appointees on fiduciaries with appointment power." <u>In re Xerox Corp. ERISA Litig.</u>, 483 F. Supp. 2d 206, 215 (D. Conn. 2007)(quoting <u>In re Electronic Data Systems Corp. "ERISA" Litigation</u>, 305 F. Supp. 2d 658, 670 (E.D. Tex. 2004)); <u>see</u> <u>In re AEP ERISA Litig.</u>, 327 F. Supp. 2d 812, 832 (S.D. Ohio 2004)("There can be no doubt that the ERISA statutory scheme imposes a duty to monitor upon fiduciaries when they appoint other persons to make decisions about the plan."); <u>In re Xcel Energy, Inc., Sec., Derivative & "ERISA" Litig.</u>, 312 F. Supp. 2d 1165, 1176 (D. Minn. 2004) ("A person with discretionary authority to appoint, maintain and

-35-

remove plan fiduciaries is himself deemed a fiduciary with
respect to the exercise of that authority." (citing Coyne &
Delany Co. v. Selman, 98 F.3d 1457, 1465 (4th Cir. 1996))).
This duty derives largely from 29 C.F.R. § 2509.75-8, which
states:

> At reasonable intervals the performance of trustees and
> other fiduciaries should be reviewed by the appointing
> fiduciary in such manner as may be reasonably expected
> to ensure that their performance has been in compliance
> with the terms of the plan and statutory standards, and
> satisfies the needs of the plan.

In Count VII, the plaintiffs allege that Yale and Peel
failed to monitor the Committee to ensure that its members
complied with their fiduciary duties to select reasonable
investment options; negotiate reasonable recordkeeping and
investment management fees; and continually monitor
investment performance, recordkeeping fees and investment
management fees.  The plaintiffs further allege that Yale
and Peel failed to remove Committee members who performed
inadequately.

The defendants contend that the facts alleged in the
Amended Complaint are insufficient to state a failure to
monitor claim.  The defendants also contend that because
the plaintiffs have not sufficiently pled any underlying
breaches of a fiduciary duty, the failure to monitor claim
fails.  See, e.g., In re Bausch & Lomb Inc. ERISA Litig.,

No. 06-CV-6297, 2008 WL 5234281, at *10 (W.D.N.Y. Dec. 12, 2008) ("Because the plaintiffs' Complaint fails to state a claim for breach of fiduciary duty by any of the Plan's fiduciaries, the plaintiffs' claims for failing to adequately monitor these fiduciaries must also be dismissed.").

However, the plaintiffs have alleged facts sufficient to state claims for breach of the duty of prudence based on the bundling arrangement, failure to employ strategies to lower recordkeeping fees, failure to offer institutional shares, and failure to remove underperforming investments. In addition, the plaintiffs have identified two fiduciaries, i.e. Yale and Peel, who were responsible for monitoring the performance of members of the Committee and had authority to discipline or remove Committee members. See Cunningham, 2017 WL 4358769, at *11 (denying motion with respect to the duty to monitor where "plaintiff allege[d] that Cornell created the Committee to oversee the Plans' investment options . . . [and] Opperman was Chair of the Committee and was given authority to appoint and remove other members of the Committee"). Also, "because the appropriate ERISA mandated monitoring procedures vary according to the nature of the Plan at issue and other facts and circumstances, an analysis of the precise

-37-

contours of the defendants' duty to monitor at this stage

is premature." <u>In re Xerox</u>, 483 F. Supp. 2d at 215.

### D.  <u>Statute of Limitations</u>

The defendants argue that the plaintiffs' claims are time-

barred under 29 U.S.C. § 1113(2), which provides that,

> [n]o action may be commenced under this subchapter with
> respect to a fiduciary's breach of any responsibility,
> duty, or obligation under this part . . .
>
>> (2) three years after the earliest date on which
>> the plaintiff had actual knowledge of the breach or
>> violation . . . .

"Actual knowledge" under § 1113(2) "is strictly construed and

constructive knowledge will not suffice." <u>L.I. Head Start Child</u>

<u>Dev. Servs., Inc. v. Econ. Opportunity Comm'n of Nassau Cty.,</u>

<u>Inc.</u>, 710 F.3d 57, 67 (2d Cir. 2013). "A plaintiff has 'actual

knowledge' of a breach or violation 'when he has knowledge of

all material facts necessary to understand that an ERISA

fiduciary has breached his or her duty or otherwise violated the

act.'" <u>Muehlgay v. Citigroup Inc.</u>, 649 F. App'x 110, 111 (2d

Cir.) (quoting <u>Caputo v. Pfizer, Inc.</u>, 267 F.3d 181, 193 (2d

Cir. 2001)).

> [And w]hile a plaintiff need not have knowledge of the
> relevant law, he must have knowledge of all facts
> necessary to constitute a claim. Such material facts
> "could include necessary opinions of experts, knowledge
> of a transaction's harmful consequences, or even actual
> harm." However, "[t]he disclosure of a transaction that
> is not inherently a statutory breach of fiduciary duty
> ... cannot communicate the existence of an underlying
> breach."

Caputo, 267 F.3d at 193 (second alteration in original)
(citations omitted).

The defendants contend that all the plaintiffs' claims are
time-barred because various annuity contracts, disclosures,
notices, and prospectuses provided the plaintiffs with actual
knowledge of the fact that Yale "had no discretion to
discontinue the Stock and Money Market Accounts," as well as
actual knowledge of fees, performance, and total number of
investments, all more than three years before the plaintiffs
commenced the instant suit.  (Defs.' Mem., at 46-48.)

However, each of the remaining claims alleges a flaw in
the process for selecting investments or services.  This is
significant because

> [a] plaintiff asserting a process-based claim under §
> 1104, § 1106(a), or both does not have actual knowledge
> of the procedural breach of fiduciary duties unless and
> until she has actual knowledge of the procedures used or
> not used by the fiduciary. . . . Thus, for a process-
> based claims under §§ 1104 and 1106(a), the three-year
> limit is not triggered by knowledge of the transaction
> terms alone.

Fish v. GreatBanc Tr. Co., 749 F.3d 671, 681 (7th Cir. 2014).
The various disclosures the defendants describe give information
about transactions or investments, not the underlying process
for reaching the decision regarding each or whether the fees
themselves are reasonable.  See Cunningham, 2017 WL 4358769, at
*12 ("Notice of a particular investment's fee alone does not

constitute actual knowledge that the particular fee is excessive and thus imprudent," especially without knowledge of the fees of comparable funds. (citing Leber v. Citigroup 401(k) Plan Inv. Comm., No. 07-CV-9329, 2014 WL 4851816, at *4-5 (S.D.N.Y. Sept. 30, 2014))

Thus, the court concludes that the defendants have not shown that the plaintiffs' claims are time-barred.

**IV.   CONCLUSION**

For the reasons set forth above, the defendants' Motion to Dismiss (Doc. No. 62) the Amended Complaint is hereby GRANTED in part and DENIED in part.  The following claims are dismissed: in Count I, the claim for breach of the duty of loyalty; in Count III, the claim for breach of the duty of loyalty; in Count V, the claim for the breach of the duty of prudence based on offering too many investment options and failing to reduce fees on several TIAA-CREF investments, and the claim for breach of the duty of loyalty.

It is so ordered.

Signed this 30th day of March 2018, at Hartford, Connecticut.

/s/ AWT
_____
Alvin W. Thompson
United States District Judge
