PUBLIC VERSION

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF CONNECTICUT

JOSEPH VELLALI *et al.*,

    *Plaintiffs*,

v.

YALE UNIVERSITY *et al.*,

    *Defendants*.

Civil Action No. 3:16-cv-01345-AWT

Hon. Alvin W. Thompson

## MEMORANDUM OF LAW IN SUPPORT OF
## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Nancy G. Ross (ct14373)
James C. Williams (ct23292)
Richard E. Nowak (phv09930)
MAYER BROWN LLP
71 South Wacker Drive
Chicago, Illinois 60606-4637
Telephone: (312) 782-0600
Facsimile: (312) 701-7711

Brian D. Netter (phv08476)
Michelle N. Webster (phv08475)
MAYER BROWN LLP
1999 K Street NW
Washington, DC 20006-1101
Telephone: (202) 263-3000
Facsimile: (202) 263-3300

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................ 1

I.  Yale Is Entitled To Summary Judgment On The Recordkeeping Claim (Count III). ............................................................................................................. 6

    A.  Yale followed a deliberate process to consolidate recordkeepers. ....... 7

    B.  Yale exercised prudent oversight of recordkeeping fees. .................... 9

        1.  ERISA does not require a per-capita fee structure.................... 9

        2.  ERISA does not require competitive bidding. ........................ 11

    C.  Plaintiffs' latest "cross-selling" theory is meritless. ........................... 12

    D.  Yale's recordkeeping fees were objectively prudent. .......................... 13

II.  Yale Is Entitled To Summary Judgment On The Investment-Monitoring Claim (Count V). ................................................................................................... 15

    A.  Plaintiffs have not provided evidence to support standing. ................. 15

    B.  Plaintiffs cannot show a breach of the duty of prudence. ................... 17

        1.  Yale exercised regular oversight over investment options. .... 18

        2.  Plaintiffs' hindsight criticisms are unavailing. ....................... 19

    C.  The investments at issue were objectively prudent.............................. 21

        1.  There is no evidence that prudent fiduciaries followed Plaintiffs' proposed methodology........................................................... 22

        2.  Dominguez compares apples and oranges. ............................. 24

        3.  Plaintiffs' "benchmark" analysis is meritless. ........................ 26

    D.  Plaintiffs' share-class theory is meritless.......................................... 31

        1.  Yale negotiated over lower-cost share classes......................... 31

        2.  Some lower-cost share classes were not available to Yale. ..... 32

        3.  Yale's revenue credit account made share classes largely irrelevant. ............................................................................. 32

III.  Yale Is Entitled To Summary Judgment On The Remaining Claims........................... 33

    A.  The "bundling" claim (Count I) is meritless....................................... 33

    B.  The prohibited transaction claims (Counts II, IV, and VI) are meritless............. 34

    C.  The duty-to-monitor claim (Count VIII) is meritless. ......................... 36

CONCLUSION.................................................................................................. 37

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Acosta v. Chimes D.C., Inc.*,
   2019 WL 931710 (D. Md. Feb. 26, 2019) ......................................................................11, 36

*Anderson v. Liberty Lobby, Inc.*,
   477 U.S. 242 (1986)..........................................................................................................6

*Barchock v. CVS Health Corp.*,
   886 F.3d 43 (1st Cir. 2018)..............................................................................................17

*Bd. of Trs. of AFTRA Ret. Fund v. JPMorgan Chase Bank, N.A.*,
   860 F. Supp. 2d 251 (S.D.N.Y. 2012).............................................................................22

*In re Bear Stearns Cos., Inc. Secs., Derivative, and ERISA Litig.*,
   763 F. Supp. 2d 423 (S.D.N.Y. 2011).............................................................................36

*Birse v. CenturyLink, Inc.*,
   2020 WL 1062902 (D. Colo. Mar. 5, 2020) ...............................................................20, 21

*Braden v. Wal-Mart Stores, Inc.*,
   588 F.3d 585 (8th Cir. 2009) ...........................................................................................35

*Cal. Ironworkers Field Pension Tr. v. Loomis Sayles & Co.*,
   259 F.3d 1036 (9th Cir. 2001) ...........................................................................................9

*Cates v. Tr. of Columbia Univ.*,
   2019 WL 8955333 (S.D.N.Y. Oct. 25, 2019)..................................................................22

*Chao v. Merino*,
   452 F.3d 174 (2d Cir. 2006).............................................................................................21

*Clark v. Duke Univ.*,
   2017 WL 4477002 (M.D.N.C. 2017)................................................................................34

*Cunningham v. Cornell Univ.*,
   2019 WL 4735876 (S.D.N.Y. 2019)...........................................................................*passim*

*Davis v. Wash. Univ.*,
   960 F.3d 478 (8th Cir. 2020) .................................................................................25, 26, 29

*Divane v. Northwestern University*,
   2018 WL 2388118, at *12 (N.D. Ill. May 25, 2018),
   *aff'd*, 953 F.3d 970 (7th Cir. 2020).........................................................................7, 25, 34, 36

*Dorman v. Charles Schwab Corp.*,
   2019 WL 580785 (N.D. Cal. Feb. 8, 2019) .....................................................................23

*Haddock v. Nationwide Fin. Servs., Inc.*,
   419 F. Supp. 2d 156 (D. Conn. 2006)...............................................................................35

*Hecker v. Deere & Co.*,
   556 F.3d 575 (7th Cir. 2009) .........................................................................................9, 13

*Howell v. Motorola, Inc.*,
633 F.3d 552 (7th Cir. 2011) ........................................................................36, 37

*Katsaros v. Cody*,
744 F.2d 270 (2d Cir. 1984)...........................................................................9, 12

*Kumho Tire Co. v. Carmichael*,
526 U.S. 137 (1999)...........................................................................................30

*L.I. Head Start Child Dev. Servs. v. Econ. Opportunity Comm'n of Nassau Cty.*,
710 F.3d 57 (2d Cir. 2013)................................................................................17

*Larson v. Allina Health Sys.*,
350 F. Supp. 3d 780 (D. Minn. 2018)...............................................................26

*Liss v. Smith*,
991 F. Supp. 278 (S.D.N.Y. 1998)....................................................................22

*Loomis v. Exelon Corp.*,
658 F.3d 667 (7th Cir. 2011) ............................................................................25

*Lujan v. Defenders of Wildlife*,
504 U.S. 555 (1992)...........................................................................................16

*Major League Baseball Props., Inc. v. Salvino, Inc.*,
542 F.3d 290 (2d Cir. 2008)..............................................................................15

*O'Connor v. Certainteed Corp.*,
1990 WL 14457 (E.D. Pa. Feb. 16, 1990) ........................................................20

*Osberg v. Foot Locker, Inc.*,
138 F. Supp. 3d 517 (S.D.N.Y. 2015), *aff'd*, 862 F.3d 198 (2d Cir. 2017) ............21

*Patrico v. Voya Fin., Inc.*,
2018 WL 1319028 (S.D.N.Y. Mar. 13, 2018) ..................................................35

*Patterson v. Stanley*,
2019 WL 4934834 (S.D.N.Y. Oct. 7, 2019) ...............................23, 26, 27, 28

*Pfeil v. State St. Bank & Tr. Co.*,
806 F.3d 377 (6th Cir. 2015) ..............................................................................9

*Pioneer Centres Holding Co. Emp. Stock Ownership Plan & Tr. v.
Alerus Fin., N.A.*,
858 F.3d 1324 (10th Cir. 2017) .........................................................................22

*Powell v. Nat'l Bd. of Med. Exam'rs*,
364 F.3d 79 (2d Cir. 2004)..................................................................................6

*Raskin v. Wyatt Co.*,
125 F.3d 55 (2d Cir. 1997)................................................................................19

*Ret. Bd. of Policemen's Annuity & Benefit Fund of the City of Chi. v.
Bank of N.Y. Mellon*,
775 F.3d 154 (2d Cir. 2014)..............................................................................16

*Sacerdote v. N.Y. Univ.*,
 328 F. Supp. 3d 273 (S.D.N.Y. 2018)..........................................................*passim*

*Sacerdote v. New York Univ.*,
 2017 WL 3701482 (S.D.N.Y. Aug. 25, 2017).................................................35

*Silverman v. Mut. Benefit Life Ins. Co.*,
 138 F.3d 98 (2d Cir. 1998)..........................................................................21

*PBGC ex rel. St. Vincent Catholic Med. Ctrs. Ret. Plan v.
 Morgan Stanley Inv. Mgmt. Inc.*,
 712 F.3d 705 (2d Cir. 2013)..........................................................................17

*Sweda v. Univ. of Pennsylvania*,
 923 F.3d 320 (3d Cir. 2019)..........................................................................35

*Taylor v. United Techs. Corp.*,
 2009 WL 535779 (D. Conn. Mar. 3, 2009),
 *aff'd*, 354 F. App'x 525 (2d Cir. 2009)...................................................21, 26

*Thole v. U.S. Bank, N.A*,
 140 S. Ct. 1615 (2020)............................................................................16, 17

*Tibble v. Edison Int'l*,
 729 F.3d 1110 (9th Cir. 2013) ......................................................................33

*Tussey v. ABB, Inc.*,
 746 F.3d 327 (8th Cir. 2014) ........................................................................21

*In re Unisys Sav. Plan Litig.*,
 74 F.3d 420 (3d Cir. 1996)............................................................................22

*Varity Corp. v. Howe*,
 516 U.S. 489 (1996)......................................................................................37

*Vt. Teddy Bear Co. v. 1-800 Beargram Co.*,
 373 F.3d 241 (2d Cir. 2004)............................................................................6

*White v. Chevron Corp.*,
 2016 WL 4502808 (N.D. Cal. Aug. 29, 2016) ..........................................11, 24

*Wilcox v. Georgetown Univ.*,
 2019 WL 132281 (D.D.C. Jan. 8, 2019)..................................15, 25, 26, 27

*Wildman v. Am. Century Servs., LLC*,
 362 F. Supp. 3d 685 (W.D. Mo. 2019) ..............................20, 23, 32, 36

**Statutes**

29 U.S.C. § 1104(a)(1)(B) ...........................................................................17

29 U.S.C. § 1106 .........................................................................................34

29 U.S.C. § 1106(a)(1)..........................................................................34, 36

29 U.S.C. § 1108(b)(2) .................................................................................35

29 U.S.C. § 1113(1) .....................................................................................34

**Other Authorities**

29 C.F.R. § 2550.404a-1(b) ............................................................................................17

29 C.F.R. § 2550.408b-2(e)(3)........................................................................................33

Fed. R. Civ. P. 56(a) .........................................................................................................6

# INTRODUCTION[1]

In 2016, Plaintiffs' counsel filed more than a dozen copy-and-paste lawsuits against large private universities, including Yale. At the time, counsel conceded that they did not know anything about the inner workings of those schools—including which schools had been the trailblazers on employee benefits and which had been inattentive. *See* Dkt. 69 at 8 & n.7. The parties in this case have now taken over 20 depositions and exchanged hundreds of thousands of pages of documents concerning Yale's fiduciary process. This material shows that Yale consistently led the pack when it came to designing, monitoring, and implementing retirement solutions for its employees.

As explained below, Yale was among the first universities to move to a single recordkeeper for its 403(b) retirement plan, reducing administrative expenses and enhancing the participant experience. Even before consolidation, Yale was a leader in negotiating recordkeeping discounts, paying recordkeeping fees at rates equal to or below those of many other universities—including schools whose recordkeeping fees have been deemed prudent as a matter of fact and law. On the investment front, Yale regularly monitored each of the funds offered to participants, ensuring a wide variety of industry-standard options construct retirement portfolios. Yale also developed a cutting-edge default offering that included a built-in annuity option to provide retirees with lifetime income. *Pensions & Investments* magazine gave Yale an award for its efforts, with one judge calling it a new paradigm for retirement savings; he wrote that he "hope[d] to see investment managers look at what Yale has done when they innovate new products for corporate plan sponsors." SUMF ¶ 24 n.24.

---

[1] "SUMF __" cites refer to paragraphs of Defendants' Local Rule 56(a)(1) Statement of Undisputed Material Facts, filed concurrently. "Ex. __" cites refer to exhibits to the Declaration of Brian D. Netter in Support of Defendants' Motion for Summary Judgment and Motions to Exclude Plaintiffs' Expert Witnesses, also filed concurrently.

PUBLIC VERSION

Yale's fiduciary oversight, in short, was consistently exemplary, reflecting exactly the kind of careful and engaged process that ERISA envisions. As David Swallow, formerly a consultant who advised Yale on issues relating to its defined-contribution plan, testified:

> The level of knowledge in the room from Yale, the engagement, the questions that were asked, the level of detail that was dug into relating to the investment was second to none that I ever sat in, in my experience working with committees.

SUMF ¶ 23 n.23. Another third-party service provider explained that "Yale was always pushing the envelope" and was "very actively involved to support their retirement plan," "more so than almost any client that I have dealt with in my entire career." SUMF ¶ 23 n.23.

Faced with this record, Plaintiffs have no remotely plausible argument that Yale's oversight was inferior to that of its peers. So Plaintiffs must argue that *everybody*—Yale included—was doing it wrong. The problem with this criticism is that ERISA "protects plan participants' reasonable expectations in the context of the market that exists." *Rosen v. Prudential Ret. Ins. & Annuity Co.*, 2016 WL 7494320, at *17 (D. Conn. 2016), *aff'd*, 718 F. App'x 3 (2d Cir. 2017). As long as a fiduciary acts in accordance with the standard of a prudent person in like circumstances, ERISA does not empower plaintiffs to second-guess the fiduciary's decisions or demand dramatic changes to suit litigation-driven preferences. It is fiduciaries, not plaintiffs' lawyers, who are responsible for administering retirement plans.

Because the record shows that Yale took its responsibilities seriously, weighed the pros and cons of its decisions, and reached conclusions that were more than reasonable based on the market as it existed at the time, Yale is entitled to summary judgment on all claims.

## BACKGROUND

The Yale University Retirement Account Plan is organized under 26 U.S.C. § 403(b). SUMF ¶ 1. Yale makes automatic contributions of 5% of eligible compensation (7.5% above the

social-security wage limit) and matches 100% of employee contributions up to another 5% of eligible compensation. Participants then invest those funds in individual accounts by choosing from a range of investment options—from target-date funds to broad index funds to actively managed funds to annuities—to meet their unique retirement and savings goals. SUMF ¶¶ 1, 4-5.

*Plan Oversight.* Yale oversees the administration of the Plan and its investment lineup to ensure that the Plan operates in the best interests of its participants. At the start of the class period, Michael Peel, Yale's Vice President for Human Resources and Administration, had primary responsibility for the Plan. Peel was supported by Yale's Benefits Department, led by Hugh Penney. SUMF ¶ 2. In 2012, Peel chartered and delegated Plan administrative responsibilities to the Retirement Account Plans Fiduciary Committee on Investments ("Committee"),[2] which has met more than three dozen times since February 2012. SUMF ¶ 3. The Committee's work is supported by the Benefits Department, and the Committee has also engaged Aon Hewitt Investment Consulting (f/k/a Hewitt EnnisKnupp) to provide outside consulting advice.

*Plan Administration*. Yale's participants have access to investments from two different investment providers. The Plan's core options, which it had offered for many decades, were annuities offered by Teachers Insurance and Annuity Association of America-College Retirement Equities Fund ("TIAA"). When the class period began in August 2010, the Plan also offered participants the option to invest in a variety of mutual funds from The Vanguard Group, Inc. ("Vanguard") and TIAA. SUMF ¶ 4.

Historically, TIAA and Vanguard were responsible for recordkeeping their respective investment options, and both provided a standard pricing model for 403(b) retirement plans.

---

[2] Reflecting the various stakeholders in the Plan, the Committee's initial members included the then-Provost (the University's chief academic officer); the Vice President for Human Resources and Administration; and the Vice President for Finance and Business Operations. In 2016, a fourth member joined the Committee from the Yale Investments Office, which manages the University's endowment. SUMF ¶ 3.

**PUBLIC VERSION**

SUMF ¶ 4. Penney had asked the vendors to provide Yale with preferred pricing terms, but they initially refused. SUMF ¶ 15. Just a few months after the start of the class period, however, those efforts began to bear fruit. Effective January 2011, Yale negotiated a new recordkeeping contract with TIAA that reduced costs by $1 million per year. Vanguard followed in 2013, reducing its administrative fee from 9 basis points (0.09%) to 5.6 basis points. SUMF ¶ 16.

In 2010, Yale also explored the possibility of consolidating recordkeeping services with a single recordkeeper instead of the dual structure it had used for some time. But Yale encountered two obstacles. First, no vendor other than TIAA had ever recordkept TIAA's annuities. This was no small obstacle, because, as of 2010, the Plan had billions of dollars invested in TIAA annuities, and Yale had no contractual authority to move participants' money out of these annuities even if it had wanted to do so. SUMF ¶¶ 5-8. Second, TIAA told Yale that it could not provide all of the services that Yale required for Plan recordkeeping. SUMF ¶ 11.

In 2013, Yale learned that TIAA's capacities had expanded and consolidation to a single recordkeeper might be a realistic possibility. SUMF ¶ 12. Yale launched a formal process, received bids for recordkeeping proposals from both TIAA and Vanguard, and hired a consultant (Aon) to give advice on the transition. SUMF ¶¶ 12-13. In 2015, Yale became one of the first large universities to migrate to sole recordkeeping with TIAA. SUMF ¶¶ 14.

*Plan Investments*. As mentioned above, Yale's investment lineup has historically consisted of a mix of TIAA and Vanguard investment options. TIAA has been helping Yale faculty and staff plan and prepare for retirement for over a century, most notably by providing participants with the ability to invest in fixed and variable annuities to save for retirement. A fixed annuity offers annuitants and their beneficiaries guaranteed returns and (at retirement) a guaranteed stream of income. A variable annuity is similar, except the returns, and hence the value of the lifetime

income stream, vary with the performance of the underlying investments. *See generally SEC v. Variable Annuity Life Ins. Co. of Am.*, 359 U.S. 65, 69-70 (1959). Either way, unlike equities or mutual funds, with which an investor might outlive his or her savings, investors in annuities receive guaranteed lifetime income. Thus, for many participants, annuities are attractive because they reduce investment risk (the risk that one's investments will perform poorly over a given time period) and longevity risk (the risk that one will live longer than expected and thus require additional funds in retirement), and ease the burden of managing investments in old age.

Three TIAA annuities are especially significant in this case. The first is the Traditional Annuity, TIAA's core fixed annuity product, which has been available to Yale employees since the inception of the Plan. The others are the CREF Stock Account ("CREF Stock"), a variable annuity that provides exposure to domestic and international equities, and the TIAA Real Estate Account ("TIAA Real Estate"), a variable annuity that provides a unique form of direct exposure to real estate. As of June 30, 2015, participants had invested $942 million in TIAA's Traditional Annuity, $735 million in CREF Stock, and $144 million in TIAA Real Estate, representing roughly 26%, 22%, and 3% of the Plan's $3.5 billion in total holdings, respectively. SUMF ¶¶ 25, 26, 31.

Yale also offered participants the ability to invest in high-quality, low-cost investment options from Vanguard, another leading investment company. Vanguard offered a mix of target-date funds ("one-stop" funds that shift exposure as a participant nears retirement); passive index funds (which track market or sector indices at low cost); and actively managed funds (which attempt to beat long-term market returns). Participants invested hundreds of millions of dollars in these offerings as well. SUMF ¶ 5.

Throughout the class period, Yale had processes in place to evaluate the Plan's investment options. Until 2012, Hugh Penney conducted annual reviews of the Plan's investment offerings. SUMF ¶ 21. The Committee has conducted annual reviews since its creation in 2012. SUMF ¶ 22.

## ARGUMENT

Rule 56 provides that summary judgment "shall" be granted where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see, e.g., Vt. Teddy Bear Co. v. 1-800 Beargram Co.*, 373 F.3d 241, 244 (2d Cir. 2004). Summary judgment is appropriate when, after discovery, the non-movant has not shown "that evidence of an essential element of her case—one on which she has the burden of proof—exists." *Powell v. Nat'l Bd. of Med. Exam'rs*, 364 F.3d 79, 84 (2d Cir. 2004). A factual dispute is "genuine" if "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Id*. at 249-50 (internal citations omitted).

## I.   Yale Is Entitled To Summary Judgment On The Recordkeeping Claim (Count III).

Plaintiffs' first principal claim is that Yale acted imprudently with regarding to Plan recordkeeping. They originally alleged that Yale should have lowered administrative fees in two ways: (i) consolidating recordkeepers at the start of the class period; or (ii) finding a third-party recordkeeper to "provide the same administrative services at lower cost." Dkt. 57 ("Am. Compl.") ¶¶ 78, 99. These theories amount to a broadside attack on the Plan's relationship with TIAA and fail based on the undisputed facts. As the record shows, Yale could not have moved to a single recordkeeper earlier than it did without dramatically—and, in Yale's eyes, imprudently—overhauling the Plan. Even then, Yale would have had to continue paying TIAA for recordkeeping legacy annuity assets.

6

Implicitly recognizing the weakness of their theories as pled, Plaintiffs announced a third theory to support their recordkeeping claim at the close of discovery. This new theory alleges that Yale failed to obtain a reasonable recordkeeping fee from TIAA because it did not monitor TIAA's sales of *non*-Plan products like life insurance (what Plaintiffs call "cross-selling") to Plan participants. *See* Dkt. 200. But no court has ever accepted a "cross-selling" theory of imprudence, and Plaintiffs' attempt is riddled with legal and factual flaws.

**A.      Yale followed a deliberate process to consolidate recordkeepers.**

As with most of its peer institutions, Yale historically used multiple service providers (TIAA and Vanguard) to recordkeep the Plan. SUMF ¶¶ 4, 14. ERISA "does not require a sole recordkeeper or mandate any specific recordkeeping arrangement at all." *Divane*, 953 F.3d 980, 990 (7th Cir. 2020) (citing *Renfro v. Unisys Corp.*, 671 F.3d 314, 319 (3d Cir. 2011)). Nevertheless, Yale began to explore the possibility of consolidating recordkeepers no later than 2010. SUMF ¶ 11. Although Plaintiffs premised this lawsuit on the conclusory allegation that Yale was either unaware of alternatives to its recordkeeping model or unwilling to pursue those alternatives (Am. Compl. ¶ 99), the record shows that Yale evaluated recordkeeping issues at the start of the class period and determined that it was not in participants' interest to consolidate. Once the transition to a single recordkeeper did become feasible, Yale proceeded with consolidation.

The principal reason Yale did not undertake recordkeeper consolidation earlier in the class period is that there was no single recordkeeper that could service Yale's Plan. In 2010, over 70% of the assets in the Plan were invested in TIAA annuities. Because of the complex characteristics of that product, no vendor other than TIAA has ever provided recordkeeping for TIAA annuities. SUMF ¶ 7; *accord Sacerdote v. N.Y. Univ.*, 328 F. Supp. 3d 273, 302 (S.D.N.Y. 2018) ("the evidence conclusively demonstrated that the only firm that recordkeeps TIAA annuities is TIAA")

(internal quotation marks omitted). This meant that the Plan could not use Vanguard or some other service provider to recordkeep all of the Plan's investment options.

At the same time, the evidence shows that TIAA could not serve as the Plan's sole recordkeeper at the start of the class period either. As TIAA's corporate representative testified, "around the 2010 time frame, Yale was inquiring as to our sole recordkeeping capabilities," but TIAA responded that it "w[as]n't comfortable with providing the sole recordkeeping for Yale"; TIAA could not provide certain services that Yale desired, and TIAA also lacked the technical capability to manage all of Yale's Vanguard funds. SUMF ¶ 11 & n.11.

The details of the Plan's investments with TIAA added further complication. TIAA annuities historically were structured as contracts directly between TIAA and individual participants. As a result, plan sponsors were unable to divest participants unilaterally from the annuity contracts and reinvest the funds in investment options that could be serviced by another vendor. SUMF ¶¶ 6-8; *accord Sacerdote*, 328 F. Supp. 3d at 303 ("TIAA annuity assets have not previously been 'mapped' into similar funds with a different recordkeeper."). Of course, there is no evidence that Yale *wanted* to forcibly map participant investments from annuities to other funds in 2010. But even if Yale had desired to do so, the presence of legacy TIAA investments would have made a unilateral change impossible. Even freezing *future* contributions to TIAA would have left the Plan with legacy TIAA assets that were more expensive to recordkeep. SUMF ¶ 9.

Although Yale concluded that a recordkeeping change was not in the Plan's interest in 2010 and 2011, Yale continued to monitor recordkeeping issues. In 2013, Yale learned that TIAA had developed its capabilities and might be able to serve as the Plan's sole recordkeeper. Yale requested a recordkeeping proposal from both TIAA and Vanguard, hired Aon to assist in the process, and in July 2014, after extensive research and discussion, decided to consolidate with

TIAA. Yale completed the massive project in early 2015, receiving an Eddy Award from *Pensions & Investments* magazine for its diligent transition. SUMF ¶¶ 12-13.

This undisputed sequence of events forecloses Plaintiffs' challenge. ERISA holds fiduciaries to "the standards of others 'acting in a like capacity and familiar with such matters.'" *Katsaros v. Cody*, 744 F.2d 270, 279 (2d Cir. 1984); *accord Pfeil v. State St. Bank & Tr. Co.*, 806 F.3d 377, 388 (6th Cir. 2015); *Cal. Ironworkers Field Pension Tr. v. Loomis Sayles & Co.*, 259 F.3d 1036, 1044 (9th Cir. 2001). But Yale did not just meet the industry standard when it came to recordkeeping; Yale set the standard. Of the 23 elite private universities with billion-dollar 403(b) retirement plans, only three had moved to a single recordkeeper by 2015. SUMF ¶ 14. Yale evaluated opportunities to consolidate recordkeepers and reasonably implemented a solution as soon as it became desirable to do so. Nothing more was required.

### B.     Yale exercised prudent oversight of recordkeeping fees.

Plaintiffs alternatively argue that, consolidation aside, Yale paid TIAA and Vanguard too much for recordkeeping services. Specifically, Plaintiffs claim that Yale should have used a different fee structure or put its contracts out for competitive bidding. Am. Compl. ¶¶ 126, 225. These criticisms have no more merit than Plaintiffs' consolidation claims.

### 1.     ERISA does not require a per-capita fee structure.

During a portion of the class period, Yale compensated its recordkeepers through an asset-based, rather than per-capita, pricing model. Plaintiffs' experts prefer per-capita pricing so that total fees do not change when the Plan's assets change. Ex. 7, Minnich Rpt. ¶ 39; Ex. 9, Otto Rpt. ¶ 27. But ERISA does not *require* a fiduciary to use one method or the other. *Hecker v. Deere & Co.*, 556 F.3d 575, 585 (7th Cir. 2009) (asset-based fees "violate[] no statute or regulation").

Plaintiffs' criticism is irrelevant in any event. For one thing, there is no evidence that a different approach was available to Yale. As Plaintiffs' expert admitted, "███████████████

██████████████████████████████████████████████ " Ex. 15, Otto Tr. 148:1-2. In

2011, *all* of TIAA's 200 largest clients with at least one 403(b) plan that negotiated plan pricing

paid asset-based recordkeeping fees, and Vanguard likewise offered only asset-based

recordkeeping pricing. SUMF ¶¶ 15, 20.

For another, Plaintiffs' concern with asset-based fees "matters only in a theoretical sense."

*Sacerdote*, 328 F. Supp. 3d at 306 n.75. Plaintiffs' theory assumes that a plan sponsor must choose

between (1) a fee of $x$ that increases over time or (2) a fee of $x$ that stays constant. But vendors

can easily anticipate that assets will grow over time and therefore require a *higher* initial fee if

negotiated on a per-capita basis. Ex. 10, Poehler Rpt. ¶ 187. Regardless, there is ultimately more

than one way for a fiduciary to ensure that recordkeeping compensation remains reasonable. For

example, a fiduciary can renegotiate asset-based fees to account for changes in the asset base. *See*

*Sacerdote*, 328 F. Supp. 3d at 306 n.75 ("as assets under management increase, so may efficiencies,

and a fiduciary can thus negotiate to reduce the [asset-based] charge").

This is precisely what Yale did throughout the class period. Yale's first round of

negotiations with TIAA became effective January 1, 2011. TIAA initially offered to reduce Yale's

rate from 20 basis points to 12 basis points (0.12%), but Yale ultimately was able to lower the rate

still further to 9.5 bps. SUMF ¶ 16. Yale also convinced TIAA to cut its rate retroactively, resulting

in a nearly $2 million refund for participants. SUMF ¶ 16. Other plans' recordkeeping fees are not

typically public, so Yale could not have seen them directly. However, before agreeing to TIAA's

final offer of 9.5 basis points (0.095%), Yale sought advice from its outside consultant and ERISA

counsel, who were familiar with other plans' recordkeeping rates. Yale's outside counsel replied

that "9.5 bps is the lowest that I've seen so far!" SUMF ¶ 16 n.16. Yale continued to negotiate to

lower fees throughout the class period. Yale initiated a new round of negotiations in 2014,

ultimately obtaining a 70% reduction to 2.4 basis points in 2016, which it again persuaded TIAA

to apply retroactively to the beginning of 2015. SUMF ¶ 17. And Yale obtained still another ██%

cut in fees from TIAA in 2019 by negotiating a per participant rate of ███. SUMF ¶ 18.

Yale's experience with Vanguard was similar. Yale was not initially eligible to negotiate

pricing. However, as soon as Vanguard began offering price concessions to plans like Yale's, Yale

acted swiftly. By 2015, when Yale moved to TIAA as the Plan's sole recordkeeper, Vanguard's

fees had dropped from 9 bps to 4.4 bps. SUMF ¶ 40.

## 2. ERISA does not require competitive bidding.

Plaintiffs alternatively contend that Yale acted imprudently by not putting out their

recordkeeping contracts for competitive bidding. Ex. 9, Otto Rpt. ¶¶ 127-48. But while bidding

"can be an example of an action taken to ensure fees are appropriate," it "is not *per se* required

under ERISA." *Sacerdote*, 328 F. Supp. 3d at 286; *see also White v. Chevron Corp.*, 2016 WL

4502808, at *14 (N.D. Cal. Aug. 29, 2016) ("nothing in ERISA compels periodic competitive

bidding"). This case shows the wisdom of that rule.

Given the continued need to recordkeep legacy TIAA assets, discussed above, Yale

concluded that an RFP would not make sense because Yale knew "that TIAA-CREF was the only

one who could do the job." SUMF ¶ 10 & n.10. Even Plaintiffs' recordkeeping expert admitted

that competitive bidding would have been productive only if the vendors responding with

proposals could recordkeep all the plan's assets—which indisputably was not the case here. Ex.

15, Otto Tr. 114:4-115:1 (███████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████). Given the

practical reality that only TIAA could serve as the recordkeeper for a sizable portion of the Plan's

investments, an RFP auction could only have told Yale what it already knew. *See Acosta v. Chimes*

*D.C., Inc.*, 2019 WL 931710, at \*7, \*19 (D. Md. Feb. 26, 2019) (defendants were not imprudent for failing to issue an RFP when "given the few choices available, … they believed that sending out a formal RFP did not make practical sense").

### C.    Plaintiffs' latest "cross-selling" theory is meritless.

At the end of discovery, Plaintiffs unveiled a new theory of recordkeeping imprudence: that Yale violated fiduciary standards by not addressing what their putative expert calls "cross-selling"—the supposed use of recordkeeping data and access to sell non-Plan products like life insurance or individual retirement accounts to Plan participants. *See* Dkt. 200 at 5.

The opinions of Plaintiffs' cross-selling expert, Daniel Alexander, are plainly unreliable and should be excluded for reasons explained in a concurrent *Daubert* motion. Indeed, as explained in that motion, Yale addressed cross-selling on its own during the class period before Alexander declared that cross-selling would be the "next fiduciary frontier" under ERISA. SUMF ¶ 43. Even if Alexander's opinions about cross-selling were admissible, however, they would not support a recordkeeping claim. There is no evidence that a reasonable fiduciary in Yale's position has ever leveraged what Alexander calls "cross-selling" to negotiate lower recordkeeping rates, and TIAA does not consider what Alexander calls "cross-selling" opportunities in setting its recordkeeping fee. *See* SUMF ¶ 42. Nor was Yale obligated to be the first plan in the market to adopt this unproven negotiating strategy. *See Katsaros*, 744 F.2d at 279.

What is more, Alexander's opinion is that Yale should have *prohibited* cross-selling. *See* Ex. 1, Alexander Rpt. ¶ 28 (███████████████████████████████████████ ███████████████████████████████████); Ex. 11, Alexander Tr. 318:15-24 (███████████ ███████████████████████████████████████). Thus, even if Alexander were correct that TIAA was engaged in impermissible "cross-selling"—a claim for

which Plaintiffs have no evidence—it does not follow that Yale should have negotiated lower recordkeeping fees as a result.

### D.    Yale's recordkeeping fees were objectively prudent.

Plaintiffs' recordkeeping claims fail for the independent reason that there is no evidence that the alleged acts of imprudence resulted in monetary loss. "Because loss is a necessary element of an ERISA claim, the absence of a genuine issue of material fact on loss warrants grant of summary judgment in a defendant's favor." *Cunningham v. Cornell Univ.*, 2019 WL 4735876, at *6 (S.D.N.Y. 2019). At the very least, Plaintiffs must "demonstrate by a preponderance . . . that any comparable Plan has ever [paid] within" within the supposedly prudent range. *Sacerdote*, 328 F. Supp. 3d at 307 (emphasis added).

As they did in *Cunningham*, 2019 WL 4735876 at *7, Plaintiffs have disclosed expert testimony from Ty Minnich and Al Otto as evidence that a "prudent" fiduciary in Yale's position would have been able to negotiate a lower recordkeeping fee. Specifically, Minnich opines that ▮

████████████████████████████████████████████████████████████

██████████████████████. Ex. 7, Minnich Rpt. ¶ 131. Otto then adopts these estimates. Ex. 9, Otto Rpt. ¶ 207. As an initial matter, just as "nothing in ERISA requires every fiduciary to scour the market to find and offer the cheapest possible fund," *Hecker*, 556 F.3d at 586, a fiduciary has no obligation to select the cheapest service provider if other considerations make the fee reasonable. TIAA offered recordkeeping and related administration services that many participants valued—dedicated on-campus representatives, investment advising and planning, and a trusted reputation. Merely observing that cheaper recordkeepers did business in the marketplace, without showing that those recordkeepers could provide the same breadth and quality of service as TIAA, does not establish imprudence.

As explained in more detail in a concurrent *Daubert* motion, moreover, neither Minnich nor Otto offers a reliable opinion that there were any comparable recordkeepers offering services to plans of Yale's complexity and character for less. That is because their opinions have no testable or verifiable methodology. Minnich and Otto merely invoke their "experience" without citing examples that could corroborate or disprove their conclusions. In *Cunningham*, Judge Castel found that Minnich and Otto's same opinions about reasonable recordkeeping rates during the 2010-2020 period were inadmissible—and hence, that summary judgment was appropriate—because the "experts" offered no methodology to support their opinions. 2019 WL 4735876, at *6-10. Minnich and Otto's opinions suffer from the same flaws in this case.

*First*, Plaintiffs' experts opinions about reasonable recordkeeping fees are expressly "███████████████████████████████████████████████" after a recordkeeper consolidation. Ex. 14, Minnich Tr. 158:21-24. But, as discussed above, even if Yale had frozen contributions to TIAA annuities going forward, the billions of dollars invested in TIAA's legacy annuities could not have been recordkept by anyone other than TIAA, which means that Minnich's supposedly "reasonable" fee is an illusion. Plaintiffs' experts impermissibly assumed away a substantial, necessary expense to "calculate" their figures.

*Second*, as explained in greater detail in the *Daubert* motion, the ██████ figure posited by Plaintiffs' experts has no evidentiary or methodological basis, and is flatly contradicted by all empirical evidence. Yale's fees were at or below the going rate paid to TIAA by its other large-plan clients, and the same as—and in some years far lower than—the fees that NYU paid to TIAA, which Judge Forrest held to be objectively prudent. SUMF ¶ 19; *Sacerdote*, 328 F. Supp. 3d at 306-07. By contrast, Otto could not identify *any* "███████████████████████████ ███████████████████████████████" Ex. 15, Otto Tr. 97:9-24.

As Judge Forrest characterized Minnich and Otto's opinions in *Sacerdote*, "nobody in the history of time has ever gotten [the] fee" that Yale purportedly should have been able to negotiate in 2010. Ex. 99, Trial Tr. 904:25-905:1, *Sacerdote*, No. 16-cv-6284 (S.D.N.Y. Apr. 19, 2018); *cf. Wilcox v. Georgetown Univ.*, 2019 WL 132281, at *13 (D.D.C. Jan. 8, 2019) ("[t]he mere allegation that Georgetown could continue to offer the same Plans and the same associated services for $35/year has no factual support"). Plaintiffs' claim in this case that a ███ fee was reasonable and attainable is based on nothing more than the unsupported *ipse dixit* of their experts. That does not create a genuine issue of fact for trial. *See Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 319 (2d Cir. 2008).

## II. Yale Is Entitled To Summary Judgment On The Investment-Monitoring Claim (Count V).

Plaintiffs' second principal claim is that Yale failed to prudently monitor the Plan's investment options. Am. Compl. ¶¶ 237-50. The Court previously dismissed several aspects of this claim, but allowed two others to proceed. Specifically, the Court held that Plaintiffs were entitled to discovery based on allegations that Yale (i) did not remove "underperforming" investments from the Plan lineup; and (ii) offered Plan participants higher-cost share classes of certain funds when lower-cost share classes were available. Dkt. 113 at 23-27. As shown below, discovery has proved fatal to both of these theories. Plaintiffs' investment-monitoring claim is discussed in Sections II.A-C. Plaintiffs' share-class claim is discussed in Section II.D.

### A. Plaintiffs have not provided evidence to support standing.

Plaintiffs claim that Yale breached its duty of prudence by failing to remove 22 supposedly underperforming funds from the Plan's investment lineup. The Amended Complaint focuses almost exclusively on two, CREF Stock and TIAA Real Estate, which were the only options the Court discussed in its ruling on the motion to dismiss. Dkt. 113 at 26-27. During discovery,

however, Plaintiffs identified another 20 offerings that they contend Yale should have removed from the Plan.[3] This expansion of Plaintiffs' claims raises fundamental Article III problems. At summary judgment, a plaintiff "must 'set forth' by affidavit or other evidence 'specific facts'" to demonstrate standing. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992). Yet Plaintiffs failed even to allege—and have not provided evidence sufficient to show—that they invested in each of the 22 offerings they now challenge. Am. Compl. ¶ 8(d).

Plaintiffs do not have standing to challenge Yale's oversight of investment options that Plaintiffs themselves did not invest in. *See Ret. Bd. of Policemen's Annuity & Benefit Fund of the City of Chi. v. Bank of N.Y. Mellon*, 775 F.3d 154, 159 (2d Cir. 2014) (holding that plaintiffs "lack standing to assert claims against BNYM related to trusts in which they did not invest"). Put another way, even if a prudent fiduciary should have removed those particular options from the Plan's lineup, Yale's decision to continue offering those funds to participants could not have harmed *Plaintiffs* in particular. The performance of Plaintiffs' retirement investments would not have changed one cent if Yale had done what Plaintiffs say was necessary.

It is true that, in certifying a class of Plan participants in September 2019, this Court concluded that Plaintiffs did not need to show personal standing. Dkt. 202 at 5. However, the Supreme Court's subsequent decision in *Thole v. U.S. Bank, N.A*, 140 S. Ct. 1615 (2020), abrogates the basis for that conclusion. In its class certification order, this Court relied on the Second Circuit's statement that ERISA plaintiffs who seek to "recover for injuries to the Plan" do not need

---

[3] The other supposedly imprudent investments are: (1) Vanguard Diversified Equity Fund, (2) Vanguard Growth Equity, (3) Vanguard Morgan Growth Fund, (4) TIAA-CREF Large-Cap Value, (5) Vanguard U.S. Value Fund, (6) Vanguard Windsor Fund, (7) Vanguard Windsor II, (8) TIAA-CREF Mid-Cap Value Fund, (9) TIAA-CREF International Equity, (10) TIAA-CREF Real Estate Securities Fund, (11) Vanguard LifeStrategy Conservative Growth, (12) Vanguard LifeStrategy Income Fund, (13) Vanguard LifeStrategy Moderate Growth, (14) Vanguard Asset Allocation, (15) Vanguard STAR Fund, (16) CREF Global Equities, (17) CREF Inflation-Linked Bond Account, (18) Vanguard International Explorer, (19) Vanguard Energy Fund, and (20) Vanguard Global Capital Cycles. *See* Ex. 5, Dominguez Rpt. Pt. VII.B.

to show individual injury because they have standing "in a derivative capacity." *L.I. Head Start Child Dev. Servs. v. Econ. Opportunity Comm'n of Nassau Cty.*, 710 F.3d 57, 67 n.5 (2d Cir. 2013). But *Thole* has since made clear that litigants cannot establish standing merely by purporting to sue "as representatives of the plan"; plaintiffs "themselves" must have a "concrete stake" in the outcome. *Thole*, 140 S. Ct. at 1620, 1622. Although the dissenting justices in *Thole* agreed that an ERISA plaintiff could rely on a derivative standing theory—*id.* at 1632-33 (opinion of Sotomayor, J.)—the majority rejected that theory and held, contrary to cases like *L.I. Head Start*, that "[t]here is no ERISA exception to Article III." *Id*. at 1622 (majority opinion).

### B.    Plaintiffs cannot show a breach of the duty of prudence.

Plaintiffs' standing deficiencies wipe out a significant portion of their investment-monitoring claim. But Plaintiffs also lack any evidence that Yale acted imprudently in monitoring investments in the first place—an independent reason Yale is entitled to summary judgment.

ERISA requires fiduciaries to act prudently under the circumstances then prevailing. 29 U.S.C. § 1104(a)(1)(B). "Prudence" is not "prescience"—the requirement "focus[es] on a fiduciary's conduct in arriving at an investment decision, not its results, and ask[s] whether a fiduciary employed the appropriate methods to investigate and determine the merits" of a given decision. *PBGC ex rel. St. Vincent Catholic Med. Ctrs. Ret. Plan v. Morgan Stanley Inv. Mgmt. Inc.*, 712 F.3d 705, 716 (2d Cir. 2013) (quoting *In re Unisys Sav. Plan Litig.*, 74 F.3d 420, 434 (3d Cir. 1996)); *accord Barchock v. CVS Health Corp.*, 886 F.3d 43, 44-45 (1st Cir. 2018) ("[t]he test . . . is one of conduct"); 29 C.F.R. § 2550.404a-1(b) (a fiduciary who gives "appropriate consideration" to the facts and circumstances of an investment decision acts in accordance with ERISA). As shown below, Yale monitored investment options in the Plan and gave extensive consideration to the relevant factors. That is all that ERISA requires.

### 1.    Yale exercised regular oversight over investment options.

Throughout the class period, Yale regularly reviewed the Plan's lineup to ensure that participants could choose from an appropriate menu of low-cost, diversified investment options. Prior to 2012, Peel and Penney performed annual reviews to ensure that Yale was offering a suitable mix of investment options. SUMF ¶ 21.

After the Committee was chartered in late 2011, it reviewed the investment lineup at least annually. The Committee examined financial statistics, fee-adjusted returns, and peer evaluations conducted by independent investment advisory services. In addition, the Committee considered broader questions like the merits of active versus passive investment strategies and the appropriate benchmarks for Plan investments. SUMF ¶ 22.

The Committee's annual reviews could last several hours, and TIAA's relationship manager for Yale, Stephen Campbell, noted that the Committee would often ask for "follow-up information." SUMF ¶ 22 n.22. For example, Committee member Ben Polak, the William C. Brainard Professor of Economics, observed that the largest single investment of many Plan participants was their primary residence. Polak asked TIAA to provide data on the correlation between TIAA Real Estate and the Case-Shiller Home Price Index to make sure that participants who selected TIAA Real Estate did not take on excessive real estate risk unwittingly. TIAA provided data demonstrating that TIAA Real Estate, backed primarily by commercial rather than residential real estate assets, was not overly correlated with residential home prices. SUMF ¶ 30.

As with its approach to recordkeeping, Yale was engaged and disciplined in ensuring that the Plan's investments were appropriate to offer to participants under the circumstances. David Swallow, then a member of Yale's consulting team at Aon, said that he was "███████████ ██████" by Yale's approach, declaring that "████████████████████████████ ████████████████████████████████████████████████████████████████" was

18

"███████████" SUMF ¶ 23 n.23. And Stephen Campbell explained that "Yale was always pushing the envelope" and was "very actively involved to support their retirement plan," "more so than almost any client that I have dealt with in my entire career." SUMF ¶ 23 n.23. As Judge Castel found in granting summary judgment to Cornell University last year, "[e]vidence of 'discussions about the pros and cons' of investment alternatives is 'fatal to' plaintiffs' claims." *Cunningham*, 2019 WL 4735876, at *14 (quoting *Tibble v. Edison Int'l*, 729 F.3d 1110, 1136 (9th Cir. 2013)). Since there is no question that Yale monitored its investment lineup and exercised judgment as to the appropriate funds to offer to participants on a continuing basis, Plaintiffs' claim likewise fails.

### 2.      Plaintiffs' hindsight criticisms are unavailing.

Plaintiffs cannot dispute that Yale regularly monitored its investment lineup. Instead, they rely on their expert witness, Wendy Dominguez, to find fault with particular outcomes of Yale's decision-making process. These criticisms miss the mark because, at most, Plaintiffs' expert identifies other procedures a fiduciary *could* have taken to monitor investments. That does not show that the procedures Yale actually undertook were imprudent. *See Raskin v. Wyatt Co.*, 125 F.3d 55, 66 (2d Cir. 1997) ("[A]n expert's report is not a talisman against summary judgment.").

Dominguez asserts that she would advise her clients to follow different practices than Yale did for reviewing plan investments. Ex. 5, Dominguez Rpt. ¶¶ 77-212. Dominguez is affiliated with a company that provides investment advice to institutions of higher education in Colorado, although as of the start of the class period in 2010, she had only one such client. As explained in a concurrently filed *Daubert* motion, her opinions are *ipse dixit*, and should be excluded in their entirety. But even if Dominguez's opinions did satisfy the *Daubert* standard, they do not create a genuine issue of material fact. As Judge Castel found in granting summary judgment to Cornell University, Dominguez's testimony does not satisfy Plaintiffs' burden because she has not opined that her personal approach to reviewing investment options is the *only* proper approach used by

reasonable fiduciaries. *See Cunningham*, 2019 WL 4735876, at *12. To the contrary, as Dominguez acknowledged, the key criteria in her report were ███████████████████████ ████████████████ Ex. 6, Dominguez Rebuttal ¶ 57.

Dominguez has acknowledged that her own clients do not follow the approach she would enforce against Yale in this case, and Dominguez has endorsed for her clients some of the very same funds that she says are imprudent in this case. Unsurprisingly, then, her specific criticisms of Yale's processes do not demonstrate imprudence. By way of example, Dominguez criticizes Yale for "███████████████████████████████████████ ████████████████████████. Ex. 5, Dominguez Rpt. ¶ 85. ████████ ████████████████████████████████████████████████ ████████████████████████ If an investment lineup is prudent, as Yale's was throughout the class period, ERISA does not require changes to be made for changes' sake.

Elsewhere, Dominguez asserts that Yale should have developed an Investment Policy Statement (IPS) to formalize its investment methodology. However, she admits in the same breath that "████████████████████████████████████████" and states that ████████████████████████████████████. Ex. 5, Dominguez Rpt. ¶¶ 140-51 & n.156. And in fact, multiple courts have held that ERISA does not require formal, written procedures. *Birse v. CenturyLink, Inc.*, 2020 WL 1062902, at *7 (D. Colo. Mar. 5, 2020) (rejecting expert's testimony that fiduciaries acted imprudently because they "did not sufficiently document their procedures"); *Wildman v. Am. Century Servs., LLC*, 362 F. Supp. 3d 685, 696 (W.D. Mo. 2019) (same); *O'Connor v. Certainteed Corp.*, 1990 WL 14457, at *8 (E.D. Pa. Feb. 16, 1990) (ERISA does not require written procedures "if the unwritten practices are adequate").

PUBLIC VERSION

In short, as the Second Circuit has held, as long as the process a fiduciary does take is prudent under the circumstances, there is no "duty to take any particular course of action if another approach seems preferable." *Chao v. Merino*, 452 F.3d 174, 182 (2d Cir. 2006); *see also, e.g.*, *Taylor v. United Techs. Corp.*, 2009 WL 535779, at *9 (D. Conn. Mar. 3, 2009) ("Although an expert may have proposed a better alternative to UTC's unitized stock plan, UTC was not obligated to proceed with that alternative since its decision to proceed with the extant unitized stock plan was prudent."), *aff'd*, 354 F. App'x 525 (2d Cir. 2009); *Osberg v. Foot Locker, Inc.*, 138 F. Supp. 3d 517, 552 (S.D.N.Y. 2015) ("A court should not find that a fiduciary acted imprudently in violation of ERISA § 404(a)(1)(B) merely because, with the benefit of hindsight, a different decision might have turned out better."), *aff'd*, 862 F.3d 198 (2d Cir. 2017). For this reason, Plaintiffs cannot get past summary judgment simply by offering an expert who claims Yale could have followed a different process to evaluate investments. *See Birse*, 2020 WL 1062902, at *8 (the "alternative courses of conduct that Plaintiffs' experts propose do not cast doubt on, or negate, the prudence of the substantive measures that Defendants employed").

### C.    The investments at issue were objectively prudent.

Even if Plaintiffs could show that Yale's decision-making process was deficient—which they cannot—their investment-monitoring claim fails for an independent reason: causation. Sometimes referred to as "objective prudence," this requires a plaintiff to show not just that the defendant failed to follow a prudent process, but also that the conclusion the defendant reached is one that a "hypothetical prudent fiduciary" would have rejected. *Tussey v. ABB, Inc.*, 746 F.3d 327, 335 (8th Cir. 2014). In concrete terms, if an objectively prudent fiduciary would have kept the same funds as the defendant, then even if the defendant failed to follow a prudent process to evaluate those funds, a plaintiff cannot demonstrate "that the plan's losses 'result[ed] from' the breach." *Silverman v. Mut. Benefit Life Ins. Co.*, 138 F.3d 98, 104 (2d Cir. 1998).

*Silverman*'s holding—that "causation [is] an element" of a prudence claim "for which plaintiffs have the burden of proof"—is "unambiguous" and widely recognized. *Bd. of Trs. of AFTRA Ret. Fund v. JPMorgan Chase Bank, N.A.*, 860 F. Supp. 2d 251, 261 (S.D.N.Y. 2012); *see also, e.g.*, *Cates v. Tr. of Columbia Univ.*, 2019 WL 8955333, at *10 (S.D.N.Y. Oct. 25, 2019); *Pioneer Centres Holding Co. Emp. Stock Ownership Plan & Tr. v. Alerus Fin., N.A.*, 858 F.3d 1324, 1336 (10th Cir. 2017); *Unisys*, 74 F.3d at 445 n.23; *Liss v. Smith*, 991 F. Supp. 278, 297 (S.D.N.Y. 1998). Plaintiffs cannot satisfy this element for three reasons.

### 1.     There is no evidence that prudent fiduciaries followed Plaintiffs' proposed methodology.

Plaintiffs have no evidence that an objectively prudent fiduciary would have removed the funds they challenge from the plan. To meet the objective prudence requirement, Plaintiffs again turn to their expert Dominguez, who outlines seven "█████████████" that she claims "████ ████████████████████████████████████████████████████████████████" Ex. 5, Dominguez Rpt. ¶ 54.[4] Dominguez then applies these criteria to 22 funds selected for her by Plaintiffs' counsel and concludes that all 22 should have been excluded from the Plan no later than September 1, 2010. Ex. 5, Dominguez Rpt. ¶¶ 213-396. Even if this opinion were admissible, however, nothing in the record suggests that any fiduciaries were actually using Dominguez's criteria to evaluate investment options in 2010, let alone that they were *required* to do so. *See* Ex. 13, Dominguez Tr. 236 (characterizing her criteria as "██████████████████████████

---

[4] Dominguez's factors are ███████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████████████
Ex. 13, Dominguez Tr. 82:24-83:4.

█████) (emphasis added). And nothing in the record demonstrates that a prudent fiduciary would have had to reach the conclusions Dominguez does in applying her criteria in any event.[5]

As Judge Castel found in rejecting Dominguez's same testimony in the *Cunningham* case, there is "no evidence" that "other fiduciaries were removing these funds from lineups in 2010, or that underperformance of certain percentages was considered at the time indicative of imprudence." 2019 WL 4735876, at *16. In fact, the funds Dominguez claims her criteria would have screened out were overwhelmingly offered by other comparable plans. SUMF ¶¶ 29, 33-36. That alone is fatal to the investment-monitoring claim.

The lack of evidence that prudent fiduciaries used Dominguez's methodology during the class period is particularly important because the methodology itself is extraordinarily dubious. Half of *all* funds will fall within the bottom 50% of their peer group during any given period. That does not mean that half of all funds in that peer group must be replaced every three years. "[N]o court has ever suggested" that ERISA "compel[s] . . . fiduciaries to reflexively jettison investment options in favor of the prior year's top performers." *Patterson v. Stanley*, 2019 WL 4934834, at *11 (S.D.N.Y. Oct. 7, 2019). What is more, courts have overwhelmingly held that "three to five years . . . [is] considered [a] relatively short period[ ] of underperformance" that does not imply imprudence. *Dorman v. Charles Schwab Corp.*, 2019 WL 580785, at *6 (N.D. Cal. Feb. 8, 2019); *see also Wildman*, 362 F. Supp. 3d at 707 (ERISA does not require fiduciaries "remove a fund

---

[5] To be precise, Dominguez criticizes two of the funds—the Vanguard Energy Fund and the Vanguard Global Capital Cycles fund—for reasons unrelated to her "performance" test. Instead, she concludes that they are imprudent because t████████████████████████████████████████ ██████████████. Ex. 5, Dominguez Rpt. ¶¶ 398, 403; Ex. 13, Dominguez Tr. 174:18-175:19. This theory cannot be raised now because it does not appear anywhere in the Amended Complaint. *See Cunningham*, 2019 WL 4735876, at *15 (rejecting a sector-fund theory that "may not be raised for the first time on summary judgment"). But regardless, Dominguez cannot dictate the investment options the Plan offers. Plaintiffs cite no rule—nor is there any—against giving participants the ability to invest in sector funds along with other investment options. *See* page 25, *infra*.

simply because it had not performed well in the short term"); *White*, 2016 WL 4502808, at \*17 ("a fiduciary may—and often does—retain investments through a period of underperformance as part of a long-range investment strategy").[6]

Finally, Dominguez herself admitted that fiduciaries and experts might reach differing conclusions in applying her test to specific investments. Ex. 13, Dominguez Tr. 130:24-25 ("███████ ███████████████████████████████████████████████"). She acknowledged that her proposed process was █████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████ Ex. 13, Dominguez Tr. 105:12-20, 226:14-23. And despite claiming that ███████████████████████████████████ ████████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████ Ex. 13, Dominguez Tr. 108:21-109:8. As such, Plaintiffs have no evidence that an objectively prudent fiduciary applying Dominguez's subjective, contextual methodology would have concluded that some, let alone all, of the 22 funds Dominguez criticizes should have been removed from the Plan.

### 2.      Dominguez compares apples and oranges.

Several of the Plan offerings Plaintiffs criticize—including two of the largest by dollar value, CREF Stock and TIAA Real Estate—are variable annuities, not mutual funds. Dominguez contends that ████████████████████████████████████████████████████████████████ ███████████████ Annuities, however, are unique investment vehicles that are distinct from equity funds in important ways. In particular, "[v]ariable annuities can provide a steady stream of income

---

[6] Dominguez's own firm has rated investment options ████████████████████████████████████████ ███████████████. *See* Ex. 13, Dominguez Tr. 95:9-100:19; Ex. 5, Dominguez Rpt. Ex. 3 (Poudre County Fire RFP response).

24

at retirement . . . and mutual funds do not." *Davis v. Wash. Univ.*, 960 F.3d 478, 485 (8th Cir. 2020). Thus, as the Eighth Circuit has held, comparing the performance of a variable annuity like CREF Stock to the performance of an equity index that lacks an annuitization feature is "comparing apples and oranges." *Id.* "Even if stock index funds will typically outperform a variable annuity like CREF Stock Account, . . . it is not imprudent to provide options with differing features from which to choose, regardless of whether some perform better than others." *Id.*

Dominguez, to be sure, does not like annuity investments and thinks they should ███ ███████████████████████████████. Ex. 5, Dominguez Rpt. ¶¶ 61-76. But Yale—and the vast majority of its peers—disagree. SUMF ¶¶ 29, 33-35. Indeed, I.R.C. § 403 specifically authorizes annuity contracts, and for much of its history permitted *only* annuity contracts. *See Wilcox*, 2019 WL 132281, at *2 (discussing the history of this provision).

ERISA does not enshrine Dominguez's or anyone else's investment preferences into law. Rather, it leaves the choice of how to structure a plan to the fiduciaries in the first instance. *See Divane*, 953 F.3d at 989 ("it would be beyond the court's role to seize ERISA for the purpose of guaranteeing individual litigants their own preferred investment options"). Dominguez's criticisms are especially misplaced because Plan participants who believed that other investments were superior to annuities were always free to choose from many other low-cost options, including low-cost equity funds. The contention that Yale had to remove annuity options like CREF Stock because they underperformed allegedly comparable mutual funds is contrary to the fundamental purpose of a defined contribution plan, which leaves it to "the people who have the most interest in the outcome" to select the investments that suit their needs. *Loomis v. Exelon Corp.*, 658 F.3d 667, 673 (7th Cir. 2011).

### 3.    Plaintiffs' "benchmark" analysis is meritless.

Differences between annuities and mutual funds to one side, Dominguez's opinions also fail to raise a genuine dispute of fact at summary judgment because she relies on cherry-picked performance comparisons. A plaintiff attempting to show that a prudent fiduciary "would have, at the time of selection, chosen a different fund . . . 'must provide a sound basis for comparison—a meaningful benchmark.'" *Larson v. Allina Health Sys.*, 350 F. Supp. 3d 780, 795 (D. Minn. 2018) (quoting *Meiners v. Wells Fargo & Co.*, 898 F.3d 820, 822 (8th Cir. 2018)); *see also, e.g.*, *Patterson*, 2019 WL 4934834, at *11; *Taylor,* 2009 WL 535779, at *10. Plaintiffs, however, ask the Court to find that the core investment options they challenge were imprudent because they underperform a hodge-podge of inapposite metrics, several invented by Dominguez at the end of the class period. No prudent fiduciary would make these comparisons.

**CREF Stock**. Dominguez offers six benchmarks for CREF Stock.[7] Yet four other courts, dismissing challenges to the same fund for the same timeframe, have held these comparators do not suggest that CREF Stock performed so poorly that Yale should have precluded participants from choosing it as an investment option. *Davis*, 960 F.3d at 485; *Sacerdote*, 328 F. Supp. at 313-16; *Cunningham*, 2019 WL 4735876, at *11-12; *Wilcox*, 2019 WL 132281, at *10-11.

*First*, Dominguez compares CREF Stock's performance to the S&P 500 index. Ex. 5, Dominguez Rpt. ¶ 232. The S&P 500, however, tracks U.S. equities, whereas CREF Stock is a blend of foreign and domestic stocks. SUMF ¶ 31. As Judge Collyer explained in dismissing an identical claim, "[t]hat the CREF Stock Account, with its deliberate mix of foreign and domestic

---

[7] Plaintiffs have abandoned five other proposed benchmarks offered in their complaint. *See* Am. Compl. ¶¶ 185-87. That is likely because, as Judge Forrest observed in *Sacerdote*, the complaint's putative benchmarks are similarly "misleading" and do not indicate underperformance. 328 F. Supp. 3d at 314-16.

investments, may not have performed as some purely domestic accounts with different investments does not indicate imprudence." *Wilcox*, 2019 WL 132281, at *11.

*Second*, Dominguez compares CREF Stock to two global indices: the MSCI All-Country World Index IMI and Investment Metrics Global Equity. But she invokes these indices selectively to maximize their supposed outperformance, comparing CREF Stock to international indices for 5-, 7-, and 10-year periods in which international markets outperformed domestic markets, then comparing CREF Stock to a domestic index for the 1- and 3-year periods in which domestic markets performed better. Ex. 5, Dominguez Rpt. ¶¶ 231-32. Mathematically, a fund that blends two different strategies (*e.g.*, domestic and international) will inevitably underperform one of the component strategies during a given period. *See* Ex. 13, Dominguez Tr. 139:13-17 ("███████

████████████████████████████████████████████████

████████████████████████████████████████████████

████). That CREF Stock underperformed international indices in certain periods thus is evidence of proper diversification, not evidence that CREF Stock was underperforming its benchmark.

*Third*, Dominguez compares CREF Stock's performance to the CREF Composite Index, a benchmark in the CREF Stock 2010 prospectus. Ex. 5, Dominguez Rpt. ¶ 231. Dominguez tallies only whether CREF Stock did better or worse than the CREF Composite Index each year, without paying attention to the magnitude of the difference. Yet CREF Stock tracked its benchmark very closely, with ten-year annualized net returns never more than 0.38% below the benchmark, even though CREF Stock's performance, unlike its benchmark, is reported net of fees and expenses. SUMF ¶ 32; *cf. Patterson*, 2019 WL 4934834, at *10 (holding that a 74 bps performance differential over a 10-year period "does not support the inference that Defendants were imprudent to retain the [challenged fund] in the set of Plan offerings").

If any real-world fiduciary employed Dominguez's strategy, it would induce whiplash, as funds with temporary or expected "underperformance" cycle through the revolving door. No court has ever interpreted ERISA to require such a process. Rather, as Judge Forrest observed from the same evidence, CREF Stock "closely tracked the performance of its benchmark index during the one-, five- and ten-year periods ending on December 31 of each year from 2009 to 2016." *Sacerdote*, 328 F. Supp. 3d at 315. Thus, a "prudent fiduciary" comparing CREF Stock to its benchmark "would draw the *opposite* conclusion" from Plaintiffs. *Id*. at 316 (emphasis added).

*Finally*, Dominguez compares CREF Stock to two *post hoc* benchmarks: a mixed equity-fixed income benchmark introduced by third-party Morningstar in 2017, which Dominguez backdates to 2010, and a blended index that Dominguez created herself in 2017. Ex. 5, Dominguez Rpt. ¶¶ 232-34, Ex. 13 Dominguez Tr. 151:15-25. Benchmarks developed seven years *after* the start of the class period do not say anything about what prudent fiduciaries would have concluded when evaluating CREF Stock in 2010. *See Cunningham*, 2019 WL 4735876, at *12 (there is "no evidence that any prudent fiduciary would benchmark" to the mix of U.S. and international equities "developed by [Dominguez] in her expert report"); *Sacerdote*, 328 F. Supp. 3d at 316 (rejecting plaintiffs' evidence because the expert "incorrectly used the benchmark for CREF Stock Account that was not in place until mid-2011 to cover a period prior to mid-2011"); *Patterson*, 2019 WL 4934834, at *11 ("[d]ata compiled in 2016 would not have been known to the fiduciaries earlier in the class period"); *see also* Ex. 13, Dominguez Tr. 240:15-19 (████████████████████ ████████████████████████████████████████████████████). Accordingly, neither of these benchmarks support a finding of imprudence as a matter of law.

*TIAA Real Estate*. Plaintiffs offer three benchmarks for TIAA Real Estate, but as courts have again concluded, *see Davis*, 960 F.3d at 484-85; *Sacerdote*, 328 F. Supp. 3d at 309-13; *Cunningham*, 2019 WL 4735876, at *12-13, all three are fatally flawed.

*First*, Dominguez compares TIAA Real Estate to the Wilshire US REIT Index. Ex. 5, Dominguez Rpt. ¶ 328. But TIAA Real Estate invests directly in real estate properties; it is not a REIT. SUMF ¶¶ 26-27. Thus, this is another example of "[c]omparing apples and oranges." *Davis*, 960 F.3d at 484 (rejecting the REIT comparison). As Judge Castel recognized, there is "no evidence that any prudent fiduciary would benchmark to the [REITs]" such as those Dominguez relies on here. *Cunningham*, 2019 WL 4735876, at *12

*Second*, Dominguez compares TIAA Real Estate to another benchmark she created especially for this litigation. Ex. 5, Dominguez Rpt. ¶ 327. Just as with Dominguez's custom CREF Stock benchmark, no prudent fiduciary could have used that benchmark in 2010 because it was not invented until the end of the class period. Not surprisingly, ███████████████████ ██████████████████████. Ex. 13, Dominguez Tr. 162:5-23.

*Finally*, Dominguez claims that TIAA Real Estate underperformed its prospectus benchmark (the REA Composite Index). Ex. 5, Dominguez Rpt. ¶ 328. ███████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ █████████████████████████████████. SUMF ¶ 28 & n.28. In fact, adjusted to account for these differences, TIAA Real Estate *outperformed* the REA Composite Index over three-, five-, and ten-year periods. SUMF ¶ 28. As two courts have recognized, therefore, "no reasonable trier of fact would conclude that a fiduciary would consider the TIAA fund an imprudent investment based on TIAA's [unadjusted] custom benchmark." *Cunningham*, 2019 WL

4735876, at *12; *see also Sacerdote*, 328 F. Supp. 3d at 311 (finding that TIAA Real Estate "closely tracked the performance of its benchmark during the one-, five-, and ten-year periods ending on December 31 of each year from 2009 to 2016").

    ***Other funds.*** Dominguez's benchmarking for the remaining funds is no more appropriate. She does not purport to have identified benchmarks that fiduciaries actually deployed at the time. And in comparing the funds to those benchmarks, she does not purport to have employed a standard for identifying funds to remove that *any* other fiduciary used at the time—let alone *every* reasonable fiduciary. *Accord Cunningham*, 2019 WL 4735876, at *16. Dominguez has elsewhere admitted that, when she picks benchmarks for her own clients, she follows a different process than the "easy way to evaluate funds" that she uses for litigation. Ex. 117, Dominguez Tr. in *Cates v. Trs. of Columbia Univ.*, No. 1:16-cv-6524 (S.D.N.Y.), ECF No. 261-4, at 107:25-108:3; *accord id.* at 108:10-11 ("So the evaluation [for Innovest's clients] is—is just different."); *id.* at 137:13-20 ("if this was our client," Dominguez would have used a different benchmarking process).

    The fact that Dominguez admits to using different processes to evaluate funds in her own practice than she used to criticize Yale's oversight is disqualifying to her report. *See Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999) (excluding opinion where there was no basis to believe that the witness would have used the same methodology in his regular employment). And it may explain why, as detailed in the *Daubert* motion, Dominguez has repeatedly endorsed the *very same* funds to her clients that she now says it was imprudent for Yale to offer.

    Hypocrisy aside, Dominguez provides no evidence that any fiduciaries evaluating the same data contemporaneously did, or would have, removed the funds for the bases she has identified. Accordingly, Plaintiffs lack evidence of causation, and their claim fails.

### D.     Plaintiffs' share-class theory is meritless.

Besides alleging that Yale should have removed certain funds entirely, Plaintiffs allege that Yale did not obtain lower-cost share classes of certain investments for the Plan and instead offered more expensive varieties. Am. Compl. ¶¶ 45, 99, 103-104. The Court previously held that whether Yale "did in fact reasonably weigh the benefits and burdens" when making decision about share classes is "more appropriately taken up at the summary judgment stage." Dkt. 113 at 23. Now that Plaintiffs have reached that stage, it is apparent that this theory of imprudence also fails.

### 1.     Yale negotiated over lower-cost share classes.

At various times during the class period, TIAA and Vanguard offered large plans the ability to invest in lower-cost share classes that carried reduced administrative fees. The record shows that Yale evaluated whether it was possible to realize savings to the Plan by moving to these lower-cost share-classes and did so as share classes became available.

TIAA's relationship manager for Yale testified that "[w]hen we were starting to introduce reduced share classes in 2010, we immediately were engaged by Yale to have a discussion around what share classes could be made available." SUMF ¶ 37. Thus, by the time the class period had begun in August 2010, Yale had already upgraded most of its TIAA funds to "Premier" or "Institutional" classes; indeed, of twenty-three universities with over $1 billion in retirement plan assets, only Yale and two others had made that switch by the end of 2010. SUMF ¶ 37. In 2011, TIAA made lower-cost share classes available for additional actively-managed investments, and Yale promptly obtained those classes for its Plan as well. SUMF ¶ 37.

The story for Vanguard is similar. Yale upgraded its Vanguard share classes twice from 2010 to 2014, when Vanguard served as a Plan recordkeeper. SUMF ¶ 40. Throughout this period, Yale paid rates comparable to those paid by other higher education plans, and there is no evidence that other universities invested in lower-cost share class options earlier than Yale. SUMF ¶ 20.

### 2. Some lower-cost share classes were not available to Yale.

Although the record shows that Yale obtained lower-cost share classes where possible, Plaintiffs criticize Yale for not obtaining these cost savings even earlier. Specifically, Plaintiffs argue that because some fund prospectuses in 2010 *mentioned* cheaper share classes, it was imprudent for Yale not to obtain those share classes immediately. *E.g.*, Dominguez Rpt. ¶ 115. As TIAA representatives testified, however, TIAA's fund prospectuses do not dictate which share classes are available for retirement plans. SUMF ¶ 41. Indeed, Yale did ask TIAA for "Institutional" classes in 2010, but TIAA agreed to provide them only for certain investments. SUMF ¶ 37. Plaintiffs thus are simply mistaken that Yale could have obtained these share classes materially earlier than it did. *See Wildman*, 362 F. Supp. 3d at 709 n.14 (granting summary judgment where the evidence in the record "only proves that the institutional share class was generally available at American Century, not to the Plan").

Similarly, many of the Vanguard prospectuses that Plaintiffs rely on specifically provided that 403(b) participants could not invest in the cheapest share classes. SUMF ¶ 41. When Yale asked Vanguard if it could move to cheaper share classes in 2013, Vanguard told Yale it would need to pay an offsetting recordkeeping fee if it wanted to access the lower-cost share classes. SUMF ¶ 41. Once again, Yale could not have acted imprudently by failing to obtain lower-cost share classes that were not in fact available. *Wildman*, 362 F. Supp. 3d at 709 n.14.

### 3. Yale's revenue credit account made share classes largely irrelevant.

Plaintiffs' share-class theory is also irrelevant as a practical matter because it focuses myopically on fund administrative expenses while ignoring Yale's other contractual arrangements with TIAA. Beginning in 2011, Yale and TIAA agreed to establish a revenue credit account for the Plan. Under this arrangement, Yale and TIAA negotiated an overall recordkeeping rate, which was paid for through investment administration fees. If total revenues exceeded the negotiated rate,

TIAA would deposit the excess into a revenue credit account, which Yale could then use for various Plan expenses. SUMF ¶ 38; *see also* Ex. 7, Minnich Rpt. ¶ 92. As a result, "the share class used" for TIAA investments "d[id] not impact the eventual total amount of administrative fees paid." Ex. 10, Poehler Rpt. ¶ 61. As Plaintiffs' own recordkeeping expert admits, ████████

████████████████████████████████████████████████████

████████████████████. Ex. 15, Otto Tr. 166:18-167:3.[8]

## III.    Yale Is Entitled To Summary Judgment On The Remaining Claims.

Plaintiffs' remaining claims are largely derivative of their failed recordkeeping and investment-monitoring claims. They are discussed in turn for completeness.

### A.    The "bundling" claim (Count I) is meritless.

In Count I, Plaintiffs challenge TIAA's requirement that plans offer CREF Stock and the CREF Money Market Account to participants as a condition of offering the TIAA Traditional Annuity. Am. Compl. ¶ 210. Plaintiffs appear to have abandoned this claim, which is not mentioned in any of their expert reports—perhaps because no participant was required to select the bundled investment and there is no evidence that the decision to offer CREF Stock and the CREF Money Market Account along with the Traditional Annuity caused Plaintiffs any harm. In any event, the only way it could have been imprudent for Yale to agree to the bundle of investments is if at least one of the component parts of the bundle were imprudent. Yet Plaintiffs do not

---

[8] In September 2019, Plaintiffs indicated their belief that Yale had improperly disbursed revenue credits received from TIAA. However, Plaintiffs stated that this issue was relevant only to their recordkeeping claim (Dkt. 200 at 9-10)—an irrelevant contention, because as shown in Part II *infra*, Yale's recordkeeping fees were objectively prudent. That said, the insinuation that Yale acted improperly is entirely baseless. After consulting with outside benefits counsel, Yale used funds in the revenue credit account to defray Plan expenses by paying for the costs of the Plan's audit, third-party consultants, and to reimburse Yale for a portion of the costs of Ms. Castello, who was a dedicated staffer for the Plan. SUMF ¶ 39. ERISA regulations confirm that a fiduciary may receive reimbursement of any "direct expenses properly and actually incurred" in providing service to the plan. *See* 29 C.F.R. § 2550.408b-2(e)(3); *Tibble*, 729 F.3d at 1133 (holding that there is no violation of ERISA § 406(b)(3) where a plan sponsor receives "reimbursement" from a third party).

challenge the prudence of the Traditional Annuity standing alone, nor do they challenge the prudence of the CREF Money Market Account. And as shown above (at Part II.B & II.C), it was reasonable for Yale to offer CREF Stock as well. The bundling claim thus fails on the merits.

A bundling claim is also time-barred. Plaintiffs identified no evidence that Yale made any bundling arrangement during the class period. Nor can Plaintiffs seek to rely on agreements Yale entered into prior to 2010. ERISA requires a plaintiff to sue within six years of the "last action which constituted part of the breach or violation." 29 U.S.C. § 1113(1); *see Clark v. Duke Univ.*, 2017 WL 4477002, at \*2 (M.D.N.C. 2017) (dismissing identical claim because the "decision to commit the Plan to an [allegedly] imprudent arrangement . . . occurred no later than 2009").

### B.       The prohibited transaction claims (Counts II, IV, and VI) are meritless.

Counts II, IV, and VI arise under ERISA's "prohibited transactions" provision, 29 U.S.C. § 1106, which, as relevant here, prohibits a fiduciary from engaging in (A) the "sale or exchange" of "any property" between "the plan and a party in interest"; or (D) the "transfer to, or use by or for the benefit of a party in interest, of any assets of the plan." 29 U.S.C. § 1106(a)(1). In substance, however, these claims are identical to Plaintiffs' prudence claims, and rest on identical evidence. The prohibited transaction claims thus fail as a legal matter because Plaintiffs cannot "repackage their imprudent fiduciary claims as prohibited transactions claims … rel[ying] largely on the same facts and allegations." *Divane*, 953 F.3d at 992.

This makes sense because the mere payment of recordkeeping fees or share-class fees to third-party service providers is not a transfer of property or plan assets to a party in interest. If that were so, then it would be *prima facie* illegal for a plan to buy recordkeeping services or offer mutual funds or other investment options—something every plan does as a matter of course. *See* Ex. 9, Otto Rpt. ¶ 19 (███████████████████████████████████████). As a host of courts have recognized, interpreting ERISA to prohibit "service arrangements between a

plan and a party rendering services to the plan" would be "absurd." *Sweda v. Univ. of Pennsylvania*, 923 F.3d 320, 340 (3d Cir. 2019); *see also, e.g.*, *Patrico v. Voya Fin., Inc.*, 2018 WL 1319028 at *6-7 (S.D.N.Y. Mar. 13, 2018) ("unpersuasive"); *Sacerdote v. New York Univ.*, 2017 WL 3701482, at *13 (S.D.N.Y. Aug. 25, 2017) ("nonsensical").

At the motion to dismiss stage, Plaintiffs cited cases like *Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 601 (8th Cir. 2009), and *Haddock v. Nationwide Fin. Servs., Inc.*, 419 F. Supp. 2d 156, 170 (D. Conn. 2006), which treated transactions with third-parties as "prohibited transactions" based on allegations of concealment or self-dealing. But Plaintiffs have not uncovered evidence of anything close to that in discovery. *See Sacerdote*, 2017 WL 3701482, at *12, *14 ("*Haddock* is not applicable here … [because] revenue sharing payments from mutual funds remain non-plan assets when they are received by non-fiduciaries"; "in *Braden*, unlike here, the revenue sharing payments were undisclosed."). Thus, as Judge Castel held in *Cunningham*, Plaintiffs have no prohibited transaction claim at summary judgment. "[A]bsent some evidence of self-dealing or other disloyal conduct, allegations that the Plans violated § 406(a) by paying Fidelity and TIAA-CREF for recordkeeping services—even allegations that the Plans paid too much for those services—do not, without more, state a claim." 2017 WL 4358769, at *10.

Finally, even if Plaintiffs could bring a *prima facie* prohibited transaction claim in these circumstances, ERISA precludes liability for payments for "services necessary for the establishment or operation of the plan" if "no more than reasonable compensation is paid therefor." 29 U.S.C. § 1108(b)(2). The Court previously declined to decide the reasonableness question on the pleadings, Dkt. 113 at 33, but the facts needed to decide that defense are now not in dispute. As explained in Part I.D above, Yale negotiated recordkeeping costs that were objectively reasonable under the circumstances. There is no evidence that other similar plans paid less for

equivalent services or that Yale could have negotiated meaningfully lower rates; to the contrary, the rates Yale paid were squarely in line with its peers. Because the Plan paid reasonable compensation to TIAA and Vanguard for the services provided, the prohibited transaction claim necessarily fails.[9]

### C.   The duty-to-monitor claim (Count VIII) is meritless.

In Count VIII, Plaintiffs allege that certain Defendants failed to adequately monitor their subordinates, who in turn allegedly acted imprudently. Am. Compl. ¶¶ 257-64. Plaintiffs' inability to show evidence of any underlying imprudence means that summary judgment is also appropriate on this claim. *See Wildman*, 362 F. Supp. 3d at 711 (a "derivative claim, such as a claim alleging a breach of the duty to monitor [fiduciaries], cannot survive without . . . an underlying breach"); *In re Bear Stearns Cos., Inc. Secs., Derivative, and ERISA Litig.*, 763 F. Supp. 2d 423, 580 (S.D.N.Y. 2011) ("With no antecedent breach by the monitored parties in this case, Defendants' alleged failure to monitor, even if true, could not have harmed the plaintiffs.").

Count VIII also fails for the independent reason that Plaintiffs have no evidence to support a supposed failure to monitor. That "relatively narrow" and "limited" duty, *Acosta*, 2019 WL 931710, at *18, requires the appointing fiduciary to review an appointee's performance at "reasonable intervals" to ensure it is "in compliance with the terms of the plan and statutory standards." *Howell v. Motorola, Inc.*, 633 F.3d 552, 573 (7th Cir. 2011). Plaintiffs do not even

---

[9] Plaintiffs asserted in a September 2019 brief that their expert's opinions about "cross-selling" are relevant to whether revenue sharing payments between Yale and its recordkeepers constitute "prohibited transactions" under 29 U.S.C. § 1106(a)(1)(A)-(D). Dkt. 200 at 5-6. Their theory (though unclear) seems to be that providing TIAA with information it could use to "cross-sell" to Plan participants amounted to a transfer of Plan property or assets under the meaning of ERISA. As in *Divane v. Northwestern University*, however, Plaintiffs "cite no case in which a court has held that such information is a plan asset for purposes of ERISA." 2018 WL 2388118, at *12 (N.D. Ill. May 25, 2018), *aff'd*, 953 F.3d 970 (7th Cir. 2020). Plaintiffs also argue that because Yale did not "investigate" alleged cross-selling, Yale cannot show that the amounts it paid for recordkeeping are reasonable. Dkt. 200 at 6. That argument simply collapses into Plaintiffs' primary recordkeeping argument, demonstrating once more how Plaintiffs are improperly trying to "repackage their imprudent fiduciary claims as prohibited transactions claims." *Divane*, 953 F.3d at 992.

PUBLIC VERSION

attempt to provide evidence to challenge Yale's compliance with this standard. Where a plaintiff "ha[s] not put anything on the subject [of monitoring appointed individuals] into the record" to show the defendant acted unreasonably, summary judgment is appropriate. *Id*.

## CONCLUSION

Relying on hindsight, a host of unsupported assumptions, and their own investment preferences, Plaintiffs ask this Court to wrest control of the Plan from the fiduciaries charged with its operation. That is not what ERISA requires; indeed, it runs directly counter to Congress's intention that ERISA not become "so complex that administrative costs, or litigation expenses, unduly discourage employers from offering welfare benefits plans in the first place." *Varity Corp. v. Howe*, 516 U.S. 489, 497 (1996). No trial is necessary to determine that Yale followed a prudent process, considered the relevant issues, and reached reasonable conclusions. The Court accordingly should grant Yale's motion for summary judgment.

Dated:  December 4, 2020                                 Respectfully submitted,

Nancy G. Ross (ct14373)                             */s/ Brian D. Netter*
James C. Williams (ct23292)                         Brian D. Netter (phv08476)
Richard E. Nowak (phv09930)                            bnetter@mayerbrown.com
MAYER BROWN LLP                                     Michelle N. Webster (phv08475)
71 South Wacker Drive                               MAYER BROWN LLP
Chicago, Illinois 60606-4637                        1999 K Street NW
Telephone: (312) 782-0600                           Washington, DC 20006-1101
Facsimile: (312) 701-7711                           Telephone: (202) 263-3000
                                                    Facsimile: (202) 263-3300

*Attorneys for Defendants*

**PUBLIC VERSION**

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on December 4, 2020, a copy of foregoing document was filed electronically using the Court's CM/ECF system. Notice of this filing will be sent by e-mail to all parties by operation of the CM/ECF system.


/s/ *Brian D. Netter*
Brian D. Netter