# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF CONNECTICUT

JOSEPH VELLALI *et al*.,

     *Plaintiffs*,

v.

YALE UNIVERSITY *et al*.,

     *Defendants*.

Civil Action No. 3:16-cv-01345-AWT

Hon. Alvin W. Thompson

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION TO EXCLUDE PLAINTIFFS' EXPERTS WENDY DOMINGUEZ & GERALD BUETOW

Nancy G. Ross (ct14373)
James C. Williams (ct23292)
Richard E. Nowak (phv09930)
MAYER BROWN LLP
71 South Wacker Drive
Chicago, Illinois 60606-4637
Telephone: (312) 782-0600
Facsimile: (312) 701-7711

Brian D. Netter (phv08476)
Michelle N. Webster (phv08475)
MAYER BROWN LLP
1999 K Street NW
Washington, DC 20006-1101
Telephone: (202) 263-3000
Facsimile: (202) 263-3300

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................. 1

BACKGROUND ................................................................................................. 2

ARGUMENT ...................................................................................................... 4

I.  Dominguez's Testimony Is Based On A Premise Already Rejected By This Court.......... 4

II.  Dominguez's Testimony Does Not Follow A Reliable Methodology............................... 6

    A.  Dominguez's testimony is tainted by her lack of a method for selecting the subset of funds that she evaluated. ........................................................... 7

    B.  Dominguez did not follow a consistent process. ..................................................... 11

    C.  Dominguez's process is not consistent with her professional practices outside of litigation................................................................................ 12

III.  Because His Testimony Is Derivative, Buetow's Testimony Should Also Be Excluded. .................................................................................................... 16

CONCLUSION.................................................................................................... 17

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Amorgianos v. Nat'l R.R. Passenger Corp.*,
303 F.3d 256 (2d Cir. 2002) .................................................................................7

*Cunningham v. Cornell University*,
2019 WL 4735876 (S.D.N.Y. Sept. 27, 2019) ...................................................9, 12

*Daubert v. Merrell Dow Pharmaceuticals*,
509 U.S. 579 (1993) ................................................................................ *passim*

*Divane v. Nw. Univ.*,
953 F.3d 980 (7th Cir. 2020) .................................................................................8

*Graham v. Playtex Prods., Inc.*,
993 F. Supp. 127 (N.D.N.Y. 1998) ........................................................................4

*Innis Arden Golf Club v. Pitney Bowes, Inc.*,
629 F. Supp. 2d 175 (D. Conn. 2009) ...............................................................6, 15

*Kumho Tire v. Carmichael*,
526 U.S. 137 (1999) ..........................................................................................2, 8, 16

*In re Refco Inc. Sec. Litig.*,
2012 WL 7007795 (S.D.N.Y. 2012) .....................................................................4, 5

*Renfro v. Unisys Corp.*,
671 F.3d 314 (3d Cir. 2011) .................................................................................8

*Reynolds v. Arnone*,
402 F. Supp. 3d 3 (D. Conn. 2019) ........................................................................4

*In re Trasylol Prod. Liab. Litig.*,
709 F. Supp. 2d 1323 (S.D. Fla. 2010) ................................................................12

*United States v. Ashburn*,
88 F. Supp. 3d. 239 (E.D.N.Y. 2015) ....................................................................2

**Other Authorities**

Donald B. Trone et al., *The Management of Investment Decisions* ................................................6

Fed. R. Evid. 702(a) .................................................................................................4

Federal Rules of Evidence 403 and 702 .......................................................................1

**PUBLIC VERSION**

Innovest, *Investment Menu Design and Considerations for Adding TIAA
    Proprietary Funds* (Spring 2018) ..............................................................................14

Innovest, *University of Colorado Portfolio Review* (3Q 2015) .....................................................13

Innovest, *University of Colorado Portfolio Review* (3Q 2018) .....................................................15

PUBLIC VERSION

Pursuant to Federal Rules of Evidence 403 and 702, Defendants Yale University, Michael A. Peel, and the Fiduciary Committee on Investments (collectively, "Yale"), respectfully move this Court for an order excluding the testimony of Plaintiffs' expert witnesses Wendy Dominguez and Gerald Buetow.[1]

## INTRODUCTION

To prevent "expert" testimony that is not grounded in genuine expertise, this Court serves a gatekeeping role described by the Supreme Court in *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579 (1993), and its progeny. Pursuant to those authorities, the party proffering an expert witness has the burden to establish that expert testimony is both relevant *and* reliable. But Plaintiffs' investment experts offer testimony that is neither.

*First*, Plaintiffs are trying to use their expert testimony to resuscitate a claim that this Court has already dismissed. Plaintiffs' Amended Complaint alleged that Yale "should have offered only the 'best in class' investment option for each asset category," reducing the menu from 100+ options to 15. Dkt. 113 at 8; Dkt. 57 ¶ 152. But this Court dismissed Plaintiffs' excessive-choice claim, relying on the "general presumption in favor of a broader range of options" and Plaintiffs' failure to allege injuries stemming from the size of the investment menu. Dkt. 113 at 25. Despite those rulings, Dominguez ███████████████████████████████████████████ ███████████. Like a game of musical chairs with too few seats, it is no wonder that Dominguez would have excluded most of the Plan's 115 investment options from a 15-fund lineup.

Testimony about whether the funds Yale offered to Plan participants would have made Dominguez's dramatically smaller lineup is irrelevant. Indeed, having prevailed on the too-much-choice argument at the outset of the case, it would be unfair to force Yale to defend the same claim

---

[1] "Ex. __" cites refer to exhibits to the Declaration of Brian D. Netter in Support of Defendants' Motion for Summary Judgment and Motions to Exclude Plaintiffs' Expert Witnesses, filed concurrently.

PUBLIC VERSION

through the backdoor of expert testimony. Moreover, it would be profoundly misleading and prejudicial to introduce evidence based on a process whose premise is that a plan should offer only 10-15 funds. Because Dominguez was asking the wrong question, her testimony impermissibly puts a thumb—or rather, an entire body—on the scale in favor of removing funds.

*Second*, even if Dominguez were asking the right question, she failed to deploy a reliable methodology to formulate her answer. *Daubert* calls upon experts to offer methodologies grounded in professional practice. However, in concluding that Yale should have removed every one of the 22 Plan funds she evaluated, Dominguez did not use a recognized methodology, a consistent set of criteria, or a process that resembles the process that she employs outside of litigation when she advises her real-world clients. In fact, many of the funds that Dominguez has recommended to her own clients would have flunked her litigation model. Dominguez has recommended to her clients funds that she faults Yale for including, and serves as the fiduciary to a collegiate retirement plan that, to this day, offers a TIAA platform with seven of the eight TIAA investments that she challenges in this case. Plaintiffs may respond that Dominguez's hypocrisy provides fodder for cross-examination. But "the explicit premise of *Daubert* and *Kumho Tire* is that, when it comes to expert testimony, cross-examination is inherently handicapped by the jury's own lack of background knowledge." *United States v. Ashburn*, 88 F. Supp. 3d. 239, 248-49 (E.D.N.Y. 2015) (quoting *United States v. Glynn*, 578 F. Supp. 2d 567, 574 (S.D.N.Y. 2008)). That is why *Plaintiffs* bear the burden to demonstrate that Dominguez's testimony is reliable. It plainly is not.

*Third*, Buetow's opinion should also be excluded. He computed "damages" based on Dominguez's report. If Dominguez's report fails, then so, too, does Buetow's.

## BACKGROUND

Yale offers its employees an individual-account, defined-contribution retirement plan. Under this type of plan, fiduciaries select a menu of investment options; plan participants then

choose where to invest their assets. At the beginning of the class period, the Yale Plan offered participants 115 investment options.

Plaintiffs sued Yale in 2016. Dkt. 1. As relevant here, they alleged that Yale violated ERISA because Yale offered them too many investment options and because Yale offered them particular options that underperformed. The Court dismissed the first theory. Plaintiffs, the Court held, had failed to "defeat the general presumption in favor of a broader range of options." Dkt. 113 at 25 (citing *Loomis v. Excelon Corp.*, 658 F.3d 667, 673-74 (7th Cir. 2011)). But the Court let Plaintiffs proceed to discovery on the theory that particular funds had underperformed to such an extent that a prudent fiduciary would have removed them. *Id.* at 27.

To support their underperformance theory, Plaintiffs intend to offer testimony from expert witnesses Wendy Dominguez and Gerald Buetow. Dominguez is the President of Innovest Portfolio Solutions, a consultancy she co-founded in 1996. Ex. 13, Dominguez Tr. 26:11-12. She has a "█████████████████████████████████████████████████████████ █████████████████████████████████████████████" *Id.* at 49:19-21, 77:14-18; *accord* Ex. 5, Dominguez Rpt. ¶ 30 ("████████████████████████████████████████ █████████████████████").

That "core belief"—which this Court dismissed as a matter of law—infects the entirety of Dominguez's expert report. First, she ████████████████████████████████████████████ ████████████████████████████. Ex. 5, Dominguez Rpt. ¶ 77. Second, she opines that t████ ████████████████████████████████████████████████████████████t, because they would not have qualified for her ████████████████. *Id.* ¶¶ 213-405. Third, for ██ ████████████████████████████████████████████████████████████. *Id.* However, Dominguez "████████████████████████████████████████████████

 Ex. 13, Dominguez Tr. 176:18-21. In particular, she could not remember

███████████████████████████████████████████. *Id.* She did

remember that she came up with one of her suggestions ████████████████████████

████████████████████████████████" *Id.* 155:1-7.

Buetow, in turn, calculates damages based on Dominguez's opinions. Ex. 3, Buetow Rpt.

¶ 22 (his report "██████████████████████████████"); *accord*

Ex. 12, Buetow Tr. 25:25-28:4. In other words, he ██████████████████████

████████████████████████████████████████████████

██████████████████████s. Then he calculates what Plaintiffs' investment returns

would have been in this counterfactual. Ex. 3, Buetow Rpt. ¶¶ 23-27.

## ARGUMENT

### I.    Dominguez's Testimony Is Based On A Premise Already Rejected By This Court.

Separate from an expert's qualifications and methodology, expert testimony can be offered

only "to determine a fact in issue." Fed. R. Evid. 702(a). This requirement "'means that the expert's

opinion must relate to an issue that is actually in dispute and must provide a valid scientific

connection to the pertinent inquiry.'" *Graham v. Playtex Prods., Inc.*, 993 F. Supp. 127, 130

(N.D.N.Y. 1998) (quoting Margaret A. Berger, *Procedural Paradigms for Applying the* Daubert

*Test*, 78 Minn. L. Rev. 1345, 1351 (1994)). Put another way, expert testimony must have "a valid

connection to the pertinent inquiry." *Reynolds v. Arnone*, 402 F. Supp. 3d 3, 23 (D. Conn. 2019)

(quoting *Daubert v. Merrill Dow Pharm., Inc.*, 509 U.S. 579, 592 (1993))

Dominguez's testimony fails to satisfy this threshold standard. Testimony "about the merits

of dismissed claims" "fail[s] the *Daubert* 'fit' requirement for the simple reason that those merits

have already been determined and are no longer relevant to the proceedings." *In re Refco Inc. Sec.*

*Litig.*, 2012 WL 7007795, at \*4 (S.D.N.Y. 2012), *report and recommendation adopted*, 2013 WL

452400 (S.D.N.Y. 2013). In *Refco*, the court dismissed the allegation that an accounting firm knew about a transaction; thus, the court excluded an expert opinion that "relied on the 'fact' that [the firm] 'knew'" this information. *Id.* at *7. Because the expert's assumption "fl[ew] in the face of the previous ruling to the contrary, any reliance on it [could] not be helpful." *Id.*

The same logic applies here. Dominguez has based not only her testimony but her entire career on the philosophy that participant choice is overrated. Indeed, Dominguez's report invokes as her firm's "philosophy" a white paper in which she acknowledges that ███████████████ ████████████████████████████████████████████e. Ex. 5, Dominguez Rpt. 7, Ex. 4; *see also, e.g.*, Ex. 13, Dominguez Tr. 48:7-49:21 (Dominguez "████████████████████████ ███████). As the Court has already concluded, however, not everyone *must* share Dominguez's preference for less choice. Dkt. 113 at 40.

The Court permitted Plaintiffs to conduct discovery on whether *particular* funds were inappropriate to include on Yale's 115-fund lineup. But Dominguez did not set out to answer that question—her ████████████████████████████████████████████████████ ████████████████████:

       Q.  ██████████████████████████████████████████?

       A.  ████

       Q (MR. NETTER) ████████████████████████████ ████████████████████████████████████████████ ██████████████

       MR. BRAITBERG: Objection.

       A.  ████████████████████████████████████████.

Ex. 13, Dominguez Tr. 49:19-21, 78:17-24.

Dominguez's report confirms that she was following a process ███████████ ███████████. Indeed, as her report explains, "███████████████████████ ███████████████████████████████████████████████ ███████████████████████" Ex. 5, Dominguez Rpt. ¶¶ 124, 213.

Likewise, Dominguez ███████████████████████████ 1996 text, Donald B. Trone et al., *The Management of Investment Decisions*. As described below, there is no evidence that this book details a process followed by industry professionals, and Dominguez's ███████████████████████████. For present purposes, however, what matters is that this text contains two processes: one for picking a new lineup from scratch and one for evaluating a lineup that is already in place. Ex. 85, Trone 138-49 (selection), 203-05 (monitoring). Dominguez invokes the process for formulating a new, streamlined lineup—and *not* the process for evaluating an existing lineup like Yale's.

The distinction between evaluating an existing lineup of 115 funds and formulating a new lineup of ███████████ is obviously a big deal. As a matter of simple math, Dominguez was pre-committed to retaining no more than 13% of the funds in Yale's lineup. Her opinion does not shed any light on whether a Plan that was entitled to offer 115 funds was permitted to include any of these funds on its lineup.

## II.    Dominguez's Testimony Does Not Follow A Reliable Methodology.

Even taking Dominguez's ███████████████████ as given, her opinion cannot be admitted unless she followed a rigorous and established methodology for picking such a lineup. After all, the reliability of expert testimony hinges on "whether the expert's methods are testable and falsifiable." *Innis Arden Golf Club v. Pitney Bowes, Inc.*, 629 F. Supp. 2d 175, 188 (D. Conn. 2009). Alas, Dominguez's methodology for evaluating the 22 funds that she looked at was not established, was not consistent across the 22 funds, and was not remotely consistent with

her professional practices. "[A]ny step that renders the analysis unreliable under the *Daubert* factors renders the expert's testimony inadmissible." *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 267 (2d Cir. 2002) (quoting *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 745 (3d Cir. 1994)). The combination of defects here shows that Dominguez's testimony flouts the purpose of expert testimony, and would prove deceptive rather than helpful.

> ### A. Dominguez's testimony is tainted by her lack of a method for selecting the subset of funds that she evaluated.

In two critical respects, Dominguez fails to contribute meaningful testimony about how a reasonable individual would have evaluated the funds in Yale's lineup. First, she did not follow *any* methodology for selecting the funds that she evaluated. Second, even as to those funds, she did not follow a methodology that is deployed by professionals outside of the litigation context.

> **a.** Dominguez had no methodology for picking the funds she evaluated. She testified repeatedly that she had ███████████████████████████████████████. Ex. 13, Dominguez Tr. 23:2-5; 119:10-13; 205:4-21. Instead, Plaintiffs' counsel selected the funds for her. That does not make any sense. How can a process for reconfiguring a retirement plan be reliable if less than 20 percent of the funds are being evaluated? Take, for example, the sector funds. Dominguez was asked to ███████████████████████████████████████, ██████████████████████████████████████. Sector funds are funds that invest in a subset of the broader market; if you take all of the sector funds together, you get the performance of the broad market. Dominguez seeks to offer testimony that Plan participants would have ██████████████████████s. Under her process, ██████████████████████ ██████████████████████████████████:

> Q. ████████████████████████████████████ ████████████████



Ex. 13, Dominguez Tr. at 174:10-17. It is, of course, impossible to judge the appropriateness of a rule prohibiting sector funds using only the performance characteristics of the subset cherry-picked by Plaintiffs after the fact—*i.e.*, after it was already known which funds had outperformed and which funds had underperformed. And it is impossible to gauge how the Plan's participants would have been affected by a rule prohibiting sector funds by evaluating only those funds from sectors that, with the benefit of hindsight, happened to be the ones that underperformed the broad market.

This shows why it is unreliable to apply a methodology to only a subset of funds, without any semblance of a process for picking that subset.

**b.** When evaluating specific funds, Dominguez did not follow a process that "enjoys general acceptance within a relevant scientific community." *Kumho Tire v. Carmichael*, 526 U.S. 137, 150 (1999) (quoting *Daubert*, 509 U.S. at 592-94) (internal quotation marks omitted).

On this point, the governing legal standard is crucial. "When claiming an ERISA violation, the plaintiff must plausibly allege action that was objectively unreasonable." *Divane v. Nw. Univ.*, 953 F.3d 980, 988 (7th Cir. 2020). That means that they bear the burden to demonstrate that no "hypothetical prudent fiduciary" would have made the same objective choice as did Yale. *Renfro v. Unisys Corp.*, 671 F.3d 314, 322 (3d Cir. 2011). So it is not enough for Plaintiffs to come forward with evidence that somebody could have followed a different process to reach a different result. They can prevail only by showing that *no* reasonable fiduciary would have followed Yale's process and that *no* reasonable fiduciary would have made the same decision that Yale made.

Following that reasoning, in *Cunningham v. Cornell University*, 2019 WL 4735876 (S.D.N.Y. Sept. 27, 2019), Judge Castel deemed Dominguez's expert opinion irrelevant because there was no evidence that "other fiduciaries removed [the challenged funds] or any other fund from their plan lineups based on the performance measures identified." *Id.* at *12. To the contrary, the evidence in *Cunningham* was that other fiduciaries were *not* removing the funds that Dominguez insisted she would have removed. The same defects exist here. There is no evidence that any fiduciaries deployed Dominguez's process to evaluate an investment lineup, or that fiduciaries removed any of the funds that she has challenged based on the analysis that she followed. Indeed, the funds challenged by Dominguez were extremely popular—some of them ubiquitously so—among the institutions that are Yale's peers. Ex. 109, Friedman Decl. ¶¶ 4-5.

Dominguez does not claim that her process was used by any fiduciaries in this space. Instead, as in *Cunningham*, ███████████████████████████████████████████████ ████████. Trone's book does recommend a process for monitoring an existing fund lineup (*see* Ex. 85, Trone 203-05)—but Dominguez did not claim to be using that process. Rather, Dominguez ████████████████████████████████████████████████████████████████████. That process does not purport to be useful for deciding which funds to remove from an active lineup, and Dominguez does not claim that anybody uses the new-lineup process for monitoring an existing lineup.

Even if there were room in this case for Dominguez to opine on what a new lineup would look like, the Trone book does not support her process. One of the tenets of the Trone book is that you cannot draw conclusions about an investment fund based on a single endpoint. That makes good sense, because investment markets can be volatile, and drawing conclusions about a fund from a single endpoint would lead to unreliable results. Trone says specifically that "a manager's

9

prior performance is of limited value in determining future performance" and that it is improper to use data from a single endpoint "to say that the manager is no longer worthy of consideration." Ex. 85, Trone at 138, 143.[2] "The analysis must include various beginning and ending periods. Looking at one ending period is not sufficient." *Id.* Indeed, "[t]o have any statistical confidence in analyzing performance, an estimated 25 years of quarterly performance data are necessary just to determine whether a manager has the ability to produce long-term above-average results." *Id.* at 139. The text therefore proposes 13 criteria when searching for a new manager. *Id.* at 157-59; *see also id.* at 348 (proposing a review of six factors by retirement-plan investment consultants before recommending finalist funds). The performance criterion encourages the comparison between candidate funds and their peers for all available annual and multi-year periods. *Id.* at 158.

Contrary to the supposed foundation for her own methodology, Dominguez did not even purport to assess fund performance over various start- and endpoints. For most funds, she ██████ ████████████████████ . ██████████████████████████████████ ██████████████████ (despite Trone's specific contrary recommendation). She did not even look to see whether *any* alternatives would have passed her test as of June 30, 2010, let alone whether they would have passed the test at every evaluation period since then.

In sum, Dominguez devised a test, with no basis in professional practice or academic literature, that needlessly tars investment funds as inappropriate. That analysis has no bearing on what actual fiduciaries did at the time, so it has no role in this litigation.

---

[2] Trone says that a manager should look at rolling data over a series of time periods. ██████ ████████████████████████████████████████████████████████████ Ex. 5, Dominguez Rpt. ¶ 53. But whether a manager *ever* underperforms the median and whether a manager "*consistently* performs below the median . . . over *rolling* three-year periods" (Ex. 85, Trone 116) are very different standards. Dominguez does not acknowledge this mutation, let alone explain why any prudent fiduciary would make Trone's criterion harsher.

### B.    Dominguez did not follow a consistent process.

Beyond the lack of support, Dominguez's process for evaluating 22 of Yale's funds was not consistent. Rather than articulating her procedure for analyzing investments, Dominguez just ██████████████████████████████████████████████. Ex. 5, Dominguez Rpt. ¶ 53. Even less clear is what Dominguez does with the list. Her report implies—contrary to the textbooks' advice—██████████████████████████████████████. *See id.* But in her deposition, she acknowledged that, ████████████████████████████████████████ ████████████████████████:

> Q ██████████████████████████████████
> ██████████████
>
> A I ████████████████████████
>
> Q ██████████████████████████████████
> ██████████
>
> A: ███

Ex. 13, Dominguez Tr. 91:11-14, 92:8-13. Here, by contrast, Dominguez did not undertake any additional scrutiny; she just banished every fund that triggered any single criterion.

In Dominguez's report, she just █████████████████████████████████ ████████████████████████████████████████████████████████ ██████████████████. *E.g.*, Ex. 5, Dominguez Rpt. ¶ 307. There is nothing in between. Especially unhelpfully, Dominguez neglects to explain how she analyzes investments that fail some criteria but pass others. Instead, she just ignores any criteria that the investment passed. For example, ████████████████████████████████████████████ ████████████████████████████████████████████ ██████████████████████████████████. I████████████████

███████████████████. *Compare, e.g.*, Ex. 5, Dominguez Rpt. ¶ 281, *with id.* ¶ 305 (risk-return graphs). Yet for most of her criteria, *not* failing the criterion is an affirmatively *positive* indicator. For example, suppose a fund failed only her first criterion (*i.e.*, it had a negative alpha), and only over a five-year window. That would be an encouraging sign: since it failed none of the other criteria, the fund must have had a *positive* alpha over the more recent three-year window; have been in the top 40% of its peer group in the last five years and top 50% of its peer group over the last three; and so on. A prudent investment manager would weigh all of these positive signals against the negative one. *Cunningham*, 2019 WL 4735876, at *11 (rejecting Dominguez's reliance on snapshots of performance ████████████████████████████ ████████████████████████████████████████████████████████████████ ████). But Dominguez has not offered any methodology for weighing these considerations.

The upshot is that Dominguez "does not analyze the facts; she . . . regurgitates them and reaches conclusory opinions that are purportedly based on these facts." *In re Trasylol Prod. Liab. Litig.*, 709 F. Supp. 2d 1323, 1346 (S.D. Fla. 2010). As a result, nobody could replicate her analysis.

**C.    Dominguez's process is not consistent with her professional practices outside of litigation.**

Dominguez not only failed to follow a consistent, repeatable process—but the process as she describes it is one that  no real professional would ever use. As she conceded under oath, "█ ████████████████████████████████████████████████████████████████ ████████████████." Ex. 13, Dominguez Tr. at 109:3-8. Her methodology suggested ████████████████████████████. So no investor would find this methodology useful.

Unsurprisingly, then, Dominguez does not apply the methodology she advocates in this litigation to her own clients—or anything like it. Take the first criterion that she applied to Yale,



" Ex. 5, Dominguez Rpt. ¶ 53. As Dominguez computed it, "[

" Ex. 13, Dominguez Tr. 82:2-3. This means alpha will be negative whenever a fund underperforms the chosen benchmark. In 2015, Dominguez reviewed the lineup of the University of Colorado, which she had helped them to select in 2014. Ex. 87, Innovest, *University of Colorado Portfolio Review* (3Q 2015) at 1, 4. By the third quarter of 2015, **ten** of Dominguez's hand-selected funds were underperforming their benchmarks on a three- and/or five-year basis. *Id.* at 19-22. So ten funds had a negative alpha. The fact that ten funds would have a disqualifying result less than a year after selection goes to show why no fiduciary would ever use Dominguez's process. More to the point, Dominguez did not recommend the removal of any of the funds. *Id.* at 27. Indeed, she didn't even put any of the funds on a watch list. *Id.* She told her client that she had "No/Minimal Concerns" about every one of those negative-alpha funds. *Id.*

When asked at her deposition



Ex. 13, Dominguez Tr. 90:6-13.

The conflicts between Dominguez's litigation opinions and real-world opinions are not just abstract disputes about process; she gave the University of Colorado advice about one of the funds at issue in this case that cannot possibly be reconciled with her proposed testimony here.

Dominguez evaluated the TIAA Real Estate Account for the University of Colorado in

early 2018. At the time, the TIAA Real Estate Account was not on the University of Colorado's lineup (instead the University offered the Morgan Stanley Institutional Global Real Estate Fund, which, incidentally, is a sector fund). Ex. 88, Innovest, *Investment Menu Design and Considerations for Adding TIAA Proprietary Funds* at 7 (Spring 2018). After conducting an in-depth analysis that examined the TIAA Real Estate Account's performance, investment guidelines, investment strategy, personnel, fees, contract terms, and performance history, Dominguez identified five "pros" to offering the Real Estate Account—"broad exposure to the U.S. real estate market," the investment's "strong diversification benefits," its use "as a strong hedge to inflation risks," the "liquidity guarantee," and the management's "extensive research team." *Id.* at 16. Dominguez also noted three qualitative points against the Real Estate Account, none of which apply to Yale's Plan. *Id.* On the strength of Dominguez's assessment—as well as a quantitative assessment that accounted for TIAA Real Estate's unique liquidity structure, *id.*—Dominguez explained to her client that replacing its "current REIT option with the TIAA Real Estate [Account] may be attractive if [the client's] committee is comfortable with liquidity restrictions." *Id.* at 50.

In other words, the only considerations that caused Dominguez hesitation in her professional context were (1) the University of Colorado's plan had existing real-estate exposure; and (2) the limitations on withdrawing money quickly when investing in actual real estate.

Upon review of Dominguez's analysis, the University of Colorado decided to *add* TIAA Real Estate to its lineup. Dominguez did not advise the University of Colorado that its decision to do so was imprudent. Dominguez then began to conduct periodic monitoring review of the Real Estate Account.

As of September 30, 2018, the TIAA Real Estate Account was in the bottom percentile of its peer group for the previous 1-, 3-, 5-, 7-, and 10-year periods, and it underperformed all

benchmarks during those periods, too. Ex. 89, Innovest, *University of Colorado Portfolio Review* (3Q 2018), at 33. But Dominguez did not recommend that the fund be *removed*. Although she acknowledged that "[t]he TIAA Real Estate Account has underperformed in recent years," she concluded, "[n]onetheless," that "the TIAA Real Estate Account remains a unique option for participants, providing liquid access to core private real estate." *Id.* at 28. Although she noted a "Minor Concern" about the fund's performance, on the basis of her complete review she had "No/Minimum Concerns" about the Real Estate Account's overall suitability. *Id.* at 27, 30.

Dominguez's 2018 analysis of the TIAA Real Estate Account for her client bears no resemblance to her 2019 analysis of the TIAA Real Estate Account for this case. ███████████ ████████████████████████████████████████ (Ex. 13, Dominguez Tr. 169:20-170:14); ████████████████████████████████████████████. *Cf. id.* at 219:12-14 (████████████████████████████████████████████████████████ ████████████████████████████████████████████). If Dominguez cannot employ the same process to evaluate the same fund, how is it fair for her testimony to be the sole support for Plaintiffs' claim to hundreds of millions of dollars in damages? *Cf. Innis Arden Golf Club v. Pitney Bowes, Inc.*, 629 F. Supp. 2d 175, 188 (D. Conn. 2009) (the reliability of expert testimony hinges on "whether the expert's methods are testable and falsifiable").

As if this weren't already enough, Dominguez is *herself* a fiduciary to 403(b) retirement plans that offer funds that she says no reasonable fiduciary would allow. Since 2016, Dominguez has been a trustee of the Metropolitan State University of Denver, with fiduciary oversight over Metro State's optional retirement plans. Ex. 13, Dominguez Tr. 206:12-207:4. Dominguez is now four years into her fiduciary role, and yet the Metro State plans continue to offer seven of the eight

TIAA funds that Dominguez says in this case that *no* reasonable fiduciary should offer.[3] Under *Daubert*, the trial court must "make certain that an expert … employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho*, 526 U.S. at 152. Dominguez plainly has not met that standard.[4]

### III.    Because His Testimony Is Derivative, Buetow's Testimony Should Also Be Excluded.

Buetow's opinions are just an extension of Dominguez's. He purports to calculate damages



." Ex. 3, Buetow Rpt. ¶ 23. Thus, his opinions are helpful only to the extent that Dominguez's opinions are admissible. Because Dominguez's opinions should be excluded, so too should Buetow's.

---

[3] *See* Ex. 115, TIAA Investment Options—MSU of Denver. The funds from Dominguez's hit list that she offers to participants of the Metro State plan are CREF Stock Account, TIAA-CREF Large-Cap Value, TIAA-CREF Mid-Cap Value, TIAA-CREF International Equity, TIAA Real Estate Account, CREF Global Equities, and CREF Inflation-Linked Bond Account.

[4] There is another problem, too: For each option that Plaintiffs' counsel asked her to analyze, Dominguez identified an allegedly prudent alternative. Invariably, her suggestion outperformed the original option. No discernable methodology supports this result. In fact, Dominguez testified that ███████████████████████ Ex. 13, Dominguez Tr. 176:18-21. In one case, she admitted that she ████████████████████████████████████████" of it. *Id*. at 155:1-7. In Dominguez's view, Yale was imprudent for not using the criteria she identified. So by her own standards, Dominguez's process for generating alternative recommendations was a deficient process that no prudent fiduciary would use. Thus, her testimony about those alternatives should be excluded.

## CONCLUSION

The Court should exclude both Wendy Dominguez and Gerald Buetow.

Dated: December 4, 2020

Respectfully submitted,

Nancy G. Ross (ct14373)
James C. Williams (ct23292)
Richard E. Nowak (phv09930)
MAYER BROWN LLP
71 South Wacker Drive
Chicago, Illinois 60606-4637
Telephone: (312) 782-0600
Facsimile: (312) 701-7711

*/s/ Brian D. Netter*
Brian D. Netter (phv08476)
   bnetter@mayerbrown.com
Michelle N. Webster (phv08475)
MAYER BROWN LLP
1999 K Street NW
Washington, DC 20006-1101
Telephone: (202) 263-3000
Facsimile: (202) 263-3300

*Attorneys for Defendants*

**PUBLIC VERSION**

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that, on December 4, 2020, a copy of the foregoing was filed electronically

using the Court's CM/ECF system, which will provide notice of the filing to all counsel of record.

By:   /s/ *Brian D. Netter*
       Brian D. Netter