**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT**

JOSEPH VELLALI *et al.*,

     *Plaintiffs*,

v.

YALE UNIVERSITY *et al.*,

     *Defendants*.

No. 3:16-cv-01345-AWT

Hon. Alvin W. Thompson

**MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT [DOC. 267]**

Exhibit A

# CONTENTS

Introduction ........................................................................................................... 1

Background ........................................................................................................... 1

Argument .............................................................................................................. 2

I.  Legal standards. ............................................................................................ 2

    A.  Summary judgment is improper for any arguably meritorious claim. ........... 2

    B.  ERISA imposes strict standards of fiduciary conduct. ................................. 3

    C.  Once Plaintiffs prove a breach and related loss to the Plan, the burden of disproving causation shifts to Defendants. ............................................... 4

II.  Defendants imprudently relied on a single employee to monitor the Plan for years. (Counts I, III, V, VIII). ....................................................................... 7

    A.  The Plan did not authorize delegation to Penney. ...................................... 7

    B.  Even if the Plan allowed delegation to Penney, it was imprudent for Defendants to delegate oversight of the multi-billion-dollar Plan to a single unqualified individual. ..... 8

    C.  Yale and Peel breached their duty to monitor Penney (Count VIII). ........... 10

III.  Overwhelming evidence shows that Defendants imprudently caused the Plan to pay excessive recordkeeping fees (Count III). ........................................... 11

    A.  Defendants breached their duty of prudence. ............................................ 11

        1.  Industry-accepted practices regarding recordkeeping fees. ..................... 12

        2.  Defendants' process for monitoring recordkeeping fees was virtually non-existent and contrary to industry-accepted practices. ........................ 13

            a. Defendants imprudently failed to obtain competitive bids. ............... 13

            b. Defendants imprudently used asset-based pricing while failing to monitor the Plan's asset-based fees for reasonableness. ...................... 15

            c. Defendants imprudently delayed consolidating to a single recordkeeper. .......... 16

        3.  Defendants imprudently failed to account for TIAA's cross-selling revenue. ......... 19

    B.  Defendants caused the Plan to pay excessive fees. .................................... 22

i

IV.  Defendants failed to adequately monitor the Plan's investments and remove imprudent ones (Counts I, V, VIII). ....................................................................... 26

    A.  This Court's Article III standing decision remains the law of the case......................... 26

    B.  Yale had a flawed process for monitoring Plan investments. ....................................... 30

    C.  Defendants' breach of fiduciary duty caused Plan losses. ............................................. 33

V.  Defendants imprudently provided higher-cost retail-class shares of the Plan's  mutual funds instead of switching to readily available institutional-class shares  (Count V). .......... 37

VI.  Defendants caused prohibited transactions (Counts II, IV, VI)............................................. 38

Conclusion ...................................................................................................................................... 40

Exhibit A

## AUTHORITIES

### Cases

*Acosta v. Chimes D.C., Inc.*,
    No. 15-3315, 2019 WL 931710 (D. Md. Feb. 26, 2019) ..................................................... 15

*Allen v. GreatBanc Trust Co.*,
    835 F.3d 670 (7th Cir. 2016) ............................................................................................... 39

*Anderson Grp., LLC v. City of Saratoga Springs*,
    805 F.3d 34 (2d Cir. 2015) ................................................................................................. 23

*Anderson v. Liberty Lobby, Inc.*,
    477 U.S. 242 (1986) ............................................................................................................. 2

*Armory v. Delamirie*,
    93 Eng.Rep. 664 (1722) ..................................................................................................... 22

*Bd. of Trustees of S. California IBEW-NECA Defined Contribution Plan v. Bank of New York Mellon Corp.*,
    No. 09-6273, 2011 WL 6130831 (S.D.N.Y. Dec. 9, 2011) ................................................. 30

*Braden v. Wal-Mart Stores, Inc.*,
    588 F.3d 585 (8th Cir. 2009) ............................................................................................. 29

*Brotherston v. Putnam Investments, LLC*,
    907 F.3d 17 (1st Cir. 2018), *cert. denied,* 140 S.Ct. 911 (2020) ....................................... 5, 7

*Cates v. Trs. of Columbia Univ.*,
    No. 16-6524, 2019 WL 8955333 (S.D.N.Y. Oct. 25, 2019), *adopted*, 2020 WL 1528124 (S.D.N.Y. Mar. 30, 2020) ................................................... 14, 17, 24, 36

*Cent. States SE & SW Areas Health & Welfare Fund v. Merck-Medco Managed Care, LLC*,
    504 F.3d 229 (2d Cir. 2007) ............................................................................................... 29

*Cunningham v. Cornell Univ.*,
    No. 16-6525, 2019 WL 4735876 (S.D.N.Y. Sept. 27, 2019), *appeal filed*, No. 21-88 (2d Cir. Jan. 13, 2021) ................................................................................................ 25, 33

*Dardaganis v. Grace Capital Inc.*,
    889 F.2d 1237 (2d Cir. 1989) ............................................................................................... 5

*DiFelice v. U.S. Airways, Inc.*,
    497 F.3d 410 (4th Cir. 2007) ............................................................................................ 9, 30

*DiLaura v. Power Auth. of State of N.Y.*,
    982 F.2d 73 (2d Cir. 1992) ................................................................................................. 38

*Divane v. Nw. Univ.*,
    953 F.3d 980 (7th Cir. 2020), *pet. for cert. pending*, No. 19-1401 ........................................ 39

iii

*Donovan v. Bierwirth (Bierwirth II)*,
    754 F.2d 1049 (2d Cir. 1985)...................................................................... 22, 23

*Donovan v. Bierwirth*,
    680 F.2d 263 (2d Cir. 1982)............................................................................. 3

*Fifth Third Bancorp v. Dudenhoeffer*,
    537 U.S. 409 (2014)........................................................... 3, 18, 19, 34

*George v. Kraft Foods Global, Inc.*,
    641 F.3d 786 (7th Cir. 2011)............................................ 12, 14, 19, 24, 35

*Herman v. Reinecke Agency*,
    37 F. Supp. 2d 1338 (M.D. Fla. 1998) ..................................................... 11

*Hughes Aircraft Co. v. Jacobson*,
    525 U.S. 432 (1999)........................................................................... 28

*In re Meridian Funds Grp. Sec. & ERISA Litig.*,
    917 F.Supp.2d 231 (S.D.N.Y. 2013).......................................................... 9

*In re State Police Litig.*,
    88 F.3d 111 (2d Cir. 1996)............................................................... 40

*In re Unisys Sav. Plan Litig.*,
    74 F.3d 420 (3d Cir. 1996)............................................................... 30

*Jeffreys v. City of New York*,
    426 F.3d 549 (2d Cir. 2005)............................................................... 2

*Katsaros v. Cody*,
    744 F.2d 270 (2d Cir. 1984).......................................... 8, 9, 10, 19, 30

*L.I. Head Start Child Dev. Servs. v. Econ. Opportunity Comm'n of Nassau Cty.*,
    710 F.3d 57 (2d Cir. 2013)............................................................... 27

*LaRue v. DeWolff, Boberg & Assocs.*,
    552 U.S. 248 (2008)........................................................................... 29

*Leber v. Citigroup 401(k) Plan Inv. Comm.*,
    323 F.R.D. 145 (S.D.N.Y. 2017) ........................................................ 29

*Leigh v. Engle*,
    727 F.2d 113 (7th Cir. 1984)............................................................. 11

*Lowen v. Tower Asset Mgmt., Inc.*,
    829 F.2d 1209 (2d Cir. 1987)........................................................... 40

*McDonald v. Provident Indem. Life Ins. Co.*,
    60 F.3d 234 (5th Cir. 1995)............................................................... 5

*Metro. Life Ins. Co. v. Glenn*,
    554 U.S. 105 (2008).......................................................................... 7

Exhibit A

*Millbrook v. United States*,
    569 U.S. 50 (2013)..................................................................................................... 40

*Moreno v. Deutsche Bank Americas Holding Corp.*,
    No. 15-9936, 2017 WL 3868803 (S.D.N.Y. Sept. 5, 2017).................................... 29

*Moreno v. Deutsche Bank Americas Holding Corp.*,
    No. 15-9936, 2018 WL 2727880 (S.D.N.Y. June 6, 2018) ...................................... 5

*N.Y. State Teamsters Council Health & Hosp. Fund v. Estate of DePerno*,
    18 F.3d 179 (2d Cir. 1994).......................................................... 4, 5, 6, 22, 40

*NECA-IBEW Health & Welfare Fund v. Goldman Sachs & Co.*,
    693 F.3d 145 (2d Cir. 2012).................................................................................... 29

*New York v. Julius Nasso Concrete Corp.*,
    202 F.3d 82 (2d Cir. 2000)...................................................................................... 23

*Pension Ben. Guar. Corp. ex rel. St. Vincent Catholic Med. Centers Ret. Plan v. Morgan
    Stanley Inv. Mgmt. Inc. (PBGC)*,
    712 F.3d 705 (2d Cir. 2013)............................................................................. 4, 30

*Ret. Bd. of the Policemen's Annuity & Ben. Fund of Chi. v. Bank of N.Y. Mellon*,
    775 F.3d 154 (2d Cir. 2014).................................................................................... 29

*Rogoz v. City of Hartford*,
    796 F.3d 236 (2d Cir. 2015)........................................................................ 2, 21, 33

*Roth v. Sawyer-Cleator Lumber Co.*,
    16 F.3d 915 (8th Cir. 1994)................................................................................ 5, 34

*Sacerdote v. New York University*,
    328 F.Supp.3d 273 (S.D.N.Y 2018) .................................................................. 23, 26

*Shrader v. CSX Transp., Inc.*,
    70 F.3d 255 (2d Cir. 1995)...................................................................................... 27

*Silverman v. Mutual Benefit Life Insurance Co.*,
    138 F.3d 98 (2d Cir. 1998)........................................................................................ 6

*Stagl v. Delta Air Lines, Inc.*,
    117 F.3d 76 (2d Cir. 1997)...................................................................................... 35

*Story Parchment Co. v. Paterson Parchment Paper Co.*,
    282 U.S. 555 (1931)................................................................................................ 23

*Sweda v. Univ. of Pennsylvania*,
    923 F.3d 320 (3d Cir. 2019), *cert. denied*, 140 S.Ct. 2565 (2020) .. 4, 9, 11, 19, 20, 23, 30, 34,
    40

*Tanasi v. New All. Bank*,
    786 F.3d 195 (2d Cir. 2015)...................................................................................... 6

*Tatum v. RJR Pension Inv. Comm.*,
    761 F.3d 346 (4th Cir. 2014).......................................................................... 5, 7, 34

Exhibit A

*Teets v. Great-W. Life & Annuity Ins. Co.*,
    921 F.3d 1200 (10th Cir.), *cert. denied,* 140 S.Ct. 554 (2019) ........................................... 4, 39

*The T.J. Hooper*,
    60 F.2d 737 (2d Cir. 1932) ........................................................................................... 35

*Thole v. U.S. Bank, N.A.*,
    140 S.Ct. 1615 (2020) ...................................................................................... 26, 27, 28

*Tibble v. Edison Int'l (Tibble I)*,
    135 S.Ct. 1823 (2015) ................................................................... 1, 3, 7, 11, 30, 32

*Tibble v. Edison Int'l (Tibble II)*,
    843 F.3d 1187 (9th Cir. 2016)(en banc) .......................................................... 3, 12, 37

*Tibble v. Edison Int'l*,
    No. 07-5359, 2010 WL 2757153 (C.D. Cal. July 8, 2010), *aff'd,* 729 F.3d 1110 (9th
    Cir. 2013). ................................................................................................................... 38

*Town of Southold v. Town of E. Hampton*,
    477 F.3d 38 (2d Cir. 2007) ............................................................................................. 2

*Tracey v. Mass. Inst. of Tech.*,
    No. 16-11620, 2019 WL 4192148 (D. Mass. Sept. 4, 2019) ................................... 37

*Trs. of Upstate N.Y. Eng'rs Pension Fund v. Ivy Asset Mgmt.*,
    843 F.3d 561 (2d Cir. 2016) ..................................................................................... 4, 23

*Tussey v. ABB, Inc.*,
    746 F.3d 327 (8th Cir. 2014) ........................................................................... 3, 5, 12, 14

*Van Buskirk v. United Grp. of Companies, Inc.*,
    935 F.3d 49 (2d Cir. 2019) ........................................................................................... 26

*Warth v. Seldin*,
    422 U.S. 490 (1975) ..................................................................................................... 29

*Wilcox v. Georgetown Univ.*,
    No. 18-422, 2019 WL 132281 (D.D.C. Jan. 8, 2019) ................................................ 26

**Statutes**

29 U.S.C. §1002(14)(B) ..................................................................................................... 4, 38

29 U.S.C. §1104(a)(1)(B) ........................................................................................ 3, 7, 8, 10, 14

29 U.S.C. §1104(a)(1)(D) ......................................................................................................... 18

29 U.S.C. §1105(a)(3) ................................................................................................................. 7

29 U.S.C. §1105(c)(1) ................................................................................................................. 8

29 U.S.C. §1105(c)(2) ............................................................................................................... 11

29 U.S.C. §1106(a) .................................................................................................................... 38

29 U.S.C. §1106(a)(1) ................................................................................................................. 4

vi

29 U.S.C. §1106(a)(1)(C) ................................................................................. 39

29 U.S.C. §1108(b) ......................................................................................... 39

29 U.S.C. §1109(a) ................................................................................. 3, 4, 7

29 U.S.C. §1113(1) ......................................................................................... 32

29 U.S.C. §1132(a)(2) ..................................................................................... 29

29 U.S.C. §1136(b) ......................................................................................... 20

**Rules**

Fed. R. Civ. P.   8(a) ...................................................................................... 38

Fed. R. Civ. P. 18(a) ...................................................................................... 38

Fed. R. Civ. P. 56(a) ........................................................................................ 2

**Other Authorities**

29 C.F.R. §2509.75-8 ...................................................................................... 11

29 C.F.R. §2550.408b-2 .................................................................................. 40

Gretchen Morgenson, *The Finger-Pointing at the Finance Firm TIAA*, N.Y. Times, Oct. 21, 2017, https://www.nytimes.com/2017/10/21/business/the-finger-pointing-at-the-finance-firm-tiaa.html ................................................................................. 20

Gretchen Morgenson, *TIAA Receives New York Subpoena on Sales Practices*, N.Y. Times, Nov. 9, 2017, https://www.nytimes.com/2017/11/09/business/tiaa-subpoena.html ..................................... 20

Reasonable Contract or Arrangement Under Section 408(b)(2)—Fee Disclosure, 77 Fed.Reg. 5632 (Feb. 3, 2012) ........................................................................... 40

RESTATEMENT (SECOND) OF TRUSTS §205(c) (1959) .................................................. 22

RESTATEMENT (THIRD) OF TRUSTS § 90 .................................................................. 12

RESTATEMENT (THIRD) OF TRUSTS §80 .................................................................. 11

Tara Siegel Bernard, *If you Bought In To TIAA Based On Reputation, Check Your Accounts*, N.Y. Times, Nov. 13, 2017, https://www.nytimes.com/2017/11/13/your-money/tiaa-403b.html ..................................... 20

U.S. Dep't of Labor, Advisory Opinion 2013-03A, 2013 WL 3546834 (July 3, 2013) ............... 20

Unif. Prudent Investor Act §7 ............................................................................. 12

Exhibit A

## INTRODUCTION

Overwhelming evidence shows that Yale University and its co-fiduciaries caused participants in the Yale University Retirement Account Plan ("Plan") to suffer significant losses of retirement savings due to Yale's failures to prudently monitor the Plan's fees and investments. Because the material facts are genuinely disputed and Defendants are not entitled to judgment as a matter of law, the Court should deny Defendants' motion for summary judgment.

## BACKGROUND

Plaintiffs represent a certified class of over 20,000 Plan participants since August 9, 2010. Doc. 202 at 14; PSF ¶44.[1] The Plan is a defined contribution plan, "meaning that participants' retirement benefits are limited to the value of their own individual investment accounts, which is determined by the market performance of employee and employer contributions, less expenses." *Tibble v. Edison Int'l*, 575 U.S. 523, 135 S.Ct. 1823, 1826 (2015) ("*Tibble I*"). Excessive fees and poor investment performance in a defined contribution plan can "significantly reduce the value" of retirement savings. *Id.* With assets of $2.6 billion to $5.5 billion during the class period, the Plan is among the largest defined contribution plans in the United States. PSF ¶44.

The Plan's fiduciaries are Yale University, Yale's former Vice President of Human Resources and Administration Michael A. Peel, and Yale's Retirement Plan Fiduciary Committee (collectively "Yale" or "Defendants"). Plaintiffs' Amended Complaint asserts in seven counts that Defendants breached their fiduciary duties and engaged in prohibited transactions, thereby causing significant Plan losses. Doc. 57 at 114–31 (¶¶ 207–64).[2] On March 30, 2018, the Court dismissed the portion of Counts I, III, and V asserting claims for breach of

---

[1] PSF refers to Plaintiffs' Local Rule 56(a)(2) Statement of Facts in Opposition to Summary Judgment. Ex. __ refers to Exhibits to the Declaration of Joel D. Rohlf.

[2] "Doc." page citations are to the page numbers on the PDF header.

Exhibit A

the duty of loyalty, and a portion of the duty of prudence claim in Count V, but otherwise denied Defendants' motion. Doc. 113 at 24–26, 28–30, 40. On September 24, 2019, the Court certified a class of all Plan participants and beneficiaries since August 9, 2010. Doc. 202 at 14.

Plaintiffs' remaining claims assert that Defendants breached their duty of prudence and violated ERISA's prohibited transaction provisions by causing the Plan to pay excessive fees to the Plan's two recordkeepers, TIAA and Vanguard (Count III–IV); failing to adequately monitor and eliminate imprudent and excessive-cost Plan investments (Counts I–II, V–VI); and failing to adequately monitor co-fiduciaries and subordinates (Count VIII). Defendants now seek summary judgment, which should be denied for the following reasons.

## ARGUMENT

### I.     Legal standards.

#### A.     Summary judgment is improper for any arguably meritorious claim.

Summary judgment is improper unless "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). In determining whether a genuine dispute exists, the proper inquiry is not whether "the evidence unmistakably favors one side or the other but whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented." *Jeffreys v. City of New York*, 426 F.3d 549, 553 (2d Cir. 2005) (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 252 (1986)).

Summary judgment must be denied "when the admissible materials in the record 'make it arguable' that the claim has merit, for the court in considering such a motion *must disregard all evidence favorable to the moving party that the jury is not required to believe.*" *Rogoz v. City of Hartford*, 796 F.3d 236, 246 (2d Cir. 2015) (citation and quotation marks omitted). Conflicting expert opinions alone preclude summary judgment. *Klein v. Tabatchnick*, 610 F.2d 1043, 1048 (2d Cir. 1979); *Town of Southold v. Town of E. Hampton*, 477 F.3d 38, 52 (2d Cir. 2007) (courts

Exhibit A

are "wary of granting summary judgment" when there are "conflicting expert reports").

"In sum, summary judgment is proper only when, if all permissible inferences and credibility questions are resolved in favor of the party against whom judgment is sought, there can be but one reasonable conclusion as to the verdict"; *i.e.*, when "it is quite clear what the truth is." *Rogoz*, 796 F.3d at 246 (citation and quotation marks omitted).

## B.   ERISA imposes strict standards of fiduciary conduct.

To protect the interests of participants in employee benefit plans, ERISA imposes upon plan fiduciaries "strict standards of trustee conduct . . . derived from the common law of trusts." *Fifth Third Bancorp v. Dudenhoeffer*, 537 U.S. 409, 416 (2014). Fiduciaries must act "solely in the interest of the participants" and with "the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims." 29 U.S.C. §1104(a)(1)(B). These duties are "*the highest known to the law*." *Donovan v. Bierwirth*, 680 F.2d 263, 272 n.8 (2d Cir. 1982) ("*Bierwirth I*") (emphasis added). A breaching fiduciary is liable for any resulting "losses to the plan" and equitable relief. 29 U.S.C. §1109(a).

The duty of prudence includes "a continuing duty to monitor" the plan and to eliminate imprudent investments and excessive fee arrangements. *Tibble I*, 135 S.Ct. at 1828–29. A fundamental aspect of prudence is "cost-conscious management." *Tibble v. Edison Int'l*, 843 F.3d 1187, 1197–98 (9th Cir. 2016) (en banc) ("*Tibble II*"). Thus, a fiduciary that fails to pursue lower-cost versions of plan investments, *id.* at 1198, or to "monitor and control recordkeeping fees," *Tussey v. ABB, Inc.*, 746 F.3d 327, 336 (8th Cir. 2014), breaches its fiduciary duty.

Causing a plan to pay excessive fees can also violate ERISA's prohibited transaction rules, which supplement the general fiduciary duties. Among ERISA's prohibited transactions are those between the plan and a "party in interest," including service providers such as a

3

Exhibit A

recordkeeper. 29 U.S.C. §1106(a)(1); §1002(14)(B). Although §1106(a) "covers wide swaths of plan activity," necessary services qualify for an exemption "so long as 'no more than reasonable compensation is paid therefor.'" *Teets v. Great-W. Life & Annuity Ins. Co.*, 921 F.3d 1200, 1222 (10th Cir.), *cert. denied,* 140 S.Ct. 554 (2019) (quoting 29 U.S.C. §1108(b)(2)). If the fiduciary fails to demonstrate that the expenditures were reasonable, a plan is "entitled to recover damages for the difference" between what the plan paid and a reasonable fee. *N.Y. State Teamsters Council Health & Hosp. Fund v. Estate of DePerno*, 18 F.3d 179, 183 (2d Cir. 1994).

     **C.**     **Once Plaintiffs prove a breach and related loss to the Plan, the burden of disproving causation shifts to Defendants.**

A prima facie case of breach of fiduciary duty has three elements: (1) fiduciary status, (2) breach, and (3) a loss to the plan. 29 U.S.C. §1109(a); *Sweda v. Univ. of Pennsylvania*, 923 F.3d 320, 328 (3d Cir. 2019), *cert. denied*, 140 S.Ct. 2565 (2020); *Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 594 (8th Cir. 2009). Defendants assert that Plaintiffs also bear the burden on "objective prudence," which Defendants describe as a "causation" standard. Defs.' Mem. in Support ("MIS") 21 (Doc. 270). The statute contains no "objective prudence" requirement for causation. *See* 29 U.S.C. §1109(a). Although the element of *breach* incorporates "the objective prudent person standard"—*i.e.*, whether Yale acted with level of "care, skill, prudence, and diligence" of a prudent person under the circumstances, 29 U.S.C. §1104(a)(1)(B)—that is a test of "conduct," not causation. *Pension Ben. Guar. Corp. ex rel. St. Vincent Catholic Med. Centers Ret. Plan v. Morgan Stanley Inv. Mgmt. Inc.*, 712 F.3d 705, 716 (2d Cir. 2013) ("*PBGC*").

The test for loss in this Circuit also has nothing to do with "objective prudence." The standard is simply whether the plan's assets are less than they would have been "but for" the breach. *Trs. of Upstate N.Y. Eng'rs Pension Fund v. Ivy Asset Mgmt.*, 843 F.3d 561, 567 (2d Cir. 2016) ("If, but for the breach, the [plan] would have earned even more than it actually earned, there is a

Exhibit A

'loss' for which the breaching fiduciary is liable.") (quoting *Dardaganis v. Grace Capital Inc.*, 889 F.2d 1237, 1243 (2d Cir. 1989)); *see also Moreno v. Deutsche Bank Americas Holding Corp.*, No. 15-9936, 2018 WL 2727880, at *4 (S.D.N.Y. June 6, 2018) ("No 'objective prudence' requirement is contained in the Second Circuit's succinct and unambiguous description of the loss analysis.") (citing *Ivy*, 843 F.3d at 567).

As support for a purported objective prudence element, Yale cites an Eighth Circuit case, *Tussey v. ABB Inc.*, 746 F.3d 327, 335 (8th Cir. 2014). MIS 21. But *Tussey* does not suggest that the burden of showing causation falls on the *plaintiff*. Quite the opposite. Yale's quote from *Tussey* is to an earlier Eighth Circuit case which holds that once an ERISA plaintiff proves "a breach of fiduciary duty and a prima facie case of loss to the plan," "the *burden of persuasion shifts to the fiduciary* to prove that the loss was not caused by ... the breach of duty." *Roth v. Sawyer-Cleator Lumber Co.*, 16 F.3d 915, 917 (8th Cir. 1994) (citation omitted, emphasis added).[3]

The burden-shifting approach is a "long-recognized trust law principle," *Tatum v. RJR Pension Inv. Comm.*, 761 F.3d 346, 363 (4th Cir. 2014), and one adopted by the Second Circuit. *N.Y. State Teamsters Council Health & Hosp. Fund v. Estate of DePerno*, 18 F.3d 179, 180, 182–83 (2d Cir. 1994). In *DePerno*, the district court awarded only nominal damages because the plaintiffs had not met their burden "to prove any losses" resulting from the defendants' breach of fiduciary duty. 18 F.3d at 180. The Second Circuit reversed. It held that "after the plaintiffs sustained their burden of showing the defendants' violation of their fiduciary duty to the Fund and the payment of money as a result of that violation, the burden should have shifted

---

[3] *See also Brotherston v. Putnam Investments, LLC*, 907 F.3d 17, 39 (1st Cir. 2018), *cert. denied,* 140 S.Ct. 911 (2020) (adopting same burden-shifting framework); *Tatum v. RJR Pension Inv. Comm.*, 761 F.3d 346, 363–64 (4th Cir. 2014) (same); *McDonald v. Provident Indem. Life Ins. Co.*, 60 F.3d 234, 237 (5th Cir. 1995) (same).

Exhibit A

to the defendants" to rebut the claimed losses. *Id.* The court explicitly rejected the notion that it was the plaintiffs' burden to prove "the *fact* of damages" resulting from the breach. *Id.* at 182. Because "principles of trust and fiduciary law" apply to ERISA cases, once the beneficiaries established a *prima facie* case by showing the defendants' breach of fiduciary duty and a related expenditure of plan assets, that "was sufficient to shift to the defendants the burden to show" that the expense was "fair and reasonable under all of the circumstances." *Id.* at 182–83. By relieving ERISA plaintiffs from having to prove "the fact of damages" caused by the violation, the Second Circuit places the burden of disproving causation on the fiduciary in breach.

Defendants contend that a later decision, *Silverman v. Mutual Benefit Life Insurance Co.*, 138 F.3d 98 (2d Cir. 1998), requires Plaintiffs to prove causation. MIS 21–22. To the extent *Silverman* conflicts with *DePerno*, the earlier *DePerno* case governs. *Tanasi v. New All. Bank*, 786 F.3d 195, 200 n.6 (2d Cir. 2015) ("Where a second panel's decision seems to contradict the first, and there is no basis on which to distinguish the two cases, we have no choice but to follow the rule announced by the first panel."). But there is no conflict, because the two cases involved different ERISA provisions. *DePerno* involved a claim directly against the wrongdoer based on the wrongdoer's *own* breach under §1104(a)(1). 18 F.3d at 182. In *Silverman*, the claim was not made directly against the principal wrongdoer—former trustees who were convicted of embezzling $130,000 from a pension fund and spending the proceeds—but instead was brought against a successor fiduciary under ERISA's co-fiduciary liability provision, §1105(a). 138 F.3d at 101–02. The theory of liability was that the successor fiduciary had violated the duty to "remedy" the wrongdoer's breach by failing to recover the embezzled funds. *Silverman*, 138 F.3d at 103–04; *see* 29 U.S.C. §1105(a)(3). In those circumstances, requiring the plaintiff to show that the successor's failure to *remedy* the embezzlement actually *caused* the plan's loss—as

6

opposed to the wrongdoer's embezzlement and dissipation of assets—served as a check on the "broadly sweeping liability" of co-fiduciaries under §1105(a). *Silverman*, 138 F.3d at 105–06 (Jacobs & Meskill, JJ., concurring). In a case like this, based on the fiduciary's *own* breach under §1104(a), *DePerno* controls. *See Tatum*, 761 F.3d at 362 n.10. Moreover, even if *Silverman* could be read as applying to §1104(a) claims, its rejection of the trust law rule is inconsistent with intervening Supreme Court authority emphasizing that courts "must look to the law of trusts" in ERISA cases. *Tibble I*, 135 S.Ct. at 1828; *Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105, 111 (2008) (courts should be "guided by principles of trust law"); *see also Brotherston v. Putnam Investments, LLC*, 907 F.3d 17, 35–37 (1st Cir. 2018), *cert. denied,* 140 S.Ct. 911 (2020) (finding no inconsistency between burden shifting and language of §1109(a)).

## II.   Defendants imprudently relied on a single employee to monitor the Plan for years. (Counts I, III, V, VIII).

In arguing that they fulfilled their duties, Defendants rely heavily upon what a single member of its benefits staff, Hugh Penney, supposedly did to monitor fees and investments. MIS 3–4, 6, 18. Yale's argument has two flaws. First, *Penney* is not a fiduciary to the Plan, and the Plan did not authorize Defendants to delegate their duties to a single staff member like Penney. Second, even if Defendants *could* have delegated their duties to Penney, it was plainly imprudent to do so. A prudent fiduciary would not leave the responsibility for a multi-billion-dollar retirement plan to a single staff member with ***no*** relevant experience managing such an enterprise. *Cf.* 29 U.S.C. §1104(a)(1)(B). On this basis alone, a reasonable factfinder could conclude that Defendants breached their duty of prudence as to Counts I, III, and V. And because Defendants did not adequately monitor Penney, Count VIII also must go to trial.

### A.   The Plan did not authorize delegation to Penney.

The governing Plan document in effect at the start of the class period identifies Yale as the

Exhibit A

named fiduciary, and gives Yale, acting through the Vice President for Human Resources and Administration (Michael Peel at the time), authority to control and manage the Plan. Doc. 281-52 at 53 (Art. 12.1–12.2). Although Defendants claim that Peel "delegated" fiduciary responsibilities to Penney until 2012, the Plan did not authorize such delegation, and Defendants present no evidence of any formal delegation. PSF ¶2.

While a fiduciary may designate another to "carry out fiduciary responsibilities," the plan document must "expressly" authorize the designation. *See* 29 U.S.C. §1105(c)(1). Here, the Plan authorized Peel to establish and delegate fiduciary responsibilities only to a "committee," and required that any such delegation be made "in writing." Doc. 281-52 at 54–55 (Art. 12.4). Penney is not a committee, and Yale presents no evidence of any delegation made "in writing." Thus, any purported delegation to Penney was null and void, and inadequate to fulfill Defendants' duty of prudence as a matter of law. Whatever *Penney* may have done to monitor the Plan until 2012 has no bearing on whether *Yale and Peel*—the Plan's *actual* fiduciaries— exercised "care, skill, prudence, and diligence" in monitoring fees and investments. Defendants present no evidence of anything *they* did to monitor the Plan or Penney until 2012. Accordingly, a reasonable jury could find that Defendants breached their duty of prudence as to Counts I, III, and V, and that Defendants also breached their duty to monitor Penney (Count VIII).

**B.      Even if the Plan allowed delegation to Penney, it was imprudent for Defendants to delegate oversight of the multi-billion-dollar Plan to a single unqualified individual.**

ERISA's prudence standard measures a fiduciary's conduct against "the standards of others 'acting in a like capacity and *familiar* with such matters.'" *Katsaros v. Cody*, 744 F.2d 270, 279 (2d Cir. 1984) (emphasis added); 29 U.S.C. §1104(a)(1)(B). This means that "[a] fiduciary's process must bear the marks of loyalty, skill, and diligence expected of *an expert* in the field." *Sweda*, 923 F.3d at 329 (emphasis added). Because this is an objective standard, a lack of

8

experience or familiarity with investments and fee issues is "no excuse." *Katsaros*, 744 F.2d at 279. In other words, "a pure heart and an empty head are not enough." *Sweda*, 923 F.3d at 329 (quoting *DiFelice v. U.S. Airways*, *Inc.*, 497 F.3d 410, 418 (4th Cir. 2007)). Accordingly, in the context of a $5.5 billion retirement plan like the Plan, ERISA requires not "merely the level of care expected of a prudent layperson," but the care and skill of "hypothetical sophisticated and prudent investment professionals" with experience managing such plans. *In re Meridian Funds Grp. Sec. & ERISA Litig.*, 917 F. Supp. 2d 231, 240 (S.D.N.Y. 2013). A fiduciary who lacks the necessary expertise is obligated to obtain outside assistance. *Katsaros*, 744 F.2d at 279.

Proper oversight of a multi-billion-dollar retirement program requires significant resources and expertise, particularly one with multiple recordkeepers and over 100 investment options. PSF ¶ 83. Yet from 2007 until 2012, Defendants relied upon a single employee, Mr. Penney, to monitor the over 100 funds in the Plan and to monitor the Plan's recordkeeping fees. PSF ¶¶ 44–45. Even after its formation in 2012, the Fiduciary Committee still largely deferred to Penney. *Id.* ¶ 46. Far from possessing the level of loyalty, skill, and diligence expected of an expert in the field, Penney had no relevant investment-related experience or education, and admittedly lacked the knowledge needed to determine whether the Plan's recordkeeping fees were reasonable. *Id.* ¶¶ 47–48. Penney did not even know that 403(b) plans were subject to ERISA's fiduciary duties until 2011 or 2012. *Id.* ¶ 48. Even if Penney had pure intentions (and he did not, *see id.* ¶ 51), his lack of experience and ignorance of fiduciary obligations would not excuse Defendants' failure to exercise prudent oversight. *Katsaros*, 744 F.2d at 279.

Because Penney was "ill equipped" to properly monitor Plan fees and investments, Defendants plainly had a "duty to seek outside assistance." *Katsaros*, 744 F.2d at 279. Yet they did not. Penney admitted that his solo review of the Plan was inadequate. *Id.* ¶ 49. He

Exhibit A

acknowledged that without a committee and professional consultant, Yale lagged behind its peers and had "catching up to do." *Id.* ¶¶ 49, 52. Despite this, Defendants still took years to provide Penney any assistance because "[c]ome on now, this is higher ed . . ." *Id.* ¶ 50. As recently as 2014—four years into the class period, Defendants relied on conflicted parties— TIAA and Vanguard—"to help keep [them] compliant." *Id.* ¶ 52. Relying on an interested party's representations without conducting an independent investigation is a recognized breach of fiduciary duty. *Katsaros*, 744 F.2d at 279. These facts alone are sufficient to sustain a jury finding that Defendants "acted imprudently in violation of ERISA." *Id.* at 280.

Worse still, Penney was not merely unqualified, he was also conflicted. *Id.* ¶ 51. For most of the class period, Penney was a member of TIAA's Advisory Council. *Id.* Penney made speeches at conferences across the country which were essentially marketing pieces for TIAA, and TIAA paid Penney's travel expenses. *Id.* Penney was also willing to offer testimony ghost-written by TIAA to the Department of Labor ERISA Advisory Council, which would have advanced TIAA's business interests. *Id.* In light of this conflicted relationship, it is unsurprising that Penney did not challenge TIAA's claims that the Plan's fees could not be reduced. *Id.* ¶ 53. Penney had an incentive *not* to seek removal of TIAA's investments and not to diligently negotiate for TIAA to reduce its fees, thereby allowing TIAA to profit at participants' expense.

In sum, a prudent fiduciary would not leave the responsibility for a multi-billion-dollar retirement plan to a single staff member with ***no*** relevant experience "acting in a like capacity" and who was completely "***[un]familiar*** with such matters." *Cf.* 29 U.S.C. §1104(a)(1)(B) (emphasis added). Accordingly, Defendants breached their fiduciary duty.

      **C.**    **Yale and Peel breached their duty to monitor Penney (Count VIII).**

Although named fiduciaries may delegate their fiduciary responsibilities if certain conditions are met, the appointing fiduciaries cannot "abdicate their duties under ERISA merely

Exhibit A

through the device of giving their lieutenants primary responsibility for the day-to-day management of the trust." *Leigh v. Engle,* 727 F.2d 113, 135–36 (7th Cir. 1984). The appointing fiduciary retains a duty to monitor the delegee on a regular basis to ensure the delegee has satisfied its fiduciary obligations. *Id.* at 135; 29 U.S.C. §1105(c)(2); 29 C.F.R. §2509.75-8, Q&A FR-17. The appointing fiduciary must "act with prudence in supervising or monitoring the agent's performance and compliance with the terms of the delegation." RESTATEMENT (THIRD) OF TRUSTS §80 cmt. d(2). Failing to determine whether the appointee "was sufficiently capable of administering the responsibilities necessarily involved" supports a breach of the duty to monitor. *Cf. Herman v. Reinecke Agency*, 37 F. Supp. 2d 1338, 1341–42, 1346 (M.D. Fla. 1998).

Here, Defendants have presented no evidence that they ever monitored Penney's performance or determined whether he was sufficiently capable of overseeing the Plan's fees and investments. Therefore, a reasonable jury could find that Defendants breached their duty to monitor Penney, precluding summary judgment on Count VIII.

### III.     Overwhelming evidence shows that Defendants imprudently caused the Plan to pay excessive recordkeeping fees (Count III).

Because Defendants' fiduciary status is undisputed, the question before the Court is whether Plaintiffs' evidence would allow a reasonable jury to find that Defendants (1) breached their duty of prudence and (2) the Plan suffered a loss. *Sweda*, 923 F.3d at 327–28. The record overwhelmingly demonstrates that Defendants had a deficient process for monitoring the Plan's recordkeeping fees, resulting in millions of dollars in Plan losses.

#### A.     Defendants breached their duty of prudence.

"In determining the contours of an ERISA fiduciary's duty, courts often must look to the law of trusts." *Tibble I*, 135 S.Ct. at 1828. Trust law principles relevant to an excessive fee claim include duties to "incur only costs that are reasonable in amount," to "minimize costs" so as to

11

Exhibit A

avoid "[w]asting beneficiaries' money," and to use the "power the trust wields" to negotiate favorable pricing to benefit participants. *Tibble II*, 843 F.3d at 1197–98 (citing RESTATEMENT (THIRD) OF TRUSTS § 90(c)(3) and Unif. Prudent Investor Act §7).

A defined contribution plan fiduciary violates those principles if it fails "diligently to investigate" recordkeeping fees and "monitor and control" "excessive revenue sharing." *Tussey*, 746 F.3d at 336. Expert testimony that a plan overpaid due to the fiduciaries' "failure to solicit bids" is enough to preclude summary judgment. *George v. Kraft Foods Global, Inc.*, 641 F.3d 786, 798–800 (7th Cir. 2011). Evidence that a defined contribution plan fiduciary failed to, *inter alia*, "calculate the amount the Plan was paying [its recordkeeper] through revenue sharing," determine whether that amount "was competitive," and "adequately leverage the Plan's size to reduce fees" is enough to sustain a finding of breach at trial. *Tussey*, 746 F.3d at 336.

Here, the evidence shows that Yale's process for monitoring the Plan's recordkeeping fees was severely flawed. Yale had no process at all for monitoring recordkeeping fees until 2012 and failed to follow the established practices of prudent fiduciaries for most of the class period. PSF ¶¶ 53–64. Yale also failed to account for the substantial revenue that TIAA received from cross-selling its non-plan products to participants. *Id.* ¶ 71.

### 1. *Industry-accepted practices regarding recordkeeping fees.*

Prudent fiduciaries of defined contribution plans follow three distinct accepted industry practices to ensure that their plans' recordkeeping fees are reasonable and competitive.

*First*, as the Department of Labor recommends—and Defendants' advisors and expert agree—a Request for Proposal ("RFP") or other competitive bidding for a plan's recordkeeping fees every three to five years is needed to determine the reasonableness of fees for large, complex plans, and is the typical practice of similarly situated fiduciaries. PSF ¶ 54.

*Second*, because the cost of providing recordkeeping services is closely correlated to the

number of participants in a plan and is unrelated to a plan's asset level, prudent fiduciaries price recordkeeping fees on a per-participant basis rather than a percentage-of-assets basis. *Id.* ¶ 57. Per-participant pricing is particularly important for large plans because recordkeeping costs are subject to economies of scale. *Id.* ¶ 69. As the number of participants grows, recordkeepers spread overhead costs among a greater number of accounts, with each additional account involving a relatively low incremental cost. Thus, a plan with 20,000 participants can obtain a much lower per-participant price than a plan with 2,000 participants. Asset-based pricing fails to leverage large plans' economies of scale and untethers the recordkeeper's compensation from the actual cost of the services provided. *Id.* ¶ 57. As with competitive bidding, industry professionals, including Defendants' advisors and expert in this case, universally recommend that fiduciaries use a per-participant pricing method for recordkeeping fees. *Id.*

*Third*, prudent fiduciaries and other industry professionals, including Defendants' advisors and retained expert, have long recognized that having only one recordkeeper both reduces fees and increases efficiency by eliminating redundant work. PSF ¶ 61.

### 2. Defendants' process for monitoring recordkeeping fees was virtually non-existent and contrary to industry-accepted practices.

For most of the class period, Defendants failed to follow the prudent fiduciary practices outlined above. In fact, between 2007 until 2012, Defendants had no process *at all* for evaluating the Plan's recordkeeping fees. PMSF ¶ 53. Mr. Penney simply accepted TIAA's and Vanguard's representations that the Plan's fees could not be reduced. *Id.* Defendants also failed to obtain competitive bids, price the Plan's fees on a per-participant basis and move to a single recordkeeper in a timely manner.

### a. Defendants imprudently failed to obtain competitive bids.

Defendants *never* conducted competitive bidding for the Plan's recordkeeping fees. *Id.* ¶ 56.

Although Defendants attempted an "RFP" in 2014, it issued the request only to the two incumbents, contrary to industry practice, one of which (Vanguard) declined to bid. *Id.* ¶ 12. This stands in stark contrast to Defendants' policy when University funds are used to purchase services. Yale's policies require competitive bidding for any expenditure over $10,000—a fraction of what the Plan paid TIAA and Vanguard for recordkeeping. *Id.* ¶¶ 12, 55.

Defendants concede that they never obtained competitive bids for the Plan's recordkeeping services but assert that ERISA does not require competitive bidding. MIS 11. Although ERISA's prudence standard establishes a general standard of care rather than a checklist of required actions, it *does* require fiduciaries to act as a prudent person would under like circumstances. 29 U.S.C. §1104(a)(1)(B). Accordingly, whether a prudent fiduciary would have obtained competitive bids under the circumstances prevailing during the class period is a question of *fact*, not law. There is ample evidence, including from Defendants' own advisors and retained expert, from which a jury could reasonably conclude that it was imprudent for Defendants not to obtain bids to determine whether TIAA's and Vanguard's fees were competitive. PSF ¶ 54; *see Tussey*, 746 F.3d at 336 (finding that fiduciary breached duty based on similar failure to "determine whether Fidelity's pricing was competitive"). Such evidence "that prudent fiduciaries would have solicited competitive bids before extending" the incumbent recordkeeper's tenure creates "a genuine issue of material fact as to whether defendants acted prudently." *George*, 641 F.3d at 798–99; *Cates v. Trs. of Columbia Univ.*, No. 16-6524, 2019 WL 8955333, at *9 (S.D.N.Y. Oct. 25, 2019), *adopted*, 2020 WL 1528124, at *5 (S.D.N.Y. Mar. 30, 2020) (rejecting similar arguments and finding "genuine issues of material fact as to whether Columbia breached its duty … by not conducting competitive bidding earlier in the class period."). Even Defendants' case supports the denial of summary judgment—the court found the lack of an RFP reasonable only

14

after hearing "credibl[e]" *trial* testimony. *Acosta v. Chimes D.C., Inc.*, No. 15-3315, 2019 WL

931710, at *7 (D. Md. Feb. 26, 2019).

Yale further contends that an RFP would not have been "productive" because "TIAA-CREF

was the only one who could do the job" of recordkeeping TIAA annuities. MIS 11. Defendants'

claim that only TIAA could recordkeep TIAA annuities, rendering Yale powerless to replace

TIAA, is genuinely disputed. PSF ¶¶ 6–8, 100–11. Although TIAA refuses to allow other

providers to recordkeep TIAA annuities as a matter of business practice, TIAA has provided the

necessary data feed to other providers and admits that another provider could develop a code to

recordkeep TIAA's annuities. PSF ¶ 7.

### b. *Defendants imprudently used asset-based pricing while failing to monitor the Plan's asset-based fees for reasonableness.*

Even though industry professionals including Defendants' advisors overwhelmingly

recommend the use of per-participant recordkeeping fees because they are "more transparent and

more accurately reflect the 'true' cost of providing administration," Defendants compensated

TIAA and Vanguard through asset-based revenue sharing. PSF ¶¶ 15, 20, 57–58. Thus,

Defendants caused TIAA and Vanguard to receive compensation which bore no relationship to

their true costs of providing administrative services to the Plan. Defendants did not move to a

per-participant for the Plan until 2015—five years into the class period. *Id.* ¶ 58.

In addition to causing the Plan to pay asset-based fees, Defendants only analyzed the Plan's

fees on a per-participant basis once, in 2012. *Id.* From 2007 until Defendants' advisor Aon

Hewitt analyzed TIAA's fees in 2012, Defendants had *no* process at all to evaluate the Plan's

recordkeeping fees. *Id.* ¶ 59. Even though Aon Hewitt "believe[d] that a review of Vanguard

would be a good idea that would likely also generate savings," Defendants never analyzed or

evaluated Vanguard's fees. *Id.*

Exhibit A

Defendants also ignored potential fee reductions which would have benefited the Plan. Even though Vanguard notified Yale in 2011 that it would accept $500,000 in annual recordkeeping fees for all Yale plans, Defendants took no action until 2013, resulting in the plans paying Vanguard significantly more than $500,000 in the interim. *Id.* ¶¶ 20, 60.

Defendants assert that the use of asset-based rather than per-participant fees is not a basis for liability because "ERISA does not *require* a fiduciary to use one method or the other." MIS 9. But as with competitive bidding, whether a prudent fiduciary would have viewed the use of asset-based pricing as imprudent under the Plan's *particular* circumstances is a question of fact. And the basis of liability is not merely the *use* of asset-based pricing, but rather the failure to calculate and monitor the *amount* of the asset-based payments to determine whether the recordkeepers' compensation was reasonable for the services rendered and competitive compared to per-participant market rates. *See Tussey*, 746 F.3d at 336.

Plaintiffs dispute Yale's claim that it ensured that the Plan's fees were reasonable by renegotiating throughout the class period. MIS 10–11. In fact, Defendants did nothing to negotiate more favorable fees until TIAA unilaterally offered a fee reduction which was implemented in late 2012. PSF ¶16. Aon Hewitt advised Defendants that they could obtain much lower fees for the Plan by moving to a single recordkeeper and per-participant fees. *Id.* Similarly, Defendants inexplicably waited two years to accept Vanguard's offer of reduced fees. *Id*. ¶ 40.

### c.   *Defendants imprudently delayed consolidating to a single recordkeeper.*

Prudent fiduciaries and industry experts, including Defendants' advisors and expert witness, have long recognized that using multiple recordkeepers is inefficient and results in unnecessary fees. PSF ¶ 61. In plans with a large number of participants, a single recordkeeper allows the fiduciary to use the full participant base to take advantage of economies of scale and reduce costs. A dual recordkeeper arrangement cuts that leverage in half. As of 2010, over 80% of

16

403(b) plans had a single recordkeeper. *Id.* ¶ 14.

Defendants knew that they could move to a single recordkeeper and that maintaining the dual recordkeeper model was causing the Plan to pay excessive fees. Between 2010 and 2014, TIAA and Vanguard repeatedly approached Defendants about the advantages of moving to a single recordkeeper. *Id.* ¶ 62. ███████████████████████████████████

███████████████████████████████████████████ *Id.* ¶ 16.

Despite the widely recognized benefits and universal recommendations of moving to a single recordkeeper, Defendants did not begin the process of exploring a change until 2014—four years into the class period. *Id.* ¶ 63. Before 2014, Defendants never received a quote as to the amount of cost savings the Plan could achieve by consolidating to a single recordkeeper. *Id.* ¶ 64. Defendants began investigating a single recordkeeper in 2014 not because the move would benefit Plan participants, but because Defendants learned that a single recordkeeper would ease Yale's administrative burden. *Id*. ¶ 63.

When Defendants finally moved to a sole recordkeeper in 2015, the Plan's recordkeeping fees dropped dramatically. *Id.* ¶ 65. Fees for participants on the TIAA platform dropped 75%—from $199 per account to $51 per account—and fees on the Vanguard platform declined by 46%—from $95 per account to $51 per account. *Id.* Soon thereafter, TIAA offered Defendants a rate of ██ per participant for recordkeeping. *Id.* Had Defendants consolidated to a sole recordkeeper at the beginning of the class period, it could have obtained similar reductions for the Plan much sooner. Defendants' imprudent delay cost the Plan millions in unnecessary fees. Based on these facts, a reasonable jury could conclude that Defendants acted imprudently by not consolidating to a sole recordkeeper until 2015. *Cates*, 2019 WL 8955333, at *8–9 (finding "genuine issues of material fact as to whether Columbia acted prudently throughout the class

period by not consolidating to a single recordkeeper" based on similar evidence).

Defendants contend that it would have been impossible to consolidate sooner because "there was no single recordkeeper that could service Yale's Plan" given that a large portion of its assets were invested in TIAA annuities. MIS 7. Defendants claim that Vanguard or another provider could not serve as recordkeeper for TIAA's annuities, and TIAA was not capable of serving "as the Plan's sole recordkeeper at the start of the class period either." *Id*. at 7–8.

The facts that Defendants cite to support this argument are genuinely disputed. TIAA was fully capable of serving as the Plan's sole recordkeeper at the start of the class period. PSF ¶ 11. As of 2008, TIAA had transitioned to a new platform which enabled it to recordkeep Vanguard's funds. *Id.* The fact that TIAA continued to promote serving as the Plan's sole recordkeeper from 2011 until 2014 contradicts Defendants' claims that TIAA lacked the necessary capabilities. *Id.* While TIAA's business practice is not to allow other providers to recordkeep its annuities, other providers are capable of doing so. *Id*. ¶ 7. As a premier institution and one of TIAA's largest clients, Yale had significant leverage to push back against TIAA's policies and to negotiate more favorable terms for the Plan. But there is no evidence that Yale ever even tried.

Defendants' contention that it could not "divest participants unilaterally" from TIAA annuities and move the assets to other investments is also disputed. MIS 8. The Plan documents explicitly give Defendants authority to remove any investment option and transfer the assets to another option ("mapping"). PSF ¶ 101. The TIAA annuity contracts contain no provision that prevents plan sponsor mapping and provide that all rights under the contracts are subject to the plan documents. *Id.* ¶¶ 102–07. Even if there were such a provision, the duty of prudence would override that instruction. *Dudenhoeffer*, 573 U.S. at 421 (citing 29 U.S.C. §1104(a)(1)(D)). Defendants also never obtained any legal opinion as to whether the assets in legacy annuities

18

could be moved to other options. *Id.* ¶ 107. Moreover, since 2006, TIAA has offered group annuity contracts that are undisputedly mappable to other options, yet Defendants did not move the Plan to group contracts until 2019—13 years after TIAA first offered them. *Id.* ¶¶ 109–12.

Yale's contention that it "set the standard" for recordkeeper consolidation relies on a misleadingly limited group of comparators—23 supposed "elite" private universities with billion-dollar 403(b) plans. MIS 9. However, the measure of prudence is not what others in a particular industry do but what a prudent investment professional would do. *Katsaros*, 744 F.2d at 279; *Sweda*, 923 F.3d at 329; *In re Meridian*, 917 F. Supp. 2d at 240. The prudence standard does not change by industry. *Dudenhoeffer*, 573 U.S. at 418–19 ("[T]he same standard of prudence applies to all ERISA fiduciaries."); *Sweda*, 923 F.3d at 334 n.9 ("ERISA fiduciaries are held to one standard under § 1104" and the standard cannot be adjusted "to accommodate subcategories of sponsors and fiduciaries."). Indeed, Yale's own internal practice is to include non-universities when benchmarking benefits. PSF ¶ 14. Numerous universities (even though they alone are not the standard)—and 80% of 403(b) plans overall—consolidated to a single recordkeeper prior to the start of the class period. *Id.*

At most, Defendants have shown only that they engaged in some discussions on the issue of consolidation, which is not enough to satisfy the duty of prudence. *George*, 641 F.3d at 795. Instead, there must be record evidence that the fiduciaries made a "reasoned decision to maintain the status quo"—"i.e., that they actually determined whether the costs" of a particular course of action "outweighed the benefits, or vice versa." *Id*. Here, Defendants made no reasoned decision. Significant issues of fact remain regarding whether Defendants followed a prudent process.

### 3. *Defendants imprudently failed to account for TIAA's cross-selling revenue.*

TIAA's position as a Plan recordkeeper provided it with more than just a steady stream of

Exhibit A

fee revenues from participants' accounts in the *Plan*. By virtue of that role, TIAA had access to demographic information about the Plan's participants, which it used to aggressively market lucrative products *outside* of the Plan (*e.g.*, insurance, individual retirement accounts, wealth management)—a practice known as "cross-selling." PSF ¶ 42. TIAA has come under scrutiny from New York's attorney general based on these "dubious" practices and has faced a host of other litigation based on allegedly fraudulent business practices.[4]

Similarly situated, prudent fiduciaries establish clear limits on the use of confidential participant information, taking affirmative steps to prevent service providers from using such data to solicit participants. Yale failed to do so. This allowed TIAA to use its access to participant data to generate tens of millions of dollars in additional revenues from the sale of products outside of the Plan, on top of the fees it made for its services to the Plan. PSF ¶¶ 42, 71.

ERISA's duty of prudence requires fiduciaries to "understand and monitor plan expenses" and to be cognizant of the manner in which service providers receive plan-related compensation. *Sweda*, 923 F.3d at 328. Guidance from the Department of Labor, the agency charged with enforcing ERISA, 29 U.S.C. §1136(b), explains that in order to "make an informed decision" as to whether a service provider's "compensation for services is no more than reasonable," plan fiduciaries must "*obtain sufficient information* regarding all fees and *other compensation*" received by the provider in connection with its services to the plan. U.S. Dep't of Labor, Advisory Opinion 2013–03A, 2013 WL 3546834, at *3–4 (July 3, 2013) (emphasis added).

Yale made no effort to obtain information about TIAA's cross-selling revenues. PSF ¶¶ 42,

---

[4] Gretchen Morgenson, *TIAA Receives New York Subpoena on Sales Practices*, N.Y. Times, Nov. 9, 2017, https://www.nytimes.com/2017/11/09/business/tiaa-subpoena.html; Gretchen Morgenson, *The Finger-Pointing at the Finance Firm TIAA*, N.Y. Times, Oct. 21, 2017, https://www.nytimes.com/2017/10/21/business/the-finger-pointing-at-the-finance-firm-tiaa.html; and Tara Siegel Bernard, *If you Bought In To TIAA Based On Reputation, Check Your Accounts*, N.Y. Times, Nov. 13, 2017, https://www.nytimes.com/2017/11/13/your-money/tiaa-403b.html.

Exhibit A

71. Accordingly, Yale could not make an informed decision as to whether TIAA's total

compensation was no more than reasonable for the services it provided to the Plan. This further

shows that Yale had a flawed process for monitoring and evaluating the reasonableness of

TIAA's Plan-related compensation.

Although Yale vaguely claims to have "addressed cross-selling" at some unspecified time

"during the class period," Yale took no action to limit TIAA's cross-selling until 2016 or later—

nearly six years into the class period. PSF ¶ 43. Prior to 2016, the Committee never discussed

TIAA's cross-selling revenue nor any restrictions on its marketing practices. *Id.* Whether Yale

breached its fiduciary duty by not addressing the issue sooner is genuinely disputed.

Defendants further note that TIAA claims not to consider cross-selling opportunities when

setting its recordkeeping fees. MIS 12. But a jury would be free to reject TIAA's self-serving

testimony, which is implausible on its face. Accordingly, the Court must disregard it at this stage

of the proceedings. *Rogoz*, 796 F.3d at 246 (court "must disregard all evidence favorable to the

moving party that the jury is not required to believe."). Moreover, Plaintiffs cite evidence to the

contrary, creating a genuine dispute. PSF ¶ 42.

Yale's contention that there is "no evidence" that other fiduciaries in Yale's position have

"ever leveraged … 'cross-selling' to negotiate lower recordkeeping rates" misses the point. MIS

12. Plaintiffs do not contend that Yale should have leveraged cross-selling to negotiate lower

fees. Plaintiffs contend that Yale should have *prohibited* cross-selling. *Id.* But because Yale

failed to do so, and there is no way to rewind the clock to 2010 to prevent TIAA's cross-selling,

the Plan is entitled to be compensated for the unlawful use of participants' information in

TIAA's cross-selling activities. TIAA considers Plan participants' personal information to be

"valuable for marketing purposes." PSF ¶ 42, Accordingly, the proper remedy is to replicate the

21

price that TIAA would have paid for access to the data in an arms'-length bargain, and to require Yale to restore that sum to the Plan. *See Donovan v. Bierwirth*, 754 F.2d 1049, 1056 (2d Cir. 1985) ("*Bierwirth II*"). (remedy for "breach of fiduciary duty is the restoration of the trust beneficiaries to the position they would have occupied but for the breach of trust.") (quoting RESTATEMENT (SECOND) OF TRUSTS §205(c) (1959)).

As a fiduciary charged with protecting the interests of Plan participants against third parties seeking to profit at their expense, Yale is akin to a bailee charged with protecting a bailor's personal property who then allows a third party to steal the property due to lax security procedures. Ideally, the bailee would have prevented the theft, just as Yale ideally would have prohibited cross-selling. But having failed to do so, the bailee is liable to the bailor for the value of the stolen property. *See Bierwirth II*, 754 F.2d at 1056 (where plaintiff bailed jewel with defendant, who failed to return it, jury should "make the value of the best jewels the measure of [plaintiff's] damages") (quoting *Armory v. Delamirie,* 93 Eng.Rep. 664 (1722) (the "Chimney Sweep's Jewel Case")). Here, Yale is liable to the Plan for the value to TIAA of Plan participants' personal information. Because any "uncertainties in fixing damages" are "resolved against the wrongdoer," it is Yale's burden to show that the value is less than the amount calculated by Plaintiffs' expert. *See id*. ("The burden of proving that the funds would have earned less than that amount is on the fiduciaries found to be in breach of their duty.").

### B.    Defendants caused the Plan to pay excessive fees.

Compelling evidence demonstrates that Defendants caused the Plan to pay unreasonable fees. To satisfy their burden on the loss element, Plaintiffs need only show an expenditure on recordkeeping fees, which shifts the burden to Yale to show that the expense was "fair and reasonable under all of the circumstances." *DePerno*, 18 F.3d at 182–83. That the Plan paid asset-based recordkeeping fees to TIAA and Vanguard is not disputed. *See, e.g.*, PSF ¶¶ 15, 20.

22

Even if Plaintiffs were required to prove "the fact of damages," Plaintiffs can meet that burden by pointing to evidence from which a jury could reasonably conclude that the Plan's fees were higher than they would have been had Defendants acted prudently. *Ivy*, 843 F.3d at 567. Whether the amounts paid were reasonable should be resolved at trial. *See Sweda*, 923 F.3d at 329 (claims regarding "reasonableness of 'compensation for services'" are "inherently factual question[s]").

Defendants incoherently describe the loss standard as requiring Plaintiffs to "'demonstrate by a preponderance . . . that any comparable Plan has ever [paid] within' [sic] within the supposedly prudent range" of $35–40 per participant. MIS 13 (quoting *Sacerdote v. New York University*, 328 F. Supp. 3d 273, 307 (S.D.N.Y 2018)). The non-binding *Sacerdote* case is a decision after *trial*, and thus supports *Plaintiffs'* position that the loss issue should be resolved at trial, not summary judgment. By suggesting that Plaintiffs must prove a specific "range" of fees, Defendants conflate the *fact* of loss with the *amount* of loss, which are distinct issues. *Anderson Grp., LLC v. City of Saratoga Springs*, 805 F.3d 34, 52 (2d Cir. 2015) (noting "clear distinction between the measure of proof necessary to establish the fact that [a plaintiff] had sustained some damage, and the measure of proof necessary to enable the jury to fix the amount.") (quoting *Story Parchment Co. v. Paterson Parchment Paper Co.*, 282 U.S. 555, 562 (1931)).

To establish the fact of loss, Plaintiffs do not need to prove a specific "range" as Defendants suggest. It is enough to show that the Plan paid more than it would have paid under prudent management. *Ivy*, 843 F.3d at 567. As to the amount of loss (which is a trial issue), Plaintiffs' burden is merely to provide "some relevant data from which the district court can make a reasonable estimated calculation of the harm suffered." *New York v. Julius Nasso Concrete Corp.*, 202 F.3d 82, 89 (2d Cir. 2000). Any "uncertainties in fixing damages will be resolved against the wrongdoer." *Bierwirth II*, 754 F.2d at 1056.

23

Defendants' sole argument on this point is that if the Court were to grant their motion to exclude Plaintiffs' experts' Tyrone Minnich and Albert J. Otto, Plaintiffs would have no evidence of loss. MIS 13–15. Not so. For the reasons explained in Plaintiffs' *Daubert* opposition, the damages opinions are admissible and preclude summary judgment. *See George*, 641 F.3d at 798–99 (expert's admissible opinions "that defendants' failure to solicit bids caused [the plan] to overpay [recordkeeper] by at least $16 per participant per year" were sufficient to "create a genuine issue of material fact"). But even assuming *arguendo* the *Daubert* motion were granted, Defendants still would not be entitled to summary judgment. Plaintiffs' experts' opinions are not necessary, because the record contains ample non-expert loss evidence. *See* PSF ¶¶65, 67–70.

*Cates*, which involved the same expert witnesses and a similar claim of excessive recordkeeping fees against Columbia University, is instructive. There, the court explicitly did "not rely on the opinions of Minnich or Otto," yet still found sufficient evidence of loss to create genuine issues of material fact. *Cates*, 2019 WL 8955333, at *11, *adopted*, 2020 WL 1528124, at *4–5. Expert testimony aside, the plaintiffs' evidence that "Columbia could have lowered its recordkeeping fees through consolidation or competitive bidding" and that "once Columbia began negotiating its fee arrangements, it did achieve reductions," was sufficient to allow a factfinder to conclude that the breach caused a loss to the plans. *Id*. The plaintiffs also submitted other loss evidence such as fee benchmarking by the plans' advisors and TIAA pricing data. *Id.* At the summary judgment stage, that was enough to show that "the alleged breaches caused a loss to the Plans," without reaching the admissibility of the plaintiffs' experts. *Id.*

The same reasoning applies here. Like the *Cates* plaintiffs, Plaintiffs have presented evidence that Yale could have lowered its recordkeeping fees through consolidation to a sole recordkeeper or competitive bidding. Defendants' own expert determined that the move to TIAA

24

as sole recordkeeper in 2015 caused a 75% fee reduction for accounts on the TIAA platform and a 46% reduction for accounts on the Vanguard platform. PSF ¶ 65. Similar to *Cates*, Plaintiffs' evidence shows that once Yale started negotiating its fee arrangements, the Plan's fees were reduced significantly. Soon after consolidation to TIAA as sole recordkeeper, TIAA reduced its recordkeeping fee to ▮▮▮▮▮▮▮▮ *Id.* Those facts alone would allow a reasonable factfinder to conclude that Yale could have achieved such fee reductions sooner had it pursued consolidation and competitive bidding.

In addition to the reduced fees that the Plan actually obtained through consolidation, benchmarking data from Defendants' advisor Aon Hewitt ▮▮▮▮▮▮▮▮▮▮



▮▮▮▮▮▮▮. *Id.* ¶ 67. Further evidence of loss is shown by the rates obtained by the Caltech plan, which has a similar number of plan participants (17,000–18,000) and reduced its fee to an average of $40 per participant from 2011–2016 ▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮ *Id.* ¶ 68. The Plan's fees were also much higher than other large TIAA clients prior to consolidation. *Id.* ¶ 69. In sum, Plaintiffs have provided more than enough evidence to show that the alleged breaches caused a loss to the Plan without even considering the opinions of Plaintiffs' experts—which, to be clear, are also admissible and provide still more evidence that the Plan suffered losses of ▮▮▮▮▮▮▮ PSF ¶ 66.

Defendants' case is distinguishable. *Cunningham* granted summary judgment because once the court found the experts' loss opinions inadmissible, the plaintiffs had no other competent evidence of loss. *Cunningham v. Cornell Univ.*, No. 16-6525, 2019 WL 4735876, at *6–7 (S.D.N.Y. Sept. 27, 2019), *appeal filed*, No. 21-88 (2d Cir. Jan. 13, 2021). By contrast,

25

Exhibit A

Plaintiffs' loss case does not depend solely on experts. Plaintiffs' evidence here is more like *Cates* than *Cunningham*.

Defendants also misrepresent *Sacerdote*, falsely claiming that the district court criticized "Minnich's and Otto's opinions." MIS 15. Neither Minnich nor Otto had any involvement in that case. The court was discussing an entirely different expert (Geist). *See Sacerdote*, 328 F. Supp. 3d at 282 & n.19. Moreover, Defendants' assertion that there is no evidence that any university obtained fees in the ██████████████ identified by Minnich is plainly wrong—Yale *itself* obtained a ████████████ once it finally moved to a single recordkeeper, which confirms the accuracy of Minnich's numbers. PSF ¶¶ 65–66. Finally, *Wilcox*'s finding that a plaintiff lacked factual support on a motion to dismiss is irrelevant to this case—Plaintiffs have backed up their allegations with hard evidence. PSF ¶¶65–70; *cf. Wilcox v. Georgetown Univ.*, No. 18-422, 2019 WL 132281, at *13 (D.D.C. Jan. 8, 2019).

## IV.   Defendants failed to adequately monitor the Plan's investments and remove imprudent ones (Counts I, V, VIII).

### A.   This Court's Article III standing decision remains the law of the case.

In granting class certification, this Court rejected Defendants' argument "that the named plaintiffs did not suffer an injury-in-fact with respect to" Plan funds in which they were not "personally invested." Doc. 202 at 4–7. Defendants now contend that a recent Supreme Court decision purportedly "abrogated" the basis for this Court's decision. MIS 16–17; *see Thole v. U.S. Bank, N.A.*, 140 S.Ct. 1615 (2020).

"A motion for reconsideration is an extraordinary request that is granted only in rare circumstances." *Van Buskirk v. United Grp. of Companies, Inc.*, 935 F.3d 49, 54 (2d Cir. 2019). For reconsideration to be warranted based on a change in the law, the new decision must "reasonably be expected to *alter the conclusion* reached by the court." *Id.* (emphasis added,

26

citing *Shrader v. CSX Transp., Inc.*, 70 F.3d 255, 257 (2d Cir. 1995)).

Yale fails to meet that strict standard. According to Yale, *Thole* abrogated Second Circuit authority, relied upon in this Court's class certification order, that a plaintiff seeking to recover for injuries to a plan need not "show individual injury." MIS 16–17; *see L.I. Head Start Child Dev. Servs. v. Econ. Opportunity Comm'n of Nassau Cty.*, 710 F.3d 57, 67 n.5 (2d Cir. 2013). Even accepting Yale's reading of *Thole*, that would not alter this Court's standing decision. Although this Court relied upon *L.I. Head Start* to find that Plaintiffs did not have to establish "individualized" injury (Doc. 202 at 5), it *also* found that Plaintiffs had standing on an *additional* ground, which Yale fails to address. The Court held that, regardless of whether lead plaintiffs and class members invested in every fund, the "alleged foregone opportunities from funds that were not included and the alleged reduction in choice that resulted is an alleged injury in fact" not merely to the Plan, but to the *individual participants* themselves. Doc. 202 at 5. Yale does not suggest that this additional basis for Article III standing conflicts in any way with *Thole*'s "individualized" injury requirement. Accordingly, there is no basis for reconsideration.

If anything, *Thole* confirms Plaintiffs' standing. Of "*decisive importance*" in *Thole* was the fact that the "plaintiffs' retirement plan is a defined-benefit plan, *not a defined-contribution plan*," as here. *Thole*, 140 S.Ct. at 1618 (emphasis added); *id*. at 1619 ("[T]he participants in a defined-benefit plan *are not similarly situated … to the participants in a defined-contribution plan*.") (emphasis added). A defined-benefit plan is essentially a contract—it provides a "fixed payment each month" which "do[es] not fluctuate with the value of the plan or because of the plan fiduciaries' good or bad investment decisions." *Id*. at 1618, 1620. By contrast, defined-contribution plan participants are similarly situated to beneficiaries of a private trust; the amount of their benefits is "tied to the value of their accounts" and "every penny of gain or loss is at the beneficiaries' risk." *Id.* at 1618, 1619–20; *see also Hughes Aircraft Co. v. Jacobson*, 525 U.S.

27

432, 439–40 (1999) (risk of loss in defined-contribution plans falls on the participants). Thus, while defined-*benefit* plan participants have no "equitable or property interest in the plan itself," defined-contribution plan participants *do* possess such interests, because plan mismanagement endangers their benefits. *Thole*, 140 S.Ct. at 1620. Indeed, the Court acknowledged that if "the litigants themselves" *had* "suffered an injury-in-fact," Article III would not prevent them from asserting "the interests of others," such as the plan itself. *Id.*

Here, the named Plaintiffs collectively invested in a total of approximately 40 of the Plan's investment options during the class period, including many of the 22 funds at issue. PMSF ¶ 72. Plaintiffs' standing to challenge the funds in which they invested is undisputed. *Cf.* MIS 16 (disputing standing only as to options in which Plaintiffs "did *not* invest") (emphasis added). As noted, the Court's class certification order establishes that Plaintiffs suffered an injury-in-fact related to funds in which they did not invest, as Defendants' inclusion of those options caused "foregone opportunities" to invest in superior options and reduction in viable choices. Doc. 202 at 5. *Thole* is fully consistent with that conclusion; it confirms that Yale's retention of imprudent options endangered Plan participants' retirement benefits and hindered their ability to obtain higher returns regardless of whether they personally invested in those funds. 140 S.Ct. at 1618, 1619 ("[E]very penny of gain or loss is at the beneficiaries' risk."). Thus, Yale's contention that its "decision to continue offering those funds … could not have harmed *Plaintiffs*" and "would not have changed" Plaintiffs' benefits "one cent" is simply wrong. MIS  16.

Aside from the grounds cited in the Court's previous decision, Plaintiffs also have Article III standing to seek Plan-wide relief for all 22 funds on two additional grounds that the Court had no occasion to reach. *See* Reply in Supp. of Mot. Class Cert. at 4–7 (Doc. 167 at 6–9). *First*, because Plaintiffs have made the required "threshold jurisdictional showing" by alleging losses

to their Plan accounts related to the 40 options in which they personally invested (*Cent. States SE & SW Areas Health & Welfare Fund v. Merck-Medco Managed Care, LLC*, 504 F.3d 229, 242–43 (2d Cir. 2007)), they can pursue relief "that sweeps beyond [their] own injury," because "[29 U.S.C.] §1132(a)(2) provides [them] a cause of action to seek relief *for the entire Plan*," *Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 592–93 (8th Cir. 2009); *see Warth v. Seldin*, 422 U.S. 490, 500–01 (1975) (so long as the plaintiff has satisfied Article III by alleging a "distinct and palpable injury to himself," "persons to whom Congress has granted a right of action … may have standing to seek relief on the basis of the legal rights and interests of others."); *see also LaRue v. DeWolff, Boberg & Assocs.*, 552 U.S. 248, 261 (2008) (Thomas, J., concurring) ("On their face," §§1109(a) and 1132(a)(2) "permit recovery of *all* plan losses caused by a fiduciary breach.").

*Second*, Plaintiffs have standing to challenge all 22 funds pursuant to the Second Circuit's "class standing" doctrine and general Rule 23 principles. *See* Reply at 6–7 (Doc. 167 at 8–9). Plaintiffs may represent a class of the Plan's participants who invested in other options that are flawed for similar reasons. *See NECA-IBEW Health & Welfare Fund v. Goldman Sachs & Co.*, 693 F.3d 145, 162 (2d Cir. 2012). Yale's plan-wide conduct in failing to adequately monitor the options in which Plaintiffs did *not* invest implicates the "same set of concerns" as Yale's conduct in failing to monitor the options in which Plaintiffs *did* invest. *Leber v. Citigroup 401(k) Plan Inv. Comm.*, 323 F.R.D. 145, 156–57 (S.D.N.Y. 2017); *Moreno v. Deutsche Bank Americas Holding Corp.*, No. 15-9936, 2017 WL 3868803, at *10 (S.D.N.Y. Sept. 5, 2017). In contrast to the non-ERISA case cited by Yale, in which the defendant did not manage each of the 530 distinct trusts in the same manner (*Ret. Bd. of the Policemen's Annuity & Ben. Fund of Chi. v. Bank of N.Y. Mellon*, 775 F.3d 154, 162–63 (2d Cir. 2014)), here Defendants applied the same

29

criteria and monitoring process to the Plan as a whole.

### B.    Yale had a flawed process for monitoring Plan investments.

"[T]he most basic of ERISA's investment fiduciary duties" is "to conduct an independent

investigation into the merits of a particular investment." *In re Unisys Sav. Plan Litig.*, 74 F.3d

420, 435 (3d Cir. 1996). ERISA's "duty of prudence involves a continuing duty to monitor

investments and remove imprudent ones under trust law." *Tibble I*, 135 S.Ct at 1829. It requires a

trustee to "'systematically consider all the investments of the trust at regular intervals' to ensure

that they are appropriate." *Id.* at 1828 (citation and alteration marks omitted). A plan fiduciary

"who simply ignores changed circumstances that have increased the risk of loss to the trust's

beneficiaries is imprudent." *PBGC*, 712 F.3d at 717 (citation omitted).

To be deemed prudent, the monitoring process requires the skill and diligence of an expert

in the field. *Katsaros*, 744 F.2d at 279; *Sweda*, 923 F.3d at 329. Whether a fiduciary acted

prudently in "selecting and retaining available investment options" depends on the "totality of

the circumstances." Doc. 113 at 14–15 (quoting *DiFelice*, 497 F.3d at 418); *see also Bd. of*

*Trustees of S. California IBEW-NECA Defined Contribution Plan v. Bank of New York Mellon*

*Corp.*, No. 09-6273, 2011 WL 6130831, at *3 (S.D.N.Y. Dec. 9, 2011) ("The fiduciary standard

imposed by ERISA requires the application of a reasonableness standard. Rarely will such a

determination be appropriate on a motion for summary judgment.").

Defendants' process was deficient in numerous respects. As discussed *supra*, Part II, from

2007 to 2012, Defendants left the responsibility for monitoring over 100 investment options to a

single individual, Hugh Penney, who had no investment expertise. PSF ¶¶ 44–45, 47–48. Single-

handedly monitoring over 100 investment options on a continuous basis would be a daunting

task for the most skilled investment professional. *Id.* ¶ 83. For someone with no background in

investments—who (mistakenly) believed that the Plan was exempt from ERISA fiduciary

requirements—it was simply impossible. Indeed, Penney admitted that his solo reviews were inadequate. *Id.* ¶¶ 49–53. In contrast to the meager resources that Yale devoted to overseeing the employees' Plan, Yale devoted far greater attention to managing its endowment, with the Yale Investments Office assigning a staff of four to monitor a much smaller number of investments. *Id.* ¶81. And there is no evidence that Yale or Peel—the Plan's *actual* fiduciaries—themselves took any significant actions to monitor either Plan investments or Penney's performance.

Defendants' process remained deficient after the Fiduciary Committee was formed in 2012. The Committee still largely deferred to Penney, which shows that the overall process did not change significantly. PSF ¶ 46. Until very recently, Defendants' entire investment review process consisted of an annual review of reports from the recordkeepers about their *own* products. *Id.* ¶ 73. Defendants' counsel advised that deferring to TIAA and Vanguard was inadequate to satisfy Defendants' duty to monitor and independently assess Plan investments. *Id.*

The TIAA and Vanguard reports were themselves deficient. They contained insufficient information to enable Defendants to adequately review Plan investments, and used benchmarks cherry-picked by the recordkeepers. *Id.* ¶ 74. In contrast, prudent financial experts consider a multitude of other factors when reviewing investments, including alpha, risk-adjusted returns over various periods, peer group ranking, risk/return statistics, changes in assets held, changes in fees and expenses, and manager tenure. *Id.* ¶ 75. ███████████████████████ ███████████ *Id.* ¶76. Prudent financial experts also do not rely on an interested party's chosen benchmark and peer group; instead, they independently determine the proper benchmark. *Id.* ¶ 77. Defendants never requested that TIAA or Vanguard provide additional benchmarks. *Id.* ¶ 78.

The frequency of Defendants' investment review also fell far short of industry standards. Prudent investment professionals, ██████████████████████, typically review

investments monthly or quarterly. *Id.* ¶ 79. The Plan's Fiduciary Committee met on an ad hoc basis and reviewed investments once a year. *Id.* ¶80. Because the Plan had over 100 investments, Defendants could not monitor them effectively by meeting once a year for 1–3 hours. *Id.* ¶ 23.

Similarly situated fiduciaries of large defined contribution plans commonly rely on full-time outside consultants to assist with the investment review process. Defendants, however, did not hire a full-time investment consultant until 2017, after Plaintiffs filed this lawsuit. *Id.* ¶84.

Another industry accepted of prudent fiduciaries is the use of an investment policy statement, or "IPS." *Id.* ¶ 85. Having a written IPS promotes procedural prudence by establishing objective criteria and a framework for the process of selecting and monitoring a plan's investment options. *Id.* Yale, however, did not adopt an IPS until 2018. *Id.*

In light of these facts, a reasonable jury could readily conclude that Defendants failed to follow a prudent process to: (1) systematically evaluate whether the CREF Stock Account, TIAA Real Estate Account, and other chronically underperforming investments remained appropriate options for the Plan (Count V); and (2) evaluate whether, given CREF Stock's severe underperformance, participants' interests were served by keeping CREF Stock locked into the Plan lineup regardless of whether it was a prudent option (Count I). Count I is not time-barred as Defendants assert (MIS 34), because the "last action which constituted part of the breach"— failing to evaluate the prudence of *maintaining* the bundled arrangement—necessarily occurred within the six-year limitations period. 29 U.S.C. §1113(1); *Tibble I*, 135 S.Ct. at 1829 ("so long as the alleged breach of the continuing duty occurred within six years of suit, the claim is timely.").

In attempting to demonstrate prudence, Yale relies on a handful of anecdotes over the decade-long class period (MIS 18–19), which are largely irrelevant to the allegedly imprudent

funds at issue in this case. PSF ¶¶ 22–23, 30. Because a jury would not be required to credit the testimony of Yale's business partners at TIAA and Aon Hewitt about the supposed thoroughness of Yale's approach (MIS 18–19), it must be disregarded. *Rogoz*, 796 F.3d at 246. While Yale relies on *Cunningham* for the proposition that evidence of sufficient discussions is "fatal" to a claim of imprudence, Yale has identified no comparable evidence here. *See Cunningham*, 2019 WL 4735876, at *14. For instance, the defendant in *Cunningham* hired an independent investment advisor in 2011, created an IPS in 2012, and relied on the advisor's recommendations to retain certain options throughout the class period. *Id.* at *2–3, *13–14. Yale had no investment advisor until 2017 and no IPS until 2018. PSF ¶¶ 84–85.

Defendants' remaining prudence arguments merely dispute the opinions of Plaintiffs' expert, Wendy Dominguez, regarding prudent investment review processes. MIS 19–21. Defendants contend that Dominguez's opinions fail to create a genuine issue of material fact because she has not shown that her approach "is the *only* proper approach used by reasonable fiduciaries." *Id.* at 19–20. But Defendants cite no authority suggesting that a jury would be *required* to disregard Dominguez's admissible testimony merely because she does not rule out the existence of other reasonable methods. Dominguez describes widely accepted industry practices for monitoring investments and shows how Yale's process deviated from that approach. A reasonable trier of fact could credit Dominguez's opinions and conclude that Yale's process was imprudent. *See George*, 641 F.3d at 799. While an IPS may not be *per se* required under ERISA (MIS 20), the failure to adopt written procedures tends to show that Defendants lacked the type of systematic review process that a prudent fiduciary in like circumstances would have used.

### C.      Defendants' breach of fiduciary duty caused Plan losses.

As discussed *supra*, Part I.C, Defendants bear the burden of disproving causation. Thus, Plaintiffs do not have to prove that a "hypothetical prudent fiduciary" would have removed the

challenged funds from the Plan. MIS 21. It is *Defendants*' burden to prove that a hypothetical prudent fiduciary who conducted a thorough review process nevertheless "would have" made the same decision by *retaining* the funds in the Plan. *Tatum*, 761 F.3d at 363–64 ("[A] plaintiff who has proved the defendant-fiduciary's procedural imprudence and a prima facie loss prevails *unless* the defendant-fiduciary can show that a prudent fiduciary *would have* made the same decision."). Determining what a hypothetical prudent fiduciary would have done is a "fact-intensive inquiry" and typically "not susceptible to summary judgment." *Roth*, 16 F.3d at 919.

To carry their burden on the element of loss, Plaintiffs (at most) need only provide some evidence from which a jury could conclude that the Plan lost money compared to what it would have earned if Defendants had diligently monitored Plan investments. *Ivy*, 843 F.3d at 567. The proper "measure of loss applicable under ERISA section 409 requires a comparison of what the Plan actually earned on the [imprudent] investment with what the Plan would have earned had the funds been available for other Plan purposes," *i.e.*, if invested in a prudent alternative. *Bierwirth II*, 754 F.2d at 1056. Applying that approach, Dominguez concluded that by retaining the challenged funds in the Plan, Defendants caused the Plan to lose over ███████ compared to what the Plan would have earned if Defendants had removed the funds and moved the assets to prudent alternatives. PSF ¶ 92. That evidence establishes a prima facie loss.

In attempting to show that a prudent fiduciary would have retained the 22 funds, Defendants rely heavily upon comparisons to "the 200 largest TIAA 403(b) clients" and "higher education institutions" with large 403(b) plans. MIS 23; *see* PSF ¶¶ 29, 33–36. Focusing exclusively on other universities is improper because the level of skill and diligence used by an expert in the field of investments does not differ based on the employer's industry. *Dudenhoeffer*, 573 U.S. at 418–21; *Sweda*, 923 F.3d at 334 n.9. Courts have long held that it is "inappropriate" to allow

34

"the custom of an industry or trade define what is reasonable in that trade." *Stagl v. Delta Air Lines, Inc.*, 117 F.3d 76, 81 (2d Cir. 1997) (citing *The T.J. Hooper*, 60 F.2d 737, 740 (2d Cir. 1932) (Hand, J.)). "[I]f a given industry lags behind in adopting procedures that reasonable prudence would dictate be instituted," courts "are free to hold a given defendant to a higher standard of care than that adopted by the industry." *Id*. Otherwise a particular group—such as TIAA's large 403(b) plan clients—could "set its own tests" of prudence. *Id*.

Moreover, the fact that Defendants can cherry-pick a group of plans that used the same funds sheds no light on whether those fiduciaries' decisions were the result of prudent or imprudent management. *See George*, 641 F.3d at 796 & n.7 (mere fact that another plan adopted a practice does not establish that the decision was made by "a prudent fiduciary. For all we know, Altria's decision to switch … was imprudent."). If other institutions also assigned a single individual to monitor 100 funds, then those plans' investments show what imprudent fiduciaries did, not what a prudent fiduciary would have done.

The record shows that if Defendants had undertaken the type of thorough investment monitoring process used by prudent fiduciaries, they would have identified a total of 22 investments which should have been removed from the Plan. Three factors support this conclusion: (1) chronic underperformance, (2) other fiduciaries' decisions and recommendations to remove the funds, and (3) other objective criteria of imprudence.

***Chronic underperformance.*** Most of the 22 options underperformed their prospectus benchmarks over five- and ten-year rolling periods from 2005 until at least 2010. PSF ¶ 86. Although Defendants dispute at length whether Plaintiffs used the proper benchmarks (MIS 26–30), Defendants are wrong. PSF ¶¶ 26–28, 31–32. Dominguez obtained benchmarks from the same sources used by Defendants' expert and investment advisor, followed industry accepted

35

practices for identifying benchmarks and formulating custom benchmarks when needed, which are the same custom benchmarks that she uses with clients. *Id.* ¶ 89. Defendants are also incorrect that variable annuities cannot be compared to mutual funds. MIS 24–25; PSF ¶¶ 29, 33–35. Both types of vehicles invest in equities and their values fluctuate with the stock market. PSF ¶ 91. These material factual disputes must be resolved at trial. *Cates*, 2019 WL 8955333, at *13–14 (denying summary judgment based on disputes regarding "the appropriate benchmark" and "whether a prudent fiduciary would have removed the investments").

 ***Prudent fiduciaries removed the funds.*** Contrary to Yale's claim (MIS 22), there is ample evidence that prudent fiduciaries would have—and did—remove many of the challenged funds from their plans. Fiduciary investment advisors recommended removal to their clients. PSF ¶87. Aon Hewitt recommended ██████████ other clients that they should terminate CREF Stock, CREF Global Equities, ██████████████████. *Id.* Numerous plans have eliminated those three options from their investment menus or frozen contributions to them. *Id.* From 2009 until 2014, Cammack, another prominent investment advisor, raised serious concerns about TIAA Real Estate, which failed nearly all of Cammack's criteria. *Id.*

 ***Other objective criteria.*** Dominguez evaluated each fund based on seven objective criteria widely used in the industry and concluded that all 22 funds should have been removed from the Plan. *Id*. ¶88. Although Defendants dispute whether other fiduciaries would use that methodology in considering removal, the factors used by Dominguez are nearly identical to those cited by the investment advisor respondents to Yale's 2015 RFP, in response to Yale's inquiry regarding the criteria used by the advisors to conduct due diligence. *Id.*

 In sum, a reasonable jury could find that Defendants' breach caused a loss to the Plan. *Cates*, 2019 WL 8955333, at *13–14; *Tracey v. Mass. Inst. of Tech.*, No. 16-11620, 2019 WL

4192148, at *4 (D. Mass. Sept. 4, 2019) ("The debate over whether certain kinds of funds should have been included in the Plan is a material factual dispute that will be preserved for trial.").

**V.     Defendants imprudently provided higher-cost retail-class shares of the Plan's mutual funds instead of switching to readily available institutional-class shares (Count V).**

"Wasting beneficiaries' money is imprudent," and "cost-conscious management is fundamental to prudence in the investment function." *Tibble II*, 843 F.3d at 1197–98 (citation omitted). With the exception of fees, the different share classes of a given mutual fund are identical in all respects. Therefore, if a plan uses a higher-cost retail share class designed for a small investor instead of an available lower-cost institutional share class designed for large institutional investors like retirement plans, the beneficiaries' money is wasted on wholly unnecessary fees. Accordingly, fiduciaries of large plans cannot ignore the plan's bargaining power to "obtain favorable investment products" that "*are substantially identical*—other than their lower cost—to products the trustee has already selected." *Id*. at 1198 (emphasis added).

Since 2009, TIAA has offered institutional share classes of its mutual funds to all defined contribution plans with at least $2 million invested, with the threshold waived for certain plans. PSF ¶ 93. As of June 2010, the Plan's investment in TIAA mutual funds exceeded the $2 million threshold, yet until 2011, Defendants retained higher-cost "premier" shares of eight TIAA-CREF mutual funds instead of available lower-cost shares. PSF ¶¶ 94–95. The Plan was also eligible for lower-cost shares of over 50 Vanguard mutual funds at various points during the class period. *Id.* ¶ 96. Defendants did not move to the lower-cost shares for several years, remaining in the higher-cost shares until as recently as August 2016. *Id.* ¶ 97. As a result, the Plan paid ▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮ due to Defendants' failure to switch to lower-cost shares. *Id.* ¶ 99.

A prudent fiduciary under like circumstances would have regularly "review[ed] all available share classes and the relative costs for each" and "would have known that investment in the retail

share classes would cost the Plan participants wholly unnecessary fees." *Tibble v. Edison Int'l*, No. 07-5359, 2010 WL 2757153, at \*25–26 (C.D. Cal. July 8, 2010), *aff'd,* 729 F.3d 1110 (9th Cir. 2013). Although Defendants dispute whether certain lower-cost shares were available and claim that they prudently negotiated (MIS 31–33), Plaintiffs' evidence creates genuine disputes on those points. PSF ¶¶20, 37, 40–41. Thus, a reasonable jury could conclude that Defendants breached their duty of prudence by their delay in moving to lower-cost shares of Plan funds.

## VI.    Defendants caused prohibited transactions (Counts II, IV, VI).

In denying Defendants' motion to dismiss Counts II, IV, and VI, the Court rejected Defendants' argument that ERISA's prohibited transaction provision, 29 U.S.C. §1106(a) [ERISA §406(a)], does not apply to the Plan's recordkeeping fees and investments as a matter of law. Doc. 113 at 30–35. As providers of investment and recordkeeping services to the Plan, TIAA and Vanguard each qualify as a "party in interest" as defined by ERISA. 29 U.S.C. §1002(14)(B). When Defendants caused the Plan to pay TIAA and Vanguard fees for their services to the Plan, Defendants "caused the plan to engage in a transaction" involving a "direct or indirect" exchange of property, furnishing of services, or transfer of assets between the Plan and a party in interest. 29 U.S.C. §1106(a)(1)(A), (C)–(D).

Defendants now repeat essentially the same legal arguments that the Court previously rejected, but identify no intervening change of controlling law or other basis to warrant departing from the law of the case. *Cf. DiLaura v. Power Auth. of State of N.Y.*, 982 F.2d 73, 76 (2d Cir. 1992). Defendants' new arguments fare no better.

Defendants misleadingly suggest that a plaintiff cannot assert multiple theories of recovery arising from the same facts. MIS 34. No such rule exists: Plaintiffs are permitted to pursue "alternative or different types of relief," alternative theories, and "as many separate claims" as they have against Defendants. Fed. R. Civ. P. 8(a)(3), (d)(2)–(3); Fed. R. Civ. P. 18(a). *Divane*

38

Exhibit A

merely held that a plaintiff who failed to allege sufficient facts to state a plausible breach of fiduciary duty claim could not avoid dismissal by simply "repackag[ing]" the same failed allegations with a prohibited transactions label. *Divane v. Nw. Univ.*, 953 F.3d 980, 992 (7th Cir. 2020), *pet. for cert. pending*, No. 19-1401. Because Plaintiffs stated plausible claims under both theories (Doc. 113 at 17–22, 25–27, 30–35), there is no impermissible "repackaging."

Although Defendants assert that it is "absurd" and "nonsensical" to construe §406(a) as covering service provider arrangements (MIS 34–35), Congress chose to use broad language. "On its face, § 406(a) covers wide swaths of plan activity." *Teets v. Great-W. Life & Annuity Ins. Co.*, 921 F.3d 1200, 1222 (10th Cir.), *cert. denied*, 140 S.Ct. 554 (2019). The statute establishes "some bright-line rules, on which plaintiffs are entitled to rely." *Teets*, 921 F.3d at 1221 (quoting *Allen v. GreatBanc Trust Co.*, 835 F.3d 670, 676 (7th Cir. 2016)).

But that does not mean it is "illegal" for a plan to buy recordkeeping services or offer investment options as Defendants dramatically assert. MIS 34. Congress tempered the wide scope of §406(a) by providing equally broad exemptions under §408(b): "ERISA plans engage in transactions nominally prohibited by §[406] all the time, while also taking steps to comply with ERISA by relying on one or more of the many exceptions under §[408]." *Teets*, 921 F.3d at 1222 (citation omitted). The exemptions "allow plans to do business with parties in interest if certain conditions are met." *Id*. (citing 29 U.S.C. §1108(b)). Thus, while §406(a) generally prohibits the "furnishing of . . . services" to a plan (29 U.S.C. §1106(a)(1)(C)), §408(b) "allows parties in interest to provide 'services necessary for the establishment or operation of the plan'—*otherwise prohibited under §406(a)*—so long as 'no more than reasonable compensation is paid therefor.'" *Teets*, 921 F.3d at 1222 (quoting 29 U.S.C. §1108(b)(2)) (emphasis added).

The agency charged with enforcing ERISA confirms Plaintiffs' position: "a service

relationship between a plan and a service provider" constitutes a prohibited transaction, subject to a potential "reasonableness" exemption. Reasonable Contract or Arrangement Under Section 408(b)(2)—Fee Disclosure, 77 Fed.Reg. 5632, 5632 (Feb. 3, 2012). The Secretary's Final Regulation repeatedly refers to "*recordkeeping services*" within the scope of the exemption. 29 C.F.R. §2550.408b-2(c)(1)(i), (iii)(B), (iv)(D), (iv)(F), (viii)(D) (emphasis added). If such services were not covered by §406(a) in the first instance, it would be wholly unnecessary for a fiduciary to show that the service arrangement qualifies for the exemption under §408(b)(2).

Defendants further contend that §406(a) should be limited to transactions involving "concealment or self-dealing." MIS 35. There is simply no basis for such a limitation in the statutory text. *Millbrook v. United States*, 569 U.S. 50, 55–56 (2013) (overruling lower court decisions which created "additional limitations designed to narrow the scope of" a broad federal statute, because "[n]one of these interpretations finds any support in the text of the statute.").

Finally, Defendants claim that they qualify for the §408(b)(2) reasonableness exemption, which is an affirmative defense. Doc. 113 at 33; *Lowen v. Tower Asset Mgmt., Inc*., 829 F.2d 1209, 1215 (2d Cir. 1987). To obtain summary judgment based on an affirmative defense, the evidence must be so conclusive that "no rational jury could fail to" sustain it. *In re State Police Litig.*, 88 F.3d 111, 123 (2d Cir. 1996). It is Yale's burden to show that Plan fees were "fair and reasonable under all of the circumstances." *DePerno*, 18 F.3d at 183. Such claims regarding "reasonableness of compensation for services" are "inherently factual" and rarely amenable to summary judgment. *See Sweda*, 923 F.3d at 329. Given Plaintiffs' evidence that the fees were many multiples higher than reasonable market rates, a jury could easily reject Yale's defense.

## CONCLUSION

The Court should deny Defendants' Motion for Summary Judgment (Doc. 267).

Exhibit A

Dated: February 2, 2021                    Respectfully Submitted,

                                           /s/ Andrew D. Schlichter
                                           SCHLICHTER BOGARD & DENTON LLP
                                           Jerome J. Schlichter (phv01476)
                                           Heather Lea, (phv08416)
                                           Andrew D. Schlichter (phv09955)
                                           Sean E. Soyars (phv08419)
                                           Joel D. Rohlf (phv09849)
                                           Alexander L. Braitberg (phv09929)
                                           100 South Fourth Street, Suite 1200
                                           St. Louis, Missouri 63102
                                           (314) 621-6115, (314) 621-7151 (fax)
                                           jschlichter@uselaws.com
                                           hlea@uselaws.com
                                           aschlichter@uselaws.com
                                           ssoyars@uselaws.com
                                           jrohlf@uselaws.com
                                           abraitberg@uselaws.com

                                           Ari J. Hoffman (ct22516)
                                           Cohen and Wolf, P.C.
                                           1115 Broad Street
                                           Bridgeport, CT 06604
                                           Telephone: (203) 368-0211
                                           Facsimile: (203) 337-5505
                                           arihoffman@cohenandwolf.com

                                           *Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

I certify that on February 2, 2021, a copy of foregoing was filed electronically using the Court's CM/ECF system, which will provide notice of the filing to all counsel of record.

                                           By: /s/  Andrew D. Schlichter

41

Exhibit A