**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT**

JOSEPH VELLALI *et al*.,

     *Plaintiffs*,

v.

YALE UNIVERSITY *et al*.,

     *Defendants*.

Civil Action No. 3:16-cv-01345-AWT

Hon. Alvin W. Thompson

**PLAINTIFFS' LOCAL RULE 56(a)(2) STATEMENT OF FACTS
<u>IN OPPOSITION TO SUMMARY JUDGMENT</u>**

1.      The Plan, organized under Section 403(b) of the Internal Revenue Code, is the primary retirement program for non-unionized managerial and professional staff employed by Yale University ("Yale"). Each participant in the Plan has an individual account, funded by voluntary contributions as well as contributions by Yale, which contributes 5 percent of each participant's eligible compensation (7.5 percent of the amount exceeding the social-security wage base) and also matches 100% of employee contributions up to 5% of eligible compensation.[1]

**RESPONSE**: Plaintiffs admit the first sentence of paragraph 1. The second sentence of paragraph 1 is not material to Defendants' Motion for Summary Judgment.

2.      The Plan identifies Yale as the named fiduciary and gives Yale, acting through the Vice President for Human Resources and Administration, discretionary authority to administer and oversee the Plan. At the start of the class period (August 2010), Yale's Vice President for Human Resources and Administration was Michael Peel. Mr. Peel delegated day-to-day Plan administration to Yale's Benefits Department, led by Senior Director of Benefits Hugh Penney.[2]

**RESPONSE**: Plaintiffs admit the first two sentences of paragraph 2. Plaintiffs deny the third sentence. Defendants present no evidence that Peel delegated any authority to Penney.[3]

3.      In early 2012, Peel chartered the Fiduciary Committee on Investments ("Committee"), which has met periodically starting February 2012. Initially, the Committee had three members: (1) Provost Peter Salovey; (2) VP for Finance and Business Operations Shauna King; and (3) Mr. Peel. Subsequently, Benjamin Polak has replaced Mr. Salovey; Stephen Murphy has replaced Ms. King; and Janet Lindner has replaced Mr. Peel. In addition, Alex Hetherington

---

[1] Doc. 281-52, YALE00139236 (2009 Plan) Art. I, IV; Doc. 281-48, YALE00096713 (2015 Am. Plan) Art. I, IV.
[2] Doc. 281-52, YALE00139236 (2009 Plan) Art. XII; Doc. 281-22, Peel Tr. 73:21-22; Doc. 281-23, Penney Tr. 60:5-21.
[3] *See supra* n. 2.

(Director, Yale Investments Office) joined as a fourth member in early 2017. Yale's Benefits Department continues to provide day-to-day administration and support.[4]

**RESPONSE**:  Deny. The Committee was formed in October 2011 and included David F. Swensen, Chief Investment Officer of the University.[5] Swensen declined to join the Committee because he served on TIAA's investment committee and was a paid consultant.[6] Peel choose instead Salovey, who had no investment experience.[7] No member with investment management expertise was added until Herrington in 2017.[8] The Committee had no set meeting schedule.[9]

4.      Since the start of the class period, the Plan has offered investment options from TIAA (fixed and variable annuities and mutual funds) and Vanguard (mutual funds). Historically, TIAA and Vanguard provided recordkeeping for their respective investment options.[10]

**RESPONSE**: Admitted. The Plan had over 100 investment options until 2019.[11] ███

████████████████████████████, it was impossible to monitor that number of investments.[12]

5.      In June 2010, approximately 83% of the Plan's $2.15 billion was held in TIAA investments. The remainder was invested in roughly 80 Vanguard funds.[13]

---

[4] Doc. 281-41, YALE00040872 (Establishment of Committee); Doc. 283-23, Compiled Minutes at CM-7 (Polak: Mar. 2013), CM-20 (Murphy: July 2015), CM-33 (Hetherington: Feb. 2017), CM-40 (Lindner: June 2017).
[5] Ex. P1, Retirement Account Plans Fiduciary Committee on Investments Charter (YALE00143324) at 1.
[6] Ex. P2, Penney Dep. 121:3–15; Ex. P3, Jan. 16, 2012 Email from D. Swensen to H. Penney (YALE00139836); Ex P4, Jan. 21, 2012 emails between P. Salovey and D. Robinson (YALE00139838).
[7] Doc. 281-41, Revised Retirement Account Plans Fiduciary Committee on Investments Charter (YALE00040872); Ex. P5, Salovey Dep. 17:23–18:15 (testifying that he had no experience managing assets other than his own prior).
[8] Doc. 283-23, Compiled Minutes at CM-33 (Hetherington: Feb. 2017).
[9] *See infra* ¶ 80.
[10] Doc. 281-42, YALE00041509 (2006 TIAA Agmt.); Doc. 281-37, YALE00020185 (2010 Vanguard Agmt.); *see also* Doc. 281-23, Penney Tr. 41:1-42:18 (noting that the Plan brought Vanguard on as recordkeeper to gain access to mutual fund options and that is was "very common" for 403(b) plans to have multiple recordkeepers).
[11] Ex. P2, Penney Dep. 132:12–133:13 (testifying that there were 112 investments in February 2019).
[12] ███████████████████████.
[13] Each year, the Plan files a Form 5500 with the Department of Labor, which lists Plan assets (as of the period ending June 30) on Schedule H. *See* Doc. 281-62, YALE00242102 at -122 (2009 Form); Doc. 281-49, YALE00110145 (2014 Form). The remaining forms during the class period are: Doc. 281-59, YALE00221422 (2010 Form); Doc. 281-58, YALE00209652 (2011 Form); Doc. 281-47, YALE00090491 (2012 Form); Doc. 281-50, YALE00110794 (2013 Form); Doc. 281-64, YALE00243029 (2015 Form); Doc. 281-63, YALE00243002 (2016 Form); Doc. 281-65, YALE00243073 (2017 Form); Doc. 281-104, 2018 Form; Doc.281-105, 2019 Form.

**RESPONSE**: Deny as immaterial.

6.      Until 2006, all TIAA annuities were structured as bilateral agreements between TIAA and individual Plan participants. None of TIAA's 15,000 institutional clients has succeeded in directing TIAA to liquidate individual-contract annuities without participant consent.[14]

**RESPONSE**: Deny. Plaintiffs incorporate paragraphs 101–112 of their additional statement of material facts. For the reasons stated therein, the legacy TIAA annuity contracts were fully transferable. Because the contractual language is unambiguous, the evidence cited by Defendants is inadmissible. *Bourne v. Walt Disney Co.*, 68 F.3d 621, 629 (2d Cir. 1995). Defendants cite to Douglas Chittenden's testimony from *Sacerdote v. New York University* ("*Sacerdote*"), 16-6284. Chittenden's testimony in another case is inadmissible hearsay. *See* Fed. R. Evid. 801, 802. To the extent admissible, he testified in that same case that TIAA allowed fiduciaries to unilaterally transfer assets in individual annuity contracts on at least one occasion.[15]

7.      No entity other than TIAA has served as the sole recordkeeper to a Plan that includes TIAA fixed annuities subject to individual contracts. Of the 200 largest TIAA 403(b) clients in 2010, all 200 continue to pay TIAA for recordkeeping today—including those plans that have frozen future contributions to TIAA annuities.[16]

---

[14] Doc. 281-27, TIAA 30(b)(6) (Sutherland) Tr. 20:20-21:25 (describing annuity contract structure); Doc. 281-31, YALE00011016 ("Understanding TIAA-CREF Contracts" presentation); Doc. 281-23, Penney Tr. 52:7-54:5, 316:15-317:7 (describing individual versus group annuities); Doc. 281-107, *Sacerdote* Chittenden Decl. ¶¶ 22-43 (same); Doc. 281-99, *Sacerdote* Trial Tr. 597:20-598:16 (The Court: "Let me just ask, are you familiar with any instance when an educational institution has, against the wishes of a participant in the RA, altered that arrangement?" Chittenden: "[T]o my knowledge it has never happened.").

[15] Ex. P7, Tr. of Trial, *Sacerdote*, No. 16-6284, at 677:19–678:9 ("Q. And TIAA and the employers map those money market accounts into some other fund in the plan. Right? A. Correct. Q. Without the permission or voluntary participation by investors. A. There's a one-time opportunity, yes.").

[16] Doc. 281-109, Friedman Decl. ¶¶ 8-9 (describing recordkeeping arrangements and noting that clients for clients that have consolidated to a vendor other than TIAA, "TIAA continues to provide recordkeeping services for legacy contributions made to TIAA products"); Doc. 281-99, *Sacerdote* Trial Tr. 595:24-596:10 (Chittenden: TIAA is "the only firm that record-keeps TIAA annuities"—"[I]t's a question of who else can do this. And so far, the answer has been nobody."); Doc. 281-25, Vanguard 30(b)(6) (Rux) Tr. 52:9-52:17 ("the TIAA annuity I know we can't recordkeep"); Doc. 283-15, Otto Tr. 28:9-17 (███████████████████████████████████████).

**RESPONSE**: Deny. Plaintiffs admit that TIAA, as a business practice, does not allow other recordkeepers to recordkeep its products. However, TIAA provides data to other providers allowing for tracking of TIAA annuities' gains, losses, and account balances on their recordkeeping platforms.[17] This information is all that an investment provider typically provides a recordkeeper.[18] Other recordkeepers regularly recordkeep other vendors' fixed annuities.[19] TIAA admitted that another provider could develop a code to recordkeep its annuities.[20]

8.     Yale felt that annuities were a valuable part of its investment lineup. In any event, because TIAA's legacy annuities were structured as individually-owned contracts, Yale understood that it could not withdraw funds from those annuities without the consent of all of the individual Plan participants.[21]

**RESPONSE**: Deny. Plaintiffs incorporate by reference paragraphs 101–112. For the reasons stated therein, the legacy TIAA annuity contracts were fully transferable by Defendants. Because the contractual language and Plan documents are unambiguous, the Defendants' evidence is inadmissible under the parol evidence rule. *Bourne*, 68 F.3d at 629. Defendants never requested a legal analysis regarding the ability to transfer assets in the individual annuities.[22]

9.     Pepperdine University was an active client of TIAA until 2009, when Pepperdine decided to retain Transamerica as sole recordkeeper. To do so, Pepperdine froze contributions to the TIAA annuities in its plan. TIAA continued to collect a fee to recordkeep the legacy annuity

---

[17] Doc. 283-7, Minnich Report ¶¶ 68–70.
[18] *Id.* ¶ 63; Ex. P8, Poehler Dep. 301:16–303:6.
[19] Doc. 283-7, Minnich Report ¶ 58; Ex. P9, Minnich Dep. 240:25–245:18; Ex. P10, Sutherland Dep. 71:14–72:12.
[20] Ex. P10, Sutherland Dep. 80:5–82:24.
[21] Doc. 281-23, Penney Tr. 39:4-40:7, 180:2-181:9 ( one of the "important elements in the design of a retirement plan . . . from Yale's perspective is to maintain annuities in the lineup"; "they provide something mutual funds couldn't, which is the option for lifetime income in retirement"); Doc. 281-43, YALE00057798 at -798 (Sept. 2012 email stating that contracts are "solely enforceable by the faculty member"); Doc. 281-31, YALE00011016 (presentation on TIAA annuity options); Doc. 281-22, Peel Tr. 145:7-16, 146:9-15, 150:7-151:3 (describing understanding of individual annuity contracts).
[22] Ex. P11, Hendel Dep at 121:23–125:10 (no legal analysis regarding the mappability of annuities).

investments and would not negotiate lower fees as long as the investments were closed to new contributions. As of the third quarter of 2015, Pepperdine was paying Transamerica $106 per participant for administrative services—while also paying TIAA to recordkeep legacy accounts.[23]

**RESPONSE:** Deny. Defendants fail to cite any admissible evidence in support of paragraph 9 as is required by Fed. R. Civ. P. 56(c)(1). The cited documents are inadmissible under Fed. R. Evid. 801 and 802. If admissible, Pepperdine's fees are not material. In 2015, it had 3,208 participants—not an appropriate comparator for the Plan (18,000 participants).[24]

10.    Given the need to use TIAA to recordkeep the Plan's TIAA annuities, the Committee did not requesting [sic] sole recordkeeping bids from anyone other than TIAA made sense.[25]

**RESPONSE**: Deny. Plaintiffs incorporate by reference their response to paragraph 8.

11.    Beginning in 2010, Yale inquired as to TIAA's ability to serve as the sole recordkeeper for the Plan. TIAA responded that it could not serve as Yale's sole recordkeeper for two primary reasons: (i) administering the Plan required services that TIAA could not then provide; and (ii) TIAA's recordkeeping platform did not have the capacity to manage the number

---

[23] Doc. 281-90, Pepperdine Investment Review (Sept. 2015) at 70 (recordkeeping costs); Doc. 281-91, Pepperdine Meeting Minutes (Sept. 2013) at 1 ("TIAA-CREF is currently making 19.5 bps on Plan Assets of approximately $150 million. The TIAA-CREF portion of the Plan is frozen to new investment . . . . If the Plan were to open the TIAA-CREF portion of the Plan to contributions, they would lower the revenue requirement to 17.0 bps."); Doc. 283-10, Poehler Rpt. ¶ 45.

[24] Ex. P12, Pepperdine University Retirement Plan Form 5500 (2015), line 6g (p. 2); Ex. P8, Poehler Dep. 200:21–201:9; Doc. 281-64, Yale University Retirement Account Plan 2015 Form 5500, at line 6g (p.2).

[25] Doc. 281-23, Penney Tr. 39:4-40:7 (open bidding "would not be particularly productive" due to "orphaned assets that would still need to be recordkept"); Dox. 281-22, Peel Tr. 56:4-13 ("by definition, if you were going to get a sole recordkeeper, it would be TIAA-CREF"); Doc. 281-20, King Tr. 39:13-40:10 ("TIAA-CREF was the only one who could do the job"); Doc. 281-24, Polak Tr. 113:16-114:17 ("An RFP at that point would be a very strange thing for us to do because there was only one person that could be . . . a sole recordkeeper."); doc. 281-18, Castello Tr. 140:16-141:5 (similar); Doc. 281-19, Hendel Tr. 118:3-24 (similar).

of investment funds and contribution characteristics required by Yale's Plan.[26]

**RESPONSE**: Deny. TIAA could recordkeep Vanguard funds after its transition to a new Omni/SunGard platform in 2008.[27] There was no limit on the number of funds that TIAA could recordkeep.[28] The "required services that TIAA could not then provide" were not being provided to the Plan in a multiple recordkeeper arrangement, so they did not prevent sole recordkeeping.[29] Some of the "required services" mentioned were "vesting services," but the Plan had no vesting period.[30] Contemporaneous documents demonstrate that TIAA continued to promote sole recordkeeping to Defendants from 2011 until 2014, contradicting claims that it was impossible.[31] Defendants only began seriously considering a single recordkeeper in October 2013, when they learned that it would make a transition to a new human resources software easier.[32]

12. Yale continued to stay abreast of TIAA's sole recordkeeping capabilities. In 2013, Yale learned that TIAA had developed the capabilities to serve as the Plan's sole recordkeeper. Yale subsequently put out a Request for Proposal ("RFP") and received a sole-recordkeeping proposal from TIAA and a master-recordkeeping proposal from Vanguard. Yale engaged Aon to

---

[26] Doc. 281-17, TIAA 30(b)(6) (Campbell) Tr. 30:21-33:4, 45:3-46:12, 49:7-50:21, 136:9-20; 139:8-10 (describing conversations and explaining "[w]e weren't comfortable with providing the sole recordkeeping for Yale, understanding Yale's arrangement back in 2010"); Doc. 281-22, Peel Tr. 159:23-161:10 ("a lot of reasons" why TIAA could not be sole recordkeeper in 2010); Doc. 281-23, Penney Tr. 165:6-169:22 (same).

[27] Ex. P10, Sutherland Dep. 70:21–23, 91:14–25, 94:7–15.

[28] *Id.* at 95:19–96:14 (testifying in response to a question regarding whether the new platform allowed TIAA to recordkeep a plan with 150 Vanguard funds that "it allows us to recordkeep both of those side by side, and with many more funds"); ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇; Ex. P14, Campbell Dep. 48:4–22 (stating he never "delve[d]" into whether there were enough "slots" for all the funds); *id.* at 50:22–51:5 (testifying he did not know if there was a limit on the number of funds); *id.* at 52:14–53:16 (testifying that it would have taken "some work" but a consolidation always required "some work"); Doc. 283-8, Minnich Rebuttal Report ¶ 92 (no limitation); Doc. 283-10, Poehler Report ¶ 172 n.428 (a plan consolidated 2012 with 85 options); Ex. P8, Poehler Dep. 226:12–227:2 (TIAA bid on sole recordkeeping on a plan with over 100 funds in 2010).

[29] Ex. P14, Campbell Dep. 36:18–37:9, 46:14–23, 46:20–47:2.

[30] *Id.* at 46:14–23; Doc. 281-52, 2009 Plan Document § 4.13 (p. 22) (same).

[31] *Infra*, ¶ 62.

[32] *See infra* ¶ 63. While the Workday transition motivated Defendants to pursue sole recordkeeping, sole recordkeeping was not dependent on Workday. Ex. P15, Jan. 20, 2015 Email from H. Penney.(YALE00003271) ("Sole Record Keeping . . . can launched as planned . . . because it is not dependent on Workday.").

evaluate the proposals and assist in conducting the negotiations.[33]

**RESPONSE**: Deny. Plaintiffs incorporate by reference their response to paragraph 11.

Plaintiffs do not dispute that Yale sent an "RFP" only to TIAA and Vanguard in 2014. However,

Vanguard never bid (or it quickly withdrew its bid), so Defendants received only a unilateral

price proposal from TIAA.[34] Defendants' procurement policy required an RFP to multiple

bidders, and they regularly conducted RFPs for other benefits services.[35] Defendants' issuance of

an "RFP" only to incumbents was contrary to industry practice.[36]

13.    In the summer of 2014, Yale entered into an agreement with TIAA to transition to

sole recordkeeping and apprised Vanguard that its recordkeeping services would be terminated.

The transition was successfully completed in early 2015. *Pensions & Investments* magazine gave

Yale a first-place "Eddy Award" in the Conversion category for its efforts.[37]

**RESPONSE**: Plaintiffs deny the third sentence as immaterial. The "Eddy Award" related

only to the communications and "praised" Yale's "capturing a sense of place by using campus

photographs in its campaign . . . ," rather than anything related to its prudence.[38]

14.    At the end of 2015, over half of the 200 largest TIAA 403(b) clients still used

---

[33] Doc. 281-79, TIAA_YALE_00060576 (Mar. 2011 call with TIAA re "sole recordkeeping"); Doc. 281-55, YALE00145429 (May 2013 TIAA Draft Proposal); Doc. 281-51, YALE00119889 (initial Jan. 2014 RFP); Doc. 2816-68, Aon-Yale-014297 (June 2014 RFP-Vanguard); Doc. 281-71, Aon-Yale-019904 (June 2014 RFP-TIAA); Doc. 283-17, YALE00087197 at 6 (July 2014 Aon analysis recommending TIAA as sole recordkeeper).
[34] Ex. P2, Penney Dep. 291:8–11; Ex. P16, Rux Dep. 47:23–48:9.
[35] *See infra* ¶ 55.
[36] ███████████████████████████████████████████████████████████████████████;
Ex. P8, Poehler Dep.238:14–239:8 (testifying that he never did an RFP with only one bidder); Ex. P17, G. Poehler and L. Pranger, "ICCCFO Conference 403(b) Plan Governance" (Apr. 26, 2012) at 7 ("Mercer solicits fee quotes . . . from four to six 403(b) providers . . .") Ex. P8, Poehler Dep. 232:7–233:6 (authenticating the 2012 presentation).
[37] Doc. 283-17, YALE00087197 (July 2014 Aon presentation); Doc. 281-56, YALE00156557 (July 2014 recommendation); Doc. 283-23, Compiled Minutes, at CM-14 (Aug. 2014) (reaffirming choice of TIAA); Doc. 281-32, YALE00011053 (Aug. 2014 Vanguard termination letter); Doc. 281-18, Castello Tr. 55:7-20 (transition was "enormous project"); doc. 281-23, Penney Tr. 170:3-173:7 (describing complexities of consolidation); Doc. 281-24, Polak Tr. 118:19-119:23 (same); Doc. 281-98, *Pensions & Investments* Article (p. 3, Vol. 44, Mar. 21, 2016).
[38] Doc. 281-98 at 5.

multiple recordkeepers. Of the 23 private universities with at least $1 billion in a 403(b) retirement plan in 2015, Yale was just the third to move to a sole recordkeeper. The two other universities (California Institute of Technology and University of Rochester) both offered substantially fewer investment options (41 and 40) than Yale's Plan (116).[39]

**RESPONSE**:  Deny as immaterial. In 2010, 80% of 403(b) plans had a single recordkeeper.[40] As discussed below in paragraph 61, industry professionals universally recommended a single recordkeeper. Moreover, TIAA's clients include a significant number of public plans,[41] which are not subject to ERISA. Many are required by law to have multiple recordkeepers; their failure to use a single recordkeeper does not demonstrate prudent practice.[42] Of the 23 private universities, Poehler admitted he excluded MIT; Fidelity was the sole recordkeeper for MIT.[43] He also said three more consolidated in 2015 or before—New York University, Notre Dame and Vanderbilt.[44] Limiting comparisons solely to universities is incorrect. Defendants' practice was to include non-university companies when benchmarking benefits.[45]

15.    As of 2011, every one of TIAA's 200 largest 403(b) clients compensated TIAA for recordkeeping through asset-based fees charged to participants who invested in TIAA's investment options. Hugh Penney had repeatedly asked TIAA to provide a recordkeeping discount based on

---

[39] Doc. 281-109, Friedman Decl. ¶¶ 8–9; Doc. 283-10, Poehler Rpt. ¶ 172 n. 428 & Ex. 1.
[40] Doc. 283-9, Otto Report ¶¶ 62–63 (citing surveys finding 85% and 78% in 2010).
[41] *See, e.g.*, Ex. P18, the State University of New York TIAA homepage; Ex. P19, University of Michigan TIAA homepage; Ex. P20, University System of Georgia TIAA homepage; Ex. P21, University of Iowa TIAA homepage.
[42] Ex. P8, Poehler Dep. 93:14–94:24; Ga. Code § 47-21-3.
[43] Ex. P8, Poehler Dep. 270:17–24.
[44] Doc. 283-10, Poehler Report, Ex. 1 (p. 123) ("The NYU Medical Plan consolidated to TIAA as their sole recordkeeper in 2013 . . . [t]he University of Notre Dame 403(b) Retirement Plan has utilized Fidelity as its 'sole recordkeeper' since January 1, 2015 . . . [and] [i]n 2015, Vanderbilt's Retirement Plan and New Faculty Plan moved to a 'sole recordkeeper' . . .").
[45] Ex. P22, Feb. 17, 2014 Emails Between S. Bedard and M. Peel (YALE00239611) at 4–5 ("I would like to have only 14 organizations so that it is an even balance between Ivy League peers and prestigious private sector employers.").

the size of Yale's Plan, but TIAA refused.[46]

**RESPONSE**: Deny as immaterial. Plaintiffs incorporate paragraph 57 demonstrating that industry professionals recommended per-participant pricing. Per-participant pricing was common for large plans in 2010.[47]

16.     In early 2011, TIAA began discussing pricing with its largest clients. TIAA initially proposed lowering the asset-based fee from 20 bps to 12 bps. Yale engaged a consultant (Aon) to assess the reasonableness of TIAA's proposal. TIAA ultimately agreed to an asset-based rate of 9.5 bps and applied a rebate retroactive to January 2011, resulting in a $1.9 million refund.[48]

**RESPONSE**: Deny. TIAA promoted plan-specific pricing to Yale in August 2010.[49] Yale did nothing until TIAA unilaterally approached it with an offer in February 2012.[50] TIAA's proposed fee reduction was not accepted until December 20, 2012.[51] Defendants' motivation in accepting this agreement was to obtain a revenue credit account as quickly as possible to reimburse expenses and employee salaries.[52] Aon Hewitt advised Defendants that they could

---

[46] Doc. 281-108, Reilly Decl. ¶ 5; Doc. 281-110, Penney Decl. ¶ 9; Doc. 281-17, TIAA 30(b)(6) (Campbell) Tr. 342:19-22 (shortly before August 2010, "Yale was asking us about the share classes," but "we only had retirement share classes on the menu").

[47] Ex. P16, Rux Dep. 28:14–16.

[48] Doc. 281-29, YALE00000008 at -009 (initial TIAA proposal); Doc. 281-81, TIAA_YALE_00066437 & TIAA_YALE_00066442 at Item 16 (Apr. 2012 proposed 12 bps rate), Doc. 281-117, TIAA_YALE_00069210 (July 2012 Aon requests to TIAA); Doc. 281-70, Aon-Yale-014774 (Oct. 2012 Aon email re TIAA counterproposal); Doc. 281-69, AON-Yale-014694 (Oct. 2012 Aon email approving latest offer); Doc. 281-61, YALE00222947 at -947 (Nov. 2012 email from benefits counsel calling the 9.5 bps rate "great" and "the lowest I've seen so far"); Doc. 281-23, Penney Tr. 235:17-236:3 (discussing negotiations); Doc. 281-35, YALE00013595 (Amendment to Recordkeeping Agmt.); Doc. 283-10, Poehler Rpt. Ex. 3 (administrative fee summary).

[49] Ex. P23, TIAA-CREF Client Services, New Mutual Fund Share Class Pricing for Yale University (August 4, 2010) (TIAA_YALE_00090370) at 4 ("Created new pricing team and enhanced financial analytics system to support activity based costing and plan-level pricing"); Doc. 283-23, Consolidated Minutes at CM1 (discussing an "'ERISA account' proposal" and the need to ensure "these fund will be used to support qualified plan expenses").

[50] Doc. 281-29, TIAA-CREF, Making the most of your retirement plan (Feb. 2012) (YALE0000008) at ECF p. 3.

[51] Doc. 281-35, Amendment No. 4 to TIAA Recordkeeping Agreement (YALE00013595) at 4.

[52] Doc. 281-69, Email between H. Penney and D. Swallow (AON-Yale-014694) at 3 ("Time is also important because we can't start using the funds until we get them."); Ex. P24, Email between C. Hendel and M. Wakino (YALE00143781) at 1–2 ("fast track the loan agreement" to begin charging invoices to the revenue credit account).

obtain further reductions through a per-participant fee and sole recordkeeping.[53] Plaintiffs incorporate by reference paragraph 67 discussing how Aon Hewitt's analysis demonstrated that Yale was paying over two times more than a similar plan using a single recordkeeper and per-participant fees.

17.     In 2014, Yale engaged Aon to re-assess the reasonableness of the Plan's recordkeeping fees. Following negotiations, TIAA agreed to a $61 per unique participant fee, equivalent to an asset-based fee of 2.4 bps, effective January 1, 2015.[54]

**RESPONSE**: Deny. Aon was engaged to obtain pricing from the Plan's incumbent providers for a sole or master recordkeeper relationship.[55] Defendants did not conduct competitive bidding, as is accepted practice, nor did they conduct any benchmarking.[56] The $61 per-participant price was not adopted as result of the 2015 recordkeeper consolidation but was a later adjustment made in response to share class restructuring for TIAA annuities.[57]

18.     In 2017, Yale reevaluated its TIAA recordkeeping fee. After negotiations, TIAA ultimately agreed to a rate of ███████████.[58]

**RESPONSE**: Admit.

19.     From 2010–2014, the Plan's per-participant fees fell between the 25th and 75th

---

[53] Doc. 281-69, Emails between H. Penney and D. Swallow (AON-Yale-014694) at 1.

[54] Doc. 281-118, YALE00187204 (Dep. Ex. 191) (Apr. 2014 engagement letter); Doc. 281-57, YALE00157329 at -330 (2016 amendment setting fees at $61 per unique participant); Doc. 283-10, Poehler Rpt. Ex. 3 (2.4 bps).

[55] Doc. 281-118 (YALE00187204) at 2–3.

[56] *See infra* ¶ 54 (accepted practice to conduct competitive bidding every three to five years); ███████████ ███████████ Ex. P2, Penney Dep. 87:12–19 (Yale never conducted a fee benchmarking study); *id.* at 249:20–250:1 (the only RFP process was in the 2014).

[57] Ex. P25, Amendment No. 6 to the TIAA-Yale Recordkeeping Agreement (Mar.6, 2015) (YALE00050105) at 33; ███████████

[58] Doc. 283-20, TIAA_YALE_00076813 at -815 (Feb. 2017 Aon email re Hugh Penney requests for fee information); Doc. 283-18, Aon-Yale-049435 (Oct. 2018 email transmitting TIAA's proposal ███████████ ███████████); Doc. 283-23, Compiled Minutes at CM-77 (Dec. 2018) (discussing negotiations); Doc. 283-24, YALE00244166 at -166 (signed amendment); Doc. 283-10, Poehler Rpt. Ex. 3 (historical figures).

percentile of the top 200 TIAA clients. From 2015–2018, the Plan's per-participant fees fell in the

lowest quartile. In addition, the Plan's per-participant fees were comparable to or lower than those

of NYU's faculty plan from 2010–2018.[59]

**RESPONSE**: Deny as immaterial. Plaintiffs incorporate by reference paragraphs 65–71

demonstrating that the Plan paid millions of dollars in excessive fees. The third sentence of

paragraph 19 is not based upon admissible evidence under Fed. R. Evid. 801, 802, and 703. The

comparison to "NYU's faculty plan" is based upon another expert's calculation in that

litigation.[60] Defendants' expert admitted that he did not rely on calculations from litigation in

practice.[61] Further, Defendants' expert's exhibit does not include 2018 and demonstrates that the

Plan paid significantly more than "NYU's faculty plan" in 2010 and 2012.[62] Additionally,

Defendants' expert admits higher education plans acted as if they did not have fiduciary

responsibilities well into the class period. [63] Additionally, Defendants included non-university

private companies when benchmarking benefits.[64]

20.     As of 2010, Vanguard used asset-based fees for 403(b) plans and did not negotiate

per-participant pricing. Prior to 2013, when Yale negotiated for a lower share class for certain

Vanguard funds, Yale paid the same rate as other university clients who used Vanguard to

recordkeep Vanguard funds.[65]

---

[59] Doc. 283-10, Poehler Rpt. Exs. 4-6 (comparing Plan fees to NYU fees and Top 200 TIAA clients); Doc. 281-108, Reilly Decl. ¶ 5.
[60] Doc. 283-10, Poehler Report Ex. 5 (p. 128).
[61] Ex. P8, Poehler Dep. 286:16–287:23 (testifying that he would not rely on public disclosures to benchmark fees).
[62] Doc. 283-10, Poehler Report Ex. 5 (p. 128).
[63] Doc. 283-10, Poehler Report ¶¶ 18–19, 46–47; *see also* Doc. 283-9, Otto Report ¶¶ 16–17 ("The practical operation of the 403(b) marketplace, in general, has been a fiduciary nightmare.").
[64] Ex. P22, Feb. 17, 2014 Emails Between S. Bedard and M. Peel (YALE00239611) at 4–5 ("I would like to have only 14 organizations so that it is an even balance between Ivy League peers and prestigious private sector employers.").
[65] Doc. 281-25, Vanguard 30(b)(6) (Rux) Tr. 27:25-28:6 ("it was not practiced in the 403(b) space at that point in time"); Doc. 283-10, Poehler Rpt. ¶¶ 75-76 & Ex. 10.

**RESPONSE**: Deny. Vanguard testified that it did not prohibit per-participant pricing for

403(b) clients, which was common for large 401(k) clients.[66] Vanguard testified it informed Yale

it required just $500,000 to recordkeep all Yale-sponsored plans ("Yale Plans") in 2011.[67] Yale

paid far more than $500,000 until 2014.[68] Defendants' expert's comparison, which they claim

demonstrates that the Plan paid the same rate as other University clients, is based on an asset-

based fee.[69] But as Defendants' expert wrote in 2012, only "hard-dollar, per participant fees . . .

reflect the 'true' cost of providing administration.'"[70] Plaintiffs incorporate paragraphs 53–71

regarding the Plan's ability to reduce its recordkeeping fees prior to 2013.

21.     Prior to the Committee's formation in 2012, Hugh Penney reviewed the Plan's fund

lineup. Penney and Peel also held annual investment review meetings with TIAA and Vanguard

to ask questions about fund performance and strategy and, as necessary, solicited the advice of

Dean Takahashi, the second-in-command at Yale's Investments Office.[71]

**RESPONSE**: Deny. Plaintiffs admit Defendants relied entirely on Penney to review

investments before 2012.[72] Plaintiffs deny that Penney or Peel solicited advice from the investment

office until Herrington in 2017.[73] The correspondence Defendants cite does not involve Takahashi

---

[66] Ex. P16, Rux Dep. 27:12–28:16 (testifying that larger clients had negotiated per-participant pricing with Vanguard in 2010, nothing prevented a 403(b) from doing it, and it was common among larger 401(k) plans).

[67] Ex. P16, Rux Dep. 24:21–25:13.

[68] Doc. 283-10, Poehler Report, Ex. 3 (p. 126).

[69] Doc. 283-10, Poehler Report ¶¶ 75-76 & Ex. 10 (p. 134).

[70] Ex. P17, G. Poehler and L. Pranger, "ICCCFO Conference 403(b) Plan Governance" (Apr. 26, 2012) at 5.

[71] Doc. 281-23, Penney Tr. 72:18-73:2; 77:18-79:6, 158:13-19 (discussing review process); Doc. 281-110, Penney Decl. ¶ 7 (same); Doc. 281-22, Peel Tr. 44:12-45:9, 59:4-60:4, 65:3-66:13 (same); Doc. 283-19, TIAA_YALE_00059633 (Sept. 2010 email regarding evaluation of TIAA Traditional Annuity); Doc. 281-17, TIAA 30(b)(6) (Campbell) Tr. 310:25-314:3 (describing a 2010 presentation in connection with the review process).

[72] *See infra* ¶ 57.

[73] Ex. P2, Penney Dep. 88:6–13 ("Q· At any time during your employment with Yale, have you sent any information regarding the plan to the investment office? A. I have not.· . . ."); Ex. P26, Peel Dep. 78:13–16 ("Q· So prior to the time that Alex Hetherington was involved, nobody from the investments office was involved with monitoring YURAP; is that right? A· That's correct."); Ex. P27, Hetherington Dep. 51:22–52:11 ██████████████████████████████████████████████████████████████████ ; Ex. P28, Mar. 10, 2011 emails regarding Defined Contribution Plan (YALE00229546) at 1–2 (emails regarding the

reviewing the Plan's investment options.[74] Takahashi was critical of TIAA;[75] ███████████

████████████████████████████████████████[76] No investments office employee

was involved in investment review until Hetherington in 2017.[77]

22.      Beginning in 2012, the Committee reviewed the Plan's investment lineup at annual

review meetings, which often lasted several hours. The Committee's members studied fee and

performance disclosure statements for each of the Plan's investments. They also reviewed

Morningstar evaluations and, where necessary, requested additional information from the Plan's

vendors or from the Yale Investments Office. In addition to reviewing individual investments, the

Committee discussed other Plan-wide considerations, like diversification, benchmarking, and

active versus passive investment strategies.[78]

**RESPONSE**: Deny. Plaintiffs incorporate paragraphs 72–85 discussing the inadequacy

of Defendants' investment monitoring. Plaintiffs dispute that "additional information" was

requested from the Investments Office prior to Hetherington joining the Committee.[79] King,

---

need to establish a "process of fulfilling fiduciary requirements in relation to the 403(b) plans" that include Takahashi).

[74] Doc. 283-19, Sept. 9, 2010 Email from Sheryl Hempel (TIAA_YALE_00059633); Ex. P29, Aug. 5, 2010 emails regarding "Yale Follow-Up" (TIAA-Yale-00059608) at 5.

[75] Ex. P30, D. Takahashi, Faculty Aging An Inconvenient (Lux et) Veritas (Feb. 1, 2011) (YALE00241292) at 19 (noting TIAA's "high administrative fee" and "problems with fixed annuities" such as "a very low guaranteed rate of return"); Ex. P28, Mar. 10, 2011 emails regarding Defined Contribution Plan (YALE00229546) at 1–2 ("we should fulfill our fiduciary monitoring and reporting requirements" and "[w]hen can we wage a proxy battle against the TIAA directors?").

[76] Ex. P31, Jan. 20, 2012 Email from C. Hendel (YALE00139830) at 1 ████████████████████████████ ████████████████████████████████████

[77] Consolidated Minutes, CM-20–22, CM-33.

[78] Doc. 281-24, Polak Tr. 38:20-41:5 (describing review process); Doc. 281-19, Hendel Tr. 35:16-37:21, 46:24-47:15, 185:15-20 (same); Doc. 281-23, Penney Tr. 131:19-132:1, 134:18 (same); Doc. 281-21, Murphy Tr. 239:15-19 ("multiple conversations" about active versus passive management); Doc. 283-16, TIAA 30(b)(6) (Campbell) Tr. 321:25-322:17 ("it was routine for the committee to want to drill down on various issues . . . and ask us to provide follow-up information, and we did that"); Doc. 281-20, King Tr. 31:23-34:11 (discussions with the Investments Office); Doc. 281-66, YALE00243424 (Apr. 2010 TIAA review); Doc. 281-39, YALE00033171 (May 2012 Vanguard review); Doc. 281-78, TIAA_YALE_00060388 (Sept. 2013 CREF Stock information sheet); Doc. 281-40, YALE00036230 (July 2015 Polak email re TIAA presentation). Annual reviews are also noted throughout the Committee minutes. *E.g.*, Doc. 283-23, Compiled Minutes at CM-3, CM-13, CM-16.

[79] *See supra* n.73.

whose testimony Defendants cite, admitted that she was not referring to discussions of

investment options but "more of a general conversation" and could not recall what was discussed

or with whom.[80] Defendants requested no benchmark beyond those provided them by TIAA and

Vanguard.[81] The discussion of active versus passive investments, benchmarks and diversification

that Defendants mention was part of the process for selecting a new fund lineup in 2019.[82]

23.     Yale's outside consultants at Aon were impressed by Yale's process, calling it

"second to none." Yale's senior relationship manager at TIAA said Yale was "always pushing the

envelope" in supporting their plan and were "very actively involved," "[m]ore so than most."[83]

**RESPONSE**: Deny. Plaintiffs incorporate paragraphs 72–85 discussing the inadequacy

of Defendants' investment monitoring. The testimony cited does not relate to Defendants'

process for reviewing investments. ███████████████████████████████████████

████████████████████████████████████████.[84] ██████████████████████

████████████████████████████████████████████████████████████

████████████.[85] Murphy's first meeting as a Committee member was February 2016, and

---

[80] Ex. P32, King Dep. 32:9–33:13.
[81] Ex. P26, Peel Dep. 108:10–109:6; Ex. P33, Kimball Dep. 120:7–17.
[82] Ex. P11, Hendel Dep. 35:16-37:21 (testifying as to process to "help them make their decisions about what funds should be in the lineup"), 46:24-47:15, 185:15-20 (recalling discussion about CREF Stock but no details).
[83] Doc. 283-16, Swallow Tr. 201:16-203:19 (███████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████
████████████; Doc. 281-17, TIAA 30(b)(6) (Campbell) Tr. 100:24-101:21, 103:23-104:15 ("Yale was always pushing the envelope in terms of they were very actively involved to support their retirement plan. More so than most other Plan sponsors. They – they would be engaged with their employees, ask what their needs were about retirement planning, make sure they understood the benefits . . . . [A]s an employer, they were very engaged, more so than almost any client that I have dealt with in my entire career, about getting the word out for their employees on the Retirement Plan. . . Yale was an engaged, an enthusiastic HR department that wanted to make sure Yale got the most out of its retirement program.").
[84] Doc. 283-16, Swallow Dep. 201:16–202:3 ████████████████████████████████████████
████████████████████; Doc. 283-23 Consolidated Minutes at CM-33–CM-34 (no discussion of investment review).
[85] Ex. P13, Swallow Dep. 211:7–20; Doc. 283-23 Consolidated Minutes at CM-33.

Hetherington's first meeting was in February 2017.[86] The statements Defendants cite from Campbell do not relate to investments but "engaging with their employees", "ask[ing] what their needs were about retirement planning, mak[ing] sure they understood the benefits" and "getting the word out for their employees."[87] Because the Plan had 112 investments prior to 2012, it would be impossible to monitor them effectively in a single one to three hour meeting a year.[88]

24.     After the Plan transitioned to TIAA as sole recordkeeper in 2015, the Committee undertook a complex project to assess the Plan's investment options and develop a new qualified default investment alternative (QDIA) with a guaranteed annuity component. *Pensions & Investments* gave Penney and Castello an Innovation Award for Yale's innovative QDIA efforts.[89]

**RESPONSE**:  Deny as immaterial. Plaintiffs challenge neither the custom target date funds nor the target date funds in the Plan prior to the adoption of the custom funds. Moreover, Defendants added the custom target date funds before removing numerous imprudent investments in the plan, without advice from any professional that it was prudent to do so.[90] A prudent fiduciary would not conduct a complex and unnecessary project like designing a custom target date fund prior to addressing the other problems with the Plan's lineup.[91] For example, at that time,

---

[86] *Id.* at CM-20–22, CM-33.
[87] Doc. 281-17, Campbell Dep. 100:24-101:21, 103:23-104:15.
[88] Ex. P6, Improta Dep. 83:22–85:17 ███████████████████████████████████████████ ; Ex. P2, Penney Dep 131:15–132:11, 133:1–3.
[89] Doc. 281-24, Polak Tr. 38:20-41:5 (describing review process); Doc. 281-19, Hendel Tr. 35:16-37:21, 46:24-47:15,185:15-20 (same); Doc. 281-23, Penney Tr. 131:19-132:1, 134:18 (same); Ex. 21, Murphy Tr. 239:15-19 ("multiple conversations" about active versus passive management); doc. 283-16, TIAA 30(b)(6) (Campbell) Tr. 321:25-322:17 ("it was routine for the committee to want to drill down on various issues . . . and ask us to provide follow-up information, and we did that"); Doc. 281-20, King Tr. 31:23-34:11 (discussions with the Investments Office); Doc. 281-66, YALE00243424 (Apr. 2010 TIAA review); Doc. 281-39, YALE00033171 (May 2012 Vanguard review); Doc. 281-78, TIAA_YALE_00060388 (Sept. 2013 CREF Stock information sheet); Doc. 281-40, YALE00036230 (July 2015 Polak email re TIAA presentation). Annual reviews are also noted throughout the Committee minutes. *E.g.*, Doc. 283-23, Compiled Minutes at CM-3, CM-13, CM-16.
[90] Ex. P35, Bedard Dep. 124:12–16.
[91] Doc. 283-5, Dominguez Report ¶¶ 181–90; ████████████████████████████ .

Defendants did not even have an investment policy statement for the Plan.[92]

25.     The TIAA Traditional Annuity is a fixed annuity product that has been available to Plan participants since the inception of Yale's Plan in 1920. In June 2010 and June 2015, the Plan had $801 million and $942 million invested in the Traditional Annuity, respectively, making it the Plan's largest investment both years.[93]

**RESPONSE**: Deny as immaterial. Popularity is not a consideration in evaluating investments.[94] "A due diligence process must be followed in selecting money managers" and an investment "should not be selected ... because everyone else . . . uses the same manager."[95]

26.     TIAA Real Estate is a variable annuity that investments [sic] approximately 80% of its assets directly in real estate or real-estate-related assets, with the remainder invested in publicly traded securities and high-quality liquid investments. In June 2010 and June 2015, the Plan had $37.5 million and $144.2 million invested in TIAA Real Estate, respectively.[96]

**RESPONSE**: Deny. Plaintiffs incorporate by reference their response to paragraph 25.

27.     TIAA Real Estate is not a real estate investment trust ("REIT"). Because REITs invest mostly in public equities whereas TIAA Real Estate mostly does not, the performance of TIAA Real Estate is less correlated with the stock market than the performance of REITs.[97]

**RESPONSE**: Deny. REITs are not materially different than TIAA Real Estate because both are managed by the same type of real estate professionals and hold real estate.[98] The TIAA

---

[92] Ex. P2, Penney Dep. 270:10–15.
[93] Doc. 281-62, YALE00242102 at -102, -122; Doc. 281-49, YALE00110145 at -166; Doc. 283-4, Chalmers Rpt. Ex. 2a; Doc. 281-23, Penney Tr. 40:12-41:8 (discussing the history of the Plan).
[94] Doc. 283-6, Dominguez Rebuttal Report ¶ 94.
[95] Ex. P36, Donald B. Trone et al., *The Management of Investment Decisions*, at 134 Irwin (1996).
[96] Doc. 281-95, TIAA Real Estate Account Prospectus (2010) at 3-5; Doc. 281-62, YALE00242102 at -122 (2009 Form 5500); Doc. 281-49, YALE00110145 at -166 (2014 Form 5500).
[97] Doc. 283-4, Chalmers Rpt. ¶¶ 97-98 & Exs. 10a, 10b, 11; Doc. 281-24, Polak Tr. 220:20-222:12 (discussing differences between TIAA Real Estate and REITs); Doc. 281-107, *Sacerdote* Chittenden Decl. ¶¶ 60-61.
[98] Doc. 283-6, Dominguez Rebuttal Report ¶ 137.

Real Estate's lack of correlation to the stock market is because it is not marked to market daily and leads to a misleading and distorted correlation profile.[99] Both the TIAA Real Estate Account and a REIT's true values depend on their real estate holdings.[100] Cammack, one of the investment advisors considered by Defendants, used a REIT index to benchmark TIAA Real Estate.[101] TIAA Real Estate invests in REITs and used REIT indexes as part of its benchmark.[102]

28.     TIAA uses a custom benchmark for TIAA Real Estate: the REA Composite Index. However, TIAA Real Estate and the REA Composite Index are priced using different methodologies. Accordingly, to compare TIAA Real Estate's performance with the benchmark, "the Account's direct real estate property returns must first be calculated using [the appropriate] methodology" to generate "*TIAA REA-with NCREIF-Calculated Property Returns*." When its performance is computed using the appropriate methodology, TIAA Real Estate outperformed the REA Composite Index over three-, five- and ten-year windows ending December 31, 2009.[103]

**RESPONSE**: Deny. TIAA only used the REA Composite Index until 2012 and then changed the benchmark to the NCREIF Fund Index – Open End Diversified Core Equity.[104] Using adjusted returns is conceptually misguided, as individuals saving for retirement care about actual returns, not adjusted returns to account for special restrictions in a fund.[105] As discussed below, TIAA Real Estate's actual returns underperformed their benchmarks for years prior to

---

[99] *Id.* ¶ 133.
[100] *Id.* ¶¶ 133–136 (citing numerous scholarly publications).
[101] Ex. P37, PX0617, *Sacerdote v. New York Univ.*, No. 16-06284 (Cammack Mar. 31, 2009 Fiduciary Due Diligence Report) at NYU0102357 and 407.
[102] Doc. 281-114, TIAA Real Estate Quarterly Analysis (Dec. 2009) (Dep. Ex. 330) at 3.
[103] Doc. 281-114, TIAA Real Estate Quarterly Analysis (Dec. 2009) (Dep. Ex. 330) at 2-3 (index "should not be construed . . . as an accurate indication" of relative performance due to "differences in methodology").
[104] Ex. P38, TIAA Real Estate 8-K, includes Quarterly Analysis for the Quarter Ending Sept. 30, 2017) at 1.
[105] Doc. 286-6, Dominguez Rebuttal Report ¶¶ 126–131.

2010.[106] ████████████████████████████████████ [107]

29.     Each year from 2010 to 2018, 196 or more of the 200 largest TIAA 403(b) clients as of December 2010 held assets in TIAA Real Estate, and between 151 and 181 allowed active contributions. Of 40 higher education institutions with at least $1 billion in assets across all 403(b) plans, 37 offered TIAA Real Estate in in 2010 and 36 offered TIAA Real Estate in 2017.[108]

**RESPONSE**: Deny as immaterial. Plaintiffs incorporate by reference their response to paragraph 25 regarding an investment's popularity. The data Defendants cite from TIAA demonstrates that nearly 20 of the top 200 clients froze contributions to TIAA Real Estate by 2010 and nearly 50 by 2018.[109] Per Defendants' expert, 13 of the 40 higher education institutions with at least $1 billion in assets "no longer offer[] the TIAA Real Estate Account, ha[ve] frozen new investments, or did not have information publicly available regarding fund status."[110] Defendants included non-university private sector employers in benefits benchmarking.[111]

30.     In September 2014, Committee member Ben Polak asked TIAA for data demonstrating the correlation between the performance of the TIAA Real Estate Account and the Case-Shiller Home Price Index to assess whether Plan participants were able to effectively diversify risks. TIAA supplied the requested data, which showed that, because TIAA Real Estate invests mainly in commercial real estate, it had low correlation with residential real estate.[112]

**RESPONSE**: Admit. Plaintiffs note that this information could have been obtained

---

[106] *See infra* ¶¶ 86–88.
[107] Ex. P39, Aon Sample Quarter Investment Review (YALE00081923) at 11; Ex. P34, YALE00150485 at 99; Ex. P40, Ryan Dep. 97:18–25, 107:21–109:23.
[108] Doc. 281-109, Friedman Decl. ¶¶ 5, 7; Doc. 283-4, Chalmers Rpt. ¶ 60, Ex. 5d.
[109] Doc. 281-109, Friedman Decl. ¶ 7.
[110] Doc. 283-4, Chalmers Report, Ex. 5d n.3 (p. 141–43).
[111] Ex. P22, Feb. 17 Emails Between S. Bedard and M. Peel (YALE00239611) at 4.
[112] Doc. 281-33, YALE00013529 (Sept. 2014 email chain regarding request); Doc. 281-34, YALE00013531 (TIAA response showing low correlation); Doc. 281-24, Polak Tr. 45:21-46:16 (describing correlation inquiries).

merely by reading TIAA Real Estate's regulatory filings that provide its holdings.[113]

31.    The CREF Stock Account is a variable annuity. It employs a diversified strategy that combines active and passive management in both domestic and foreign securities. In June 2010 and June 2015, the Plan had $553.0 million and $735.4 million invested in CREF Stock, respectively, making it the Plan's second largest investment both years.[114]

**RESPONSE**: Deny as immaterial. Plaintiffs incorporate by reference their response to paragraph 25 regarding an investment's popularity.

32.    The prospectus for CREF Stock uses a custom index, the CREF Stock Account Composite Index, as a benchmark. From 2009 to 2019, CREF Stock's ten-year annualized returns never trailed those of its prospectus benchmark by more than 38 basis points, even though CREF Stock, unlike the index, reports performance net of fees and expenses.[115]

**RESPONSE**: Deny as immaterial. Plaintiffs allege that CREF Stock should have been removed in August 2010, so its performance after that point is irrelevant other than to determine loss. *Terreza v. Safeway Inc. ("Terreza")*, 16-cv-03994-JST, 2019 WL 1589979 at *1-2.[116] From 2005 until 2010, CREF Stock underperformed its 10-year composite benchmark every year and often by more than 38 basis points.[117] Defendants admit that TIAA used the Russell 3000, a broad-based domestic-only benchmark, for the CREF Stock Account in various regulatory

---

[113] Ex. P41, TIAA Real Estate 2017 10-K https://sec.report/Document/0001628280-18-003214/, *archived at* https://perma.cc/4EP5-WC44 at 26 (residential properties were less than 23% ($3,671,000 of $16,161,100) TIAA Real Estate's property holdings).
[114] Doc. 281-120, CREF Prospectus (2010) (Dep. Ex. 295) at 16-18; Doc. 281-62, YALE00242102 at -122; Doc. 281-49, YALE00110145 at -166); Doc. 283-4, Chalmers Rpt. Ex. 2a.
[115] Doc. 281-120, CREF Prospectus (2010) (Dep. Ex. 295) at 49-50; Doc. 281-101, CREF Stock Account Prospectus (2011) at 54-55 (transition from four-index to two-index benchmark); Doc. 283-4, Chalmers Rpt. ¶¶ 79-82 & Ex. 8a.
[116] Citing *Pension Ben. Guar. Corp. ex rel. St. Vincent Catholic Med. Centers Ret. Plan v. Morgan Stanley Inv. Mgmt. Inc. ("PBGC")*, 712 F.3d 705 at 716 (2d Cir. 2013).
[117] Ex. P42, Rule 1006 Exhibit on Investment Performance at 1.

filings.[118] Additionally, Cammack, one of the investment advisors that Defendants considered in its RFP, used the S&P 500 to benchmark CREF Stock during the class period.[119] Plaintiffs incorporate by reference paragraphs 86–88 regarding CREF Stock's imprudence.

33.     Each year from 2010 to 2018, 197 or more of the 200 largest TIAA 403(b) clients as of December 2010 held assets in CREF Stock, and between 163 and 185 allowed active contributions. Of 40 higher education institutions with at least $1 billion in assets across all 403(b) plans, 38 offered CREF Stock in 2010 and 37 offered CREF Stock in 2017.[120]

**RESPONSE**: Deny as immaterial. Plaintiffs incorporate by reference their response to paragraph 25 regarding an investment's popularity. Defendants' data from TIAA demonstrates that 16 of the top 200 clients froze contributions to CREF Stock by 2010 and 37 by 2018.[121] , Defendants' expert admitted that 13 of the 40 higher education institutions with at least $1 billion in assets "no longer offer[] the CREF Stock Account, ha[ve] frozen new investments, or did not have information publicly available regarding fund status."[122] Defendants' advisor, Aon Hewitt, consistently recommended removal of CREF Stock from 2012 until present.[123] Defendants included non-university private sector employers when benchmarking benefits.[124]

34.     The CREF Global Equities Account is a variable annuity. It typically allocates 50 percent of its assets to domestic securities and the rest to foreign securities. Of 40 higher education institutions with at least $1 billion in assets across all 403(b) plans, 38 offered the CREF Global

---

[118] Defs.' Answer (Doc. 117) ¶ 184 ("Defendants admit that the TIAA-CREF disclosures presented the Russell 3000 Index as a benchmark for the CREF Stock Account").
[119] Ex. P37, PX00617, *Sacerdote*, No. 16-06284 (Cammack May 15, 2009 Fiduciary Due Diligence Report) at 53.
[120] Doc. 281-109, Friedman Decl. ¶¶ 4, 6; Doc. 283-4,Chalmers Rpt. Ex. 5b.
[121] Doc. 281-109, Friedman Decl. ¶ 6.
[122] Doc. 283-4, Chalmers Report, Ex. 5b n.3 (p. 133–34).
[123] *See infra* ¶ 87.
[124] Ex. P22, Feb. 17, 2014 Emails Between S. Bedard and M. Peel (YALE00239611) at 4.

Equities Account in 2010 and 37 offered the CREF Global Equities Account in 2017.[125]

**RESPONSE**: Deny as immaterial. Plaintiffs incorporate by reference their response to paragraph 25 regarding an investment's popularity. Defendants' expert admitted that 23 of the 40 higher education institutions with at least $1 billion in assets "no longer offer[] the CREF Global Equities Account, ha[ve] frozen new investments, or did not have information publicly available regarding fund status."[126] Aon Hewitt recommended removal of CREF Global Equities in 2012.[127] Defendants included non-university employers when benchmarking benefits.[128]

35.     The CREF Inflation-Linked Bond Account is a variable annuity that typically invests 80% of its assets in U.S. Treasury inflation-indexed securities. Of 40 higher education institutions with at least $1 billion in assets across all 403(b) plans, 37 offered the CREF Inflation-Linked Bond Account in 2010 and 37 offered the CREF Inflation-Linked Bond Account in 2017.[129]

**RESPONSE**: Deny as immaterial. Plaintiffs incorporate by reference their response to paragraph 25 regarding investment popularity. Defendants' expert admitted that 22 of the 40 higher education institutions "no longer offer[] the CREF Inflation-Linked Bond Account ha[ve] frozen new investments, or did not have information publicly available regarding fund status."[130] Aon Hewitt recommended removal of CREF Inflation-Linked Bond. Defendants included non-university employers when benchmarking benefits.[131]

36.     Of 40 higher education institutions with at least $1 billion in assets across all 403(b)

---

[125] Doc. 281-120, CREF Prospectus (2010) (Dep. Ex. 295) at 18-20; Doc. 283-4, Chalmers Rpt. Ex. 5c.
[126] Doc. 283-4, Chalmers Report, Ex. 5c n.3 (p. 137-38).
[127] *See infra* ¶ 87.
[128] Ex. P22, Feb. 17 Emails Between S. Bedard and M. Peel (YALE00239611) at 4.
[129] Doc. 281-120, CREF Prospectus (2010) (Dep. Ex. 295) at 26-27; Doc. 283-4, Chalmers Rpt. Ex. 5e.
[130] Doc. 283-4, Chalmers Report, Ex. 5e n.3 (p. 145-46).
[131] Ex. P22, Feb. 17 Emails Between S. Bedard and M. Peel (YALE00239611) at 4.

plans, 39 offered sector funds in 2010 and 39 offered sector funds in 2017.[132]

**RESPONSE**: Deny as immaterial. Plaintiffs incorporate by reference their response to paragraph 25 regarding an investment's popularity. Plaintiffs incorporate by reference paragraph 90 demonstrating that industry standard practice was to not include sector funds in a plan. Defendants included non-university employers when benchmarking benefits.[133]

37.     In June 2010, Yale requested a meeting with TIAA to discuss moving to lower share classes for certain Plan investments. In August 2010, TIAA agreed to move the Plan to "Institutional" shares of indexed mutual funds and "Premier" shares of certain actively managed funds. Yale's relationship manager at TIAA stated that this was "the best I could provide" in 2010, but "as soon as we can make institutional share class available for the actively managed funds, we would make that happen." In 2011, Yale obtained additional share class changes, moving actively managed funds from the "Premier" to the "Institutional" share class. Of twenty-three elite universities with over $1 billion in retirement plan assets, only Yale and two others had switched all of their TIAA funds to the lower-cost shares by the end of 2010.[134]

**RESPONSE**: Deny. TIAA offered institutional share classes for all its mutual funds in February 2009.[135] All investors were eligible for institutional share classes if they had over $2 million invested in the funds, and certain defined contributions plans were eligible for institutional shares without any threshold. On June 30, 2010, the Plan had more than $2,000,000

---

[132] Doc. 283-4, Chalmers Rpt. Ex. 4.

[133] Ex. P22, Feb. 17 Emails Between S. Bedard and M. Peel (YALE00239611) at 4.

[134] Doc. 281-75, TIAA_YALE_00059404 (June 2010 Penney email); Doc. 281-77, TIAA_YALE_00059747 at -747 (Aug. 2010 email re share class transition); Doc. 281-80, TIAA_YALE_00062052 at -052 (Aug. 2011 email re institutional share-class pricing for actively managed funds); Doc. 281-23, Penney Tr. 329:1-15 (discussing "regular conversations" with TIAA); Doc. 281-110, Penney Decl. ¶¶ 9-11; Doc. 281-17, TIAA 30(b)(6) (Campbell) Tr. 81:18-82:10, 341:12-344:11, 352:17-354:4, 359:16-360:23 ("[w]hen we were starting to introduce reduced share classes in 2010, we immediately were engaged by Yale to have a discussion around what share classes could be made available"); Doc. 283-10, Poehler Rpt. ¶ 68 (only Yale, Harvard, and Caltech had transitioned all funds to Premier or Institutional class by the end of 2010).

[135] Ex. P43, Rule 1006 Share Class Exhibit at 3.

of assets in all the TIAA-CREF mutual funds in the Plan other than 5 funds with no assets.[136]

38.      In January 2011, Yale's benefits counsel informed Hugh Penney that TIAA was beginning to negotiate expense reimbursement accounts for plan sponsors to use to pay expenses for services not rendered by TIAA. Yale and TIAA entered into an expense reimbursement agreement in December 2012. TIAA agreed to "reconcile [its] actual revenue earned" against a negotiated recordkeeping fee and deposit any excess into a revenue credit account twice annually. TIAA also gave Yale a credit retroactive to January 1, 2011.[137]

**RESPONSE**: Deny. Plaintiffs incorporate by reference their response to paragraph 16 demonstrating that TIAA offered plan-specific pricing in 2010 and that Defendants took no action until TIAA unilaterally offered a revenue credit account in 2012. Plaintiffs also deny that the third sentence of paragraph 38 is material to Defendants' Motion. Defendants offer no evidence: (1) that any portion of the revenue credit received in 2012 related to any of the at-issue funds or (2) that the recordkeeping fees that were paid for via revenue sharing were reasonable as is their burden to prove an offset of loss from their breach.

39.      Yale solicited guidance from its benefits counsel to determine how the revenue credit account should be administered. Counsel advised that the revenue credit account could be used to defray the Plan's expenses and (after those expenses were addressed) to provide rebates to participant accounts. Yale has used the revenue credit account to pay for the costs of the Plan's audit, its third-party consultants, and, during certain years, to reimburse Yale for a portion of the costs of Ms. Castello, a dedicated staffer for the Plan.[138]

---

[136] Ex. P44, June 30, 2010 TIAA Fee and Expense Disclosures (YALE00051358 at 1–2).
[137] Doc. 281-60, YALE00221758 (Jan. 2011 email with benefits counsel); Doc. 281-35, YALE00013595 at Item 16 (amendment with 2011 and prospective revenue requirements).
[138] Doc. 281-54, YALE00143364 (Mar. 2012 email to counsel); Doc. 281-53, YALE00143093 (June 2013 memo).

**RESPONSE**: Deny as incomplete and misleading. Counsel also advised Defendants that they needed to track time for Ms. Castello paid through the revenue credit account, but Defendants refused because it would be "overly burdensome."[139] Yale never tracked Ms. Castello's time and her supervisor could not even give an approximate estimate on how much time she spent on Plan- versus non-Plan-related tasks.[140] Ms. Castello's role would have existed even if there were not funds from the Plan to pay her salary.[141]

40.     Penney also had conversations with Vanguard about share classes. In 2013, the Plan upgraded the share classes of many of its Vanguard funds, reducing the Plan's Vanguard fees from 9 bps to 5.6 bps. In 2014, Yale negotiated additional share class changes, lowering its Vanguard fee rate to 4.4 bps.[142]

**RESPONSE**: Deny. The evidence demonstrates that Penney first discussed share classes with Vanguard in 2013.[143] Vanguard approached Penney in 2011 to say Vanguard only required $500,000 to recordkeep the Yale Plans, and "the only way you can arrive at a revenue target is to introduce lower share classes."[144] Defendants did not accept Vanguard's offer until 2013.[145]

41.     The 2010 prospectuses for several of the Vanguard funds for which Yale negotiated lower rates in 2013 and 2014 expressly prohibited 403(b) plans from obtaining the cheapest share class. Even where prospectuses did not contain that express prohibition, both TIAA and Vanguard at times would not permit retirement plans to invest in the lowest-cost share classes or informed

---

[139] Ex. P45, Draft Reimbursement Agreement (YALE00219912) at 1; Ex. P46, February 2013 emails between C. Hendel and M. Wakino (YALE00221586) at 1–2.
[140] Ex. P35, Bedard Dep. 193:24–194:18.
[141] Ex. P2, Penney Dep. 291:4–24.
[142] Doc. 281-110, Penney Decl. ¶ 9; Doc. 281-38, YALE00022495 at -495 (Apr. 2013 email to discuss "alternative share class options"); Doc. 281-45, YALE00078052 (Apr. 2013 share change); Doc. 281-30, YALE00004663 (July 2014 share change); Doc. 281-84, Vanguard_000044 (Dec. 2014 disclosure listing 4 bps "recordkeeping compensation"); Doc. 283-10, Poehler Rpt.¶ 75 (computing bps rates).
[143] *See supra* n.141.
[144] Ex. P16, Rux Dep. 24:21–25:14, 60:6-11.
[145] *Id.*

Yale that it would have to pay additional fees to offset the change in revenue.[146]

    **RESPONSE**: Deny. The 2010 prospectuses for many funds in the Plan did not contain any restriction related to 403(b) plans.[147] Vanguard could "change the eligibility requirements of its share classes, including the types of clients who are eligible to purchase each share class."[148] In 2010, Vanguard eliminated the restriction on 403(b) eligibility for admiral shares of these funds.[149] While Vanguard may have required a per-participant fee if its revenue threshold was not met, Vanguard had excess revenue until the Plan finally accepted share class reductions in 2013.[150] Defendants misleadingly quote Campbell's testimony; he did not testify that TIAA would prohibit plans that met the minimums but would lower the share classes "across the board, regardless of fund minimums of a particular fund."[151]

    42.    Plan participants are free to purchase products and services from TIAA outside of those available through the Plan. However, TIAA does not track at the plan level the revenue it receives from selling non-plan products or services to participants. TIAA also does not take into account revenue from non-plan products and services when pricing recordkeeping fees.[152]

    **RESPONSE**: Deny. TIAA representatives have regular, in-person access to Yale employees, whom Yale assumes are neutral advisors.[153] ████████████████████████

---

[146] Doc. 281-102, Vanguard Capital Opportunity Fund Prospectus (Jan. 2010) at 6 ("Admiral Shares are not available for . . . Section 403(b)(7) custodial accounts."); Doc. 281-103, Vanguard PRIMECAP Fund (Jan. 2010) at 6 (same); Doc. 281-94, Vanguard Windsor II Fund Prospectus (Feb. 2010) at 7 (same); Doc. 281-17, TIAA 30(b)(6) (Campbell) Tr. 351:18-352:16 ("my experience has been that those minimum investment limits do not apply when they're offered in conjunction with a retirement plan"); Doc. 281-25, Vanguard 30(b)(6) (Rux) Tr. 58:1-13 ("If there were lower share classes in 2010, . . . we would need to look at whether we needed some form of a discrete participant recordkeeping fee to offset our recordkeeping expenses.").
[147] Ex. P43, Rule 1006 Share Class Exhibit.
[148] *See, e.g.*, Doc. 281-102 at 40; Doc. 281-103 at 40, Doc. 281-94 at 40.
[149] Ex. P43, Rule 1006 Share Class Exhibit.
[150] *See infra* ¶ 60.
[151] Ex. P14, Campbell Dep. 352:9–16.
[152] Doc. 281-16, Porter Tr. 9:24-10:20, 151:2-152:3, 160:18-161:7; 166:8-167:3 (discussing TIAA practices).
[153] Ex. P2, Penney Dep. 297:21–300:16.



[154] TIAA provides its investment advisors and registered representatives bonuses tied to recommending the transfer of Plan assets to TIAA's own proprietary products.[155]

[156]

These products have generally higher fees than Plan investments.[157] The problem of additional indirect revenues being earned by recordkeepers through cross-selling has long been recognized, including by the GAO in January 2011.[158] But Yale never took action to monitor or control this additional indirect revenue.[159]

[160]

[161] Plaintiffs' expert Daniel Alexander did this calculation.[162] Recordkeepers routinely consider ancillary sales opportunities in pricing recordkeeping services.[163]

"[164]

.[165]

---

[154] Ex. P47, Porter dep. 28:18–33:25.

[155] Ex. P48, TIAA Advice and Planning Services, 2013 Form ADV Part 2A at 16; Ex. P49, TIAA Portfolio Advisor Wrap Fee Program, March 2019 Form ADV Part 2A at 13-15; TIAA 2020 Form CRS at 4.

[156] Ex. P47, Porter dep. 186:20-25.

[157] Ex. P50, *Improved Regulation Could Better Protect Participants from Conflicts of Interest*, GAO, Jan. 2011; Ex. P51, *Labor and IRS Could Improve the Rollover Process for Participants*, GAO, Mar. 2013; Doc. 283-1, Alexander Report ¶ 30.

[158] Ex. P50, *Improved Regulation Could Better Protect Participants from Conflicts of Interest*, GAO, Jan. 2011; Ex. P51, *Labor and IRS Could Improve the Rollover Process for Participants*, GAO, Mar. 2013; Doc. 283-23, Consolidated Minutes, at 1–85.

[159] Doc. 283-23, Consolidated Minutes, at CM-1–85 (minutes never discuss Committee evaluation, let alone action, regarding monitoring of TIAA's additional indirect compensation through cross-selling).

[160] Doc. 283-21, TIAA_YALE_00093625 at 1.

[161] Ex. P47, Porter dep. 152:4–161:17.

[162] Doc. 283-1, Alexander Report Exhibit 3.

[163] Doc. 283-7, Minnich Report ¶ 55.

[164] Ex. P47, Porter dep. 34:18–35:2.

[165] Doc. 283-1, Alexander Report, Exhibit 3.

Yale did not attempt to monitor or control this compensation.[166]

43.     During the class period, Yale twice requested that TIAA not market certain non-plan products and services to Plan participants. In 2018, Yale amended its agreement with TIAA to place additional restrictions on non-plan product marketing to participants, including requiring Yale's consent before marketing a non-plan product to more than one participant and requiring TIAA to disclose that Yale does not review or endorse any non-plan products.[167]

**RESPONSE**: Deny as immaterial. The Defendants' two requests occurred in or after 2016, the year this Complaint was filed.[168] During the class period, the Committee never discussed additional indirect revenue earned by TIAA through cross-selling nor restrictions on marketing.[169] ████████████████████████████████████████

██████[170]  Yale took action to limit TIAA's indirect cross-selling only after this lawsuit.[171]

## PLAINTIFFS' ADDITIONAL MATERIAL FACTS

**I.     Defendants Relied Upon a Single Employee to Monitor the Plan for Years**

44.     The Plan was one of the largest in the country with 14,417 participants and $2.6 billion in assets in 2010 and 20,747 participants and $5.5 billion in assets in 2019.[172]

45.     From 2007 until 2012, Defendants relied upon a single employee, Hugh Penney, to monitor the over 100 funds in the Plan and to monitor the Plan's recordkeeping fees.[173]

---

[166] Doc. 283-23, Consolidated Minutes, at CM-1–85.
[167] Doc. 281-16, Porter Tr. 37:14-40:9 (discussing suppression requests); Doc. 284, TIAA_YALE_00014595 at -615 (Amended Recordkeeping Agmt.).
[168] Doc. 1, Compl.
[169] Doc. 283-23, Consolidated Minutes at CM-1–CM-55 (first discussion by Committee of TIAA's conflicted advice, in December 2017, in response to New York Times article; Committee "directed the staff to work with TIAA on this issue"); at CM-56–CM-87 (showing no subsequent discussion or follow up of TIAA's conflicted advice; minutes never discuss TIAA's marketing).
[170] Ex. P47, Porter dep. 38:21-39:16; 39:17–40:10.
[171] *Id.*; Compl.
[172] Doc. 281-59 at 3 (line 6g), 19 (line l); Doc. 281-105 at 3 (line 6g), 19 (line l).
[173] Ex. P2, Penney Dep. 73:7–12; *id.* at 59:18–60:13; Ex. P26, Peel Dep. 48:13–18.

46.     Even after the Fiduciary Committee on Investments (the "Committee" or "FCI")

was formed in 2012, it largely deferred to Penney.[174]

47.     Penney had no background or education in investments to make him competent to

be solely responsible for managing a multi-billion-dollar retirement plan.[175]

48.     Penney admitted that he lacked knowledge to determine whether the Plan's

recordkeeping fees were reasonable.[176] Penney believed (mistakenly) that there were no

fiduciary oversight responsibilities for 403(b) plans until 2011 or 2012.[177]

49.     Penney also admitted in emails that his solo review was not sufficient, and

Defendants needed a committee and professional consultant to be on par with peers.[178]

50.     However, Defendants took years to provide Penney any assistance because

"[c]ome on now, this is higher ed . . ."[179]

51.     Penney was conflicted because of his relationship with TIAA. Penney was on

TIAA's Advisory Council for most the class period.[180] As part of that role, TIAA paid for

---

[174] Ex. P52, Polak Dep. 81:8–22 (testifying the committee would "rely on the expertise of people like Hugh Penney [sic]" regarding how TIAA and Vanguard were compensated for recordkeeping services); Ex. P53, Murphy Dep. 98:11–20 (referring to Penney as "our expert on benefits plans, including retirement plans . . .").

[175] Ex. P2, Penney Dep. 29:21–30:4 ("I don't have the certifications or qualifications to provide investment advice.").

[176] *See infra* n.184.

[177] Ex. P54, Mar. 31, 2014 email from H. Penney to S. Bedard (YALE00143046) ("The difference between the 403(b) and 401(k) worlds is that fiduciary oversight was not the requirement until just a few years ago while with k plans it was required for 3 decades. We have a little catching up to do.").

[178] Ex. P55, October 2010 emails between H. Penney and M. Wakino (YALE00220536) at 1 ("This could serve as the catalyst for us *to form a more robust Oversight Committee with fiduciary responsibility for the investment lineup* and plan administration. *We have talked about the need to do this but need a little be more socializing of the subject here.* I see one of the first tasks of this committee to be the review of our lineup and the creation of a much more structured offering.") (emphasis added); Ex. P56, Mar. 11, 2011 Email from H. Penney (YALE00219512) at 1 (". . . the need for more formal and regular oversight is necessary to meet Yale's fiduciary obligations under ERISA."); Ex. P57, July 26, 2011 Email from H. Penney to C. Hendel (YALE00142991) ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ t 1 (emphasis added).

[179] Ex. P58, Nov. 11, 2010 Email from H. Penney (YALE00039343) at 1.

[180] Ex. P59, Nov. 11, 2011 meeting invite re: "New Advisory Council Member Meeting with Hugh [sic] Penney at Yale" (YALE00034621); Ex. P2, Penney Dep. 308:22–309:5 (testifying that he was a member of the advisory council in 2015).

Penney to travel to conferences around the country and gave him speaking opportunities, which were essentially marketing pieces for TIAA.[181] Penney was willing to offer testimony ghost-written by TIAA to the Department of Labor ERISA Advisory Council.[182]

52.    As late as 2014, Defendants "rel[ied] on [their] vendors [TIAA and Vanguard] to help keep [them] compliant."[183] Penney admitted that "[w]e have a little catching up to do."[184]

## II.    Defendants Caused the Plan to Pay Excessive Recordkeeping Fees

53.    From 2007 until 2012, Defendants did not have a process for evaluating the Plan's recordkeeping fees.[185] Defendants accepted, without question, TIAA's and Vanguard's representations that this is how 403(b) plans operate.[186]

54.    Industry professionals, including Defendants' advisors ███████ ████████, and the Department of Labor recommend that fiduciaries conduct a RFP or other competitive bidding process for a plan's recordkeeping fees every three to five years.[187]

55.    Yale's policies require competitive bidding for any service over $10,000.[188]

---

[181] Ex. P2, Penney Dep. 309:11–313:23; Ex. P60, Mar. 13, 2012 Email from C. Garrison to H. Penney (YALE00143033) ( "Lifetime Income: Designing the Best Possible Solutions for Every Generation").

[182] Ex. P61, Emails between H. Penney and C. Cutlip (YALE00148454) at 1–3.

[183] Ex. P54, March 31, 2014 emails between H. Penney and S. Bedard (YALE00143046).

[184] *Id.*

[185] Ex. P2, Penney Dep. 58:19–59:17 (Q.·Okay.· *Was there any regular process in place to evaluate recordkeeping fees prior to the committee's formation*? . . . ·A.· · *Between 2007 and '11, there was not.*· Q.· · Okay.· Are you aware of *any steps that were taken by anyone at Yale between 2007 and 2012 to evaluate recordkeeping fees*? A.· · *To evaluate them, no . . .*) (emphasis added).

[186] *Id.*

[187] *See* Reasonable Contract or Arrangement Under Section 408(b)(2)—Fee Disclosure, 75 FR 41600, 41625 (July 16, 2010) ("The Department also assumes that changes in plan disclosures will occur at least once every three years, because plans normally conduct requests for proposal (RFPs) from service providers at least once every three to five years."); ███████████████████████████████████████████████████████████████████████ ████████████; *id.* at 88:20–89:8 (testifying the "industry standard" was to advise clients to conduct RFPs every five years); *id.* at 92:19–93:13 (testifying that he conducted RFPs for 403(b) plans, including higher education plans, in the mid-1990s); Ex. P62, FDG Group, Best Practices: A Guide for Retirement Plans (YALE00097743) at 3 ("The best way for trustees to confirm 'reasonableness' is to mark the plan to market at least every five years. This can be accomplished through an RFI or RFP."); ███████████████████████████████████████████████

[188] Ex. P63, Yale University Policy 3201 General Purchasing (YALE00243486) at 3 ("The University's competitive bidding threshold is $10,000, at which competition via bids and quotes from multiple vendors is required before

56.     Defendants never conducted competitive bidding for recordkeeping fees.[189]

57.     Industry professionals, including Defendants' advisors and expert in this case, recommend that fiduciaries price recordkeeping fees on a per-participant basis rather than using an asset basis.[190] This is because, "[h]ard dollar fees do not generally increase at the same rate as asset based fees since they are not tied to the growth in the market value of the plan's investments . . . [and] hard-dollar, per participant fees are generally more transparent and more accurately reflect the 'true' cost of providing administration."[191]

58.     Defendants did not adopt a per-participant fee for the Plan until 2015 and only analyzed its fees on a per-participant basis once in 2012.[192]

59.     In fact, there was no process to evaluate the Plan's recordkeeping fees from 2007 until an Aon Hewitt analysis of TIAA's fees in 2012.[193] █████████████████████████████ ███████████████████████████████████████████[194] No analysis or

---

purchase of a good or service."); *see also* Ex. P26, Peel Dep. 131:7–17 (testifying he had used competitive bidding "hundreds and hundreds of times"); Ex. P32, King Dep. 59:25–61:7 (discussing a RFP for the Plan auditor); Ex. P64, Memo re: RFP- Audit Service for Defined Contribution Plans (YALE00235444) (same).

[189] Ex. P65, Castello Dep. 156:20–24; Ex. P26, Peel Dep. 178:1–9, 248:20–249:4; Ex. P2, Penney Dep. 249:20–250:8; 264:7–12; 269:23–270:9.

[190] Ex. P17, G. Poehler and L. Pranger, "ICCCFO Conference 403(b) Plan Governance" (Apr. 26, 2012) at 6; Ex. ███████████████████████████████████████████████████████████████████████████████████████ ████████ , *id.* at 8 █████████████████████████████████████████████████████████████████████ ); Ex. ████████████████████████████████████████████████ █████████████████████████████████████████████████████████████ ; Ex. P68, Amy Reynold and Sabrina Bailey, "DC Fee Management – Mitigating Fiduciary Risk and Maximizing Plan Performance" at 3 (providing Mercer's best practice was to price recordkeeping fees on a per-participant basis); Ex. P8, Poehler Dep. 281:9–283:20(authenticating the Mercer Best Practices).

[191] Ex. P17, G. Poehler and L. Pranger, "ICCCFO Conference 403(b) Plan Governance" (Apr. 26, 2012) at 6.

[192] Ex. P15, Compilation of TIAA Recordkeeping Agreements at 1–33 (capping recordkeeping fees at $79 in a March 6, 2015 amendment); Ex. P16, Rux Dep. at 24:12–20 (Vanguard's fee was always asset-based); ██████████ ████████████████████████████████████████████████████████████████████████

[193] Ex. P2, Penney Dep. 58:19–59:17.

[194] Ex. P69, Sept. 10, 2013 emails between D. Swallow, S. Bedard and B. Lucido (YALE00156212) at 2.

evaluation of Vanguard's fees was ever conducted.[195]

60.     In 2011, Vanguard informed Yale that it was looking to generate $500,000 from all the Yale Plans for recordkeeping in 2011, but no action was taken by Defendants until 2013.[196] While Vanguard only required $500,000, the participants in the ████████████ ███████████████████████████████████ in recordkeeping fees per year from 2011 to 2013.[197]

61.     Industry professionals, including Defendants' advisors and expert in this case, recommend that fiduciaries consolidate to a single recordkeeper to reduce fees.[198]

62.     Contrary to Defendants' claims that TIAA was not capable or comfortable with providing the Plan sole recordkeeping between 2010 and 2014, TIAA (and Vanguard) repeatedly approached Defendants about recordkeeper consolidation or master administration and the advantages of such a change throughout that period.[199]

---

[195] ████████████████████████████████████████████████████████████████████ Ex. P32, King Dep. 65:13–24 (testifying that the only review of Vanguard fees would have been the review of the total expense ratio in the annual reviews); Ex. P26, Peel Dep. 234:4–8 (testifying that he could not recall any benchmarking of Vanguard's fees); Doc. 283-23, Meetings Minutes Compilation (no discussion of Vanguard's fees).

[196] Ex. P16, Rux Dep. 24:21–25:14.

[197] Ex. P70, Poehler Yale Fee Analysis at Vanguard Per Account, Cells F46, G46, and H46.

[198] Ex. P8, Poehler Dep. 254:13–255:1 (testifying that as early as 2009 most consultants recommended consolidate to save fees, including him); Ex. P71, Single Provider, Multiple Choices (March 22, 2010) at 2 ("Today, . . . the new model for the 403(b) retirement plan market is likely to be a single plan, provider and administrator. . . . The single provider arrangement can also enable a greater level of convenience, consistency, and potential cost savings as well as expert assistance needed to comply with new regulations."); Ex. P6, Improta Dep. 39:2–13 (██████████████)█ ████████████████████████████████████████████████████████████████████████ █████████████████████████████████████████████████████████ *id.* at 32-34 (most of the plans listed as exemplars of "Best Practice 403(b) Investment Structure Large Public Universities" had a single recordkeeper or master administrator).

[199] *See, e.g.*, Ex. P2, Penney Dep. 168:17–169:1 (testifying that he discussed sole recordkeeping with TIAA in 2010); Doc. 281-79 (TIAA_YALE_00060576) (Mar. 10, 2011 appointment from Stephen Campbell (TIAA) to Hugh Penney (Yale) with "Sole Recordkeeping" on the agenda); Ex. P73, Feb. 22, 2013 Email from Stephen Campbell to Hugh Penney (YALE00088453) (████████████████████████████████████████████████████ ███); Doc.281-55, May 2013 TIAA Presentation: "Sole Recordkeeping Update" (YALE00145429); Ex. P74, June 6, 2013 email from Stephen Campbell to Hugh Penney regarding Revised SRK Discussion Deck (YALE00237749) at 1–2 (noting that recordkeeping fees would decrease 38% through consolidation and all investments would move to the cheapest share class possible); Ex. P75, Oct. 8, 2013 Emails between Penney and Schultz (Vanguard)

63.     Defendants began the process of exploring single recordkeeping in 2014 not because TIAA was finally capable, but because Defendants discovered in 2013 that "a Master or Single Recordkeeper model was a great way to take the pressure off their HRIS/Payroll for managing 401(b) and 457(b) eligibility, match, and contributions" and "would make managing 403(b) and 457(b) significantly easier for Workday."[200] After Defendants learned this, the Committee discussed sole recordkeeping at its next meeting.[201]

64.     Before July 2014, Defendants never received a quote regarding how much the Plan could save by consolidating to a single recordkeeper.[202]

65.     Defendants' expert's calculations demonstrate that when the Plan consolidated to TIAA in 2015, TIAA participants' recordkeeping fees fell from $199 per account to $51 per account (a 75% reduction).[203] Vanguard participants' recordkeeping fees fell from $95 per account to $51 per par account (a 46% reduction).[204] Very quickly after consolidation, TIAA offered to recordkeep the Plan's fees for ████████████.[205]

66.     Tyrone Minnich opined that reasonable fees for the Plan would have been ████ ████████████████████████████████████████████████████████████ ████.[206] Between August 2010 and 2018, the Plan participants paid ████████ in excessive fees relative to Minnich's reasonable fees.[207] Considering the lost investment opportunity, participants in the Plan lost ██████████ as of November 1, 2019.[208]

---

(YALE00036727). Ex. P76, TIAA Presentation: Prepared for a lifetime Managing your plan to drive retirement readiness (YALE00009127) at 7–8.

[200] Ex. P77, October 21, 2013 email from Hugh Penney to Nancy Creel-Gross (YALE00096989) at 1.

[201] Doc. 283-23, Consolidated Minutes at CM-10 (first discussion of sole recordkeeping at a Committee meeting).

[202] Ex. P2, Penney Dep. 274:8–275:11.

[203] Doc. 283-10, Poehler Report, Ex. 3 (p. 126).

[204] Id.

[205] Doc. 283-23 at CM-86.

[206] Doc. 283-7, Minnich Report ¶ 131.

[207] Ex. P107, Otto Corrected Rebuttal Report, Ex. E at cell M18.

[208] Id. at cell M19.

67.    The Plan paid far more than plans that used prudent practices since the beginning of the class period. For example, the only benchmark that Defendants reviewed that had consolidated and ██████████████████████████████████████████████.[209] ██

██████████████████████████████████████████[10] This means participants in the Plan were paying nearly ███ more than a comparable plan that had consolidated and adopted a per-participant fee.[211] If the Plan participants had paid ████████████ from August 2010 until the end of 2014 (TIAA became the sole recordkeeper in 2015), participants would have had ████████ more in retirement savings.[212]

68.    Similarly, Defendants' expert calculated in another case that California Institute of Technology,██████████████████████████████████████ paid on average $40 per-participant between 2011 and 2016 with 16,922 to 18,451 participants.[213]

69.    Because of economies of scale, plans with more participants pay less in recordkeeping fees than plans with fewer participants, so large plans are the Plan's appropriate comparators.[214] Therefore, when comparing plans an expert wants to be as close as possible in participant count.[215] When comparing the Plan's fee appropriately to top quartile of TIAA clients, Plan participants paid ████████ of excess fees prior to consolidation in 2015.[216]

70.    Finally, general market data demonstrates that the Plan's fees were excessive. ██

████████████████████████████████████████████████████

---

[209] Ex. P66, Hewitt EnnisKnupp, 403(b) Plan Administration Fee Review (YALE00143637) at 14-15.
[210] *Id.* at 6.
[211] *Id.*
[212] Ex. P107, Corrected Otto Rebuttal Report ¶43. Defendants' motion to exclude does not challenge this calculation. *See* Doc. 280 (only challenging Otto's reliance on Minnich's reasonable fee numbers and process opinions).
[213] Ex. P78, Doc. 380-4, *Cunningham v. Cornell Univ.*, No. 16-06525-PKC-JLC (Dec. 5, 2019); Ex. P8, Poehler Dep. 259:12–260:17 (($78.15+$85.85+$44.14+$59.36+$-22.53+$-5.48)/6=$40).
[214] Ex. P8, Poehler Dep. 200:21–201:9; ████████████████████; Ex. P107, Otto Corrected Rebuttal ¶ 72.
[215] Ex. P8, Poehler Dep. 203:17–24.
[216] Ex. P107, Otto Corrected Rebuttal ¶ 72.

███████████████████████████████████████████████████████

█████████████████████████████████████████████ [217]

71.      Further, TIAA earned tens of millions of dollars in additional unaccounted-for indirect compensation.[218] Yale did not attempt to monitor or control this compensation.[219]

## III.      Defendants Failed to Monitor and Retained Numerous Imprudent Investment Options in the Plan

72.      During the class period, the named plaintiffs were invested in the investment options listed in the attached Rule 1006 exhibit.[220]

73.      Until last year, Defendants' investment review process consisted of annually reviewing reports from its recordkeepers on their *own* products.[221] Counsel advised Defendants against deferring to TIAA and Vanguard or that they were not addressing their duty to monitor.[222]

74.      These reports did not contain sufficient information to adequately review the investments in the Plan.[223]  For most of the relevant period, the TIAA and Vanguard reviews only contained comparisons to benchmarks chosen by TIAA or Vanguard and Morningstar-

---

[217] Doc. 283-9, Otto Report ¶ 208; Doc. 283-10, Poehler Report, Ex. 3 (p. 126).

[218] Doc. 283-1, Alexander Report, Exhibit 3.

[219] Doc. 283-23, Consolidated Minutes, at CM-1–85 (showing no such discussions through period).

[220] Ex. P79, Rule 1006 Exhibit Regarding Plaintiffs' Investments.

[221] *See supra* ¶¶ 22–23; Ex. P2, Penney Dep. 72:18–74:12 (testifying that he reviewed information from the recordkeepers prior to formation of the Committee); Ex. P32, King Dep. 24:22–25:22 (testifying to the process after the Committee consisted solely of receiving "materials" "from TIAA-CREF and from Vanguard"); Ex. P35, Bedard Dep. 62:20–63:4 (similar); Doc. 283-23 (Consolidated Minutes) at CM-3, CM-8, CM-9, CM-13, CM-16, CM-21, CM-26, CM-38–39 (Investment Reviews from 2012 until 2017).

[222] Ex. P80, Email from C. Hendel to J. Kimball and S. Federico (YALE00201636) at 1 ("The committee needs to review the plan services fees and determine whether the vendors are being overpaid. I'm not sure how best to present that, but I don't think it's having the vendors do it.") Ex. P81, Draft Meeting Minutes for May 16, 2012 (YALE00220506) ███████████████████████████████████████████████████

[223] *See infra* n.223.

assigned peer groups.[224] The analysis of TIAA Real Estate only involved raw performance

numbers, without any benchmark or peer group, and pictures of a few properties.[225]

75.     As demonstrated by responses to Defendants' investment advisor RFP and the

practices of the experts in this case, industry professionals look at alpha, risk-adjusted returns

over multiple periods, peer group ranking, risk/return statistics, changes in assets held, changes

in fees and expenses, and manager tenure.[226]

76.     ████████████████████████████████████████████████ [227]

---

[224] *See, e.g.*, Doc. 281-66, Aug. 16, 2010 TIAA-CREF Asset Management Investment Review (YALE00243424) at 30–40, 47–62; Ex. P82, May 16, 2012 TIAA-CREF Asset Management Investment Review (YALE00032729) at 18–29, 38–53; Ex. P83, April 18, 2013 TIAA-CREF Asset Management Investment Review (YALE00000035) at 21–32, 40–58;  Ex. P84, Aug. 19, 2014 TIAA-CREF Asset Management Yale Investment Review (YALE00034126) at 37–60 78–97; Ex. P85, July 30, 2015 TIAA-CREF Asset Management Yale University Investment Review (YALE00031483) at 30–56; Ex. P86, May 16, 2012 Vanguard Yale University Review (YALE00032782) at 45–58; Ex. P87, April 11, 2013 Vanguard Yale University Review (YALE00001386) at 78–92; Ex. P88, July 30, 2015 Yale Investment Review (YALE00031561) at 29–58. The Vanguard reviews did include slightly more information for a handful of "Top Holdings" of the Plan. *See, e.g., id.* at 62–118.

[225] *See, e.g.*, Doc. 281-66, Aug. 16, 2010 TIAA-CREF Asset Management Investment Review (YALE00243424) at 40; Ex. P82, May 16, 2012 TIAA-CREF Asset Management Investment Review (YALE00032729) at 29; Ex. P83, April 18, 2013 TIAA-CREF Asset Management Investment Review (YALE00000035) at 32; Ex. P84, Aug. 19, 2014 TIAA-CREF Asset Management Yale Investment Revie (YALE00034126) at 60; Ex. P85, July 30, 2015 TIAA-CREF Asset Management Yale University Investment Review (YALE00031483) at 46–48.

[226] Doc. 285-5, Dominguez Report ¶¶ 53–54, 98–103.; ████████████████████████████████████
███████████████████████████████████████████████████████████████████████████████████
██████████████ ██ ████████████████████████████████████████████████████████████████████
██████████████████████████████ ; Ex. P91, Oct, 21. 2015 FIA RFP Response (YALE00038027) at 12–13 (considering "Changes to the organization and investment process[,] Investment professional turnover[,] Asset and account loss / Asset and account gain[,] total fund performance[,] Quarterly commentary[,]" comparison to a benchmark determined through a holding analysis, peer group rankings, and style discrepancies); *id.* at 69–86 (sample investment report including risk adjusted return, peer groups, risk analysis, manager commentary and other metrics); Ex. ██████████████████████████████████████████████
███████████████████████████████████████████████████████████████████████████████████
███████████████████████████ Ex. P93, Rocaton Sample Due Diligence Report (YALE0018048); Ex. P36, Donald B. Trone, et al., THE MANAGEMENT OF INVESTMENT DECISIONS, at 116-17 Irwin (1996); Ex. P94, Rocco DiBruno, BEST PRACTICES FOR INVESTMENT COMMITTEES at 44-45, Wiley (2006); Ex. P95, Oregon Public Universities Tax Deferred Investment 403(b) Plan and Optional Retirement Plan Compilation of Investment Policy Statements at 7, 11, 19.

[227] ████████████████████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████████████████████████

77.     Additionally, industry standard practice is to independently determine the proper benchmark rather accept a vendor's benchmarks and peer group choices.[228]

78.     Defendants never requested additional benchmarks from TIAA or Vanguard.[229]

79.     Professionals, including Yale's investment office, review investments on regular monthly or quarterly intervals.[230]

80.     The Committee met on an ad hoc basis and reviewed investments once a year.[231]

81.     Until 2012, only Hugh Penney monitored the Plan's investments (over 100).[232]

82.     ███████████████████████████████████████████████████████

████████[233] Investment advisors have dozens of analysts reviewing investments.[234]

83.     Industry professionals, ███████████████████████████, believe it is

---

[228] Doc. 283-5, Dominguez Report ¶¶ 104–06; Ex. P27, Hetherington Dep. 27:11–28:2 (████████████████████████████████████████████████); ████████████████████████████████████████; Ex. P91, Oct. 21. 2015 FIA RFP Response (YALE00038027) at 20.

[229] Ex. P14, Campbell Dep. 333:25–334:8; Ex. P11, Hendel Dep. 203:20–204:6;  Ex. P35, Bedard Dep. 80:19–81:18; Ex. P33, Kimball Dep. 120:7–17.

[230] ███████████████████████████████████████████████████ Ex. P32, King Dep. 23:3–15 (testifying that the investment committee for the endowment meets quarterly for three or four hours); Doc. 283-5, Dominguez Report ¶¶ 35, 54; ); Ex. P91, Oct, 21. 2015 FIA RFP Response (YALE00038027) at 20 (discussing their quarterly due diligence process); ████████████████████████████████████████████████████

[231] Ex. P32, King Dep. 24:22–25:10 (testifying the investment reviews were annual); Ex. P2, Penney Dep. 131:10–14 (testifying to the ad hoc meeting schedule); Doc. 283-23, Consolidated Minutes at CM-3, CM-8, CM-9, CM-13–CM-14, CM-16, CM-20–CM-21, CM-26–CM-27, CM-28 (recording annual investment reviews on May 16, 2012, April 11, 2013 (Vanguard only), April 18, 2013 (TIAA only), August 15, 2014 (Vanguard only), August 19, 2014 (TIAA only), July 30, 2015 , June 9, 2016, April 17, 2017).

[232] *See supra* n.172.

[233] Ex. P27, Hetherington Dep. 19:23–21:6 ███████████████████████████████

[234] *See, e.g.,* ███████████████████████████████████████████ Ex. P96, Oct. 21, 2015 Rocaton RFP Response (YALE00018007) at 19 ("Our team of 22 research associates meets regularly with the investment managers our clients utilize and maintain ratings on the products.").

impossible to effectively monitor over 100 funds, even with assistance from a professional.[235]

84.     Yale did not hire a full-time investment advisor until after Plaintiffs filed this lawsuit.[236] Most of its peers and fiduciaries of 401(k) plans employed advisors prior to 2017.[237]

85.     Industry accepted practice is to have an investment policy statement to guide investment review.[238] Yale did not adopt an IPS until December 2018.[239]

86.     Most of the at-issue investments consistently underperformed their prospectus benchmarks over five-, and ten-year rolling periods from 2005 until at least 2010.[240]

87.     Investment advisors acting as fiduciaries recommended removal of many of these funds.[241] For example, Aon Hewitt recommended terminating the CREF Stock, CREF Global Equities, and ██████████████   ████   other clients during the relevant period.[242] Similarly, numerous plans have removed CREF Stock, CREF Global Equities and CREF Inflation-Linked Bond from their lineup or frozen contributions to them.[243] Cammack,

[235] ████████████████  ████████████████████████████  .

[236] Ex. P97, Dec. 20, 2016 Schedule to Aon Hewitt Consulting Agreement (Aon-Yale-001828) at 1–2.

[237] Ex. P16, Rux Dep. 77:12–17 ("In my experience with the really big clients that I've worked with over the years, in more than 50 percent of the instances, there's a consultant involved."); Ex. P54, Mar. 31, 2014 emails between H. Penney and S. Bedard at 1 ("I was surprised to learn we do not have a DC advisor when I first arrived at Yale as all of my former clients utilize an advisor (be it Mercer or one of their competitors).") (YALE00143046) at 1.

[238] See Ex. P32, King Dep, 23:16–18 (stating the investment committee for Yale's endowment had an IPS); ████████████████████████████████  ; Doc. 283-5, Dominguez Report ¶¶ 45–49 (citing numerous texts on investment analysis); Ex. P110, Buetow Rebuttal Report ¶¶ 13–16 (same).

[239] Ex. P2, Penney Dep. 270:10–16 (testifying the IPS was adopted on November 15, 2018).

[240] Ex. P42, Rule 1006 Exhibit on Investment Performance.

[241] See infra nn.241 and 242.

[242] Ex. P98, July 2012 Aon Hewitt In-Brief, TIAA and CREF Accounts (YALE-PLTF-001499) at 1; ████████████████████████████████████████████  ;

[243] See supra ¶¶ 29, 33–

another investment advisor that Defendants considered hiring, expressed serious concerns about TIAA Real Estate from 2009 until 2014, and the fund failed nearly all Cammack's criteria.[244]

88.     Finally, Wendy Dominguez, who has been recognized in multiple publications for her work, evaluated for all 22 at-issue funds: (1) alpha for three and five years, (2) peer group rankings for three and five years, (3) the risk-return scattergram, (4) assets in the fund, (5) deviation from style or strategy, (6) fees and expenses, and (7) changes in fund management and found that the 22 at-issue investments should have been removed from the Plan.[245] These factors are nearly identical to the factors all the investment advisors who responded to Yale 2015 RFP stated that they used for conducting due diligence on investments.[246]

89.     Dominguez relied on benchmarks, peer groups, data, and financial statistics from Morningstar and Lipper.[247] Defendants' investment advisor, Aon Hewitt, and other advisors use Morningstar, Lipper or other similar platforms to determine benchmarks, peer groups and obtain data to evaluate funds.[248] Defendants' expert similarly relied upon Morningstar and Lipper for benchmarking, peer groups, data and ratings.[249] If Dominguez found the benchmark or peer group inappropriate she looked at other benchmarks or peer groups, conducted a holding analysis and consulted a custom benchmark when necessary.[250] Industry professional conduct a similar analysis to determine the proper benchmarks.[251] Her custom benchmarks or peer groups were

---

[244] Ex. P92, Oct. 21, 2015 Cammack Retirement Group RFP Response (YALE00008518) at 1; Ex. P101, Doc. 297-9, *Cates*, 16-06524, at 48 (TIAA Real Estate failing 8 of 11 measures in July 2012).
[245] Doc. 283-5, Dominguez Report ¶¶ 54, 213–405.
[246] *See supra* n.224.
[247] Doc. 283-5, Dominguez Report ¶ 75, 213–405, n.270.
[248] ⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛; Ex. P91, Oct. 21. 2015 FIA RFP Response (YALE00038027) at 19–20, 26–27 (same); Ex. P92, ⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛. Ex. P96, Oct. 21, 2015 Rocton RPF Response (YALE00018007) (same).
[249] *See, e.g.*, Doc. 283-4, Chalmers Report ¶¶ 26, 27, 30, 33, 36, 38, 41, 42, 49, nn. 53–54, 60–61, 67, 73, 86, Ex. 3
[250] *See, e.g.,* Doc. 283-5, Dominguez Report ¶¶ 235, 243, 327.
[251] *See supra* n.227.

benchmarks or peer group that she and other advisors used to advise clients in practice.[252]

90.     Sector funds and balance funds are inappropriate investments for a plan.[253]

91.     In a fixed annuity, an insurance company guarantees the investment principal and a minimum rate of return of an investment, which then pays out over a lifetime.[254] In contrast, a variable annuity is invested in a fund with an investment object, like a mutual fund.[255] There is no guarantee on the rate of return or principal, and the amount of money ultimately paid is determined by the market (like a mutual fund).[256] Investors in a variable annuity can, but do not have to, convert their investment into a guaranteed source of lifetime income.[257] In practice, very few investors in variable annuity convert their investment into a lifetime stream of income.[258]

92.     Defendants' retention of the 22 at-issue investments caused Plan participants to lose ▮▮▮▮▮▮▮▮ in retirement savings.[259]

## IV.   Defendants Failed to Adopt Identical Lower Cost Share Classes

93.     TIAA offered institutional share classes for all its mutual funds as early as

---

[252] *Compare* Doc. 283-5, Dominguez Report ¶ 328 (▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮) ▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮ .
[253] Doc. 283-5, Dominguez Report ¶¶ 38, 387–89; Doc. 283-6, Dominguez Rebuttal Report ¶¶ 157–61; Ex. P110, Buetow Rebuttal ¶¶ 21, 83–87; ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
[254] Doc. 283-10, Poehler Report ¶ 23; Ex. P53, Murphy Dep. 186:2–187:1.
[255] Doc. 283-10, Poehler Report ¶ 23; Ex. P53, Murphy Dep. 186:2–187:1; Doc. 283-5, Dominguez Report ¶ 62.
[256] Doc. 283-10, Poehler Report ¶ 23; Ex. P53, Murphy Dep. 186:2–187:1; Doc. 283-5, Dominguez Report ¶ 62.
[257] *Id.*
[258] Doc. 283-5, Dominguez Report ¶ 62 ("In my experience, less than 1% of plan participants reaching retirement age annuitize their variable annuity."); Ex. P110, Buetow Rebuttal Report ¶ 61 (discussing studying showing annuitization rates of 10% for retirement age participants and 5% for all participants).
[259] Ex. P110, Buetow Rebuttal Report ¶ 7.

February 2009.[260] All defined contribution plans were eligible for institutional share classes if they had over $2 million invested in most of the funds, and certain defined contributions plans were eligible for institutional shares without any threshold.[261]

94.     The Plan had over $2 million invested its TIAA mutual funds in June 2010.[262]

95.     However, until 2011, TIAA-CREF Growth & Income (Premier) (TRPGX); TIAA-CREF International Equity (Premier) (TREPX); TIAA-CREF Large-Cap Value (Premier) (TRCPX); TIAA-CREF Mid-Cap Growth (Premier) (TRGPX); TIAACREF Mid-Cap Value (Premier) (TRVPX); TIAA-CREF Real Estate Securities (Premier) (TRRPX); TIAA-CREF Small-Cap Equity (Premier) (TSRPX); and TIAA-CREF Social Choice Equity (Premier) (TRPSX) were in the higher-cost premier share class.[263]

96.     During the class period, the Plan was eligible for lower cost share classes of the following Vanguard Funds: Vanguard 500 Index (Inv) (VFINX); Vanguard Capital Opportunity (Inv) (VHCOX); Vanguard Emerging Markets Stock Index (Inv) (VEIEX); Vanguard Inflation-Protected Securities (Inv) (VIPSX); Vanguard PRIMECAP (Inv) (VPMCX); Vanguard Total Bond Market Index (Inv) (VBMFX); Vanguard Total International Stock Index (Inv) (VGTSX); Vanguard Total Stock Market Index (Inv) (VTSMX); Vanguard Wellington (Inv) (VWELX); Vanguard Windsor II (Inv) (VWNFX); Vanguard Windsor (Inv) (VWNDX). Vanguard Energy (Inv) (VGENX); Vanguard Extended Market Index (Inv) (VEXMX); Vanguard Health Care (Inv) (VGHCX); Vanguard International Growth (Inv) (VWIGX); Vanguard Prime Money Market (Inv) (VMMXX); Vanguard REIT Index (Inv) (VGSIX); Vanguard Wellesley Income

---

[260] Ex. P43, Rule 1006 Share Class Exhibit.
[261] Ex. P44, June 30, 2010 Investment Fee & Expense Disclosure at 1–2 (YALE00051358).
[262] Ex. P43, Rule 1006 Share Class Exhibit.
[263] Ex. P43, Rule 1006 Share Class Exhibit.

(Inv) (VWINX); Vanguard Balanced Index (Inv) (VBINX); Vanguard Developed Markets Index (Inv) (VDVIX); Vanguard Equity-Income (Inv) (VEIPX); Vanguard European Stock Index (Inv) (VEURX); Vanguard Explorer (Inv) (VEXPX); Vanguard GNMA (Inv) (VFIIX); Vanguard Growth & Income (Inv) (VQNPX); Vanguard Growth Index (Inv) (VIGRX) Vanguard High-Yield Corporate (Inv) (VWEHX); Vanguard Intermediate-Term Bond Index (Inv) (VBIIX); Vanguard Intermediate-Term Investment-Grade (Inv) (VFICX); Vanguard Intermediate-Term Treasury (Inv) (VFITX); Vanguard Large-Cap Index (Inv) (VLACX); Vanguard Long-Term Investment-Grade (Inv) (VWESX); Vanguard Long-Term Treasury (Inv) (VUSTX); Vanguard Mid-Cap Index (Inv) (VIMSX); Vanguard Morgan Growth (Inv) (VMRGX); Vanguard Pacific Stock Index (Inv) (VPACX); Vanguard Short-Term Federal (Inv) (VSGBX); Vanguard Short-Term Investment-Grade (Inv) (VFSTX); Vanguard Short-Term Treasury (Inv) (VFISX); Vanguard Small Cap Growth Index (Inv) (VISGX); Vanguard Small Cap Index (Inv) (NAESX) Vanguard Small Cap Value Index (Inv) (VISVX); Vanguard U.S. Growth (Inv) (VWUSX); Vanguard Value Index (Inv) (VIVAX); Vanguard Developed Markets Index (Adm) (VTMGX); Vanguard Target Retirement 2010 (Inv) (VTENX) Vanguard Target Retirement 2015 (Inv) (VTXVX); Vanguard Target Retirement 2020 (Inv) (VTWNX); Vanguard Target Retirement 2025 (Inv) (VTTVX); Vanguard Target Retirement 2030 (Inv) (VTHRX); Vanguard Target Retirement 2035 (Inv) (VTTHX); Vanguard Target Retirement 2040 (Inv) (VFORX); Vanguard Target Retirement 2045 (Inv) (VTIVX); Vanguard Target Retirement 2050 (Inv) (VFIFX); Vanguard Target Retirement 2055 (Inv) (VFFVX); Vanguard Target Retirement 2060 (Inv) (VTTSX); Vanguard Target Retirement Income (Inv) (VTINX).[264]

97.     Defendants did not adopt the lower-cost share class for these funds until July

---

[264] Ex. P43, Rule 1006 Share Class Exhibit; Doc. 283-5, Dominguez Report ¶¶ 117–19.

2013, October 2014, April 2015 or August 2016 (depending on the particular fund).[265]

98.    Providers will waive the share class requirements for large plans, like the Plan.[266]

99.    Plan participants lost over ▮▮▮▮▮▮ in retirement savings as a result of Defendants' failure to adopt the lowest-cost share classes of funds.[267]

100.    Even assuming that all the revenue sharing for the high-cost share classes was rebated to participants or paid reasonable recordkeeping fees, the Plan still suffered losses.[268]

## V.    Defendants Had Authority to Transfer Funds Invested in Individual Annuities

101.    The Plan document provides that Defendants have to ability to remove any investment options from the Plan, including TIAA annuities.[269]  Defendants also can terminate an investment option and transfer the assets to another investment option.[270]

102.    Prior to adopting group annuity contracts in 2018, the Plan included "legacy" individual annuity contracts from TIAA.[271]

103.    No provision of the legacy contracts specifically addresses transfers by Plan sponsors, let alone prohibits them.[272]

104.    The legacy contracts also state that all rights and payments under them must comply with ERISA and other applicable laws and regulations.[273]

105.    To be eligible for tax deferred status, all individual annuity contracts in 403(b)

---

[265] Doc 283-5, Dominguez Report ¶ 409.
[266] *Id.* ¶ 117
[267] *Id.* ¶ 409.
[268] Ex. P110, Buetow Rebuttal ¶ 112.
[269] Doc. 281-5, 2009 Plan Document for YRAP § 6.1 (p. 27).
[270] *Id.*; *see also* Ex. P11, Hendel Dep. 124:1–9.
[271] Ex. P10, Sutherland Dep. 20:20–21:15 (describing the individual or "legacy" contracts and group contracts).
[272] Ex. P104, Retirement Annuity Contract (YALE00002042) at 1–96.
[273] *Id.* at 30 ("The choice of Income Option, Annuity Starting Date, Beneficiary, Second Annuitant, Method of Payment of the Death Benefit, and the availability of the Transfer Payout Annuity as set forth in this contract are subject to the applicable restrictions, distribution requirements, and incidental benefit requirements of ERISA and the IRC, and any rulings and regulations issued under ERISA and the IRC.").

plans must operate in accordance with the terms of the plan.[274] Failure to do so will result in loss of tax deferred status for all contracts issued by the employer.[275]

106.    Consistent with regulatory requirements the individual contracts recognize that they can be restricted by the Plan.[276]

107.    The Plan document expressly provides that if there is any "inconsistency or ambiguity" between the Plan document and annuity contracts, the Plan document controls.[277]

108.    Defendants did not conduct any legal analysis regarding whether the legacy annuities contained any provision prohibiting Plan sponsor mapping.[278]

109.    TIAA made group contracts available in 2005 and 2006.[279]

110.    TIAA targeted its top 200 clients, including Yale, for the new group contracts.[280]

111.    TIAA agrees that the group contracts are fully mappable.[281]

112.    However, the Plan did not move to the retirement choice contracts until 2019— over 13 years after TIAA first offered them to Yale and 3 years after this lawsuit was filed.[282]

---

[274] 26 CFR § 1.403(b)-3(b)(3).
[275] 26 CFR § 1.403(b)-3(d)(iii).
[276] Ex. P104, Retirement Annuity Contract (YALE00002042) at 86 ("For accumulation units purchased by premiums remitted under a retirement plan, the plan may limit: withdrawals, availability of the unit-annuity for a fixed period, participation in accounts, to the extent described above, and transfers to a funding vehicle not offered by CREF or TIAA."); *id* at 10, 14, 17, 23 (similar language regarding plan restrictions on transfers and withdrawals).
[277] Doc. 281-5, 2009 Plan Document for YRAP § 6.5 (p. 29).
[278] Ex. P11, Hendel Dep. 121:10–122:3, 124:17–125:10.
[279] Ex. P10, Sutherland Dep. 24:12–16.
[280] *Id.* at 26:1–27:5.
[281] *Id.* at 54:8–22.
[282] *Id.* at 59:22–25, 62:7–16.

Dated:  February 2, 2021                    Respectfully submitted,

                                            /s/ Andrew D. Schlichter
                                            Jerome J. Schlichter (phv01476)
                                            Heather Lea, (phv08416)
                                            Andrew D. Schlichter (phv09955)
                                            Sean E. Soyars (phv08419)
                                            Joel D. Rohlf (phv09849)
                                            Alexander L. Braitberg (phv09929)
                                            SCHLICHTER BOGARD & DENTON LLP
                                            100 South Fourth Street, Ste. 1200
                                            St. Louis, MO 63102
                                            Phone: (314) 621-6115
                                            Fax: (314) 621-5934
                                            jschlichter@uselaws.com
                                            hlea@uselaws.com
                                            aschlichter@uselaws.com
                                            ssoyars@uselaws.com
                                            jrohlf@uselaws.com
                                            abraitberg@uselaws.com

                                            *Lead Counsel for Plaintiffs*

                                            Ari J. Hoffman (ct22516)
                                            Cohen and Wolf, P.C.
                                            1115 Broad Street
                                            Bridgeport, CT 06604
                                            Telephone: (203) 368-0211
                                            Facsimile: (203) 337-5505
                                            arihoffman@cohenandwolf.com

                                            *Local Counsel for Plaintiffs*

**CERTIFICATE OF SERVICE**

I hereby certify that, on February 2, 2021, a copy of the foregoing was filed electronically using the Court's CM/ECF system, which will provide notice of the filing to all counsel of record.

By:   /s/ Andrew D. Schlichter