GLENN POEHLER                                    November 21, 2019
Confidential

Page 1

1              IN THE UNITED STATES DISTRICT COURT

2                  DISTRICT OF CONNECTICUT

3      - - - - - - - - - - - - - - - x

4      JOSEPH VELLALI, et al.,        :

5            Plaintiffs,             :     CONFIDENTIAL

6      vs.                           : Case No. 3:16-cv-01345-AWT

7      YALE UNIVERSITY, et al.,       :

8            Defendants.             :

9      - - - - - - - - - - - - - - - x

10

11

12                    CONFIDENTIAL

13            DEPOSITION OF GLENN POEHLER

14                  Washington, D.C.

15                  November 21, 2019

16

17

18

19

20

21

22     Reported by:
       Misty Klapper, RMR, CRR
23     Job No.: 860856

24

U.S. Legal Support, Inc.
(312) 236-8352

Exhibit P8 at 1

GLENN POEHLER                                    November 21, 2019
Confidential



Page 84

1

15          Q.    Now, you've been deposed twice before,

16    correct?

17          A.    Yeah.  Yes.

18          Q.    And those are both closer to your

19    tenure at Mercer than they are now, right?

20          A.    Yes.

21

GLENN POEHLER                                    November 21, 2019
Confidential

Page 85



8        Q.    I believe you testified in both those

9    cases -- we can pull it up, I have it -- that you

10    never used database fee benchmarking.

11        A.    I didn't -- I wouldn't -- I wouldn't

12    call that a database.

13        Q.    Okay.  So you stand by your testimony

14    that you've never used database fee benchmarking?

15        A.    I -- I didn't -- we didn't -- Mercer

16    didn't maintain a database.

Exhibit P8 at 3

GLENN POEHLER                                    November 21, 2019
Confidential

Page 88

1          Q.     So you weren't advising plans at the

2    time on how often they should benchmark their

3    recordkeeping fees or conduct RFPs?

4          A.     I was -- I was advising --

5                 MR. NETTER:  Objection to form.

6                 THE WITNESS:  I was advising them

7       that -- that they should -- that they should

8       monitor their -- their fees and that conducting

9       an RFP process was a good methodology to

10      accomplish that and it should be done on a --

11      on -- on a regular basis.

12                BY MR. ROHLF:

13         Q.     And what do you mean by regular basis?

14         A.     I didn't -- you know, I didn't -- you

15   know, it -- it -- that was an evolving amount of

16   time.  As time went on and we got closer, you know,

17   into the post-2009 era, the industry -- the industry

18   standard as we got -- became more frequent than I

19   was seeing early on.

20         Q.     And what is your understanding of what

21   the industry standard was post-2009?

22         A.     From a generic standpoint, when --

23   when you're advising clients -- when consultants are

24   out advising clients on what general industry

Exhibit P8 at 4

Page 89

1    standards are, the -- the general communication was

2    typically within five years.

3          Q.    Okay.  What would you estimate when

4    you were a 401(k) consultant was the average length

5    of time your clients went between RFPs?

6          A.    I would say five years might be a -- a

7    good average.  There were -- there were some that

8    would do it more often, some that did it less.

9          Q.    Do you have any 401(k) clients that

10   never did an RFP?

11         A.    Again, my work was project-based.  So

12   I -- it is -- you know, and I -- I had clients

13   who -- I -- I didn't -- the work I did wasn't vendor

14   management related, so I -- I really can't answer

15   the question.

16         Q.    Okay.  So you can't recall a specific

17   client that never did an RFP during your tenure as a

18   401(k) consultant?

19         A.    I -- I'm -- I'm sure there -- there

20   were.  If you give me -- if you're asking me to give

21   an example, I'm not -- you know -- not -- not at

22   this point can give examples of that kind of

23   information.

24         Q.    When you were a 401(k) consultant,

Exhibit P8 at 5

GLENN POEHLER                                          November 21, 2019
Confidential



Page 92

1 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ted RFPs from between, let's say,

24    1995 and 2000?

Exhibit P8 at 6

GLENN POEHLER                          November 21, 2019
Confidential

Page 93



22          Q.    And so generally they're governed by

23     state law; is that correct?

24          A.    They -- they are subject to federal,

Exhibit P8 at 7

GLENN POEHLER                                        November 21, 2019
Confidential

```
                                                        Page 94
 1    certain -- certain -- certain aspects of the IRS

 2    code.

 3              Q.    But generally, their fiduciary

 4    standards, is it your understanding that they're

 5    governed by state law?

 6                    MR. NETTER:  Objection to form.

 7                    THE WITNESS:  They -- yes.

 8                    BY MR. ROHLF:

 9              Q.    Do you have any experience with plans

10    where state law required them to have multiple

11    vendors?

12              A.    There are some -- there were some

13    states that had a -- a universal availability rule

14    for 403(b) plans.

15              Q.    And what is a universal availability

16    rule?

17              A.    Meaning that -- that if a -- if an

18    arrangement -- if a -- if a vendor came forward and

19    wanted to participate in that plan and you had an

20    available slot, you -- you needed to give it to

21    them.

22              Q.    Okay.  And so some public 403(b) plans

23    would be required to have multiple vendors, correct?

24              A.    Correct.
```

Exhibit P8 at 8

Page 114

1    correct?

2           A.    Again, I'm relying on my expertise.

3           Q.    Okay.  If I wanted to go back and

4    replicate how your plans were priced in 2010, how

5    would I do that?

6           A.    There -- I -- I don't think there's

7    any way for you to do that.

8           Q.    Do you have any data in your report --

9                 MR. NETTER:  I think -- I think he's

10          still answering the question.

11                THE WITNESS:  The -- there's --

12          there's no -- there's no way for -- unless you

13          have a direct disclosure from the recordkeeper

14          as to what their fees are, that -- that's --

15          that's the only way to really know what -- what

16          the total fees are collected for

17          administration.

18                To try to use information from 5500s

19          or to disclosures to employees potentially only

20          gives you a part of the -- a part of the

21          revenue.

22                BY MR. ROHLF:

23          Q.    But you rely on 5500s and disclosures

24    to employees in your report, correct?

Exhibit P8 at 9

GLENN POEHLER                                    November 21, 2019
Confidential

Page 119

1    in 2018 if there are plan sponsors that disclose

2    that compensation of 5500s?

3           A.    I would have to do that research.

4           Q.    Okay.  Now, since you -- you don't

5    have any of your own experience data points --

6           A.    I will -- I will say, you know, again,

7    as I looked at -- at Yale, the disclosure for the

8    direct expense was $130,000.  It was not 3 million.

9           Q.    Yes.  But it didn't say that it

10   included those services in the disclosure, did it?

11          A.    Well, I'd -- I'd have to go back and

12   review.

13          Q.    Okay.  Since you can't use your own

14   plans, your evaluation of the recordkeeping fees is

15   based on benchmarking that you got from CAPTRUST,

16   COMAC and TIAA in other cases, correct?

17          A.    I -- I -- I -- again, I based my

18   analysis based upon my knowledge of -- of 20 years

19   of experience and I -- I then went back -- on top of

20   that, I compared Yale's fees -- I calculated Yale's

21   fees and then compared them to -- to other

22   benchmarks, including the information from COMAC and

23   Aon, as well as the information provided in a

24   declaration for this -- for this litigation from --

Exhibit P8 at 10

GLENN POEHLER                                    November 21, 2019
Confidential

Page 120

1    from TIAA.

2              Q.    Okay.  So -- and I think you -- you

3    still have your spreadsheet in front of you.  Your

4    per accounts fee for TIAA in 2010 for Yale is $296,

5    right?

6              A.    Excuse me while I get my eyes on.

7              Q.    It's 296.

8              A.    Okay.

9              Q.    Excuse me.  That's your per unique

10   participant fee.  I'm looking at the wrong tab.

11             A.    Right, yeah.  The per -- per -- the

12   per -- per unique, that's for the --

13             Q.    Um-hmm.

14             A.    -- for the four plans.

15             Q.    Do you know a single plan that was

16   paying that much to TIAA in 2010?

17             A.    The -- we could certainly go back

18   and -- and -- what I -- what I do know is how

19   those -- that fee compares based on the -- the TIAA

20   declaration.

21             Q.    TIAA declaration, yeah.  So TIAA's top

22   200 clients?

23             A.    Right.

24             Q.    And that is considerably higher than

Exhibit P8 at 11

GLENN POEHLER                                    November 21, 2019
Confidential

Page 121

```
 1   even the median in that, isn't it?

 2          A.    To -- considerably higher than the --

 3   than the median?

 4          Q.    Even the median fee.

 5          A.    The -- for all their 15,000 clients?

 6          Q.    No, for their top 200.

 7          A.    For the -- yeah, but we -- we can

 8   certainly -- we can go back and look at the -- that

 9   exhibit, if you -- if you'd like to pull it up,

10   but --

11                MR. ROHLF:  Can you get his

12       Exhibit 6?

13                I'm going to mark this as

14       Exhibit 312.

15                        (Thereupon, Exhibit Number 312

16               was marked for identification.)

17                THE WITNESS:  This -- this --

18                BY MR. ROHLF:

19          Q.    Excel.

20          A.    Okay.  This -- this is from -- this

21   shows 2011 to 2018.

22          Q.    Oh, so you didn't have the any numbers

23   from 2010, did you, for TIAA?

24          A.    No.
```

GLENN POEHLER                                    November 21, 2019
Confidential

Page 122

 1          Q.    So do you have any data points from
 2   2010?

 3          A.    No.

 4          Q.    And you can't tell me what any of your
 5   own clients were paying in 2010, correct?

 6          A.    I am not allowed, the -- to --

 7          Q.    Can you tell me if it was more or less
 8   than $300 per participant?

 9          A.    I -- Yale's average balance was --
10   is -- is very high, if you -- if you look at
11   their -- how their -- where they fall in rank from
12   an asset basis versus where they fall in rank from a
13   participant basis.  Their asset -- their asset rank
14   is -- is higher than their participant rank, which
15   means their average balance is higher.

16          Q.    Does the average balance affect the
17   cost of recordkeeping a plan?

18          A.    Remember in 2010 that the -- that we
19   hadn't got to the point of having required revenue.
20   So the -- the pricing for TIAA was -- was calculated
21   across their entire book of business.

22          Q.    You mean TIAA hadn't got to the point
23   of having required revenue?

24          A.    That's correct.

Exhibit P8 at 13

GLENN POEHLER                                    November 21, 2019
Confidential

Page 125

1          Q.    And it's been fairly common for

2    decades, correct, that --

3          A.    It's been fairly common, but, you

4    know, we've also seen -- there's also been

5    restrictions in a lot of different contracts, not

6    just TIAA's.

7                VALIC, for instance, had contracts

8    that weren't -- that weren't portable.

9          Q.    Have you ever read a VALIC contract?

10         A.    Sure.

11         Q.    Do you know if it contains a provision

12   that says the plan sponsor maintains the ultimate

13   control of the asset?

14         A.    The -- the current ones -- the -- the

15   current ones do.  The -- historically there -- there

16   were -- there were funds that were -- that -- where

17   it was only movable by the employee.

18         Q.    You're not a lawyer, so you don't know

19   if that's for certain, do you?

20         A.    I'm not giving a legal opinion.

21         Q.    Okay.

22         A.    I'm simply giving you my experience

23   working with VALIC.

24         Q.    All right.  So the first data source I

Exhibit P8 at 14

GLENN POEHLER                                    November 21, 2019
Confidential

Page 126

1    think we mentioned you relied on was benchmarking

2    from COMAC, correct?

3          A.    Yes.

4          Q.    And COMAC provided that to Columbia,

5    it wasn't for Yale, correct?

6          A.    Correct.

7          Q.    Did you do anything to verify the data

8    in the benchmarking from COMAC?

9          A.    I did not have access.  I only had

10   access to the reports, not to the underlying data.

11         Q.    Okay.  In practice, did you ever rely

12   on data from COMAC to benchmark the fees of your

13   plans?

14         A.    No, I would not -- I -- I had no

15   reason to do so.

16         Q.    Okay.  Do you know anything about the

17   services that these clients at COMAC received?

18         A.    That -- that was a limitation that I

19   had with all of this data, you know, similar to

20   limitations that your experts had as -- as well.

21               Consequently, I -- you know, when --

22   that was a -- a primary reason where I did my

23   analysis separate for TIAA and Vanguard, was to try

24   to -- as close as I could, try to -- like fees

GLENN POEHLER                                    November 21, 2019
Confidential

Page 127

1   for -- for as close to like services as I could

2   based on the limited information I had.

3           Q.    But the services vendors provide

4   individual clients can vary, correct?

5           A.    They -- they can, but it's a -- it's a

6   matter of how close can I get --

7           Q.    And they can vary quite a --

8           A.    -- based on -- based on the data I

9   have.

10          Q.    They can vary quite a bit, can't they?

11          A.    They -- they can, but, again, I didn't

12  have access to that information.  You -- you -- I

13  have to do the best that -- the best I can with the

14  information that's -- that's available.

15          Q.    That's why, in practice, you did RFIs

16  and RFPs, correct, so you could get the actual

17  services for that plan?

18                MR. NETTER:  Objection to form.

19                THE WITNESS:  That's true, but I -- I

20      couldn't do an RFI in -- in this case.  You

21      can't do -- you can't -- I -- one, I can't do

22      an RFI for 2010 or 2012 or -- or 2014.  I can't

23      do an RFI period, because vendors are -- are

24      not going to provide that information in a

Exhibit P8 at 16

GLENN POEHLER                                          November 21, 2019
Confidential

Page 146



19              BY MR. ROHLF:

20              Q.    Okay.  Did you read the cover E-mails

21    for the Excel spreadsheets you relied on?

22              A.    Yes.

23              Q.    What did they say was the purpose

24    of --

Exhibit P8 at 17

Page 147

1          A.    I'd have to --

2          Q.    -- that collection?

3          A.    -- go back and review them.  I'm not

4    going to try to quote them.  I reviewed thousands of

5    documents.

6          Q.    Okay.  Was it generally just

7    collecting information to put in their database?  Is

8    that what you recall?

9          A.    My -- my recollection is that they --

10   they -- they -- they utilized the -- the information

11   from -- from their clients to populate that -- that

12   database.

13         Q.    Yes, but the specific data that you

14   rely on, was that actually pulled from the database

15   for benchmarking or was it collected for other

16   reasons?

17         A.    I'd -- I'd have to go back and review.

18         Q.    Okay.  I'll share with you what's

19   going to be Exhibit 313.  It's Yale00244185.

20               (Thereupon, Exhibit Number 313

21               was marked for identification.)

22               MR. BUMB:  Excel.

23               THE WITNESS:  Okay.  This -- this --

24      this doesn't -- this is just the data.

Exhibit P8 at 18

GLENN POEHLER                                    November 21, 2019
Confidential

Page 149

```
1                    BY MR. ROHLF:

2            Q.    Okay.  Do you know if CAPTRUST ever

3     used a single one of these data points to benchmark

4     a client?

5            A.    Well, I -- I don't know that I -- that

6     it -- that makes a difference, as long as this

7     data -- you know, these are data points of these

8     clients' required -- TIAA required revenue.

9     ███████████████████████████████████████

███████████████████████████████████

█████████████████████████████████████████████

████████████████████████████████████████

█████████████████████████████████████████████

█████████████████████

██████████████████████

████████████████████████████████████████

███████████████████

█████████████████████████████████████████████

███████████████████████████████████████████

██████████████████████████████████████████

████████████████

█████████████████████████████████████████████

███████████████████████

24           Q.    Okay.  Do you know the recordkeeping
```

Exhibit P8 at 19

GLENN POEHLER                                          November 21, 2019
Confidential

Page 150

1   and administrative services TIAA provided to any of

2   these plans?

3          A.     That was -- that was an -- an issue

4   that all of the experts had with trying to do any of

5   this work, is limited information on specific

6   services.

7          Q.     Do you know what the investment

8   options were in any of these plans?

9          A.     The -- I -- I didn't need to know the

10  investment options.  I -- I -- I just really needed

11  to know that they were TIAA.  TIAA has certain

12  requirements.

13         Q.     What certain requirements are you

14  referencing?

15         A.     Well, with regard to if you -- if

16  you're going to have the TIAA fixed, you have to

17  have the CREF stock fund as -- as well.

18         Q.     Is that always the case?

19         A.     You don't have to have those funds at

20  all.

21         Q.     Um-hmm.  And there's -- you don't have

22  to if you have the RC contracts, correct?

23         A.     Correct.

24         Q.     And this is data from 2014, correct?

Exhibit P8 at 20

GLENN POEHLER                                    November 21, 2019
Confidential

Page 154

1   know, 24- to 29,000 --

2           A.    Right.

3           Q.    -- more?

4           A.    Right.  And, you know, it has -- you

5   know, I'll continue to say it:

6                 I didn't use this for purposes of --

7   of -- of -- of benchmarking like plans.  I was

8   simply trying to show the data points.  You know,

9   that's why I broke it down.  That's why I gave

10  multiple graphs: one, for purposes to show the

11  whole -- total market; another, you know, solely --

12  solely large plans.

13          Q.    Well, if your purpose was to show the

14  total market, why didn't you include pricing for

15  plans that were recordkept by someone other than

16  TIAA?

17          A.    I was -- again, I was trying -- I

18  was -- the reason I was -- I broke it down TIAA

19  and -- and Vanguard was to try as close as I could

20  to have like -- to -- to eliminate the issue of --

21  of service differences.  I couldn't eliminate it

22  entirely.  As you point out, that information simply

23  isn't available.

24          Q.    And the TIAA -- the services both TIAA

Exhibit P8 at 21

GLENN POEHLER                                    November 21, 2019
Confidential

 1   and Vanguard provide can vary greatly, correct?

 2          A.    It -- it can, but it's more -- it's --

 3   in my -- in my experience, it's more likely that the

 4   services provided by TIAA are more alike from one

 5   university to another than it is to compare them

 6   to -- to another -- to another organization.  It's a

 7   way to -- to narrow that scope.

 8          Q.    You -- I think you refer to those in

 9   your report as, quote/unquote, high-touch services;

10   is that correct?

11          A.    Yes.

12          Q.    Have you ever used that term prior to

13   your expert work?

14          A.    Yes.

15          Q.    When did you use it prior to your

16   expert work?

17          A.    I would -- I would use it while I was

18   at Mercer.

19          Q.    Okay.  You ever -- anything you

20   publish ever use it?

21          A.    I don't specifically recall.  It

22   may -- I -- it may have.

23          Q.    Do you know anyone else that's ever

24   used it?

GLENN POEHLER                                    November 21, 2019
Confidential

Page 171

1      break here.

2                    MR. ROHLF:  Let me wrap up this line

3         of questioning and we can take a break.

4                    MR. NETTER:  Great.

5                    BY MR. ROHLF:

6         Q.    Now, did you -- do you know what the

7    Government Accountability Office is?

8         A.    Sure.

9         Q.    And do they issue reports on defined

10   contribution plans?

11        A.    I believe they have, yes.

12        Q.    Did you ever review those in practice?

13        A.    I've reviewed lots of things, so --

14        Q.    I'm going to share with you what's

15   going to be Exhibit -- 314 -- is that -- no 315.

16   It's a 2011 report from the Government

17   Accountability Office.

18                       (Thereupon, Exhibit Number 315

19              was marked for identification.)

20                 THE WITNESS:  You got a page number?

21                 BY MR. ROHLF:

22        Q.    Well, just first off, did you -- do

23   you ever recall reviewing this before?

24        A.    I -- I believe I have, yes.

Exhibit P8 at 23

GLENN POEHLER                                    November 21, 2019
Confidential

Page 172

1          Q.    Okay.  And you would have reviewed

2    this when you were in practice at Mercer?

3          A.    I can't say I remember it

4    specifically.  I've certainly reviewed it again as

5    part of my expert work.

6          Q.    Okay.  Did you rely on this in forming

7    your opinion in your report?

8          A.    Not specifically.

9          Q.    Okay.  Did you consider it in forming

10   your opinion --

11         A.    I'm --

12         Q.    -- in your report?

13         A.    Well, let's say I'm -- I'm aware of

14   it.

15         Q.    Okay.  You're aware of it.

16               If you go down to page 36, it talks

17   about cross-selling.

18         A.    I going to -- I need a -- a -- a

19   plug-in cable.  I'm --

20         Q.    Okay.

21         A.    -- running out of battery.

22         Q.    All right.  We'll -- we'll plug you in

23   as soon as -- as soon as we finish this up.

24         A.    Okay.

Exhibit P8 at 24

GLENN POEHLER                                    November 21, 2019
Confidential

 1          Q.    If you go down to 36 it -- and this

 2    report's dated January 2011, correct?

 3               MR. NETTER:  Is that -- is that

 4         page 36 of the PDF or page 36 of the document's

 5         number?

 6               MR. ROHLF:  I believe 36 of the

 7         document number, but --

 8               THE WITNESS:  36.

 9               MR. ROHLF:  Can you re-share that

10         with me, Scott?  I didn't get it for some

11         reason.

12               THE WITNESS:  I'm looking at page --

13         not page 30 -- not the labeled page 36 of --

14         36 --

15               BY MR. ROHLF:

16         Q.    The PDFs --

17         A.    -- of the document.

18         Q.    Yeah.

19               MR. NETTER:  I -- yeah, I -- I think

20         he means the page is --

21               BY MR. ROHLF:

22         Q.    The page is actually --

23               MR. NETTER:  -- labeled 36 at the

24         bottom.

GLENN POEHLER                                    November 21, 2019
Confidential

Page 174

1                    BY MR. ROHLF:

2          Q.    -- actually labeled 36 at the bottom,

3    yeah, paginated page 36.  So it would be --

4          A.    Okay.

5          Q.    It's 41 of the PDF.

6          A.    Okay.  What -- what --

7          Q.    All right.  And you see that industry

8    experts are recommending -- as early as 2010, I

9    assume, since they published this in 2011 --

10   recognize this problem of cross-selling; is that

11   correct?

12                MR. NETTER:  Objection to form.

13                THE WITNESS:  Yeah, that -- that's

14      what -- yes, that's what it does say.

15                BY MR. ROHLF:

16         Q.    And they recognize that it was a large

17   revenue source for recordkeepers?  Is that true as

18   well?

19         A.    Can you point to me -- rather than me

20   reading all of this?

21         Q.    Cross-selling products outside of a

22   plan to participants can substantially increase a

23   service provider's compensation, which creates an

24   incentive for the service provider to steer

Exhibit P8 at 26

GLENN POEHLER                                    November 21, 2019
Confidential

Page 175

1    participants towards the purchase of these products

2    even though the purchases may not serve the

3    participants' best interests.

4                    Do you see that?

5          A.    I'm trying to find it specifically on

6    here.

7          Q.    It's --

8          A.    Which, the first paragraph or the

9    second?

10         Q.    The first paragraph, I think the third

11   sentence.

12         A.    I've -- I've got it.  All right.  I

13   see it now.  Okay.  Sorry.

14                Yeah.  Yes, I do see that and --

15   and -- and certainly, you know, why I recommended

16   that representatives not be -- be compensated.  I --

17   I didn't want there to be any incentive to steer

18   participants anywhere.  I didn't want there to be an

19   incentive for -- for example, for a TIAA

20   representative to -- to push people to a TIAA -- to

21   a annuity contract or -- you know, or -- or anywhere

22   else, you know.  I -- I wanted their compensation

23   based on their service to the plan.

24         Q.    Well, you state in paragraph 208 of

Exhibit P8 at 27

Page 176

```
 1   your report that while at Mercer prior to 2015, the

 2   prevailing practice among plan sponsors was to allow

 3   vendors to market and discuss nonplan products with

 4   participants in a limited manner.

 5            A.    And -- and -- and again, just as I

 6   pointed out, out -- you know, outside of the normal

 7   routine of -- you know, why I would limit the direct

 8   plan representatives, but not necessarily the -- the

 9   complete sale of those products, because, again,

10   many of our -- my clients didn't want to put that

11   kind of handcuffs on their faculty members, who they

12   felt were highly educated in making the -- being

13   able to make a decision as to where to go in the

14   marketplace.

15            Q.    But your recommendation as early as

16   2009 was to limit it, correct?

17            A.    Was --

18                 MR. NETTER:  Objection to form.

19                 THE WITNESS:  My -- my recommendation

20       as -- again, was to not have the plan

21       representatives have compensation that was

22       impacted by the sale -- by -- by specific

23       recommendations.

24
```

Exhibit P8 at 28

GLENN POEHLER                                        November 21, 2019
Confidential

Page 181

1    TIAA pricing, is it relevant TIAA pricing.

2         Q.    But, again, you don't know the

3    services for any of these plans, correct?

4         A.    I -- we've -- we've discussed that

5    issue multiple times.  That's one of the -- that was

6    the key limitation applicable to -- to me, as -- as

7    well as the experts on -- on your side, not -- not

8    having that level of -- of information.

9         Q.    And were all the plans in this data

10   over 10,000 participants?

11        A.    Davidson likely is -- is not.  I'm not

12   sure about Wake.

13        Q.    Okay.

14             MR. ROHLF:  Can you share what's

15        going to be Exhibit 316, and it's -- 317, and

16        it's going to be Yale00244186.1.

17                   (Thereupon, Exhibit Number 317

18             was marked for identification.)

19             MR. BUMB:  Excel?

20             MR. ROHLF:  Um-hmm.

21             THE WITNESS:  Okay.

22             BY MR. ROHLF:

23        Q.    And is this the actual data that you

24   relied on from CAPTRUST in 2017?

Exhibit P8 at 29

GLENN POEHLER                                    November 21, 2019
Confidential

Page 183

1   reason to -- to question it.

2          Q.    And there are a number of public plans

3   in here that would not be subject to ERISA; is that

4   correct?

5          A.    That's correct.

6          Q.    Do you know if any of those were

7   required to have multiple vendors by law?

8          A.    I would have to -- I would have to do

9   the specific research as to what -- what states

10  these --

11         Q.    But you didn't do that research; is

12  that correct?

13         A.    No.

14         Q.    Okay.  Did you -- you didn't do any

15  research into the services that -- that were

16  provided; is that correct?

17         A.    That information wouldn't have been --

18  I'm not aware of any way to -- way to do that.

19         Q.    Okay.  And you don't know when they

20  negotiated these prices, do you?

21         A.    Again, this -- you know, we all had

22  limitations with regard to what -- what we could

23  obtain.  It was simply a matter of, you know, doing

24  my best to -- as I indicated, that's the reason I'm

Exhibit P8 at 30

Page 185

```
 1              Q.    Okay.  Would you agree that TIAA is

 2    not a -- does not provide services for very many

 3    401(k) plans?

 4              A.    It would certainly be not their -- not

 5    their normal book of business.  If they had -- to

 6    the extent they -- they service 401(k) plans,

 7    it's -- it's to a client that's an education client

 8    or a nonprofit client who's -- simply has -- has a

 9    401(k) plan.

10              Q.    And there are significantly more large

11    401(k) plans than there are 403(b) plans, correct?

12              A.    I haven't done that research, but I --

13    that would -- that would be my expectation.

14              Q.    Okay.  Do you know the services that

15    TIAA provided to any of these 200 clients?

16              A.    I think we went -- been through that

17    multiple times.  No, I do not.

18              Q.    Do you know the participant count for

19    any of these clients?

20              A.    I -- I -- I -- that data is here.

21              Q.    The participant count?

22              A.    Or -- column E.

23              Q.    I -- I'm talking about the TIAA data

24    in Exhibit 6.
```

Exhibit P8 at 31

GLENN POEHLER                                    November 21, 2019
Confidential

Page 190

1        Q.    And you're assuming when you analyze
2   this data that's all -- all things are equal because
3   you don't know the services, correct?
4        A.    That's -- that's correct, although I
5   do -- you know, as I -- as I -- looking at the data,
6   I'm also thinking about the impact of -- of -- what
7   I -- what I don't know is each of these plans have
8   at least -- with at least one 403(b) plan.  I don't
9   know how many plans they have.  I do know Yale has
10  four, so that -- that may likely have an
11  implication.
12             It also -- as time goes on, you know,
13  the -- the number of -- of organizations moving to
14  sole recordkeeping before -- who may have done it
15  before Yale has a implication as well as to how they
16  compare.
17       Q.    But you don't know how many had
18  multiple plans and how many had one plan, correct?
19       A.    I only -- I only know what's on this
20  data, so correct.
21       Q.    Okay.
22       A.    That -- that -- and that's part of
23  what I have to think about as I determine the
24  relevant -- how they use this data.

Exhibit P8 at 32

GLENN POEHLER                                    November 21, 2019
Confidential

Page 199

1    know, it's inclusive of those -- those general

2    services.

3              The -- those -- there may be some

4    elements of the work that a vendor does that's

5    outside of that terminology, but varying vendor by

6    vendor.

7         Q.    Generally education services?

8    Participant education services included?

9         A.    Again, that may impact price, but --

10   but would generally be included.

11        Q.    Okay.  And generally in the market are

12   the -- are the terms recordkeeping and

13   administrative services used interchangeably?

14        A.    I would say it -- in the majority of

15   cases, yes.  Might be -- I wouldn't say it's

16   universal.

17        Q.    Can you provide me an example of when

18   it's not used interchangeably?

19        A.    Not specifically.

20        Q.    Okay.  And are there generally

21   economies of scale in providing a recordkeeper --

22   recordkeeping and administrative services?

23        A.    Economies of scale from a per --

24   per-participant perspective?  To the -- yes, to the

Exhibit P8 at 33

GLENN POEHLER                                      November 21, 2019
Confidential

Page 200

1    extent that there are certain services that you have

2    to provide that aren't -- that -- where the --

3    their -- the cost doesn't vary by participant.  Then

4    the -- the more participants you have, the lower

5    that flat base cost --

6              Q.    Um-hmm.

7              A.    -- comes per participant.

8              Q.    And most recordkeeping costs are flat

9    fixed costs, correct?

10             A.    Well, certainly a -- a good portion of

11   them are.  Certainly there are some that are

12   dependent.  Mailing statements, dependent on number

13   of participants; processing and writing checks; you

14   know, number of withdrawals you're going to have,

15   the -- you know, all of that is somewhat dependent

16   on numbers of -- numbers of participants.  Basic

17   cost of warehousing the data, you know, the size of

18   the -- the size of your files, how much -- how much

19   data storage you need can all -- can -- that's

20   minimal, but it's -- it's all impacted.

21             Q.    Generally would you agree that all

22   things held -- held equal, the more participants in

23   the plan, the lower the per-participant fee?

24                   MR. NETTER:  Objection to form.

Exhibit P8 at 34

GLENN POEHLER                              November 21, 2019
Confidential

Page 201

```
 1              THE WITNESS:  I -- I think that's --
 2      that's pretty -- based on your -- your stated
 3      fact of all things being held equal, plan
 4      designed the same, funding structure the same,
 5      you know, data delivery is the same, service --
 6      you know, number of reps is the same.  Keep all
 7      of that -- all that's the same.  More
 8      participants you have, the lower the
 9      per-participant cost.
10              BY MR. ROHLF:
11      Q.    So to really accurately compare
12 pricing, you need to know the plan design, date of
13 delivery, the services and the participant --
14 participants?
15      A.    The --
16              MR. NETTER:  Objection to form.
17              THE WITNESS:  The more data you have,
18      the -- the more comfort level you have, but you
19      can't -- you don't always have everything
20      you -- you wish you had, and that's clearly the
21      case that -- that -- you know, that all the
22      experts are -- are in, including me.  Don't
23      have all the -- all the data you wish you had
24      isn't -- isn't available to you.
```

Exhibit P8 at 35

GLENN POEHLER                                    November 21, 2019
Confidential

Page 203

1          seems to be suggesting that perhaps both of you

2          should slow down a bit.

3                    MR. ROHLF:  Okay.

4                    BY MR. ROHLF:

5          Q.    And the same would be true in

6    comparing a plan with 20,000 participants to 1,000?

7          A.    Same issue, you know, all things --

8    all things treated equally.

9          Q.    You testified earlier when you were a

10   401(k) consultant that you sometimes used other

11   client pricing to benchmark the fees of plans; is

12   that correct?

13         A.    Yeah, what -- yeah, what I would --

14   what I said was I would -- I'd -- I'd use it as a

15   chart to compare, whether you call that benchmarking

16   or simply data.

17         Q.    Okay.  Did you have any cut-off point

18   on how close they needed to be in participant count?

19         A.    Well, it didn't have -- I didn't have

20   a cut-off.  I would simply provide the best data I

21   had available to the situation I had, you know.

22   You -- you don't always have data points that match

23   exactly to a -- to a specific client.  You do -- you

24   do the best you can.

Exhibit P8 at 36

GLENN POEHLER                                    November 21, 2019
Confidential

Page 226

1    recordkeep?

2            A.    I don't recall the specific person.

3            Q.    Do you recall when it was?

4            A.    I was in constant communication with

5    TIAA during that -- that time period.  I was -- I

6    was -- had -- I was, both -- you know, both at the

7    senior executive level, as well as with the --

8    the -- the day-to-day people, having conversations

9    with regard to their -- to their capabilities with

10   regard to their creating the revenue credit

11   accounts.

12           Q.    Did -- did TIAA offer to recordkeep

13   any plans with over 100 funds in their lineup at

14   that time?

15                 MR. NETTER:  Objection to form.

16                 THE WITNESS:  Not that I recall.

17                 BY MR. ROHLF:

18           Q.    Well, you --

19           A.    Not -- not that I recall working on.

20           Q.    Okay.  But you looked at a lot of

21   documents related to NYU, correct?

22           A.    Yes.

23           Q.    And TIAA bid to be the sole

24   recordkeeper for the NYU faculty plan, correct?

Exhibit P8 at 37

GLENN POEHLER                                    November 21, 2019
Confidential

Page 227

1          A.    Right.  And -- and as I -- as I

2    indicated, it's -- it's the number of slots, not

3    just the -- the -- the number of funds, but -- but

4    even if they did, I still go -- I still go back to

5    what was communicated from TIAA to Yale.

6          Q.    So if that communication didn't

7    happen, they would have -- they should have

8    consolidated?

9          A.    If -- if the -- if the -- if the

10   communication had been we can do it and if we -- you

11   know, in other cases, particularly cases that I've

12   been deposed on before, we saw constant proposals

13   from -- from TIAA saying let's -- let's go, let's

14   go, let's go, let's move to sole recordkeeping.

15   Didn't see that here.

16         Q.    It's on the agenda multiple times for

17   discussions between the Yale people and TIAA, isn't

18   it, in the early 2010s?

19         A.    It is -- it was -- it was brought --

20   my -- my reading of that, it was brought up by Hugh

21   Penney and it was included in a 2011 board meeting.

22   My -- my expectation is that if -- if TIAA said

23   we're ready to go, what would have happened is

24   the -- the board would have considered it -- taken

Exhibit P8 at 38

GLENN POEHLER                                    November 21, 2019
Confidential

Page 232

1              BY MR. ROHLF:

2         Q.    Okay.  I'm going to share with you a

3    document that's going to be Exhibit 319.

4                    (Thereupon, Exhibit Number 319

5              was marked for identification.)

6              BY MR. ROHLF:

7         Q.    And I'll just ask, do you recognize

8    this document?  Take as much time as you need to

9    review it.

10        A.    Yes, I do.

11        Q.    Okay.  And what is it?

12        A.    It -- it appears to be a draft of a --

13   of a meeting deck I did when I was presenting to a

14   group of community college financial officers.

15        Q.    Okay.  And that was in 2012, correct?

16        A.    Yes.

17        Q.    And did you -- were you involved in

18   drafting this deck?

19        A.    Yeah.  I co-drafted it with

20   Ms. Pranger.

21        Q.    And did you approve all the content in

22   this deck?

23        A.    Yeah, and we -- as I pointed out, we

24   created it together.  So, yes, I --

Exhibit P8 at 39

GLENN POEHLER                                    November 21, 2019
Confidential

                                                        Page 233

1          Q.    Okay.  Are you aware of any changes

2    that were made to this deck between this draft and

3    when you presented it?

4          A.    I -- I don't recall any changes.  I'm

5    not saying there weren't.  I'm just saying I don't

6    recall it.

7          Q.    Okay.  If you flip ahead to page 6 --

8          A.    Um-hmm.

9                MR. NETTER:  Again, Joel, are you

10       looking for PDF page 6 or slide number 6?

11               MR. ROHLF:  Slide number 6, PDF page

12       number 7.  Thank you, Brian.  The title pages

13       in the deck get it -- make it confusing every

14       time.

15               BY MR. ROHLF:

16         Q.    And that's -- it's a slide titled

17   Benchmarking Administrative Fees; is that correct?

18         A.    Yes.

19         Q.    Mercer Methodology?

20         A.    Yes.

21         Q.    And this is the RFI methodology you've

22   discussed today?

23         A.    Correct.

24         Q.    And following the similar methodology

                                        Exhibit P8 at 40

GLENN POEHLER                                    November 21, 2019
Confidential

Page 238

1              BY MR. ROHLF:

2         Q.    Are you aware of any evidence that

3    prior to 2014, Aon Hewitt did an RFI or an RFP for

4    the Yale plans?

5         A.    I don't believe the -- the -- I'm not

6    aware that they did, no.

7         Q.    And that 2014 RFP ultimately only

8    resulted in a bid from one vendor, correct?

9         A.    They got a bid from TIAA.  Vanguard

10   came back to them and indicated they were -- were

11   not able to provide the master recordkeeping

12   services that were requested.  So that eliminated

13   that option.

14        Q.    Do you recall between 2009 and when

15   you retired in 2014, did you ever connect an RFP

16   where you ultimately only looked at one bid?

17        A.    No, I didn't.

18        Q.    The purpose of an RFP is to get

19   competitive bids from multiple vendors, correct?

20        A.    Purpose of an RFP is to -- is to

21   get -- is to get bids.  The -- the -- the one thing

22   I will, you know, point out here is that it -- it

23   was -- it was never the intent of the committee to

24   remove TIAA.  We have commentary from the

Exhibit P8 at 41

GLENN POEHLER                              November 21, 2019
Confidential

Page 239

1    depositions indicating they were extremely pleased

2    with TIAA.  They -- they -- they knew the

3    limitations with regard to moving assets and they --

4    they were looking to -- once -- once Vanguard --

5    once it was determined that Vanguard wasn't an

6    option from a master recordkeeping perspective,

7    their goal was to -- was to move to -- to TIAA as a

8    sole.

9           Q.    If you're moving to a sole vendor, you

10   did an RFP, though, correct?

11          A.    Not in every case.

12          Q.    Can you name a case where you didn't

13   do an RFP?

14          A.    We didn't do one with -- with Memorial

15   Sloan-Kettering.

16          Q.    Okay.  And when was that?

17          A.    When was that?  It was 2012, 2013,

18   somewhere in that range.

19          Q.    Any other time where you moved to a

20   sole vendor and you didn't conduct an RFP?

21          A.    That's -- that's the one that jumps

22   out at me.

23          Q.    Okay.  Now, one of the reasons you

24   justify Yale not conducting an RFP is the cost of

Exhibit P8 at 42

GLENN POEHLER                                November 21, 2019
Confidential

Page 254

1          A.    It's -- it's -- it's -- it's data I

2    had for 2012.

3                MR. NETTER:  Just make sure you give

4       him a chance to finish asking his question.

5                BY MR. ROHLF:

6          Q.    And you don't have any data for

7    2000 -- 2012, at least on a per-participant basis,

8    that anyone other than TIAA selected, correct?

9          A.    I -- I did not.

10         Q.    And you can't tell us the pricing of

11   your own clients at that time, correct?

12         A.    I cannot.

13         Q.    Would you agree that as early as 2009,

14   most investment advisors recommended consolidation

15   to a single recordkeeper?

16         A.    My experience there is that -- that

17   consultants certainly recommended looking at it,

18   looking at the potential savings from -- from doing

19   so.

20         Q.    And you recommended that to your own

21   clients, correct?

22         A.    I did.  And as you saw, a -- a number

23   of them did it.  It's -- and -- as did Yale.  And --

24   and I think Yale did it as soon as they -- they

Exhibit P8 at 43

GLENN POEHLER                                    November 21, 2019
Confidential

Page 255

1    could, given their situation.

2              Q.    It was also the standard

3    recommendation of Aon Hewitt; is that correct?

4              A.    I think -- I think you could safely

5    say that would be true with consultants in -- in

6    general.  There was -- the -- the result was -- the

7    results of that consolidation would speak for

8    themselves with regard to the fee that was achieved.

9    But, again, Yale did do it and they -- and they did

10   it as soon as they could, given their -- their --

11   their situation.

12   ████████████████████████████████████████████████

     ██████████████████████████████████████████

     ██████████████████████████████

     ██████████████████████████████████████████

     ████████████████████████████████████████████

     ██████████████████

     ████████████████████████

     ██████████████████████████

     ████████████████████████████████████████████████

     ██████████████████████████████████

22             Q.    Okay.  You state that Yale was

23   justified in not consolidating to prevent

24   participant disruption; is that correct?

Exhibit P8 at 44

GLENN POEHLER                                    November 21, 2019
Confidential

Page 259



10          Q.    I have a couple friends who will get

11    very mad at me if I say it that way.

12

Exhibit P8 at 45

GLENN POEHLER
Confidential

November 21, 2019

Page 260



```
18          Q.    Okay.  That's not always reported on
19     5500s, correct?
20          A.    Not always, but it was consistently --
21     at -- at least from that point forward, it was
22     consistently reported on their 5500s.
23          Q.    Do you remember, was that a
24     per-participant cap or a asset-based cap that they
```

Exhibit P8 at 46

GLENN POEHLER                                          November 21, 2019
Confidential

Page 270

1    in there, correct?

2            A.    That -- that -- I should -- Princeton

3    was -- was a multi vendor in 2015.  So they're on

4    the right side of the chart.  I -- I failed -- I

5    should have been consistent and had them on my -- in

6    my footnotes of -- of transitioning in, I believe it

7    was, 2016.

8            Q.    And they're a 401(a) plan, not a

9    403(b) plan; is that correct?

10           A.    I -- I don't recall specifically what

11   Princeton is.

12           Q.    Okay.  But you excluded other 401(k)

13   plans, right?

14                 MR. NETTER:  Objection to form.

15                 THE WITNESS:  I --

16                 BY MR. ROHLF:

17           Q.    You excluded MIT, didn't you?

18           A.    Yeah, but what -- yes, I did exclude

19   MIT.

20           Q.    And MIT is a --

21           A.    Is a -- is a 401(k) plan.

22           Q.    And it had a single vendor, Fidelity,

23   correct?

24           A.    Right.  Yes.  I'm -- I'm not sure I

Exhibit P8 at 47

GLENN POEHLER                                    November 21, 2019
Confidential

Page 281

```
1                    MR. ROHLF:  Okay.

2                    MR. NETTER:  -- have a natural

3          point --

4                    MR. ROHLF:  We'll go through this

5          document and then take a break because my iPad

6          is still not charging, so we're going to have

7          to do something about that.  It is getting old,

8          so it could be just dying.

9                         (Thereupon, Exhibit Number 321

10                was marked for identification.)

11                   BY MR. ROHLF:

12         Q.    And I'll just ask you, do you

13    recognize this document?  Take as much time as you

14    need to review it.

15         A.    I -- I do.  It's a general Mercer U.S.

16    point of view, again written for the market in

17    general.

18         Q.    This would have been issued at your

19    time -- during your time at Mercer?

20         A.    The date on it is -- is -- looking for

21    a date.

22         Q.    I believe there's a 2013 copyright.

23    Let me find it for you.

24         A.    I do -- I do recall this was -- well,
```

Exhibit P8 at 48

Page 282

```
 1   yeah.  Was it 2013?  Yes.  So, yes, it was during my

 2   time.

 3          Q.    And it was -- looks like it was

 4   drafted by Amy Reynolds and Sabrina Bailey; is that

 5   correct?

 6          A.    Correct.

 7          Q.    And who is Amy Reynolds?

 8          A.    Amy Reynolds was the -- the leader of

 9   the -- of the -- of Mercer's D.C. business.  I think

10   that was -- I think that was true in 2013.

11          Q.    Okay.

12          A.    There was a changeover sometime --

13          Q.    Would you --

14          A.    -- around then.

15          Q.    And would you consider her an expert

16   on recordkeeping fees?

17          A.    Yes, particularly for large 401(k)

18   plans.

19          Q.    Okay.  And would you have distributed

20   this document to your clients?

21          A.    This was -- I believe this would have

22   been mass distributed.

23          Q.    Okay.  And it applies -- at least how

24   it's written, it says it applies to all D.C. plans,
```

Exhibit P8 at 49

GLENN POEHLER                              November 21, 2019
Confidential

Page 283

1    correct?

2         A.    Yeah, it's -- as you saw with other

3    consultants in other general communications, this is

4    the type of information that you put out in the

5    marketplace on general best practices.

6         Q.    Okay.  And it says -- best practice

7    number 1, if you go to page 3 -- yeah, it's page 3

8    of the document, end of the page.  That's good.

9         A.    Um-hmm.

10        Q.    It says, Price administrative fees on

11   a per-participant basis.

12        A.    Right.

13        Q.    And that was Mercer's best practice in

14   2013, correct?

15        A.    It's always the goal.

16        Q.    And was it your best practice dating

17   back to 2009?

18        A.    It was -- it -- it was my goal.

19   Couldn't always get there, but I would certainly

20   attempt to get there.

21        Q.    Okay.  I think if you look at the

22   little paragraph under there, it says that using a

23   pricing model that is dependent on the value of plan

24   assets arbitrarily builds in fee increases that are

Exhibit P8 at 50

GLENN POEHLER                                    November 21, 2019
Confidential

Page 286

1    would be particularly true if you have an

2    asset-based fee.

3            Q.    Okay.  And Yale had an asset-based

4    fee, right?

5            A.    Up until 2015.

6            Q.    And did they every year look at the

7    recordkeeping fees prior to 2015?

8            A.    They -- what they did do was they --

9    when -- when Aon reviewed it in 2012, they did a

10   projection into 2013 and 2014.  So they had some

11   expectation as to what the fee would look like in

12   2013 and 2014.

13           Q.    But nothing prior to 2012, correct?

14           A.    They -- they -- they didn't have a

15   required revenue to -- to benchmark against.

16           Q.    Okay.  And under that in the paragraph

17   it says, in the first sentence, Comparing a plan's

18   recordkeeping and trustee fees to the fees of other

19   plans based on survey data or publicly available

20   information does not provide a fiduciary safe harbor

21   for the monitoring of reasonableness of fees.

22                 Do you see that?

23           A.    I do.

24           Q.    Do you agree with that statement?

Exhibit P8 at 51

GLENN POEHLER                                    November 21, 2019
Confidential

Page 287

1           A.    I -- I think that's a good -- a good

2     statement for, again, these -- this general

3     communication and -- and best practice.

4           Q.    And was it a best practice that you

5     would have advised your clients about?

6           A.    Yes.

7           Q.    And dating back to 2009, would that

8     have been your advice to clients?

9           A.    My -- my advice was consistent with

10    Mercer best practices.

11          Q.    Okay.  And so you wouldn't have done

12    benchmarking to other plans' fees like you did here

13    in practice, correct?

14                MR. NETTER:  Objection to form.

15                THE WITNESS:  I -- I -- I would have

16        used -- in -- in this time frame I would have

17        used an RFI.  That methodology was not

18        available to me -- available to me here.

19                BY MR. ROHLF:

20          Q.    Okay.  And that's because, I think as

21    it states there, you need market data specific to

22    the plan at issue, correct?

23          A.    That's -- that's correct.

24          Q.    Okay.  Did Yale ever look at market

GLENN POEHLER                                    November 21, 2019
Confidential

Page 301

1   whether or not the TIAA fixed annuities impact

2   the -- the recordkeeping costs.  And I'm -- I'm

3   suggesting that they do and I'm giving you reasons

4   why.  It's because the recordkeeping is more.

5   There's more to the recordkeeping.  Simple as that.

6   There's more to the recordkeeping than there is to a

7   mutual fund or a variable annuity.

8            Q.    But what you're talking about are

9   distribution expenses and things like that that

10  aren't recordkeeping --

11           A.    I'm -- I'm not talking about

12  distribution.  I'm simply talking about my -- that

13  you've got to -- that the recordkeeping itself --

14  system itself has to -- has to handle all of the --

15  all of those pieces.

16           Q.    Well, is the recordkeeping responsible

17  for -- the recordkeeper generally responsible for

18  calculating the return on an investment?

19           A.    They are -- if -- if somebody -- if

20  somebody else attempted to record -- if I was

21  recordkeeping a fixed annuity, somebody else's fixed

22  annuity, what -- what -- what I would know for that

23  fixed annuity is what the return is for that period.

24  I would then -- if -- and so in this case, if it was

Exhibit P8 at 53

Page 302

1    3 percent, TIAA would not have an account for Glenn

2    Poehler saying his fixed annuity is worth X dollars.

3    He's not doing the recordkeeping anymore.  I'm doing

4    the -- the new recordkeeper is doing the

5    recordkeeping.  So that -- so TIAA would be looking

6    for the new recordkeeper to apply that 3 percent

7    rate to the -- that person's account.

8          Q.    Are you aware of any other investment

9    product where the recordkeeper is responsible for

10   calculating the return on the --

11         A.    I didn't say they were calculating the

12   return.  I said they were -- TIAA is giving them the

13   return.  It's -- it's that -- the return is

14   3 percent or 3.2 or whatever it is.

15               Same thing as -- same thing is true

16   with a mutual fund.  Right?  Mutual fund provider

17   doesn't tell -- you know, if I'm in a -- a Vanguard

18   fund, they tell the recordkeeper that the NAV for

19   that day is -- is no longer $10.11, it's $10.12.

20         Q.    Um-hmm.

21         A.    They then apply -- from a daily

22   valuation perspective, they then allocate that

23   difference in NAV.  They don't tell them hey, we're

24   not -- for John Doe buy 23 cents.  They tell him the

Exhibit P8 at 54

GLENN POEHLER                                    November 21, 2019
Confidential

Page 303

1   NAV went up by one basis -- by -- by one -- one

2   point.

3          Q.    And then the recordkeeper applies it?

4          A.    Then the -- the recordkeeper then

5   determines -- determines how that change in NAV

6   impacts that participant's account.

7          Q.    Yeah, and they can do that with

8   multiple NAVs, right?  So if you have six funds, you

9   just apply that across, right, the recordkeeper, and

10  that's something you do with mutual funds every day?

11                MR. NETTER:  Objection to form.

12                THE WITNESS:  If you have six --

13         well, six funds you'd have six different

14         NAVs --

15         Q.    Yeah.

16         A.    -- right?

17                BY MR. ROHLF:

18         Q.    Yeah.  How is that any different than

19  applying six different vintage rates?

20         A.    It -- it -- what you -- what you --

21  what you asked was doesn't -- you know, doesn't --

22  doesn't the -- the -- the annuity provider give

23  the -- give the interest.  No.  They give -- they

24  give the return, and then the recordkeeper does the

Exhibit P8 at 55

GLENN POEHLER                              November 21, 2019
Confidential

Page 326

 1          A.     That's what I'm looking for.  I -- I
 2   believe I have his rebuttal here.
 3                 Minnich.  I don't think this
 4   includes -- right.  Yeah, Aurora Health.
 5          Q.     Um-hmm.
 6          A.     He -- he quotes $35.
 7          Q.     Yeah, and that's a blended of three
 8   rates that Aurora has, right?
 9          A.     Right, which -- and he doesn't try to
10   do a weighted average.  He simply does --
11          Q.     You didn't do --
12          A.     -- an average.
13          Q.     You didn't do a weighted average
14   either, did you?
15          A.     Well, what I'm saying -- I'm not
16   saying I know what the recordkeeping fee is.  What I
17   am saying is the $35 isn't -- isn't right.  It
18   makes -- and if I simply look at -- as we talked
19   about earlier, in which you say I don't know what it
20   includes.  But the actual -- the actual revenue
21   to -- was -- was in excess of 65.
22          Q.     But that's --
23          A.     It certainly doesn't -- it -- I don't
24   know exactly -- it -- it certainly includes some

Exhibit P8 at 56

GLENN POEHLER                                    November 21, 2019
Confidential

Page 327

1    other things other than recordkeeping expense.  I

2    don't know exactly what it is.  But in -- in my

3    opinion, it's -- the -- the vast majority of that is

4    going to be direct recordkeeping cost and it's not

5    going to be $35.

6            Q.    Well, it includes investment advisory

7    expenses, right?

8                  MR. NETTER:  Objection, asked and

9        answered.

10                 BY MR. ROHLF:

11           Q.    Well, let's pull --

12                 MR. ROHLF:  Get the Aurora 5500.

13       We'll mark it as Exhibit 323 -- 324.

14                      (Thereupon, Exhibit Number 324

15               was marked for identification.)

16                 BY MR. ROHLF:

17           Q.    As a little prep work, the Department

18   of Labor -- sorry.  I didn't see you drinking.

19                 As a little prep work here, the

20   Department of Labor has various service codes that

21   they assign for 5500s, correct?

22           A.    Correct.

23           Q.    Did you work with the -- and you use

24   those service codes in practice, right?

Exhibit P8 at 57

Page 328

```
 1           A.    Yes.

 2           Q.    And you generally know what they are,

 3   right?

 4           A.    There's a lot of them.

 5           Q.    Yeah.

 6           A.    So do I have them memorized?  No way.

 7           Q.    Okay.

 8           A.    You'd have -- we'd have to pull up the

 9   instructions and look at --

10           Q.    Okay.  Do you know if --

11           A.    There must be -- there must be 50 of

12   them.

13           Q.    Did you look at all those service

14   codes for -- for Transamerica?

15           A.    Actually, I -- I did -- I -- I

16   pulled -- I did pull up the instructions and -- and

17   looked at -- at all of the -- at all the different

18   potential codes.

19           Q.    And it included investment advisory

20   services, correct?

21           A.    It --

22                 MR. NETTER:  Objection, asked and

23      answered.

24                 THE WITNESS:  I believe it did, but
```

Exhibit P8 at 58

GLENN POEHLER                                    November 21, 2019
Confidential

Page 329

1        I -- what I'm saying is the -- the -- if we

2        look in this -- to defend that -- that number,

3        what -- what Mr. Minnich did was to say -- he

4        pulled a number from Mr. Alexander's report

5        of -- of the investment management cost of

6        portfolio advisor services of --

7                    BY MR. ROHLF:

8        Q.    Well, that's not a -- that's not --

9        A.    -- which is not --

10       Q.    That's not an actual --

11                   MR. NETTER:  Joel, the witness is

12       still answering.

13                   THE WITNESS:  Right.  So that's

14       clearly not -- you know, we're trying to

15       compare administrative costs, not investment

16       management costs.

17                   BY MR. ROHLF:

18       Q.    I agree, but that investment

19   management or investment advice cost is included in

20   the Aurora number you're using, correct?

21       A.    I -- there's no way to know exactly

22   what's included in that.  And I haven't seen

23   anything come up, but --

24       Q.    Do you have the Aurora -- 2018 Aurora

GLENN POEHLER                                           November 21, 2019
Confidential

Page 356

1                    CERTIFICATE OF NOTARY

2                    I, MISTY KLAPPER, the officer before

3        whom the foregoing deposition was taken, do

4        hereby certify that the witness whose testimony

5        appears in the foregoing deposition was duly

6        sworn by me; that the testimony of said witness

7        was taken by me in shorthand and thereafter

8        reduced to typewriting by me; that said

9        deposition is a true record of the testimony

10       given by said witness; that I am neither

11       counsel for, related to, nor employed by any of

12       the parties to the action in which this

13       deposition was taken; and, further, that I am

14       not a relative or employee of any attorney or

15       counsel employed by the parties hereto, nor

16       financially or otherwise interested in the

17       outcome of this action.

18       Dated: November 27, 2019

19

20                              _____

21                              Misty Klapper
                                Notary Public in and for
22                              the District of Columbia

23

24

Exhibit P8 at 60

GLENN POEHLER                                    November 21, 2019
Confidential

Page 354

1                 CERTIFICATE OF DEPONENT

2            I, Glenn Poehler, do hereby certify

3      that I have read the foregoing pages, 7

4      through 352, inclusive, which contain a

5      correct transcript of the answers given by me

6      to the questions propounded to me herein,

7      except for changes, if any, duly noted on the

8      enclosed errata sheet.

9

10         X   Corrections have been submitted

11         ____ No corrections have been submitted

12

13                                    WITNESS

14

15

16

17            Sworn and subscribed to before me

18      this ____ day of _____, 2019.

19

20

21      My commission expires:        Notary Public:

22      _____          _____

23

24      U.S. Legal Support Job No.: 860856

Exhibit P8 at 61

GLENN POEHLER                                November 21, 2019
Confidential

Page 355

```
 1    CASE:  Vellali, et al. v. Yale University, et al.

 2    DEPOSITION OF:  Glenn Poehler

 3    TAKEN:  November 21, 2019

 4    U.S. Legal Support Job No.:  860856

 5    PAGE  LINE  ERROR           CORRECTION        REASON

 6    123:10        Change end to ed        mistake

 7    207:16        change bare to bear     mispelling

 8    Throughout    Comac to Cammack        mispelling

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23    12/24/2019                Glenn R. Poehler
24      Date                         Witness
```

U.S. Legal Support, Inc.
(312) 236-8352

Exhibit P8 at 62