# Exhibit 121

Page 1

```
 1              IN THE UNITED STATES DISTRICT COURT

 2                FOR THE DISTRICT OF CONNECTICUT

 3      ------------------------)

 4      JOSEPH VELLALI et al.,   )

 5               Plaintiffs,     )

 6          v.                   ) No.:16-cv-01345-AWT

 7      YALE UNIVERSITY et al.,  )

 8               Defendants.     )

 9      ------------------------)

10

11

12        VIDEOTAPED DEPOSITION OF:  HUGH K. PENNEY

13               DATE:  FEBRUARY 20, 2019

14                    HELD AT:

15      YALE UNIVERSITY OFFICE OF THE GENERAL COUNSEL

16                  2 Whitney Avenue

17                New Haven, Connecticut

18                     - - -

19

20

21

22

23    Reporter:  Sandra Semevolos, RMR, CRR, CRC, CSR #74

24
```

HUGH PENNEY                                    February 20, 2019

```
 1     A.    Yes.

 2     Q.    Do you know what that is?

 3     A.    Yes, I do.

 4     Q.    And what is it?

 5     A.    ERISA is a federal law that governs

 6  pensions and retirement plans.

 7     Q.    In your education, have you had any

 8  coursework that in any way covers ERISA?

 9     A.    In my coursework, no.

10     Q.    Have you had any training related to ERISA

11  at any time?

12     A.    I have.  I've been responsible for

13  managing benefit plans for over 40 years and have

14  had quite a lot of interaction with ERISA attorneys,

15  conferences, training seminars and the like.

16  Nothing of a formal nature.

17     Q.    What was your first job after your MBA?

18     A.    I took -- my MBA was in the middle of my

19  career.  I was working for Shaw Supermarkets at the

20  time.  The next job that I had was at the Tufts

21  Medical Center.

22     Q.    When did you start at Tufts Medical

23  Center?

24     A.    I started at Tufts Medical Center in
```

HUGH PENNEY                                    February 20, 2019

Page 13

 1   approximately 2005.  I don't have the exact date on

 2   me.

 3        Q.    And what year did you get your MBA?

 4        A.    2002.

 5        Q.    And what was your job at Tufts Medical

 6   Center when you started in 2005?

 7        A.    I was the benefits director.

 8        Q.    What were your job responsibilities when

 9   you were the benefits director at Tufts Medical?

10        A.    My responsibilities as the benefits

11   director was the administration of all of the health

12   and welfare programs.  It would include medical and

13   dental and life insurance and disability.  In

14   addition, I was responsible for the retirement

15   plans.  We had a 403(b) and a 457(f).

16        Q.    How long were you employed by Tufts

17   Medical Center?

18        A.    Approximately two years.

19        Q.    Throughout that time, were you the

20   benefits director for that entire two-year period?

21        A.    Yes.

22        Q.    And your responsibilities remained

23   consistent?

24        A.    I didn't have a different job; I had a

Page 136

```
 1        A.    I-m-p-r-o or-a-t-t-o, or something along

 2    that line.  I'm a terrible speller and I'm terrible

 3    with names, but --

 4        Q.    Okay, fair enough.

 5              You mentioned you had worked at Shaw

 6    Supermarkets while getting your MBA?

 7        A.    That's correct.

 8        Q.    What was your position there?

 9        A.    I was vice president for compensation and

10    benefits.

11        Q.    And when did you start that position?

12        A.    I started it approximately 2000 -- I'm

13    sorry, 19 -- let's see.  It went through about --

14    about 1994 or '5.

15        Q.    So you were there from '94 or '95 until

16    2005?

17        A.    That's correct.

18        Q.    What did you do before working at Shaw

19    Supermarkets?

20        A.    Before Shaw Supermarkets, I was the vice

21    president of benefits for BayBanks in Massachusetts.

22        Q.    And how long did you do that?

23        A.    Just under three years.

24        Q.    So you would have started approximately
```

HUGH PENNEY                                      February 20, 2019

Page 137

1    1991?

2         A.    It was -- yes, August.

3         Q.    Is that Bay Bank two words?

4         A.    Two capital Bs, but one word.

5         Q.    What did you do before that, in terms of

6    employment?

7         A.    Prior to that, I worked at Filene's

8    Department Store, a division of May Company.  And

9    prior to that a division of Federated Department

10   Stores.

11        Q.    What did you do at Filene's?

12        A.    I was the divisional vice president for

13   compensation benefits and human resource information

14   systems.

15        Q.    And when did you start at Filene's?

16        A.    I started at Filene's in 1983, early

17   January.

18        Q.    And what did you do before that?

19        A.    Before that I worked with the Social

20   Security Administration.

21        Q.    And what did you do there?

22        A.    I was a claims representative.

23        Q.    How long did you do that?

24        A.    Just under five years.

Page 138

```
 1      Q.    So is that approximately 1978 when you
 2   started?
 3      A.    Started in '78, yes, training started in
 4   '78.
 5      Q.    Were you employed prior to that?
 6      A.    Yes, I was.
 7      Q.    And what was your job prior to that?
 8      A.    I was a national park ranger in the Boston
 9   National Historic Park.
10      Q.    And when did you start there?
11      A.    In 1977.
12      Q.    Were you employed prior to that?
13      A.    Yes, I was.
14      Q.    And what was your job prior to that?
15      A.    Prior to that, I was the trail supervisor
16   for Baxter State Park in Maine.
17      Q.    When did you start that position?
18      A.    I started that position in early '77.
19      Q.    Were you employed prior to that?
20      A.    I was.
21      Q.    What was your job?
22      A.    I was the supervisor for gate houses at
23   North Maine Woods.
24      Q.    When did you start?
```

HUGH PENNEY                                          February 20, 2019

Page 139

```
 1      A.    Excuse me.  I actually started that job as
 2  an intern during the summer when I was in college,
 3  and then was the first full-time, year-round
 4  employee of the organization.  It would have been --
 5  that would have been in '76.
 6      Q.    When did you graduate college?
 7      A.    '76.
 8      Q.    Okay.  Did you have any full-time
 9  employment prior to that job as supervisor for gate
10  houses?
11      A.    No.
12      Q.    Okay.  You haven't had any employment
13  prior to your time at Yale that involves monitoring
14  of investment performance; is that right?
15      A.    I'm sorry, how did you phrase the
16  question?
17      Q.    Have any of your positions prior to the
18  beginning of your time at Yale involved monitoring
19  of investment performance?
20      A.    Absolutely.
21      Q.    And could you tell me what that experience
22  was?
23      A.    Yes.  In the mid-'90s, I formed a
24  fiduciary committee at Shaw Supermarkets.  I was on
```

Page 140

1    the committee, and we were responsible for

2    redesigning the plan, its investment lineup, its

3    recordkeeping and monitoring of the plans.

4           I was also the day-to-day administrator of

5    those plans.

6       Q.    Did you have a consultant involved with

7    that endeavor in 1990?

8       A.    Yes, we did.

9       Q.    Throughout your career, have you relied on

10   outside consulting advice with respect to each

11   instance in which you were responsible for

12   monitoring investments?

13      A.    In the early part of my career at Shaw's,

14   no, I was responsible.  There was no committee.  So

15   my responsibility was to -- excuse me.

16          Prior to that, I was responsible as the

17   head of benefits for monitoring the plans, but then

18   formed a committee about halfway through.  It was a

19   time where we introduced automatic enrollment and

20   escalations, sort of before the IRS blessed it and

21   also introduced target date investing as a default

22   option before QDIAs were around.

23      Q.    When you were responsible for the head of

24   benefits for monitoring the plans at Shaw's, how did

HUGH PENNEY                                    February 20, 2019

Page 141

1    you go about doing that monitoring?

2         A.    I had, again, had the documented

3    information from the recordkeeper in terms of the

4    investments that we had, and typically with the

5    chief financial officer, myself, we were -- would

6    meet with the committee and get the reports, and we

7    would review them to see if it was still the

8    appropriate lineup.

9         Q.    Are you familiar with manager tenure in

10   the context of monitoring investments?

11        A.    I am.

12        Q.    And what does that mean?

13        A.    Well, manager tenure is how long that

14   typically the management team or the individual

15   managers that are leading an investment mutual fund

16   or other investment have been responsible for that

17   particular investment group.

18        Q.    Has your job responsibility at any time

19   during your career involved monitoring manager

20   tenure for any investment?

21        A.    It certainly involved reviewing it to see

22   if there were any concerns or major changes in the

23   investment.  Significant change in a manager might

24   suggest that it would bear further watch.

HUGH PENNEY                                    February 20, 2019

 1    investment orientation of a fund, let's say that it

 2    is a fund that is 50/50, Investment A and B, or

 3    Categories A and B, and if over time it moves to

 4    60/40 and stays there, it's no longer delivering --

 5    it may be getting better returns, it may be getting

 6    worse returns, but it's problematic because the

 7    investments are outside of the parameters of what

 8    the investment was selected for.

 9        Q.    Have you ever done any work to assess

10    whether or not any investment in the Yale plan has

11    been subject to style drift during the time that

12    you've been employed there?

13        A.    Style drift or understanding what the

14    investments are compared to what they're stated is

15    the information that I would have seen in the

16    prospectuses, and since we had an independent

17    advisor, style drift would be something that they

18    would report if it was identified in any of the

19    investments that they were reporting on.

20        Q.    Have you ever assessed whether or not any

21    individual investment in Yale's plan lineup has been

22    subject to style drift?

23        A.    I have not found one in the time that I

24    was overseeing them where one had style drift that

HUGH PENNEY                                    February 20, 2019

1    would suggest that it was of concern.

2         Q.    Have you ever analyzed those funds to

3    determine whether style drift had occurred?

4         A.    I would compare the primary investment

5    categories and compare it to the stated objectives

6    of a fund.  If it was in the parameters, it would

7    not be an issue.

8         Q.    Have you ever analyzed the performance of

9    the holdings within any mutual fund held within the

10   Yale plan?

11        A.    What level of holdings are we talking

12   about?  An individual stock or a --

13        Q.    Yeah.  I'm asking a general question as to

14   any level.  So with respect to any level, have you

15   analyzed the performance of the holdings within any

16   mutual fund held within the Yale plan?

17        A.    When I look at a mutual fund and read

18   through the materials, if it's invested -- if it's a

19   healthcare dedicated fund, I would expect to see the

20   top investments in healthcare.  Typically they

21   report any major categories.  Again, if a fund is

22   investing in specific categories or specific

23   investment styles, that's typically reported out.

24   And again, what I'd be looking for would be

HUGH PENNEY                                    February 20, 2019

Page 148

```
 1   discrepancies between its stated goals and its

 2   actual goals, and I have not identified any that,

 3   again, would have caused concerns for consideration

 4   for removing it from the plan.

 5       Q.    I understand that you've described a

 6   methodology and you've also said that you haven't

 7   identified any concerns.

 8           My question is:  Have you actually done

 9   the work to analyze the holdings of any mutual fund

10   within the Yale plan during your time of employment?

11       A.    I've tried to answer this multiple times.

12   I've certainly gone through materials from all of

13   the investments that we have over time and have

14   looked at the characteristics of their returns

15   versus their benchmarks, the reporting on their

16   holdings, reporting on what the basic direction of

17   that fund is to make sure that it appears to be in

18   compliance with its mandate, and in my time of

19   looking at these investments, they have -- I have

20   not identified any that suggest that they are

21   operating outside of their norms and would rise to a

22   level where they should be considered for dropping

23   or putting on a watch list.

24       Q.    Throughout the time of your employment
```

HUGH PENNEY                                    February 20, 2019

Page 206

1    corporations issue.

2          So there are annuities on the lineup for

3    different reasons.  In some cases, they are there

4    because of what they can do as an investment during

5    your accumulating years.  In some cases, the same

6    fund or a different fund is on the right-hand side

7    where it's an investment for lifetime income that

8    can be invested in that market category so that you

9    have the access or access to appreciating values

10   even while you are being paid for the rest of your

11   life.

12        Q.    Let's take a look at a document,

13   YALE00032729.

14              MR. BUMB:  Exhibit 50.

15              MR. BRAITBERG:  50.

16               (Exhibit 50, Document dated May

17               16, 2012, YALE00032729, previously

18               marked.)

19   BY MR. BRAITBERG:

20        Q.    This document is dated May 16, 2012 and it

21   says TIAA-CREF Asset Management Investment Review.

22              Do you see that?

23        A.    I do.

24        Q.    This would be an example of one of the

HUGH PENNEY                                    February 20, 2019

Page 207

1  investment review documents provided by TIAA that

2  you used to monitor investment performance?

3      A.    Let me review the document.

4            MS. ROSS:  I'm going to note for the

5  record that it's a 53-page document, so to the

6  extent that you're going to ask him specific

7  questions about it, we should figure out a way to be

8  efficient in allowing him to adequately review it.

9            MR. BRAITBERG:  I agree, absolutely.

10     Q.    So I'm happy to tell you what specifically

11  I'm going to be asking you about.

12     A.    So just in terms of -- was this one of the

13  attachments to the minutes of a committee meeting?

14     Q.    I believe that to be the case.  Is that

15  your understanding?

16     A.    I'd have to refer to the documents.

17     Q.    Okay.  You have no -- well, you have no

18  reason to disagree with that?

19     A.    I have no reason, but I -- I'm happy to

20  look at what you'd like me to look at, but again,

21  this is a document that would take a little bit of

22  time to get -- refamiliarize myself with.  So where

23  would you like me to focus?

24     Q.    All right.  Well, I'd like you to take a

Page 208

1    look at page 18 of the PDF, and it's also marked

2    page 18, and it stays CREF Stock Account at the top.

3         A.    Okay.  I'm sorry, which page am I looking

4    at?

5         Q.    It's page 18.

6         A.    Oh, I'm sorry, I thought you said --

7         Q.    It says CREF Stock Account at the top.

8         A.    I had a page that didn't say CREF Stock

9    Account.  I've got it.  So it's page 18 of the PDF,

10   CREF Stock account.

11        Q.    Yes.

12        A.    Page 18 of the document, okay, got it.

13        Q.    Is this the type of information that you

14   would receive from TIAA in order to perform your

15   investment monitoring function prior to the

16   formation of the committee?

17        A.    This is -- this is one format of

18   information.  Oftentimes it's provided in tabular

19   form as opposed to graph form, but we have reports

20   in both formats.

21        Q.    Do you see on the right side, towards the

22   bottom right-hand corner where it says Benchmark:

23   CREF Composite?

24        A.    I do.

HUGH PENNEY                                    February 20, 2019

 1      Q.    Do you know what the CREF Composite is?

 2      A.    The CREF composite is TIAA's custom

 3   benchmark to try and reflect the fact that the CREF

 4   Stock Account, although it's been a very successful

 5   investment for decades for participants, that it is

 6   in a combination where it doesn't comfortably fit

 7   with some of the standard benchmarks.  It's

 8   typically in the 70/30 space, as I recall, and

 9   benchmarks would be, you know, 60/40 and so on.

10           So one of the challenges with the CREF

11   Stock Account is the purpose and who might be

12   interested in investing in this particularly active

13   managed account.  The CREF Stock Account is largely,

14   the vast majority of it is U.S. Domestic Equity with

15   international exposure.  In its day it was

16   extraordinarily cutting edge, back in 1955.  But

17   it's grown and developed, and it doesn't fully

18   reflect the full weight of global exposure that you

19   would typically have in a global fund, but it also

20   is not a U.S. fund, so you could think of it as a

21   world fund that's overweighted for domestic or a

22   domestic fund with exposure to international.  So

23   again, the challenge gets to be that it doesn't fit

24   well against the benchmark, so they have a composite

HUGH PENNEY                                    February 20, 2019

1   as well as using the Morningstar Peer Group.

2      Q.    This document shows the CREF Stock

3   underperforming its custom TIAA-CREF assigned

4   composite benchmark on a one, three, five and

5   ten-year basis; right?

6      A.    Slightly, yes.

7      Q.    Where it says peer group, colon -- is that

8   Morningstar Large-Cap Blend?

9      A.    I'm assuming that's what that abbreviation

10  stands for.

11     Q.    Do you know whether that's the appropriate

12  peer group for comparing this particular fund?

13     A.    Well, again, large-cap blend is the fund

14  that they register in their prospectus, as I recall.

15  I'd need to reconfirm that with a prospectus, but

16  that would be my expectation as to why that is the

17  peer group.

18     Q.    Have you ever measured the performance of

19  the CREF Stock Account as compared to any other

20  benchmark besides what's listed on this document?

21     A.    I'm not sure what year the composite came

22  up.  I don't recall if this one had a composite in

23  all of the years, but again, I would have used both

24  the prospectus-based standard benchmark.  And again,

HUGH PENNEY                                    February 20, 2019

Page 211

1    when a vendor or when a consultant suggests a custom

2    benchmark might be appropriate, as TIAA is

3    suggesting here, it's in large part because the fund

4    doesn't invest in the same way that the typical

5    benchmarks do, so therefore, you know, you kind of

6    get the traditional apple and oranges.  A

7    benchmark -- the performance relative to the

8    benchmarks here, particularly when benchmarks do not

9    have fees taken out, you know, this is one of the

10   types of forms we'd be looking at.

11       Q.   Okay.  So I guess my -- I'm not sure if I

12   got an answer to my question, which is:  Have you

13   ever performed a comparison of the CREF Stock

14   Account's performance against any other benchmarks

15   besides the CREF Composite and the Morningstar

16   Large-Cap Blend Peer Group?

17       A.   And my answer was I don't recall what was

18   in the materials in every year.

19       Q.   So if you did, it would have been whatever

20   was in the vendor materials --

21       A.   What was in --

22       Q.   -- or what was in the prospectus?

23       A.   I'm sorry, I didn't mean to interrupt.

24   Whatever would be in the vendor materials or

HUGH PENNEY                                          February 20, 2019

Page 212

1    prospectus, yes.

2        Q.    Okay.  Do you recall anyone on the

3    committee ever inquiring as to the -- strike that.

4             Do you recall any conversation at any

5    committee meeting regarding the CREF Stock's

6    underperformance relative to benchmark as shown in

7    this document?

8        A.    I don't recall if it was for this

9    document.  The first time that we received

10   information in terms of concerns about the CREF

11   document was from Aon fairly recently.

12       Q.    Okay.  Do you recall any discussion in any

13   committee meeting regarding the performance of the

14   CREF Stock Account relative to its composite

15   benchmark?

16       A.    Yes, because CREF Stock is one of our

17   largest investments, so it would always, with the

18   other major investments, would be one that had

19   specific scrutiny, and so the conversation would be,

20   okay, what's going on, are we concerned with the

21   performance of this investment versus its benchmark,

22   recognizing that the benchmarks were for mutual

23   funds and this is a variable annuity.  So there is

24   a -- there is a disconnect.  You know, the SEC

HUGH PENNEY                                    February 20, 2019

Page 213

1    requires that variable annuities essentially report

2    out and compare themselves as if they are mutual

3    funds, which they are not.  So it's not an ideal

4    benchmark from that standpoint because CREF Stock

5    can be in an account for reasons other than just

6    investing.

7              As I said before, CREF Stock is also an

8    investment that allows you to have guaranteed

9    lifetime income while investing in a U.S. Domestic

10   Stock Fund that also has some international exposure

11   to try and buffer over time or aversely a world fund

12   that's overweighted U.S.  That's what the fund is.

13   It's tracking its benchmarks fairly closely.  It

14   doesn't -- benchmarks typically don't have fees

15   factored in, so this is -- this would not have

16   raised alarm bells.

17        Q.    CREF Composite is a benchmark created by

18   TIAA; right?

19        A.    By CREF, but yes.

20        Q.    And do you know whether or not the

21   underlying components of the CREF Composite

22   benchmark are mutual funds?

23        A.    I don't recall without looking at the

24   prospectus as to the structure of this.

HUGH PENNEY                                February 20, 2019

1        Q.    Do you know whether the CREF Composite's
2   performance reported here is net of fees?
3        A.    Without looking at the underlying
4   documents, I do not.
5        Q.    Do you recall any discussion at any
6   committee meeting regarding whether the performance
7   reported here for CREF Composite was net of fees?
8        A.    I don't recall the conversation that would
9   have gone on with this document in 2012.
10        Q.    Do you recall any discussion at any time
11   at any committee meeting regarding whether or not
12   the performance reported for CREF Composite was net
13   of fees?
14        A.    I do not.
15        Q.    You mentioned there are imperfections in
16   the benchmarks that are noted in this document.
17             Are you aware of any other benchmark
18   against which the performance of CREF Stock can be
19   compared?
20        A.    I don't have a recommendation for a
21   different one.  These are the ones that are used,
22   again, for regulatory purposes and also a custom
23   benchmark that's designed to better reflect the
24   actual construct of the investment.

Page 215

1             I do think it's important to recognize
2    that CREF Stock is both an investment vehicle and a
3    lifetime income vehicle, so when we are looking at a
4    variable annuity, you have to consider it in both
5    lights.
6        Q.    A participant in the Yale plan would be
7    free to invest in mutual funds up until the time of
8    their retirement and at that point move their funds
9    to an annuity for the purposes of annuitization; is
10   that right?
11       A.    They could.
12       Q.    So is there any reason in your mind why a
13   Yale participant should be invested in a variable
14   annuity with performance that's poorer than
15   alternatives so that they can preserve the right for
16   annuitization?
17       A.    It's not --
18             MS. ROSS:   Objection, calls for
19   speculation, assumes facts not in evidence.
20       A.    The structure of your question is -- seems
21   to me to be that if you don't like it as an
22   accumulation vehicle, then participants shouldn't
23   have access to that market segment in retirement of
24   his lifetime income.  As a plan sponsor, we can't

HUGH PENNEY                                    February 20, 2019

Page 216

 1   advise a participant.  I can't as a plan sponsor put

 2   out a memo that says, Dear Participant, we think you

 3   should invest in this mutual fund first, and then at

 4   the day of retirement or sometime thereafter, invest

 5   in something else because you'd have an annuity

 6   option.  That's investment advice that a plan cannot

 7   provide a participant.

 8            Now, the advice that a participant can get

 9   that at this time -- while it's certainly at times

10   up to and including before we -- until we brought

11   the sole recordkeeping to bear, if they were getting

12   their advice from Morningstar, which was looking at

13   all of the investments on the lineup strictly from

14   an investment perspective, and Aon is very clear in

15   their advice around these when they are looking at

16   this type of review that they are not evaluating its

17   value as an annuity.  They are simply looking at it

18   as an investment, which I understand why they are

19   doing that, but in some respects is a shortfall

20   because it's not here solely as an investment.

21            But if you had sat down and had a

22   Morningstar portfolio evaluation, Morningstar is a

23   third-party independent, algorithmic-driven

24   computerized program essentially that looks at all

HUGH PENNEY                                    February 20, 2019

Page 217

1    the funds on the lineup and suggests that you would

2    be well-served based on one of your nine risk

3    profiles with an investment portfolio that includes

4    these things.  And CREF Stock was very often in

5    several of those investments.

6              So Morningstar as an independent advisory

7    service would actually -- has actually on a pretty

8    regular basis had CREF Stock as part of their

9    recommended portfolios.  So from that standpoint,

10   there are other -- if you will, there are other

11   sources of the value of CREF Stock.  It's there

12   because it's on the lineup.  If it wasn't there,

13   something else would be in its place.  But the idea

14   that it's all, it's all based on how -- that you

15   have to beat your benchmark all the time everywhere

16   as an investment when in fact you're a variable

17   annuity, I struggle with that as a premise in terms

18   of why it would be in the lineup.

19      Q.    It's true, isn't it, that a participant

20   could enjoy the benefits of lifetime income that you

21   mentioned associated with CREF Stock without having

22   CREF Stock in the lineup?

23      A.    They could pick a different annuity.

24   That's correct.

Page 218
```
 1      Q.    And they could pick that annuity after
 2 they invested in mutual funds throughout the course
 3 of their working years and invest in the annuity
 4 upon retirement?
 5      A.    With variable annuities, there is no
 6 specific advantage to investing in the variable
 7 annuity as it relates to annuitization.  I think you
 8 are not catching my major point, which is the point
 9 is, if you were going to annuitize, then what is an
10 appropriate variable annuity in which you might want
11 to invest?  And CREF Stock is one the participants
12 have viewed for many years as an investment that is
13 good for them in that regard.  And secondly, as
14 simply a straight-up investment vehicle for
15 accumulation, Morningstar's portfolio prior to sole
16 recordkeeping would actually include CREF Stock as
17 one of their recommended buys.
18      Q.    Is there any document that you've seen
19 that shows that?
20      A.    Yeah, there are documents that were
21 included with the materials that were forwarded as
22 part of the discovery, I don't know the legal terms.
23      Q.    Was the committee ever provided with these
24 Morningstar ideal lineups that you are referring to?
```

HUGH PENNEY                                          February 20, 2019

Page 219

1        A.      They are familiar with them, yes.

2        Q.      Were they ever provided with that

3    information?

4        A.      They were.

5        Q.      And would that be reflected in the

6    materials distributed at committee meetings?

7        A.      It would be.  It came back under

8    consideration after we moved to sole recordkeeping

9    because the structure of the recommended risk

10   profiles changed so significantly because now

11   Morningstar was looking not just at the TIAA-CREF

12   lineup, but they were looking at the consolidated

13   lineup, so the structure of the portfolios, again,

14   because it is mathematically derived, became very

15   complex, in many cases 14 or 15 investments, and so

16   that was a concern.  And again, we looked, once

17   again, at the structure of those risk portfolios,

18   both before sole recordkeeping and also after sole

19   recordkeeping, and we also projected what they would

20   potentially look like after the move to the new

21   lineup.

22       Q.      Yale determined not to include the CREF

23   Stock in its consolidated lineup?

24       A.      That's correct, because it didn't fit into

HUGH PENNEY                                    February 20, 2019

Page 220

1    the -- either the U.S. -- it's not solely a U.S.

2    investment; it's not a developed investment, and

3    it's not an emerging markets investment.  And

4    instead -- and it wouldn't serve the purpose as a

5    replacement for those three.  The decision was that

6    CREF Global was a better choice for filling that

7    total stock market exposure, because this is a

8    70/30.  So, again, it's an investment that is

9    structured in a way that is -- again, if you want an

10   investment that is heavily U.S. with some

11   international or is world overweighted for the U.S.,

12   this is an investment.  If you are looking for an

13   investment on our lineup which was a total world

14   investment, one of its sisters in the variable

15   lineup was more appropriate.  But again, it was

16   from -- we built the slot and then asked the

17   question, what was the best investment, and CREF

18   Stock in terms of a total world investment for an

19   annuity was beat out by CREF Global.

20        Q.    When it says here Blended active, passive

21   equity strategy, do you know what that means?

22        A.    I do.

23        Q.    And what does it mean?

24        A.    CREF's model is to use a variety of

HUGH PENNEY                                    February 20, 2019

Page 270

1      A.    A request for proposals from Vanguard and

2    TIAA were done.  An RFI is less precise than an RFP.

3    An RFI is give us some information, we won't hold

4    you to it.  We just want to get a sense.  An RFP is

5    give us some real numbers that we can work with.  So

6    doing an RFI is a lower standard than doing an RFP.

7    The writer of this article is not familiar with the

8    Yale plan and their advice would not necessarily

9    work in the Yale world.

10     Q.    Do you know whether Yale has ever adopted

11   an IPS, an investment policy statement, for the

12   plan?

13     A.    We have.

14     Q.    When was the first time that an IPS for

15   the plan was adopted by Yale?

16     A.    Effective November 15, 2018.

17     Q.    Prior to that effective date, there was no

18   IPS in place at any time during your employment with

19   Yale with respect to the plan; is that true?

20     A.    That is correct.

21     Q.    Let's take a look at another document.

22   It's going to be YALE00143046.

23               MR. BUMB:  Previous Exhibit 8.

24               (Exhibit 8, Emails, YALE00143046,

HUGH PENNEY                                      February 20, 2019

Page 271

 1                    previously marked.)

 2    BY MR. BRAITBERG:

 3        Q.    The email that appears at the top of this

 4    page looks to be an email from you dated April 1st

 5    of 2014 at 3:28 a.m.

 6              Do you see that?

 7        A.    I do.

 8        Q.    Do you see the language in the second

 9    paragraph that states, The difference between the

10    403(b) and 401(k) world is that --

11        A.    Wait, wait, excuse me.  The zooming size

12    is going around here.  Okay, I'm sorry, what was

13    your question?  The second paragraph?

14        Q.    Yes, I just wanted to see if you see the

15    language there that says, The difference between the

16    403(b) and 401(k) world is that fiduciary oversight

17    was not the requirement until just a few years ago,

18    while with K plans, it was required for three

19    decades.

20              Do you see that language?

21        A.    I do see that language.

22        Q.    And did you write that?

23        A.    I did write that.

24        Q.    The reference to three decades, is that a

HUGH PENNEY                                    February 20, 2019

1    reference to when ERISA was passed?

2        A.    That -- this was a quick response to

3    Sylvia, and the three decades would largely be, yes,

4    you know, ERISA had been in place, and our plan was

5    covered by ERISA.  But anyway, your question?

6        Q.    You would agree that fiduciary oversight

7    over the Yale plan is now required with respect to

8    these topics that are mentioned here, Recordkeeping,

9    Investment Advice and Fund Lineup?

10       A.    I would actually say that fiduciary

11   oversight has been -- Yale has been an ERISA

12   fiduciary plan for quite some time even before I got

13   here.  This was really referencing the fact that

14   there were new protocols for fiduciary oversight and

15   that the model of having -- of oversight being done

16   via committees was becoming a new norm.  It was

17   inarticulate at 3:00 in the morning, not my best

18   work.

19       Q.    I would move to strike as non-responsive.

20             Again, my question is:  With respect to

21   today, whether fiduciary oversight is required with

22   respect to the topics that are mentioned here,

23   Recordkeeping, Investment Advice and Fund Lineup?

24       A.    Fiduciary oversight has been required for

Page 344

1    Q.    And did they draft the testimony that you

2  provided?

3    A.    No.  I wrote it personally.

4    Q.    Did they have any input as to the

5  testimony that you gave?

6    A.    They did not.

7    Q.    Let's take a look at a document,

8  YALE00148454.

9              MR. BUMB:  Exhibit 95.

10             (Exhibit 95, Emails, YALE00148454

11             through 148459, marked.)

12  BY MR. BRAITBERG:

13    Q.    The first item on this document is dated

14  August 19, 2015 and it says Subject Re DOL ERISA

15  Advisory Council Testimony.

16         Do you see that?

17    A.    I do.

18    Q.    I'd like to draw your attention to page 4

19  of this document, and it shows at the top what

20  appears to be an email to you, among others, from

21  Christina Cutlip dated August 13, 2015.

22             MS. ROSS:  This seems to be a series

23  of emails, so I would request that Mr. Penney be

24  given ample time to review it.

HUGH PENNEY                                    February 20, 2019

Page 345

1              THE WITNESS:  Does it -- Friday,

2    10:48 a.m.

3              MS. ROSS:  Right.

4              THE WITNESS:  So it looks like it

5    goes from the bottom up.

6                      (Pause.)

7    A.    All right.  What can I help you with?

8    Q.    Let's take a look at the bottom of page 2,

9    which is the beginning of an email from you dated

10   August 14 of 2015, and then the email continues on

11   page 3.

12         It says --

13   A.    Wait, wait, let me get there.  Page 2,

14   okay.  Where on page 2?  Which one?

15   Q.    I'm actually looking at the very top of

16   page 3 and the very bottom of page 2.

17   A.    Okay, to Christina Cutlip at 9:41 p.m.,

18   that part?

19   Q.    Yes.

20   A.    Okay, thank you.

21   Q.    And it says, Attached is my testimony.

22   Seeing that this is my first time testifying, please

23   let me know if there is anything that should be

24   adjusted.

HUGH PENNEY                                    February 20, 2019

1              Did you write that?

2       A.     Yes, I did.

3       Q.     And then if you see the next chronologic

4   email on the string which appears above it on page

5   2, it says, Hi, Hugh, I think you attached the draft

6   I sent you as our draft working report, not your

7   actual testimony.  Can you please resend when you

8   get a moment.

9              Do you see that?

10      A.     I do.

11      Q.     Does viewing this document change your

12  testimony as to whether TIAA assisted in drafting

13  your testimony?

14      A.     No, because the "Our draft" -- she was a

15  member of the committee and the "Our draft" as I

16  recall was the draft report that the committee was

17  working on, not TIAA.

18             Christina Cutlip was a member of the DOL

19  ERISA Advisory Council.  They had been working on a

20  project relative to a number of retirement topics

21  that Christina was aware that I had expertise and

22  passion about, and asked if I would provide

23  testimony to help the committee draft their working

24  report.  So the draft that we are looking -- "Our"

1   in this statement is "our" being the committee, not

2   TIAA.  So no, I would not change my testimony.

3          Q.     Okay.  So this was sent to you by

4   Christina Cutlip who is a TIAA-CREF employee; is

5   that right?

6          A.     Yes.

7          Q.     And we could look at the attachments that

8   were produced by the defendants to determine what

9   drafts are being exchanged here; is that right?

10         A.     Yes.  And as I say, as I recall, because

11  the structure of this was that they've been working

12  on a possible report about topics about preventing

13  leakage in plans, you know, people rolling over and

14  cashing out plans when they change employers, about

15  lifetime income and the advantages that it could

16  apply.  I think it was lower down in the message

17  here, several of the topics that they were looking

18  at.  They'd been working on it for some time and

19  were trying to get to a final report.

20              I've never testified with the federal

21  government, so again, as Christine is a member of

22  that committee, I wanted to make sure I was not

23  doing anything, you know, unusual in terms of how I

24  was structuring my testimony.  But again, the "our"

HUGH PENNEY                                        February 20, 2019

Page 348

```
 1   is not TIAA.  The "our" from Christina is the "our"
 2   the committee.  That's, again, my understanding of
 3   looking at this document from five years ago.
 4                    MR. BRAITBERG:  Okay, well, I
 5   think --
 6                    MS. ROSS:  We are done.
 7                    MR. BRAITBERG:  -- we've reached the
 8   end here.
 9                    MS. ROSS:  The clock has just hit
10   seven hours.
11                    THE WITNESS:  Just getting warmed up.
12                    THE VIDEO OPERATOR:  We are off the
13   record.  The time is 6:36.
14                    THE REPORTER:  Ms. Ross, are you
15   ordering a copy of the transcript?
16                    MS. ROSS:  I am, please.
17                    Do we have a standing order on file
18   yet in this case?
19                    THE REPORTER:  I don't know.
20                    MS. ROSS:  I'd like a Search Book
21   copy and minuscript.
22                    THE REPORTER:  Would you like a
23   draft?
24                    MS. ROSS:  Yes.
```

Page 350

```
 1                         JURAT

 2        I, HUGH K. PENNEY, do hereby certify that the

 3   foregoing testimony given by me on FEBRUARY 20,

 4   2019, is true and accurate, including any

 5   corrections noted on the corrections page, to the

 6   best of my knowledge and belief.

 7

 8

 9   _____

10              HUGH K. PENNEY

11

12   At _New Haven, CT____ in said County of _New Haven,_

13   this _15th_ day of _April__, 2019, personally appeared

14   HUGH K. PENNEY, and he made oath to the truth of the

15   foregoing corrections by him subscribed.

16

17   Before me,_____, Notary Public.

18   My Commission Expires: ___3/31/2024____

19
           SHARON E. FOY BAIRD
20            NOTARY PUBLIC
        MY COMMISSION EXPIRES MAR. 31, 2024
21

22

23

24
```

HUGH PENNEY                                    February 20, 2019

Page 351

1    TRANSCRIPT CORRECTIONS

2    REPORTER:  SANDRA SEMEVOLOS, RMR, CRR, CRC, CSR #74

3    CASE NUMBER:  3:16-cv-01345-AWT

4    CASE STYLE:

5    JOSEPH VELLALI et al.

6         VS.

7    YALE UNIVERSITY et al.

8    PAGE LINE        CORRECTION           REASON

9    7:1        Change PENNEY,? to PENNEY    mistake

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24   NAME: _____    DATE: 04/17/2019

HUGH PENNEY                                            February 20, 2019

Page 352

 1                    C E R T I F I C A T E

 2     STATE OF CONNECTICUT

 3             I, SANDRA SEMEVOLOS, a Registered Merit
       Reporter and Notary Public within and for the State
 4     of Connecticut, do hereby certify that I reported
       the deposition of HUGH K. PENNEY on FEBRUARY 20,
 5     2019, at the offices of YALE UNIVERSITY OFFICE OF
       THE GENERAL COUNSEL, 2 Whitney Avenue, New Haven,
 6     Connecticut.

 7             I further certify that the above-named
       deponent was by me first duly sworn to testify to
 8     the truth, the whole truth and nothing but the truth
       concerning his knowledge in the matter of the case
 9     of JOSEPH VELLALI et al., vs. YALE UNIVERSITY et
       al., now pending IN THE UNITED STATES DISTRICT
10     COURT, FOR THE DISTRICT OF CONNECTICUT.

11             I further certify that the within
       testimony was taken by me stenographically and
12     reduced to typewritten form under my direction by
       means of COMPUTER ASSISTED TRANSCRIPTION; and I
13     further certify that said deposition is a true
       record of the testimony given by said witness.
14
               I further certify that I am neither
15     counsel for, related to, nor employed by any of the
       parties to the action in which this deposition was
16     taken; and further, that I am not a relative or
       employee of any attorney or counsel employed by the
17     parties hereto, nor financially or otherwise
       interested in the outcome of the action.
18
19             WITNESS my hand this 4th day of March,
       2019.
20

21

22

       _____
23     Sandra Semevolos, RMR, CRR, CRC, CSR #74
       Notary Public
24     My Commission Expires:  September 30, 2020

U.S. Legal Support, Inc.
(312) 236-8352