# Exhibit 125

# EXHIBIT F

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

CASEY CUNNINGHAM, et al.,

      Plaintiffs,

v.

CORNELL UNIVERSITY, et al.

      Defendants.

No. 1:16-CV-06525-PKC

Expert Report of Ty Minnich

August 24, 2018

CONFIDENTIAL

Table of Contents

I.     Engagement ................................................................................................... 1

II.    Qualifications and Experience ...................................................................... 2

III.   Executive Summary of Opinion Regarding the Cornell Plans ..................... 3

IV.   History of the 403(b) Plans Recordkeeping Market .................................... 4

V.    Factual Background ...................................................................................... 9

VI.   Cornell's Flawed Fiduciary Process .......................................................... 13

      a.     Prudent fiduciary practices for defined contribution recordkeeping fees. ........... 13

      b.     Cornell failed to follow a prudent fiduciary process. ........................................... 21

           1.     Prior to November 2011, the Cornell Defendants were unaware of the Plans' recordkeeping and administrative fees and had no process for monitoring their reasonableness. ........................................ 21

           2.     The Cornell Defendants failed to engage in a Request for Proposal or any other process to determine whether the recordkeeping and administrative fees the Plans paid are reasonable. ................................... 21

           3.     The Cornell Defendants only once reviewed the per-participant or total recordkeeping and administrative fees the Plans were paying. ............... 22

           4.     The Cornell Defendants improperly relied on CAPTRUST to determine the recordkeeping and administrative fees the Plans paid. ...... 24

           5.     CAPTRUST only conducted limited benchmarking and negotiations. .... 24

           6.     The Committee never seriously considered consolidating to a single recordkeeper. ........................................................................... 26

           7.     The members of RPOC showed a remarkable lack of understanding regarding the Plans' recordkeeping and administrative fees. .................. 27

VII.  Publicly available data as well as my personal experience pricing 403(b) plans demonstrates that Cornell could have paid far lower recordkeeping costs than what it actually paid. .................................................................................................. 29

      a.     California Institute of Technology ...................................................................... 29

      b.     Stanford University ........................................................................................... 31

Case 3:16-cv-01345-PKC-JLC Document 355-8 Filed 10/04/19 Page 4 of 57

c.      Harvard University ................................................................... 33

d.      New York University ............................................................... 34

e.      Nevada System of Higher Education ....................................... 35

f.      North Carolina 403(b) Program ............................................... 36

VIII.   Calculations of Damages for Excessive Recordkeeping Fees ........................................... 37

## I.  Engagement

1.      I was retained by Plaintiffs' counsel in this matter to provide my expert analysis and opinions regarding Cornell University, the Retirement Plan Oversight Committee, and the Defendants' (including Cornell University, CAPTRUST, and Mary Opperman, collectively "Defendants") administration of the Plans at issue, the Cornell University Retirement Plan for Employees of the Endowed Colleges at Ithaca and the Cornell University Tax Deferred Annuity Plan (collectively the "Plan" or "Plans"), and regarding the recordkeeping fees[1] charged to each.

2.      I have been asked to apply my knowledge of the defined contribution plan industry, including my extensive experience pricing recordkeeping for 403(b) plans, regarding the standard of care and prudence for fiduciaries of plans like these Plans. I also applied my expertise and knowledge of recordkeeping fees and negotiations and offer my opinion as to whether the Defendants in this case carried out their duties regarding the Plans with the appropriate level of care, skill, prudence, and diligence from before 2010 to present.

3.      I am compensated at the rate of $400 per hour. My compensation is not dependent on my opinions or on the outcome in this matter. My opinions are based on my review of the documents in this case, deposition testimony, and my professional experience. My opinions on this matter are ongoing. I specifically reserve the right to supplement, revise, or amend these opinions.

4.      A list of the materials considered in this matter is attached hereto as **Exhibit 1**.

---

[1] In this report, when I refer to "recordkeeping" services, I am including the recordkeeping and administrative services that vendors provide pursuant to a recordkeeping and administrative services agreement, e.g., the agreements in this case between Cornell University and TIAA and Cornell University and Fidelity. Similarly, when I refer to fees associated with recordkeeping, throughout this report I am including fees for this bundle of recordkeeping and administrative services. This is consistent with industry usage and my experience, and it is also consistent with the documents I have reviewed in this case.

1

## II.  Qualifications and Experience

5.      I am a highly accomplished financial services professional with 30 years' experience working exclusively in the defined contribution not-for-profit markets with specialization in 403(b) plans and the applicable requirements from a fiduciary due diligence perspective. For the past 15 years I have been in senior defined contribution practice leader roles responsible for delivering market expansion and revenue maximization solutions in the not-for-profit 403(b) markets. This included responsibility for the RFP process and pricing, as well as leading a sales team for new business growth. This experience has given me an opportunity to become a thought leader in the 403(b) markets.

6.      As Vice President for the not-for-profit institutional defined contribution markets for Transamerica Retirement Solutions (Transamerica) from 2013-2017, I was responsible for overseeing all recordkeeping pricing and requests for proposals (RFPs). This due diligence, competitive bidding process gave me an excellent understanding of the fair and reasonable fee benchmarks necessary to grow market share.

7.      I have been personally involved in several campaigns at universities to transition from TIAA legacy contracts to open architecture products with recordkeeping provided by Transamerica. As key executive contact, I had oversight of all aspects of the transition process and well understand the necessary steps that are required to have a successful transition to a new provider.

8.      Earlier, as National Executive Director of Metropolitan Life Insurance Company, I led a team of 30 responsible for driving new growth in the 403(b) defined contribution markets and directed the RFP process and pricing on new and existing business.

9.      I have been a speaker or panelist on 403(b) topics at various pension, investment,

and other industry conferences.

10.     I hold a B.S. in Mathematics from the University of Miami, RPA and CEBS designations from the Wharton School, and I currently hold series 6, 26, & 63 registrations and NJ/NY Life and A&H Licenses.

11.     I am currently an independent consultant offering my services to best promote and refine the fiduciary due diligence process regarding 403(b) plan sponsors.

12.     My curriculum vitae outlining my experience and education is attached as **Exhibit 2**.

## III.     Executive Summary of Opinion Regarding the Cornell Plans

13.     In my opinion, the Defendants in this case did not act as prudent fiduciaries pursuant to the standards applicable during the relevant time period including from before 2010 until the present.

14.     The Defendants did not act as knowledgeable and prudent fiduciaries because they did not exercise the required degree of skill, care, prudence and diligence with respect to their oversight and management of the Plans.

15.     Specifically, Defendants did not competitively bid the Plans' services using a request for proposal (RFP) process, did not consolidate the Plans' recordkeepers, did not negotiate reasonable recordkeeping fees for the Plans, and did not monitor the recordkeeping fees.

16.     As a result of Defendants' conduct, the Plans incurred excessive and unreasonable recordkeeping expenses.

17.     If the Defendants had acted as prudent fiduciaries, they would have competitively bid the Plans' recordkeeping services via an RFP process. In addition, Defendants would have consolidated recordkeeping services to a single provider by 2010 at the latest. Had Defendants

3

followed a prudent process, they could have gotten the same or better recordkeeping services and paid a lower cost per participant.[2]

18.     Because Defendants failed to act as prudent fiduciaries, the Plans and their participants suffered significant losses. Specifically, the Plans paid excessive and unreasonable recordkeeping fees totaling $21,176,568.46 for the period from October 1, 2010 through July 31, 2018. If those fees had not been taken from the Plans, the money would have been invested and generated additional returns to the Plans, the participants, and their beneficiaries. The total losses as a result of Defendants' conduct, accounting for these lost investment returns, come to $35,466,775.51.

## IV.     History of the 403(b) Plan Recordkeeping Market

19.     The 403(b) plan market has historically been slow to react to regulatory changes and has neglected to implement any fiduciary monitoring and oversight.[3]  In the absence of any fiduciary process, 403(b) plans typically had multiple recordkeepers which created an excessive number of fund choices including retail-class mutual funds and proprietary funds of the recordkeeper.[4]  Simply stated, plan sponsors believed they were not fiduciaries (or at least acted as if they were not fiduciaries) and, as a result, participants have been forced to pay higher fees which ultimately reduces their retirement savings.

20.     Given the history of 403(b) plans, and their tendency to ignore fiduciary obligations, as set forth above, the typical or average conduct of a 403(b) plan fiduciary cannot be

---

[2] *See* Jeffrey J. Capone, *Vendor Consolidation: Why Less is More & More is Less*, September 2012.
[3] *See e.g.*, Fiduciary Plan Governance, LLC, *When History Gets in the Way: "How Things Have Always Been Done" in Higher Education*, John Hare, available at:
http://www.fiduciaryplangovernance.com/blog/when-history-gets-in-the-way-overcoming-how-things-have-always-been-done-in-higher-education.
[4] *See e.g.*, Fiduciary Plan Governance, LLC, *Legacy Investments in Higher Education: What is a Plan Sponsor's Responsibility to Participants*, John Hare, available at
http://www.fiduciaryplangovernance.com/blog/legacy-investments-in-higher-education-what-is-a-plan-sponsors-responsibility-to-participants.

the measure of appropriate fiduciary conduct. Similarly, given their history, averages of 403(b) plan fees cannot be used as the standard by which a fiduciary's conduct in securing reasonable fees is judged.

21.    A 403(b) plan allows employees to make pre-tax contributions through payroll deductions to an individual account. Employers may make contributions on behalf of all participants or making matching contributions based on the employees' elective contributions. The participants direct their retirement funds into certain investment options selected by the fiduciary of the plan or through a brokerage window, if available. Therefore, the fiduciary monitoring and oversight process is most critical to making certain that plan participants have access to the "best in class" investment choices at the most reasonable cost. This is not a one-time selection of investment choices. It must be an on-going monitoring process to eliminate underperforming funds and make certain fees are reasonable for the underlying services provided.

22.    Recordkeeping and related administrative services must be performed in the operation of all defined contribution plans. These services include but are not limited to: maintaining plan records, tracking account balances and investment elections, transaction processing, call center support, participant education and participant communications. Third-parties provide these services on behalf of a defined contribution plan. These services may be provided on a stand-alone basis or may be bundled with other offerings. Certain recordkeepers are affiliated with insurance or financial services companies which offer mutual funds and insurance products. Best practices require separating recordkeepers and money managers, creating an ideal platform with single provider streamlined administration, true open architecture, reasonable fees with full transparency and a true focus on the participant experience and retirement readiness. This best practice approach eliminates any conflict of interest and creates a better

5

outcome for the fiduciary to act exclusively for the benefit of the plan participant or their beneficiaries.

23.     The market for defined contribution recordkeeping services is highly competitive, especially for the largest plans because service providers for such plans enjoy significant economies of scale.

24.     Numerous companies are capable of rendering high quality recordkeeping and related services to the largest plans.

25.     Even for the largest plans, the transition to a different recordkeeper is not difficult or expensive, since any conversion cost is typically included in the new recordkeeping firm's per participant or asset fee. Competitive firms will typically employ a dedicated transition team manager with daily oversight of the entire team devoted to transitioning plans from the previous recordkeeper.

26.     Every recordkeeper that services large plans routinely performs transition services; they are generally regarded as a cost of doing business. My experience at Transamerica included executive oversight over these transitions in order to ensure we met timelines and that the clients were satisfied. I presided over 20 to 30 such transitions involving medium or large 403(b) defined contribution plans over my tenure at Transamerica, including transitions involving Teachers Insurance Annuity Association of America ("TIAA") and higher education institutions. I was also involved as executive contact with multiple new business transitions as 403(b) practice leader at MetLife.

27.     Since the mid-2000s, the basic recordkeeping services provided to 401(k) defined contribution plans have been increasingly similar to 403(b) plans. Competing firms in the marketplace tend to try to win business based on service quality, but for the services that must be

6

offered in order to accomplish the basic core recordkeeping functions, no significant differences between providers exists.

28. The cost of providing recordkeeping services varies with the number of accounts, not the amount of assets. That is, it would not cost a recordkeeper more to provide recordkeeping services simply because the value of plan assets increases.

29. Compared with smaller plans, larger plans have greater leverage to negotiate recordkeeping services.

30. The pricing structure for recordkeeping services usually follows one of two models: (1) a per-participant fee based on the number of participants with account balances; or (2) an asset-based fee.

31. A per-participant fee structure may operate in several different ways. The total contract amount is typically negotiated based on a per-participant rate. That contract amount can be paid by the employer, allocated to participants per capita, allocated to participants pro rata, or allocated per capita or pro rata with larger accounts paying the shares of smaller accounts.

32. In plans with a per-participant fee structure, the recordkeeping fees may also be paid via revenue sharing, i.e., through a portion of the expenses comprising the expense ratio for each individual investment option. In this scenario, if the revenue sharing collected is more than the agreed contract amount, the recordkeeper returns the excess funds to the plan.

33. A per-participant fee is the best practice for prudent fiduciaries. In part, this is because such a fee is not dependent on the amount of assets that are recordkept.

34. Ideally, no revenue sharing is used to pay for recordkeeping because it may result in disproportionate allocation of recordkeeping expenses among plan participants, may be a drag on investment performance, may result in inequitable allocations of recordkeeping expenses among

7

plan participants, and reduces transparency of recordkeeping fees. If a fund with revenue sharing is used, the fiduciary should ensure that costs of recordkeeping are re-allocated fairly among plan participants.

35.     Under the per-participant fee model, the plan sponsor has several options as to how to pay the fee, including the employer directly paying the fee, or having the plan pay the fee. If the plan pays, the fee can be allocated among participants in a variety of ways, including by assessing a flat rate to each participant, or by allocating the fee to participants on a pro rata basis pursuant to each participant's assets.

36.     By contrast, in an asset-based pricing arrangement, the recordkeeper typically collects a percentage of assets in the plan, via a portion of each fund's fees. Recordkeepers usually enter into agreements with mutual funds by which the funds agree to pay a portion of the fees they deduct from the fund to the recordkeeper to compensate it for its plan recordkeeping services. Recordkeepers whose own funds are in the plan (either directly or through an affiliate) usually designate a portion of that fund's fees as compensation for its recordkeeping services.

37.     Because assets in the plan typically increase over time with market appreciation and ongoing contributions, the compensation received by the recordkeeper also increases, despite the fact that the services provided and the recordkeeper's cost to provide the services has not changed. Recordkeepers generally prefer this structure because they can obtain higher fees without engaging in contract negotiations, and without having to expend any additional resources or effort to provide more services.

38.     In some asset-based fee structures, recordkeepers may include breakpoints in their pricing to reduce percentage fees as assets grow. These consist of provisions in recordkeeping agreement that set a sliding scale asset-based fee percentage that decreases as the value of the

8

assets increase.

39.     It is more common to have asset-based arrangements in smaller plans because the revenue sharing generated by those plans may not be sufficient to cover the revenue requirement. On the other hand, larger plans using asset-based fees will typically generate surplus revenue sharing, because the cost-per-participant is much lower due to economies of scale. Therefore, a prudent fiduciary of a plan that includes investment options that generate revenue sharing for the recordkeeper should negotiate a per-participant revenue requirement, and secure the return of all excess revenue to the plan. The prudent fiduciary then monitors the amount of revenue sharing the recordkeeper collects to ensure that compensation is limited to the negotiated, reasonable amount.

**V.     Factual Background**

40.     Two plans are at issue here – the Cornell University Retirement Plan for the Employees of the Endowed Colleges at Ithaca ("CURP" or "Retirement Plan") and the Cornell University Tax-Deferred Annuity Plan ("TDA Plan") (collectively, "the Plans"). Both plans are governed by Section 403(b) of Internal Revenue Code.[5] Cornell and its Board of Trustees serve as the named fiduciaries for the Plans.[6]

41.     Prior to April 17, 2011, the Cornell Defendants' oversight of the Plans' recordkeeping and administrative fees rested entirely with its benefits employees.[7] On April 7, 2011, Cornell's Board of Trustees delegated oversight authority to the Retirement Plan Oversight Committee ("RPOC").[8] According to the RPOC Charter, the Chair of the RPOC shall at all times be the Vice President for Human Resources of Cornell University, "who shall determine the

---

[5] CORNELL027154; CORNELL027163.
[6] Tr. of Dep. of G. Bursic ("Bursic Dep.") at 63:13-64:1.
[7] Tr. of Dep. of M. Opperman ("Opperman Dep.") at 222:21-25.
[8] CORNELL019448.

number of other RPOC members and appoint all of the other RPOC members."[9]

42.    The Cornell Defendants failed to undertake any prudent process to ascertain that the recordkeeping fees of the Plans were reasonable.

43.    Prior to late 2011, the Cornell Defendants were entirely unaware what the recordkeeping and administrative fees the Plans paid, lacked any process for years to evaluate the reasonableness of the fees and never even attempted to negotiate with their two recordkeepers.

44.    The Cornell Defendants have *never* engaged in an RFP for the Plans' recordkeeping and administrative services.

45.    The Cornell Defendants only analyzed the per participant or total fees on one occasion—in 2012—and otherwise only discussed the Plans' recordkeeping fees according to the basis points applied to the assets in the Plans.

46.    The Cornell Defendants delegated the negotiation of the Plans' recordkeeping and administrative fees to their outside consultant CAPFINANCIAL PARTNERS, LLC d/b/a CAPTRUST Financial Advisors ("CAPTRUST") and did nothing to monitor CAPTRUST's negotiations.

47.    CAPTRUST followed a deficient process for negotiating the Plans' recordkeeping fee by merely accepting price reduction offers from TIAA and Fidelity Investments Institutional Operations Company, Inc. ("Fidelity").

48.    Cornell never considered consolidating to a single recordkeeper for the Plans despite knowing it would result in the best cost structure for participants.

49.    Paul Bursic, a member of RPOC and the human resources department that RPOC

---

[9] Id.

members relied upon for his expertise in recordkeeping and administrative fees, demonstrated a remarkable lack of knowledge, expertise, and care regarding recordkeeping and administrative fees.

50. Throughout the relevant time period, Cornell has used TIAA to be one of the recordkeepers for Plans.[10]

51. Cornell also has used Fidelity as a recordkeeper throughout the relevant time period.[11]

52. TIAA's compensation for providing recordkeeping services to the Plans is and at all relevant times has been paid by participants through uncapped asset-based revenue sharing.[12]

53. The earliest recordkeeping agreement I have reviewed between Cornell and TIAA is dated November 11, 2006.[13]

54. The November 11, 2006 contract between TIAA and Cornell states TIAA will be compensated for its recordkeeping services. Paragraph 8 of the March 2008 contract is titled "Fees" and provides:

> [Cornell] understands and accepts that TIAA may be compensated for its services under this Agreement by payments made by providers of mutual funds, or their affiliates, used as allocation options under the Plans and from fees under the TIAA-CREF annuity contracts. This shall include sharing, on a periodic basis, in the revenue derived by such mutual funds providers and TIAA-CREF.[14]

---

[10] TIAA_CORNELL_00000007; TIAA_CORNELL_00036237; TIAA_CORNELL_00000026; TIAA_CORNELL_00000061; TIAA_CORNELL_00000055; TIAA_CORNELL_00043632; TIAA_CORNELL_00000004; TIAA_CORNELL_00000045; TIAA_CORNELL_00030507; TIAA_CORNELL_00000051; TIAA_CORNELL_00042694; CORNELL024772; TIAA_CORNELL_00038768; TIAA_CORNELL_00036239; CORNELL013800; CAPTR_0012723; TIAA_CORNELL_00041591.
[11] Tr. of Dep. of P. Warner ("Warner Dep.") at 19:8-14.
[12] TIAA_CORNELL_00000007; TIAA_CORNELL_00036237; TIAA_CORNELL_00000026; TIAA_CORNELL_00000061; TIAA_CORNELL_00000055; TIAA_CORNELL_00043632; TIAA_CORNELL_00000004; TIAA_CORNELL_00000045; TIAA_CORNELL_00030507; TIAA_CORNELL_00000051; TIAA_CORNELL_00042694; CORNELL024772; TIAA_CORNELL_00038768; TIAA_CORNELL_00036239; CORNELL013800; CAPTR_0012723; TIAA_CORNELL_00041591.
[13] TIAA_CORNELL_00000007.
[14] Id.

11

55.     Because the November 11, 2006 agreement does not specify the amount TIAA will
be paid for recordkeeping services, it is not possible from that contract to determine the amount
Cornell agreed to cause the Plans' participants to pay TIAA for recordkeeping services.[15]

56.     No limit was imposed on the amount of compensation TIAA could receive for
recordkeeping until Amendment No. 5, dated June 21, 2012.[16] That contract instituted a new
system whereby a Revenue Credit Account would be funded with any revenue sharing collected
by TIAA in excess of a "revenue requirement," as expressed in basis points.

57.     Even when Cornell executed amended recordkeeping agreements with TIAA, the
amount the Plans' participants would pay for recordkeeping services remained unclear because the
amount to be paid is expressed in basis points.[17]

58.     When the revenue requirement is stated in basis points, there is no limit on the
dollar amount a service provider may collect for recordkeeping services.

59.     This use of asset-based revenue sharing has continued to date in the Plans as
opposed to a flat rate per participant fee.[18]

60.     TIAA admitted that under the recordkeeping agreements, the compensation TIAA
would receive depended on the value of assets in the Plans, rather than the value of the services
provided, and so as of the date of execution of the agreements, the actual dollar cost of
recordkeeping services that Cornell was agreeing to pay was unknown.[19]

61.     TIAA admitted it was not aware of any time it provided to Cornell any information

---

[15] TIAA_CORNELL_00000007.
[16] TIAA_CORNELL_00043632.
[17] TIAA_CORNELL_00043632; TIAA_CORNELL_00000004; TIAA_CORNELL_00030507;
TIAA_CORNELL_00042694.
[18] While there have been reductions in the number of uncapped basis points charged for recordkeeping, Cornell has
never negotiated a flat per-participant fee. Tr. of Dep. of P. Weber ("Weber Dep.") at 226:13-16.
[19] Weber dep. at 104:20-107:18.

quantifying the per-participant fee to provide recordkeeping services to the Plans, until this lawsuit was filed.[20]

62.     Fidelity's compensation for providing recordkeeping services to the Plans has also been paid by participants through uncapped asset-based revenue sharing.[21]

63.     Effective January 1, 2012, the first amendment to the custodial account agreement, Fidelity began offering revenue credits set forth as flat dollar amounts.[22]

64.     Thereafter, each amendment to the custodial agreement provided for uncapped revenue sharing with flat revenue credit amounts.[23]

65.     Fidelity's uncapped asset-based revenue sharing pricing structure for Fidelity has continued to date in the Plans.[24]

66.     Fidelity admitted that Cornell never countered any of the offers that Fidelity made to Cornell regarding the Plans' recordkeeping fees paid to Fidelity, including each successive revenue credit Fidelity proposed over the years, which were all flat dollar figures that Fidelity itself came up with and Cornell accepted.[25]

## VI.   Cornell's Flawed Fiduciary Process

### a.   Prudent fiduciary practices for defined contribution recordkeeping fees.

67.     Based on my lengthy experience in the 403(b) industry, including interacting with plan fiduciaries and preparing pricing proposals, a prudent fiduciary should, among other things,

---

[20] *See* Weber dep. at 165:7-167:7.
[21] Warner dep. at 57:20-58:9 ("So it's asset-based fees that are coming in for recordkeeping."); *see also* id. at 215:20-216:21; CORNELL021699; CORNELL024545; CORNELL024546; CORNELL003409; CAPTR_0012873; CAPTR_0015229.
[22] Warner Dep. at 122:13-123:15; CORNELL024545.
[23] Warner Dep. at 123:10-125:6, 126:13-129:22, 149:21-163:1; CORNELL024546; CORNELL003409; CAPTR_0012873.
[24] Warner dep. at 57:20-58:9 ("So it's asset-based fees that are coming in for recordkeeping."); *see also* id. at 215:20-216:21; CORNELL021699; CORNELL024545; CORNELL024546; CORNELL003409; CAPTR_0012873; CAPTR_0015229.
[25] Warner dep. at 123:1-131:19, 149:21-172:20, 171:20-173:20.

follow the recommendations set forth herein, which are the same standards that were applicable since well before 2010.

68.    A prudent fiduciary of a 403(b) plan should engage in competitive bidding of recordkeeping services every 3-5 years via a request for proposal (RFP).[26]

69.    A prudent fiduciary of a 403(b) plan should negotiate a per-participant revenue requirement (or per-participant revenue threshold) based on the number of participants with account balances.

70.    A prudent fiduciary of a 403(b) plan should understand the amounts and sources of revenue paid for recordkeeping services.

71.    A prudent fiduciary of a 403(b) plan should consider consolidating recordkeeping providers, including considering whether and how much consolidation would save in plan expenses.

72.    Moving to a single recordkeeper model is a fiduciary best practice because, among other things, it allows the plan to maximize its bargaining power. In a multiple-recordkeeper model, each recordkeeper only receives a portion of the plan assets and participants, reducing the economies of scale that could be achieved by the recordkeeper in a single-recordkeeper model.

73.    A multi-recordkeeper model is also inefficient, in that it leads to duplicative services and increases plan costs. A single recordkeeper model simplifies the HR tasks needed to support the plan, and allows for a broader array of services for participants from a single vendor. These advantages of consolidating to a single recordkeeper are widely known in the industry and

---

[26] *See, e.g.*, Polk, Tyler, *Is it Time for a Change? Best Practice in Retirement Plan Record Keeper Searches*, Fiduciary Investment Advisors (April 2015); *see also* Carl, John, *Including Regular RFPs as Part of a Fiduciary Liability Reduction Strategy*, January 24, 2018 ("The DOL assumes that plan sponsors solicit RFPs for service providers every three to five years as part of their fiduciary duty to monitor plan service providers."), available at: https://www.napa-net.org/news/technical-competence/case-of-the-week/including-regular-rfps-part-fiduciary-liability-reduction-strategy/.

have been for over a decade.[27] Cornell could have and should have consolidated to a single recordkeeper at least by 2010.

74.     A prudent fiduciary of a 403(b) plan should regularly monitor the amounts paid for recordkeeping, including rebates or amounts deposited in revenue credit accounts, to ensure that recordkeeper compensation is in conformance with the recordkeeping agreements and otherwise remains reasonable. This is especially important where asset-based fees are charged because the fees may become unreasonable as assets grow. Prudent fiduciaries should take action to promptly remedy any such unreasonable recordkeeping fee.

75.     A prudent fiduciary should request and make every effort to obtain rebates or credits to offset all past recordkeeping fees above a reasonable rate; this is an ongoing responsibility. In many cases, recordkeepers will grant retroactive revenue credits to offset such past recordkeeping fees, especially if this request is made in the context of a robust negotiation regarding recordkeeping fees going forward.[28]

76.     Fiduciary best practices require separation of the recordkeeper and investment management functions in order to eliminate conflicts of interest and allow full fee transparency.

77.     An effective RFP process requires that the fiduciary act prudently in selecting a recordkeeper and investment advisor void of any conflict of interest acting solely in the best interest of plan participants and their beneficiaries. In other words, the best practice is for a fiduciary to issue separate RFPs for recordkeeping and investment advisory services. If the entity (or related entities) providing recordkeeping services also provides ancillary services or offers proprietary funds, this creates an inherent conflict of interest. Dual RFPs for recordkeeping and

---

[27] *See, e.g.*, *The Standard Retirement Services, Inc., Fixing Your 403(b) Plan: Adopting a Best Practices Approach*, at 2 (Nov. 2009); *Vendor Consolidation in Higher Education: Getting More from Less*, PLANSPONSOR (July 29, 2010).
[28] An example of this is evident in the substantial revenue credits obtained by CalTech for its 403(b) retirement program, discussed below.

investment advisory services ensure that the recordkeeper has no control over the fund lineup and therefore eliminates a conflict of interest. In this scenario, the best practice for eliminating this conflict is for the recordkeeping RFP to stipulate that the recordkeeping provider will have no control over the fund lineup, no proprietary funds will be used, that the platform will offer open architecture, and set forth how the pricing will be expressed (ideally on a per-participant fixed-dollar basis[29]). A fiduciary who does not follow this best practice must be extraordinarily careful to actively and diligently monitor recordkeeping fees in order to overcome this conflict and to ensure that only appropriate and agreed-upon recordkeeping fees are charged.

78. The RFP process should include these key steps:

- Assemble the team from the committee who will be responsible for key decisions. Best choice is to include individuals with a variety of perspectives and skills. Make certain to document all steps during the process.

- Determine what independent advisors/consultants can assist with the RFP process. Negotiate fees and initiate process.

- Develop the timeline and create and approve RFP format. Be sure to reflect your culture and provide significant background information to help prospective firms customize their proposals.

- Identify recordkeepers and investment providers to receive RFP and distribute with strict timeline.

- Review and score responses and decide on providers for finals presentations. Interview the potential recordkeepers and investment providers and complete negotiations on fees and services.

- Finalize selection process, communicate process and results, and initiate transition.

- Establish responsibilities and timeline for on-going fiduciary monitoring and due diligence.

79. Evaluating RFP responses requires comparing the services and pricing of each

_____

[29] *403(b) Plan Redesign Working Paper*, University of Notre Dame (Feb. 2014).

provider who responds. This also may require sending follow-up requests for information from the provider. Ultimately, the prudent fiduciary must engage, to the extent possible, in an "apples-to-apples" comparison between potential recordkeepers and the services provided in order to secure the best price, given the service level, for the plan participants.

80.     Because recordkeeping candidates are motivated to secure the business and because they face price competition, additional quotes may be presented to the plan fiduciary that are substantially lower than the initial bids. The final quote provided by a provider after engaging in negotiations associated with an RFP is likely to be lower than the initial bid. Even the threat of engaging in a RFP process can cause the incumbent to renegotiate its contract to reduce its compensation significantly.

81.     A prudent fiduciary negotiates with the recordkeeper, and does not simply accept the first offer. Negotiation means doing more than simply asking a service provider for a reduction and then receiving one. If a service provider makes an offer to reduce fees, that should be a signal to the plan fiduciaries that there may be further room to negotiate. A prudent fiduciary then negotiates to see if the bidders will lower their bid even further before agreeing to a final price. This includes inquiring as to the basis for the reduction, in order to gain an understanding of what cost factors the service provider is relying on in providing pricing. A prudent fiduciary must be cautious not to simply take the first offer as the "easy way out."

82.     In pricing negotiations, recordkeeping providers are often more concerned with and tend to base their pricing proposals on their own funding goals, rather than on providing the plan with the best possible price. This means that a prudent fiduciary must push back on the provider and separate the discussion about funding from the discussion about pricing.

83.     When dealing with an investment product priced using an all-inclusive fee (also

referred to as a "bundled" or "wrap" fee), the fiduciary should make certain the fees are reasonable for services provided and be able to have full fee transparency eliminating any potential conflict of interest.

84.     Another way that plans may attempt to gather pricing data is through a request for information (RFI). This process involves asking incumbent and outside recordkeepers for information regarding recordkeeping pricing based on generic plan characteristics, such as the number of participants and value of the assets.

85.     An RFI does not generate the lowest possible price for a given service level, because, among other reasons, unlike an RFP, it does not send a clear signal that the plan is considering engaging a different recordkeeping provider.

86.     Plan sponsors may also engage in benchmarking studies. This involves comparing plan fees to a dataset, which might be a consultant's or other third-party's database, or a survey.

87.     Benchmarking studies do not result in the lowest price point for the desired service level because, among other reasons, they do not provide plan-specific information, may contain outdated or otherwise unreliable information, and may contain pricing data that did not result from competitive bidding. In addition, these studies may not reflect a level of service comparable to that required by the plan at issue.

88.     The requirements set forth above regarding prudent processes are widely accepted in the industry, and have been the standard for plan fiduciaries throughout my career and well before 2010.

89.     Hiring a third-party advisory or consulting firm to assist with the RFP due diligence process or on-going fiduciary monitoring should be done with strict compliance to fiduciary goals and investments monitored in-line with an IPS. Although third-party independent

advisory/consulting support can assist with fiduciary responsibilities, it is the plan sponsor's ultimate responsibility to meet all fiduciary requirements.

90.     In my career in the 403(b) marketplace, I have personally been involved in consolidations involving TIAA "legacy" assets.

91.     These "legacy" assets, including the TIAA Traditional annuity, have built-in limitations, depending on the type of retirement annuity contract that is used.

92.     For example, with the TIAA Traditional annuity under the "legacy" Retirement Annuity ("RA") contract, there is an approximately 10-year "lockup" provision requiring gradual withdrawal of assets over that period.

93.     TIAA asserts that the RA contract, as well as several other legacy contract types, do not allow a plan sponsor to directly map assets from one investment option to another. Instead, the individual participants must authorize a transfer of assets. This would mean that even if plan fiduciaries determine that an annuity governed by an RA contract is no longer prudent and should be removed, funds cannot be transferred out of that annuity at the plan level. I am not opining as to the legal validity of TIAA's assertions that the plan sponsor cannot map assets from any TIAA Annuity and am not aware of any contractual language or other legal rationale that entails that these assets cannot be mapped by the plan sponsor.

94.     Since 2005, TIAA's Retirement Choice (RC) contract type has been available to Cornell. Even TIAA agrees that this is a contract under the control of the plan sponsor, meaning that assets governed by this contract type can be mapped at the plan level. The plan has the ability to choose what contract type to use on a go-forward basis. Similarly, the Retirement Choice Plus (RCP) contract type gives plan-level control over assets it governs, and has been available since 2006.

95.     Cornell still uses the legacy contract types, despite its ability to use RC contracts since 2005.[30] If Cornell had opted for RC contracts on a go-forward basis, all new money deposited by plan participants in TIAA annuities since that time would indisputably be mappable. Cornell could have chosen to move to RC contracts at any time since 2005.

96.     I have been personally involved with several educational campaigns designed to move participants' assets out of "legacy" investment options. These campaigns have involved plan sponsors' efforts to escape from the restrictive and burdensome TIAA contract provisions. These campaigns were necessary because of TIAA's assertions that the legacy contracts were not mappable. I have spent a great deal of time in my career promoting change and assisting 403(b) plan sponsors to move away from TIAA. I have had success in engaging plan sponsors based on, among other things, the lack of liquidity and underperformance of TIAA "legacy" assets.

97.     These campaigns involved multiple facets, including email campaigns, a pre-transition website, and on-campus visits. The messaging of these campaigns included: explaining to participants how much in fees they are paying in legacy TIAA investments; how that is diminishing their retirement funds; showing them how the same or very similar investments are available in new plan investment options but at lower cost and better performance; showing them how much better their retirement accounts would be by switching over. Participants would then be provided with instructions and forms for them to sign instructing TIAA to transfer their accounts.

98.     In my experience, educational campaigns directed to plan participants in order to move funds out of TIAA products and into more prudent investment options have been highly successful. A highly effective, "boots-on-the-ground" educational campaign can result in 60-80% of the active plan participants moving their retirement assets out of TIAA "legacy" products and

---

[30] *See* Tr. of Dep. of A. Polacek ("Polacek Dep.") at 23:15-19.

into superior investment options.

### b. Cornell failed to follow a prudent fiduciary process.

#### 1. Prior to November 2011, the Cornell Defendants were unaware of the Plans' recordkeeping and administrative fees and had no process for monitoring their reasonableness.

99.     Cornell's Senior Director of Benefits Services and Administration from May 1997

until November 2016,[31] Paul Bursic, testified that prior to the retention of Defendant CAPTRUST

in December 2011,[32] no one at Cornell knew what the Plans were paying in recordkeeping and

administrative fees, the Cornell Defendants believed that they could not determine what the

recordkeeping and administrative fees the Plans were paying, and that the Cornell Defendants

never attempted to negotiate or benchmark their recordkeeping fees with TIAA or Fidelity.[33] In

sum, the Cornell Defendants admittedly did nothing to ensure that their recordkeeping and

administrative fees were reasonable until after December 2011 and did not follow a prudent

process.

#### 2. The Cornell Defendants failed to engage in a Request for Proposal or any other process to determine whether the recordkeeping and administrative fees the Plans paid are reasonable.

100.     Even after Cornell hired CAPTRUST in December 2011, the Cornell Defendants

failed to engage in a prudent process to ensure that the recordkeeping and administrative fees that

Plans paid were reasonable.

101.     As discussed above, a prudent fiduciary of a defined contribution plan conducts a

RFP for recordkeeping and administrative fees every three-to-five years. In fact, every investment

advisory that responded to Cornell's request for proposals for an investment advisor indicated that

---

[31] Bursic Dep. at 24:12-25:1. Bursic was initially Director of Benefit Services and Administration and was promoted to Senior Director prior to his retirement. Id.
[32] CORNELL021910.
[33] Id. at 92:7-95:14.

an RFP should be conducted for recordkeeping and administrative services.[34]

102.   However, it is clear from my review that Cornell never conducted an RFP for recordkeeping and administrative services.[35]

103.   Beyond failing to ever engage in the prudent process of an RFP, the Cornell Defendants never conducted a single RFI regarding the recordkeeping and administrative services for the Plans.[36]

104.   Finally, the Cornell Defendants admitted that the RPOC never reviewed any benchmarking or other data to determine if the recordkeeping and administrative fees the Plans were paying were reasonable.[37]

105.   Members of RPOC believed that CAPTRUST was conducting fee benchmarking but did not ever recall reviewing the fee benchmarks that they believed CAPTRUST was conducting.[38]

### 3.   The Cornell Defendants only once reviewed the per-participant or total recordkeeping and administrative fees the Plans were paying.

106.   As discussed above, a prudent fiduciary examines recordkeeping and administrative fees on a per-participant or total fee basis to determine whether the fees are reasonable rather than only examining asset-based fees or revenue requirements.

107.   The Plans' recordkeeping and administrative fees have always been paid through

---

[34] Tr. of Dep. of E. Walsh ("Walsh Dep.") at 127:7-16; CORNELL024180; CORNELL006782; CORNELL006753; CORNELL024169; CORNELL015325; CORNELL024183; CORNELL011415; CORNELL011420; CORNELL011422; CORNELL015395; CAPTR_0015566; CORNELL027629.

[35] Bursic Dep. at 44:4-23; Tr. of Dep. of P. Gallagher ("Gallagher Dep.") at 26:19-24; Tr. of Dep. of A. Edwards ("Edwards Dep.") at 119:22-110:5; Tr. of Dep. of J. DeStefano ("DeStefano Dep.") at 130:8-13; Opperman Dep. at 251:25-252:3; Tr. of Dep. of M. Prasad ("Prasad Dep.") at 38:20-14; Walsh Dep. at 198:24-199:5; Tr. of Dep. of J. Strodel ("Strodel Dep.") at 239:7-13; Warner dep. at 343:14-344:7.

[36] Bursic Dep. at 50:23-51:2; Gallagher Dep. at 27:16-20; Edwards Dep. at 110:6-13; Opperman Dep. at 252:5-12; Prasad Dep. at 41:21-42:20.

[37] Bursic Dep. at 51:3-14; Gallagher Dep. at 79:5-8; Walsh Dep. at 51:5-15; Opperman Dep. at 252:13-253:11.

[38] *See, e.g.,* Bursic Dep. at 52:16-54:15; Prasad Dep. at 44:12-46:2.

asset-based arrangement in which the recordkeeping fees participants pay are determined by taking a number of basis points or a percentage.[39] The recordkeeping and administrative fees for the Plans have never been calculated based on a per-participant or flat fee despite the fact that the cost for recordkeeping is primarily determined by the number of participants rather than the amount of assets invested.

108. The only time RPOC examined the Plans via a per-participant rate was on April 13, 2012.[40] Cornell was paying TIAA an estimated $214 dollars per participant in recordkeeping and administrative fees and Fidelity $112 per participant in recordkeeping and administrative fees.[41] The presentation related that under a new arrangement TIAA's per participant fee was estimated at $145 and Fidelity's at $58 dollars.[42]

109. No member of the RPOC even questioned why Cornell was paying recordkeeping and administrative fees to TIAA that were between two and three times higher than the per participant fees paid to Fidelity.[43]

110. All other references to recordkeeping fees in meeting materials and minutes I reviewed are reflected as the number of basis points or percentage of the assets used to calculate the fees the Plans paid and not on a per-participant basis. Reviewing merely the basis point or so-called "required revenue rate"[44] a plan is paying does not allow a fiduciary to prudently judge the reasonableness of fees.

---

[39] *See infra* at ¶¶ 52, 62.
[40] *See* CORNELL022014 at 12-13.
[41] Id. at 13.
[42] Id.
[43] Bursic Dep. at 131:9-132:14; Gallagher Dep. at 85:9-86:12.
[44] The term "required revenue rate" is in fact a misnomer. There is nothing "required" about this rate, other than the fact that it reflects the fee that TIAA desires to be paid. In my experience, and based on numerous RFPs I have been involved with alongside TIAA, this "required" revenue rate is often *far* above what TIAA is ultimately willing to accept.

### 4. The Cornell Defendants improperly relied on CAPTRUST to determine the recordkeeping and administrative fees the Plans paid.

111.   Rather than engaging in a prudent process to ensure the Plans were paying reasonable recordkeeping and administrative fees, the Cornell Defendants deferred entirely to CAPTRUST to negotiate and assure the Plans' recordkeeping and administrative fees were reasonable.[45]

112.   The Cornell Defendants did nothing to monitor or independently assess CAPTRUST's negotiations and determinations regarding the Plans' recordkeeping and administrative fee and assumed that CAPTRUST was negotiating reasonable fees for the Plans.[46]

### 5. CAPTRUST only conducted limited benchmarking and negotiations.

113.   As discussed above, CAPTRUST never conducted an RFP for the Plans' recordkeeping and administrative services as a prudent fiduciary would do every 3 to 5 years.

114.   The only fee benchmarking that CAPTRUST Senior Vice President James Strodel recalled was a comparison to the fees paid by other CAPTRUST clients in 2012.[47]

115.   CAPTRUST Senior Vice President Barron Schmitt did not recall benchmarking TIAA's recordkeeping fee when TIAA offered new prices in 2012, 2014, or 2017.[48] Schmitt recalled the most recent fee amendments, after this lawsuit, being benchmarked but could not

---

[45] Bursic Dep. at 53:18-54:15; Gallagher Dep. at 62:11-63: DeStefano Dep. at 129:16-21, 131:4-14; Edwards dep. at 107:14-109:6; Tr. of Dep. of J. Schwartz at 78:8-80:12; Prasad Dep. at 67:22-68:16.

[46] *See, e.g.,* Bursic Dep. at 53:18-54:15 ("Q. Okay. So you relied on CAPTRUST to negotiate the fees but didn't look at any independent data to validate whether those fees were within the market; is that a correct characterization? A. We relied on CAPTRUST to do their professional job and they gave us great results and we did not have a way to independently assess it unless we went out to the market with a new RFP, found another consultant that could look over CAPTRUST's shoulders. That's an infinite loop RPOC did not want to get into -- we -- as long as we're satisfied with the results that we have and that we feel that we're getting a really good deal with this, and we've heard, without direct comparison from other competitor institutions with whom we're not supposed to be sharing a lot of information, but a lot of smiles around the table. We're getting much better rates than we used to before, some of which have used CAPTRUST, some of them used AON Hewitt, AON, AON Hewitt, Hewitt, Mercer, a big company in the New York City area, Cammack, C-A-M-M-A-C-K").

[47] Strodel Dep. at 223:12-16.

[48] Schmitt Dep. at 156:13-157:5, 157:19-158:1, 159:12-160:11, 162:22-163:10, 166:14-167:3.

recall how Cornell's fees compared to the 10 to 20 other similar CAPTRUST clients.[49] Schmitt

also could not recall ever benchmarking Fidelity's fees with CAPTRUST's internal database after

2012.[50]

116.     Moreover, the one or two times CAPTRUST may have conducted benchmarking

on the Plans, its efforts were very limited. Any benchmarking in 2012 only consisted of a "fairly

limited" set of "maybe" five comparable clients of CAPTRUST.[51] Additionally, CAPTRUST

only benchmarked TIAA's fees relative to the fees TIAA was providing other CAPTRUST clients

and Fidelity fees to the fees that Fidelity was providing other CAPTRUST clients and did nothing

to compare the fees to other vendors.[52] These very limited fee benchmarking exercises that

CAPTRUST may have conducted are not a substitute for a robust and competitive RFP process.

117.     Additionally, CAPTRUST's negotiations with TIAA and Fidelity regarding

recordkeeping fees did not follow a prudent process. Rather than engaging in back and forth to

achieve the lowest prices, CAPTRUST only periodically asked the recordkeeper for a lower price

and then accepted the price offered.[53] CAPTRUST never counter-offered or otherwise negotiated

with TIAA or Fidelity beyond asking for whatever price reduction these entities saw fit to give.[54]

James Strodel of CAPTRUST had a "vague recollection" of subsequent negotiations with TIAA

but could not identify any specifics.[55] TIAA and Fidelity's corporate representatives testified that

CAPTRUST always accepted their first offer and never counter-offered.[56]

---

[49] Schmitt Dep. at 169:21-:170:4.
[50] Schmitt Dep. at 176:22-178:24.
[51] Strodel Dep. at 223:13-227:10.
[52] Schmitt Dep. at 179:12-21.
[53] Strodel Dep. at 230:23-231:7.
[54] Strodel Dep. at 233:18-238:22.
[55] Strodel Dep. at 238:7-16.
[56] Weber Dep. at 164:13-165:5; 198:23-199:5; 199:24-201:9; Warner Dep. at 43:19-44:6, 52:1-52:7, 71:24-72:6, 171:20-173:20.

### 6. The Committee never seriously considered consolidating to a single recordkeeper.

118. As discussed above, consolidating to a single recordkeeper from a multiple recordkeeper platform results in significant cost savings regarding recordkeeping and administrative fees. A prudent fiduciary would have consolidated to a single recordkeeper prior to 2010.

119. The Plans used both TIAA and Fidelity as recordkeepers throughout the class period.[57]

120. Despite being advised by CAPTRUST in January 2012 that consolidation results in the "best cost structure,"[58] the RPOC never consolidated to a single recordkeeper. Additionally, there does not appear to be any substantial discussion of recordkeeper consolidation in any meeting materials or minutes after the recommendation was made.

121. In fact, CAPTRUST tried to include recordkeeper consolidation as an agenda item for future meetings, but it was removed from the agenda by Paul Bursic and Patrick Gallagher at Cornell prior to the meeting.[59]

122. Recently, the RPOC decided to consolidate the 403(b) plans for the Weill Cornell Medical School to a single recordkeeping agreement with TIAA.[60] The consolidation of the Weill Cornell plans resulted in fee reductions for participants.[61] However, inexplicably, to this day the Plans use multiple recordkeepers and RPOC has never given serious consideration to consolidating the Plans.

---

[57] *See supra* at Section V (describing and citing the Plans' operative recordkeeping agreements).
[58] CORNELL015581.
[59] CAPTRUST_0014242.
[60] Gallagher Dep. at 61:3-13.
[61] Id. at 138:17-19.

### 7. The members of RPOC showed a remarkable lack of understanding regarding the Plans' recordkeeping and administrative fees.

123.     The members of RPOC showed a remarkable lack of understanding regarding the Plans recordkeeping and administrative fees and services demonstrating that they could not have conducted a prudent review. For example, multiple RPOC members testified that Paul Bursic was the member most familiar with or involved with the Plans recordkeeping and administrative fees.[62] However, Bursic demonstrated a tremendous lack of understanding regarding how the Plans recordkeeping and administrative fees operated and the general market for recordkeeping fees and a lack of desire to expand his knowledge.

124.     For example, Bursic, despite testifying that he deferred to CAPTRUST regarding fees, was unaware whether CAPTRUST acted as a co-fiduciary related to recordkeeping and administrative fees.[63]

125.     Cornell has always had an asset-based recordkeeping fee structure but Bursic repeatedly and insistently testified that he believed that Cornell had a flat or per participant fee.[64]

126.     Despite Department of Labor regulations requiring fiduciaries to consider and assess all types of fees individually,[65] Bursic believed it was improper to consider the Plans' recordkeeping and administrative fees alone and only considered the expense ratio for funds.[66]

127.     Bursic did not even know what the Plans paid for recordkeeping fees and testified "[i]f you want to know what the number is ask CAPTRUST."[67]

128.     Bursic also testified "I have no idea and I have no desire to find out" whether any

---

[62] *See, e.g.*, Opperman Dep. at 229:8-10 (Paul Bursic took the lead on negotiating TIAA's recordkeeping agreement) 252:19-2529 ("Paul worked with CAPTRUST on the revenue sharing").
[63] Bursic Dep. at 57:2-59:12.
[64] Bursic Dep. 105:22-115:24.
[65] *See* DOL Advisory Op. 2013-03A, at 4 (July 3, 2013); DOL Adv. Op. 97-15A (May 22, 1997); DOL Adv. Op. 97-16A (May 22, 1997); DOL Adv. Op. 97-19A (Aug. 28, 1997).
[66] Bursic Dep. at 99:21-102:1.
[67] Bursic Dep. at 106:7-107:13.

vendor "charges recordkeeping and administrative fees on a set dollar amount per participant rather than a basis point like this."[68]

129.    Bursic also did not know whether TIAA could put a per participant cap on recordkeeping and administrative fees and testified "[y]ou would have to talk to CAPTRUST."[69]

## VIII.    403(b) Plans' Recordkeeping Costs are No More Expensive Than Those for 401(k) Plans.

130.    Pricing models for 401(k) and 403(b) plans have merged into a similar format resulting in very similar costs. Enhanced on-site education services typically requested by 403(b) plan sponsors are part of the 403(b) recordkeeper's expense and considered a necessary function of the transition team. As such, information regarding 401(k) plans comparable in asset value and participant counts to a given 403(b) plan, including regarding the market price, is highly relevant in assessing reasonable recordkeeping fees for a higher education 403(b) plan.

131.    At Transamerica, for medium or large plans, we used a similar pricing model for both 401(k) and 403(b) plans, the same recordkeeping system, the same bidding process, and the same pricing teams.

132.    The differences in the work required to perform recordkeeping for retirement plans containing annuities as opposed to retirement plans containing only mutual funds or other non-annuity investment products are minimal. Daily valuation and net asset values of individual annuities are calculated by the investment provider, not by the recordkeeper. As with mutual funds, the annuity data is simply transferred to the plan's recordkeeper for entry.

133.    Most providers have additional revenue sources that may not be directly related to recordkeeping the 403(b) plan. Although the single provider model will reduce costs and enhance

---

[68] Bursic Dep. at 117:15-118:6.
[69] Bursic Dep. at 118:17-119:3.

the participant experience, plan sponsors need to be aware of the fact that some firms consider the

retirement plan to be a loss leader that gives them access to a captive audience to sell other

products.

134.    A prudent fiduciary must be aware of potential conflicts of interest where the

recordkeeper is "owning the participant" and capturing revenue from other sources including:

- Proprietary investment options

- IRA rollovers

- Cross selling insurance products

- Use of wealth advisors for employees with higher balances

- Using plan revenue to have larger plans subsidizing un-related smaller
  plans

135.    Cornell was aware that the Plan recordkeepers were engaging in this kind of

cross-selling but failed to stop it, nor did Cornell use it as a point of leverage to gain concessions in

recordkeeping fee pricing.[70]

136.    CAPTRUST was also aware of the recordkeepers' practices of using plan

participant information to sell non-plan products but did not inquire further or stop the practice.[71]

## IX.    Publicly available data as well as my personal experience pricing 403(b) plans demonstrates that Cornell could have paid far lower recordkeeping costs than what it actually paid.

### a.    California Institute of Technology

137.    With the DOL regulations announced in 2007 and scheduled to become effective at

the start of 2009,[72] prudent fiduciaries in the 403(b) marketplace were actively putting in place

---

[70] Gallagher dep. at 368:22-369:4; 372:9-21; Bursic dep. at 170:5-19; 170:20-171:13.
[71] Strodel dep. 252:18-22; 252:23-253:6.
[72] *See* Sean K. Arnold, *§403(b) To Do List: Getting Ready for 2009,* Am. Soc'y of Pension Prof'l & Actuaries asap 08-39 (Nov. 7, 2008), *available at* http://www.asppa.org/Portals/2/PDFs/GAC/ASAPs/08-39.pdf.

measures at this time to ensure their plans only paid reasonable fees. For example, effective

January 1, 2010, the California Institute of Technology ("CalTech") TIAA-CREF DC Retirement

Plan consolidated from multiple recordkeepers (TIAA and Fidelity) to having TIAA as the

CalTech Plan's single recordkeeper.[73]

138.  In conjunction with this consolidation, CalTech also engaged in a thorough review

and negotiation process regarding the Plan's recordkeeping fees, which included setting a per

participant cap on recordkeeping fees with TIAA.[74]  With this per participant cap in place, CalTech

was able to have over $15,000,000 in excess recordkeeping funds that had been paid to TIAA

reimbursed to the Plan, including over $7,000,000 in April 2014 alone.[75]

139.  Based on its publicly filed Form 5500 filings, as of 2013, as a result of these

negotiations with TIAA and rebates for excess recordkeeping fees, CalTech was paying

approximately $27 per participant in recordkeeping fees.[76]  CalTech was able to negotiate its

recordkeeping fees down to a reasonable rate because it consolidated its multi-vendor

recordkeeping structure as of January 1, 2010 (one year after the DOL's regulations became

effective), and was then able to assert its *full* Plan leverage in negotiations with TIAA.

140.  Also, by requiring the Plan to be priced and capped on a per participant basis,

CalTech ensured that the Plan was paying a reasonable fee for the services provided because all

---

[73] *Caltech Names TIAA-CREF Recordkeeper,* INSTITUTIONAL INVESTOR (Dec. 10, 2009), available
at:http://www.institutionalinvestor.com/Article/2355324/Search/Caltech-Names-TIAA-CREF-Record-Keeper.html#
/.WBn8Oy0rKpp.
[74] *See* Plan's 2013 Form 5500 filing, pg. 33, Plan Servicing Credit section, stating that the "TIAA-CREEF
recordkeeping expenses are limited to an annual per-participant maximum amount that is negotiated with the Plan
sponsor."
[75] *See* the Plan Servicing Credit section of the Plan's 2013-2016 Form 5500s.
[76] This amount is calculated based on the Plan's 2013 Form 5500 filing, pg. 33, discussing the Plan Servicing Credit.
This section states that the "TIAA-CREF recordkeeping expenses are limited to an annual per-participant maximum
amount that is negotiated with the Plan sponsor." It also discloses that during the year ended December 31, 2013,
TIAA-CREF transferred $7,002,000 in revenue credits to the Plan and paid $507,000 in Plan administration expenses.
Based on the Plan's participants as of 2013 (17,247) (see Line 6g), the Plan paid approximately $29/participant or
($507,000/17,247).

excess above that amount was refunded to the Plan and its participants. This also prevented against

the Plan's recordkeeping fees becoming excessive in later years, which would have undoubtedly

occurred if it had simply retained an asset-based fee due to the Plan's significant growth in assets

between 2010 (approx. $2b) and the present (approx. $3b).[77]

141.    It is important to understand that the lower fees that CalTech negotiated with TIAA

did not result in any material decline in services. To the contrary, CalTech's actions actually

*enhanced* the services being provided by enabling CalTech "to provide faculty and staff with more

investment options, access to personalized investment advice, enhanced online retirement

planning tools, and improved customer service."[78]

142.    Based on my experience, nothing prevented Cornell from taking the same measures

as CalTech took back in 2009 or 2010 in order to negotiate for competitive recordkeeping fees.

The difference here—and why the Cornell Plans' recordkeeping fees have been (and remain)

considerably higher than those at CalTech—is that the fiduciaries responsible for the Cornell Plans

simply failed to take action to thoroughly assess, negotiate, and ensure that the Cornell fees were

reasonable.[79]

### b. Stanford University

143.    The recordkeeping rates that CalTech was able to negotiate are consistent with the

recordkeeping rates that have been achieved by those universities that have employed similar

---

[77] This is based on the Plan's 2010 and 2016 Form 5500 filings.
[78] See BusinessWire, *Caltech Consolidates Retirement Plan Recordkeeping with TIAA-CREF*, December 7, 2009, available at:
https://www.businesswire.com/news/home/20091207006230/en/Caltech-Consolidates-Retirement-Plan-Recordkeeping-TIAA-CREF; *see also* Pensions&Investments, *Eddy winners double, triple their fun*, April 3, 2017, available at: http://www.pionline.com/article/20170403/PRINT/304039988/eddy-winners-double-triple-their-fun.
[79] *See e.g.*., Stefano Dep. at 130:5-133:15; Opperman Dep. at 204:6-207:25, 209:1-14, 212:1-7, 214:5-215:3, 221:20-222:20, 228:13-12, 233:7-15, 241:11-242:19, 251:25-252:3; Bursic Dep. at 24:12-25:1, 92:7-95:14; 117:15-118:6; Warner Dep at 43:19-44:6, 52:1-52:7, 71:24-72:6, 171:20-173:20; Weber Dep. at 164:13-165:5; 198:23-199:5; 199:24-201:9; Walsh Dep. at 127:7-16, 198:24-199:5, 343:14-344:7; Strodel Dep. at 239:7-13; Gallagher Dep. at 26:19-24; Edwards Dep. at 119:22-120:5; Prasad Dep. at 38:20-14.

prudent practices, including consolidating recordkeepers, conducting competitive requests for proposals from their service providers, and negotiating based on per-participant caps.

144.    For example, in a recent announcement on August 25, 2016 (shortly after the filing of this case), Stanford University announced that its annual fee for recordkeeping its defined contribution 403(b) plan is approximately $44 per participant.[80] Notably, in this same announcement, Stanford acknowledged that,

> About 10 years ago, new legislation required employers to disclose all fees that employees could be charged for the administration of their retirement savings plans. That prompted us to take a hard look at our plans, our investment funds, and the administrative fees in place, with a goal to increase efficiency of plan administration and simplify retirement savings investing for employees. *We spent several years studying the plans and funds and negotiating with plan providers, and implemented changes in late 2009.* We streamlined the number of funds because by doing so, we were able to reduce administrative fees. So while some employees weren't happy that the number of funds decreased in 2009, what we gained was less complexity in investing and low administrative fees.[81]

145.    As with CalTech, Stanford implemented fund consolidation in 2009, putting it in a position to better negotiate with the Stanford plan's service providers for competitive recordkeeping fees. Importantly, Stanford understood this process required an assessment of the plan's fees and robust negotiation with plan recordkeepers—not mere idle acceptance of what these service providers saw fit to offer.

146.    This approach contrasts sharply with the practices of Cornell, and its fiduciaries, who entirely failed to negotiate with the Cornell Plans' service providers on recordkeeping fees not simply by failing to *ever* conduct a competitive request for proposals from the Plans' service providers, but also by simply accepting the recordkeeping rates proposed by these entities.[82]

---

[80] *See* Stanford's Q&A regarding Retirement Fees, August 25, 2016, available at https://cardinalatwork.stanford.edu/engage/news/qa-retirement-fees.
[81] Id. (emphasis added).
[82] *See e.g.*, Stefano Dep. at 130:5-133:15; Opperman Dep. at 204:6-207:25, 209:1-14, 212:1-7, 214:5-215:3,

Indeed, the Cornell Defendants did not even conduct a single request for information regarding the recordkeeping and administrative services of the Plans.[83]

### c. Harvard University

147. Even for a university retirement plan that has not consolidated recordkeepers, recordkeeping fees much lower than what Cornell has been paying are attainable. For example, Harvard University has been able to achieve recordkeeping fees of between $34 per participant (Vanguard), $38 per participant (Fidelity), and 3.8bps (TIAA) (which equates to approximately $18/participant).[84] This is possible because, unlike Cornell, Harvard has negotiated and capped recordkeeping arrangements with each of these service providers across its four plans.[85]

148. Also, effective January 1, 2018, Harvard University announced that it was making changes related to administrative and investment management fees associated with its retirement program.[86] As a part of these changes, Harvard announced that a "Plan Servicing Fee" of 0.038% per year would be deducted from each of its participants TIAA retirement plan accounts, while TIAA would refund a portion of their expense ratio to participants in those options.[87] What this process recognizes is the need for a level fee across all TIAA-participants in order to separate the costs associated with recordkeeping from other services like investment management. By ensuring

---

221:20-222:20, 228:13-12, 233:7-15, 241:11-242:19, 251:25-252:3; Bursic Dep. at 117:15-118:6; Warner Dep. at 43:19-44:6, 52:1-52:7, 71:24-72:6, 171:20-173:20; Weber Dep. at 164:13-165:5, 198:23-199:5, 199:24-201:9; Bursic Dep. at 24:12-25:1, 92:7-95:14; Walsh Dep. 127:7-16, 198:24-199:5, 343:14-344:7; Strodel Dep. at 239:7-13, Gallagher Dep. at 26:19-24; Edwards Dep. at 119:22-120:5; Prasad Dep. at 38:20-14.

[83] *See* Bursic Dep. at 50:23-51:2; Gallagher Dep. at 27:16-20; Edwards Dep. at 110:6-13; Opperman Dep. at 252:5-12; Prasad Dep. at 41:21-42:20.

[84] *See* Harvard's August 2018 Fee Disclosure, available at: https://hr.harvard.edu/files/humanresources/files/fee_disclosure.pdf. I calculated TIAA's per participant recordkeeping fee as .038% multiplied by $805,752,113 divided by 17,058 participants based on the Harvard Plan's 2016 Form 5500.

[85] These Plans are: (1) the Retirement Income Plan for Teaching Faculty of Harvard University; (2) the Harvard University Defined Contribution Retirement Plan; (3) Harvard University Retirement Plan; and (4) the Harvard University Tax-Deferred Annuity Plan.

[86] *See* Changes Coming soon to TIAA Accounts in the Harvard University Retirement Programs, November 28, 2017, available at: https://hr.harvard.edu/files/humanresources/files/harvard_tiaa_fee_notice_nov2017.pdf.

[87] Id. at 1.

that TIAA rebates the revenue sharing amounts for these funds, Harvard is able to disentangle the costs associated with plan recordkeeping and administration from all the other fees that would otherwise be baked into the TIAA products as a part of the expense ratio.

### d. New York University

149.    Even universities whose 403(b) plan fiduciaries had questionable processes have been able to attain recordkeeping rates approaching that which I would consider reasonable. For example, New York University, who itself has been sued for its fiduciary practices related to the administration of its 403(b) retirement plans,[88] was able to obtain a recordkeeping rate of $42 per participant from TIAA as of 2016.[89] This reduction only came after NYU conducted a competitive request for proposals for recordkeeping services in 2016.[90] In this process, TIAA initially bid $48 per participant and Vanguard bid $46 per participant.[91] New York then went back to TIAA who offered $42 per participant, which NYU then accepted.[92] It is my understanding that NYU did not even go back to Vanguard (in response to Vanguard's first offer) to see if it would beat TIAA's $42 price.[93]

150.    It is my experience having worked in the non-profit 403(b) recordkeeping space for decades, that a recordkeeper's initial bid in a competitive bidding process is rarely (if ever) its best. It is very likely that if NYU had sought a bid beyond the initial one from Vanguard that it could have gotten an offer approaching $36 per participant or lower. Even so, the NYU example confirms that even fiduciaries of plans with questionable processes[94] were able to obtain

---

[88] *Sacerdote v. New York Univ.*, No. 16-6284 (S.D.N.Y.).
[89] *Sacerdote v. New York Univ.*, No. 16-6284 (S.D.N.Y.), Doc. 316 ¶¶192-198.
[90] Id.
[91] Id.
[92] Id.
[93] Id.
[94] *Sacerdote v. New York Univ.*, No. 16-6284 (S.D.N.Y.), Doc. 351 (Plaintiffs' Memorandum in support of their request to remove certain NYU Plan fiduciaries based on the Court's concerns regarding their lack of knowledge and

recordkeeping rates considerably below that of the Cornell Plans. This is because, unlike NYU, the
Cornell Plans' fiduciaries failed to conduct even a single request for proposals on recordkeeping
(or even an RFI) in the past decade and beyond.[95]  In doing so, in my opinion, the Cornell
Defendants entirely failed in their efforts to monitor and control their Plans' recordkeeping costs.

### e. Nevada System of Higher Education

151.    As of 2014, the Nevada System of Higher Education conducted a plan fee
benchmarking study conducted by Hewitt.[96]  Hewitt began this fee benchmarking study by quoting
from Department of Labor's guidance to plan fiduciaries as follows:

> Understanding fees and expenses is important in providing for the services necessary
> for your plan's operation. This responsibility ongoing. After careful evaluation during
> the initial selection, the plan's fees and expenses should be monitored to determine
> whether they continue to be reasonable.[97]

In this review, Hewitt assessed that as of 2014 Nevada was paying $31 per participant for
recordkeeping on its TIAA platform.[98]  This pricing was the result of a negotiated 6 basis point fee
for recordkeeping with all the excess being rebated to participant accounts.[99]  The Hewitt
benchmarking study—and the results achieved by Nevada—demonstrate the importance of
unpacking and fully understanding all the layers of fees associated with a plan's investment
products. In doing this, a plan fiduciary is able to assess the competitiveness of their plan's fees
relative to the discrete services being provided as compared to the marketplace.

152.    Based on my review of the documents and relevant depositions in this case, Cornell

---

other deficiencies).
[95]  Bursic Dep. at 50:23-51:2; Gallagher Dep. at 27:16-20; Edwards Dep. at 110:6-13; Opperman Dep. at 252:5-12;
Prasad Dep. at 41:21-42:20.
[96]  *See* Nevada System of Higher Education, Total Plan Cost Benchmarking, November 14, 2014, available at:
https://nshe.nevada.edu/tasks/sites/Nshe/assets/File/HR/retirement/Performance%20Reports/2014/2014_11_%2014
%20Total%20Plan%20Cost%20Analysis.pdf.
[97]  Id. at 8 (*citing* A Look at 401(k) Plan Fees for Employers, U.S. Department of Labor).
[98]  Id. at 20.
[99]  Id. (showing "[r]evenue sharing is rebated back to participant accounts").

fell miserably short of this standard, and allowed the Plans' fees to go largely unchecked and unscrutinized for decades.[100] Indeed, unlike Nevada, the Cornell Defendants have even admitted that the RPOC never reviewed any benchmarking data to determine if the recordkeeping and administrative fees the Cornell Plans were paying were reasonable or competitive.[101] Moreover, Cornell failed to ever conduct even a single request for proposal for recordkeepers at any time during the class period in this case—dating back to 2010.[102]

153.    Indeed, as evident by the depositions I have reviewed of pertinent fiduciaries and committee members, Cornell simply accepted the arrangements that their service providers offered and agreed to uncapped asset-based fee agreements that were not even close to being market competitive or reasonable.[103]

### f.   North Carolina 403(b) Program

154.    Reasonable recordkeeping fees have also achieved through the conduct of prudent fiduciaries at other 403(b) programs that take steps to negotiate these fees and ensure that they remain reasonable. For example, on September 15, 2016, the Director of North Carolina's 403(b) Program issued a letter to the NC 403(b) Program Board of Trustees recommending a transition in recordkeepers (from TIAA to Prudential) in order to provide "a more tailored,

---

[100] *See e.g.*, Stefano Dep. at 130:5-133:15; Opperman Dep. at 204:6-207:25, 209:1-14, 212:1-7, 214:5-215:3, 221:20-222:20, 228:13-12, 233:7-15, 241:11-242:19, 251:25-252:3; Bursic Dep. at 117:15-118:6; Warner Dep. at 43:19-44:6, 52:1-52:7, 71:24-72:6, 171:20-173:20; Weber Dep. at 164:13-165:5; 198:23-199:5; 199:24-201:9; Bursic Dep. at 24:12-25:1, 92:7-95:14; Walsh Dep. 127:7-16, 198:24-199:5, 343:14-344:7; Strodel Dep. at 239:7-13; Gallagher Dep. at 26:19-24; Edwards Dep. at 119:22-120:5; Prasad Dep. at 38:20-14.

[101] Bursic Dep at 51:3-14; Gallagher Dep at 79:5-8; Walsh Dep. at 51:5-15; Opperman Dep. at 252:13-253:11.

[102] Stefano Dep. at 130:5-133:15; Opperman Dep. at 204:6-207:25, 209:1-14, 212:1-7, 214:5-215:3, 221:20-222:20, 228:13-12, 233:7-15, 241:11-242:19, 251:25-252:3; Bursic Dep. at 117:15-118:6; Warner Dep. at 43:19-44:6, 52:1-52:7, 71:24-72:6, 171:20-173:20; Weber Dep. at 164:13-165:5; 198:23-199:5; 199:24-201:9; Bursic Dep. at 24:12-25:1, 92:7-95:14; Walsh Dep. 127:7-16, 198:24-199:5, 343:14-344:7; Strodel Dep. at 239:7-13; Gallagher Dep. at 26:19-24; Edwards Dep. at 119:22-120:5; Prasad Dep. at 38:20-14.

[103] Id.

36

participant-centered, robust program."[104] As a result of this recommendation, which was ultimately implemented, the North Carolina 403(b) Program was able to achieve a flat fee of $31 per account for the plan's participants for 403(b) recordkeeping services.[105]

155.    A Recordkeeping Fee and Service Benchmarking study performed by Mercer in March 2017 showed that by comparison to other state retirement programs, North Carolina's recordkeeping rate of $31 per participant remained competitive.[106] A PlanSponsor article awarding the North Carolina plan fiduciaries as the 2018 Plan Sponsor of the year for a public defined contribution plan, recognized that the actions these fiduciaries took including "unbundling services, consolidating recordkeeping and renegotiating investment fees" "have led to lower fees and streamlined services."[107]

156.    This was not only possible for the Cornell Plans' fiduciaries, as set forth above, but was *necessary* in order for them to ensure that the Cornell Plans' fees were reasonable relative to the services being provided. In my opinion, the Cornell Plans' excessive recordkeeping fees were the result of Cornell's failures to take prudent steps to monitor and control these costs.

## X.    Calculations of Damages for Excessive Recordkeeping Fees

157.    If Defendants had acted as prudent fiduciaries as outlined herein (consolidating recordkeepers, rigorously negotiating, regularly issuing RFPs, properly monitoring recordkeeping

---

[104]  *See* NC 403(b) Record Keeping Contract, September 15, 2016, available at:
https://www.nctreasurer.com/ret/Board%20of%20Trustees/SRP%20BOT%20403(b)%20RK%20Contract%20Terms%209%2015%2016.pdf.
[105]  *See* 2018 Plan Sponsor of the Year, available at:
https://www.plansponsor.com/awards/2018-plan-sponsor-of-the-year/?pid=105240.
[106]  *See* Recordkeeping Fee and Service Benchmarking study, March 2017, available at:
https://www.nctreasurer.com/ret/Board%20of%20Trustees/NC%20Supplemental%20Retirement%20Plans'%20Recordkeeping%20Fees%20and%20Services%20Benchmarking%20Report%20-%20Tab%2010.pdf (showing NC ($31 per participant and 2.5bps) CA ($18 per participant and 5bps), LA County ($58.44 per participant), MI ($41 per participant), MO ($15 per participant and 9bps), NY ($20 per participant and 4bps), VA ($30.50 per participant) and WA (11.33bps -12.83bps)).
[107]  *See* Plan Sponsor of the Year, 2018, available at:
https://www.plansponsor.com/awards/2018-plan-sponsor-of-the-year/?pid=105240.

fees) for the time periods below, and the including the same services as were provided, the reasonable recordkeeping fees that the Plans could have paid would be as follows:

| Year(s) | Reasonable Fee (per participant) |
|---|---|
| 2010-2012 | $40 |
| 2013-2015 | $38 |
| 2016-present | $36 |

158.    I established these reasonable fees on a per-participant basis after reviewing the publicly available data points listed herein. These data points are consistent with my own 30 years of experience, including significant experience providing pricing information in response to RFPs for 403(b) plans including numerous institutions of higher education in order to arrive at the per-participant fees that would have been provided to these Plans based on the services provided had Cornell followed a prudent process, as it was required to do.

159.    From October 1, 2010 through July 31, 2018 the Plans suffered losses from excessive recordkeeping fees in the total amount of $21,176,568.46.

160.    The calculations supporting the above conclusion are contained in accompanying spreadsheet referred to as **Exhibit 3**.

161.    Losses caused by Defendants' failure to act as prudent fiduciaries also include the lost value that would have been produced if the excessive recordkeeping fees had instead been invested in the Plans. To calculate the amount of damages caused by this lost investment opportunity, I used the actual returns these funds would have produced over the relevant time frame, if they had been invested in the Vanguard Institutional Index fund (VIIIX), a fund which tracks the S&P 500 index. The S&P 500 is often used as a proxy for calculating returns in the U.S. Stock market, and is the most widely recognized and used investment benchmark.

162.    I have not independently calculated the amount of recordkeeping fees charged to the plan. I rely on and adopt the Plans' annual recordkeeping fees and the relevant participant totals as calculated and reported to me by Al Otto, which are set forth in an exhibit accompanying his report.

163.    Accounting for lost investment opportunity, total losses of the Plans from October 1, 2010 through July 31, 2018 resulting from Defendants' failure to follow the prudent fiduciary practices as outlined herein are $35,466,775.51.

164.    The calculations supporting the above conclusion are contained in the spreadsheet in **Exhibit 3**.

Respectfully submitted,

Ty Minnich

39

Materials Considered

In addition to the materials cited in my report, I considered the following documents:

- 5500s for the Cornell University Retirement Plan of Endowed Colleges at Ithaca 403(b) Plan and the Cornell University Deferred Annuity 403(b) Plan
- Cornell University Retirement Plan Oversight Committee Meeting Minutes and Materials
- Materials prepared by the committee or third parties that were presented during the committee meetings
- Investment Policy Statements
- Contracts
- Fee Disclosures
- Invoices
- IPS
- Plan Documents
- Quarterly Assets
- Pleadings
- Quarterly Investment Reports
- Surveys
- All stamped deposition exhibits
- All documents used during depositions.
- All deposition transcripts
- FAQ Upcoming 403(b) Supplemental Retirement Plan Changes for Louisiana State University
- University of Oklahoma Retirement Plan Management Committee February 15, 2013 Meeting Minutes

And the following bates stamped documents:

| | | |
|---|---|---|
| | CORNELL013557 | CORNELL020299 |
| CAPTR_0005130 | CORNELL013558 | CORNELL020300 |
| CAPTR_0005425 | CORNELL014038 | CORNELL020301 |
| CAPTR_0005441 | CORNELL014041 | CORNELL020302 |
| CORNELL013264 | CORNELL014042 | CORNELL020303 |
| CORNELL013267 | CORNELL014043 | CORNELL020304 |
| CORNELL013268 | CORNELL014044 | CORNELL020305 |
| CORNELL013269 | CORNELL014045 | CORNELL020306 |
| CORNELL013270 | CORNELL014334 | CORNELL020307 |
| CORNELL013271 | CORNELL014335 | CORNELL020591 |
| CORNELL013492 | CORNELL014336 | CORNELL020638 |
| CORNELL013537 | CORNELL014338 | CORNELL020660 |
| CORNELL013539 | CORNELL014339 | CORNELL028906 |
| CORNELL013540 | CORNELL014341 | CORNELL028907 |
| CORNELL013555 | CORNELL020172 | CORNELL028908 |

Exhibit 1

| | | |
|---|---|---|
| CORNELL028909 | CAPTR_0016522 | TIAA_CORNELL_00011970 |
| CORNELL028910 | CAPTR_0016565 | TIAA_CORNELL_00021339 |
| CORNELL028911 | CORNELL025362 | TIAA_CORNELL_00032741 |
| CORNELL028912 | CORNELL025390 | CORNELL025343 |
| CORNELL028913 | TIAA_CORNELL_00011306 | CORNELL024111 |
| CORNELL028914 | TIAA_CORNELL_00020831 | CORNELL024112 |
| TIAA_CORNELL_00001451 | CORNELL016840 | CORNELL011408 |
| TIAA_CORNELL_00001517 | CORNELL016842 | CORNELL024113 |
| TIAA_CORNELL_00001553 | CORNELL011416 | CORNELL024114 |
| TIAA_CORNELL_00001481 | CORNELL027587 | CORNELL024115 |
| TIAA_CORNELL_00001384 | TIAA_CORNELL_00025489 | CORNELL024116 |
| TIAA_CORNELL_00001417 | CORNELL011420 | CORNELL011410 |
| TIAA_CORNELL_00001584 | CORNELL016839 | CORNELL014375 |
| TIAA_CORNELL_00000007 | TIAA_CORNELL_00000061 | CORNELL024124 |
| TIAA_CORNELL_00035994 | CORNELL021944 | CORNELL011406 |
| TIAA_CORNELL_00042002 | CORNELL025334 | CORNELL011407 |
| TIAA_CORNELL_00042017 | CORNELL025340 | CORNELL021930 |
| TIAA_CORNELL_00000022 | CORNELL024177 | CORNELL025425 |
| CORNELL016846 | TIAA_CORNELL_00021727 | CORNELL025426 |
| TIAA_CORNELL_00036237 | TIAA_CORNELL_00021442 | CORNELL014456 |
| TIAA_CORNELL_00042015 | TIAA_CORNELL_00021536 | CORNELL024123 |
| CORNELL027154 | TIAA_CORNELL_00025516 | CORNELL015278 |
| CORNELL027163 | CORNELL025342 | CORNELL015279 |
| CORNELL027588 | CORNELL003106 | CORNELL024125 |
| TIAA_CORNELL_00000026 | CORNELL016844 | CORNELL024126 |
| CORNELL015991 | CORNELL011421 | CORNELL014377 |
| CORNELL027140 | CORNELL016838 | CORNELL014479 |
| CORNELL027155 to | CORNELL016841 | CORNELL011418 |
| CORNELL027589 | CORNELL016845 | CORNELL024179 |
| CORNELL027164 | CORNELL027605 | TIAA_CORNELL_00025541 |
| CORNELL027165 | CORNELL011399 | CORNELL024128 |
| TIAA_CORNELL_00021214 | CORNELL011400 | CORNELL024129 |
| TIAA_CORNELL_00021032 | CORNELL011401 | CORNELL024130 |
| TIAA_CORNELL_00025456 | CORNELL021932 | CORNELL024132 |
| CORNELL016843 | CORNELL027604 | CORNELL024134 |
| CORNELL011423 | CORNELL021663 | CORNELL024136 |
| TIAA_CORNELL_00020947 | CORNELL011417 | CORNELL024138 |
| CORNELL025344 | CORNELL022506 | CORNELL024141 |
| CORNELL025345 | CORNELL022536 | CORNELL024143 |
| CORNELL025346 | CORNELL022564 | CORNELL024145 |
| CORNELL025347 | CORNELL022565 | CORNELL014355 |
| CORNELL025348 | CORNELL025458 | CORNELL014359 |
| CORNELL025349 | CORNELL025460 | CORNELL015313 |

2

Exhibit 1

| | | |
|---|---|---|
| CORNELL015315 | CORNELL019404 | CORNELL011433 |
| CORNELL011412 | CORNELL019405 | CORNELL015396 |
| CORNELL001058 | CORNELL024194 | CAPTR_0052645 |
| CAPTR_0052622 | CORNELL024195 | CORNELL015395 |
| CORNELL015323 | CORNELL021931 | CORNELL015399 |
| CORNELL019448 | CORNELL007015 | CORNELL015887 |
| CORNELL024150 | CORNELL015340 | CORNELL015888 |
| CORNELL024152 | CORNELL015341 | CORNELL015889 |
| CORNELL024154 | CORNELL024199 | CORNELL015890 |
| CORNELL024155 | CORNELL012302 | CORNELL015401 |
| CORNELL024156 | CAPTR_0041246 | CORNELL015402 |
| CORNELL024158 | CORNELL_021892 | CORNELL015403 |
| CORNELL024160 | CORNELL015578 | CORNELL015404 |
| CORNELL024162 | TIAA_CORNELL_00022267 | CORNELL015405 |
| CORNELL025524 | CORNELL015362 | CORNELL027623 |
| CORNELL014447 | CORNELL015363 | CORNELL027624 |
| CORNELL014450 | CORNELL015364 | CORNELL027625 |
| CAPTR_0015450 | CORNELL015365 | CORNELL015406 |
| CAPTR_0015475 | CORNELL015377 | CORNELL015407 |
| CORNELL006751 | CORNELL015390 | CORNELL015408 |
| CORNELL006753 | CORNELL015366 | CORNELL015410 |
| CORNELL006781 | CORNELL015367 | CORNELL015411 |
| CORNELL006782 | CORNELL015368 | CORNELL015412 |
| CORNELL015324 | CORNELL015369 | CORNELL015413 |
| CORNELL024168 | CORNELL015370 | TIAA_CORNELL_00021950 |
| CORNELL024169 | CORNELL015371 | TIAA_CORNELL_00022059 |
| CORNELL024176 | CORNELL011597 | CORNELL011441 |
| CORNELL024180 | CORNELL011599 | CORNELL015473 |
| CORNELL011413 | CORNELL011601 | CORNELL015474 |
| CORNELL015325 | CORNELL011603 | CORNELL016059 |
| CORNELL024183 | CORNELL015375 | CORNELL024225 |
| CORNELL024184 | CORNELL015376 | CORNELL024226 |
| CORNELL024185 | CORNELL027622 | CORNELL027626 |
| CORNELL011344 | CORNELL015389 | CORNELL027627 |
| CORNELL024182 | CAPTR_0015322 | CORNELL027634 |
| CORNELL015994 | CORNELL015392 | CORNELL015419 |
| CORNELL021699 | CAPTR_0015324 | CORNELL015420 |
| CORNELL011425 | CAPTR_0015503 | CORNELL015422 |
| CORNELL011426 | CAPTR_0015513 | CORNELL016057 |
| CORNELL015823 | CAPTR_0015723 | CORNELL016058 |
| CORNELL015824 | CAPTR_0015734 | CORNELL027630 |
| CORNELL024188 | CORNELL015394 | CORNELL015908 |
| CORNELL024189 | CORNELL011432 | CORNELL015909 |

3

Exhibit 1

| | | |
|---|---|---|
| CORNELL015432 | CORNELL007750 | CAPTR_0047907 |
| CORNELL015433 | CORNELL007758 | CORNELL003529 |
| CORNELL015434 | CAPTR_0019469 | CORNELL016898 |
| CORNELL015435 | CORNELL022009 | CORNELL022007 |
| CORNELL015436 | CORNELL022010 | CORNELL022014 |
| CORNELL015437 | CORNELL023606 | TIAA_CORNELL_00000055 |
| CORNELL021726 | CORNELL024853 | TIAA_CORNELL_00042031 |
| CORNELL027633 | CORNELL024854 | CAPTR_0034689 |
| CORNELL015475 | CORNELL024855 | TIAA_CORNELL_00022479 |
| CORNELL024227 | CORNELL024856 | CAPTR_0020302 |
| CORNELL027629 | CORNELL025220 | CORNELL023609 |
| CORNELL027631 | CORNELL025275 | CORNELL001804 |
| CORNELL027635 | TIAA_CORNELL_00003515 | TIAA_CORNELL_00025868 |
| CORNELL027628 | TIAA_CORNELL_00012719 | CORNELL022070 |
| CORNELL027632 | TIAA_CORNELL_00012722 | CORNELL025205 |
| CORNELL015455 | TIAA_CORNELL_00012726 | CORNELL025206 |
| CORNELL027658 | TIAA_CORNELL_00021841 | CORNELL019950 |
| CORNELL015460 | TIAA_CORNELL_00028878 | CAPTR_0027318 |
| CORNELL015937 | TIAA_CORNELL_00028915 | TIAA_CORNELL_00043632 |
| CORNELL015942 | CORNELL015580 | CAPTR_0034556 |
| CAPTR_0020567 | CORNELL016836 | CAPTR_0052948 |
| CAPTR_0041249 | CORNELL022008 | CAPTR_0052952 |
| CORNELL015471 | CORNELL022232 | CORNELL014362 |
| CORNELL015472 | CORNELL024545 | CORNELL014364 |
| CORNELL021736 | CORNELL015566 | TIAA_CORNELL_00022837 |
| CORNELL015476 | CORNELL015579 | TIAA_CORNELL_00029216 |
| CORNELL019412 | CAPTR_0047903 | TIAA_CORNELL_00029218 |
| CORNELL024224 | CORNELL015581 | TIAA_CORNELL_00029220 |
| CORNELL024230 | CORNELL015582 | CORNELL003576 |
| CORNELL024231 | CORNELL015583 | CORNELL007070 |
| CORNELL015482 | CORNELL015584 | CORNELL001816 |
| CORNELL015486 | CORNELL022077 | CORNELL019568 |
| CORNELL015487 | CORNELL022078 | CAPTR_0018846 |
| CORNELL015489 | CORNELL015163 | CORNELL003581 |
| CORNELL015490 | CORNELL015164 | CORNELL022076 |
| CORNELL015491 | CORNELL015165 | CORNELL016834 |
| TIAA_CORNELL_00033129 | CORNELL021927 | CORNELL016837 |
| CAPTR_0016832 | CORNELL022011 | CAPTR_0020513 |
| TIAA_CORNELL_00025568 | CORNELL022503 | CAPTR_0047911 |
| TIAA_CORNELL_00020571 | CORNELL022015 | CORNELL004323 |
| CAPTR_0033178 | TIAA_CORNELL_00025596 | CORNELL014825 |
| CORNELL021910 | CORNELL022006 | CORNELL019443 |
| CORNELL025735 | CORNELL022013 | CORNELL019444 |

Exhibit 1

| | | |
|---|---|---|
| TIAA_CORNELL_00026009 | CORNELL011481 | CORNELL022819 |
| CAPTR_0020262 | CORNELL012409 | CORNELL024274 |
| CORNELL022755 | CORNELL020061 | CORNELL014776 |
| CORNELL024392 | CORNELL020064 | CAPTR_0052728 |
| TIAA_CORNELL_00025623 | CORNELL011493 | CORNELL001206 |
| CORNELL001937 | CORNELL012410 | CAPTR_0004432 |
| CAPTR_0052936 | CORNELL020066 | CAPTR_0004434 |
| CAPTR_0052941 | CORNELL020841 | CAPTR_0052792 |
| CORNELL003614 | CORNELL020226 | CAPTR_0052812 |
| CORNELL011643 | TIAA_CORNELL_00026023 | CAPTR_0005101 |
| CORNELL001940 | CORNELL022228 | CAPTR_0005113 |
| CAPTR_0020321 | CORNELL024263 | CAPTR_0005114 |
| CORNELL011454 | CORNELL016959 | CAPTR_0005118 |
| CORNELL013432 | CAPTR_0047924 | CAPTR_0005125 |
| CORNELL013433 | CORNELL011453 | CAPTR_0005138 |
| CORNELL013435 | CORNELL016983 | CAPTR_0005143 |
| CORNELL013439 | CORNELL022229 | CAPTR_0005149 |
| CORNELL013440 | CORNELL013763 | CAPTR_0005155 |
| CORNELL013441 | CORNELL004474 | CAPTR_0005370 |
| CORNELL022241 | CORNELL008149 | CAPTR_0005411 |
| CORNELL022248 | CORNELL008157 | CAPTR_0005418 |
| CORNELL022249 | CAPTR_0018845 | CAPTR_0005426 |
| CORNELL001203 | CAPTR_0036079 | CAPTR_0005434 |
| CORNELL003642 | CAPTR_0039749 | CAPTR_0005533 |
| CORNELL019956 | CORNELL013491 | CAPTR_0005540 |
| CORNELL020053 | CORNELL022918 | CAPTR_0052969 |
| CORNELL020054 | CORNELL024868 | CAPTR_0052989 |
| CORNELL020194 | CORNELL024869 | CAPTR_0052996 |
| CORNELL020557 | CORNELL025888 | CAPTR_0005828 |
| CORNELL020560 | CORNELL025890 | CAPTR_0005829 |
| CORNELL020577 | CORNELL025921 | CAPTR_0005830 |
| CORNELL027033 | CORNELL025922 | CAPTR_0005831 |
| CORNELL013443 | CORNELL025944 | CAPTR_0053084 |
| CORNELL001329 | CORNELL025976 | CAPTR_0053087 |
| CORNELL011452 | TIAA_CORNELL_00004344 | CORNELL022253 |
| CORNELL011455 | TIAA_CORNELL_00013504 | CAPTR_0053423 |
| CORNELL011456 | TIAA_CORNELL_00013505 | CORNELL001341 |
| CORNELL011463 | TIAA_CORNELL_00013509 | CORNELL001944 |
| CORNELL011464 | TIAA_CORNELL_00022369 | CORNELL011365 |
| CORNELL019957 | TIAA_CORNELL_00043983 | CORNELL011366 |
| CORNELL019959 | CORNELL014641 | CORNELL019449 |
| CORNELL019960 | CAPTR_0014774 | CAPTR_0053726 |
| CORNELL011472 | CAPTR_0015016 | CORNELL013902 |

Exhibit 1

| | | |
|---|---|---|
| CORNELL013903 | CORNELL014672 | CORNELL014314 |
| CORNELL019987 | CORNELL014673 | TIAA_CORNELL_00023414 |
| CORNELL022834 | CORNELL014674 | TIAA_CORNELL_00043994 |
| CORNELL022835 | CORNELL014675 | CORNELL020115 |
| CORNELL0244405 | CORNELL012536 | CORNELL024454 |
| CORNELL014789 | CORNELL014918 | CAPTR_0053381 |
| CORNELL014790 | CORNELL015161 | CORNELL014847 |
| CORNELL015136 | CORNELL020124 | CORNELL014848 |
| CORNELL022836 | CORNELL014797 | CORNELL014850 |
| CORNELL028991 | CORNELL014798 | CORNELL014851 |
| CORNELL014295 | CORNELL022255 | CORNELL014867 |
| CORNELL022837 | CAPTR_0052929 | CORNELL014868 |
| CORNELL014793 | TIAA_CORNELL_00026051 | CORNELL014870 |
| CORNELL028894 | CORNELL015140 | CORNELL014871 |
| CORNELL004521 | CORNELL022916 | CAPTR_0053362 |
| CORNELL021558 | CORNELL022917 | CAPTR_0053397 |
| CAPTR_0014706 | CORNELL011574 | CORNELL013473 |
| CORNELL012432 | CORNELL022922 | CORNELL014834 |
| CORNELL022839 | CORNELL022923 | CORNELL014835 |
| CORNELL024373 | CORNELL014808 | CORNELL014838 |
| CAPTR_0014849 | CORNELL014815 | CORNELL014839 |
| CAPTR_0014851 | CORNELL024443 | CORNELL014840 |
| CORNELL024374 | CORNELL014820 | CORNELL014841 |
| TIAA_CORNELL_00022580 | CORNELL014821 | CORNELL014842 |
| CORNELL022842 | CORNELL024441 | CORNELL014843 |
| CORNELL022843 | CORNELL024442 | CORNELL014844 |
| CORNELL022844 | CORNELL024444 | CORNELL014845 |
| CORNELL022841 | CORNELL024445 | CORNELL014846 |
| CORNELL004551 | TIAA_CORNELL_00023153 | CORNELL014858 |
| CAPTR_0052617 | CORNELL011367 | CORNELL014859 |
| CAPTR_0052619 | CORNELL024447 | CORNELL014860 |
| CAPTR_0052725 | CORNELL024448 | CORNELL014861 |
| CORNELL024285 | CORNELL014824 | CORNELL014862 |
| TIAA_CORNELL_00026037 | CORNELL014826 | CORNELL014863 |
| CAPTR_0003661 | CAPTR_0050462 | CORNELL014864 |
| CAPTR_0003664 | CAPTR_0050482 | CORNELL014865 |
| CAPTR_0003675 | CAPTR_0053364 | CORNELL014866 |
| CAPTR_0003677 | CORNELL014831 | CORNELL014875 |
| CORNELL024286 | CORNELL014855 | CAPTR_0050444 |
| TIAA_CORNELL_00025652 | CORNELL020614 | CORNELL014837 |
| CAPTR_0038203 | CAPTR_0038752 | CORNELL014849 |
| CAPTR_0052980 | CAPTR_0038756 | CORNELL014852 |
| CAPTR_0052985 | CORNELL013252 | CORNELL014853 |

6

Exhibit 1

| | | |
|---|---|---|
| CORNELL014854 | CORNELL008345 | CORNELL020241 |
| CORNELL014857 | CORNELL008358 | CORNELL020589 |
| CORNELL014869 | CORNELL019920 | CAPTR_0010936 |
| CORNELL014872 | CORNELL012507 | CAPTR_0010937 |
| CORNELL014873 | CORNELL015158 | CAPTR_0010938 |
| CORNELL014874 | CORNELL016137 | CAPTR_0010940 |
| CORNELL016126 | CORNELL002980 | CAPTR_0010947 |
| CORNELL022257 | CORNELL002983 | CAPTR_0010948 |
| CORNELL004741 | CORNELL007081 | CORNELL004828 |
| CORNELL014836 | CORNELL007084 | CORNELL007095 |
| CORNELL014856 | CORNELL007087 | CORNELL007096 |
| CAPTR_0053520 | CORNELL020350 | CORNELL011743 |
| CAPTR_0049754 | CORNELL020635 | CAPTR_0050442 |
| CORNELL019890 | CORNELL020657 | CAPTR_0050479 |
| CORNELL019891 | CORNELL020745 | CORNELL015160 |
| CORNELL020121 | CAPTR_0010728 | CORNELL020125 |
| CAPTR_0047921 | CAPTR_0050139 | CORNELL019997 |
| CORNELL016370 | CORNELL011737 | CAPTR_0011688 |
| CORNELL016371 | CORNELL020402 | CORNELL012510 |
| CORNELL020122 | CORNELL020808 | CAPTR_0050761 |
| CORNELL015162 | CAPTR_0050141 | CORNELL014687 |
| CORNELL016136 | CAPTR_0050144 | CORNELL014688 |
| CAPTR_0049995 | CAPTR_0050168 | CORNELL014689 |
| CORNELL020178 | CORNELL015159 | CORNELL014690 |
| TIAA_CORNELL_00026065 | CORNELL015166 | CAPTR_0011960 |
| CAPTR_0009964 | CAPTR_0010764 | CAPTR_0019325 |
| CAPTR_0009966 | CAPTR_0010856 | CORNELL011581 |
| CAPTR_0050081 | CAPTR_0010857 | CORNELL014900 |
| CAPTR_0010005 | CAPTR_0010858 | CORNELL016403 |
| CAPTR_0010007 | CAPTR_0010863 | CAPTR_0011958 |
| CAPTR_0010009 | CAPTR_0010865 | CORNELL001220 |
| CORNELL014683 | CAPTR_0010866 | CORNELL011580 |
| CORNELL014684 | CAPTR_0050344 | CORNELL011746 |
| CORNELL014685 | CORNELL002669 | CORNELL011747 |
| CORNELL020631 | CORNELL003090 | CORNELL011748 |
| CORNELL001216 | CORNELL004825 | CORNELL012513 |
| CORNELL015157 | CORNELL004826 | CORNELL014899 |
| CORNELL019940 | CORNELL014894 | CORNELL016402 |
| CORNELL019941 | CORNELL014895 | CORNELL020002 |
| CORNELL020155 | CORNELL019995 | CORNELL020171 |
| CORNELL020175 | CORNELL019996 | CORNELL020218 |
| CORNELL020666 | CORNELL020106 | CORNELL020250 |
| CORNELL007079 | CORNELL020152 | CORNELL020584 |

Exhibit 1

| | | |
|---|---|---|
| CORNELL020597 | CORNELL020594 | CORNELL0000237 |
| CAPTR_0011963 | CAPTR_0050990 | CORNELL0000267 |
| CAPTR_0012115 | CAPTR_0051123 | CORNELL014582 |
| CAPTR_0012123 | CORNELL012554 | CORNELL014954 |
| CAPTR_0050762 | CORNELL012532 | CORNELL026093 |
| CORNELL001991 | CAPTR_0019280 | CORNELL026175 |
| CORNELL011654 | CAPTR_0047918 | CORNELL026198 |
| CORNELL012514 | CORNELL012533 | TIAA_CORNELL_00005255 |
| CORNELL012515 | CORNELL012534 | TIAA_CORNELL_00014390 |
| CORNELL013249 | CORNELL014944 | TIAA_CORNELL_00014396 |
| CORNELL013250 | CAPTR_0051629 | TIAA_CORNELL_00014423 |
| CORNELL013251 | TIAA_CORNELL_00025677 | TIAA_CORNELL_00022947 |
| CORNELL014901 | CORNELL022261 | TIAA_CORNELL_00043998 |
| CORNELL014903 | CORNELL022263 | CORNELL023026 |
| CORNELL016404 | CAPTR_0013081 | CORNELL023068 |
| CORNELL016406 | CAPTR_0013171 | CORNELL027401 |
| CORNELL020126 | CAPTR_0013199 | CORNELL027402 |
| CORNELL020156 | CAPTR_0013612 | TIAA_CORNELL_00030031 |
| CAPTR_0012141 | CAPTR_0051798 | TIAA_CORNELL_00026840 |
| CAPTR_0012144 | TIAA_CORNELL_00023057 | TIAA_CORNELL_00030035 |
| CAPTR_0012147 | CORNELL013778 | TIAA_CORNELL_00030038 |
| CAPTR_0012170 | CORNELL020006 | TIAA_CORNELL_00030048 |
| CORNELL001739 | CORNELL020007 | TIAA_CORNELL_00030051 |
| CORNELL001995 | CORNELL016437 | TIAA_CORNELL_00030055 |
| CORNELL002927 | CORNELL016438 | TIAA_CORNELL_00042370 |
| CORNELL011582 | TIAA_CORNELL_00026079 | TIAA_CORNELL_00042374 |
| CORNELL011749 | CAPTR_0051956 | CAPTR_0037317 |
| CORNELL011752 | CORNELL012547 | CAPTR_0037320 |
| CORNELL011761 | CORNELL014935 | CAPTR_0037325 |
| CORNELL012525 | CORNELL020009 | CAPTR_0052518 |
| CORNELL014904 | CORNELL020013 | CORNELL012332 |
| CORNELL014905 | CORNELL020271 | CORNELL012550 |
| CORNELL014906 | CORNELL014946 | CORNELL013490 |
| CORNELL014907 | CORNELL014947 | TIAA_CORNELL_00026093 |
| CORNELL015167 | CAPTR_0052057 | CORNELL014950 |
| CORNELL015168 | CAPTR_0052060 | CAPTR_0014661 |
| CORNELL016146 | CAPTR_0052069 | CAPTR_0014663 |
| CORNELL016407 | CORNELL014936 | CAPTR_0014665 |
| CORNELL016408 | CORNELL014941 | CAPTR_0033163 |
| CORNELL020003 | CAPTR_0047915 | CAPTR_0033175 |
| CORNELL020094 | CORNELL014943 | CAPTR_0004284 |
| CORNELL020191 | CORNELL014945 | CORNELL002154 |
| CORNELL020229 | CAPTR_0021863 | CORNELL013494 |

8

Exhibit 1

| | | |
|---|---|---|
| CORNELL014951 | CORNELL014980 | CAPTR_0002155 |
| CORNELL014953 | CAPTR_0015102 | CAPTR_0002157 |
| CORNELL016512 | CORNELL014982 | CAPTR_0002219 |
| CAPTR_0015113 | CORNELL016547 | CAPTR_0002376 |
| CORNELL_023268 | CAPTR_0033782 | CAPTR_0031752 |
| CAPTR_0014686 | CAPTR_0037591 | CAPTR_0031810 |
| CAPTR_0014689 | CORNELL014639 | CORNELL011587 |
| CORNELL014959 | TIAA_CORNELL_00023954 | CORNELL012630 |
| CORNELL016516 | TIAA_CORNELL_00044003 | CORNELL013266 |
| CAPTR_0014692 | CAPTR_0031286 | CORNELL013272 |
| CAPTR_0014694 | CAPTR_0031289 | CORNELL013530 |
| CORNELL012567 | CAPTR_0031318 | CORNELL013531 |
| CORNELL016518 | CORNELL023232 | CORNELL013532 |
| CORNELL016519 | CORNELL023233 | CORNELL013533 |
| CORNELL023057 | TIAA_CORNELL_00027437 | CORNELL013542 |
| CORNELL024592 | TIAA_CORNELL_00027441 | CORNELL013545 |
| CAPTR_0033200 | CORNELL022282 | CORNELL013554 |
| CAPTR_0033203 | TIAA_CORNELL_00026121 | CORNELL014036 |
| CORNELL022278 | CORNELL014039 | CORNELL014040 |
| CAPTR_0014785 | CORNELL013544 | CORNELL014046 |
| CAPTR_0014787 | CORNELL016574 | CORNELL014337 |
| CAPTR_0014788 | CORNELL016589 | CORNELL014340 |
| CORNELL015187 | CORNELL011778 | CORNELL014984 |
| CAPTR_0014789 | CAPTR_0002259 | CORNELL016559 |
| CAPTR_0014791 | CAPTR_0002310 | CORNELL016560 |
| CAPTR_0014792 | CAPTR_0002318 | CORNELL016561 |
| CAPTR_0014805 | CAPTR_0031802 | CORNELL016562 |
| CAPTR_0014688 | CORNELL013541 | CORNELL016573 |
| CAPTR_0014691 | CORNELL013543 | CORNELL016576 |
| CAPTR_0020647 | CORNELL013556 | CORNELL016579 |
| CORNELL014960 | CORNELL016575 | CORNELL016586 |
| CORNELL016517 | CORNELL016577 | CORNELL016587 |
| TIAA_CORNELL_00000004 | CORNELL016588 | CORNELL016590 |
| TIAA_CORNELL_00026107 | CAPTR_0002216 | CAPTR_0002210 |
| CAPTR_0031320 | CAPTR_0002304 | CAPTR_0002267 |
| CAPTR_0034032 | CAPTR_0002362 | CAPTR_0002271 |
| CORNELL014981 | CAPTR_0031794 | CAPTR_0002280 |
| CAPTR_0015075 | CORNELL013265 | CAPTR_0002289 |
| CORNELL007372 | CORNELL013538 | CAPTR_0002295 |
| CORNELL014979 | CORNELL013550 | CAPTR_0031782 |
| CAPTR_0034028 | CORNELL014333 | CAPTR_0031785 |
| CAPTR_0034030 | CORNELL016580 | CAPTR_0031792 |
| CAPTR_0034037 | CORNELL016594 | CAPTR_0031800 |

9

Exhibit 1

| | | |
|---|---|---|
| CAPTR_0031850 | CORNELL024730 | TIAA_CORNELL_00044009 |
| CORNELL011660 | TIAA_CORNELL_00000045 | TIAA_CORNELL_00042694 |
| CORNELL011661 | TIAA_CORNELL_00000051 | CAPTR_0003647 |
| CORNELL012335 | TIAA_CORNELL_00036008 | CORNELL022293 |
| CORNELL012631 | TIAA_CORNELL_00036014 | CAPTR_0029460 |
| CORNELL013536 | CAPTR_0002213 | CORNELL015007 |
| CORNELL013546 | CAPTR_0002307 | CAPTR_0036915 |
| CORNELL013547 | CAPTR_0002365 | CORNELL015018 |
| CORNELL013548 | CAPTR_0031797 | CORNELL015019 |
| CORNELL013549 | CORNELL013551 | TIAA_CORNELL_00026150 |
| CORNELL016174 | CORNELL013552 | CAPTR_0029756 |
| CORNELL016572 | CORNELL013553 | CORNELL011387 |
| CORNELL016582 | CORNELL016578 | CAPTR_0029771 |
| CORNELL016583 | CORNELL016581 | CAPTR_0029773 |
| CORNELL016585 | CORNELL016591 | CAPTR_0030629 |
| CORNELL016592 | CORNELL016593 | CAPTR_0030780 |
| CORNELL020298 | CORNELL024546 | CORNELL013288 |
| CORNELL028905 | TIAA_CORNELL_00025702 | CORNELL014743 |
| CAPTR_0002302 | CAPTR_0002368 | CORNELL014744 |
| CAPTR_0002358 | TIAA_CORNELL_00025729 | CAPTR_0029970 |
| CAPTR_0002360 | CORNELL011091 | CORNELL024736 |
| CAPTR_0002416 | TIAA_CORNELL_00026136 | CORNELL024737 |
| CORNELL011588 | TIAA_CORNELL_00023632 | CORNELL014745 |
| CORNELL014332 | CAPTR_0013586 | CORNELL014746 |
| CORNELL014435 | CAPTR_0029398 | TIAA_CORNELL_00025741 |
| CORNELL019844 | CORNELL015004 | CAPTR_0004212 |
| CORNELL013263 | CORNELL015006 | CORNELL019975 |
| CORNELL014037 | CORNELL026221 | TIAA_CORNELL_00026164 |
| CORNELL019928 | CORNELL026222 | CAPTR_0030234 |
| CORNELL013566 | CAPTR_0003959 | CORNELL013285 |
| CAPTR_0004286 | CAPTR_0004048 | CAPTR_0013598 |
| CORNELL013567 | CAPTR_0004213 | CORNELL013286 |
| CORNELL013568 | CAPTR_0018481 | CORNELL013289 |
| TIAA_CORNELL_00030507 | CAPTR_0037857 | CAPTR_0004600 |
| CORNELL019965 | CORNELL0000297 | CORNELL_019324 |
| CORNELL020224 | CORNELL0000355 | CORNELL019590 |
| CAPTR_0032933 | CORNELL023310 | TIAA_CORNELL_00024570 |
| CAPTR_0032934 | CORNELL023311 | TIAA_CORNELL_00044015 |
| CAPTR_0037833 | TIAA_CORNELL_00006246 | CAPTR_0025605 |
| CORNELL013573 | TIAA_CORNELL_00015318 | CORNELL015044 |
| CORNELL013574 | TIAA_CORNELL_00015336 | CORNELL015045 |
| CORNELL015005 | TIAA_CORNELL_00015371 | CORNELL009248 |
| CORNELL024729 | TIAA_CORNELL_00023524 | CORNELL009263 |

10

Exhibit 1

| | | |
|---|---|---|
| CORNELL021566 | TIAA_CORNELL_00043964 | CAPTR_0013580 |
| CORNELL021567 | TIAA_CORNELL_00043967 | |
| CAPTR_0004524 | TIAA_CORNELL_00044016 | CAPTR_0008512 |
| CORNELL013300 | CAPTR_0027310 | CAPTR_0041127 |
| CORNELL013301 | TIAA_CORNELL_00024279 | CAPTR_0043477 |
| CORNELL015071 | CORNELL014459 | TIAA_CORNELL_00002064 |
| CAPTR_0025528 | TIAA_CORNELL_00026207 | TIAA_CORNELL_00025795 |
| CAPTR_0025574 | TIAA_CORNELL_00041742 | TIAA_CORNELL_00035914 |
| CORNELL011398 | TIAA_CORNELL_00041743 | TIAA_CORNELL_00035942 |
| TIAA_CORNELL_00026179 | TIAA_CORNELL_00041750 | TIAA_CORNELL_00035943 |
| CORNELL013304 | CORNELL019832 | TIAA_CORNELL_00035975 |
| CORNELL013305 | CORNELL011359 | TIAA_CORNELL_00026249 |
| CORNELL015077 | CORNELL011362 | CAPTR_0007462 |
| CORNELL010981 | CAPTR_0013568 | CAPTR_0007468 |
| CORNELL011394 | CORNELL011360 | CAPTR_0007469 |
| CAPTR_0013573 | CORNELL013413 | CAPTR_0007500 |
| CORNELL011395 | CAPTR_0028183 | CAPTR_0007501 |
| CORNELL011397 | CORNELL024756 | CAPTR_0007555 |
| CAPTR_0027417 | CORNELL024750 | CAPTR_0043375 |
| CORNELL011357 | CORNELL024751 | CAPTR_0007924 |
| CORNELL003409 | TIAA_CORNELL_00024176 | CAPTR_0007926 |
| CAPTR_0026280 | TIAA_CORNELL_00024810 | CAPTR_0043473 |
| TIAA_CORNELL_00026193 | TIAA_CORNELL_00025769 | CAPTR_0043565 |
| CORNELL011712 | TIAA_CORNELL_00026221 | |
| CAPTR_0005206 | CORNELL023441 | CAPTR_0008485 |
| CORNELL011718 | CORNELL023442 | CAPTR_0013590 |
| CORNELL011719 | CORNELL024769 | CAPTR_0044456 |
| CORNELL011354 | CORNELL024770 | CAPTR_0010696 |
| CORNELL011358 | CORNELL024772 | CAPTR_0010618 |
| CAPTR_0013594 | TIAA_CORNELL_00038768 | CAPTR_0012792 |
| CAPTR_0027364 | CORNELL013412 | CAPTR_0012830 |
| CORNELL011355 | CAPTR_0013565 | CAPTR_0042229 |
| CAPTR_0038206 | CORNELL013414 | CORNELL021042 |
| CORNELL0000419 | CAPTR_0006755 | CORNELL021078 |
| CORNELL0000481 | CORNELL_024965 | TIAA_CORNELL_00008549 |
| CORNELL011361 | CORNELL024966 | TIAA_CORNELL_00017487 |
| TIAA_CORNELL_00007323 | TIAA_CORNELL_00025224 | TIAA_CORNELL_00017505 |
| TIAA_CORNELL_00016350 | TIAA_CORNELL_00036239 | TIAA_CORNELL_00017535 |
| TIAA_CORNELL_00016368 | CORNELL013800 | TIAA_CORNELL_00024684 |
| TIAA_CORNELL_00016400 | CORNELL013801 | TIAA_CORNELL_00038669 |
| TIAA_CORNELL_00024062 | TIAA_CORNELL_00026235 | TIAA_CORNELL_00038707 |
| TIAA_CORNELL_00038349 | CAPTR_0006750 | TIAA_CORNELL_00043965 |
| TIAA_CORNELL_00038387 | CAPTR_0006751 | TIAA_CORNELL_00043968 |

11

Exhibit 1

| | | |
|---|---|---|
| CAPTR_0044513 | CAPTR_0013561 | TIAA_CORNELL_00040083 |
| CAPTR_0044939 | CAPTR_0012262 | TIAA_CORNELL_00043966 |
| CAPTR_0009601 | CAPTR_0013296 | TIAA_CORNELL_00043969 |
| CAPTR_0009605 | CAPTR_0013385 | CAPTR_0015229 |
| CAPTR_0009705 | CAPTR_0035943 | CORNELL028139 |
| CAPTR_0009639 | CAPTR_0045862 | CORNELL029129 |
| CAPTR_0009630 | CAPTR_0046666 | CORNELL028138 |
| CORNELL027850 | TIAA_CORNELL_00025338 | CORNELL029128 |
| CORNELL027851 | TIAA_CORNELL_00039435 | CAPTR_0005122 |
| CORNELL027852 | TIAA_CORNELL_00039448 | CAPTR_0005142 |
| CAPTR_0009703 | CAPTR_0012816 | CAPTR_0005154 |
| CAPTR_0009759 | CAPTR_0012855 | CAPTR_0005161 |
| CAPTR_0009760 | CAPTR_0012723 | CAPTR_0005417 |
| CAPTR_0009842 | CAPTR_0012728 | CORNELL029125 |
| CAPTR_0009854 | CAPTR_0012731 | TIAA_CORNELL_00041591 |
| CAPTR_0009880 | CAPTR_0012772 | CORNELL029126 |
| CAPTR_0045002 | TIAA_CORNELL_00026288 | CORNELL028143 |
| CAPTR_0009945 | TIAA_CORNELL_00043802 | CAPTR_0016245 |
| CAPTR_0009946 | TIAA_CORNELL_00025844 | CORNELL029039 |
| TIAA_CORNELL_00024926 | CAPTR_0013290 | CORNELL029040 |
| CAPTR_0010165 | CAPTR_0013291 | CORNELL028135 |
| CAPTR_0010701 | CAPTR_0013939 | CORNELL028136 |
| CAPTR_0010703 | CAPTR_0013943 | CORNELL028144 |
| CAPTR_0010613 | CAPTR_0014034 | CORNELL029038 |
| TIAA_CORNELL_00026262 | CAPTR_0046693 | CORNELL029036 |
| TIAA_CORNELL_00038762 | CORNELL027998 | CORNELL029037 |
| TIAA_CORNELL_00038765 | CAPTR_0012873 | CAPTR_0019249 |
| CAPTR_0011460 | CAPTR_0047975 | CAPTR_0035131 |
| CAPTR_0011552 | CAPTR_0013937 | CORNELL028595 |
| CAPTR_0039673 | CAPTR_0013938 | TIAA_CORNELL_00038606 |
| TIAA_CORNELL_00039340 | CAPTR_0014065 | CAPTR_0020687 |
| TIAA_CORNELL_00039384 | CAPTR_0015281 | CORNELL006365 |
| CAPTR_0010611 | TIAA_CORNELL_00043690 | CORNELL021848 |
| CAPTR_0013583 | CORNELL028141 | CORNELL023396 |
| TIAA_CORNELL_00025821 | CORNELL028142 | CORNELL023615 |
| CAPTR_0048046 | CORNELL029131 | CORNELL028144 |
| TIAA_CORNELL_00026275 | CORNELL029132 | TIAA_CORNELL_00039690 |
| CAPTR_0010886 | TIAA_CORNELL_00009829 | TIAA_CORNELL_00040102 |
| CAPTR_0045959 | TIAA_CORNELL_00018652 | TIAA_CORNELL_00041843 |
| CAPTR_0011455 | TIAA_CORNELL_00018669 | TIAA_CORNELL_00044742 |
| CAPTR_0011456 | TIAA_CORNELL_00018700 | |

Exhibit 1

TY MINNICH
4 Orchid Lane, Brick, New Jersey
(732) 740-2209 | tmin5491@gmail.com

RETIREMENT PLAN EXECUTIVE

Highly accomplished retirement services professional with extensive experience delivering market expansion and revenue maximization solutions in the not-for-profit 403(b) retirement markets. Proven ability to motivate and mentor high-performance teams, gain trusted advisor status with clients and intermediaries, and implement strategies to increase sales, profitability, and market share.

New business development | Revenue generation | Pipeline rainmaking
Strategic planning | Project management | Leadership & team building
Fiduciary guidance | Executive presentation | Advisor/Consultant network

PROFESSIONAL EXPERIENCE

**Consultant - DC Institutional Markets**
**Prudential Retirement**
2013 – 2017 |

- Provided consulting on business acquisition in defined contribution 403(b) markets

**Vice President - Not-For–Profit Institutional DC Markets**
**Transamerica Retirement Solutions**
2013 – 2017 | Harrison, NY

- As co-practice leader, responsible for growth of all NFP markets
- Prospecting/rainmaking focus through strategic relationships developed with advisors, consultants, DCIO partners, associations and plan sponsors
- Fostered unparalleled growth of $15B in new sales moving Transamerica from #5 to #3 in total NFP AUM
- Close ratio in excess of 60%, doubling prior close rates

Exhibit 2

**National Executive Director – Case Acquisition & Development**
**Metropolitan Life Insurance Company**
2005 – 2012 | NY, NY

- DC practice leader with team of 30 responsible for increasing AUM to $35+B while driving new growth in the DC/DB markets
- Served as executive contact for company's top 50 clients
- Directed the RFP process and finals strategy, increasing opportunities closing ratio by 25%
- Exceeded all sales goals as one of MetLife's most profitable sales divisions
- Designed, priced and led sales in presenting new retirement solutions to new and existing clients
- As industry expert and thought leader, participated as speaker and panelist at industry events

**Senior Vice President, Northeast Sales Region**
**CitiStreet Associates**
2002 – 2005 | Somerset, NJ

- Responsible for all aspects of new DC business development, leading the company in YOY asset growth, profitability and client retention during tenure
- Developed and implemented team marketing strategies, directing pipeline efforts to expand customer base throughout six states
- Acted as executive contact to maintain and enhance client Managed client relationships
- Maintained personal production responsibilities
- Supervised 300 financial service representatives
- Early career role as Director of Healthcare & Government Markets

### EDUCATION & PROFESSIONAL DEVELOPMENT

University of Miami, Miami, FL – B.S. in Mathematics

Wharton School, International Foundation of Employee Benefits – RPA and CEBS designations

Harvard Learning – Cornerstones of Management

Currently hold series 6, 26,& 63 registrations and NJ/NY Life, A&H licenses

### PRESENT & PAST PROFESSIONAL MEMBERSHIPS

- American Society for Healthcare Human Resources Administration (ASHHRA)
- National Association of Defined Contribution Administration (NAGDCA)
- American Society of Pension Professionals & Actuaries (ASPPA)
- Healthcare Financial Management Association (HFMA)
- DC Plan Sponsors    ▪    403(b) Advisors
- Speaker/panelist at Pension and Investment and other industry conferences

Exhibit 2