# Exhibit 126

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| CASEY CUNNINGHAM, et al., | No. 1:16-CV-06525-PKC |
| *Plaintiffs*, | |
| v. | **MEMORANDUM IN OPPOSITION TO** |
| CORNELL UNIVERSITY, et al. | **CORNELL DEFENDANTS' MOTION** |
| | **TO EXCLUDE PLAINTIFFS' EXPERTS** |
| *Defendants* | **AL OTTO AND TY MINNICH [DOC.** |
| | **228]** |

# TABLE OF CONTENTS

Table of Authorities ..................................................................................................... ii

Preliminary Statement ................................................................................................. 1

Background ................................................................................................................. 1

I.    Minnich's and Otto's Experience ........................................................................ 1

    A.    Minnich Has Decades of Experience Pricing Recordkeeping Fees ..................... 1

    B.    Otto Has Years of Experience Advising Defined Contribution Plan Sponsors on Recordkeeping Fiduciary Best Practices and Pricing ..................... 4

II.    Cornell's Misleading and Improper Attacks on Otto's and Minnich's Credibility ........... 6

    A.    Minnich and Otto Rely Upon Their Experience ................................................. 6

    B.    Minnich's Comparable Clients at Transamerica Were Not Paying Higher Rates than the Plans ....................................................................................... 8

    C.    Minnich Had More Than Three Clients Over 5,000 Participants ......................... 10

    D.    Active Participants Were Used Because of Poor Data Provided By TIAA .......... 10

    E.    Other Vendors Have the Experience and the Capability to Recordkeep TIAA Annuities ........................................................................................... 11

    F.    Minnich and Otto Did Not Copy Each Other's Reports ..................................... 11

    G.    Minnich's and Otto's Data Points Support Their Opinions ................................. 12

Argument ................................................................................................................... 16

I.    Cornell's Credibility Attacks are Improper and Irrelevant to a *Daubert* Analysis ........... 16

II.    Minnich and Otto have Unparalleled Expertise in Recordkeeping Fees ..................... 17

    A.    Minnich and Otto Are Experts in Recordkeeping Fees, RFPs for Recordkeeping Fees, and the Prudent Practices Related Thereto ....................... 17

    B.    Specific Experience with TIAA Annuities is Not a Prerequisite to Admission ............................................................................................... 19

III.    Otto and Minnich's Methodologies are Sound .................................................... 21

IV.    Minnich's and Otto's Testimony Is Not Cumulative ........................................... 23

Conclusion ................................................................................................................. 24

Case 1:16-cv-06525-PKC-JLC Document 342-8 Filed 08/04/21 Page 4 of 30

# TABLE OF AUTHORITIES

## Cases

*Abbott v. Lockheed Martin Corp.*,
No. 06-0701-MJR, Doc. 225 (S.D. Ill. Mar. 31, 2009) ............................................................ 6

*Bah v. City of N.Y.*,
No. 13-6690, 2017 WL 435823 (S.D.N.Y. Jan. 31, 2017) ...................................................... 21

*Campbell v. Metro. Prop. & Cas. Ins. Co.*,
239 F.3d 179 (2d Cir. 2001) ................................................................................................... 16

*Colon ex rel. Molina v. BIC USA, Inc.*,
199 F. Supp. 2d 53 (S.D.N.Y. 2016) ................................................................................. 19, 23

*Corneli v. Adventure Racing Co., LLC*,
No. 12-1303, 2015 WL 4716285 (N.D.N.Y. Aug. 7, 2015) ................................................... 22

*Crockford v. Spencer*,
No. 10-813, 2012 WL 370187 (D. Conn. Feb. 3, 2012) ....................................................... 22

*In re M/V MSC FLAMINIA*,
No. 12-8892, 2017 WL 3208598 (S.D.N.Y. July 28, 2017) ................................................... 23

*In re Meridian Funds Grp. Sec. & ERISA Litig.*,
917 F.Supp.2d 231 (S.D.N.Y. 2013) ..................................................................................... 18

*In re Rezulin Prods. Liab. Litig.*,
309 F.Supp.2d 531 (S.D.N.Y. 2004) ................................................................................. 17, 18

*Mahoney v. JJ Weiser & Co.*,
No. 04-2592, 2007 WL 3143710 (S.D.N.Y Oct. 25, 2007) ............................................. 21, 22

*McCullock v. H.B. Fuller Co.*,
61 F.3d 1038 (2d Cir. 1995) ................................................................................................... 19

*MF Global Holdings, Ltd, v. PricewaterhouseCoopers LLP*,
232 F.Supp.3d 558 (S.D.N.Y. 2017) ..................................................................................... 17

*Pension Comm. of Univ. of Montreal Pension Plan v. Banc of Am. Sec., LLC*,
691 F.Supp.2d 448 (S.D.N.Y. 2010) ..................................................................................... 22

*R.F.M.A.S., Inc. v. So*,
748 F.Supp.2d 244 (S.D.N.Y. 2010) ..................................................................................... 17

*Rule v. Brine, Inc.*,
85 F.3d 1002 (2d Cir. 1996) ................................................................................................... 16

*Sacerdote v. N.Y. Univ.*,
No. 16-6284, Doc. 270 (S.D.N.Y. Apr. 5, 2018) ................................................................... 20

*Sacerdote v. New York University*,
328 F.Supp.3d 273 (S.D.N.Y. 2018) ..................................................................................... 20

*Scentsational Techs., LLC v. Pepsi, Inc.*,
No. 13-8645, 2018 WL 910587 (S.D.N.Y. Feb. 14, 2018) .................................................... 19

*Sec. & Exch. Comm'n v. Yorkville Advisors, LLC*,
   305 F.Supp.3d 486 (S.D.N.Y. 2018)..................................................... 22

*Snyder v. Wells Fargo Bank, N.A.*,
   No. 11- 4496, 2012 WL 4876938 (S.D.N.Y. Oct. 15, 2012)....................... 22

*SR Int'l Bus. Ins. Co. v. World Trade Ctr. Props.*, LLC,
   467 F.3d 107 (2d Cir. 2006)....................................................... 1, 17, 21, 23

*Stagl v. Delta Air Lines, Inc.*,
   117 F.3d 76 (2d Cir. 1997)................................................................. 17, 19

*Tibble v. Edison Int'l*,
   843 F.3d 1187 (9th Cir. 2016)................................................................ 18

*Tussey v. ABB, Inc.*,
   746 F.3d 327 (8th Cir. 2014)................................................................... 5

*Tussey v. ABB, Inc.*,
   No. 06-04305, 2012 WL 1113291 (W.D. Mo. Mar. 31, 2012).................... 5

*U.S. Bank, Nat. Assoc. v. UBS Real Estate Sec. Inc.*,
   205 F.Supp.3d 386 (S.D.N.Y 2016)........................................................ 21

*United States v. Tin Yat Chin*,
   371 F.3d 31 (2d Cir. 2004).................................................................... 17

*Veleron v. Stanley*,
   117 F.Supp.3d 404 (S.D.N.Y. 2015)........................................................ 18

*Wilcox v. Georgetown University*,
   No. 18-00422, 2019 WL 132281 (D.D.C. 2019) .................................... 21

## Other Authorities

Bogert, Law of Trusts and Trustees § 684 (3d ed.) ...................................... 18

## PRELIMINARY STATEMENT

Defendants Cornell University's, the Retirement Plan Oversight Committee's ("RPOC") and Mary Opperman's (collectively, Cornell) motion to exclude Al Otto and Ty Minnich fails for four reasons. *First*, Cornell misrepresents Otto and Minnich's respective extensive experience in recordkeeping, and they unquestionably have expertise that will aid the jury. *Second*, Cornell ignores the standard for evaluating experience-based expert opinion, which requires an expert to show "how his or her experience . . . led to his conclusion or provided a basis for his opinion." *SR Int'l Bus. Ins. Co. v. World Trade Ctr. Props., LLC*, 467 F.3d 107, 132 (2d Cir. 2006). Minnich and Otto meet this standard, showing how their experience—pricing hundreds of recordkeeping proposals for Transamerica, MetLife and CitiStreet (Minnich), negotiating with countless plan sponsors (Minnich), advisors or recordkeepers (Otto), engaging in numerous requests for proposals ("RFPs") (both)—led to their opinions. *Third*, this practical experience, in which Minnich and Otto worked and negotiated with and for plan sponsors and investment advisors on recordkeeping RFPs and fees, makes them not only competent, but the ideal experts to opine on the fiduciary process and the recordkeeping decisions of prudent investment professionals. *Fourth*, Minnich's and Otto's opinions are not cumulative.[1]

## BACKGROUND

### I.    Minnich's and Otto's Experience

#### A.    Minnich Has Decades of Experience Pricing Recordkeeping Fees

Ty Minnich has over 30 years of experience in the defined contribution space related to the pricing and provision of recordkeeping and other services to non-profit defined contribution

---

[1] "Ex. __" refers to the Exhibits to the Declaration of Joel D. Rohlf in Support of Plaintiffs' Opposition to the Cornell Defendants' Motion to Exclude Plaintiffs' Experts Al Otto and Ty Minnich. "Doc. __" refers to the filings in this case by docket number with page references to the PDF header. The "Plans" are the Cornell University Retirement Plan for the Employees of the Endowed Colleges at Ithaca ("CURP") and the Cornell University Tax Deferred Annuity Plan ("TDA Plan"). Doc. 81 ¶¶9, 13.

plans, including numerous 403(b) plans with both fixed and variable annuities. Upon graduating

from college in 1974, Minnich joined DF Smith and Associates ("DF Smith"). Ex. 1, Tr. of Dep.

of T. Minnich ("Minnich Dep."), at 18:6-22. At DF Smith, Minnich was responsible for pricing

"fixed and variable annuity platforms" for 403(b) plans. *Id.* at 18:16–19:4. DF Smith and its

successor company, Copeland Companies, included recordkeeping as part of their services to

403(b) plans using SunGard's Omni platform. *Id.* at 19:20–20:6. Cornell attempts to

mischaracterize Minnich's testimony to suggest that Minnich was not pricing recordkeeping

services prior to 2002. Doc. 230 at 5. Rather, his testimony was that DF Smith and Copeland

used SunGard's Omni platform, which TIAA also uses, rather than their own proprietary

recordkeeping platform. [2]

After CitiStreet Associates ("CitiStreet") purchased Copeland Companies, as senior vice

president, Minnich was responsible for "all aspects of market growth in the DC markets that we

serve inclusive of health care, higher education, the governmental markets." Minnich Dep. at

21:7-10. At CitiStreet, Minnich's responsibilities included "understanding the dynamics" of the

recordkeeping market and the "pricing and product mix" offered to clients. *Id* at 21:21–22:4. His

clients continued to include 403(b) plans, including higher education plans. *Id.* at 22:16–23:2.

Metropolitan Life Insurance Company ("MetLife") purchased CitiStreet in 2005. *Id.* at 23:3-

8. As National Executive Director at MetLife, Minnich "led a team of 30 responsible for driving

new growth in the 403(b) defined contribution markets and directed the RFP process and pricing

on new and existing business." Doc. 229-6, Expert Report of Ty Minnich, ¶7. His responsibilities

---

[2] Doc. 229-1, Minnich Dep., at 19:23–20:6. Omni is a recordkeeping software platform provided by SunGard. *See* Ex. 2, Rebecca More, Do Recordkeeping Systems Matter, PlanSponsor Magazine (Aug. 8, 2015), *available at* https://www.plansponsor.com/do-recordkeeping-systems-matter; Ex. 3, US Omni, About Omni, *available at* https://www.omni403b.com/AboutUs.aspx/. Similar, to DF Smith and Copeland, TIAA does not have its own proprietary recordkeeping platform and uses Omni. *See* Ex. 4, US Omni, Preferred Provider Programs, *available at* US Omni, Preferred Provider Program, *available at* https://www.omni403b.com/p3.aspx; Ex. 5, PlanSponsor 2017 Recordkeeping Survey, TIAA, *available at* https://www.plansponsor.com/research/2017-recordkeeping-survey/4/?pid=46&pname=TIAA (listing SunGard Omni as TIAA's recordkeeping platform).

included "full responsibility for the [recordkeeping] RFP team," all pricing, and conducting finalist presentations for recordkeeping RFPs. Minnich Dep at 24:1-18. MetLife provided recordkeeping for proprietary and non-proprietary fixed annuities, variable annuities and mutual funds to 403(b) plans, including in the higher education space. *Id*. at 31:22–34:19, 36:5-9. This included recordkeeping fixed annuities with vintages or bucketed interest rates similar to the TIAA Traditional Annuity. *Id.* at 33:18–34.[3] Dating back to at least his tenure at MetLife, Minnich has regularly competed against TIAA in RFPs and requests for information ("RFIs"), including higher education plans. Minnich Dep. at 38:24–39:14. Minnich also presided over a number of transitions of large 403(b) clients from other recordkeepers during his tenure at MetLife. Doc. 229-6, Expert Report, of Ty Minnich, ¶26. In 2012, MetLife decided to close its defined contribution recordkeeping business and eliminated Minnich's role. Minnich Dep. at 41:17-24.

From 2013 until 2017, Minnich was "Vice President for the not-for-profit institutional defined contribution markets for Transamerica Retirement Solutions (Transamerica)." Doc. 229-6, Expert Report of Ty Minnich, ¶6. At Transamerica, Minnich "was responsible for overseeing all recordkeeping pricing and requests for proposals (RFPs)." *Id.* Minnich "presided over 20 to 30 such [recordkeeper consolidation] transitions involving medium or large 403(b) defined contribution plans over [his] tenure at Transamerica, including transitions involving TIAA and higher education institutions." Doc. 229-6, Expert Report of Ty Minnich, ¶26. At Transamerica, Minnich's "target markets were higher education, health care and other [501(c)(3)] not-for-profit organizations." Minnich Dep. at 42:8-21. Minnich also provided recordkeeping services for both fixed and variable annuities during his tenure at Transamerica, including proprietary annuities of

---

[3] Cornell ignores these clear statements and take out of context statements that Minnich could not remember the names of higher education plans he was involved in bidding on between seven and seventeen years ago to assert he "did not compete for business from any new university clients." Doc. 230 at 9.

multiple other providers.  *Id.* at 56:11–58:10. Although TIAA's business practice was to insist that no one else could recordkeep its products, Transamerica effectively recordkept TIAA annuity products on its platform through a data feed similar to other vendors' products. *Id.* At Transamerica, Minnich regularly competed against many providers, including TIAA, in the higher education space for large plans. Minnich Dep. at 87:5–88:7. During this process, TIAA often lowered its price to meet competitive bids and retain the business. *Id.* Minnich also has experience working on transitions with TIAA "legacy assets" which Cornell asserts were not mappable.[4] *Id.* at 103:8-13.  In Minnich's experience, over 60% of assets of active participants will move to the new platform without plan sponsor mapping if the plan sponsor conducts a proper education program. *Id.*

After Transamerica eliminated his position in a restructuring, Minnich joined Prudential as a consultant from 2017 to 2018. *Id.* at 62:10-14. In sum, Minnich spent over 30 years pricing recordkeeping services for 403(b) plans, including annuities, and unquestionably has expertise that will help the jury in deciding this case.

### B.   Otto Has Years of Experience Advising Defined Contribution Plan Sponsors on Recordkeeping Fiduciary Best Practices and Pricing

Al Otto, for more than 20 years, advised and acted as a co-fiduciary with plan sponsors on recordkeeping fees for hundreds of plans. Doc. 229-4, Expert Report of Al Otto, ¶6. During Otto's tenure at Shepard Kaplan, OneFiduciary Group and White Horse Advisors (from 2001 until 2016), he was responsible for "delivering, creating, and/or overseeing RFPs and Requests for Information (RFIs) for hundreds of retirement plans ranging in size from small plans with 100 participants to mega plans with more than 15,000 participants." *Id.* His clients included plans with well over 30,000 participants and one billion dollars in assets. *Id.*  Otto was also

---

[4] For the reasons set out in Plaintiffs' Response to the Cornell Defendants Rule 56.1 Statement, TIAA annuity contracts allow plan sponsor mapping. Doc. 289. However, that is a legal question irrelevant to the instant motion.

4

responsible for running "quarterly plan committee meetings for hundreds of plans," "was a fiduciary to all of" the plans he advised and "operated as a §3(21) investment advisor, a §3(38) investment manager, and also as part of an investment committee that was the §402(a) named investment fiduciary to defined contribution retirement plans." *Id.* At OneFiduciary Group, Otto "oversaw the creation of an in-depth RFP decision tool used to determine best-fit providers for plan sponsors" that continues to be used at Shepard Kaplan. *Id.* Otto's clients included multiple 403(b) plans. Ex. 6, Tr. of Dep. of A. Otto ("Otto Dep."), at 21:21–22:5. This included clients with TIAA annuities. *Id.*[5] In fact, Otto is the only recordkeeping expert in this matter who has accepted fiduciary status on behalf of a 403(b) plan. *Id.* at 45:18-20. Prior to advising fiduciaries on prudent practices, including conducting hundreds of recordkeeping RFPs, Otto worked at Minnesota Mutual Insurance Company and was involved in providing annuity based 401(k) plans. Otto Dep. at 71:19–72:15.

Otto has published numerous articles on fiduciary practices regarding recordkeeping and administrative fees. *See* Doc. 229-4, Expert Report of Al Otto at pp. 50-51. Otto has also given numerous industry presentations regarding recordkeeping fees. *Id.* at pp. 51-52. Numerous courts have admitted Otto as an expert and relied upon his testimony regarding recordkeeping fees. *See, e.g.*, *Tussey v. ABB, Inc.*, No. 06-04305, 2012 WL 1113291, at *13 (W.D. Mo. Mar. 31, 2012), *amended in part on other grounds*, 2012 WL 2368471 (W.D. Mo. June 21, 2012) (emphasis added), *and aff'd in part, vacated in part, rev'd in part on other grounds,* 746 F.3d 327 (8th Cir. 2014) ("Accordingly, the Court finds that *the reasonable recordkeeping fee estimates used in Otto's calculations are appropriate*."); *Tussey v. ABB, Inc.*, 746 F.3d 327, 337 (8th Cir. 2014) ("Contrary to the ABB fiduciaries' assertion that the district court failed to rule on Otto's

---

[5] Cornell focuses on the fact that Otto has never advised "university 403(b) retirement plan" with TIAA annuities. Doc. 230 at 7. However, its own expert admits that industry sector does not matter in pricing recordkeeping services. Ex. 7, Tr. of Dep. of G. Poehler ("Poehler Dep."), at 37:5-14.

reliability, the district court denied the *Daubert* challenge before trial, stating the *Daubert* issues in the case were 'matters for the court to consider in terms of weighing the evidence [in this bench trial] as opposed to finding that the evidence is so unreliable that it should not even be considered.' The district court's reliability ruling is inherent in that determination, and the district court's rejection of the ABB fiduciaries' challenge was well within its discretion."); Ex. 8, *Abbott v. Lockheed Martin Corp.*, No. 06-0701-MJR, Doc. 225 (S.D. Ill. Mar. 31, 2009) (rejecting a similar *Daubert* motion by Cornell's counsel to exclude Otto).

Cornell misleadingly suggests that Otto has not advised clients on recordkeeping fees since his time at White Horse Advisors in 2008.  Doc. 230 at 8–9. However, the testimony Cornell cites does not state that Otto did not advise any clients on recordkeeping during his tenure at Shepard Kaplan, but states that he "was not the direct consultant on that particular plan" and that his knowledge of that particular plan was as a member of the investment committee. Otto Dep. at 22:13-18. As discussed above, Otto was responsible for the RFP process for hundreds of clients during his tenure at White Horse Advisors, OneFiduciary Group and Shepard Kaplan, including clients with over 30,000 participants. Doc. 229-4, Expert Report of Al Otto, ¶6.

## II.    Cornell's Misleading and Improper Attacks on Otto's and Minnich's Credibility

Much of Cornell's argument consists of inaccurate attacks on Minnich's and Otto's credibility. While the Court should not consider Cornell's attacks on Otto's and Minnich's credibility, Plaintiffs address the most egregious inaccuracies.

### A.    Minnich and Otto Rely Upon Their Experience

Cornell repeatedly misstates that Minnich and Otto did not rely upon their 30 and 20-years of experience, respectively, in coming to their reasonable fee calculations. However, both Minnich and Otto expressly stated in their reports and their depositions that their experience with market prices was the driving factor in their opinion on the fees that participants would have paid

if Cornell had followed industry-accepted practices. Doc. 229-6, Expert Report of Ty Minnich, ¶158; Minnich Dep. at 115:6–116:4 (testifying that his reasonable fee was based upon "30 years of what I know from my experience of having gone through this process dozens, in facts, hundreds of times."); Doc. 229-4, Expert Report of Al Otto, ¶81; Otto Dep. at 83:16–84:18 (testifying he based his reasonable fee numbers on "my experience, just in the market place. . . . from the RFPs that I've done on, you know, larger plans . . . the experience of working in other, in other cases. . . Fidelity produced its pricing methodology and what it took to win a case, . . .")

Minnich and Otto did not present their data points regarding other plans as a benchmarking exercise, like Cornell's expert attempted to conduct (using mainly plans he admitted were not appropriate comparisons but used just "to show the range of fees" (Poehler Dep. at 218:5–221:15)). Rather, Minnich and Otto provide examples in the market that support their experience of market prices at the time. *See, e.g.*, Otto Dep. at 85:8-16. In fact, Minnich, Otto and Poehler all agree that benchmarking to other plans is not the appropriate method for determining the reasonableness of a large, complex plan's fees and competitive bidding was necessary. *See* Doc. 229-6, Expert Report of Ty Minnich, ¶¶68, 77–87; Doc. 229-4, Expert Report of Al Otto, ¶¶27–48; Poehler Dep. at 87:16–88:6. Because Cornell never conducted an RFP, or any type of competitive bidding, Minnich and Otto had to rely on their experience in the market place.

Cornell is also incorrect that Minnich's and Otto's reasonable fees are inaccurate because they do not include an additional fee for TIAA annuities, which it asserts Cornell could not map. First, as even Cornell's expert recognizes, whether the assets were mappable is a legal opinion that a recordkeeping expert should not opine on. Poehler Dep. at 46:10-14. Second, contrary to Cornell's assertions, neither Minnich nor Otto assume any particular recordkeeper would maintain the business, but rather opined on a market rate after a consolidated RFP. Minnich Dep.

7

at 296:13–20; Otto Dep. at 191:2-18. Moreover, Otto and Minnich both recognized that incumbent recordkeepers, including TIAA, often provide the most competitive bid. *Id.*; Minnich Dep. at 296:21–297:12.  Because of this, TIAA would likely have retained Cornell's business but at a lower price after an RFP.

**B.     Minnich's Comparable Clients at Transamerica Were Not Paying Higher Rates than the Plans**

Cornell also incorrectly suggests that Minnich's comparable clients were actually paying higher fees than the Plans. As even Cornell's expert admits, there are economies of scale in providing recordkeeping services and plans with more participants pay a lower fee on a per-participant basis than plans with fewer participants. Poehler Dep, 51:23–53:5; *see also* Otto Dep. at 93:21–94:6. Because of this, plans with less than 10,000 participants are not appropriate comparators to the Plans. Poehler Dep. at 210:6–231:24, 233:234-11. The Transamerica clients that Cornell claims demonstrate Minnich's opinion is not consistent with his experience are all less than or close to 10,000 participants (most of them significantly less). For example, Pepperdine had just over 3,000 participants during 2013, when Cornell provides pricing for that plan. Otto Dep. at 155:10–156:10. In contrast, there were 18,172 participant accounts with balances in CURP and 10,541 participant accounts with balances in the TDA Plan.[6] In other words, the Pepperdine plan that Cornell criticizes Minnich and Otto for not considering was 15,000 participants smaller than CURP alone. Similarly, in 2016, Loyola Marymount had roughly 2,400 participants according to the documents that Cornell relies upon. Otto Dep. at 162:14-17. In 2016, Cornell reported 19,191 participants in CURP and 11,778 participants in the TDA Plans.[7] Therefore, CURP alone had nearly 17,000 more participants than the Loyola

---

[6] Ex. 9 2013 Department of Labor Form 5500 for CURP (CORNELL0000237) at 239 (line 6g); Ex. 10, 2013 Department of Labor Form 5500 for the TDA Plan (CORNELL0000267) at 269 (line 6g).

[7] Ex. 11, 2016 Department of Labor Form 5500 for CURP (CORNELL021042) at 043 (line 6g); Ex. 12, 2016

Marymount plan that Cornell wishes Minnich and Otto would have considered. The largest plan

that Cornell accuses Minnich of failing to consider is Loyola Chicago. While Minnich recalled

Loyola Chicago as having roughly 11,000 participants (Minnich Dep. at 44:7-9), Cornell did not

show him the 5500 for Loyola Chicago to refresh his recollections as it did for numerous other

plans. In 2017 (the most recent year for which there are filings), Loyola Chicago had 10,173

participants in its plan.[8] In 2017, Cornell reported 15,463 participants in CURP and 11,746 in the

TDA Plans.[9] The combined Cornell Plans had over 15,000 more participant accounts than the

Loyola Chicago plan.

Cornell also failed to ask Minnich about numerous 403(b) clients that were similar in size to

the Plans and paid fees similar to his price points for Cornell. For example, Cornell's expert,

Poehler, admitted Trinity Healthcare's 403(b) and 401(k) plans, recordkept by Transamerica,

paid $41 per participant for 17,600 participants accounts (nearly 10,000 less than Cornell).

Poehler Dep. at 280:18–285:18. Similarly, on the same Transamerica website that Cornell used

to find fee disclosures for Transamerica's much smaller clients, Cornell could have found a fee

disclosure for Aurora Health Care's plan. As of August 1, 2018, the Aurora Health Care plan

capped its recordkeeping fees at $10 per account for participants with balances of less than

$3,000, $30 per account for participants with balances of $3,000 to $10,000 and $65 per account

for participants with balances greater than $10,000. [10] In other words, the average per participant

rate was $35 per account. The Aurora plan had 35,066 participants in 2017[11] and is much closer

---

Department of Labor Form 5500 for the TDA Plan (CORNELL021078) at 079 (line 6 g).

[8] Ex.13, 2017 Department of Labor Form 5500 for Loyola University Chicago Defined Contribution Retirement Plan, PDF 2 (line 6g).

[9] Ex. 14, 2017 Department of Labor Form 5500 for CURP at PDF 2 (line 6g); Ex. 15, 2017 Department of Labor Form 5500 for the TDA Plan, at PDF 2 (line 6g).

[10] Ex. 16, Fee Disclosure for Aurora Health Care, Inc., Incentive Savings Plan, *available at* https://fp.trsretire.com/PublicFP/fpClient.jsp?c=TA069527&a=00001&l=TDA&p=aurora

[11] Ex. 17, Aurora Health Care, Inc. Incentive Savings Plan 2017 Department of Labor Form 5500, at line 6g.

in participant count to the Plans than the examples Cornell chooses.[12]

### C. Minnich Had More Than Three Clients Over 5,000 Participants

Contrary to Cornell's assertions, Minnich had more than three clients with more than 5,000 participants. The testimony that Cornell relies upon (1) only asked Minnich about "university plans"; and (2) Minnich only testified that he could recall those three off the top of his head at that moment. Minnich Dep. at 44:19-45:6. Cornell ignores that Minnich also identified at least one additional higher education client with over 5,000 participants, Ivy Tech Community College. *Id.* at 97:12-18. Cornell also ignores numerous non-profit healthcare plans, like Aurora and Trinity discussed above.

### D. Active Participants Were Used Because of Poor Data Provided By TIAA

Cornell expends multiple pages attacking Otto's use of active participants rather than participants with balances and Minnich's reliance on that data. Doc. 230 at 13–14, 20-25. However, Cornell neglects to mention why Otto used active participants rather than participants with balances – the data that TIAA produced did not distinguish between terminated participants with balances and terminated participants without balances. Otto Dep. at 47:2–48:8; Ex. 19, Expert Rebuttal Report of Al Otto, ¶59. Because of the limitations in the data TIAA produced, Otto used active participants in his opening report to be consistent across vendors. *Id.* In his rebuttal report, Otto went back through documents TIAA used to create 5500s, to correct the deficiencies in the data TIAA produced. *Id.* ¶59. Otto's revised calculation still demonstrated that participants lost nearly $30 million dollars because of the Plans' unreasonable fees. *Id.* ¶60. Cornell's expert, Poehler, improperly assumes that all terminated accounts had balances. Doc. 246-004, Poehler Report at 107.

---

[12] Cornell does discuss one healthcare plan Northwell, with 50,000 participants. However, it neglects to mention that the Northwell plan was the result of recent mergers of a number of much smaller plans.  Ex. 18, Northwell Health 403(b) Plan 2016 Form 5500 (Dep. Ex.  227) at PDF 59 (Auditor's notes page 5).

### E. Other Vendors Have the Experience and the Capability to Recordkeep TIAA Annuities

Contrary to Cornell's assertions other vendors, including Transamerica, can and do effectively recordkeep TIAA annuities, but it is TIAA's business practice to continue to charge recordkeeping fees on those funds. In fact, Minnich testified that Transamerica created "a unique solution for handling the contention that TIAA would not permit other third party providers to record keep the retirement annuity legacy contracts." Minnich Dep. at 56:11–59:10. Minnich testified that Transamerica developed a data feed with all the information from TIAA necessary to recordkeep the products, as it did with annuities from other providers. *Id.* Minnich concluded "[i]t wasn't that we couldn't record keep a TIAA annuity, it was . . . TIAA's contention that no one else can record keep their RA contracts." *Id.* In short, Cornell argues the Court should exclude Minnich's and Otto's testimony, because it made the imprudent decision to retain and continue to retain a vendor that will not allow other recordkeepers to recordkeep its products (contrary to industry practices).

### F. Minnich and Otto Did Not Copy Each Other's Reports

Cornell also misleadingly argues that Minnich and Otto either copied each other's reports or did not write their own reports. Doc. 230 at 25-26. Specifically, Cornell states "portions of Otto's and Minnich's reports are identical to each other, down to the same citations and calculations errors." *Id.* First, Cornell does not identify any calculation error that both Minnich and Otto made. *Id.* Earlier it alleges that Minnich and Otto both relied upon an asset-based fee of 3.8 bps that Harvard was paying to "improperly" calculate a fee of $18 per participant but only cite to Minnich's report. Doc. 230 at 21. Contrary to Cornell's assertion of copying, Otto only relies upon the disclosed $34 per-participant fee that the Harvard plans paid Vanguard and does not discuss TIAA's fees. Doc. 229-4, Expert Report of Al Otto ¶85. The deposition testimony

Cornell cites does not demonstrate a single sentence that is even similar between Otto's and

Minnich's reports. Rather, Cornell unremarkably identifies three footnotes where Otto and

Minnich cited to the same portions of depositions transcripts for similar factual propositions.[13]

Doc. 229-5 at 181:11-190:9. Cornell neglects to mention that Otto and Minnich had 353 total

footnotes in their opening and rebuttal reports. Doc. 229-4, Expert Report of Al Otto Report

(containing 100 footnotes); Doc. 229-6, Expert Report of Ty Minnich (containing 107 footnotes);

Ex. 19 Rebuttal Report of Al Otto (containing 89 footnotes); Ex. 20, Rebuttal Report of Ty

Minnich (containing 73 footnotes). Nor is it remarkable that they used similar data points. Both

recordkeepers and investment advisors keep the recordkeeping fees their clients paid confidential

and guard them as closely held secrets, so the number of publicly available data points is very

limited. *See* Doc. 257 (arguing the recordkeeping fees of CAPTRUST's clients should be

sealed); Doc. 261 (similar for TIAA); Doc. 266 (similar for Fidelity).

### G. Minnich's and Otto's Data Points Support Their Opinions

Cornell is also wrong that the data points that Minnich and Otto used to support their

experience are unreliable.[14] First, Cornell quibbles with Otto's reliance on the University of

Pittsburgh Medical Center ("UMPC"). While Otto admittedly misread UPMC's fee disclosure,

he identified this misreading prior to his deposition and corrected it on the record. Otto Dep. at

89:4-14. Subsequent to discovering his misreading of the fee disclosure, Otto calculated UPMC's

maximum recordkeeping fee from its Department of Labor Form 5500 and found it to be $26.42

per-participant. Otto Dep. at 93:4-11; Otto Dep. at 194:3-20. It was this calculation that caused

Otto to testify that UMPC "was the best evidence for [his] claim that a recordkeeper would have

---

[13] In a parenthetical, Cornell also incorrectly states that there are a "series of identical quotations." There are no "identical quotations" in the cited testimony and it focused entirely on the citation of similar sources. Doc. 229-5 at 181:11-190:9.

[14] As discussed above, recordkeepers and investment advisors closely protect the pricing for their clients, so publicly available data points are often difficult to obtain and professionals in the industry often derive pricing data from publicly filed documents that can be interpreted in multiple ways.

been willing to recordkeep Cornell's plans for $40 per participant in 2010.'" Doc. 230 at 18 (quoting Otto Dep. at 128:1-8).

Cornell also quibbles with Minnich's and Otto's use of a fee benchmarking analysis that Aon Hewitt conducted for the Nevada System of Higher Education. However, it does not dispute that Minnich and Otto accurately reported that the active portions of that plan were paying $31 per participant in 2014. Doc. 230 at 19. Rather, Cornell's quibble is that Otto and Minnich should have focused on fees paid on frozen portions of that plan, which are more favorable to Cornell. Cornell also conveniently ignores that Otto and Minnich relied upon the benchmarking data within that report to support their experience regarding the market rates at that time. Doc. 229-6, Minnich Report ¶151; Otto Dep. at 151:19–152:10. That benchmarking data includes Aon Hewitt's best-fit benchmark of plans between 6,250-8,900 participants (half the size of the Plans) and between $263 million and $530 million in assets (less than half the size of the Plans).[15] The best fit benchmarks from Aon Hewitt's clients half of the size of the Plans was $56 per participant in 2014. *Id.* at 20. Cornell does not dispute that that active Nevada participants paid $31 per-participant or that the average price for much smaller Aon Hewitt clients was $56 per participant in 2014.

Cornell also quibbles with Minnich's calculation for the California Institute of Technology ("CalTech") in 2013 and Otto's calculation for CalTech in 2015. Doc. 230 at 20. Cornell's primary argument is that the figure that Minnich and Otto use from similar portions of the auditor's note in the Department of Labor Form 5500s does not include recordkeeping fees. *Id.* However, Cornell ignores that CalTech's auditor wrote in both 2013 and 2015 that fees included "***the cost of recordkeeping***, participant communication, audits, investment performance,

---

[15] Ex. 21, Nevada System of Higher Education, Total Cost Benchmarking at 17-18, *available at* https://nshe.nevada.edu/wp-content/uploads/file/HR/retirement/Performance%20Reports/2014/2014_11_%2014%20 Total%20Plan%20Cost%20Analysis.pdf.

13

monitoring, third party compliance consulting, and other administration costs."[16] In short,

Cornell's argument is that it is unreliable to rely on clear statements from audited financial

statements. Otto and Minnich did not "admit they made a computational error in evaluating

Caltech's plans." Doc. 230 at 17. Cornell is referencing a calculation of the revenue rebated back

to CalTech participants. As Otto testified, the calculation was "aggressive" because there is $7

million in revenue credits that is "unclear" from CalTech's disclosures whether and when

CalTech rebated it back to participants and it would have been more accurate to say $15 to $22

million. Otto Dep. at 119:18–23.

Cornell is plainly incorrect that Otto and Minnich made "the same error" in their analysis of

the Harvard plans. Doc. 230 at 21. Cornell focuses entirely on a calculation of the fee that one

Harvard plan paid to TIAA. *Id.* However, Otto's report does not include a calculation for TIAA

and only discusses Vanguard's explicit $34 per-participant fee for Harvard. Doc. 229-4, Expert

Report of Al Otto ¶¶85. Second, Minnich's calculation is not "in error" as Cornell claims.

Cornell does not dispute his calculation but rather argues that he should have evaluated

additional Harvard plans rather than a single plan. Doc. 230 at 17.

Cornell is also incorrect that the $44 dollar per participant fee that Minnich cites for Stanford

is in error. Cornell quibbles with Minnich's reliance on an explicit statement by Stanford and

claims (without evidence) that it does not include recordkeeping fees paid to TIAA. Doc. 230 at

21–22. However, the document Minnich relies upon expressly states "[o]ur annual fees for

recordkeeping hover now around $44 per employee" without any limitation to the vendor

---

[16] Otto Dep. at 192:18-23 (emphasis added); Ex. 22, California Institute of Technology TIAA-CREF Defined Contribution Retirement Plan Form 5500 (2013) Report of Independent Certified Public Accountants, p.8. ("[t]he revenue credit account is used to offset certain permitted Plan administration expenses, including those incurred for TIAA-CREF").

providing the services.[17] Again, Cornell is asking the Court to use its speculative calculations to deem Minnich's reliance on explicit statements unreasonable.

Cornell is incorrect that the best bid in New York University's 2009 RFP was $224.80. Otto acknowledged that counsel's math in the cited testimony was correct, but not his underlying assumptions. Otto Dep. at 142:6–143:3. Notably, Otto did not discuss New York University at all in his report and had never reviewed any documents related to that case prior to his deposition. Otto Dep. at 130:10-12. Nonetheless, Cornell's counsel placed a 25-page presentation with five bids and numerous pages of Department of Labor Form 5500s in front of Otto without giving him any time to review them and insisting that he only review the portions directed to. Otto Dep. at 132:9–143:3.[18] In fact, Cornell's counsel ignored that Fidelity made an $80 per-participant fee bid in that 2009 presentation – much less than Cornell paid TIAA until 2018. *Id.* at 198:17-21. Cornell also ignored that one of the incumbent recordkeepers, Prudential Retirement Services, declined to bid because a "perceived competitive disadvantage" to the other incumbents based on how the RFP was structured. Ex. 23, (Dep. Ex, 260), at CLC0022527. Also, Cornell's counsel misleadingly used asset levels and fees for a bid for multiple New York University plans to create a hypothetical blended rate (that never existed) and then applied that speculative blended rate to a single New York University plan without any evidence the asset levels were consistent. *Id.* at 138:9-21 (The "programs are comprised of multiple 403(b) plans, multiple 457(b) plans and one frozen 401(a) plan with combined assets of over $3 billion" and using all the assets in the plans to determine what would be moved to the new recordkeeper); *id.* at 139:5–141:6 (attempting to calculate a blend rate using the assets of all the plans); *id.* at 145:14–8 (using that

---

[17] *See* Stanford's Q&A regarding Retirement Fees, August 25, 2016, *available at* https://cardinalatwork.stanford.edu/engage/news/qa-retirement-fees

[18] Interestingly, Cornell chose not to question Minnich, who did rely on data from New York University, regarding its speculative reconfiguration of New York University's 2009 RFP.

blended rate calculated based on asset levels and fees for multiple plans and applying it to one plan). As Otto testified and Cornell ignores, he lacked knowledge of many important factors necessary to evaluate whether New York University properly conducted the RFP and whether it was a good comparison to Cornell. *Id.* at 197:5–198:10.

Finally, Cornell criticizes Minnich's and Otto's reliance on the North Carolina 403(b) Program because of its over 200,000 participants and small account balances. Even Cornell's expert admits that the amount of assets in an account or plan has nothing to do with the cost of recordkeeping. Poehler Dep. at 55:18–56:5. Additionally, because the economies of scale in recordkeeping begin to level off between 20,000 and 30,000 participants, the cost differential per-participant to recordkeep a 20,000-participant plan versus a 300,000-participant plan is marginal. Minnich Dep. at 298:15–299:5; Otto Dep. at 93:21–94:6. At most, Cornell's criticisms identify gaps in the experts' analysis for cross-examination.

## ARGUMENT

**I.** **Cornell's Credibility Attacks are Improper and Irrelevant to a *Daubert* Analysis**

Much of Cornell's argument consists of misleading and improper attacks on Minnich's and Otto's credibility and inconsistencies or gaps in their analysis. As discussed above, these attacks are unfounded, but the Court should not consider attacks that go to the weight of Otto's and Minnich's testimony.

 "[T]he weight of the evidence is a matter to be argued to the trier of fact, not a basis for reversal on appeal." *Campbell v. Metro. Prop. & Cas. Ins. Co.*, 239 F.3d 179, 185 (2d Cir. 2001); *Rule v. Brine, Inc.,* 85 F.3d 1002, 1011 (2d Cir. 1996) ("Assessments of credibility and choices between conflicting versions of the events are matters for the jury, not for the court on summary judgment."). Any "gaps or inconsistencies" in Minnich's and Otto's testimony that "go to the weight of the testimony not to its admissibility" and are not pertinent to the *Daubert* analysis. *SR*

*Int'l*, 467 F.3d at 134. *See also MF Global Holdings, Ltd, v. PricewaterhouseCoopers LLP*, 232

F.Supp.3d 558,572 (S.D.N.Y. 2017) ("Minor flaws in an expert's analysis . . . can be probed

through cross-examination and generally go to the weight to be accorded to the expert's

testimony rather than admissibility.") (quoting *R.F.M.A.S., Inc. v. So*, 748 F.Supp.2d 244, 252

(S.D.N.Y. 2010)). The Court should not consider Cornell's improper and premature arguments

regarding the weight of Minnich's and Otto's testimony.

## II.    Minnich and Otto have Unparalleled Expertise in Recordkeeping Fees

Minnich and Otto are uniquely qualified to opine about recordkeeping fees, RFPs for

recordkeeping fees, and prudent practices for recordkeeping fees and RFPs. Despite Cornell's

arguments to the contrary, Minnich and Otto need not have worked for TIAA or a large

university to offer an opinion in this case. *Stagl v. Delta Air Lines, Inc*., 117 F.3d 76, 82 (2d Cir.

1997).

### A.    Minnich and Otto Are Experts in Recordkeeping Fees, RFPs for
### Recordkeeping Fees, and the Prudent Practices Related Thereto

Minnich's and Otto's vast experience with recordkeeping fees and RFPs make them experts

on those subjects and related prudent practices. "To determine whether a witness qualifies as an

expert, courts compare the area in which the witness has superior knowledge, education,

experience, or skill with the subject matter of the proffered testimony." *United States v. Tin Yat

Chin*, 371 F.3d 31, 40 (2d Cir. 2004). The Second Circuit takes a "liberal view of qualification"

and allows admission of experts based on "equivalent relevant practical experience," even if they

lack "formal training." *In re Rezulin Prods. Liab. Litig.*, 309 F.Supp.2d 531, 559 (S.D.N.Y.

2004).

Minnich has significant experience in pricing recordkeeping proposals, extensively studied

the market for recordkeeping proposals, and competed in hundreds of RFPs for 403(b) plans. *See*

*supra* at 1–4. His background includes experience with large 403(b) plans and plans with annuities like the Plans. *See Id.* Otto has advised and acted as a co-fiduciary regarding recordkeeping and administrative fees for defined contribution plans, including 403(b) plans, for over twenty years. *See supra* at 4–6. He has run hundreds of recordkeeping RFPs, including for plans seeking to consolidate to a single vendor and plans with over 30,000 participants. *See Id.*

Minnich's and Otto's abundance of "relevant practical experience" allows them to opine on reasonable recordkeeping fees, the RFP process for recordkeeping fees, and what a prudent investor would do to monitor and negotiate recordkeeping fees. *In re Rezulin*, 309 F. Supp. 2d at 559. Moreover, Minnich's wealth of experience in negotiating with numerous plan sponsors and advisors and engaging in RFPs and Otto's experience conducting hundreds of recordkeeping negotiations on behalf of clients give them unparalleled insight into what a "prudent investment professional" would do. *In re Meridian Funds Grp. Sec. & ERISA Litig.,* 917 F.Supp.2d 231, 240 (S.D.N.Y. 2013) ("In this case, prudence *is measured against hypothetical sophisticated and prudent investment professionals* with experience controlling and managing large hedge funds.") (emphasis added); *see also Tibble v. Edison Int'l*, 843 F.3d 1187, 1197 (9th Cir. 2016) (holding fiduciary must comply with "'the prudent investor rule,' which requires that he '*invest and manage trust assets as a prudent investor would*'") (emphasis added) (quoting Bogert, Law of Trusts and Trustees § 684 (3d ed.)).

As another court in this District recently said in a similar context:

> The word of an experienced trader about what traders are and are not allowed to do with information obtained during negotiations — especially if that information is market-moving, and the trader is also a disposal agent for the stock whose price is likely to move — is potentially worth far more than the opinion of any ivory tower academic.

*Veleron v. Stanley*, 117 F.Supp.3d 404, 445 (S.D.N.Y. 2015). Here, "the word of an

18

experienced" recordkeeper and advisor regarding how reasonable, prudent plan sponsors and investment advisors conduct themselves during RFP negotiations "is potentially worth far more than the opinion of any ivory tower academic." *Id.*

### B. Specific Experience with TIAA Annuities is Not a Prerequisite to Admission

Cornell also argues that Minnich's and Otto's analyses are unreliable because they mostly worked with non-higher education 403(b) plans or 401(k) plans, their experience does not involve plans with TIAA annuities, and they lack sufficient experience with large 403(b) plans. Setting aside that these allegations are untrue (*see supra* at 1–6), "disputes" with an expert's experience on specific points of a case are "properly explored on cross-examination and [go] to his testimony's weight and credibility -- not its admissibility." *McCullock v. H.B. Fuller Co.*, 61 F.3d 1038, 1043 (2d Cir. 1995). The Second Circuit has explicitly rejected requirements of levels of specificity that would allow an industry to "indirectly set its own standards." *Stagl*, 117 F.3d at 82 ("Accordingly, to require the degree of specificity the court imposed came close to letting that industry indirectly set its own standards. At times, this cannot be avoided. But where, as here, well-trained people with somewhat more general qualifications are available, it is error to exclude them. For this reason, the court should have allowed Fischer, an undoubted expert in human-machine interactions, to testify."). "If an expert's training and experience are in a field closely related to the area to the proposed testimony, that may—in appropriate circumstances— be sufficient to meet Rule 702's qualification standards." *Scentsational Techs., LLC v. Pepsi, Inc.*, No. 13-8645, 2018 WL 910587, at *2 (S.D.N.Y. Feb. 14, 2018); *see also Colon ex rel. Molina v. BIC USA, Inc.*, 199 F. Supp. 2d 53, 73 (S.D.N.Y. 2016) ("An expert's training need not narrowly match the point of dispute in the case.").

Here, the standard Cornell asks the Court to adopt goes beyond the level of specificity the Second Circuit rejected in *Stagl*. Cornell argues that specific experience with one vendor, TIAA,

is necessary and seeks to let TIAA "indirectly set its own standards." 117 F.3d at 82. Thus, even

if it were true that Otto and Minnich had no experience with private higher education 403(b)

plans with TIAA annuities (which is not accurate); the lack of specific experience would go to

the weight of the testimony, not its admissibility.

Moreover, there is no material difference between the costs of recordkeeping 403(b) and

401(k) plans or between recordkeeping annuities and mutual funds. Otto Dep. at 203:2-11;

Minnich Dep, at 26:3-22. Cornell's Motion to Exclude offers no contrary evidence that would

establish a material difference in the costs of recordkeeping a higher education 403(b) plan and

any other plan. Accordingly, Cornell's argument boils down to a distinction without a difference.

Cornell relies primarily on *Sacerdote v. New York University*, 328 F.Supp.3d 273 (S.D.N.Y.

2018), to support its argument that Minnich and Otto lack sufficient experience. Cornell neglects

to mention that *Sacerdote* is not a decision under Rule 702 determining the admissibility of an

expert, but a trial order *after* complete testimony and based on weight and credibility

determinations. In fact, *Sacerdote* denied a similar motion to exclude. Ex. 24, *Sacerdote v. N.Y.*

*Univ.*, No. 16-6284, Doc. 270 (S.D.N.Y. Apr. 5, 2018). When determining admissibility the

court held "[w]hile the parties have identified a wealth of material for cross-examination, the

Court does not find that any expert is subject to exclusion based on the arguments presented by

the parties." *Id.* Second, *Sacerdote* relied upon lack of experience with "(1) the type of plans at

issue here (403(b) plans); (2) participants heavily invested in TIAA annuities; or (3) transitioning

large plans from multiple to single recordkeepers" to give little weight to the expert's testimony.

*Sacerdote*, 328 F.Supp.3d at 282, n.19. As discussed above, Minnich spent most of his career

working exclusively with large 403(b) plans, and Minnich spent a large portion of his career

transitions large plans from multiple to a single recordkeeper, including plans with TIAA

annuities. *See supra* at 1–4. Similarly, Otto spent most of his career working with large 401(k) and 403(b) plans, worked with plans with TIAA annuities, and transitioning plans to a single recordkeeper. *See supra* at 4–6. Even if *Sacerdote* excluded evidence under Rule 702 (it did not), its rationales are not applicable here.[19]

### III.    Otto and Minnich's Methodologies are Sound

Contrary to Cornell's assertions, Otto and Minnich's methodologies more than meet the standard for the admission of experience-based expert testimony. Notably, Cornell never addresses the legal standard for reliability of experience-based expert opinions. For such an opinion to be reliable, the expert "must show how his or her experience . . . led to his conclusion or provided a basis for his opinion." *SR Int'l*, 467 F.3d at 132. "[C]ourts focus on the relationship between the experience and the opinion and whether the latter is rationally related to the former." *Mahoney v. JJ Weiser & Co.*, No. 04-2592, 2007 WL 3143710, at *5 (S.D.N.Y Oct. 25, 2007); *see also U.S. Bank, Nat. Assoc. v. UBS Real Estate Sec. Inc.*, 205 F.Supp.3d 386, 404-05 (S.D.N.Y 2016) (admitting expert testimony based on "extensive experience in underwriting residential mortgage loans and the mortgage industry"); *Bah v. City of N.Y.*, No. 13-6690, 2017 WL 435823, at *9-10 (S.D.N.Y. Jan. 31, 2017) (admitting expert testimony on bullet trajectories based on the expert's experience in the field).

In *Mahoney*, the plaintiff offered an expert who worked in the insurance industry for 50 years. *Id.* at *5. The expert provided testimony on industry standards for claims loss ratios (below 70–75%), and industry customs if the ratio fell too far (below 60%). *Id.* The expert based this opinion solely on "his employment in the insurance industry, information he has learned

---

[19] The other case Cornell relies upon is decision regarding a motion to dismiss in *Wilcox v. Georgetown University*, No. 18-00422, 2019 WL 132281 (D.D.C. 2019) that has nothing to do with expert testimony, and this Court already rejected similar arguments in its orders denying Cornell's motion to dismiss and granting class certification. *See* Doc. 107; Doc. 219.

through his attendance at numerous trade association meetings, information he has received from other insurance companies and published statistics compiled by A.M. Best Company and Ward Financial Group." *Id.* at \*7–8. The Court found the opinion reliable based on testimony that "in the course of his experience" the expert "had access to the premium and claims information of the companies at which he was employed," "access to claim-loss ratio information with respect to other insurers through his participation in professional associations," and based on citations to two supporting industry publications. *Id.* Courts in the Second Circuit routinely allow experience based testimony regarding market rates and pricing for goods and services. *See, e.g., Sec. & Exch. Comm'n v. Yorkville Advisors, LLC*, 305 F.Supp.3d 486, 508–09 (S.D.N.Y. 2018) (admitting experience based testimony "concerning the value of businesses and securities in the oil-and-gas industry"); *Pension Comm. of Univ. of Montreal Pension Plan v. Banc of Am. Sec., LLC*, 691 F.Supp.2d 448, 476–78 (S.D.N.Y. 2010) (allowing testimony on the proper value of restricted securities based on industry experience); *Snyder v. Wells Fargo Bank, N.A.*, No. 11-4496, 2012 WL 4876938, at \*3 (S.D.N.Y. Oct. 15, 2012) (allowing experience based testimony regarding the proper valuation of securities); *Corneli v. Adventure Racing Co., LLC*, No. 12-1303, 2015 WL 4716285, at \*11–12 (N.D.N.Y. Aug. 7, 2015) (permitting experience based expert testimony on the cost of caring for a disabled individual); *Crockford v. Spencer*, No. 10-813, 2012 WL 370187, at \*3 (D. Conn. Feb. 3, 2012) (admitting testimony regarding lost earnings capacity from an experience based expert).

Similar to the expert in *Mahoney*, "in the course of [their] experience," Minnich and Otto "had access to the [RFPs] of the companies at which [they were] employed," "access to [recordkeeping fees for competitors] through [their] participation in professional associations," and cited supporting industry publications. 2007 WL 3143710 at \*3-4. These three factors alone

22

are sufficient to satisfy admissibility requirements. *Id.* Additionally, Minnich and Otto both point to data points and industry publications that support their experience. Minnich and Otto have more than demonstrated how their experience "led to [their] conclusion[s]or provided a basis for [their] opinion[s]." *SR Int'l*, 467 F.3d at 132.

**IV.    Minnich's and Otto's Testimony Is Not Cumulative**

Cornell is also incorrect that Minnich's and Otto's testimony is cumulative. While Minnich and Otto came to similar conclusions, Minnich and Otto base their opinions on entirely different perspectives and experiences. Minnich worked for thirty years providing recordkeeping services to 403(b) plans and negotiating with prudent and imprudent plan sponsors. He has unparalleled insight into the factors that go into a recordkeeper's determination of the fees they charged. Otto, in contrast, spent over 20 years on the other side of the bargaining table advising and acting a co-fiduciary with plan sponsors. If Plaintiffs had offered Minnich alone, Cornell would argue he is not qualified to opine on industry-accepted practices because he has never served as a fiduciary nor advised plan sponsors. *See* Minnich Dep. at 64:6–67:2 (questioning him about his experience as a fiduciary). If Plaintiffs offered Otto alone, Cornell would argue he never worked for a recordkeeper of annuities (as discussed above this is not true), so he lacks sufficient expertise. Even the cases Cornell cites recognize that expert testimony coming to the same conclusion is admissible when the experts reach those conclusions through different methods. *See Colon ex rel Molina*, 199 F. Supp. 2d at 96 ("Because neither Labrum nor Adams performed any of the tests Broutman conducted, Broutman's testimony is not cumulative."). Courts in this district have even admitted testimony from an expert that largely directly quotes another expert and then offers his or her "reactions and independent assessment based on [the expert's] experience and additional data." *In re M/V MSC FLAMINIA*, No. 12-8892, 2017 WL 3208598, at *17 (S.D.N.Y. July 28, 2017). Similarly, Otto and Minnich came to similar conclusions but did so based on

their own "reactions and independent assessments based on [their] experience and additional

data." *Id.*

## CONCLUSION

For the reasons stated above, the Court should deny Cornell's Motion to Exclude Plaintiffs'

Experts Al Otto and Ty Minnich.

March 11, 2019                                   Respectfully submitted,

                                                /s/ Joel D. Rohlf
                                                SCHLICHTER, BOGARD & DENTON, LLP
                                                Andrew D. Schlichter, Bar No. 4403267
                                                Jerome J. Schlichter (*pro hac vice*)
                                                Joel D. Rohlf (*pro hac vice*)
                                                Scott Apking (*pro hac vice*)
                                                100 South Fourth Street, Suite 1200
                                                St. Louis, MO 63102
                                                Phone: (314) 621-6115
                                                Fax: (314) 621-5934

                                                *Counsel for Plaintiffs*

**CERTIFICATE OF SERVICE**

I hereby certify that on March 11, 2019, I electronically filed the foregoing document with the Clerk of Court using the CM/ECF system, which will automatically send e-mail notification of such filing to the attorneys of record.

/s/ Joel D. Rohlf
*Counsel for Plaintiffs*