# Exhibit 127

# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

CASEY CUNNINGHAM, et al.,

     *Plaintiffs*,

v.

CORNELL UNIVERSITY, et al.

     *Defendants*.

No. 1:16-CV-06525-PKC

**MEMORANDUM IN OPPOSITION TO CORNELL DEFENDANTS' MOTION TO EXCLUDE PLAINTIFFS' EXPERTS WENDY DOMINGUEZ AND GERALD BUETOW [DOC. 225]**

Case 1:16-cv-06525-PKC-JLC Document 342-30 Filed 08/04/21 Page 2 of 30

# TABLE OF CONTENTS

Table of Authorities ............................................................................................................. ii

Preliminary Statement......................................................................................................... 1

I.     Dominguez and Buetow's Extensive Relevant Experience................................................. 1

II.    Dominguez Followed a Reliable Methedology in Evaluating All Investments in the Plans ........................................................................................................................ 3

      A.    Dominguez applied the same process she applies for all clients. .......................... 3

      B.    Dominguez's methodology led to the removal of TIAA Real Estate and CREF Stock from multiple clients' 403(b) plans prior to 2016............................. 6

      C.    Contrary to Cornell's assertions, Dominguez's evaluation of CREF Stock is consistent with her practice and appropriate. .................................... 11

      D.    Dominguez's process for evaluating TIAA Real Estate is consistent with her practice and other investment advisors' practices. .......................... 14

III.    Dominguez Does Not Offer Legal Opinions, but her Observations Regarding Industry Standards and Processes ..................................................................................... 17

IV.    Dominguez's Share Class Methedology is Sound............................................................. 18

V.     Dominguez Opines on Marketplace Practices Not the Desireability of Consolidated Plan Lineups ............................................................................................... 19

VI.    Dominguez Should be Permitted to Opine on All Funds ................................................. 21

VII.   Dr. Buetow Should be Permitted to Opine on Mapping and Damage Calculations......... 21

Conclusion .......................................................................................................................... 25

Case 1:16-cv-06525-PKC-JLC Document 342-30 Filed 08/04/21 Page 4 of 31

# TABLE OF AUTHORITIES

**Cases**

*Best v. Lowe's Home Ctrs., Inc.*,
   563 F.3d 171 (6th Cir.2009) ............................................................................. 3

*Brown v. CTC Corp.*,
   2017 WL 5992333 (D. Vt. Dec. 1, 2017) ........................................................ 18

*Crockford v. Spencer*,
   No. 10-813, 2012 WL 370187 (D. Conn. Feb. 3, 2012) ................................... 19

*Daubert v. Merrell Dow Pharms., Inc.*,
   509 U.S. 579 (1993) ....................................................................................... 25

*Donovan v. Bierwirth*,
   680 F.2d 263 (2d Cir. 1982) ...................................................................... 13, 24

*Fiataruolo v. United States*,
   8 F.3d 930 (2d Cir. 1993) ............................................................................... 17

*In re Blech Sec. Litig.*,
   No. 94-7696, 2003 WL 1610775 (S.D.N.Y. Mar. 26, 2003) ............................. 17

*Jones v. O'Higgins*,
   1989 WL 103035 (N.D.N.Y.) .......................................................................... 18

*Katsaro v. Cody*,
   744 F.2d 270 (2d Cir. 1984) ........................................................................... 13

*Levinson v. Westport Nat'l Bank*,
   2012 WL 4489260 (D. Conn. Sept. 28, 2012) ................................................ 18

*Lynch v. J.P. Stevens & Co.*,
   758 F. Supp. 976 (D.N.J. 1991) ..................................................................... 18

*Marini v. Adamo*,
   995 F.Supp.2d 155 (E.D.N.Y 2014) ................................................................. 3

*Marx & Co. v. Diners' Club Inc.*,
   550 F.2d 505 (2d Cir. 1977) ........................................................................... 17

*McCullock v. H.B. Fuller Co.*,
   61 F.3d 1038 (2d Cir.1995) .............................................................................. 3

*Meiners v. Wells Fargo & Co.*,
   898 F.3d 820 (8th Cir. 2018) .......................................................................... 13

*Passlogix, Inc. v. 2FA Tech, LLC*,
   708 F.Supp.2d 378 (S.D.N.Y. 2010) ............................................................... 18

*Sacerdote v. N.Y. Univ.*,
   No. 16-6284, Doc. 270 (S.D.N.Y. Apr. 5, 2018) ............................................. 16

*Sacerdote v. New York University*,
   328 F.Supp.3d 273 (S.D.N.Y. 2018) ............................................................... 16

*SEC v. U.S. Envtl., Inc.,*
  No. 94-6608, 2002 WL 31323832 (S.D.N.Y. Oct. 16, 2002)................................... 17

*Severstal Wheeling, Inc. v. WPN Corp.,*
  119 F.Supp.3d 240 (S.D.N.Y. 2015)....................................................................... 24

*Trs. of the Upstate N.Y. Eng'rs Pension Fund v. Ivy Asset Mgmt.,*
  843 F.3d 561 (2d Cir. 2016)..................................................................................... 24

*United States v. Bilzerian,*
  926 F.2d 1285 (2d Cir. 1991)................................................................................... 17

**Rules**

Fed. R. Evid. 704 ........................................................................................................... 17

## PRELIMINARY STATEMENT

The Court should deny Defendants Cornell University's, the Retirement Plan Oversight Committee's and Mary Opperman's (collectively, Cornell) motion to exclude Wendy Dominguez and Dr. Gerald Buetow. (Doc. 225). *First*, Cornell does not (because it cannot) dispute that Dominguez, who has worked for over 25 years advising fiduciaries and acting as fiduciary and co-fiduciary to retirement plans, and Dr. Buetow, who has a doctorate in finance and has designed, taught and written on multi-asset class portfolios for decades, are experts who will aid the jury. *Second*, the primary thrust of Cornell's Motion—attacks on Dominguez's methodology as inconsistent with her practice—are entirely untrue. Even if there were any inconsistency between Dominguez's methodology and her practice, it would go to the weight of her testimony not its admissibility. *Third*, Plaintiffs never limited their claims to only CREF Stock and TIAA Real Estate as Cornell argues. Even if Plaintiffs' initial disclosures violated Rule 26(a) (they did not because Plaintiffs were not required to calculate damages when the information necessary to do so was in the possession of Cornell) as this Court has recognized, Cornell needs to bring a motion under Rule 37 to strike these damages. *Finally*, Buetow's methodology is consistent with his practice and minor cut and paste issues between his report and attached exhibits at most go to the weight and not the admissibility of his testimony.

## ARGUMENT

## I. DOMINGUEZ AND BUETOW'S EXTENSIVE RELEVANT EXPERIENCE

Cornell does not challenge and glosses over Dominguez's and Buetow's impeccable credentials. Plaintiffs briefly describe their credentials to provide a full record for the Court to decide Cornell's Motion. Dominguez is the President and Co-Founder of Innovest Portfolio Solutions, a registered investment advisor assisting retirement plans, specifically 403(b) plans. Doc. 226-2, Expert Report of W. Dominguez, ¶6. Innovest has over 200 institutional clients

throughout the country with asset totaling over $18 billion. *Id.* Dominguez has over 25 years of experience providing investment-consulting services to defined contribution plans. *Id.* ¶5. Dominguez has assisted numerous 403(b) plans, including higher education plans, in designing and consolidating investment menus, selecting investments options, and monitoring and removing investments options. *Id.* ¶¶13-16. Numerous publications have repeatedly recognized Dominguez and Innovest as one of the nation's top investment advisors, including as "Retirement Plan Advisor Team of the Year" in the defined contribution space. *Id.* ¶¶12, 17–19.

Dr. Buetow earned a Ph.D. in finance and econometrics. Doc. 226-22, Expert Report of Gerald Buetow ("Buetow Report") at ¶ 18.[1] Buetow is a Chartered Financial Analyst (CFA), certified in investment performance measurement. *Id.* Buetow currently is the President and Founder of BFRC Services, LLC, where he provides, among other things, "quantitative financial modeling as it relates to portfolio construction and management." *Id.* at ¶¶ 5-6. Buetow was a professor of quantitative finance at James Madison University in Virginia from 1993 until 1996 and 1997 until 1999. *Id.* at ¶ 13. From June 1996 until August 1997, Buetow was the Director of Quantitative Research for Prudential Investments' Quantitative Investment Management Group. Buetow Report *Id*. Buetow was Vice President of Curriculum Development and a consultant for the CFA Institute from 1998 until 1999. *Id.* at ¶ 12. While at the CFA Institute, Dr. Buetow wrote and edited "in-depth portfolio management and educational materials," including "several cutting-edge textbooks in both Portfolio Management and Quantitative [Investment] Methods." *Id*. Buetow spent the last 25 years as an academic, a researcher, and a professional in the field of multi-asset class portfolio management, including defined contribution benefits plans.

---

[1] "Ex. __" refers to the Exhibits to the Declaration of Joel D. Rohlf in Support of Plaintiffs' Opposition to Defendant's Motion to Exclude Plaintiffs' Experts Wendy Dominguez and Gerald Buetow. "Doc." refers to the filings in this case by docket number. Plaintiffs employed by Cornell participated in the Cornell University Retirement Plan for the Employees of the Endowed Colleges at Ithaca ("CURP") and the Cornell University Tax Deferred Annuity Plan ("TDA Plan"). Plaintiffs refer to the CURP and TDA Plan collectively as "the Plans."

## II.    DOMINGUEZ FOLLOWED A RELIABLE METHODOLOGY IN EVALUATING ALL INVESTMENTS IN THE PLANS

Cornell argues that Dominguez failed to follow a reliable methodology for three reasons: (1) alleging Dominguez failed to follow the methods she employed for her clients; (2) alleging Dominguez's process for evaluating CREF Stock deviates from the process she used for her clients or alternatively that her evaluation is flawed because she did not use CREF's composite index; and (3) alleging Dominguez's process for evaluating TIAA Real Estate deviates from the process she used for her clients or alternatively that her evaluation is flawed because she used actual, real returns instead of "adjusted" returns to evaluate TIAA Real Estate. Cornell bases its narrative on factual assertions that are either incorrect or grossly overstated and disputed. Nonetheless, the cases Cornell cites establish that disputes as to faults or gaps in methodology go to the weight, not the admissibility of testimony. *Marini v. Adamo*, 995 F.Supp.2d 155, 181-82 (E.D.N.Y 2014), *aff'd*, 644 F. Appx 33 (2d Cir. 2016), and *aff'd*, 644 F. Appx 33 (2d Cir. 2016); *see also McCullock v. H.B. Fuller Co.*, 61 F.3d 1038, 1044 (2d Cir.1995) ("Disputes as to ... faults in [the expert's] use of differential etiology as a methodology, or lack of textual authority for his opinion, go to the weight, not the admissibility, of his testimony."); *Best v. Lowe's Home Ctrs., Inc.*, 563 F.3d 171, 181 (6th Cir.2009) ("Admissibility under Rule 702 does not require perfect methodology.").

### A.    Dominguez applied the same process she applies for all clients.

Cornell asserts that Dominguez applied a different methodology than she applies in practice, including alleging that she omitted qualitative analysis she would have performed for clients when recommending removal of investments. This is incorrect. In practice (as in her report), Dominguez's application of qualitative criteria depends on the purpose of the analysis and a different evaluation process is applied "to create a new investment menu" versus

evaluating "an existing product that has already been through a due diligence process to be put on an investment menu." Ex. 1, Tr. of Dep. of W. Dominguez ("Dominguez Dep.") at 85:9-20. Cornell's investments had not been through any due diligence process as of 2010 or 2013 when Ms. Dominguez was evaluating them. Doc. 226-2 at ¶¶ 79-83. When Dominguez evaluates funds for retention or selection in an investment menu without any prior due diligence (Cornell's situation) she looks first at performance issues and would remove any funds with performance issues in the selection/retention process without reaching qualitative measures. Dominguez Dep. at 90:1-10; 92:5-10. Cornell ignores that Dominguez explicitly testified "if I was creating a new investment menu from scratch, I wouldn't include a fund that had any red flag or yellow flags[.]" *Id*. at 89:8-14. Dominguez also made clear that "standard investment practice is to look in a retirement plan, is to look at the [asset class] box you are trying to fill within the investment menu and then compare that investment to other alternatives within that same [asset class] box." *Id*. at 116:2-13. By way of example, in 2018 Dominguez compared TIAA Real Estate to the existing REIT in ███████████████████████ retirement plans. Ex. 2, 2018 ██████████████████████. Using this process for Cornell, Dominguez screened out specific underperforming funds, including CREF Stock and TIAA Real Estate where better performing and lower cost investments were available for the designated asset class. Doc. 226-2 at ¶¶ 114-116; Ex. 3 (Exhibit 4 to W. Dominguez Expert Report); and Ex. 4 (Exhibit 6 to W. Dominguez Expert Report); Dominguez Dep. at 99:10-100:5.

    Dominguez's process is also consistent with how Innovest and Dominguez described their general methodology and principles in a 2012 RFP response. Ex. 5, Innovest 2012 RFP Response; Dominguez Dep. at 34:2-19. Innovest stated that it "was founded on the principles of fiduciary investing" and that it adheres to the principles put forth in "*The Management of*

*Investment Decisions*," which was edited by Dominguez's business partner and is "utilized by the Center of Fiduciary Studies, one of the leading institutions in this area." Ex. 5, at 4. Consistent with Dominguez's process, *The Management of Investment Decisions* states that the first step in the due diligence process for selecting money managers is reviewing performance numbers and that this "enables one to narrow the list of potential candidates so that other quantitative and qualitative criteria can be applied." Ex. 6, Excerpts from *The Management of Investment Decisions* at 137-138. It is only after the sixth quantitative screen out criteria is applied that finalists for the consolidated investment menu receive a qualitative assessment. *Id*.

According to this well-respected text on fiduciary process and Dominguez's process, once a manager goes through a thoroughly vetted process and makes it into the consolidated line-up, the manager is placed on watch for removal if the manager performs in the bottom quartile (75th percentile) of its peer group over a quarterly and annual period or if the manager has a five-year risk-adjusted return below that of median managers within the appropriate peer group. *Id* at 116, 205. Managers would be replaced in the menu if they are performing below the median (50th percentile) of the peer group over a rolling three-year period, fall below the top 40 percent of the peer group over a five-year period or has a negative alpha for three- and/or five-year time periods. *Id*. at 116-117, 205; *see also* Doc. 226-2 at ¶¶ 51-51, 114-115; Ex. 3-4. In July 2013, CREF Stock ranked below the 50th percentile of its annualized peer groups for the 3 and 5 year periods. Doc. 291-40 at 49; Doc 241-1 at 48; Doc. 291-45 at 28.[2]



| Asset Class | Investment Name | Ticker | 3 yr RAP | 5 yr RAP | 3 yr Peer | 5 yr Peer | 3 yr Style | 5 yr Style | Expense | Total Quant | Total Quant |
|---|---|---|---|---|---|---|---|---|---|---|
| Large Company Blend**** | CREF Stock | - | ⚠ | ⚠ | ⚠ | ⚠ | 🟢 | 🟢 | 🟢 | 45 | ⚠ |

As Dominguez explained, managers already exhibiting these problems would never make it to

---

[2] A yellow triangle in CAPTRUST's report meant that the investment falls below the 50th percentile of the peer group. Doc. 291-45 at 134.

the qualitative assessment portion of manager selection in an unmonitored, haphazard investment menu like Cornell's lineup. Dominguez followed this same process with her clients. When a client retains Dominguez, she creates a consolidated line-up for her client. Dominguez removes all investments not included in the consolidated line-up. Doc. 226-2 at ¶¶ 39-43; Dominguez Dep. at 57:24-66:22; 72:9-76:24; Ex. 5, at 7. Because CREF Stock and TIAA Real Estate failed multiple performance measures, consistent with her practice in the "real-world," Dominguez did not need to reach qualitative measures.

B. **Dominguez's methodology led to the removal of TIAA Real Estate and CREF Stock from multiple clients' 403(b) plans prior to 2016.**

Cornell claims "had Dominguez followed" Cornell's mischaracterization of her methodology, "she would have concluded—as virtually all university fiduciaries did during the relevant time period—that CREF Stock and TIAA Real Estate were prudent investment options." Doc. 227 at 7. Cornell turns a blind eye to Dominguez's actual advice to 403(b) retirement plan clients both prior to any lawsuit challenging CREF Stock and TIAA Real Estate and after. In contrast to Cornell's unsupported assertion, Dominguez removed CREF Stock and TIAA Real Estate at least twice and recommended against clients using both investments after 2016.

First, Cornell falsely states that in "2016, Innovest was retained by . . . ██ and that "██ did not initially offer the TIAA Real Estate Account" to suggest Dominguez's methodology would produce different results in her "real-world" practice. Doc. 227 at 11. ██ retained Dominguez and Innovest in 2014, not 2016. Doc. 226-2 at ¶ 15; Dominguez Dep. at 64:16-24; Doc. 226-12 at 4. Prior to her 2014 retention, ██ had CREF Stock and TIAA Real Estate in its 403(b) and 401(a) plans. Dominguez Dep. at 65:1-66:20; 148:20-149:9; Doc. 226-07 at 26 (PDF 18); Doc. 226-08 at 70 (PDF 25). Applying Innovest's methodology and advice, ██ *removed* both investments from its retirement plans. *Id*; Exhibit 7, 2015 ██ Transition Notice Removing

6

CREF Stock and Real Estate at 2; Ex. 8, Expert Rebuttal Report of Wendy Dominguez at ¶ 27, fn. 32. In 2014, Dominguez also removed TIAA Real Estate and CREF Stock from another 403(b) plan—████████████████████. Doc. 226-2 at ¶ 15; Dominguez Dep. at 72:9-74:14; Ex. 8 at ¶ 27, fn. 31; Ex. 9, 2015 ████████████ Retirement Plan Changes at 1 (noting Innovest is the investment advisor) and 3 (removing CREF Stock and TIAA Real Estate).

████████████████████████████
████████████████████████████
████████████████████████████
████████████████████████████
████████████████████████████
████████████████████████████
████████████████████████████
████████████████████████████
████████████████████████████
████████████████████████████
████████████████████████████
████████████████████████████
████████████████████████████
████████████████. Cornell conveniently leaves out Innovest's ultimate recommendations, which Cornell obtained with the other exhibits it filed.

████████████████████████████
████████████████████████████
████████████████████████████

7

██████████████████████████████████████████

███████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████████████

██████████████████████████████████████. Additionally, Cornell provides no

reason why this analysis conducted in *2018* is relevant to whether the analysis Dominguez

conducted for *2010* or *2013* is reliable.

Dominguez's detailed and thoughtful analysis, ████████████████████████████

██████████████, also sheds light on why Dominguez opined that Cornell and CAPTRUST's

process was deficient. ████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████████. Dominguez Dep.at

67:20-68:22. Dominguez opined that prudence "depends on the facts and circumstances" of each

individual case, ████████████████████████████████t, Dominguez

provided an exhaustive analysis within the context of the already vetted best-in-class line-up so

the fiduciaries could evaluate and consider all relevant materials. *Id*; Ex. 2 at 8- 21. In contrast,

Cornell and CAPTRUST added the TIAA Real Estate Account to a best-in-class investment

menu without any performance analysis.



| Asset Class | Investment Name | Ticker | 3 yr RAP | 5 yr RAP | 3 yr Peer | 5 yr Peer | 3 yr Style | 5 yr Style | Expense | Total Quant | Total Quant |
|---|---|---|---|---|---|---|---|---|---|---|
| Direct Real Estate**** | TIAA Real Estate | - | - | - | - | - | - | - | - | - | - |

Doc. 241-1 at 49. ████████████████████ like with any investment, Dominguez

provided ████ with detailed reports including asset allocation monitoring, manager scorecards,

underlying comments, watch list history, tables of historic returns and detailed fund fact sheets

and analysis. Doc. 226-12 at 17-19, 27-28, 29-30 and 33-36; Doc. 226-11 at 2-44. Contrast this

with Cornell and CAPTRUST, who only provided and reviewed an "investment scorecard" with

only green, yellow and red symbols and no performance information. *Id*; Doc. 290-15 at 3, Doc.

241-1 at 41-49; Doc. 241-01 at 40-48. Unsurprisingly, Dominguez opines that CAPTRUST and

Cornell failed to implement a proper fiduciary governance structure, failed to engage in a

diligent process for the selection, monitoring and removal of the Plans' investments and that

CAPTRUST failed to provide and Cornell failed to consider, critical underlying performance

data when selecting investments for the best-in-class investment menu. Doc. 226-2 at ¶¶ 68, 79-

123.

Cornell also misstates Dominguez and Innovest's role in the 2014 ORP report intended to

comply with Colorado House Bill 04-1007 for the state colleges and universities of Colorado.

Doc. 227 at 1, 10. To comply with Colorado House Bill 04-1007, the state universities of

Colorado (which ERISA does not govern) determined that gathering and reporting performance

data on a three-year cycle satisfies 04-1007. Doc. 226-6 at 3 ("The law's intent is to provide

oversight by establishing periodic review of the Optional Retirement Plans (ORPs) If the ORPs

comply with these oversight standards, the governing board, its members, agents, employees,

and plan administrators, 'shall have no liability whatsoever the participants in the plan.'");

Dominguez Dep. at 147:18-148:19. Contrary to Cornell's suggestions, the state colleges retained

Innovest solely to report underlying performance data in accordance with a pre-approved format

for House Bill 04-1007 reports. Dominguez testified that Innovest was not retained to make

recommendations, but "just to layout information" and that it was not their "role in this process"

to provide advice on any investment. Dominguez Dep. at 155:20-22, 156:22-157:5, 158:16-20;

Doc. 226-06 at 32. Although all of these non-ERISA schools retained CREF Stock and TIAA

Real Estate, investment professionals do not select investments "because everyone else at the country club uses the same" investment. Ex. 6, Excerpts from *The Management of Investment Decisions* at 134; Doc. 227 at 1. ███████████████████████████████████ ██████████████████████████.

Cornell omits the fact that Metropolitan State College of Denver is also governed by Colorado House Bill 04-1007, not ERISA. Doc. 227 at 1, 10. As explained below, it is important that a fiduciary is aware of what laws and regulations govern their conduct and fashion their minimum duties and processes based on those applicable laws and regulations. Metropolitan State followed the pre-approved reporting of information process for years. ████████ ████████████████████████████████████ ████████████████████████████████████ ████████████████████████████████ ████████████████████████████████████ ███████████████████████████████ Doc. 226-2 at ¶ 20. Consistent with Dominguez's advice to ████ and other clients, Dominguez would have advised Cornell to remove CREF variable annuity products in 2010 and 2013. Doc. 226-2; Exs. 2, 7 and 9.

Finally, Cornell cites ████████████ to suggest Dominguez employed a different process, but neglects to note that ████████████ was not Dominguez's client but a client of other advisors at her firm. Dominguez Dep. at 69:3-11. Therefore, Dominguez had no involvement in the account and could not identify whether Innovest had previously advised against ████████████ retaining the TIAA Real Estate Account (it likely had). Dominguez Dep. at 70:12-17; 71:12-16.

## C. Contrary to Cornell's assertions, Dominguez's evaluation of CREF Stock is consistent with her practice and appropriate.

Cornell offers three arguments to suggest Dominguez's evaluation of CREF Stock is improper by alleging: (1) she would not have deemed CREF Stock as underperforming for her clients; (2) Dominguez's benchmark "materially misstates CREF Stocks' exposure[s]," and (3) Dominguez's comparisons are "meaningless." All of Cornell's arguments are flawed.

*First*, Cornell states that "the document [Dominguez] cites" demonstrating underperformance, "speaks volumes" and proceeds to only cite a portion of the document. Doc. 227 at 12. In reality, Cornell, CAPTRUST (for at least two clients) CAPTRUST's expert, ███ ████████████████████████████████████████████████ all classified CREF Stock as a Large Company Blend and the CREF Stock Account underperformed against the Russell 3000 Index (a Large Company Blend style benchmark) including in the portion of the disclosure that Cornell omits:

**Performance as of December 31, 2013**

| | Inception date | Total return 1 year | Average annual total return 5 years | 10 years |
|---|---|---|---|---|
| **CREF Stock Account** | 7/31/1952 | 27.83% | 16.84% | 7.28% |
| CREF Stock Composite Benchmark* | — | 28.07 | 16.89 | 7.47 |
| **Broad market index** | | | | |
| Russell 3000® Index | — | 33.55 | 18.71 | 7.88 |

Based on this omission, Cornell suggests that for "her real-world clients," Dominguez would not have removed CREF Stock. Incredibly, Cornell then cites a performance review for ██████ ████████████—the same 403(b) plan that *removed* the CREF Stock Account after retaining Innovest in 2014. Doc. 226-04; Ex. 9. To support its narrative, Cornell discusses the underperformance of Blackrock Mid Cap Value that Innovest removed from ████████ ██████ retirement plan (and ██████ plan). Dominguez Dep. at 201:8-24 (the investment Cornell notes as underperforming at ██████████████████ is being replaced by a Vanguard Fund"); *see also* Doc. 226-12 at 3 (for ██████ a "search for a Mid Cap Value was prepared and Vanguard

11

Selected Value was chosen to replace Blackrock Mid Cap Value").

Cornell then cites an allegedly underperforming funds in Innovest's plan, but neglects to mention that the at-issue fund cited is only included not in the fund lineup but in Innovest's custom risk-based model portfolios. As Innovest explained in 2012, risk-based model portfolios work like target date funds, providing "a professional asset allocation alternative" where a participant gets the overall return of the portfolio, not the return for any particular investment held in the portfolio. Ex. 5 at 7. In this scenario, the investment professional has absolute control over the asset allocations and can rebalance the holdings at any time. *Id*. In contrast, a Cornell plan participant could allocation 100% of their retirement savings to a risky sector fund—like the Leisure or Retailing sector only funds that were in Cornell's Plans. Cornell incorrectly implies that Dominguez offers these types of sector funds in retirement plans where plan participants are making asset allocations decisions. Doc. 227 at 22. Innovest recommends that clients only use alternative investments in risk-based portfolios where professionals manage the asset allocations and exposures and will change the asset allocation in response to market forces. Ex. 5 at 7-8.

*Second*, Cornell claims that Dominguez's comparison of CREF Stock to the 70% Russell 3000, 23% MSCI EAFE and 7% MSCI Emerging Markets index is "unreliable" and "invalid" because, among other things, it "materially misstates CREF Stock's exposure to emerging markets, Canadian stocks, and small cap international stocks." Doc. 227 at 13-14. Cornell's position is irreconcilable with its own, CAPTRUST, Segal Investment Advisors and TIAA's practices. When responding to Cornell's RFP in May 2011, Segal Advisors provided Cornell with a sample analysis of CREF Stock, benchmarking it against a blend of 80% Russell 3000, 20% MSCI Net EAFE. Doc. 291-11, Segal Advisors Response to Cornell's RFP for an Investment Advisor at 1, 158-160. In 2013, CAPTRUST benchmarked CREF Stock against the

S&P 500 Index and Morningstar Large Blend Index. Doc. 291-40 at 49. CAPTRUST's investment advisors' best description of the "custom benchmark" it used after 2014 was 70% domestic equity and 30% international equity, with 7-8% of the 30% in emerging markets. Doc. 290-23 at 144:22-145:7; Doc. 291-9 at 116:19-118:12. This is Dominguez's precise benchmark allocation. Doc. 227 at 13. Even Cornell's expert, John Chalmers, does not claim that the only way to evaluate the CREF Stock Account is to compare it to the composite created by TIAA. Ex. 10, Tr. of Dep. J. Chalmers ("Chalmers Dep.") at 175:5-179:7. Further, using Cornell's logic, TIAA's use of the MSCI World Index as the only benchmark for CREF Global Equities would "materially misstate" CREF Global Equities' "exposure to emerging markets" and therefore would be an "unreliable" and "invalid" comparator because the MSCI World Index benchmark "does not offer exposure to emerging markets." Doc. 240-3 at 20; Ex. 11, MSCI World Index Fact Sheet at 1.

Additionally, relying solely on the benchmark provided by a vendor, as Cornell suggest is necessary, is contrary to ERISA's fiduciary standards. Controlling Second Circuit precedent provides that a fiduciary cannot "rel[y] exclusively on the representations of [a vendor] as to [an investment's] financial strength" and must conduct its own "reasonable investigation." *Katsaro v. Cody*, 744 F.2d 270, 279-80 (2d Cir. 1984); *see also Donovan v. Bierwirth*, 680 F.2d 263, 272 (2d Cir. 1982) (holding that reliance on a vendor or advisor cannot "operate as a complete whitewash which, without more, satisfies ERISA's prudence requirement.").

***Third***, Cornell's citation to *Meiners*, a case resolving a motion to dismiss, undermines its position. *Meiners* supports using a market index as a comparator. *Meiners v. Wells Fargo & Co.*, 898 F.3d 820, 822 (8th Cir. 2018) (observing that comparison against a market index states a claim for underperformance). The use of CREF Stock Account's market index (Russell 3000

13

Index) is particularly compelling here where Cornell and CAPTRUST designated CREF Stock to fill the Large Company Blend asset class box in the Plans. CAPTRUST evaluated CREF Stock against the S&P 500 and Morningstar Large Company Blend Universe, and CREF Stock lists the Russell 3000 Index as its "appropriate broad-based securities market index" in all of its SEC filings and DOL disclosures during the class period. Doc. 292-35 at 11-13, 60-61; Docs. 292-12 to 292-21. Cornell, CAPTRUST, CAPTRUST's expert, and other 403(b) Plans' designation of the CREF Stock Account in the Large Company Blend asset class box is consistent with *The Management of Investment Decisions* which explains that an investment committee sets the asset classes and then selects managers that fit into each asset class. Ex. 6 at 4; Dominguez Dep. at 129:13-17. In this case, apart from assigning CREF Stock to the Large Company Blend asset class, Cornell and CAPTRUST's Investment Policy Statement provides that they will benchmark funds in the Large Company Blends asset class box against the S&P 500 (as CAPTRUST initially did) or Russell 1000 Index. Doc. 252-6 at 11. There is no entry on the IPS for "distinct asset classes." *Id*. This IPS benchmark designation is consistent with retirement plan practice because an IPS includes "as a minimum, the index and the style against which the manager's performance will be compared." Ex.6 at 116; Doc. 226-2 at ¶¶ 35-36; Doc. 252-6 at 11.

## D. Dominguez's process for evaluating TIAA Real Estate is consistent with her practice and other investment advisors' practices.

Cornell asserts that Dominguez's TIAA Real Estate analysis should be excluded for three reasons: (1) alleging Dominguez would not have removed TIAA Real Estate in 2010 or 2013; (2) alleging Dominguez is required to use adjusted return only to evaluate TIAA Real Estate; and (3) alleging that Dominguez believes there is no benchmark available to evaluate TIAA Real Estate. Cornell's arguments lack merit.

*First*, as noted above, Dominguez removed the TIAA Real Estate Account from at least two

retirement plans in 2014-2015 and ████████████████████████████████

████████████████████

     **Second**, Cornell assert that Dominguez's review of TIAA Real Estate's prospectus is "a flat-out mischaracterization of the document she cites" asserting that a fiduciary **must** use the adjusted returns to evaluate TIAA Real Estate. Doc. 227 at 16. Unsurprisingly, using TIAA's "adjusted returns" methodology, Cornell explains that TIAA Real Estate outperforms its benchmark. Doc. 227 at 16. Cornell's position is entirely contrary to the practices of investment advisors working with retirement plans and Cornell's position impugns its own and CAPTRUST's evaluation of TIAA Real Estate. In 2011, Segal Advisors provided Cornell with a sample of its analysis of TIAA Real Estate. Doc. 291-11 at 192. Segal used the unadjusted returns when comparing TIAA Real Estate against the NCREIF Property Index. *Id*. CAPTRUST compared TIAA Real Estate's unadjusted returns to the Dow Jones US Select REIT and Morningstar Specialty-Real Estate benchmarks. Doc. 291-40 at 68. By 2014, CAPTRUST evaluated TIAA Real Estate's unadjusted returns against the NACREIF Property Index and Morningstar Specialty-Real Estate Universe. Doc. 291-45 at 28, 51; Doc. 290-23 at 145:8-24. Cornell's former Chief Investment Officer testified that removing the lowest performing portion of a fund to compare it to a benchmark—as Cornell suggests is proper for TIAA Real Estate— "doesn't make sense." Doc. 290-46 at 117:5-8. Dominguez, CAPTRUST and Cornell's CIO apply a simple concept—plan participants do not care about adjusted returns because they are experiencing unadjusted returns. TIAA discreetly discloses this fact in a SEC filing, stating that "adjusted performance figures are designed for use of Account investors for comparison purposes only, **and do not reflect the true returns experienced by holders of interests in the Account**." Doc. 292-7 at 2. Consistent with her opinions, Dominguez used unadjusted returns in

her evaluation of the TIAA Real Estate Account for ██ ████ comparing it to the existing

**REIT** already filling the Real Estate asset class box in the plans and the NCREIF Property Index.

Ex. 2 at 17-19.

Cornell relies on *Sacerdote v. New York University*, 328 F.Supp.3d 273 (S.D.N.Y. 2018), to

argue that Dominguez's use of unadjusted returns requires her exclusion. Doc. 227 at 16.

Cornell neglects to mention that *Sacerdote* is not a decision under *Daubert* or Rule 702

determining the admissibility of an expert, but a trial order *after* complete testimony and based

on weight and credibility determinations. Cornell simply overstates the opinion. Instead, the

court made credibility determinations to rely upon one expert over another. 328 F. Supp. 3d at

310-311. In fact, *Sacerdote* denied a similar motion to exclude. Ex. 12, *Sacerdote v. N.Y. Univ.*,

No. 16-6284, Doc. 270 (S.D.N.Y. Apr. 5, 2018).

**Third**, Cornell inflates Dominguez's opinion stating that Dominguez's ultimate opinion

is that "the Real Estate Account cannot be prudent because it 'offers no benchmark.'" Doc. 227

at 17, citing Dominguez's Expert Report (Doc. 226-2) at ¶ 105. Dominguez is a fiduciary process

expert. In full context, Dominguez opines that Cornell and CAPTRUST did not engage in a

process to determine a proper benchmark or reconcile the multiple benchmarks CAPTRUST

utilized over time. CAPTRUST provided no benchmark in its 2013 analysis, which Dominguez

opines is not a proper analysis. Doc. 226-2 at ¶ 105 ("It is apparent from CAPTRUT's July 31,

2013 report that they did not have a procedure in place to benchmark and evaluate the TIAA

Real Estate Account for the Plans."). Despite having multiple real estate investments, Cornell

and CAPTRUST's Investment Policy Statement does not identify real estate as a proper asset

class and provides no benchmark for real estate investments in the Plans. Doc. 252-6; *see* Ex. 6

at 116. Dominguez based her opinion on CAPTRUST's and Cornell's failure to identify any

benchmark to evaluate the TIAA Real Estate Account up to July 2013. Doc. 241-1 at 49.

## III.    DOMINGUEZ DOES NOT OFFER LEGAL OPINIONS, BUT HER OBSERVATIONS REGARDING INDUSTRY STANDARDS AND PROCESSES.

Apart from its unwarranted attacks on Dominguez's methodology, Cornell argues that she offers opinions on pure questions of law. Doc. 227 at 17. While Cornell is correct that expert opinions on pure questions of law are impermissible, "[e]xperts may testify on" industry standards related to "mixed questions of fact and law" regardless of whether "'it embraces an ultimate issue to be decided by the trier of fact.'" *Fiataruolo v. United States*, 8 F.3d 930, 941 (2d Cir. 1993) (quoting Fed. R. Evid. 704); *United States v. Bilzerian*, 926 F.2d 1285, 1295 (2d Cir. 1991) ("testimony concerning the ordinary practices in the securities industry may be received to enable the jury to evaluate a defendant's conduct against the standards of accepted practice."); *Marx & Co. v. Diners' Club Inc.*, 550 F.2d 505, 509 (2d Cir. 1977) (holding that testimony on "Customary practices of a trade of business" are admissible). Thus, expert testimony on standards of conduct and professional principles, like Dominguez offers, are proper. *Fiataruolo* 8 F.3d at 942; *In re Blech Sec. Litig.*, No. 94-7696, 2003 WL 1610775 at *21 (S.D.N.Y. Mar. 26, 2003) (allowing expert to "testify on customs and standards of an industry, and to opine as to how a party's conduct measured up against such standards"); *SEC v. U.S. Envtl., Inc.,* No. 94-6608, 2002 WL 31323832, *3 (S.D.N.Y. Oct. 16, 2002) (admitting expert's testimony that "certain trading patterns would raise 'red flags'" based on expert's knowledge of typical activities and the types of patterns that would be recognized as irregular, as supported by the expert's experience). Even where expert testimony "lies near the border, close to a prohibited invasion" into the province of the court, it is nonetheless proper if the expert "provid[es] factual explanations" and opinions that are based "on the evidence [the expert] looked at and the work that [he] did." *Fiataruolo*, 8 F.3d at 942.

The cases cited by Cornell are distinguishable. *Sacerdote* did not excluded any experts' testimony regarding industry standards, but limited an ERISA lawyer from using the word "prudent" in her testimony. Ex. 12. *Lynch v. J.P. Stevens & Co.* excluded testimony not on the standards that professionals in the industry applied but that segregation of plan assets outside the master trust was a per-se violation of ERISA. 758 F. Supp. 976, 1014 (D.N.J. 1991). *Jones v. O'Higgins* actually admitted testimony of an experience investment advisor, like Dominguez, on prudent practices by industry professionals and excluded as legal opinion only testimony from an ERISA attorney. 1989 WL 103035 at *7-8 (N.D.N.Y. Sept. 5, 1989). *Brown v. CTC Corp.* did not exclude testimony from an industry professional on prudent practices but testimony from legal experts regarding compliance with ERISA's "'top hat' plan" exemption. 2017 WL 5992333 at * 3 (D. Vt. 2017). Similarly, *Levinson v. Westport Nat'l Bank* did not exclude portions of the expert's opinions related to industry standards or customs but excluded legal conclusions he drew from applying Internal Revenue Code regulations to facts. 2012 WL 4489260 at *5-6 (D. Conn. 2012).

## IV. DOMINGUEZ'S SHARE CLASS METHEDOLOGY IS SOUND

Cornell argues that apart from Dominguez's methods regarding retirement plan fiduciary process, plan construction and investment removal, her methodology for opining on Cornell's share-classes falls short of "professional standards." Doc. 227 at 19. Cornell seeks to argue the merits of the case, but Plaintiffs challenge the reasonableness of Cornell's recordkeeping fees. Cornell did not add revenue credit accounts to the Plans until 2012 and because "Dominguez's opinion covers the period August 2010-December 2011," these "credits" were non-existent. Doc. 246-5 at 38-39; Doc. 227 at 19. Dominguez is permitted to assume Cornell's recordkeeping fees were not reasonable. *Passlogix, Inc. v. 2FA Tech, LLC*, 708 F.Supp.2d 378, 396 (S.D.N.Y. 2010) (contentions that an expert's assumption are unfounded go to the weight, not the admissibility of

18

the testimony). "Whether there are any potential offsets that could affect the amount of damages awarded if plaintiff were to prevail at trial is separate and apart from the issue of" Cornell's failure to move to a lower share-class and Ms. Dominguez is not required to account for every potential outcome in this case. *Crockford v. Spencer*, No. 10-813, 2012 WL 370187, at *3 (D. Conn. Feb. 3, 2012).

Further, Cornell was not monitoring and had no clue which investments were producing any amount toward any ERISA revenue credit prior to 2014 (and after). Ex. 13, E-mail exchange between J. Strodel and RPOC in 2014 (CAPTR_0014867). CAPTRUST informed Cornell that "CREF annuities and the TIAA Traditional [were] the main vehicles that generate the ERISA account funding[,]" not the mutual funds that are the subject of Dominguez's opinions. *Id*. Cornell even moved to Institutional shares of these funds after 2011 but prior to receiving any revenue credits with TIAA. *Id*. ("Cornell and WCMC are using institutional shares. The institutional share class does not provide revenue share"). In any event, Dominguez testified that she would "not necessarily" back out revenue sharing when assessing the expense of the fund and she would only do this after a thorough evaluation of the recordkeeping fees. Dominguez Dep. at 45:23-46:2, 48:9-20. Cornell provides no evidence in its motion as to the amount of revenue sharing credited back to plan participants versus to offset plan expenses in 2011—because there was no revenue credit account in 2011. Cornell's theory is simply inapplicable to Dominguez's opinion on share class damages.

## V.    DOMINGUEZ OPINES ON MARKETPLACE PRACTICES NOT THE DESIRABILITY OF CONSOLIDATED PLAN LINEUPS

Cornell argues that Dominguez's testimony relates solely to claims that have been dismissed. Doc. 227 at 20. Cornell seeks to limit Dominguez's testimony by defining its own view of Dominguez's opinions and their scope. Dominguez is a fiduciary process expert.

Defendants cannot dispute this, nor have they offered any expert to rebut (or offer an alternative to) Dominguez's descriptions of prudent fiduciary process and industry standards. Dominguez's opinion that "a prudent fiduciary conducts appropriate due diligence to develop an investment menu from which plan participants invest their retirement savings" and that this "is a fundamental step that any prudent fiduciary must undertake when overseeing a defined contribution plan" is highly relevant. Doc. 226-2 at ¶¶ 39-48; Doc. 226-12 at 4, 7-8, 15-16; Ex. 5 at 8-9, 37. Dominguez opines, based on her over 25 years of experience, that this process includes building a streamlined investment menu with coverage over major asset classes. *Id*. Dominguez's opinions pertain to industry standard processes within defined contribution plans during the relevant period and Cornell's failure to follow CAPTRUST's advice on these industry standards in July 2013—facts at issue in this case. Doc 241-1 at 23-39 (recommending the removal of all investments in red, freezing of all annuities in purple and creating a Tier 2 best-in-class investment menu per industry standard). Dominguez applied the same methodology in this case as she does with all of her retirement plan clients, while also identifying the Cornell Plans' specific underperforming and inappropriate funds in the process.

Cornell next asserts that Dominguez used 2014 performance data to develop her suggested line-up. Dominguez's evaluation of an acceptable best-in-class line-up in 2010 is not flawed and is consistent with industry practice. Dominguez opined that it would have been reasonable for a fiduciary to develop the proposed consolidated line-up in August 2010. Doc. 226-2 at ¶ 86. Dominguez conducted an evaluation of asset class coverage and a detailed analysis of each fund as of 2010, using data available in 2010. *Id*. at ¶ 87; Ex. 3. Dominguez excluded certain funds that did not pass this analysis. *Id*. at ¶ 87, 89-110. She observed that "the line-up is comparable to the best in class line up utilized by plan sponsors in 2010 and 2011" and that at least 7 "of my

13 choices were included in best-in-class line ups in 2010 and early 2011[.]" Ex. 8 at ¶ 70. This is entirely consistent with *Katsaros v. Cody*, 744 F.2d 270, 279 (2d Cir. 1984) which holds that the court's proper focus is on the Defendants and whether "at the time they engaged in the challenged transactions, employed the appropriate methods to investigate the merits of the investment and to structure the investment." Contrary to Cornell's assertions, Dominguez's line-up was plausible, if not probable, as of 2010. By July 2013, CAPTRUST had proposed many of the same investment alternatives. *Compare* Doc. 241-1 at 12 with Doc. 226-2 at ¶ 86.

## VI.  DOMINGUEZ SHOULD BE PERMITTED TO OPINE ON ALL FUNDS

Cornell again disregards discovery dispute procedure, arguing that Plaintiffs have waived certain damages. For the same reasons stated in Plaintiffs' Memorandum in Opposition to CAPTRUST's Motion for Summary Judgment (Doc. 288) at pages 15-17, the Court should allow Dominguez to testify as to the defects of all investments in the Plans. To further support its discovery related argument, Cornell mischaracterizes Dominguez's testimony by failing to include that Dominguez put forth specific underperforming funds that Cornell should have removed as of September 1, 2010. Doc. 226-2 at ¶ 114-116; Ex. 4. Further, CAPTRUST's July 2013 presentation demonstrated that any fund with a yellow triangle in a performance metric failed Cornell's IPS. Doc. 241-1 at 39-47; Doc. 291-45 at 134. These investments also failed the standardized criteria put forth in *The Management of Investment Decisions*. Ex. 6 at 116-117, 205. Cornell simply failed to take any action on underperforming funds—even those that failed its own standards for retention.

## VII.  DR. BUETOW SHOULD BE PERMITTED TO OPINE ON MAPPING AND DAMAGE CALCULATIONS

Cornell does not challenge Dr. Buetow's methodology for actually calculating damages. Doc. 227 at 23-25. Nor does Cornell claim that there are mathematical errors. Chalmers Dep. at

239:16-23. Instead, Cornell alleges three flaws in Buetow's opinions: (1) Buetow did not disclose his mapping method; (2) all individual mappings are improper; and (3) Buetow made errors that render his opinion unreliable. Each is unpersuasive and contradicted by the record.

**First**, Cornell is incorrect that Buetow failed to disclose his mapping methodology and opinions. *See* Doc. 226-22 at ¶ 34, fns. 7-8. To support this claim, Cornell states that "Buetow further testified that he was not opining that the mapping he used to generate damages . . . was an appropriate mapping." Doc. 227 at 23. This citation addresses a portion of Buetow's mappings, but is not a complete or accurate description of Buetow's opinions and testimony. In the testimony Cornell cites Buetow indicates that counsel gave him the best-in-class line up of funds listing the corresponding asset classes, i.e., Dominguez's best-in-class line-up. Doc. 226-2 at ¶ 86, Doc. 226-22 at ¶ 34, fn. 7. Buetow then matched Cornell's investments by asset class as designated by CAPTRUST to the corresponding asset class box in Dominguez's best-in-class line-up. Doc. 226-22 at ¶ 34, fn. 8. For example, CAPTRUST designated the Fidelity Stock Selector All Cap (FSSKX) as Large Growth so it would go to the T. Rowe Price Institutional Large Cap Growth Fund in the Dominguez line up, while the Fidelity Value K (FVLKX) went to the Dominguez designated Mid-Cap Value fund, JHancock Disciplined Value Mid Cap R6. Doc. 241-1 at 27; Doc. 226-2 at ¶ 86; Excerpt of FidelityDamagesProduction Workbook at rows 261 and 283 reproduced below:

| 261 | 2101-FID STK SEL ALL CP K | FSSKX | T Rowe Price Instl Large Cap Growth | TRLGX |
| 283 | 2102-FID VALUE K | FVLKX | JHancock Disciplined Value Mid Cap R6 | JVMRX |

For these types of funds with a direct match between CAPTRUST's asset class designation and the Dominguez best-in-class designation, Buetow stated he was not offering an opinion as the propriety of this mapping because it was merely a simple application of CAPTRUST's asset class designation to the Dominguez asset class designation. Ex. 14, Tr. of

Dep. of G. Buetow ("Buetow Dep.") at 47:16-50:3. This was Cornell's ultimate mapping strategy. Ex. 15, CAPTRUST and Cornell's mapping process (CORNELL027852) ("Base mappings on the Morningstar classification at time of mapping. Note: For recommended funds, CAPTRUST's classification always supersedes the Morningstar classification if applicable."); Ex. 16, Dr. Buetow's FidelityDamagesProduction Workbook, Mapping Tab Columns A-D; Ex. 17, Dr. Buetow's TIAAdamagesproduction Workbook, Mapping Tab Columns A-D; Ex. 18, Dr. Buetow's Fidelity Mapping Workbook.

In the same portion of Buetow's testimony, he states that for funds that fell outside of the matching CAPTRUST to Dominguez asset class procedure "we had to analyze those funds individually and ... make mappings to that smaller [Dominguez best-in-class] list" based upon Buetow's 25-year experience "mapping funds." Buetow Dep. at 49:9-22. For those funds, Buetow ran alternative calculations to the qualified default investment alternative option (QDIA) as well. Ex. 19, Expert Rebuttal Report of Dr. Gerald Buetow at ¶¶ 1, 4, 5, 6. When there was no corresponding asset class between CAPTRUST's designation and the Dominguez menu, Buetow looked to Morningstar's classification first, but testified that when "there wasn't a Morningstar class, we felt, we dug a little deeper. So we didn't just do this, you know, mindlessly." Buetow Dep. at 59:3-7; 60:18-19. Buetow explained that because "Morningstar isn't always exhaustive" he used "all of the experience [he has] doing this" to best match the "investment characteristics" and that all of the mapping detail was included "in the workbooks that [he] provided as part of this case." Id. at 55:11-63:12; Exs. 16-18. Buetow fully described his methodology, exhaustively walking through several examples. Buetow Dep. at 72:4-82:17. Buetow's mapping is consistent with industry practice. Ex. 8 at ¶¶ 62-67, fns. 86, 87, 90, 94-97, 99 (collecting examples of retirement plan mapping outcomes consistent with Buetow's workbooks); Exs. 16-18.

These mappings are the accepted method of determining damages, as set forth in the Second Circuit's hallmark decision in *Donovan v. Bierwirth*, 754 F.2d 1049 (2d Cir. 1985). When defendant fiduciaries fail to remove imprudent investment vehicles from defined contribution plans, "the measure of loss . . . requires a comparison of what the Plan actually earned on the [imprudent investment] with what the Plan would have earned had the funds been available for other Plan purposes." *Id.* at 1056. "Where several alternative investment strategies were equally plausible, the court should presume that the funds would have been used in the most profitable of these." *Id.* The Court should resolve "[a]ny doubt or ambiguity" regarding damages against the fiduciary. *Id.* In other words, any "uncertainties in fixing damages will be resolved against the wrongdoer." *Id*. Applying these principles, courts use the most profitable "plausible" replacement funds to calculate damages. *Id*; *see also Trs. of the Upstate N.Y. Eng'rs Pension Fund v. Ivy Asset Mgmt.*, 843 F.3d 561, 567 (2d Cir. 2016); *Severstal Wheeling, Inc. v. WPN Corp.*, 119 F.Supp.3d 240, 268 (S.D.N.Y. 2015) (both similar).

Cornell argues that Buetow followed a different methodology than for his clients, erroneously implying that Buetow uses an algorithm in all instances when making mapping decisions. Instead, Buetow testified that he used algorithms "in some instances[,]" that there has to be some outside "expertise and subjectivity" and that algorithms are "only as good as the person developing" them. Buetow Dep. at 63:15-24. Buetow testified that in other instances you "have to make that [mapping] determination manually[.]" *Id*. at 64:8-17. Buetow testified that his "skill and judgment developed the algorithms" he used for select clients so "they're one in the same." *Id*. at 64:18-24. Buetow testified he did not use an algorithm in this case because it was not necessary for a variety of straightforward reasons. *Id*. at 65:18-69:18.

Cornell bases its "unreliability" arguments on three citations to the record to declare that

Buetow made "many errors." All citations are inadequate and unconvincing. The reliability determination "entails a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue." *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 592–93 (1993). ***First***, Cornell asserts Buetow uses "the wrong month's numbers in his figures," but TIAA only produced quarterly balances, while Fidelity produces monthly balances. Therefore, TIAA's damages calculations for the 2013 number had to start at the beginning of the quarter, while Fidelity's numbers start immediately after July 2013. Buetow Dep. at 54:18-22; 103:1-104:18; 115:3-6. In any event, Buetow's methodology is unchallenged, so damages can be calculated from any start date. ***Second***, Cornell cites a copy and paste transcription issue when Buetow pulled the summarized damages from the underlying workbook onto the actual Expert Report. Buetow pointed out the transcription issue and corrected it. *Id*. at 123:17-124:12. ***Third***, Cornell cites to the start of Buetow's deposition where he makes corrections to a few select inadvertent codes being overwritten in his calculation tables during the process of producing his report to Defendants. *Id*. at 17:23-19:18. The corrected calculations were produced the same day. *Id*. Obviously, Buetow's methodology and results are easily verifiable and any minor inaccuracies have been identified. Buetow's transcription issues are editorial in nature and in no way can they be considered "conceptual errors."

## CONCLUSION

For the reasons stated above, the Court should deny Cornell's Motion to Exclude Plaintiffs' Experts Wendy Dominguez and Gerald Buetow.

March 11, 2019                               Respectfully submitted,

                                            /s/ Scott T. Apking
                                            SCHLICHTER, BOGARD & DENTON, LLP
                                            Andrew D. Schlichter, Bar No. 4403267
                                            Jerome J. Schlichter (*pro hac vice*)
                                            Joel Rohlf (*pro hac vice*)
                                            Scott Apking (*pro hac vice*)
                                            100 South Fourth Street, Suite 1200
                                            St. Louis, MO 63102
                                            Phone: (314) 621-6115
                                            Fax: (314) 621-5934

                                            *Counsel for Plaintiffs*


## CERTIFICATE OF SERVICE

I hereby certify that on March 11, 2019, I electronically filed the foregoing document with the Clerk of Court using the CM/ECF system which will automatically send e-mail notification of such filing to the attorneys of record.


                                            /s/ Scott T. Apking
                                            *Counsel for Plaintiffs*