**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT**

| | |
|---|---|
| JOSEPH VELLALI *et al.*, | Civil Action No. 3:16-cv-01345-AWT |
| *Plaintiffs*, | |
| v. | Hon. Alvin W. Thompson |
| YALE UNIVERSITY *et al.*, | |
| *Defendants*. | |

**REPLY IN SUPPORT OF
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Nancy G. Ross (ct14373)
James C. Williams (ct23292)
Richard E. Nowak (phv09930)
Jed W. Glickstein (phv09543)
MAYER BROWN LLP
71 South Wacker Drive
Chicago, Illinois 60606-4637
Telephone: (312) 782-0600
Facsimile: (312) 701-7711

Brian D. Netter (phv08476)
Michelle N. Webster (phv08475)
MAYER BROWN LLP
1999 K Street NW
Washington, DC 20006-1101
Telephone: (202) 263-3000
Facsimile: (202) 263-3300

# TABLE OF CONTENTS

INTRODUCTION ........................................................................................................ 1

I.     Plaintiffs Have No Evidence Of An Imprudent Recordkeeping Process. ......................... 2

     A.     Plaintiffs mischaracterize Yale's recordkeeping process before 2014. ................. 3

     B.     Plaintiffs' "mapping" contention is unsupported and irrelevant........................... 4

     C.     Plaintiffs' generic criticisms do not raise material issues of fact.......................... 6

II.     Plaintiffs Have No Evidence Of An Imprudent Investment Monitoring Process............. 7

     A.     Plaintiffs' attack on Mr. Penney fails. ................................................................. 7

     B.     Plaintiffs' criticism of the Investment Committee's oversight fails. .................... 9

     C.     Plaintiffs' criticism of share classes fails............................................................ 11

III.     Plaintiffs Have No Evidence Of An Imprudent "Cross-Selling" Process. ..................... 12

IV.     Plaintiffs' Claims Independently Fail On Causation Grounds. ...................................... 13

     A.     Plaintiffs are required to show that any breach caused them harm...................... 13

     B.     Plaintiffs lack evidence that recordkeeping fees would have been lower. .......... 14

     C.     Plaintiffs lack evidence that challenged investments would have been removed................................................................................................................. 16

V.     Plaintiffs Do Not Have Standing As To 13 Of The Funds They Challenge................... 19

VI.     Plaintiffs' Remaining Claims Fail. ................................................................................ 20

CONCLUSION........................................................................................................... 20

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Anderson v. Intel Corp. Investment Policy Comm.*,
2021 WL 229235 (N.D. Cal. Jan. 21, 2021) .........................................................................19

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986) ..............................................................................................................2, 19

*Azam v. Yale Univ.*,
2020 WL 5803222 (D. Conn. Sept. 29, 2020) ...........................................................................2

*Bd. of Trs. of AFTRA Ret. Fund v. JPMorgan Chase Bank, N.A.*,
860 F. Supp. 2d 251 (S.D.N.Y. 2012) ......................................................................................13

*Birse v. CenturyLink, Inc.*,
2020 WL 1062902 (D. Colo. Mar. 5, 2020) .......................................................................11, 19

*Cates v. Trustees of Columbia Univ.*,
2019 WL 8955333 (S.D.N.Y. Oct. 25, 2019) ...........................................................4, 6, 14, 19

*Cunningham v. Cornell Univ.*,
2019 WL 4735876 (S.D.N.Y. Sept. 27, 2019) ................................................................. *passim*

*Davis v. Washington Univ.*,
960 F.3d 478 (8th Cir. 2020) .............................................................................................18, 19

*Divane v. Nw. Univ.*,
2018 WL 2388118 (N.D. Ill. May 25, 2018),
*aff'd*, 953 F.3d 980 (7th Cir. 2020) ..........................................................................................12

*Ferguson v. Ruane Cunniff & Goldfarb Inc.*,
2019 WL 4466714 (S.D.N.Y. Sept. 18, 2019) ....................................................................11, 18

*Fifth Third Bancorp v. Dudenhoeffer*,
573 U.S. 409 (2014) ....................................................................................................................1

*George v. Kraft Foods Global, Inc.*,
641 F.3d 786 (7th Cir. 2011) .................................................................................................4, 10

*Gottlieb v. Cnty. of Orange*,
84 F.3d 511 (2d Cir. 1996) .........................................................................................................10

*Hecker v. Deere & Co.*,
556 F.3d 575 (7th Cir. 2009) .....................................................................................................16

*Henry v. Champlain Enters., Inc.*,
445 F.3d 610 (2d Cir. 2006) .......................................................................................................12

*Katsaros v. Cody*,
744 F.2d 270 (2d Cir. 1984) .........................................................................................................1

*Laboy v. Bd. of Trs. of Bldg. Serv. 32 BJ SRSP*,
  2012 WL 3191961 (S.D.N.Y. Aug. 7, 2012),
  *aff'd*, 513 F. App'x 78 (2d Cir. 2013)....................................................8

*Lawton v. Alitalia–Linee Aeree Italiane–Societa*,
  1999 WL 632846 (S.D.N.Y. Aug. 18, 1999)......................................10

*Ortiz v. Am. Airlines, Inc.*,
  2020 WL 4504385 (N.D. Tex. Aug. 5, 2020)...............................19, 20

*Patterson v. Morgan Stanley*,
  2019 WL 4934834 (S.D.N.Y. Oct. 7, 2019)..................................18, 20

*Rinehart v. Lehman Bros. Holding Inc.*,
  817 F.3d 56 (2d Cir. 2016)..........................................................4

*Rosen v. Prudential Ret. Ins. & Annuity Co.*,
  2016 WL 7494320 (D. Conn. Dec. 30, 2016),
  *aff'd*, 718 F. App'x 3 (2d Cir. 2017)...........................................5

*Sacerdote v. N.Y. Univ.*,
  328 F. Supp. 3d 273 (S.D.N.Y. 2018)..................................... *passim*

*Silverman v. Mutual Benefit Life Ins.*,
  138 F.3d 98 (2d Cir. 1998)...................................................13, 14

*In re SunEdison, Inc. ERISA Litig.*,
  331 F. Supp. 3d 101 (S.D.N.Y. 2018)...........................................2

*Sweda v. Univ. of Pa.*,
  923 F.3d 320 (3d Cir. 2019).....................................................12

*Teamsters Council Health & Hospital Fund v. Estate of DePerno*,
  18 F.3d 179 (2d Cir. 1994).......................................................14

*Thole v. U.S. Bank, N.A.*,
  140 S. Ct. 1615 (2020).......................................................19, 20

*Tibble v. Edison Int'l*,
  135 S. Ct. 1823 (2015)...........................................................11

*Tracey v. Mass. Inst. of Tech.*,
  404 F. Supp. 3d 356 (D. Mass. 2019) ..........................................19

*Wilcox v. Georgetown Univ.*,
  2019 WL 132281 (D.D.C. Jan. 8, 2019) ........................................5

**Statutes**

29 U.S.C. § 1104(e) ....................................................................9

29 U.S.C. § 1105(c)(1).................................................................7

29 U.S.C. § 1109(a) ...............................................................13, 14

29 U.S.C. § 1132(a)(2)................................................................20

SECURE Act of 2019, Pub. L. No. 116-94 ........................................9

**Other Authorities**

Fed. R. Evid. 703 ...................................................................................................................15

Fed. R. Evid. 807 ...................................................................................................................15

*Selection of Annuity Providers—Safe Harbor for Individual Account Plans*,
   73 Fed. Reg. 58,447 (Oct. 7, 2008)...............................................................................9

## CITATION FORMAT

| Citation | Description | Docket No. |
|---|---|---|
| Mem. | Memorandum of Law in Support of Defendants' Motion for Summary Judgment, December 4, 2020 | Dkt. 270 |
| SUMF | Defendants' Local Rule 56(a)(1) Statement of Undisputed Material Facts, December 4, 2020 | Dkt. 271 |
| Opp. | Memorandum of Law in Opposition to Defendants' Motion for Summary Judgment, February 2, 2021 | Dkt. 300 |
| PSF | Plaintiffs' Local Rule 56(a)(2) Statement of Facts In Opposition to Summary Judgment, February 2, 2021 | Dkt. 302 |
| Ex. 1 – Ex. 120 | Exhibits to the Declaration of Brian D. Netter in Support of Defendants' Motion for Summary Judgment and Motions to Exclude Plaintiffs' Expert Witnesses, December 4, 2020 | Dkt. 281 & Dkt. 283 |
| Ex. 121 – Ex. 127 | Exhibits to the Supplemental Declaration of Brian D. Netter in Support of Defendants' Motion for Summary Judgment and Motions to Exclude Plaintiffs' Expert Witnesses, March 4, 2021 | Filed simultaneously |
| Ex. P__ | Exhibits to the Declaration of Joel Rohlf, February 2, 2021 | Dkt. 309 |

## INTRODUCTION

Trials are supposed to be reserved for cases with genuine factual disputes—where evidence must be weighed or credibility assessed in order to determine which party is entitled to judgment.

This is not such a case. Here, the *material* facts are beyond dispute: Yale's retirement plan offers TIAA annuities that cannot be liquidated by Yale unilaterally and that require TIAA's administrative services. Among similarly situated plan fiduciaries—*i.e.*, other fiduciaries operating benefit plans with the same constraints—Yale was a trailblazer, among the first to negotiate lower recordkeeping fees, among the first to obtain access to lower-cost investment funds, among the first to consolidate to a sole recordkeeping platform, and a leader in scrutinizing investment funds that are ubiquitous in comparable retirement plans.

Plaintiffs' opposition suffers from two overriding flaws. *First*, although Plaintiffs do not dispute that Yale was a trailblazer among plan sponsors in higher education, Plaintiffs insist that Yale is arguing for a lower bar for that "industry." Opp. 34-35. That is incorrect. ERISA explicitly adopts the standard of a prudent person "acting in a like capacity . . . in the conduct of an enterprise of a like character." *Katsaros v. Cody*, 744 F.2d 270, 279 (2d Cir. 1984) (quoting 29 U.S.C. § 1104(a)(1)(B)). "[T]he content of the duty of prudence turns on 'the circumstances . . . prevailing' at the time the fiduciary acts," and thus "the appropriate inquiry will necessarily be context specific." *Fifth Third Bancorp v. Dudenhoeffer*, 573 U.S. 409, 425 (2014) (quoting 29 U.S.C. § 1104(a)(1)(B)). Here, the context is that Yale had a plan with TIAA annuities; it so happens that the majority of TIAA's clients are large universities.

The legal question that this Court must answer is whether Yale acted prudently, as a fiduciary to a plan with TIAA annuities. Plaintiffs' non-TIAA generalizations and purported experts contribute nothing to their burden to provide evidence that "no prudent fiduciary could

have concluded" that Yale's course of conduct was correct under the circumstances. *In re SunEdison, Inc. ERISA Litig.*, 331 F. Supp. 3d 101, 113 (S.D.N.Y. 2018).

*Second*, because the facts about TIAA are devastating to Plaintiffs' case, Plaintiffs just say that they are disputed. Although none of TIAA's 15,000 institutional clients ever managed to remove funds from TIAA annuity contracts controlled by individual plan participants, Plaintiffs say that fact is disputed, because we cannot know if there are circumstances under which TIAA *might* have taken a different position. Likewise, although not a single retirement plan with legacy TIAA annuity contracts ever avoided paying TIAA to administer those contracts, Plaintiffs say that it is disputed whether another vendor *might* have stepped in to obviate TIAA's role. Arguments based on "speculation and conjecture" are "insufficient to defeat a motion for summary judgment." *Azam v. Yale Univ.*, 2020 WL 5803222, at *3 (D. Conn. Sept. 29, 2020) (Thompson, J.).

Behind all of their briefing and exhibits, Plaintiffs have no evidence that other fiduciaries in similar circumstances behaved as Plaintiffs desire, let alone that all prudent fiduciaries followed Plaintiffs' preferences. Nor do Plaintiffs point to any evidence of loss. There is no evidence that a fiduciary that did follow Plaintiffs' preferred process in Yale's circumstances would have obtained lower recordkeeping rates or chosen better funds (hindsight bias notwithstanding).

It is black-letter law that summary judgment should be granted in the absence of a "*genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-248 (1986). When all of the evidence is on the same side of the scale, as it is here, proceeding to trial would waste countless party and judicial resources. The Court should grant Yale's motion.

## I. Plaintiffs Have No Evidence Of An Imprudent Recordkeeping Process.

Plaintiffs' recordkeeping claim asserts that Yale acted imprudently by waiting until 2015 to convert to a sole recordkeeper. Yale was among the first of the large plans with TIAA annuities

to move to a sole recordkeeper, SUMF ¶ 14, three years before NYU did—a decision that Judge Forrest found to be prudent. *Sacerdote v. N.Y. Univ.*, 328 F. Supp. 3d 273, 293-304 (S.D.N.Y. 2018). Despite this, Plaintiffs claim that a trial is necessary to decide whether Yale was obligated to consolidate recordkeepers even earlier, at a time when TIAA told Yale that it could not serve as the Plan's sole recordkeeper. To state the argument is to refute it.

**A.** **Plaintiffs mischaracterize Yale's recordkeeping process before 2014.**

Plaintiffs' argument begins from a fictitious premise. According to Plaintiffs, Yale had "no process at all" for monitoring recordkeeping fees prior to 2012 and "did not begin the process of exploring a change [in recordkeepers] until 2014." Opp. 13, 17. But multiple witnesses testified that Yale explored consolidation in 2010 and 2011. *See* Mem. 4, 7-8. Plaintiffs assert a lack of process based on deposition testimony from Hugh Penney, PSF ¶ 53, but they cut off Mr. Penney's answer midstream. In the very next breath, Mr. Penney explained that between 2007 and 2012 he "had conversations with both of our vendors to see what opportunities were available"; that "with continued pushing from ourselves and from others, TIAA started in 2011 to start looking at the possibility of looking at revenue sharing as a way for reducing their fees," and that during this time period he "certainly" saw it as "part of [his] job responsibilities to negotiate recordkeeping fees with vendors for the plan." Ex. P2, Penney Tr. 59:2-60:21; *see also* Ex. 110, Penney Decl. ¶¶ 4-5.

To be sure, Yale did not consolidate recordkeepers at the start of the class period— principally because, as TIAA's Steven Campbell stated, at that time TIAA was not "comfortable" providing sole recordkeeping as Yale requested. SUMF ¶ 11. Plaintiffs purport to "dispute" this fact (Opp. 18), but their denial is improper, unsupported, and immaterial. Plaintiffs claim merely that TIAA *secretly* had the ability to be sole recordkeeper, notwithstanding what it told Yale. The evidence they cite shows that TIAA advertised the ability to recordkeep some *other* plans, not

Yale's in particular. PSF ¶ 11. However, even if TIAA had misrepresented its capabilities to Yale in 2010—which is unfounded—Plaintiffs do not cite any authority requiring Yale to disbelieve its recordkeeper and insist on services that TIAA said it could not provide. Fiduciaries must act with "prudence, not prescience." *Rinehart v. Lehman Bros. Holding Inc.*, 817 F.3d 56, 63-64 (2d Cir. 2016). Plaintiffs seem to think ERISA forbids fiduciaries from trusting their own eyes and ears.

Presumably recognizing the irrationality of their position, Plaintiffs assert that "some discussions on the issue of consolidation . . . is not enough." Opp. 19 (citing *George v. Kraft Foods Global, Inc.*, 641 F.3d 786, 795 (7th Cir. 2011)). But *George* cuts exactly the opposite way. There, the court merely concluded that it was not sufficient to state that "the Plan fiduciaries had made a reasoned decision to maintain the status quo" without "cit[ing] a document or affidavit, or any deposition testimony, explaining what that decision was." 641 F.3d at 795. Here, there is unambiguous record evidence that Yale's determination to delay recordkeeper consolidation in 2010 and 2011 was based on the understanding that consolidation was not possible at that time because TIAA could not provide the desired services. SUMF ¶ 11. Penney gave four pages of deposition testimony about Yale's reasoning on this issue alone. Ex. 23, Penney Tr. 165:6-169:22.

*Cates v. Trustees of Columbia Univ.*, 2019 WL 8955333 (S.D.N.Y. Oct. 25, 2019), also is inapposite, as it is based on a completely different record. Columbia did not move to a single recordkeeper when TIAA offered the service in 2014. *Id.* at *8. Yale opted to move to a single recordkeeper as soon as TIAA made the service available. SUMF ¶ 13. Unless Yale was required to force TIAA to offer services that TIAA said it could not offer, Plaintiffs' claim has no substance.

### B.    Plaintiffs' "mapping" contention is unsupported and irrelevant.

Plaintiffs contend that Yale could have moved to a sole recordkeeper other than TIAA in 2010—if only Yale had "mapped" the billions of dollars of participant investments from TIAA

annuities to different investment options. Opp. 18-19. But as Judge Forrest noted in *Sacerdote*, there is no evidence that TIAA legacy annuity assets have ever "previously been 'mapped' into similar funds with a different recordkeeper." 328 F. Supp. 3d at 303. The record here is identical— there is not an iota of evidence that any sponsor undertook a different course of conduct. Moreover, it is undisputed that Yale solicited advice from its legal counsel, who advised Yale that it could not map the TIAA annuities. SUMF ¶ 8; Ex. 22, Peel Tr. 150:3-19.

Tacitly acknowledging these facts, Plaintiffs argue that there is a dispute as to whether Yale had the legal authority to demand that TIAA release the annuities for mapping. PSF ¶ 8. That is wrong (Mem. 8), but also, as in *Sacerdote*, beside the point. TIAA had the assets, and Plaintiffs do not have a theory for how Yale could have extracted those assets. It surely was not required (or prudent) to pursue years-long litigation with a doubtful outcome at participants' expense. *Sacerdote*, 328 F. Supp. 3d at 303. Plaintiffs similarly assert that, though no one other than TIAA has ever recordkept TIAA annuities, Yale was obligated to somehow apply "leverage" to force a change. Opp. 18. This argument is also unavailing. ERISA "protects plan participants' reasonable expectations in the context of the market that exists." *Rosen v. Prudential Ret. Ins. & Annuity Co.*, 2016 WL 7494320, at *17 (D. Conn. Dec. 30, 2016), *aff'd*, 718 F. App'x 3 (2d Cir. 2017). It is dispositive, under ERISA's fiduciary standard, that Plaintiffs lack any evidence that any similarly situated fiduciary, among thousands of examples, took Plaintiffs' preferred course.

Fundamentally, Yale was entitled to determine that it would offer TIAA annuities. ERISA does not require fiduciaries to "materially change[]" a plan to reduce recordkeeping costs. *Wilcox v. Georgetown Univ.*, 2019 WL 132281, at *12 (D.D.C. Jan. 8, 2019). That is like claiming that every prudent homeowner *must* tear down their house to the studs and rebuild just to save on utilities. Chasing low recordkeeping fees to the exclusion of every other valid consideration of

plan management is not a prudent fiduciary strategy.

### C. Plaintiffs' generic criticisms do not raise material issues of fact.

Plaintiffs argue that "prudent fiduciaries" generally follow various recordkeeping practices. Opp. 12. That is immaterial. As Plaintiffs almost immediately concede, ERISA does not establish "a checklist of required actions." Opp. 14.

For example, Plaintiffs say prudent fiduciaries "normally" should issue multiple requests for proposal when selecting recordkeepers. Opp. 12, 14. But it is undisputed that ERISA does not require multiple RFPs under any circumstances. Mem. 9-11. Multiple witnesses testified that Yale did not issue multiple RFPs in this context because it would be unnecessary—and wasteful—in light of the need to use TIAA to recordkeep at least the Plan's TIAA annuities. Yale appropriately made that decision after considering the relevant factors. SUMF ¶ 10.

*Cates* again is not to the contrary. There, the plaintiffs adduced evidence that "once Columbia conducted an RFI" (request for information) in 2017 or 2018, "TIAA lowered its fee by more than half per participant and Vanguard lowered its fee by over 25% per participant." 2019 WL 8955333, at *9. Plaintiffs here cite no evidence that Yale's recordkeepers would have lowered their fees in response to an RFI or RFP in 2011 or 2012.

The argument that prudent fiduciaries avoid asset-based pricing (Opp. 12-13) is also insubstantial. Plaintiffs concede that nothing in ERISA requires per-participant pricing, Opp. 16; *see also* Mem. 9-10, and they admit that every one of TIAA's 200 largest clients used asset-based pricing at the start of the class period. PSF ¶ 15. Plaintiffs therefore clarify that they are not challenging "the *use* of asset-based pricing, but rather the failure to calculate and monitor the *amount* of asset-based payments." Opp. 16. But that criticism is flatly contrary to the record. Yale certainly monitored the amount of its recordkeeping payments. Mr. Penney periodically pressed

Yale's recordkeepers to lower their fees and the recordkeepers responded that they were giving Yale the lowest rate; eventually, Yale negotiated a deep discount retroactive to January 2011, six months into the class period. SUMF ¶ 16. Plaintiffs' "denial" of this fact is yet one more non-genuine dispute that cannot forestall summary judgment. Plaintiffs merely assert that the recordkeeping discount was "implemented" in 2012. Opp. 16.

Last, Plaintiffs insist (at Opp. 16) that Vanguard was being paid more than its target compensation, but they lack a theory for how Yale could have obtained a lower fee. Vanguard did not offer fee rebates and was unwilling, at the time, to provide Yale with the share classes that would reduce Vanguard's compensation. SUMF ¶¶ 40-41; Ex. 110, Penney Decl. ¶ 9.

## II. Plaintiffs Have No Evidence Of An Imprudent Investment Monitoring Process.

Plaintiffs' monitoring claim asserts that Yale failed to monitor the Plan's investment offerings, and as a result offered 22 funds that no prudent fiduciary would have offered to participants as of 2010. Plaintiffs' Opposition confirms that the claim fails for several reasons.[1]

### A. Plaintiffs' attack on Mr. Penney fails.

Like their recordkeeping claim, Plaintiffs' challenge to Yale's monitoring begins from a fictitious premise: that Yale's Director of Benefits, Hugh Penney, was "unqualified," "conflicted," and had "*no* relevant experience" to monitor investments. Opp. 7-10. These claims are not just insulting. They are based on egregious misreading of the evidence.[2]

Mr. Penney is a distinguished professional with a long history in employee benefits. He

---

[1] Plaintiffs' claim suffers at the threshold from standing deficiencies, described at Mem. 15-17 and in Part V *infra*. Those deficiencies do not dispose of the entire claim, so Yale brackets that discussion here.

[2] Plaintiffs also incorrectly contend that Mr. Penney was not "authorized" to discharge fiduciary obligations. Opp. 7-8. The Plan gives the Vice President for Human Resources and Administration discretion to authorize individuals to carry out general administrative functions for the plan separate from a formal delegation of fiduciary responsibility. Ex. 52 (2009 Plan) §§ 12.2(e), 12.4. In addition, Plaintiffs' citation to 29 U.S.C. § 1105(c)(1) is inapposite. That provision is a safe harbor for fiduciaries—not a rule that imposes liability if a fiduciary relies on a designee without a formal delegation under the plan.

has "been responsible for managing benefit plans for over 40 years," and previously held HR positions at Tufts Medical Center, Shaw's Supermarkets, BayBanks, and Filene's Department Stores. Ex. 121, Penney Tr. 12:10-13:21, 136:5-141:24, 146:9-148:23. He noted that these jobs "absolutely" involved monitoring investment options quantitatively and qualitatively. *Id.* at 139:17-20. Ignoring this evidence, Plaintiffs contend that Mr. Penney had "no relevant investment-related experience" on the basis of one sentence from his deposition. Opp. 9. But that testimony says nothing of the sort—Mr. Penney merely states that he is not an *investment advisor* and does not give individualized investment advice to participants. PSF ¶ 47.

The other contortions of the record are equally far-fetched. For instance, Plaintiffs claim that various emails about the formation of an investment committee in 2010 and 2011 are evidence that Mr. Penney's review of investment options "was not sufficient." PSF ¶ 49. But the emails they cite reflect Mr. Penney's efforts to ensure that Yale's processes remained best-in-class. "It would turn the law on its head were we to embrace a concept where a plaintiff could use allegations of prudent measures to prove a defendant's imprudence." *Laboy v. Bd. of Trs. of Bldg. Serv. 32 BJ SRSP*, 2012 WL 3191961, at *3 (S.D.N.Y. Aug. 7, 2012), *aff'd*, 513 F. App'x 78 (2d Cir. 2013).[3]

Most galling, Plaintiffs claim that Mr. Penney lacked "pure intentions" because he served as a member of TIAA's Advisory Council in the early 2010s. Opp. 9-10. Plaintiffs accuse the Council of issuing "essentially marketing pieces for TIAA." PSF ¶ 51. As evidence, they point to a single document: an email about a 2012 panel discussion on encouraging younger workers to use annuities in retirement. Ex. P60. Plaintiffs' apparent dislike of annuities is contrary to Mr.

---

[3] The emails cited in PSF ¶ 49 are also contrary to the assertion (at Opp. 9) that Mr. Penney "did not even know that 403(b) plans were subject to ERISA's fiduciary duties until 2011 or 2012." This is based on a single out-of-context sentence from a 2014 email. *See* PSF ¶ 48. As Mr. Penney explained about this email, "Yale has been an ERISA fiduciary plan for quite some time before I got here. [That sentence] was really referencing the fact that there were no protocols for fiduciary oversight and that the model of . . . oversight being done via committee was becoming a new norm." Ex. 121, Penney Tr. 271:8-272:18.

Penney's view, which is the product of decades of experience; the history of 403(b) plans, which historically permitted investments *only* in annuities; and the views of Plan participants and countless other professionals and investors. Mem. 1, 25. ERISA itself encourages the use of annuities to provide benefits inside a plan through a statutory safe-harbor. *See Selection of Annuity Providers—Safe Harbor for Individual Account Plans*, 73 Fed. Reg. 58,447 (Oct. 7, 2008); SECURE Act of 2019, Pub. L. No. 116-94, Div. O, Title II, § 204, codified at 29 U.S.C. § 1104(e). How Mr. Penney's participation on a panel discussion about annuities is evidence that he is a conflicted mouthpiece for TIAA is totally unexplained.

Second, Plaintiffs accuse Mr. Penney of giving testimony "ghost-written" by the Council in 2015. Opp. 10 (citing PSF ¶ 51). Plaintiffs know that is untrue. Mr. Penney explained that he was seeking input on testimony *he* drafted to present to the Department of Labor. Ex. 121, Penney Tr. 344:13-348:3. Mr. Penney's testimony is publicly available—Yale encourages the Court to read it. *See* Ex. 122. In that testimony, Mr. Penney discusses his experience managing retirement plans and urges the Department to create standardized practices in connection with participant rollovers at retirement. He explains that doing so would prevent participant confusion, reduce unnecessary rollovers, and prevent "leakage" of savings out of retirement plans. *Id.* As with the 2012 panel discussion, that Plaintiffs try to pass off this testimony as evidence of a "conflicted relationship" speaks volumes—but not about Mr. Penney.[4]

## B. Plaintiffs' criticism of the Investment Committee's oversight fails.

In 2012, Yale transitioned investment monitoring responsibility to the newly established

---

[4] Plaintiffs' decision to cast these aspersions is especially remarkable because ███████████████████ ████████████████████████████████████████████████ ███████ In contrast, Mr. Penney did not receive any compensation for serving on the Advisory Council. All Plaintiffs can muster is that TIAA reimbursed his travel expenses for annual meetings, which usually entailed a train ride from New Haven to New York. Ex. P2, Penney Tr. 309:14-310:2.

Investments Committee, with Mr. Penney's continued assistance. SUMF ¶ 22. Plaintiffs' attacks on the Committee (Opp. 30-33) either ignore evidence that does not fit their narrative or misconstrue evidence to try to paint Yale as an uninvolved fiduciary. None raise a genuine issue.

To begin, Plaintiffs do not deny that Yale's consultant and its relationship manager at TIAA both praised Yale's oversight of the Plan. Mem. 18-19. Plaintiffs assert only that "a jury would not be required to credit the testimony of Yale's business partners." Opp. 33. It is settled law, however, that a party cannot avoid summary judgment with "mere assertions that affidavits supporting the motion are not credible." *Gottlieb v. Cnty. of Orange*, 84 F.3d 511, 518 (2d Cir. 1996); *see also Lawton v. Alitalia–Linee Aeree Italiane–Societa*, 1999 WL 632846, at *5 (S.D.N.Y. Aug. 18, 1999) ("[attorney] speculation cannot serve to contradict the sworn testimony of the witnesses").

The Committee's regular review of investment options is documented in extensive meeting minutes. *See* SUMF ¶ 12; Ex. 113. Plaintiffs take several potshots at the Committee's process but cannot deny that the Committee reached "reasoned decision[s]" about investments (*George*, 641 F.3d at 796) and therefore do not raise a genuine issue of material fact. *Cunningham v. Cornell Univ.*, 2019 WL 4735876, at *16 (S.D.N.Y. Sept. 27, 2019) ("[S]o long as the 'prudent person' standard is met, ERISA does not impose a duty to take any particular course of action if another approach seems preferable.") (quoting *Chao v. Merino*, 452 F.3d 174, 182 (2d Cir. 2006)).

First, Plaintiffs repeat their critique of Mr. Penney. Opp. 31. As explained above, those criticisms grossly distort the record. *See* Part II.A *supra*. Second, Plaintiffs say that the Committee's "entire investment review process" was an annual review of detailed, 50-page investment reports. Opp. 31. Plaintiffs' premise is inaccurate. Yale did not just review reports but discussed the suitability of individual investments. Mem. 18-19; SUMF ¶ 22.[5] In any event, that

---

[5] Plaintiffs try to waive away one example of this evidence as "anecdotal" (Opp. 32), but do not even understand what Yale did. *See* PSF ¶ 30 ("not[ing] that this information could be been obtained merely by

Plaintiffs complain that the reports did not include all of the metrics they think a fiduciary should consider is irrelevant. That Yale could have looked at other metrics does not mean that Yale was *required* to do so. "[E]ven if an expert proposes a better alternative to a fiduciary's conduct, the fiduciary will not be in breach of its duties if its course of conduct was prudent." *Birse v. CenturyLink, Inc.*, 2020 WL 1062902, at *8 (D. Colo. Mar. 5, 2020).

Third, Plaintiffs complain that Yale did not hire an outside consultant, have an investment policy statement (IPS), or meet as frequently as Plaintiffs would like. Opp. 31-32. But "[n]othing in ERISA requires a 401(k) retirement plan investment committee to engage an investment adviser," *Ferguson v. Ruane Cunniff & Goldfarb Inc.*, 2019 WL 4466714, at *11 (S.D.N.Y. Sept. 18, 2019), particularly when an alternate approach would conserve plan assets. Likewise, nothing in ERISA requires an IPS (Mem. 20; Opp. 33) or demands that fiduciaries review investments "monthly or quarterly." Opp. 32. Here, Committee members would review reports before each meeting and, quite reasonably, spend more time in meetings discussing the Plan's major offerings. Ex. 23, Penney Tr. 134:5-18. That is fully consistent with the duty to "consider all the investments . . . at regular intervals." *Tibble v. Edison Int'l*, 135 S. Ct. 1823, 1828 (2015) (cleaned up). [6]

### C. Plaintiffs' criticism of share classes fails.

The last investment-related claim contends that Yale used higher-cost share classes when lower-cost share classes of the same fund were available. Opp. 37-38. Plaintiffs ignore the negotiation of a revenue credit account which, as Yale explained, renders this theory largely

---

reading TIAA Real Estate's regulatory filings that provide its holdings"). Yale did not ask for data on TIAA Real Estate's holdings. It asked for data on the correlation between the holdings and a residential real estate index to ensure that participants did not take on excess risk. SUMF ¶ 30; Ex. 33 & Ex. 34.

[6] Aon's Diane Improta did not testify that Yale could not "effectively" monitor the Plan. *See* PSF ¶ 83.

▬▬▬▬▬▬ As this Court has already held, Yale was under no obligation to shrink the number of investments, and ERISA has a "general presumption" in favor of participant choice. Dkt. 113 at 25.

irrelevant after 2011. *See* Mem. 32-33. What is left of the claim is meritless.

The record shows that Yale asked about lower-cost share classes throughout 2010 to 2014, but that TIAA and Vanguard refused to make those share-classes available to Yale or told Yale it would have to pay an offsetting recordkeeping fee. Mem. 31-32; Ex. 110, Penney Decl. ¶¶ 9-12. As with the recordkeeping issue, *supra* pp. 3-4, Plaintiffs want the Court to ignore this evidence, "disputing" whether Yale was *actually* ineligible for share classes that TIAA and Vanguard said (at the time) they would not provide. Opp. 38. That is not a material dispute. The Court has recognized that the relevant question is whether Yale "reasonably weigh[ed] the benefits and burdens" when reaching its conclusions. Dkt. 113 at 23. The record shows that Yale clearly did.

## III.     Plaintiffs Have No Evidence Of An Imprudent "Cross-Selling" Process.

Plaintiffs assert that "[s]imilarly situated, prudent fiduciaries . . . tak[e] affirmative steps to prevent service providers from using such data to solicit participants." Opp. 20. However, as with their counsel's same rejected claim against another university, Plaintiffs do not cite "a single case in which a court has held that releasing confidential information or allowing someone to use confidential information constitutes a breach of fiduciary duty under ERISA." *Divane v. Nw. Univ.*, 2018 WL 2388118, at *12 (N.D. Ill. May 25, 2018), *aff'd*, 953 F.3d 980 (7th Cir. 2020).[7]

Even if the claim were actionable, Plaintiffs cannot simply state that "[w]hether Yale breached its fiduciary duty by not addressing the issue sooner is genuinely disputed." Opp. 21. "The focal point of [the] inquiry under ERISA" is whether a fiduciary acted with the prudence required "under the prevailing circumstances at the time of the transaction." *Henry v. Champlain Enters., Inc.*, 445 F.3d 610, 620 (2d Cir. 2006). But the earliest examples in the record of a

---

[7] Plaintiffs cite a Department of Labor advisory opinion that does not mention "cross-selling," and a case that did not involve a cross-selling claim and stated only that fiduciaries must "understand and monitor plan expenses." *Sweda v. Univ. of Pa.*, 923 F.3d 320, 328 (3d Cir. 2019). Plaintiffs themselves concede (at Opp. 21) that so-called "cross-selling" does not increase plan expenses.

fiduciary limiting a recordkeeper's use of plan information are actions taken *by Yale*. SUMF ¶ 43. Plaintiffs' "expert" could not name a single 403(b) plan that addressed recordkeeper use of participant information earlier than Yale; the expert even wrote an article the year after Yale formalized restrictions in its recordkeeping agreement, declaring that "cross-selling" monitoring "may prove to be the *next* fiduciary frontier." Dkt. 272 at 7-8 (citing Ex. 86 at 3) (emphasis added). Plaintiffs must come forward with evidence to support their assertions—and they have none.[8]

## IV. Plaintiffs' Claims Independently Fail On Causation Grounds.

Even if Plaintiffs could show a genuine issue as to Yale's process, Plaintiffs' claims still should be dismissed on causation grounds. Mem. 13-15, 21-30. ERISA creates fiduciary liability for "any losses to the plan *resulting from* each such breach." 29 U.S.C. § 1109(a) (emphasis added). Yet Plaintiffs have no evidence that Yale's supposed breaches caused them any loss.

### A. Plaintiffs are required to show that any breach caused them harm.

Plaintiffs argue that they do not have to show at summary judgment that a purportedly prudent fiduciary would have reached different conclusions than Yale. Opp. 4-7. But as noted in *Bd. of Trs. of AFTRA Ret. Fund v. JPMorgan Chase Bank, N.A.*, 860 F. Supp. 2d 251, 260 (S.D.N.Y. 2012), the Second Circuit has "directly addressed" this issue. Two judges concluded that "[c]ausation of damages is . . . an element of the [prudence] claim, and the plaintiff bears the burden of proving it." *Silverman v. Mutual Benefit Life Ins.*, 138 F.3d 98, 105 (2d Cir. 1998). This makes good sense. Although it may be appropriate to put the burden of proof on a party with unique access to information, *cf*. Dkt. 113 at 39-40, causation is objective. Yale has no advantage

---

[8] The facts Plaintiffs cite in support of their cross-selling argument are ¶¶ 42, 43 and 71 of their PSF. Opp. 20-22. Paragraph 42 is an improper denial that spews a battery of supposed facts about TIAA that are not responsive to the statement in question. Paragraph 43 addresses the steps Yale took to limit cross-selling during the period. Plaintiffs oddly "[d]eny" that undisputed fact as "immaterial." Finally, Paragraph 71 asserts that TIAA earned "unaccounted-for indirect compensation."

vis-à-vis Plaintiffs and their experts in assessing a hypothetical prudent fiduciary's conduct.

Plaintiffs contend that *Teamsters Council Health & Hospital Fund v. Estate of DePerno*, 18 F.3d 179 (2d Cir. 1994), establishes a different rule than *Silverman*. Opp. 6-7. But as Plaintiffs' favored case recognizes, *DePerno* addresses damages rather than causation. *See Cates*, 2019 WL 8955333, at *10 (citing *AFTRA* and other cases). At a minimum, Plaintiffs must come forward with *some* prima facie evidence of loss to get past summary judgment. *See Cunningham*, 2019 WL 4735876, at *6 n.6; *Sacerdote*, 328 F. Supp. 3d at 288.[9]

### B. Plaintiffs lack evidence that recordkeeping fees would have been lower.

To recover damages, a plaintiff must show that an objectively prudent fiduciary would have paid less than the defendant during the relevant time period. Mem. 13 (citing *Sacerdote*). Absent any evidence from which a finder of fact could conclude that Yale's conduct caused the Plan to forgo lower recordkeeping fees, there is no genuine issue of material fact requiring a trial.

Plaintiffs' attempt to show causation rests almost exclusively on the opinions of their experts, Ty Minnich and Al Otto, whose opinions Judge Castel excluded in *Cunningham*, resulting in summary judgment for Cornell on the recordkeeping claim. *Cunningham*, 2019 WL 4735876, at *6-10. Plaintiffs incorporate their *Daubert* opposition, *see* Opp. 24, and Yale will do likewise. However, Plaintiffs argue there is other, non-expert evidence that suffices to show loss even if Minnich's and Otto's opinions are excluded. Opp. 24-25. Here too, Plaintiffs' showing falls flat.

First, Plaintiffs claim that, after Yale moved to a sole recordkeeper in 2015, its recordkeeping fees decreased. Opp. 25-26. That does not show that *before* 2015, Yale would have

---

[9] *DePerno* also dealt with a breach of loyalty claim, and justified its burden-shifting rule in that context. 18 F.3d at 183. Plaintiffs' analogous claim has already been dismissed from this case. *See* Dkt. 113 at 30. That *DePerno* involved a direct fiduciary breach claim under § 1104(a)(1) while *Silverman* involved a co-fiduciary claim under § 1105(a), *see* Opp. 6, makes no difference. The analysis in *Silverman* turns on 29 U.S.C. § 1109(a), which establishes *one* causation standard for breach of ERISA's fiduciary obligations.

achieved similar savings. To the contrary, as Yale has explained (Mem. 8), although Yale theoretically could have frozen contributions to TIAA annuities and found a new recordkeeper before 2015, doing so would certainly have increased total expenses by requiring the Plan to pay TIAA's undiscounted rates to continue to recordkeep legacy investments. SUMF ¶ 9.[10]

Second, Plaintiffs argue that Yale paid more than other plans. Opp. 25. The core evidence they cite, however, is from a presentation Yale received two years into the class period, from a consultant Yale had already engaged to negotiate lower administrative fees. PSF ¶ 67. Shortly after the presentation, these negotiations resulted in a retroactive fee reduction that Yale's benefits counsel called "great" and "the lowest I've seen so far." SUMF ¶ 16. In other words, Yale *did* follow a prudent process to obtain the lower prices Plaintiffs say it should have been able to obtain. *Cf. Cunningham*, 2019 WL 4735876, at *16 ("No reasonable fact finder could conclude that the defendant fiduciaries [were] objectively imprudent by not eliminating underperforming funds the very day that CAPTRUST presented its results."). There is no evidence that Yale could have saved still more by following a different process urged by Plaintiffs.

Plaintiffs also cite calculations about Caltech that Yale's expert, Glenn Poehler, offered in the *Cunningham* case. PSF ¶ 68. Judge Castel granted summary judgment in that case. Moreover, as Mr. Poehler explained, the calculations Plaintiffs are citing are not relevant to Yale. Unlike Yale, Caltech's investment lineup included only 18 non-TIAA funds in 2010. Therefore, TIAA

---

[10] Plaintiffs' main response to this conundrum is a "denial" on hearsay grounds. PSF ¶ 9. That is meritless. First, the material is available on the website of Pepperdine University's recordkeeper, and Plaintiffs do not question its authenticity or reliability. It is therefore admissible, at a minimum, under Federal Rule of Evidence 807. Second, the fact is supported by Yale's unchallenged expert. SUMF ¶ 9 (citing Ex. 10, Poehler Rpt. ¶ 45). Third, Yale's expert can rely on hearsay if other experts in the field would "reasonably rely" on that information. Fed. R. Evid. 703. Plaintiffs do not even attempt to argue that Poehler cannot rely on the Pepperdine material, likely because their own experts rely on similar publicly available material in their analyses. Plaintiffs also state (at PSF ¶ 9) that Pepperdine is "not an appropriate comparator," which is ironic, because (1) Yale's point is simply that costs increased after Pepperdine froze contributions, and (2) *Plaintiffs* invoked Pepperdine as a comparator in their Amended Complaint. Dkt. 57 ¶¶ 84-85.

was able to provide sole recordkeeping to Caltech much earlier than to Yale. Ex. 10, Poehler Rpt. ¶ 69; SUMF ¶ 13. Finally, Plaintiffs say Yale's fees were "much higher" than other large TIAA clients, but the evidence they cite simply asserts that the Plan paid more than some plans in the "top quartile of TIAA clients." PSF ¶ 69. ERISA does not require prudent fiduciaries to "scour the market" because a plan's fees are not in the top quartile. *Hecker v. Deere & Co.*, 556 F.3d 575, 585 (7th Cir. 2009) (holding that the fact "that it is possible that some other funds" had lower expenses is "beside the point," because a fiduciary need not offer "the cheapest possible fund"). It is enough if, as here, the fees are well within the reasonable range.

In sum, this case is like *Cunningham*, where once the plaintiffs' experts were excluded "the plaintiffs had no other competent evidence of loss." Opp. 25. And Plaintiffs' experts should be excluded. In Judge Forrest's words, among plans with TIAA annuities, "nobody in the history of time" obtained fees that Plaintiffs' experts would consider reasonable in 2010 and 2011 because "[w]hat we know is, nobody has ever managed a TIAA annuity apart from TIAA." Ex. 99, *Sacerdote* Trial Tr. 904-905; *see also Sacerdote*, 328 F. Supp. 3d at 303 ("on the record before the Court, no other vendor has ever recordkept TIAA annuities"). Supposed expert evidence of loss premised on the assumption that such fees were available cannot satisfy Plaintiffs' burden.[11]

### C.   Plaintiffs lack evidence that challenged investments would have been removed.

Plaintiffs have no competent evidence that a hypothetical prudent fiduciary would have removed the 22 funds they challenge. *See Cunningham*, 2019 WL 47835876, at *11-12. Although

---

[11] In its opening brief (at Mem. 15), Yale inadvertently stated that Judge Forrest "characterized" Minnich and Otto's opinions. In fact, as Plaintiffs point out (at Opp. 25), Judge Forrest was addressing a different expert retained by Plaintiffs' counsel, Michael Geist. Yale regrets the error, but the core point still stands. Minnich and Otto reached essentially the same conclusions as Geist with regard to reasonable recordkeeping fees. *Compare Sacerdote*, 327 F. Supp. 3d at 306, *with* Ex. 7, Minnich Rpt. ¶ 131 & Ex. 9, Otto Rpt. ¶ 207. As explained in Yale's motion to exclude, Minnich's and Otto's conclusions are equally unreliable and unsupported because they ignore that the claimed rates were not available to plans with significant investments in TIAA annuities.

Plaintiffs purport to offer "ample evidence" that prudent fiduciaries did "remove" these funds (Opp. 36), their PSF does not cite any evidence that fiduciaries removed any of the 22 challenged funds during the class period. The PSF merely cites two earlier paragraphs, which state that in 2010, "nearly 20" of TIAA's top 200 clients froze future contributions to TIAA Real Estate and 16 froze future contributions to CREF Stock. *See* PSF ¶ 87 & n.243 (citing PSF ¶¶ 29, 33).[12] Plaintiffs have no evidence that any of the referenced plans deemed those two funds to be imprudent; indeed, those examples cut against Plaintiffs' arguments because freezing investments leaves them available for legacy participants.

Regardless, it is undisputed that in 2018, over 75% and 80% of TIAA's top 200 clients still allowed active contributions to TIAA Real Estate and CREF Stock, respectively. PSF ¶¶ 29, 33. How can it be objectively imprudent to offer products that the vast majority of similar institutions also offered to their participants during the class period? Plaintiffs' answer is that those fiduciaries are guilty by association. Accusing Yale of "cherry-picking" *two hundred* comparators, Plaintiffs say "those plans' investments [merely] show what imprudent fiduciaries did." Opp. 35. That is circular. Plaintiffs cannot declare a fund imprudent and then tell the Court to ignore evidence that actual fiduciaries overwhelmingly disagreed. *Cunningham*, 2019 WL 4735876, at *12 (looking to evidence from other TIAA clients); *Sacerdote*, 328 F. Supp. 3d at 312 (same).[13]

---

[12] The cross-reference in PSF ¶ 87 n. 243 apparently means to cite ¶¶ 34 and 35, although the paragraph range is blank. Even giving Plaintiffs the benefit of the doubt, those paragraphs are not evidence of imprudence. They do not deny, as with the other annuities, that nearly all of the referenced plans offered CREF Global Equities Account and the CREF Inflation-Linked Bond Account in 2010 and continued to hold substantial investments in those annuities every year thereafter. Plaintiffs' response simply observes that, as Yale's expert indicated, some sponsors froze those investments or did not offer them to participants as of September 2019. Ex. 4, Chalmers Rpt. Ex. 5c & 5e.

[13] Also as supposed evidence of imprudence, Plaintiffs assert that Aon and certain other advisors issued negative ratings of certain funds at various times during the class period. PSF ¶ 87. As Yale has already explained, Aon did not advise Yale on investment lineups until 2016, and the 2012 Aon recommendation on CREF Stock that Plaintiffs cite explicitly states that "annuity contract provisions or guarantees . . . may impact your best course with regard to this investment." Dkt. 295 at 7. Given the value placed on the Plan's annuity features and the investments' long-term performance, Yale viewed traditional benchmarking as

Plaintiffs' remaining evidence of objective imprudence crumbles—unsurprisingly, because if it was so clearly imprudent to offer the 22 named investments in 2010, Plaintiffs should be able to offer evidence that other fiduciaries were fleeing those same investments in droves.

First, Plaintiffs say that "most" of the 22 options—actually, 14—underperformed their benchmarks over a 5- to 10-year period. Opp. 35. However, fiduciaries are not required to remove investments simply because they underperform over short periods. Mem. 23-24 (collecting cases). Plaintiffs do not mention any of these authorities. What is more, Plaintiffs' own summary does not show consistent underperformance. Many investments had periods of overperformance as well. *See* Ex. P42 (1.92% excess return for Vanguard Morgan Growth Fund for the 10-year period ending 2010). Courts routinely dismiss claims where, as here, "the performance data shows that the alleged investments did not consistently underperform," *Ferguson*, 2019 WL 4466714, at *9 & n.14, or underperformed mildly, *Patterson v. Morgan Stanley*, 2019 WL 4934834, at *10 (S.D.N.Y. Oct. 7, 2019). And well they should, because underperformance can represent bad luck, random chance, or many other factors besides an imprudent investment. *See* Mem. 28.

Other investments Plaintiffs criticize are variable annuities, for which apples-to-apples performance comparisons are inappropriate. Plaintiffs contend that variable annuities can be compared to mutual funds because "[b]oth types of vehicles invest in equities and their values fluctuate with the stock market." Opp. 36. That is a red herring. Yale's point is not that annuities and mutual funds are totally dissimilar. It is that, because annuities have unique features like income guarantees, it is wrong as a matter of law to claim that a variable annuity is imprudent simply because it underperforms a similar mutual fund. *See Davis v. Washington Univ.*, 960 F.3d 478, 484-85 (8th Cir. 2020) (cited at Mem. 24-25). Plaintiffs do not mention *Davis*, let alone

---

presenting an incomplete picture of TIAA funds, a conclusion reinforced by more favorable assessments issued by other market participants like Morningstar. Ex. 121, Penney Tr. 206:12-213:16, 215:20-220:19.

explain why its analysis is unconvincing.[14]

Finally, Plaintiffs point to what they call "other objective criteria," by which they mean the criteria their expert used to evaluate the Plan's lineup in 2010. Opp. 36. Even if Dominguez's opinions were admissible—as explained in Yale's *Daubert* briefing, they are not—they would not change the outcome. Under the "substantive law" governing their claims (*Anderson*, 447 U.S. at 248), Plaintiffs cannot merely pay a purported expert to opine that a different evaluation process would lead to different conclusions. *See* Mem. 21; *Birse*, 2020 WL 1062902, at *8 ("alternative courses of conduct that Plaintiffs' experts propose do not cast doubt on, or negate, the prudence of the substantive measures that Defendants employed"). As Plaintiffs concede, Ms. Dominguez "does not rule out the existence of other reasonable methods" of monitoring. Opp. 33.[15]

## V. Plaintiffs Do Not Have Standing As To 13 Of The Funds They Challenge.

It is now clear that Plaintiffs invested in only 9 of the 22 funds they challenge.[16] Under *Thole v. U.S. Bank, N.A.*, 140 S. Ct. 1615 (2020), Plaintiffs lack standing to pursue claims as to the other 13. Plaintiffs do not dispute that *Thole* abrogated the *L.I. Head Start* decision on which this Court relied at the class certification stage. *See* Mem. 16-17. And although Plaintiffs try to cabin *Thole* to defined-benefit plans, courts apply it to defined-contribution plans like the Plan as well. *E.g.*, *Anderson v. Intel Corp. Investment Policy Comm.*, 2021 WL 229235, at *14 (N.D. Cal. Jan. 21, 2021); *Ortiz v. Am. Airlines, Inc.*, 2020 WL 4504385, at *13 (N.D. Tex. Aug. 5, 2020).

Plaintiffs thus pivot to an "additional ground" for standing, claiming that they suffered a

---

[14] Notably, the two district court decisions Plaintiffs cite (at Opp. 36) pre-date *Davis* and simply state without substantive analysis that there are "questions of fact." *Cates*, 2019 WL 8955333, at *13; *Tracey v. Mass. Inst. of Tech.*, 404 F. Supp. 3d 356, 362 (D. Mass. 2019).

[15] Plaintiffs do not dispute that Ms. Dominguez's only basis for criticizing two sector funds Yale offered is that she does not like sector funds. Such a theory fails as a matter of law. *See* Mem. 23 n.5.

[16] *See* Ex. P79 (mentioning investments in CREF Stock, TIAA Real Estate, Vanguard Morgan Growth Fund, Vanguard Windsor Fund, TIAA-CREF Real Estate Securities Fund, CREF Global Equities, Vanguard International Explorer, Vanguard Energy Fund, and Vanguard Global Capital Cycles).

concrete injury due to a "reduction in choice." Opp. 27. The Court did not adopt this ground in its class certification decision. It merely noted the discussion in *Sacerdote*—which also rested on *L.I. Head Start*. *See* Dkt. 202 at 5-6 (citing *Sacerdote* v. *N.Y. Univ.*, 2018 WL 840364, at *7 (S.D.N.Y. Feb. 13, 2018)). In any case, at summary judgment, Plaintiffs must support standing with evidence, not lawyer assertions. Mem. 16. Plaintiffs do not—and cannot—"point to any evidence" (*Ortiz*, 2020 WL 4504385, at *13) that they would have invested in an alternative fund if Yale had removed one of the 13 funds in which Plaintiffs did not invest. Indeed, Plaintiffs previously alleged that they were harmed because they had too much choice, not too little. Dkt. 57 ¶ 157.[17]

## VI.    Plaintiffs' Remaining Claims Fail.

Yale is entitled to summary judgment on the remaining claims. First, as Yale surmised (at Mem. 33), Plaintiffs abandon their "bundling" claim, which they mention in one sentence. Opp. 32. Second, Plaintiffs admit that they cannot "repackage" failed fiduciary duty claims as prohibited transaction claims. Opp. 39. Finally, the basis for Plaintiffs' failure-to monitor-claim is that Yale did not appropriately monitor Mr. Penney. Opp. 10-11. Plaintiffs do not cite any evidence that Mr. Penney was unmonitored. They cannot. Ex. 22, Peel Tr. 44:6-19 ("I supervised Hugh. . . I had weekly meetings with him. . . I had quite a bit of playback."). In any event, Plaintiffs do not dispute that without an underlying breach, their monitoring claim fails. Mem. 36-37.

## CONCLUSION

Plaintiffs have no evidence of a genuine issue of material fact requiring trial. The Court should award Yale summary judgment on all remaining claims.

---

[17] Plaintiffs also claim standing on two new grounds: (1) they seek relief for the "entire Plan" under 29 U.S.C. § 1132(a)(2); and (2) they seek relief under the "class standing" doctrine. Opp. 28-29. Neither is availing. The first alternative is foreclosed by *Thole*. 140 S. Ct. at 1620-21. The second has been persuasively rejected. *Patterson*, 2019 WL 4934834, at *6.

Dated: March 4, 2020

Respectfully submitted,

Nancy G. Ross (ct14373)
James C. Williams (ct23292)
Richard E. Nowak (phv09930)
Jed W. Glickstein (phv09543)
MAYER BROWN LLP
71 South Wacker Drive
Chicago, Illinois 60606-4637
Telephone: (312) 782-0600
Facsimile: (312) 701-7711

*/s/ Brian D. Netter*
Brian D. Netter (phv08476)
  bnetter@mayerbrown.com
Michelle N. Webster (phv08475)
MAYER BROWN LLP
1999 K Street NW
Washington, DC 20006-1101
Telephone: (202) 263-3000
Facsimile: (202) 263-3300

*Attorneys for Defendants*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on March 4, 2021, a copy of foregoing document was filed electronically using the Court's CM/ECF system. Notice of this filing will be sent by e-mail to all parties by operation of the CM/ECF system.

*/s/ Brian D. Netter*
Brian D. Netter