**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

```
-------------------------------- x
JOSEPH VELLALI, NANCY S. LOWERS, :
JAN M. TASCHNER, and JAMES       :
MANCINI, individually and as     :
representatives of a class of    :
participants and beneficiaries   :
on behalf of the Yale University :
Retirement Account Plan,         :
                                 :
        Plaintiffs,              :   Civil No. 3:16-cv-1345(AWT)
                                 :
v.                               :
                                 :
YALE UNIVERSITY, MICHAEL A.      :
PEEL, and THE RETIREMENT PLAN    :
FIDUCIARY COMMITTEE,             :
                                 :
        Defendants.              :
-------------------------------- x
```

<u>**RULING ON MOTION TO EXCLUDE PLAINTIFFS' EXPERT DANIEL ALEXANDER**</u>

The defendants move to exclude plaintiffs' expert Daniel Alexander. For the reasons set forth below, their motion is being denied.

**I.   BACKGROUND**

Yale University ("Yale") offers to eligible employees the opportunity to participate in an individual account, 403(b) defined-contribution plan (the "Plan") governed by the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 <u>et</u> <u>seq</u>. Under the Plan, employees put a portion of their income into personal retirement savings accounts and invest those savings in an array of investment options. Yale makes

1

matching contributions under certain conditions. Each of the
four named plaintiffs in this case is a current or former Yale
employee and a participant in the Plan. Yale is the Plan's
administrator and named fiduciary with authority to control and
manage the operation and administration of the Plan.

Two key aspects of maintaining a 403(b) plan are managing
the plan's investment options and providing recordkeeping for
plan participants. Plan fiduciaries typically contract with
third-party vendors for both of these services. The process of
selecting vendors and negotiating service fees can materially
affect an employee's retirement income because every dollar
spent on either recordkeeping or investment management is a
dollar that is not contributing to increasing the amount of the
employee's retirement savings. The plaintiffs contend that, over
time, excessive service fees can erode an employee's retirement
savings to the tune of tens or hundreds of thousands of dollars.

The plaintiffs seek to offer the expert testimony of Daniel
Alexander "in support of their claims that Defendants failed to
act exclusively in participants' best interests" and "allowed
Plan service providers to receive excessive and prohibited
compensation." Pls.' Opp. Defs.' Mot. Exclude Pls.' Expert
Daniel Alexander ("Pls.' Opp.") at 4, ECF No. 308. Alexander is
the "co-founder, Principal and Managing Director of Principal
Review, LLC (d/b/a RetireAware), a consulting firm focusing on

retirement plan fiduciary and conflict of interest matters."
Expert Rep. Daniel Alexander ("Alexander Rep.") at ¶ 6, ECF No.
283-1.

Alexander "ha[s] spent [his] career servicing the private-
and public-sector defined contribution retirement markets." Id.
at ¶ 8. From 2000 to 2017, he was employed by Variable Annuity
Life Insurance Company ("VALIC"), a "leading retirement plan
provider in the public sector and non-profit markets." Id. at 48.
Alexander began as a Financial Services Representative and
progressed to Financial Advisor, to Senior Financial Advisor, to
District Vice President, to Regional Director, and ultimately to
the position of Regional Vice President, Midwest Region. He
served in that position from 2013 to 2017. He reported directly
to the president and was responsible for a region composed of
nine states and six district territories with $13.8 billion in
assets under management and $1 billion in annual deposits.

Alexander left VALIC in 2017 to cofound RetireAware.
RetireAware's focus is on "identifying and mitigating the
potentially adverse effects of conflicts of interest associated
with the structure and providers of retirement plan services"
and "[p]rovid[ing] specialized services to protect group
sponsored retirement plans and plan participants from the
adverse effects of conflicts of interest service and sales

structures that jeopardize plan health, employee retirement readiness and data security." Id.

Alexander's experience has included "institutional retirement sales and retention, sales management and leadership, staffing and recruitment, compensation and incentive structures, product and service development and enhancements, marketing and marketplace intelligence, pricing, key account relationship management, legislative and lobbyist strategies, project management, conflict analysis, engagement with regulators regarding plan participant education and regulations impacting group retirement plans." Id. at ¶ 8. Over the course of his career, he has had "extensive firsthand experience in the various ways plan recordkeepers leverage access to plan data, their exclusive and/or privileged on-site access to plan participants, and plan sponsors' implicit endorsements to generate undisclosed revenue in connection with contracted recordkeeping services." Id. at ¶ 9. He has "participated in plan recordkeeper compensation redesign projects and reviewed on-site compensation structures with plan sponsors seeking to better understand plan representative incentive models and conflicts those models may create." Id.

Alexander describes the scope of his engagement for this case as follows:

> I was asked to apply my knowledge of the defined contribution industry to calculate the revenue generated by the Plan's recordkeepers, if any, through the use of personal information and in-person access to sell products and services outside the Plan ("Non-Plan Products") to the Plan's participants. I was also asked to opine regarding the effect, if any, of the use of Plan data and in-person access to sell Non-Plan Products on the determination of whether the fees collected by the Plan's recordkeepers for their services were reasonable, in light of industry standards and practices. Further, I was asked to opine regarding whether the conduct of Yale University and its employees ("Yale") related to the marketing of Non-Plan Products by the Plans' recordkeepers followed industry-accepted principles.

Id. at ¶ 2. In opposing the instant motion, the plaintiffs state:

> Alexander has offered the following opinions:
>
> (1) [Defendants] acted contrary to prudent industry-accepted principles by allowing the Plan's recordkeepers to use Plan participants' confidential information for non-plan related sales and marketing purposes unrelated to the Plan;
>
> (2) [Defendants] acted contrary to prudent industry-accepted principles by allowing the Plan's recordkeepers to use in-person access to Plan participants for non-plan related sales and marketing purposes;
>
> (3) TIAA's sale of proprietary non-plan related products in connection to TIAA's contracted services to the plan generated undisclosed revenue in excess of $130 million, dwarfing the amount of direct recordkeeping revenue TIAA actually disclosed; and
>
> (4) As a result of [Defendants'] conduct, none of the revenue collected by the recordkeepers from the Plan during the period of time from August of 2010 to present can be considered "reasonable."

Pls.' Opp. at 7. <u>See</u> Alexander Rep. at ¶ 39.[1]

## II.   LEGAL STANDARD

Federal Rule of Evidence 702 sets forth the standard to be used by the court in evaluating the admissibility of expert testimony:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> > (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> >
> > (b) the testimony is based on sufficient facts or data;
> >
> > (c) the testimony is the product of reliable principles and methods; and
> >
> > (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.

In <u>Daubert v. Merrell Dow Pharm., Inc.</u>, 509 U.S. 579 (1993), the Supreme Court made clear that "the district court has a 'gatekeeping' function under Rule 702—it is charged with

---

[1] In their supporting memorandum, the defendants cite to and use language from the Executive Summary to describe the opinions Alexander would offer. <u>See</u> Mem. L. Supp. Defs.' Mot. Exclude Pls.' Expert Daniel Alexander ("Defs.' Mem.") at 3-4, ECF No. 274. The Executive Summary refers to industry-accepted "practices." <u>See</u> Alexander Rep. at ¶ 12. The court addresses the concerns raised by the instant motion based on the opinions the plaintiffs state they want Alexander to give, which are consistent with the scope of the engagement.

'the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand.'" Amorgianos v. Nat'l R.R. Passenger Corp., 303 F.3d 256, 265 (2d Cir. 2002) (quoting Daubert, 509 U.S at 597). "In fulfilling this gatekeeping role, the trial court should look to the standards of Rule 401 in analyzing whether proffered expert testimony is relevant, i.e., whether it 'ha[s] any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.'" Amorgianos, 303 F.3d at 265 (alteration in original) (quoting Campbell ex rel. Campbell v. Metro. Prop. & Cas. Ins. Co., 239 F.3d 179, 184 (2d Cir. 2001)). "Next, the district court must determine 'whether the proffered testimony has a sufficiently reliable foundation to permit it to be considered.'" Id. (quoting Campbell, 239 F.3d at 184).

"Relevance can be expressed as a question of 'fit'—'whether expert testimony proffered in the case is sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute.'" In re Digital Music Antitrust Litig., 321 F.R.D. 64, 75 (S.D.N.Y. 2017) (quoting Daubert, 509 U.S. at 591). "[Expert] testimony is not helpful if it 'usurp[s] either the role of the trial judge in instructing the jury as to the applicable law or the role of the jury in applying that law to the facts before it.'" Id. (second alteration in original)

(quoting United States v. Duncan, 42 F.3d 97, 101 (2d Cir. 1994)). "[E]xpert testimony that seeks to address 'lay matters which [the] jury is capable of understanding and deciding without the expert's help' is not relevant and is therefore inadmissible." United States v. Jiau, 734 F.3d 147, 154 (2d Cir. 2013) (second alteration in original) (quoting Andrews v. Metro N. Commuter R.R. Co., 882 F.2d 705, 708 (2d Cir.1989)).

With respect to reliability, the Supreme Court identified four factors that, while not definitive, are ones a district court might consider: "whether a theory or technique has been and could be tested, whether it had been subjected to peer review, what its error rate was, and whether scientific standards existed to govern the theory or technique's application or operation." Ruggiero v. Warner–Lambert, 424 F.3d 249, 253 (2d Cir. 2005) (citing Nimely v. City of N.Y., 414 F.3d 381, 397 (2d Cir. 2005)). "These factors do not constitute, however, a 'definitive checklist or test.'" Amorgianos, 303 F.3d at 266 (quoting Daubert, 509 U.S. at 593). "Rather, '[t]he inquiry envisioned by Rule 702 is . . . a flexible one,' and 'the gatekeeping inquiry must be tied to the facts of a particular case.'" Id. (first quoting Daubert, 509 U.S. at 594; then quoting Kumho Tire Co., v. Carmichael, 526 U.S. 137, 150 (1999)). Consequently, "[a]lthough Rule 702 sets forth specific criteria for the district court's consideration, the Daubert

inquiry is fluid and will necessarily vary from case to case."
Id.

"In undertaking this flexible inquiry, the district court
must focus on the principles and methodology employed by the
expert, without regard to the conclusions the expert has reached
or the district court's belief as to the correctness of those
conclusions." Id. (citing Daubert, 509 U.S. at 595).

Whether the expert bases testimony on professional studies
or personal experience, he must employ "the same level of
intellectual rigor that characterizes the practice of an expert
in the relevant field." Kumho Tire, 526 U.S. at 152. In Kumho
Tire, the Court emphasized the relevance/reliability standard in
determining the admissibility of expert testimony, stating that
Rule 702 "'establishes a standard of evidentiary reliability.'
It 'requires a valid . . . connection to the pertinent inquiry
as a precondition to admissibility.' And where such testimony's
factual basis, data, principles, methods, or their application
are called sufficiently into question, . . .  the trial judge
must determine whether the testimony has 'a reliable basis in
the knowledge and experience of [the relevant] discipline.'" Id.
at 149 (alteration in original) (citations omitted) (quoting
Daubert, 509 U.S. at 590, 592).

"In deciding whether a step in an expert's analysis is unreliable, the district court should undertake a rigorous examination of the facts on which the expert relies, the method by which the expert draws an opinion from those facts, and how the expert applies the facts and methods to the case at hand." Amorgianos, 303 F.3d at 267. "A minor flaw in an expert's reasoning or a slight modification of an otherwise reliable method will not render an expert's opinion per se inadmissible." Id. "The judge should only exclude the evidence if the flaw is large enough that the expert lacks 'good grounds' for his or her conclusions." Id. (quoting In re Paoli R.R. Yard PCB Litig., 35 F.3d 717, 746 (3d Cir. 1994)) (citing Daubert, 509 U.S. at 590). "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." Daubert, 509 U.S. at 596 (citing Rock v. Arkansas, 483 U.S. 44, 61 (1987)).

"In addition, if the admissible evidence is insufficient to permit a rational juror to find in favor of the plaintiff, the court remains free to direct a verdict or grant summary judgment for defendant." Amorgianos, 303 F.3d at 267 (citations omitted). However, "the district court's Daubert gatekeeping role does not permit the district court, in ruling on evidentiary sufficiency, to reject admissible expert testimony." Id. at 267–68 (citations

omitted). "Once the district court has deemed the evidence sufficiently reliable so as to be admissible, it is 'bound to consider the evidence in the light most favorable to plaintiff' when deciding motions for summary judgment or judgment as a matter of law." Id. at 268 (quoting In re Joint E. & S. Dist. Asbestos Litig., 52 F.3d 1124, 1135 (2d Cir. 1995)).

The Second Circuit has noted "the uniquely important role that Rule 403 has to play in a district court's scrutiny of expert testimony, given the unique weight such evidence may have in a jury's deliberations." Nimely, 414 F.3d at 397 (citing Daubert, 509 U.S. at 595). Rule 403 provides that "[t]he court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403.

## III. DISCUSSION

The defendants argue that Alexander's opinions about the retirement industry are inadmissible because they are not based on any objective methodology; that his opinion regarding TIAA's undisclosed revenue is inadmissible because his methodology is unreliable; and that his remaining opinions are also inadmissible because they are not based on any industry expertise at all.

### A. **Opinions Regarding the Retirement Industry**

The defendants contend that Alexander's opinions that the defendants acted contrary to prudent industry-accepted principles by allowing the Plan's recordkeepers to use Plan participants' confidential information for non-Plan related sales and marketing purposes unrelated to the Plan, and by allowing the Plan's recordkeepers to use in-person access to Plan participants for non-Plan related sales and marketing purposes are inadmissible because they lack a reliable foundation. The defendants argue that these opinions are not based on any objective methodology but rather are simply based on Alexander's "naked experience," Defs.' Mem. at 5, and "naked 'experience' is not a reliable methodology for assessing the state of the industry in 2010." Id.

However, Alexander has not simply relied on "naked experience" to formulate his opinions. Experience is the basis for certain of Alexander's factual conclusions that are part of the support for his analysis, but the core of the basis for his opinions is facts taken from materials he cites in his report. See Alexander Rep., Ex. 1, at 44 ("In addition to the materials cited in my report, I considered the following documents: Department of Labor form 5500s for Yale University Retirement Account Plan[;] Meeting minutes and materials of the Fiduciary Committee on Investments[;] Charters[;] Fee Disclosures[;]

12

Investment Policy Statements[;] Plan Documents and Amendments[;] Deposition Transcripts[;] Documents and exhibits used during depositions[;] [a]nd the following bates stamped documents . . . .").  The bates stamped documents include numerous documents from Yale, as well as "TIAA," "Aon," and "Vanguard" documents.  Id. at 44-46.

For example, in formulating his opinion, with respect to cross-selling, that the defendants acted contrary to prudent industry-accepted principles, Alexander based his opinion on his knowledge of industry practices and standards, and on facts showing, inter alia, that (i) "TIAA employs a variable compensation structure that incentivizes financial representatives with access to participant data to recommend non-plan investment and insurance products," Alexander Rep. at 13; (ii) "Yale allowed TIAA to use Plan data, including confidential plan participant data, to conduct non-plan related marketing and advertising activities," id. at 15; (iii) "Yale allowed TIAA to leverage its in-person access to Plan participants to recommend or refer Non-Plan [p]roducts and services," id. at 18; and (iv) "Yale failed to take any action to prohibit the Plan's recordkeepers from sharing confidential plan data internally and with others, for purposes unrelated to the exclusive benefit of the Plan." Id. at ¶ 75.

Having explained his qualifications and experience, Alexander discusses industry practices and standards. Making it clear that he is not giving a legal opinion, he states his understanding that "ERISA and its associated regulations require disclosure of all indirect compensation received and/or reasonably expected to be received by a plan's service provider in connection with providing such services . . . ." Id. at ¶ 15. He also discusses the obligation under Department of Labor regulations of plan fiduciaries to assess the reasonableness of all recordkeeper compensation generated from a defined contribution plan. See id. at ¶ 29. He discusses steps a plan sponsor can take in identifying recordkeeper practices that create conflicts of interest. See id. at ¶ 32. Alexander is qualified to testify about all of these matters by virtue of his experience.

Alexander draws on his experience to conclude that "a plan fiduciary cannot assess the reasonableness of a plan's recordkeeping or administrative fee arrangement without considering all direct and indirect forms of compensation earned by the recordkeeper in connection with its services to the plan." Id. at ¶ 16. As support for this conclusion, he includes "a sample illustration I use in my practice to demonstrate the potential effect on total recordkeeper compensation of Non-Plan Products." Id. at ¶ 18. He discusses things that are common

14

knowledge in the industry and explains why he advises his clients not to "allow recordkeepers to market and sell Non-Plan Products and services to participants (regardless of whether they can) to obtain lower-cost or even no-cost recordkeeping services for their defined contribution plans." Id. at ¶ 28.

With respect to his factual conclusion that TIAA employed a variable compensation structure that incentivized its investment advisors and financial representatives to recommend non-Plan investment and insurance products, Alexander analyzed the compensation structure employed by TIAA, obtained information from regulatory filings by TIAA, and relied on the deposition testimony of E. Craig Porter ("Porter"), Vice President of Customer Insights & Analytics at TIAA during the relevant time period. TIAA's employee scorecards include the referral and recommendation of "complex" product solutions, and Alexander relied on his experience to conclude that "the inclusion of a specific metric in an employee performance scorecard highlights its importance to the respective organization." Id. at ¶ 44. He also relied on his experience in the financial services industry to conclude that "incentive compensation programs are adopted to generate specific behaviors[,]" and then on a filing by TIAA to conclude that "TIAA incents the transfer of group retirement plan assets to its complex product solutions." Id. at ¶ 45. Alexander reviewed TIAA regulatory filings to determine that

"TIAA compensates its financial representatives with a
combination of fixed salary and variable compensation." Id. at ¶
46. Then, based on his experience, he concluded that financial
representatives at TIAA had an incentive to recommend and refer
"plan participants to transfer core products and/or non-TIAA
assets to TIAA's complex suite of products." Id. at ¶ 47. Also,
based on a statement in TIAA's ADV Form Part 2A, Alexander
concluded that TIAA had "made a business decision to adopt the
compensation model and accept the conflict, and disclose the
conflict as a part of regulatory filing with the SEC." Id. at ¶
49.

     With respect to his factual conclusion that Yale allowed
TIAA to use Plan data, including confidential Plan participant
data, to conduct non-Plan related marketing and advertising
activities, Alexander relied on, inter alia, Yale documents,
Porter's deposition testimony, and deposition testimony of Hugh
Penney, Yale's Senior Director of Benefits. Alexander relied on
his experience to conclude that "date of birth is collected for
every recordkeeping participant." Id. at ¶ 52.

     With respect to his factual conclusion that Yale allowed
TIAA to leverage its in-person access to Plan participants to
recommend or refer non-Plan products or services, Alexander
relied on Yale documents, including emails "from the official
Yale Employee Services email account to every benefit-eligible

Yale employee," id. at ¶ 70, and deposition testimony of Julie M. Kimball, Associate Director of Benefits Planning at Yale. Alexander relied on his experience in reaching a conclusion about the value of the "ability to sort and query specific segments of participant data . . . in targeting plan participants for specific sales and marketing campaigns," id. at ¶ 65, and to conclude that an "explicit endorsement of the recordkeeper for its contracted services yields an implicit endorsement of the recordkeeper's non-contracted services . . . ." Id. at ¶ 69.

With respect to his factual conclusion that Yale failed to prohibit its recordkeepers from sharing confidential Plan data internally and with others for purposes unrelated to the exclusive benefit of the Plan, Alexander relied on Porter's deposition testimony. He relied on his experience and Porter's deposition testimony to conclude that "it would be necessary to share some information obtained from plan participants with outside vendors [such as Equifax or InfoGroup] in order to match incoming data with existing data." Id. at ¶ 77.

Consequently, the defendants' argument that Alexander simply relied on "naked experience" in giving these opinions is unpersuasive. To the extent Alexander relied on his knowledge and experience, he did so with respect to matters that were within the ambit of that knowledge and experience, and in his

report he also cites extensively to facts and data on which his opinions are based.

## B. Opinion Regarding TIAA's Undisclosed Revenue

The defendants argue that Alexander's methodology with respect to his opinion regarding undisclosed revenue earned by TIAA is unreliable for several reasons, so the opinion should be excluded. The objections raised by the defendants do not, individually or collectively, show that Alexander's opinion should be excluded.

First, the defendants argue that Alexander improperly counts revenues TIAA earned before and after individuals were Plan participants and thus his "methodology includes revenue that has nothing to do with Yale." Defs.' Mem. at 14. Alexander relies on a TIAA spreadsheet "created by TIAA for this litigation at Plaintiffs' request," Pls.' Opp. at 1, and the defendants rely on Porter's testimony that "[t]his report doesn't have any linkage between the participation in the Plan and the purchase of the product." Defs.' Mem. at 15. The plaintiffs, however, point to other deposition testimony by Porter to support their position that "TIAA admitted that its primary source of information driving its direct marketing efforts is information collected about participants in retirement plans it recordkeeps," Pls.' Opp. at 18 (emphasis omitted). They also point out that there is no evidence to

support an assumption made by the defendants that "there exist
Plan participants who formerly participated in one or more
retirement plans whose fiduciaries, like Defendants, neglected
to take action to suppress marketing." Id. at 19.

Consequently, the court agrees with the plaintiffs that
"[a]t most, the issues raised by Defendants create uncertainties
concerning the amounts Alexander calculated," id. at 19, and
thus their objection to Alexander's opinion goes to weight, not
admissibility.

Second, the defendants argue that Alexander improperly
counts revenues TIAA earned "regardless of its ability to
'cross-sell.'" Defs.' Mem. at 15. They maintain that "[t]he fact
that TIAA earns revenue from selling a nonplan product to a Plan
participant does not show that TIAA is earning that revenue
because of cross-selling." Id. They point out that Alexander
does not attempt to "estimate what proportion of the revenue he
measured was earned only because of TIAA's supposed ability to
cross-sell." Id.

The plaintiffs, however, have support in the record for
their position that "TIAA's direct marketing operation is
primarily based on data obtained from providing recordkeeping
services to retirement plans." Pls.' Opp. at 20. The plaintiffs
maintain that Alexander's methodology yields, in the context of
this case, a reasonable approximation of cross-selling revenue,

and such a reasonable approximation is all that is required here
for Alexander's opinion to assist the trier of fact. See Pls.'
Opp. at 21-22 ("It is likewise well-established that while a
plaintiff who seeks disgorgement 'has the burden of producing
evidence permitting at least a reasonable approximation of the
amount of the wrongful gain,' the '[r]esidual risk of
uncertainty in calculating net profit is assigned to the
defendant.' This is consistent with ERISA, which resolves '[a]ny
doubt or ambiguity' regarding damages against the breaching
fiduciary.'" (first and second quotes from Restatement (Third)
of Restitution and Unjust Enrichment § 51(d) (2011); then
quoting Bierwirth, 754 F.2d at 1056)). The court agrees.

Thus, the defendants merely show that there are
uncertainties concerning the amount calculated by Alexander.
They do not point to any available data that he should have
taken into account to eliminate such uncertainties. They merely
assert, with no citation to evidence, that "[e]very year,
countless individuals choose TIAA for their individual (non-
plan) retirement needs not because of 'cross-selling,' but
because they value its expertise and offerings." Defs.' Mem. at
16. Here again the defendants' objection to Alexander's opinion
goes to weight, not admissibility.

Third, the defendants argue that Alexander "plainly
misconstrues life insurance data." Id. at 16. They neglect to

20

disclose to the court (only discussing the issue once it is
flagged by the plaintiffs in their opposition) that this
argument is based on a declaration made by Porter changing his
deposition testimony after Alexander had relied on it in his
report. Paragraph 93 of Alexander's report states in pertinent
part:

> The most straightforward calculation is of TIAA's
> revenue for life insurance. Porter testified that the $
> shown on the spreadsheet represents annual premiums
> paid. Thus, the total amount of revenue TIAA earned from
> providing life insurance products to Plan participants
> is simply the sum of these premiums, which is over $80
> million, for calendar years 2010 through 2018.

Alexander Rep. at ¶ 93. The report accurately cites to Porter's
deposition testimony. See Confidential Videotaped Dep. E. Craig
Porter, at 158:2-12, ECF No. 315-10. While the defendants assert
in their reply that "Mr. Porter has since clarified that his
response to Plaintiffs' counsel's characterization was not
sufficiently complete," Reply Supp. Defs.' Mot. Exclude Pls.'
Expert Daniel Alexander ("Defs.' Reply") at 8, ECF No. 339, that
assertion by the defendants is a mischaracterization. The
questions Porter was asked at his deposition were clear and
straightforward. There was no "'muddled exchange' at the
deposition." Defs.' Reply at 9 (quoting Phoenix Light SF Ltd. v.
Bank of New York Mellon, No. 14-CV-10104 (VEC), 2019 WL 5957221,
at *4 (S.D.N.Y. Nov. 13, 2019)). Porter simply changed his
testimony, and the court agrees with the plaintiffs that

"Alexander could not have been expected to know that Porter would conveniently alter his previously unambiguous testimony." Pls.' Opp. at 24.

Finally, the defendants argue that Alexander "plainly misconstrues fund expenses data." Defs.' Mem. at 18. They contend that "Alexander opined that TIAA collected millions of dollars for account management services, but public sources show that TIAA credits significant portions of these revenues back to its clients." Defs.' Reply at 10. The defendants assert that "when a customer purchases TIAA funds through a managed TIAA account, TIAA rebates the fund management fees to the customer directly." Defs.' Mem. at 19 (citing Decl. Jason Creel, at ¶¶ 3-5, ECF No. 281-112).

Again, the defendants' objection to Alexander's opinion goes to weight, not admissibility. The plaintiffs disagree and the parties rely on different TIAA Portfolio Advisor ADV forms and brochures to support their positions. See Defs.' Mem. at 19 (citing TIAA Portfolio Advisor Form ADV Part 2 dated March 31, 2011); Pls.' Opp. at 26 (citing TIAA Portfolio Advisor Form ADV Part 2A brochure dated December 7, 2020). The plaintiffs contend that the evidence shows that "TIAA has full discretion to exclude expenses from the credits. But neither the Creel declaration nor the Form ADV provide details regarding the amounts of credits, if any, after expenses are deducted. . . .

Creel's declaration and Form ADV state, only IRAs are eligible for this credit. But TIAA's revenue data does not specify that any private asset management customers are invested in IRAs." Pls.' Opp. at 26.

While the defendants have shown that there are a number of areas where Alexander may be subject to vigorous cross-examination, they have not shown that he failed to "identify the key considerations necessary to derive a reasonable estimate of alleged TIAA revenues from 'cross-selling.'" Defs.' Reply at 10.

### C. **Additional Arguments**

Making general reference to paragraphs 40 to 84 and 94 to 107 of Alexander's report, the defendants argue that Alexander is simply giving narrative recitations, and that a factfinder is "more than capable of reviewing Yale and TIAA documents, meeting minutes, and testimony and drawing conclusions about what they say." Defs.' Mem. at 20. The defendants cite to In re Fosamax Products Liability Litigation, 645 F. Supp. 2d 164 (S.D.N.Y. 2009). There the court cited the general proposition that "an expert cannot be presented to the jury solely for the purpose of constructing a factual narrative based upon record evidence." Id. at 192 (citations omitted). The court then observed, with respect to the expert witness in question, that "[s]he will not be permitted to merely read, selectively quote from, or regurgitate the evidence." Id. (emphasis added) (citations and

internal quotation marks omitted). That is not the situation
with respect to Alexander.

As discussed above, in paragraphs 40 to 84, Alexander sets
out the basis for factual conclusions that support his opinions.
The same is true with respect to paragraphs 94 to 107. "An
expert opinion will be disallowed when it is directed solely to
'lay matters which a jury is capable of understanding and
deciding without the expert's help.' But testimony will be
admitted if it helps the factfinder 'understand the facts
already in the record, even if all it does is put those facts in
context.' Summaries of testimony in the record does not
necessarily 'impinge on the jury's functions.'" In re Xerox
Corp. Sec. Litig., No. 3:99CV02374 AWT, 2009 WL 8556135, at *3
(D. Conn. Apr. 22, 2009) (first quoting Andrews v. Metro N.
Commuter R. Co., 882 F.2d 705, 708 (2d Cir. 1989); then quoting
United States v. Schiff, 538 F. Supp. 2d 818, 844 n. 26 (D.N.J.
2008); then quoting In re Air Disaster at Lockerbie Scotland on
Dec. 21, 1988, 37 F.3d 804, 826 (2d. Cir. 1994), overruled on
other grounds by Zicherman v. Korean Air Lines Co., Ltd., 516
U.S. 217, 229 (1996)) (citing United States v. Duncan, 42 F.3d
97, 1010 (2d Cir. 1994) ("Expert witnesses are often uniquely
qualified in guiding the trier of fact through a complicated
morass of obscure terms and concepts.")).

Also, citing generally to paragraphs 108 to 134 and 152 to 154 of Alexander's report and quoting the caption for Part VI.G (which pertains only to paragraphs 108 to 130), the defendants assert that "[e]ven more inappropriate than his narrative recitations is Alexander's opinion that Yale 'failed to act prudently in determining indirect compensation.'" Defs.' Mem. at 20 (quoting Alexander Rep. at 26). Notwithstanding the caption in part VI.G, nowhere in these paragraphs does Alexander state that Yale failed to "act prudently." He merely discusses and puts in context facts that support his opinions. Objections with respect to the language in that caption and the "smattering of additional opinions," id. at 21, referenced by the defendants at the end of their memorandum are minor matters that are not a basis for granting the defendants' motion and can be addressed at a later point in time, if necessary.

**IV.   CONCLUSION**

For the reasons set forth above, Defendants' Motion to Exclude Plaintiffs' Expert Daniel Alexander (ECF No. 272) is hereby DENIED.

It is so ordered.

Signed this 30th day of March 2022, at Hartford, Connecticut.

/s/ AWT
Alvin W. Thompson
United States District Judge
