```
                     UNITED STATES DISTRICT COURT
                       DISTRICT OF CONNECTICUT

-------------------------------- x
JOSEPH VELLALI, NANCY S. LOWERS, :
JAN M. TASCHNER, and JAMES       :
MANCINI, individually and as     :
representatives of a class of    :
participants and beneficiaries   :
on behalf of the Yale University :
Retirement Account Plan,         :
                                 :
          Plaintiffs,            :   Civil No. 3:16-cv-1345(AWT)
                                 :
v.                               :
                                 :
YALE UNIVERSITY, MICHAEL A.      :
PEEL, and THE RETIREMENT PLAN    :
FIDUCIARY COMMITTEE,             :
                                 :
          Defendants.            :
-------------------------------- x
```

## ORDER RE DEFENDANTS' MOTION TO EXCLUDE PLAINTIFFS' EXPERTS AL OTTO AND TY MINNICH

For the reasons set forth below, Defendants' Motion to Exclude Plaintiffs' Experts Al Otto and Ty Minnich (ECF No. 278) is hereby DENIED.

This motion is one of three motions by the defendants to exclude the plaintiffs' experts in this case. The factual background is summarized in the Ruling on Motion to Exclude Plaintiffs' Expert Daniel Alexander. See ECF No. 408.

The defendants address only one aspect of Minnich's opinions: namely, his opinion that, during the relevant period, a reasonable market rate for the Plan's recordkeeping services during the relevant period was $34 to $40 per-participant per

1

year. Similarly, the defendants address only two aspects of Otto's opinions: (i) his conclusion regarding a reasonable recordkeeping rate for the Plan; and (ii) his opinion regarding Yale's process with respect to monitoring and controlling recordkeeping fees.

**I.   TY MINNICH**

   **A. Minnich's Opinion Does Not Hinge on a Mistaken Assumption**

Federal Rule of Evidence 702 "requires that the evidence or testimony 'assist the trier of fact to understand the evidence or to determine a fact in issue.'" Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579, 591 (1993) (quoting Fed. R. Evid. 702). "An additional consideration under Rule 702—and another aspect of relevancy—is whether expert testimony proffered in the case is sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute." Id. (quoting United States v. Downing, 753 F.2d 1224, 1242 (3d Cir. 1985)). The "[a]dmission of expert testimony based on speculative assumptions is an abuse of discretion." Major League Baseball Properties, Inc. v. Salvino, Inc., 542 F.3d 290, 311 (2d Cir. 2008) (alteration in original) (quoting Boucher v. U.S. Suzuki Motor Corp., 73 F.3d 18, 21 (2d Cir. 1996)).

The defendants argue that "Minnich's opinion should be excluded because it relies on a verifiably false premise and

2

therefore offers testimony that does not bear on a question before this Court." Mem. L. Supp. Defs.' Mot. Exclude Pls.' Experts Al Otto and Ty Minnich ("Defs.' Mem.") at 4, ECF No. 280. The defendants state that "the Plan needed to have an ongoing relationship with TIAA." Id. at 6. Then, with respect to Minnich, they assert:

> But Minnich assumed exactly the opposite—his opinion was "predicated on the assumption that . . . [Yale would switch] all participant accounts [] to [a] new provider." [Video Dep. Ty Minnich ("Minnich Dep.") at 158:21-25, ECF No. 283-14].

Id. at 6 (first, second, and third alterations in original).

But the defendants distort Minnich's deposition testimony. As the plaintiffs state:

> The testimony that Defendants cite ([Defs.' Mem.] at 6 (citing Minnich Dep. [at] 158:21—25)), misleadingly omits the question. Counsel asked Minnich a hypothetical requiring him to assume "it is not TIAA." [Minnich Dep.] at 158:14—25. In a hypothetical world without TIAA, Minnich had to assume the assets moved to another provider.

Pls.' Mem. Opp. Defs.' Mot. Exclude Pls.' Experts Al Otto and Ty Minnich ("Pls.' Mem.") at 20, ECF No. 304. Specifically, that portion of Minnich's deposition testimony was as follows:

> Q   You are indicating that these numbers are for a sole recordkeeper, right, you just testified?
>
> A   Yes, I am.
>
> Q   Assuming that it is not TIAA, does this number assume that all TIAA products would, all TIAA annuities would have been mapped out of the Yale plan when TIAA was no longer the recordkeeper?

3

>    MR. ROHLF: Objection to form.
>
> A    To note that I didn't assume that it is not TIAA.
>
> Q    (MS. ROSS) But I'm asking you, I'm asking you to assume if it is not TIAA because you said it could have been TIAA, not that it would have been TIAA. So I'm saying assuming it is not TIAA, do these numbers assume that the TIAA annuities would have all been mapped out of the Yale plans?
>
>    MR. ROHLF: Objection to form.
>
> A    **These numbers are predicated on the assumption that there's a due diligence process and inclusive in that all new records go to the new provider. All participant accounts go to the new provider.**

Minnich. Dep. at 158:3-25 (emphasis added). A comparison of the language the defendants select from Minnich's deposition testimony to the last four lines excerpted above (see language in bold) shows there is no basis for the defendants' argument.

### B. Methodology

"In fulfilling [its] gatekeeping role, the trial court should look to the standards of Rule 401 in analyzing whether proffered expert testimony is relevant, i.e., whether it 'ha[s] any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.'" Amorgianos v. Nat'l R.R. Passenger Corp., 303 F.3d 256, 265 (2d Cir. 2002) (second alteration in original) (quoting Campbell ex rel. Campbell v. Metro. Prop. & Cas. Ins. Co., 239 F.3d 179, 184

4

(2d Cir. 2001)). "Next, the district court must determine 'whether the proffered testimony has a sufficiently reliable foundation to permit it to be considered.'" Id. (quoting Campbell, 239 F.3d at 184).

The defendants argue that Minnich's opinion lacks an adequate foundation. They contend that he followed no methodology and "refused to even hint at how he derived his specific numbers. He just asserts that they are true." Defs.' Mem. at 6. They maintain that "[t]here is no way to test the embedded assumptions . . . ." Id. at 8. That is not correct.

### 1. Minnich Explained His Methodology

Minnich's report does not contain a clear explanation of the methodology he followed. However, Minnich does explicitly map out the methodology he followed in his rebuttal report and in his deposition testimony. He wrote in his rebuttal report:

> Industry standards are clear, recordkeeping pricing for large plans is based on three factors: 1) participant count; 2) any enhanced services beyond the core recordkeeping services; and 3) any ancillary revenue that can be received by the recordkeeper from non-recordkeeping sources taking into consideration total assets. These are the same three factors that I considered pricing plans for decades and are the same factors that I considered and applied in forming my opinions here.

Expert Rep. Ty Minnich in Rebuttal to Expert Rep. of Glenn Poehler (Oc. 7, 2019) and Conrad Ciccotello (Oct. 7, 2019) ("Minnich Rebuttal Rep.") at ¶ 6, ECF No. 283-8. He then

5

explained, with respect to participant count, that "[b]ecause of the economies of scale and fixed costs in providing recordkeeping services, the primary factor that I used in practice in determining recordkeeping fees is participant count. The higher the participant count, the less the per-participant cost of recordkeeping services." Id. at ¶ 8. Minnich further explained that "[t]he relationship forms a simple exponential curve," id., and he pointed to the acceptance of this approach by the Department of Labor. See id.

Minnich stated that "[c]ommon industry standards and practices agree on this exponential curve. For example, an available pricing curve from an April 2005 presentation cited in my opening report demonstrates a pricing curve used by Fidelity. At that time, consistent with my experience, Fidelity identified a simple exponential curve based entirely on participant count to price plans." Id. at ¶ 10. Minnich explained that he has used a similar exponential curve in his work in the industry. Id. at ¶ 11 ("Consistent with this DOL guidance and industry practice, I used a similar pricing curve to price plans at Transamerica, MetLife and CitiStreet."). He noted that the pricing curve used by Fidelity to which he cited in his opening report was consistent with his experience. See id. at ¶ 10 ("At that time, consistent with my experience, Fidelity identified a simple

exponential curve based entirely on participant count to price plans.").

Minnich identified fourteen specific plans that he concluded were "relatively similarly-sized plans" as "examples of market pricing I use to support my reasonable fee opinion." Id. at ¶ 12. Minnich explained that "I choose these examples because there was evidence that the example plans had undergone a due diligence process either through an RFP, consolidation or adoption of a new per-participant price, and that they were mostly large plans between 10,000 and 40,000 participants." Id. He then explained:

> As noted above by the DOL and consistent with my experience, an industry practice by large plan sponsors is to request competitive bids from a number of 401(k) service providers. Thus, in assessing the marketplace, reviewing recently negotiated fees is noted as a compelling source of pertinent and competitive information. To demonstrate the relationship between participant count and pricing, I plotted the examples from my opening report on an exponential curve. For these Plans, I used the participant count noted in my opening report or the number of participants with account balances (line 6(g)) from the plan's form 5500 filed with the Department of Labor for the year discussed in my report. When a Plan sponsor had multiple plans, I assumed that the participant count was the count for the largest plan sponsored to avoid double counting if the participants overlapped unless the structure suggested that there was no overlap. Credible and reliable information, the kind I considered in my practice, existed showing that these relatively similarly-sized plans in term of participant counts recently engaged in a competitive bidding process, consolidated, or adopted per-participant fees to ensure these fees were negotiated at some level. As demonstrated in Exhibit B, my examples create a similar pricing curve to what I

  used in practice and all defined contribution plan major recordkeepers use.

Id.

  Minnich then used the information with respect to those fourteen specific plans to plot an exponential curve, and he maintains that that exponential curve shows his reasonable fee opinion is supported by actual examples of market pricing where a plan had undergone a due diligence process.

  With respect to the second factor, any enhanced services beyond the core recordkeeping services, Minnich listed the complete services provided by TIAA and Vanguard and categorized them as either "core" or "enhanced" services. See id., Ex. D-E, at ¶ 26-27. He then concluded that "[t]he only enhanced services that would materially affect pricing are the one-on-one advisors and the access to managed advice." Id. at ¶ 30. He then explained the basis for his conclusion that the on-site advisors would not add any additional cost of recordkeeping the plan. See id. at ¶ 31.

  With respect to the third factor, ancillary revenue sources, Minnich explained why he "discount[ed] the enhanced services to zero and based [his] reasonable fee almost entirely on the participant count." Id. at ¶ 35.

### 2. The Defendants' Objections Do Not Justify Excluding Minnich

  The defendants argue that Minnich's opinion should be excluded because he "needed an objective methodology for selecting

8

his comparators--which he lacked." Defs.' Mem. at 13. They maintain that his methodology is flawed because "[f]or all but one of his examples, he quotes the plan's recordkeeping rate from the year it paid the least, while ignoring that it paid more every other year. Thus, Minnich's evidence fails to show that his examples paid the fees he quotes throughout the class period--something he claims the Plan should have done." Id. at 12 (emphasis in original). They also argue that Minnich "ignored plan size." Id. at 13.

The defendants' objections appear to target a methodology that is not the one Minnich used. Minnich is not averaging or taking the mean for comparators on a per-year basis and then comparing that to what Yale paid. Rather, he is using data to plot an exponential curve, and the data is taken from plans that have undergone a due diligence process, either through an RFP, a consolidation, or adoption of new per-participant pricing. See Minnich Rebuttal Rep. at ¶ 12. Also, Minnich references plan size for each example either in his report or in his rebuttal report. See Pls.' Mem. at 28.

The defendants also argue that Minnich's numbers are wrong and that he makes several math or reading comprehension errors, which Minnich disputes in his rebuttal report. These objections go to weight, not admissibility.

**II.   AL OTTO**

The defendants challenge two aspects of Otto's opinions. First, they object to his opinion with respect to a reasonable fee range. Second, they object to his opinion concerning Yale's process with respect to monitoring and controlling the Plan's recordkeeping fees.

### A. Reasonable Fee Range

The defendants argue that "if Minnich's opinions are excluded . . . the fact that Otto expressly 'adopts Minnich's fee range' for his damages opinions means that Otto's opinions should be excluded, too." Reply Supp. Defs.' Mot. Exclude Pls.' Experts Al Otto and Ty Minnich ("Defs.' Reply") at 8, ECF No. 341 (quoting Defs.' Mem. at 20). However, Minnich's opinions are not being excluded.

The defendants object to Otto's opinion because he relies on survey data from New England Pension Consultants ("NEPC"). Otto testified that NEPC is "a large retirement plan consulting investment advisor" that "do[es] survey work," Video Dep. Albert J. Otto ("Otto Dep.") at 100:9-10, ECF No. 309-106, and that he relies on NEPC data outside of litigation for the purpose of helping him understand where the market is. See id. at 100:12-16. "If experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject, they need not be admissible for the opinion to be admitted." Fed. R. Evid. 703. Thus, Otto can rely on NEPC survey

10

data as a basis for his opinion. Moreover, as the plaintiffs point out, "Otto was not trying to use the NEPC data to establish a reasonable fee for the Plan." Pls.' Mem. at 33. Otto makes it clear that he is "us[ing] general market data to demonstrate that the reductions the Plan received in fees could not be caused by general market trends." Id. See Rebuttal Rep. Al Otto Nov. 5, 2019 to Oct. 7, 2019 Expert Reps. of Glenn Poehler, John Chalmers and Conrad Ciccotello, at ¶ 94, ECF No. 315-27.

The defendants object that "Otto takes a survey of retirement plans—he does not know which plans were surveyed, or whether any were even 403(b) plans," Defs. Mem. at 20, but Otto explained at his deposition that, while it is likely there are 403(b) plans in the cohort, for purposes of his analysis it does not matter even if that cohort does not include plans with TIAA annuities. See Otto Dep. at 100:5–23.

The defendants argue that "Otto also uses an alternative methodology which, he claims, supports Minnich's range," Defs.' Mem. at 20, but that methodology is "inadmissible on its own terms" because it "flouts Federal Rule of Evidence 407." Id. at 21. Rule 407 "prohibits a plaintiff from introducing evidence of subsequent remedial measures taken by the defendant in order to establish the defendant's underlying liability." Estate of Hamilton v. City of New York, 627 F.3d 50, 53 (2d Cir. 2010)

11

(citing Lust v. Sealy, Inc., 383 F.3d 580, 585 (7th Cir. 2004)). But Rule 407 also provides that "the court may admit this evidence for another purpose, such as impeachment or--if disputed--proving ownership, control, or the feasibility of precautionary measures." Fed. R. Evid. 407. As an initial matter, paragraph 208 of Otto's report relates to determination of a reasonable per-participant fee, not establishing liability. Otto states: "Another method shows the fees cited by Ty Minnich are in line with industry data. I use as a starting point the $34 per-participant fee Yale currently pays TIAA, and assume that this is a reasonable fee." Otto Rep. at ¶ 208. This evidence may be admitted for that purpose.

Secondly, Rule 703, not Rule 407, governs the bases of opinion testimony by experts. See West v. Bayer HealthCare Pharms. Inc., 293 F. Supp. 3d 82, 91-92 (D.D.C. 2018) ("In the context of Defendant's motion to exclude expert testimony, Defendant's focus on Rule 407 is misguided, because the admissibility of the [evidence of a subsequent remedial measure] is irrelevant. Defendant's focus should instead be on Rule 703 . . . ."); see also Pineda v. Ford Motor Co., 520 F.3d 237, 246-47 (3d Cir. 2008) ("The District Court and the parties conflate the separate issues of whether [a subsequent remedial measure] itself can be admitted into evidence and whether [an expert's] opinion can be admitted if it is based on a consideration of the

[subsequent remedial measure]. Rule 703 is clear that the [subsequent remedial measure] does not need to be admissible evidence in order for [an expert's] opinion [relying on the subsequent remedial measure] . . . to be admitted. The Rule's only requirement is that the data be 'of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject.' . . . Thus, despite Rule 407's general exclusion of subsequent remedial measure evidence, we hold that Rule 703 permits [an expert] to base his opinion on a consideration of the [subsequent remedial measure]." (quoting Fed. R. Evid. 703)).

"An expert may base an opinion on facts or data in the case that the expert has been made aware of or personally observed. If experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject, they need not be admissible for the opinion to be admitted." Fed. R. Evid. 703. Otto has been made aware of the $34 per-participant fee Yale currently pays TIAA, and experts in his field reasonably rely on such data in forming an opinion.

### B. The Defendants' Remaining Objections Do Not Justify Excluding Otto

Citing to paragraphs 68 to 204 of Otto's report, the defendants argue that "Otto's summary of Yale's process is improper expert testimony." Defs.' Mem. at 22. However, in those

paragraphs Otto merely sets forth in detail the basis for his factual conclusions that:

> Among other things, Defendants (1) delegated responsibility for recordkeeping to a single conflicted individual, who in turn relied solely on information from current vendors; (2) had no process for monitoring the reasonableness of recordkeeping fees; (3) allowed Yale to improperly pay itself from Plan participants' funds; (4) failed to timely consolidate to a single recordkeeper; (5) failed to timely adopt per-participant recordkeeping fees; (6) failed to engage in a competitive bidding for Plan recordkeeping services; (7) failed to negotiate recordkeeping fees; and (8) delayed taking necessary action to ensure reasonable fees. In addition, Defendants showed a remarkable lack of care and understanding regarding the Plan's recordkeeping and administrative fees.

Otto Rep. at ¶ 78.

Finally, the defendants object that Otto states a legal conclusion in paragraph 12 of his report: "They failed to exercise the care, skill, prudence, and diligence of a knowledgeable and prudent fiduciary under the circumstances . . . ." Id. at ¶ 12. This objection is not a basis for excluding Otto and can be addressed at a later point in time, if necessary.

It is so ordered.

Signed this 30th day of March 2022, at Hartford, Connecticut.

/s/ AWT
Alvin W. Thompson
United States District Judge
