**UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT**

```
------------------------------ x
JOSEPH VELLALI, NANCY S. LOWERS,  :
JAN M. TASCHNER, and JAMES        :
MANCINI, individually and as      :
representatives of a class of     :
participants and beneficiaries    :
on behalf of the Yale University  :
Retirement Account Plan,          :
                                  :
          Plaintiffs,             :   Civil No. 3:16-cv-1345(AWT)
                                  :
v.                                :
                                  :
YALE UNIVERSITY, MICHAEL A.       :
PEEL, and THE RETIREMENT PLAN     :
FIDUCIARY COMMITTEE,              :
                                  :
          Defendants.             :
------------------------------ x
```

**RULING ON MOTION FOR SUMMARY JUDGMENT**

Plaintiffs Joseph Vellali, Nancy S. Lowers, Jan M. Taschner and James Mancini, individually and as representatives of a class of participants and beneficiaries in Yale University's 403(b) Retirement Account Plan (the "Plan"), bring this action under 29 U.S.C. § 1132(a)(2) on behalf of the Plan against defendants Yale University ("Yale"), Michael A. Peel ("Peel"), and the Retirement Plan Fiduciary Committee for violations of the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1001 et seq. ("ERISA"). The class is "[a]ll participants and beneficiaries of the Yale University Retirement Account Plan

from August 9, 2010, through the date of judgment, excluding the Defendants." Vellali v. Yale Univ., 333 F.R.D. 10, 18 (D. Conn. 2019)(the "Class Certification Ruling").

The plaintiffs allege in their Amended Complaint (ECF No. 57) that the defendants violated ERISA in three ways: (1) by breaching their fiduciary duties of prudence and loyalty (Counts I, III, and V), (2) by engaging in transactions prohibited by ERISA (Counts II, IV, and VI), and (3) with respect to Yale and Peel, by failing to monitor members of the Retirement Plan Fiduciary Committee to ensure compliance with ERISA's standards (Count VIII). (There is no Count VII.)

The court has dismissed the plaintiffs' claims for breach of the duty of loyalty in Counts I, III, and V, and the claim in Count V for the breach of the duty of prudence based on the Plan offering too many investment options to participants and the Plan failing to reduce fees with respect to several investments offered by The Teachers Insurance and Annuity Association of American ("TIAA"). See Vellali v. Yale, 308 F.Supp.3d 673, 693 (D. Conn. 2018).

Yale, Peel and the Retirement Plan Fiduciary Committee (the "defendants" or "Yale") have moved for summary judgment on all remaining claims. For the reasons set forth below, the defendants' motion for summary judgment is being granted with respect to Counts II, IV, VI, and VIII, and otherwise denied.

## I.     FACTUAL BACKGROUND

Yale offers to eligible employees the opportunity to participate in a 403(b) defined-contribution plan. Under such a plan, participants put a portion of their income into personal retirement savings accounts and invest those savings in an array of investment options. The Plan's investment options include fixed and variable annuities offered by The Teachers Insurance and Annuity Association of American-College Retirement Equities Fund (TIAA-CREF) and Vanguard mutual funds.

The Plan "identifies Yale as the named fiduciary and gives Yale, acting through the Vice President for Human Resources and Administration, discretionary authority to administer and oversee the Plan." Pls.' Local Rule 56(a)(2) Statement of Facts in Opp. to Summ. J. ("PSF") ¶ 2, ECF No. 302. At the beginning of the class period, August 2010, Peel was Yale's Vice President for Human Resources and Administration.

Two key aspects of maintaining a 403(b) plan are managing the plan's investment options and providing recordkeeping for plan participants. Plan fiduciaries typically contract with third-party vendors for both services. The process of selecting vendors and negotiating recordkeeping fees can materially affect an employee's retirement income because every dollar spent on either recordkeeping or investment management is a dollar that is not contributing to increasing the amount of the employee's

retirement savings. Over time, excessive fees can erode an employee's retirement savings.

The plaintiffs claim that Yale's processes for monitoring investments and recordkeeping fees were deficient in the ways described below.

### A. Bundling of Recordkeeping and Investment Services

In Counts I and II, the plaintiffs claim that Yale accepted a "bundled" services arrangement from TIAA that caused losses to Plan participants in violation of 29 U.S.C. §§ 1104(a) and 1106(a)(1). Am. Compl. ¶ 113. At the beginning of the class period, Yale contracted with TIAA and Vanguard to provide both investment management and recordkeeping services. According to the plaintiffs, under Yale's agreement with TIAA-CREF, in order to offer as an investment option the TIAA Traditional Annuity, which is a "fixed annuity contract that returns a contractually specified minimum interest rate", Am. Compl. ¶ 114, the Plan had to comply with two conditions. First, it had to include as part of the Plan two additional TIAA investment options in which participants could invest: CREF Stock Account and CREF Money Market. These investment options are variable annuities where "[t]he value of the Plan's investment . . . changes over time based on investment performance and the expenses of the accounts." Am. Compl. ¶ 107. Second, Yale had to use TIAA as the recordkeeper for TIAA annuities.

In Count I, the plaintiffs claim that by entering into this bundled services arrangement with TIAA, Yale "committed the Plan to an imprudent arrangement in which certain investments had to be included and could not be removed from the plan, *even if they were no longer prudent investments*, and prevented the Plan from using alternative recordkeepers who could provide superior services at lower cost." Am. Compl. ¶ 210. The plaintiffs claim that, by doing so, Yale "abdicated its duty to independently assess the prudence of each option in the Plan on an ongoing basis, and to act prudently and solely in the interest of participants in selecting the Plan's recordkeeper." Am. Compl. ¶ 210.

In Count II, the plaintiffs claim that "[b]y allowing the Plan to be locked into an unreasonable arrangement that required the Plan to include the CREF Stock Account and to use TIAA as the recordkeeper for its proprietary products even though the fund was no longer a prudent option for the Plan due to its excessive fees and poor performance, and even though TIAA's recordkeeping fees were unreasonable for the services provided", the defendants caused the Plan to engage in prohibited transactions. Am. Compl. ¶ 218.

### B. Recordkeeping Fees

In Counts III and IV, the plaintiffs claim that, over the course of the class period, the defendants caused the Plan to pay unreasonable administrative and recordkeeping fees.

At the beginning of the class period, Yale engaged two entities for recordkeeping services: TIAA and Vanguard. They provided recordkeeping for their respective investment options. Although the parties dispute precisely when Yale began the process of recordkeeping consolidation, in May 2013, Yale received a draft proposal from TIAA pitching TIAA as a sole recordkeeper for the Plan. In January 2014, Yale put out a Request for Proposal ("RFP") seeking a master recordkeeper proposal from Vanguard and a single recordkeeper proposal from TIAA. In July 2014, Yale received an evaluation from its consultant, Aon Hewitt. Later that year Yale "entered into an agreement with TIAA to transition to sole recordkeeping and apprised Vanguard that its recordkeeping services would be terminated." Statement of Facts, Defs.' Mot. Summ. J. ("DSMF") ¶ 13, ECF No. 271. Yale completed the transition to sole recordkeeping in "early 2015." DSMF ¶ 13.

Following the consolidation of recordkeepers, Yale also changed the way that recordkeeping fees were calculated. Prior to the consolidation, TIAA and Vanguard employed a "revenue-sharing" or "asset-based" model for calculating recordkeeping

6

fees. Under this approach, to calculate and extract recordkeeping fees, "the investment management company takes a portion of the fees (the 'expense ratio') it receives for managing an investment and forwards it to a third-party company that provides the [recordkeeping] services". Vellali v. Yale, 308 F.Supp.3d at 679. Under this arrangement, the amount of the recordkeeping fees is tied to the amount of the assets in the Plan. In contrast, under a "per-participant" or "flat fee" model, investment managers charge "a fixed price [for recordkeeping services] based on the number of participants in the plan, rather than the total amount of assets invested." Id.

At the beginning of the class period, the Plan paid TIAA an asset-based recordkeeping fee of 20 bps, which translated to $325 per participant. See Expert Rep. Glenn Poehler, ("Poehler Rep.") at 125, ECF No. 283-10. By 2012, after Yale engaged Aon Hewitt to assist it with reviewing and evaluating the administration fees being paid on Yale's various qualified defined contribution plans, Yale and TIAA ultimately agreed on a rate of 9.5 bps for the Plan. This translated to $173 per participant. This rate reduction was applied retroactively to January 2011, resulting in a $1.9 million refund to Plan participants. In 2013 and 2014, the rate continued to be 9.5 bps, which, due to growth of assets, resulted in per-participant recordkeeping fees of $186 in 2013 and $199 in 2014, using the

numbers of the defendants' expert Poehler. In 2015, Yale and
TIAA transitioned to a per-participant model, with a
recordkeeping fee of $51 per participant (2.4 bps) for the Plan.
Between 2015 and 2018, TIAA charged between $46 and $51 per
participant for recordkeeping fees.

In 2010, Vanguard also charged an asset-based recordkeeping
fee. At the beginning of the class period, Vanguard charged 11
bps, which translated to $112 per participant. See Poehler Rep.
at 125. In 2011, Vanguard charged 10.5 bps, which translated to
$131 per participant; in 2012, 10.0 bps, which translated to
$132 per participant; and, in 2013, 7.2 bps, which translated to
$112 per participant. In 2014, prior to Yale's transition to
TIAA as sole recordkeeper, Vanguard charged 5.3 bps, which
translated to $95 per participant.

In Count III, the plaintiffs claim that "Defendants'
process for monitoring and controlling the Plan's recordkeeping
fees was a fiduciary breach in that Defendants failed to
adequately monitor the amount of the revenue sharing received by
the Plan's recordkeepers, determine if those amounts were
competitive or reasonable for the services provided to the Plan,
or use the Plan's size to reduce fees or obtain sufficient
rebates to the Plan for the excessive fees paid by participants."
Am. Compl. ¶ 225. They claim that Yale failed to take a number of
actions that would have reduced recordkeeping fees.

8

In Count IV, the plaintiffs claim that "[b]y causing the Plan to use TIAA-CREF and Vanguard as the Plan's recordkeepers from year to year, Defendants caused the Plan to engage in" prohibited transactions. Am. Compl. ¶ 233.

### C. Investment Monitoring

In Count V, the plaintiffs claim that the defendants failed to "engage[] in a prudent investment review process." Am. Compl. ¶ 247. The plaintiffs contend that the defendants failed to adequately monitor the Plan's investment options and remove underperforming investments from the Plan, and also failed to offer lower-cost versions of certain investment options.

Prior to 2012, Senior Director of Benefits Hugh Penney had primary responsibility for reviewing the Plan's fund lineup. In early 2012, Yale's Retirement Account Plans Fiduciary Committee on Investments (the "Committee") began to meet to review the Plan's investment lineup at meetings that were held annually. (It is named in the Amended Complaint as the "Retirement Plan Fiduciary Committee".) In 2017, Yale hired Aon Hewitt as a full-time investment advisor to monitor the Plan's assets, and in 2018 Yale adopted an Investment Policy Statement.

The plaintiffs claim that the inclusion of twenty-two of the investment options in the Plan was imprudent and caused losses to Plan participants. The plaintiffs contend that compared to appropriate industry benchmarks each of these funds

underperformed during the class period and should have been removed from the Plan. The plaintiffs contend that Yale's imprudent inaction caused Plan participants to lose $431,298,918 in retirement savings.

TIAA and Vanguard offer lower-cost versions of certain investment options. Both Vanguard and TIAA offer institutional share classes of some of their investment options. Retail share classes are marketed to individuals with small amounts to invest. Institutional share classes are offered to investors with large amounts to invest, such as large retirement plans. The different share classes of a given mutual fund are identical, except that higher fees are charged for the retail share classes. The plaintiffs claim that Yale unreasonably delayed adopting the lower-cost share classes for both TIAA-CREF and Vanguard funds for which the Plan was eligible. The plaintiffs contend that Yale's inaction was a breach of fiduciary duty and caused Plan participants to lose millions of dollars in retirement savings.

In Count VI, the plaintiffs claim that "[b]y placing investment options in the Plan managed by TIAA-CREF[] and Vanguard in which all of the Plan's $3.8 billion in assets were invested, Defendants caused the Plan to engage in" prohibited transactions. Am. Compl. ¶ 253.

### D. Count VIII: Failure to Monitor Fiduciaries

In Count VIII, the plaintiffs claim that the Yale and Peel failed to monitor its appointees, including the Committee, to ensure that its members complied with their fiduciary duties to select reasonable investment options; negotiate reasonable recordkeeping and investment management fees; and continually monitor investment performance, recordkeeping fees and investment management fees.

### II.    LEGAL STANDARD

"A motion for summary judgment may properly be granted . . . only where there is no genuine issue of material fact to be tried, and the facts as to which there is no such issue warrant the entry of judgment for the moving party as a matter of law." Rogoz v. City of Hartford, 796 F.3d 236, 245 (2d Cir. 2015) (quoting Kaytor v. Elec. Boat Corp., 609 F.3d 537, 545 (2d Cir. 2010)) (citing Fed. R. Civ. P. 56(a)). "The function of the district court in considering the motion for summary judgment is not to resolve disputed questions of fact but only to determine whether, as to any material issue, a genuine factual dispute exists." Id. (quoting Kaytor, 609 F.3d at 545) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249–50 (1986)).

When ruling on a motion for summary judgment, the court must respect the province of the jury. "In reviewing the evidence and the inferences that may reasonably be drawn, the

11

court 'may not make credibility determinations or weigh the evidence . . . .'" Kaytor, 609 F.3d at 545 (quoting Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150 (2000)) (internal quotation marks and citation omitted). "Where an issue as to a material fact cannot be resolved without observation of the demeanor of witnesses in order to evaluate their credibility, summary judgment is not appropriate." Kaytor, 609 F.3d at 546 (quoting Fed. R. Civ. P. 56(e) Advisory Committee Note (1963)).

When reviewing the evidence on a motion for summary judgment, "the court must draw all reasonable inferences in favor of the nonmoving party, . . . even though contrary inferences might reasonably be drawn". Kaytor, 609 F.3d at 545 (emphasis, internal quotation marks and citations omitted). "Summary judgment is inappropriate when the admissible materials in the record make it arguable that the claim has merit, . . . for the court in considering such a motion must disregard all evidence favorable to the moving party that the jury is not required to believe." Id. (emphasis, internal quotation marks and citations omitted).

Because credibility is not an issue on summary judgment, the nonmovant's evidence must be accepted as true for purposes of the motion. Nonetheless, the inferences drawn in favor of the nonmovant must be supported by the evidence. "[M]ere speculation

and conjecture is insufficient to defeat a motion for summary judgment." Stern v. Trustees of Columbia Univ., 131 F.3d 305, 315 (2d Cir. 1997) (internal quotation marks omitted) (quoting W. World Ins. Co. v. Stack Oil, Inc., 922 F.2d 118, 121 (2d Cir. 1990)). Moreover, the "mere existence of a scintilla of evidence in support of the [nonmovant's] position will be insufficient; there must be evidence on which [a] jury could reasonably find for the [nonmovant]." Liberty Lobby, 477 U.S. at 252.

Also, the nonmoving party cannot simply rest on the allegations in its pleadings since the essence of summary judgment is to go beyond the pleadings to determine if a genuine issue of material fact exists. See Weinstock v. Columbia Univ., 224 F.3d 33, 41 (2d Cir. 2000). "Although the moving party bears the initial burden of establishing that there are no genuine issues of material fact," id., if the movant demonstrates an absence of such issues, a limited burden of production shifts to the nonmovant, who must "demonstrate more than some metaphysical doubt as to the material facts, . . . [and] must come forward with specific facts showing that there is a genuine issue for trial," Aslanidis v. United States Lines, Inc., 7 F.3d 1067, 1072 (2d Cir. 1993) (emphasis, quotation marks and citations omitted). "Accordingly, unsupported allegations do not create a material issue of fact." Weinstock, 224 F.3d at 41. If the

nonmovant fails to meet this burden, summary judgment should be granted.

Summary judgment is inappropriate only if the issue to be resolved is both genuine and related to a material fact. Therefore, the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment. A material fact is one that would "affect the outcome of the suit under the governing law". Liberty Lobby, 477 U.S. at 248. As the Court observed in Liberty Lobby: "[T]he materiality determination rests on the substantive law, [and] it is the substantive law's identification of which facts are critical and which facts are irrelevant that governs." Id. Thus, only those facts that must be decided in order to resolve a claim or defense will prevent summary judgment from being granted. When confronted with an asserted factual dispute, the court must examine the elements of the claims and defenses at issue on the motion to determine whether a resolution of that dispute could affect the disposition of any of those claims or defenses. See Crawford v. Franklin Credit Mgmt. Corp., 758 F.3d 473, 486 (2d Cir. 2014) ("'[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial.'" (quoting Celotex Corp. v. Catrett, 477 U.S.

317, 323 (1986))). Immaterial factual disputes will not prevent summary judgment.

**III.   DISCUSSION**

"ERISA's central purpose is to protect beneficiaries of employee benefits plans." Pension Ben. Gar. Corp. v. Morgan Stanley Inv. Mgmt. Inc., 712 F.3d 705, 712 (2d Cir. 2013) (internal quotation marks and citation omitted). ERISA ensures the protection of beneficiaries of employee benefit plans by requiring that plan fiduciaries adhere to the twin duties of prudence and loyalty. ERISA codifies the duty of prudence. "[A] fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and . . . with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of a like character and with like aims". 29 U.S.C. § 1104(a)(1)(B). An ERISA fiduciary's duties are "those of trustees of an express trust—the highest known to law." Donovan v. Bierwirth, 680 F.2d 263, 272 n.8 (2d Cir. 1982).

"The prudence of a fiduciary 'is measured according to the objective prudent person standard developed in the common law of trusts.'" Sacerdote v. New York Univ., 9 F.4th 95, 107 (2d Cir. 2021) (quoting Katasaros v. Cody, 744 F.2d 270, 279 (2d Cir. 1984)). The objective prudent person standard "'focuses on a

fiduciary's conduct in arriving at an investment decision, not on its results, and asks whether a fiduciary employed the appropriate methods to investigate and determine the merits of a particular investment.'" Sacerdote, 9 F.4th at 107 (quoting Pension Benefit Guar. Corp., 712 F.3d at 716. In assessing the prudence of a fiduciary's conduct, courts "must look to 'not only [a fiduciary's] investigation procedures, but also to the methods used to carry out those procedures as well as the thoroughness of their analysis of the data collected in that investigation.'" Sacerdote, 328 F.Supp.3d 273, 284 (S.D.N.Y 2018) (aff'd in relevant part 9 F.4th 95 (2d Cir. 2021)) (quoting Chao v. Tr. Fund Advisors, No. Civ. A. 02-559, 2004 WL 444029, at *3 (D.D.C. Jan. 20, 2004)). "[S]o long as the prudent person standard is met, ERISA does not impose a duty to take any particular course of action if another approach seems preferable." Chao v. Merino, 452 F.3d 174, 182 (2d Cir. 2006) (internal quotations and citations omitted). In addition to meeting the prudent person standard, fiduciaries must also act "in accordance with the documents and instruments governing the plan . . . insofar as such documents and instruments are consistent with" ERISA. 29 U.S.C. § 1104(a)(1)(D).

The prudence of a fiduciary's conduct is "'based upon information available to the fiduciary at the time of each investment decision and not from the vantage point of

16

hindsight.'" <u>Sacerdote</u>, 9 F.4th at 107 (quoting <u>Pension Benefit</u>
<u>Guar. Corp.</u>, 712 F.3d at 716). At the same time, a fiduciary's
"'lack of familiarity with investments is no excuse' for failing
to act with the care, skill, prudence and diligence required
under the circumstances then prevailing." <u>Sacerdote</u>, 328
F.Supp.3d at 284 (quoting <u>Katsaros</u>, 744 F.2d at 279). "[T]he
prudence of each investment is not assessed in isolation but,
rather, as the investment relates to the portfolio as a whole."
<u>Pension Benefit Guar. Corp</u>., 712 F.3d at 717. "In determining
the contours of an ERISA fiduciary's duty, courts often must
look to the law of trusts." <u>Tibble v. Edison Int'l</u>, 575 U.S.
523, 528–529 (2015).

"Because the content of the duty of prudence turns on the
circumstances . . . prevailing at the time the fiduciary acts,
the appropriate inquiry will necessarily be context specific."
<u>Fifth Third Bancorp v. Dudenhoeffer</u>, 573 U.S. 409, 425 (2014)
(internal quotation marks and citation omitted). "Many
allegations concerning fiduciary conduct, such as reasonableness
of 'compensation for services' are 'inherently factual
question[s]' for which neither ERISA nor the Department of Labor
give specific guidance." Universities Facing Retirement Plan
Class Actions, 1 Employee Benefits Handbook § 8:152 (quoting
U.S. Dep't of Labor Advisory Opinion 2013-03A (ERISA July 3,
3013), 2013 WL 3546834, at *4-5. Accordingly, ERISA "does not

dictate 'any particular course of action' with regards to fees".
Sacerdote, 328 F.Supp.3d at 286 (quoting Chao v. Merino, 452
F.3d at 182). However, "it does require a 'fiduciary . . . to
exercise care prudently and with diligence under the
circumstances then prevailing.'" Chao, 452 F.3d at 182. "For
example, competitive bidding is not per se required under ERISA,
but it can be an example of an action taken to ensure fees are
appropriate." Sacerdote, 328 F.Supp.3d at 286.

### A. Count III: The Recordkeeping Claim

In Count III, the plaintiffs claim that the defendants
breached their duty of prudence by failing to employ strategies
and procedures that would lower recordkeeping fees. An ERISA
fiduciary's duty of prudence encompasses a duty to prevent plan
participants from incurring excessive and unreasonable fees.
"Fiduciaries must also understand and monitor plan expenses.
'Expenses, such as management or administrative fees, can
sometimes significantly reduce the value of an account in a
defined-contribution plan,' . . . by decreasing its immediate
value, and by depriving the participant of the prospective value
of funds that would have continued to grow if not taken out in
fees." Sweda v. Univ. of Pennsylvania, 923 F.3d 320, 328 (3d
Cir. 2019) (quoting Tibble v. Edison, 575 U.S. 523, 525 (2015)).
A fiduciary must ensure that "fees paid to recordkeepers are not
excessive relative to the services rendered." Sacerdote, 328

F.Supp.3d at 286. "Cognizant of the impact of fees on Plan value, fiduciaries should be vigilant in 'negotiation of the specific formula and methodology' by which fee payments such as 'revenue sharing will be credited to the plan and paid back to the plan or to plan service providers.'" Sweda, 923 F.3d at 328 (quoting Dep't of Labor Advisory Opinion 2013-03A (ERISA July 3, 2013), 2013 WL 3546834, at *4). "[A] prudence claim based on excessive fees must be supported by facts that take the particular circumstances into account", which "may go to the fiduciaries' 'independence and conscientiousness'". Sacerdote, 328 F.Supp.3d at 286 (quoting Krinski v. Fund Asset Mgmt., Inc., 875 F.2d 404, 409 (2d Cir. 1989) (internal citations omitted)). A fiduciary must "adequately tether fees to services rendered". Sacerdote, 328 F.Supp.3d at 286.

The defendants argue that they are entitled to summary judgment on the recordkeeping claim in Count III because there are no genuine disputes of material fact as to whether Yale followed a reasonably prudent process for monitoring and avoiding unreasonable recordkeeping fees throughout the class period and as to whether the recordkeeping fees that Plan participants paid were reasonable. In addition, they argue that there is no evidence that the claimed acts of imprudence resulted in any loss to the Plan.

19

For the reasons set forth below, the court finds that there are genuine issues of material fact as to whether Yale breached its fiduciary duty to monitor and avoid unreasonable recordkeeping fees with respect to the plaintiffs' contentions that Yale imprudently (i) delayed consolidating to a single recordkeeper, (ii) failed to obtain competitive bids, (iii) used asset-based pricing, and (iv) failed to prohibit TIAA from cross-selling; and also with respect to (v) whether the claimed acts of imprudence resulted in loss to the Plan.

Thus, the motion for summary judgment is being denied as to Count III.

### 1. Recordkeeper Consolidation

The plaintiffs claim that the defendants breached their fiduciary duty because Yale imprudently delayed consolidating to a single recordkeeper.  The defendants contend that they are entitled to summary judgment because in June 2010 there was no single recordkeeper that could service the Plan, and beginning in 2010 Yale began inquiring about TIAA's sole recordkeeping capabilities and once it learned TIAA had developed such capabilities it put out an RFP and then entered into an agreement with TIAA to transition to sole recordkeeping.

The defendants contend that the evidence establishes the following. In June 2010, approximately 83% of the Plan's $12.5 billion dollars was held in TIAA investments and the remaining

was invested in roughly 80 Vanguard funds.  No entity other than TIAA has served as the sole recordkeeper for a plan that includes TIAA fixed annuities subject to individual contracts. Thus there was a need to use TIAA to recordkeep the Plan's TIAA annuities, and because there was a need to use TIAA to recordkeep the Plan's TIAA annuities, it made no sense for Yale to request sole recordkeeping bids from anyone else. Beginning in 2010, Yale began to inquire as to TIAA's ability to serve as sole recordkeeper for the Plan. TIAA informed Yale that it could not serve as Yale's sole recordkeeper for primarily two reasons: administering the Plan required services that TIAA could not provide at that time, and TIAA's recordkeeping platform did not have the capacity to manage the number of investment funds and contribution characteristics required by the Plan. Yale continued to stay abreast of TIAA's sole recordkeeping capabilities and learned in 2013 that TIAA had developed the capability to serve as the Plan's sole recordkeeper. Yale then put out an RFP and received a sole recordkeeper proposal from TIAA and a master-recordkeeping proposal from Vanguard. Yale hired Aon to evaluate the proposals and assist in conducting negotiations, and in the summer of 2014 Yale entered into an agreement with TIAA to transition to sole recordkeeping and informed Vanguard that its recordkeeping services would be terminated. The transition was completed in early 2015. Thus,

Yale contends that it engaged in a deliberate, prudent process to consolidate recordkeepers.

However, the plaintiffs have created genuine issues of material fact with respect to each aspect of these contentions by the defendants. The plaintiffs do not dispute that TIAA, as a business practice, does not allow other recordkeepers to recordkeep its products. But the plaintiffs do dispute the degree to which that was an obstacle to having another provider perform recordkeeping services for TIAA products. The plaintiffs point to evidence that TIAA provides data to other providers allowing for tracking of TIAA annuities' gains, losses, and account balances on the recordkeeping platforms of those providers, and that such information is all that an investment manager typically provides a recordkeeper. They also proffer evidence that other recordkeepers regularly recordkeep the fixed annuities of other investment managers and have the ability to develop code for their own products or for whatever products they need to recordkeep.

The plaintiffs assert that contrary to the deposition testimony of Stephen Campbell of TIAA, Peel and Penney, there were no insurmountable barriers to TIAA serving as sole recordkeeper at the beginning of the class period. The plaintiffs contend that the services that supposedly prevented TIAA from serving as sole recordkeeper were either not being

offered under the Plan's multiple recordkeeping arrangement or
were superfluous. The plaintiffs point to Campbell's testimony
to support their position that the absence of eligibility
tracking and vested services was no barrier to recordkeeper
consolidation. With respect to whether TIAA's recordkeeping
platform had the capacity to manage the number of investment
funds and contribution characteristics required by Yale's plan,
the plaintiffs proffer evidence that TIAA transitioned to a new
platform before the beginning of the class period and this new
platform allowed it to recordkeep both annuity products and
mutual funds side-by-side, and with many more funds than
previously. The plaintiffs proffer testimony by David Swallow of
Aon Hewett that he could not recall there being a limit on the
number of funds that TIAA could keep on its recordkeeping
platform. Campbell does not recall discussing with Yale at any
point in 2010 or earlier whether there was a limit on the number
of funds that the TIAA recordkeeping platform could support, and
he observed that any such limit would have been an incidental
concern because the key issue at the time was the inability to
provide the outsourced services. The plaintiffs proffer
additional testimony by Campbell that because "[TIAA] didn't
have enough slots on [their] platform" for Vanguard funds early
in the class period, consolidation would have "taken work by
colleagues in terms of determining a solution and implementing

23

whatever that happened to be." Dep. Stephen Campbell ("Campbell Dep.") at 52:22-23, 53:8-10, ECF No. 309-14. The plaintiffs also proffer evidence from their expert Ty Minnich that "[i]t is difficult to imagine that TIAA could accommodate 103 investments from NYU in 2010 but not 116 from Yale". Expert Rebuttal Rep. Ty Minnich ¶ 91, ECF No. 283-8. In addition, they proffer evidence from Minnich that, based on his experience working with the new platform to which TIAA transitioned before the beginning of the class period, there was no limitation on the number of slots for funds.

Moreover, internal TIAA correspondence appears to conflict with the defendants' position. In an August 2010 email to others at TIAA, a TIAA employee stated, "We [TIAA] are trying to get Yale to ultimately consolidate their plans and Vanguard would likely come on our platform if this occurs." Pls.' Ex. 29, at 3, ECF No. 309-29.

The plaintiffs proffer documentary evidence that TIAA continued to promote sole recordkeeping to Yale from 2011 to 2014, which appears to conflict with the defendants' position. In an October 15, 2012, email Campbell stated to Penney, "As you know, under a sole recordkeeping, there would be an additional pricing impact that would likely result in increased savings that could be returned to Yale and its employees." Defs.' Ex. 70, at 5, ECF No. 281-70. An email from Campbell to Penney dated

24

February 22, 2013 contains 16 examples of plans that had consolidated from 2010 to 2012 and one plan that was to consolidate in 2013. A draft deck of slides from TIAA, dated May 2013, on the subject of sole recordkeeping for the Plan, indicates that TIAA had consolidated 80 other plans, including retirement plans at institutions of higher education. A 2013 TIAA brochure markets sole recordkeeping, among other services. In that brochure, TIAA stated, among other things, that "[w]ith all plan investments delivered on a single platform, this model also provides improved fiduciary oversight . . . ." Pls.' Ex. P76 at 7, ECF No. 309-76.

In October 2013 Penney attended a TIAA benefit conference, which was also attended by "several schools that have implemented Workday."  Pls.' Ex. P77 at 1, ECF No. 309-77.  In an October 21, 2013 email to others at Yale, Penney wrote:

> A number of schools also found moving to a Master or Single Recordkeeper model was a great way to take the pressure off of their HRIS/Payroll for managing 401(b) and 457(b) eligibility, match, and contributions.  Master Recordkeeper is a single vendor (TIAA or Vanguard) who serves as a single entry point to two underlying programs while Master Recordkeeping is available only from TIAA where the investments including Vanguard Investments are available on their platform.

Id.  The plaintiffs point to this communication as evidence that Yale did not begin the process of exploring single recordkeeping because TIAA was finally capable of serving as the Plan's sole recordkeeper but, rather, because the sole recordkeeper model

was a way to take pressure off of Yale's HRIS/Payroll department. They also point to the fact that prior to July 2014, Yale never received a quote regarding how much the Plan could save by consolidating to a single recordkeeper.

The plaintiffs also claim that Yale was imprudent by failing to explore whether Vanguard or another party other than TIAA could have served as the Plan's sole recordkeeper earlier in the class period. Yale argues that it was tethered to TIAA as at least one of its recordkeepers because only it could recordkeep TIAA annuities. As discussed above, the plaintiffs have proffered evidence that creates a genuine dispute as to this contention.

The defendants argue that Yale was ahead of the pack when it consolidated to a sole recordkeeper in 2015, and therefore Yale could not have breached its duty of prudence by consolidating when it did. Yale points out that, among twenty-three private universities with at least one billion dollars in a 403(b) retirement plan in 2015, it was the third to move to a sole recordkeeper, and that the two that had already moved offered less than half of the Plan's offerings. The plaintiffs proffer evidence that comparisons should not be limited to universities and TIAA clients. "There is no difference in the fiduciary requirements applied to sponsors of higher education plans as opposed to any other industry." Expert Rep. Al Otto

26

("Otto Rep.") ¶ 64, ECF No. 283-9. <u>See</u> <u>Sweda v. Univ. of</u>
<u>Pennsylvania</u>, 923 F.3d 320, 333 n.9 (3d Cir. 2019) ("ERISA
fiduciaries are held to one standard under § 1104 and we cannot
adjust our pleadings standards to accommodate subcategories of
sponsors and fiduciaries."). Moreover, according to a study
cited by plaintiffs' expert Al Otto, even among 403(b) plans, by
2010 over seventy-eight percent of them had consolidated to a
single recordkeeper, and by 2012 eighty-two percent had
consolidated.

Thus, on the question of whether the defendants imprudently
delayed consolidating to a single recordkeeper, the plaintiffs
have created genuine issues of material fact as to whether the
defendants "made a reasoned decision to maintain the status quo"
for as long as Yale did. <u>George v. Kraft Foods Global, Inc.</u>, 641
F.3d 786, 795 (7th Cir. 2011).

### 2. Competitive Bidding

The plaintiffs claim that the defendants breached their
fiduciary duty because Yale imprudently failed to obtain
competitive bids for recordkeeping services, and if Yale had
done so, Plan participants would have paid less for
recordkeeping services. The defendants argue that ERISA does not
require competitive bidding and contend that an RFP made no
sense because of the need to use TIAA to recordkeep the Plan's
TIAA annuities.

The defendants maintain that upon learning in 2013 that TIAA could serve as the Plan's sole recordkeeper, Yale began to take steps to issue an RFP. An RFP was sent to TIAA and Vanguard in early 2014. In June 2014, Yale received a sole recordkeeping proposal from TIAA. The parties dispute whether Yale actually received a master recordkeeping proposal from Vanguard.

While the defendants are correct that ERISA does not require competitive bidding, a fiduciary's failure to use reasonable means to determine whether administrative fees are reasonable, such as through a competitive bidding process, can constitute a breach of the duty of prudence. See Tussey v. ABB, Inc., 746 F.3d 327, 336 (8th Cir. 2014) (401(k) fiduciary breached its fiduciary duty by, inter alia, failing to "determine whether Fidelity's pricing was competitive"); George, 641 F.3d at 798-99 ("fiduciaries were not necessarily prudent in relying on the advice of consultants in lieu of" a competitive bidding process).

The plaintiffs proffer evidence that creates a genuine issue of material fact with respect to Yale's failure to obtain competitive bids. They proffer evidence that "[i]ndustry professionals, including Defendants' advisors and expert in this case, and the Department of Labor recommend that fiduciaries conduct a RFP or other competitive bidding process for a plan's recordkeeping fees every three to five years." PSF ¶ 54. A 2012

best-practices guide for retirement plans published by FDG Group
stresses the importance of ensuring that plan expenses are
reasonable for the services provided and states that "[t]he best
way for trustees to confirm 'reasonableness' [of plan expenses]
is to mark the plan to market at least every five years. This
can be accomplished through an RFI or RFP." Pls.' Ex. P62, at 3,
ECF No. 309-62. See also Reasonable Contract or Arrangement
under Section 408(b)(2)—Fee Disclosure, 75 FR 41600, 41625 ("The
Department also assumes that changes in plan disclosures will
occur at least once every three years, because plans normally
conduct requests for proposal (RFPs) from service providers at
least once every three to five years."). The plaintiffs point to
evidence which suggests that the defendants' conduct was
inconsistent with Yale's own policies, under which "[p]urchases
for University business must be made through standard methods,"
and "[t]he University's competitive bidding threshold is
$10,000, at which competition via bids and quotes from multiple
vendors is required before purchase of a good or service." Pls.'
Ex. 63, at 3, ECF No. 309-63. The plaintiffs contend that Yale's
deviation from the recommendations of industry professionals and
Yale's own policies was imprudent.

    In addition, the plaintiffs proffer evidence that Yale's
2014 RFP was deficient because, "contrary to industry practice",
Yale only solicited bids from its two incumbent recordkeepers.

PSF ¶ 12. Also, it is undisputed that the Plan's fees for recordkeeping dropped considerably after Yale issued an RFP.

The defendants contend that not issuing an RFP until 2014 was reasonable because prior to 2013 it was Yale's understanding that TIAA could not provide sole recordkeeping services, so issuing an RFP for such services would have been "unnecessary" and "wasteful." Reply in Supp. of Defs.' Mot. Summ. J. ("Defs.' Reply) at 6, ECF No. 338. They maintain that soliciting only a sole recordkeeper bid from TIAA and a master-recordkeeper bid from Vanguard was reasonable "[g]iven the need to use TIAA to recordkeep the Plan's TIAA annuities". DSMF ¶ 10. As discussed above, the plaintiffs have evidence that creates genuine issues of material fact with respect to these contentions by the defendants.

The defendants cite to Acosta v. Chimes District of Columbia, Inc. to support their argument that failing to issue an RFP when few choices are available is not imprudent, but in that case the defendant engaged in significant "informal search activities [that] were the functional equivalent [of an RFP] given the few choices available". Acosta v. Chimes D.C., Inc., No. CV RDB-15-3315, 2019 WL 931710, at *7 (D. Md. Feb. 26, 2019). But here the defendants do not point to evidence that Yale engaged in a "functional equivalent" of an RFP, such as "periodically sp[eaking] with similar or peer organizations to

30

gauge whether the value they were receiving was reasonable in comparison to the fees they were paying", or such as relying on an advisor "to monitor the [] marketplace," provide "regular reports and pricing information," furnish "comparison information during Plan review meetings", and "consider[] and review[] [additional] companies as potential [third-party administrators] for the Plan." Id. at 7.

### 3. Per-Participant vs. Asset-Based Recordkeeping Fees

The plaintiffs claim that the defendants breached their fiduciary duty by imprudently using asset-based pricing while failing to monitor the Plan's asset-based fees for reasonableness, causing Plan participants to pay unreasonable, asset-based recordkeeping fees.

The defendants argue that ERISA does not require a fiduciary to use an asset-based, rather than a per-capita pricing model; and that a fiduciary can ensure that recordkeeping compensation remains reasonable by renegotiating asset-based fees that account for changes in the asset base, which "is precisely what Yale did throughout the class period." Mem. of Law in Supp. of Defs.' Mot. for Summ. J. ("Defs.' Mem.") at 9, 10, ECF No. 270.  They argue further that in any event "there is no evidence that a different approach was available to Yale." Defs.' Mem. at 9.

While the defendants are correct that ERISA does not require a per-capita fee structure, it does require that a fiduciary ensure that "fees paid to recordkeepers are not excessive relative to services rendered." Sacerdote, 328 F.Supp.3d at 286.

The defendants maintain that their prudence is demonstrated by the fact that "[a]s of 2011, every one of TIAA's 200 largest 403(b) clients compensated TIAA for recordkeeping through asset-based fees". DSMF ¶ 15. They make a similar argument with respect to Vanguard. They also cite a declaration by Penney in which he states that he was "surprised when [he] transitioned to the 'not-for-profit' 403(b) space in 2007 how little leverage employers had and how unwilling 403(b) recordkeepers were to renegotiate fees", but that "[r]egardless, [he] routinely pushed for accommodations". Decl. Hugh K. Penney Supp. Defs.' Mot. Summ. J., at 3, ECF No. 281-110.

However, the plaintiffs proffer evidence that industry professionals were recommending per-participant pricing and that such an option was available to Yale in the early part of the class period. The plaintiffs point to a 2012 report by Poehler, one of Yale's experts, on 403(b) plan governance, in which he states the following:

> Generally, pricing structures offered by vendors rely heavily on asset-based revenues generated from the plan's investments. . . . From a plan sponsor's

> governance perspective, hard-dollar, per participant
> fees are generally more transparent and more accurately
> reflect the "true" cost of providing administration.

Pls.' Ex. P17, at 5, ECF No. 309-17. The plaintiffs point to
additional reports to support their position. They proffer a
2012 report prepared by Aon Hewitt for Yale, which states, "As
this is an asset based pricing model, as assets grow, so does
TIAA's revenue, hence the importance of continuing to closely
monitor the administration fees being paid to ensure their
reasonableness", Pls.' Ex. P66, at 8, ECF No. 315-12, and
"[r]ecommend[s] exploring a gross per participant pricing model
with TIAA for the [Plan]," id. at 17. The plaintiffs also
proffer a 2013 report by Mercer that has a section entitled
"Mercer's Fiduciary Best Practices." That section begins, "Based
on DOL guidelines, case law, and extensive marketplace
experience, Mercer has established the following best practices
to assist committee members in satisfying their fiduciary
requirements". Pls.' Ex. P68, at 3, ECF No. 309-68. The first
best practice listed is "Price administrative fees on a per-
participant basis." Id.

The defendants maintain that Yale's prudence is
demonstrated by Yale's periodic negotiations with TIAA. They
point out that TIAA began discussing pricing with its largest
clients in early 2011 and initially proposed lowering the asset-
based fee from 20 bps to 12 bps. Yale engaged Aon Hewitt as a

consultant to assess the reasonableness of TIAA's proposal, and TIAA ultimately agreed to a rate of 9.5 bps and applied a rebate retroactive to January 2011, which resulted in a $1.9 million refund.

But the plaintiffs proffer evidence that supports a different narrative. They have evidence that TIAA promoted plan-specific pricing to Yale in August 2010 but "Yale did nothing until TIAA unilaterally approached it with an offer in February 2012." PSF ¶ 16. The proposed fee reduction was accepted in December 2012. Also, the plaintiffs have created a genuine issue as to whether Yale's "motivation in accepting this agreement was to obtain a revenue credit account as quickly as possible to reimburse expenses and employee salaries." Id. Moreover, even at that time Aon Hewett was advising Yale that "[a] future consideration to help address the ongoing issue is to consider moving away from an asset based pricing structure to a per participant pricing structure." Defs.' Ex. 69, at 2, ECF No. 281-69.

With respect to Vanguard, the defendants maintain that "[a]s of 2010, Vanguard used asset-based fees for 403(b) plans and did not negotiate per-participant pricing." PSF ¶ 20. But the plaintiffs proffer testimony from a Vanguard representative that although per-participant pricing was "not practiced in the 403(b) space [in 2010]," there was no internal policy at

34

Vanguard that prevented per-participant pricing if it was
negotiated by a 403(b) plan, and that such pricing was common at
that time for Vanguard's larger 401(k) clients. Dep. Margaret
Rux at 27:19-28:16, ECF No. 309-16.

The plaintiffs also proffer evidence that there was no
process to evaluate Yale's recordkeeping fees from 2007 until an
Aon Hewitt analysis of TIAA's fees, which was performed in 2012.
They proffer evidence that no analysis or evaluation of
Vanguard's fees was ever conducted despite Aon Hewitt's
September 2013 recommendation that "a review of Vanguard would
be a good idea that would likely also generate savings." Pls.'
Ex. P69, at 2, ECF No. 315-14.

### 4. Cross-Selling

The plaintiffs contend that TIAA's role as recordkeeper
gave it access to demographic information about Plan
participants, which TIAA was free to use to "aggressively market
lucrative products outside of the Plan (e.g., insurance,
individual retirement accounts, wealth management)—a practice
known as 'cross-selling.'" Mem. L. Opp. Defs.' Mot. Summ J.
("Pls.' Opp.") at 20, ECF No. 300. Yale did not take any action
to limit TIAA's cross-selling until 2016, while making no effort
to obtain information about TIAA's revenues from cross-selling.
Thus, the plaintiffs claim that in this context the defendants

breached their fiduciary duty by imprudently failing to prohibit
TIAA from cross-selling.

The defendants argue that they are entitled to summary
judgment on this claim because no court has held that releasing
confidential information or allowing someone to use confidential
information constitutes a breach of fiduciary duty under ERISA,
and there is no evidence that a reasonable fiduciary in Yale's
position has ever leveraged what plaintiffs' expert Daniel
Alexander calls cross-selling opportunities in setting its
recordkeeping rates. The defendants rely principally on Divane
v. Northwestern University, where the Seventh Circuit affirmed a
ruling denying a motion for leave to file an amended complaint
to add cross-selling claims. The court stated:

> Regarding [the proposed cross-selling claims], alleging
> Northwestern improperly allowed TIAA to access and use
> participant data, the [district] court held that both
> claims were futile because it was "in no way imprudent"
> to allow TIAA access to participants' information as
> necessary "to serve as a record keeper." The court noted
> plaintiffs' failure to "cite[ ] a single case in which
> a court has held that releasing confidential information
> or allowing someone to use confidential information
> constitutes a breach of fiduciary duty under ERISA" or
> "that such information is a plan asset" in a prohibited
> transaction.

Divane v. Northwestern University, 953 F.3d 980, 987 (7th Cir.
2020), cert. granted sub nom. Hughes v. Nw. Univ., 141 S. Ct.
2882 (2021), and vacated and remanded sub nom. Hughes v.
Northwestern University, 142 S. Ct. 737 (Mem.) (2022) (internal

quotation marks and citations omitted). The defendants also cite
Harmon v. Shell Oil Company, where the court dismissed the
plaintiffs' cross-selling claim because "participant data does
not amount to plan assets under ERISA" and because the
plaintiffs "failed to cite any court that has ever held that
releasing or allowing someone to use confidential information
constitutes a breach of fiduciary duty under ERISA". Harmon v.
Shell Oil Co., No. 3:20-CV-00021, 2021 WL 1232694, at *3 (S.D.
Tex. Mar. 30, 2021) (internal quotation marks and citation
omitted).

Here, the plaintiffs' claim based on cross-selling is not
that Yale allowed confidential information to be used. Rather
the plaintiffs here claim that under the circumstances Yale
should have prohibited cross-selling, and they have created
genuine issues of material fact as to that claim. "Fiduciaries
must [] understand and monitor plan expenses." Sweda v. Univ. of
Pennsylvania, 923 F.3d 320, 328 (3d Cir. 2019). A Department of
Labor advisory opinion in connection with certain revenue
sharing payments Principal Life Insurance Company was receiving
from third parties stated that plan fiduciaries should "assure
that the compensation the plan pays directly or indirectly to
Principal for services is reasonable, taking into account the
services provided to the plan as well as all fees or
compensation received by Principal in connection with the

investment of plan assets, including any revenue sharing," and also should "obtain sufficient information regarding all fees and other compensation that Principal receives with respect to the plan's investments to make an informed decision as to whether Principal's compensation for services is no more than reasonable." U.S. Dep't of Labor Advisory Opinion 2013-03A (ERISA July 3, 2013), 2013 WL 3546834, at *3 (emphasis added).

The plaintiffs proffer expert testimony that "a plan fiduciary cannot assess the reasonableness of a plan's recordkeeping or administrative fee arrangement without considering all direct and indirect forms of compensation earned by the recordkeeper in connection with its services to the plan." Expert Rep. Daniel Alexander ("Alexander Rep.") ¶ 16, ECF No. 283-1. Alexander states that using plan participants' confidential data can generate substantial amounts of undisclosed revenue for recordkeepers:

> TIAA's use of (i) confidential plan data (inclusive of confidential, non-publicly available, plan participant information), (ii) Plan-approved access to Plan participants, and (iii) targeted email campaigns by the Plan encouraging plan participants to engage with TIAA financial planning services and one-on-one sessions with TIAA's representatives, together with TIAA's creation of financial incentives for its Plan representatives to transfer Plan assets to TIAA proprietary non-Plan "complex" products and services, and sell TIAA proprietary non-Plan related "core" and "complex" products, collectively directly resulted in TIAA generating undisclosed revenue in excess of $130 million . . . .

Alexander Rep. ¶ 12. The plaintiffs also point to the Office of the Attorney General of the State of New York's July 13, 2021 Assurance of Discontinuance, which contains a finding, among others, that "TIAA Services has earned hundreds of millions of dollars in management fees on Portfolio Advisor accounts that clients opened with assets rolled over from employer-sponsored plans." Assurance of Discontinuance ¶ 2, ECF No. 360-3.

Alexander advises his clients to "***not*** allow recordkeepers to market and sell Non-Plan Products and services to participants (regardless of whether they can) to obtain lower-cost or even no-cost recordkeeping services for their defined contribution plans" because "[t]he inclusion of revenue generated from these Non-Plan Products and services can mask the true cost of recordkeeping and the reasonableness of the compensation received by the recordkeeper." Alexander Rep. ¶ 28.

The defendants also argue that, even if a court were to accept cross-selling as a basis for an imprudence claim, there is no evidence that a reasonable fiduciary in Yale's position has ever leveraged cross-selling to negotiate lower recordkeeping rates. But Alexander states:

> I have seen multiple examples where recordkeepers offer to provide recordkeeping services for "net zero" cost (and also provide the lowest-cost share classes for the investment options in the plan) as long as marketing and sale of Non-Plan Products and services to plan participants was ***not expressly*** prohibited.

39

Alexander Rep. ¶ 19. More importantly, however, the plaintiffs'
claim is not that the defendants were imprudent because they
disclosed confidential information or because they failed to
leverage cross-selling to negotiate a better deal. Rather, the
plaintiffs' claim is that Yale's failure to prohibit TIAA from
cross-selling was imprudent because Yale made no effort to
obtain information about TIAA's cross-selling revenues and thus
could not make an informed decision about whether TIAA's total
compensation, including that from cross-selling, was no more
than reasonable.

### 5. Loss to the Plan

The defendants argue that they are entitled to summary
judgment on Count III because there is no evidence that the
claimed acts of imprudence resulted in any loss to the Plan.
Under § 1109(a), "[a]ny person who is a fiduciary with respect
to a plan who breaches any of the . . . duties imposed upon
fiduciaries . . . shall . . . make good to such plan any losses
to the plan resulting from each such breach". 29 U.S.C. §
1109(a). "Because loss is a necessary element of an ERISA claim,
the absence of a genuine issue of material fact on loss warrants
grant of summary judgment in a defendant's favor." Cunningham v.
Cornell Univ., No. 16-cv-6525 (PKC), 2019 WL 4735876, at *6
(S.D.N.Y. Sept. 27, 2019). "Loss is measured in this context by
a comparison of what the [p]lan actually earned on the . . .

investment with what the [p]lan would have earned had the funds
been available for other [p]lan purposes. If the latter amount
is greater than the former, the loss is the difference between
the two." Sacerdote v. New York Univ., 9 F.4th 95, 112 (2d Cir.
2021), cert. denied, 142 S. Ct. 1112 (2022) (internal quotation
marks and citation omitted). "If, but for the breach, the [plan]
would have earned even more than it actually earned, there is a
loss for which the breaching fiduciary is liable." Trustees of
Upstate N.Y. Eng'rs Pension Fund v. Ivy Asset Mgmt., 843 F.3d
561, 567 (2d Cir. 2016) (internal quotation marks and citation
omitted). "Beneficiaries subject to higher fees for materially
identical funds lose not only the money spent on higher fees,
but also lost investment opportunity; that is, the money that
the portion of their investment spent on unnecessary fees would
have earned over time." Tibble v. Edison Int'l, 843 F.3d 1187,
1198 (9th Cir. 2016) (internal quotation marks and citation
omitted). "Where alternative strategies are possible, courts
'presume that the funds would have been used in the most
profitable of these.'" Cunningham, 2019 WL 4735876, at *6
(quoting Donovan v. Bierwirth, 754 F.2d 1049, 1056 (2d Cir.
1985)).

     "Although plaintiffs bear the burden of proving a loss, the
burden under ERISA shifts to the defendants to disprove any
portion of potential damages by showing that the loss was not

caused by the breach of fiduciary duty." Sacerdote, 9 F.4th at
113.

> Put differently, if a plaintiff proved that it was
> imprudent to pay $100 for something but that it would have
> been prudent to pay $10, it is not the plaintiff's burden
> to prove that it would also have been imprudent to pay
> every price between $11 and $99. It is on the defendant to
> prove that there is some price higher than $10 that it
> would have been prudent to pay.

Id.

To survive summary judgment, the plaintiffs must show that
there are genuine issues of material fact as to whether the
charged fees were imprudent and also as to whether a prudent
alternative to such fees was available. See id. ("Had plaintiffs
been able to prove that the charged fees were imprudent, and had
the plaintiffs shown a prudent alternative, the burden would
have shifted to the defendant to disprove that the entire amount
of loss should be awarded as damages.").

Yale argues that the recordkeeping fees that Plan
participants paid were reasonable in light of the package of
services that TIAA offered and industry standards during the
class period. But the plaintiffs create a genuine dispute as to
this contention. They contend that the combination of evidence
indicating that consolidation with a single recordkeeper was
possible and the fact that Yale achieved a significant rate
reduction once it moved to a single recordkeeper, supports an
inference that Yale could have transitioned to a cheaper,

single-recordkeeper model earlier in the class period, and therefore the fees Plan participants paid prior to the recordkeeper consolidation were unreasonable. The plaintiffs proffer evidence that Plan participants paid millions of dollars in excess recordkeeping fees during the class period due to Yale's imprudence.

The defendants maintain that this case is comparable to Cunningham, where the court found that the plaintiffs had failed to create a genuine issue of material fact with respect to loss and granted summary judgment on a claim that the defendants' process to monitor recordkeeping fees was a breach of the duty of prudence. There the court excluded the testimony of plaintiffs' experts Minnich and Otto, leaving only two pieces of evidence offered by those plaintiffs with respect to loss: "(1) TIAA's pricing data that shows the Plans paid higher fees than the top quartile of TIAA's Top 200 clients and (2) CAPTRUST's data that shows two plans in 2014 with over 10,000 participants had higher recordkeeping fees by basis point than Cornell and four plans in 2017 with over 10,000 participants had higher fees by per participant total than Cornell." Cunningham, 2019 WL 4735876, at *6.

But the instant case is not comparable to Cunningham because the plaintiffs proffer much more in the way of evidence. First, as the defendants acknowledge, the plaintiffs "have

disclosed expert testimony from Ty Minnich and Al Otto as
evidence that a 'prudent' fiduciary in Yale's position would
have been able to negotiate a lower recordkeeping fee", and the
court has not excluded the expert testimony of either Minnich or
Otto. Defs.' Mem. at 13. Second, even if the court had excluded
the testimony of Otto and Minnich, the plaintiffs have evidence
that Yale could have lowered its recordkeeping fees through
consolidation to a sole recordkeeper or competitive bidding. The
plaintiffs proffer evidence in the form of calculations of the
defendants' own expert, showing that after the Plan moved to
TIAA as the sole recordkeeper in 2015 there was a seventy-five
percent fee reduction for accounts on the TIAA platform and a
forty-six percent fee reduction for accounts on the Vanguard
platform. The plaintiffs proffer evidence that "[v]ery quickly
after consolidation, TIAA offered to recordkeep the Plans' fees
for $34 per participant." PSF ¶ 65. The plaintiffs proffer
benchmarking data from Aon Hewitt showing that the Plan was
paying $327 per participant in 2011, which was nearly four times
as much as the $83 rate paid by comparable plans that had
consolidated and adopted a per-participant fee. The plaintiffs
also proffer evidence with respect to the rates obtained by
California Institute of Technology, which they maintain has a
similar number of plan participants and reduced its fees to
around $40 per participant during the period from 2011 to 2016

after conducting an RFP in 2010 and moving to a single recordkeeper. In addition to the foregoing, the plaintiffs offer a comparison to the fees paid by the top quartile of TIAA clients.

### B. Count V: The Investment-Monitoring and Share-Class Claims

Two claims remain in Count V, namely, the plaintiffs' claims that the defendants breached their duty to monitor the Plan's investments and remove imprudent investments because they failed to remove underperforming investments (the "investment-monitoring claim") and because they failed to offer lower-priced institutional shares rather than higher-priced retail shares (the "share-class claim").

With respect to the investment monitoring claim, the defendants argue that they are entitled to summary judgment (i) on part of the claim because the named plaintiffs lack standing "to challenge Yale's oversight of investment options that Plaintiffs themselves did not invest in", Defs.' Mem. at 16; (ii) on the entire claim because the plaintiffs have failed to create a genuine issue of material fact as to whether Yale acted imprudently in monitoring investments; and (iii) on the entire claim because the investments themselves were objectively prudent. With respect to the share-class claim, the defendants argue that they are entitled to summary judgment because the

45

plaintiffs have failed to create a genuine issue of material fact as to whether Yale's decision to not offer lower-cost share classes of certain investments earlier than it did was imprudent. The motion for summary judgment is being denied as to these arguments.

### 1. Standing

The plaintiffs claim that the defendants breached their fiduciary duty by failing to monitor and remove investments in twenty-two funds the plaintiffs maintain were imprudent investments. The named plaintiffs invested in only nine of the twenty-two funds. The defendants argue that "Plaintiffs do not have standing to challenge Yale's oversight of investment options that Plaintiffs themselves did not invest in." Defs.' Mem. at 16.

In the Class Certification Ruling, the court found that the named plaintiffs had Article III standing to assert claims against the defendants for Yale's management of funds in which the named plaintiffs did not personally invest. See Vellali v. Yale Univ., 333 F.R.D. 10, 15 (D. Conn. 2019) ("Even though every member of the proposed class—including the proposed lead plaintiffs—did not invest in all of the Plan's funds, the alleged foregone opportunities from funds that were not included and the alleged reduction in choice that resulted is an alleged injury in fact.") (quoting Sacerdote v. New York Univ., No. 16-

cv-6284 (KBF), 2018 WL 840364, at *7 (S.D.N.Y. Feb. 13, 2018) (internal quotations and citations omitted).

The defendants argue that the Supreme Court's subsequent decision in Thole v. U.S. Bank, N.A, 140 S. Ct. 1615 (2020), abrogates the basis for the court's conclusion that the named plaintiffs have standing with respect to funds in which they did not personally invest. However, as explained in In re Omnicom ERISA Litig., No. 20-CV-4141 (CM), 2021 WL 3292487, at *7 (S.D.N.Y. Aug. 2, 2021), Thole is "not an apposite precedent". The named plaintiffs in Thole were participants in a defined-benefit retirement savings plan, and the Court stated: "Of decisive importance to this case, the plaintiffs' retirement plan is a defined-benefit plan, not a defined-contribution plan." Thole, 140 S. Ct. at 1618. "Thole discussed only Article III standing for plaintiffs who were participants in defined-benefit plans." In re Omnicom, 2021 WL 3292487, at *8. "Thole . . . has little or no relevance when evaluating standing in ERISA cases concerning defined-contribution plans. See, e.g., Brown v. Daikin Am., Inc., No. 18-cv-11091 (PAC), 2021 WL 1758898, at *4 (S.D.N.Y. May 4, 2021); Cates v. Trustees of Columbia Univ., No. 16-cv-6524 (GBD), 2021 WL 964417, at *1 (S.D.N.Y. Mar. 15, 2021)." Id. Thus Thole is not a reason to change the court's finding on the issue of whether the named plaintiffs have

standing with respect to the funds in which they did not personally invest.

The defendants also argue that another aspect of the decision in Omnicom will be helpful to the court as it considers their motion for summary judgment, namely the part of the analysis which concludes that plaintiffs like the named plaintiffs here do not have standing with respect to funds in which they did not personally invest. In that part of the analysis, Omnicom cites to Patterson v. Morgan Stanley, No. 16-cv-6568 (RJS), 2019 WL 4934834, at *5 (S.D.N.Y. Oct. 7, 2019), and In re UBS ERISA Litig., No. 08-cv-6696, 2014 WL 4812387, at *7 (S.D.N.Y. Sept. 29, 2014) aff'd, Taveras v. UBS AG, 612 F. App'x 27 (2d Cir. 2015). See Omnicom at *9. However, the points made in that part of the analysis in Omnicom were addressed in the Class Certification Ruling. In fact, the court took into account the summary order in UBS-Taveras. See Vellali, 333 F.R.D. at 15 ("Relying on Taveras v. UBS AG, 612 F. App'x 27 (2d Cir. 2015), the defendants argue that '[a]n ERISA plan participant lacks standing to sue for ERISA violations that cause injury to a plan but not individualized injury to the plan participant.'") (citation omitted). In any event, the court finds more persuasive the analysis in Falberg v. Goldman Sachs Grp., Inc., No. 19 CIV. 9910 (ER), 2020 WL 3893285, at *7-*8 (S.D.N.Y. July 9, 2020); Brown, 2021 WL 1758898, at *3; Leber v.

Citigroup 401(k) Plan Inv. Comm., 323 F.R.D. 145, 155-56

(S.D.N.Y. 2017); and Cates, 2021 WL 964417, at *2.

As explained in Brown:

The nature of this lawsuit is derivative, not personal: the
Plaintiffs bring their breach of fiduciary duty claims
pursuant to Sections 1109(a)[] and 1132(a)(2)[] of ERISA,
which do not call for "individual relief, but instead [are
claims] brought in a representative capacity on behalf of
the plan." L.I. Head Start Child Dev. Servs., Inc. v. Econ.
Opportunity Comm'n of Nassau Cty., Inc., 710 F.3d 57, 65
(2d Cir. 2013) (cleaned up) . . . . Accordingly, the
Plaintiffs sue not only to recover their individual losses
but to also vindicate the collective injuries suffered by
the Plan and its participants. L.I. Head Start, 710 F.3d at
65. And ERISA permits them to do this—to step into the
shoes of Plan attorney general—so long as they can
demonstrate that they are "within the zone of interests
ERISA was intended to protect." Id. (quoting Mullins v.
Pfizer, Inc., 23 F.3d 663, 668 (2d Cir. 1994)).

Brown, 2021 WL 1758898, at *3. The foregoing analysis is

consistent with LaRue v. DeWolff, 552 U.S. 248 (2008).

In other words, LaRue instructs that a plaintiff's
individual recovery is not mutually exclusive with plan-
wide relief under Section 1132(a)(2). Id. ("We therefore
hold that although [§ 1132(a)(2)] does not provide a remedy
for individual injuries distinct from plan injuries, that
provision does authorize recovery for fiduciary breaches
that impair the value of plan assets in a participant's
individual account.").

Brown, 2021 WL 1758898, at *4.

Here the claim is that Yale's flawed process for monitoring

investments affected the entire Plan. Thus, the court's

conclusion as to standing has not changed.

## 2. Process for Monitoring Plan Investments

The plaintiffs claim that the defendants breached their duty of prudence because Yale had a process for monitoring Plan investments that was deficient in a number of respects.

"[T]he most basic of ERISA's investment fiduciary duties [is] to conduct an independent investigation into the merits of a particular investment." In re Unisys Sav. Plan Litig., 74 F.3d 420, 435 (3d Cir. 1996). An ERISA fiduciary's duties "'apply not only in making investments but also in monitoring and reviewing investments, which is to be done in a manner that is reasonable and appropriate to the particular investments, courses of action, and strategies involved.'" Tibble v. Edison Int'l, 575 U.S. 523, 529 (2015) (quoting Restatement (Third) of Trusts § 90 cmt. b, p. 295 (2007)).

> Under trust law, a trustee has a continuing duty to monitor trust investments and remove imprudent ones. This continuing duty exists separate and apart from the trustee's duty to exercise prudence in selecting investments at the outset. The Bogert treatise states that "[t]he trustee cannot assume that if investments are legal and proper for retention at the beginning of the trust, or when purchased, they will remain so indefinitely." A. Hess, G. Bogert, & G. Bogert, Law of Trusts and Trustees § 684, pp. 145–146 (3d ed. 2009) (Bogert 3d). Rather, the trustee must "systematic[ally] conside[r] all the investments of the trust at regular intervals" to ensure that they are appropriate. Bogert 3d § 684, at 147–148 . . . .

Tibble, 575 U.S. at 529. A fiduciary "'who simply ignores changed circumstances that have increased the risk of loss to

the trust's beneficiaries is imprudent.'" <u>Pension Benefit Guar.</u>
<u>Corp. v. Morgan Stanley Inv. Mgmt. Inc.</u>, 712 F.3d 705, 717 (2d
Cir. 2013)) (quoting <u>Armstrong v. LaSalle Bank Nat'l Ass'n</u>, 446
F.3d 728, 734 (7th Cir. 2006)).

> Bearing these fiduciary duties in mind, a court assesses a
> fiduciary's performance by looking at process rather than
> results, "focusing on a fiduciary's conduct in arriving at
> [a] . . . decision . . . and asking whether a fiduciary
> employed the appropriate methods to investigate and
> determine the merits of a particular investment."

<u>Sweda v. Univ. of Pennsylvania</u>, 923 F.3d 320, 329 (3d Cir. 2019)
(quoting <u>In Re Unisys</u>, 74 F.3d at 434). In assessing a
fiduciary's performance, the court must "examine the totality of
the circumstances". <u>DiFelice v. U.S. Airways, Inc.</u>, 497 F.3d
410, 418 (4th Cir. 2007).

The defendants argue that they are entitled to summary
judgment on the investment monitoring claim because
"[t]hroughout the class period, Yale regularly reviewed the
Plan's lineup to ensure that participants could choose from an
appropriate menu of low-cost, diversified investment options."
Defs.' Mem. at 18. They rely on evidence that prior to the
formation of the Committee, Penney reviewed the Plan's fund
line-up, and Penney and Peel held annual investment review
meetings with TIAA and Vanguard to ask questions about fund
performance and strategy. They point to evidence that
"[b]eginning in 2012, the Committee reviewed the Plan's

investment lineup at annual review meetings, which often lasted several hours." DSMF ¶ 22.

> The Committee's members studied fee and performance disclosure statements for each of the Plan's investments. They also reviewed Morningstar evaluations and, where necessary, requested additional information from the Plan's vendors or from the Yale Investments Office.

DSMF ¶ 22.

First, the plaintiffs have created genuine issues of material fact with respect to the period prior to the formation of the Committee. During this period Penney was "the only person that was responsible for the benefit plans." Dep. Hugh K. Penney ("Penney Dep."), ECF Nos. 281-23 and 309-2, at 60:9–10. He "reported to the plan administrator, and the plan administrator delegated the role of managing the day-to-day operations of the retirement plans to [Penney]." Penney Dep. at 60:10–13. In 2010 the Plan had $2.6 billion in assets invested in over 100 funds.

The plaintiffs proffer evidence that industry professionals believe that it is not possible to effectively monitor over 100 funds, even with assistance from a professional. Also, the plaintiffs point to the fact that the Yale Investments Office assigned a staff of four people to monitor a much smaller number of investments.

While the defendants assert that, as necessary, they would solicit the advice of Dean Takahashi, the second in command at the Yale Investments Office, the plaintiffs proffer evidence to

the contrary, including testimony by Penney that prior to 2017 no one in the Investments Office was involved in monitoring the Plan.

The plaintiffs also proffer emails from Penney commenting on the need for an investment committee, including a March 2011 email in which he refers to the fact that "the need for more formal and regular oversight is necessary to meet Yale's fiduciary obligations under ERISA." Pls.' Ex. P56, ECF No. 309-56. The plaintiffs highlight the fact that although the Vice President for Human Resources and Administration authorized the establishment of an investment committee in April 2009, the Committee was not chartered until October 2011 and did not hold its first meeting until February 2012. In a 2014 email Penney observed that "[i]t took 5 years to convince leadership we needed a committee." Pls.' Ex. P54, at 1, ECF No. 309-54.

The plaintiffs have also created genuine issues of material fact as to whether Yale acted imprudently in monitoring investments after the Committee was chartered and began meeting in 2012. They proffer evidence that during the relevant period Yale's investment review process consisted of annually reviewing reports from its recordkeepers about their own products. Such evidence includes deposition testimony by Penney:

> The committee, we would typically structure the committee so that the major investments or the more complex investments or any investments that the

> committee had questions about would be discussed in
> detail. The members of the committee would review all
> the reports in advance and ask questions of the vendors,
> and then after the, sort of the review of the major
> investments and the -- any investments that were of
> question, we would then look through the remainder and
> see if there were any that were red-flagged.

Penney Dep. at 134:8-18. The plaintiffs proffer similar

deposition testimony by Committee member Shauna King, who

testified:

> Annually we would receive from TIAA-CREF and from
> Vanguard a very exhaustive set of materials about
> performance fees, status of the firm, economic outlooks,
> those kinds of things. And we were able to spend time on
> our own going through that in depth. And then we met
> with each of the sponsors in committee. And they would
> present that material, you know, focusing on sort of the
> highlights, emerging trends, obviously the large
> holdings. And were prepared and did answer any of the
> questions that we had about anything else in the
> materials.

Dep. Shauna King ("King Dep.") at 24:24-25:10, ECF No. 309-32.

See Dominguez Rep. ¶ 128, ECF No. 285-5 ("The Committee had no

written criteria to determine which investments to discuss (or

not discuss) during reviews. Rather, it had an ad hoc process

whereby if a member happened to have questions about a given

investment, it would be discussed.").

In addition, the plaintiffs proffer evidence that the

reports from TIAA and Vanguard were themselves deficient because

"[t]hese reports did not contain sufficient information to

adequately review the investments in the Plan", and "[f]or most

of the relevant period, the TIAA and Vanguard reviews only

54

contained comparisons to benchmarks chosen by TIAA or Vanguard
and Morningstar-assigned peer groups." PSF ¶ 74. According to
Dominguez, "critical information about manager tenure and
performance, risk-adjusted return, and other measures were
absent from the vendor's annual reviews and was not considered
by Yale's fiduciaries." Dominguez. Rep. ¶ 103. The plaintiffs
also submit evidence that the responses to Yale's investment
advisor RFP reflect that "industry professionals look at alpha,
risk-adjusted returns over multiple periods, peer group ranking,
risk/return statistics, changes in assets held, changes in fees
and expenses, and manager tenure." PSF ¶ 75.

    The plaintiffs proffer evidence that Yale's process was
also deficient because the defendants relied on benchmark and
peer group choices provided by an interested party as opposed to
"look[ing] at assigned peer groups to determine whether it might
be a good idea to use a different peer group." Dominguez Rep. ¶
108. The plaintiffs point to the difference between the process
followed by the defendants and the Yale Investments Office's
process for determining the proper benchmark. As additional
evidence of deficiency, the plaintiffs point to evidence that
the frequency of Yale's investment review was inconsistent with
industry standards. Review of investments occurred at annual
review meetings that "typically range[d] anywhere from an hour
to over two." Penney Dep. at 131:17-18. The plaintiffs contrast

evidence that "Professionals, including Yale's investment office, review investments on regular monthly or quarterly intervals", PSF ¶ 79, to the fact that "[t]he Committee met on an ad hoc basis and reviewed investments once a year", PSF ¶ 80.

The plaintiffs proffer evidence that many similarly situated fiduciaries of defined contribution plans rely on full-time outside consultants to assist with the investment review process, but Yale did not hire Aon Hewitt to assist the Committee until December 2016.

Finally, the plaintiffs submit evidence that it is an accepted practice in the industry "to have an investment policy statement to guide investment review." PSF ¶ 85. Yale did not adopt an investment policy statement until November 2018.

Thus, genuine issues of material fact exist with respect to this argument made by the defendants.

### 3. Loss to the Plan

The elements of a claim for breach of fiduciary duty are: "(1) a plan fiduciary (2) breaches an ERISA-imposed duty (3) causing a loss to the plan." Sweda v. Univ. of Pennsylvania, 923 F.3d 320, 328 (3d Cir. 2019) (internal quotations and citation omitted). See also Jeffrey D. Mamorsky, 1 Employee Benefits Handbook § 8:152 (2022), Westlaw EMBEHB. The defendants contend that they are entitled to summary judgment because the plaintiffs have failed to create a genuine issue of material

fact as to the third element, i.e. that breach of the duty of prudence caused a loss to the Plan.

In Estate of DePerno, the court explained with respect to the third element:

> that after the plaintiffs sustained their burden of showing the defendants' violation of their fiduciary duty to the Fund and the payment of money as a result of that violation, the burden should have shifted to the defendants to demonstrate factors mitigating the costs incurred by the plaintiffs.

New York State Teamsters Council Health & Hosp. Fund v. Estate of DePerno, 18 F.3d 179, 180-81 (2d Cir. 1994). With respect to the meaning of the term "loss", Ivy Asset Management explains:

> "If, but for the breach, the [plan] would have earned even more than it actually earned, there is a 'loss' for which the breaching fiduciary is liable." Dardaganis v. Grace Capital Inc., 889 F.2d 1237, 1243 (2d Cir. 1989). Losses are measured by the difference between the plan's actual performance and how the plan would have performed if the funds had been invested "like other funds being invested during the same period in proper transactions." Donovan v. Bierwirth, 754 F.2d 1049, 1056 (2d Cir. 1985). "Where several alternative investment strategies were equally plausible, the court should presume that the funds would have been used in the most profitable of these." Id.

Trustees of Upstate New York Engineers Pension Fund v. Ivy Asset Mgmt., 843 F.3d 561, 567 (2d Cir. 2016).

The defendants contend that the plaintiffs' investment-monitoring claim fails because they do not have evidence as to causation. The defendants argue: "Sometimes referred to as 'objective prudence,' this requires a plaintiff to show not just that the defendant failed to follow a prudent process, but also

57

that the conclusion the defendant reached is one that a 'hypothetical prudent fiduciary' would have rejected. Tussey v. ABB, Inc., 746 F.3d 327, 335 (8th Cir. 2014)." Defs.' Mem. at 21. They argue further: "In concrete terms, if an objectively prudent fiduciary would have kept the same funds as the defendant, then even if the defendant failed to follow a prudent process to evaluate those funds, a plaintiff cannot demonstrate 'that the plan's losses "result[ed] from" the breach.' Silverman v. Mut. Benefit Life Ins. Co., 138 F.3d 98, 104 (2d Cir. 1998)." Id. The defendants also cite to Silverman, 138 F.3d at 105, for the proposition that "[c]ausation of damages is . . . an element of the [prudence] claim, and the plaintiff bears the burden of proving it." Defs.' Reply at 13 (internal quotation marks omitted).

However, Tussey does not support the defendants' argument with respect to a "hypothetical prudent fiduciary". The language in Tussey to which the defendants cite is a quote from Roth v. Sawyer-Cleator Lumber Co., 16 F.3d 915 (8th Cir. 1994), where the court stated:

> ERISA plaintiffs bear the burden of proving a breach of fiduciary duty and a prima facie case of loss to the plan. Id. Once the plaintiff has satisfied these burdens, "the burden of persuasion shifts to the fiduciary to prove that the loss was not caused by . . . the breach of duty."

Roth, 16 F.3d at 917 (citing Martin v. Feilen, 965 F.2d 660, 671 (8th Cir. 1992). See also Moreno v. Deutsche Bank Americas

58

Holding Corp., No. 15 Civ. 9936 (LGS), 2018 WL 2727880, at *4
(S.D.N.Y. June 6, 2018) ("No 'objective prudence' requirement is
contained in the Second Circuit's succinct and unambiguous
description of the loss analysis".).

Also, the defendants' reliance on Silverman with respect to
their position on burden shifting is misplaced. As explained in
Tatum v. RJR Pension Inv. Comm., 761 F.3d 346 (4th Cir. 2014):

> [I]n Silverman, the decision not to shift the burden of
> proof was based in large part on the unique nature of a co-
> fiduciary's liability under § 1105(a)(3). See 138 F.3d at
> 106 (Jacobs, J., concurring). That reasoning does not apply
> to the present case, in which plan participants sued
> under § 1104(a)(1) and alleged losses directly linked to
> the defendant-fiduciary's own fiduciary breach. Nor does it
> appear that the Second Circuit would apply the
> Silverman reasoning to a case brought under § 1104(a).
> See N.Y. State Teamsters Council, 18 F.3d at 182, 182-83
> (acknowledging "the general rule that a plaintiff bears the
> burden of proving the fact of damages" but concluding in an
> ERISA case that "once the beneficiaries have established
> their prima facie case by demonstrating the trustees'
> breach of fiduciary duty, the burden of explanation or
> justification shifts to the fiduciaries" (internal
> quotation marks and alterations omitted)).

Tatum, 761 F.3d at 362 n.10.

The defendants make two additional arguments in support of
their position that they are entitled to summary judgment
because the plaintiffs have not created a genuine issue of
material fact as to whether a breach by the defendants caused a
loss to the Plan. First, the defendants argue that the
plaintiffs "have no evidence that an objectively prudent
fiduciary would have removed the funds they challenge from the

plan." Defs.' Mem. at 22. Noting that the plaintiffs proffer evidence from their expert Wendy Dominguez on this issue, the defendants assert that "nothing in the record suggests that any fiduciaries were actually using Dominguez's criteria to evaluate investment options in 2010, let alone that they were <u>required</u> to do so." <u>Id.</u> However, as discussed above, an objective prudence requirement is not part of the loss analysis. <u>See</u> <u>Moreno</u>, 2018 WL 2727880, at *4.

Second, the defendants attack Dominquez's methodology. They argue that Dominguez's "methodology itself is extraordinarily dubious". Defs.' Mem. at 23. They contend that she compares "apples and oranges" because "CREF Stock and TIAA Real Estate [] are variable annuities, not mutual funds." <u>Id.</u> at 24. In addition, the defendants contend that Dominguez "relies on cherry-picked performance comparisons" and that the plaintiffs' benchmark analysis is meritless. <u>Id.</u> at 26. With respect to the defendants' "apples and oranges" contention, the plaintiffs offer evidence that "a variable annuity is invested in a fund with an investment object, like a mutual fund." PSF ¶ 91. "There is no guarantee on the rate of return or principal, and the amount of money ultimately paid is determined by the market (like a mutual fund)." PSF ¶ 91. Also, in ruling on the defendants' motion to exclude Dominguez, the court concluded that a number of their objections to her methodology go to

weight not to admissibility. See Order re Defendants' Motion to Exclude Plaintiffs' Experts Wendy Dominguez and Gerald Buetow, ECF No. 409.

Also, the plaintiffs point to evidence that "Dominguez obtained benchmarks from the same sources used by Defendants' expert and investment advisor, [and she] followed industry accepted practices for identifying benchmarks and formulating custom benchmarks when needed, which are the same custom benchmarks that she uses with clients." Pls.' Opp. at 35-36. The court agrees with the plaintiffs that the arguments raised by the defendants merely create material factual disputes that must be resolved at trial. Moreover, the plaintiffs also proffer evidence that "[i]nvestment advisors acting as fiduciaries recommended removal of many of these funds." PSF ¶ 87.

Thus, genuine issues of material fact exist as to this argument made by the defendants.

### 4. Lower Cost Share Classes

The plaintiffs claim that Yale's decision not to offer lower-cost share classes of certain investments earlier than it did was a breach by the defendants of their duty of prudence. A fiduciary must systematically consider all the investments at regular intervals to ensure that they are appropriate. See Tibble v. Edison Int'l, 575 U.S. 523, 529 (2015). "'[C]ost-conscious management is fundamental to prudence in the

investment function,' and should be applied 'not only in making
investments but also in monitoring and reviewing investments.'"
Tibble v. Edison Int'l, 843 F.3d 1187, 1197–98 (9th Cir. 2016)
(quoting Restatement (Third) of Trusts § 90(c)(3)(2007)).

The defendants argue that they are entitled to summary
judgment on the share-class claim because "[t]he record shows
that Yale evaluated whether it was possible to realize savings
to the Plan by moving to these lower-cost share-classes and did
so as share classes became available", Defs.' Mem. at 31; some
lower-cost shares were not available to Yale; and Yale's revenue
credit account made share classes largely irrelevant.

The defendants rely on testimony from TIAA's relationship
manager for Yale, Stephen Campbell, that when TIAA was starting
to introduce new share-classes in 2010, it was "immediately
engaged by Yale to have a discussion around what share classes
could be made available". DSMF ¶ 37 n.37. With respect to
Vanguard, the defendants submit evidence that "the Plan upgraded
the share classes of many of its Vanguard funds" in 2013 and
2014. DSMF ¶ 40. The defendants also submit evidence that Yale
asked TIAA for institutional classes in 2010 but TIAA agreed to
provide them for only certain investments, as well as evidence
that "[t]he 2010 prospectuses for several of the Vanguard funds
for which Yale negotiated lower rates in 2013 and 2014 expressly
prohibited 403(b) plans from obtaining the cheapest share

class." DSMF ¶ 41. Relying on the report of their expert Glenn Poehler, the defendants contend that the share class used for TIAA investments "[did] not impact the eventual total amount of administrative fees paid." Poehler Rep. ¶ 61.

However, the plaintiffs proffer evidence sufficient to create genuine issues of material fact as to this claim. With respect to TIAA, the plaintiffs submit evidence that "[a]ll defined contribution plans were eligible for institutional share classes if they had over $2 million invested in most of the funds, and certain defined contributions plans were eligible for institutional shares without any threshold." PSF ¶ 93. The Plan had over $2 million invested in its TIAA mutual funds in June 2010 but until 2011, eight TIAA mutual funds were "in the higher-cost premier share class." PSF ¶ 95. The plaintiffs submit evidence that "TIAA offered institutional share classes for all its mutual funds as early as February 2009." PSF ¶ 93. With respect to Vanguard, the plaintiffs submit evidence that numerous Vanguard funds were eligible for lower-cost share classes during the class period but the defendants "did not adopt the lower-cost share class for these funds until July 2013, October 2014, April 2015 or August 2016 (depending on the particular fund)." PSF ¶ 97. Moreover, the plaintiffs proffer evidence that "[p]roviders will waive the share class requirements for large plans, like the Plan." PSF ¶ 98.

With respect to the revenue credit account, the plaintiffs proffer evidence that "TIAA promoted plan-specific pricing to Yale in August 2010 [but] Yale did nothing until TIAA unilaterally approached it with an offer in February 2012.[] TIAA's proposed fee reduction was not accepted until December 20, 2012." PSF ¶ 16. The plaintiffs also proffer evidence that the defendants' "motivation in accepting this agreement was to obtain a revenue credit account as quickly as possible to reimburse expenses and employee salaries." PSF ¶ 16.

Thus, the motion for summary judgment is being denied as to this claim.

### C. Count I: The Bundled Sevices Arrangement

The defendants observe that the "Plaintiffs challenge TIAA's requirement that plans offer CREF Stock and the CREF Money Market Account to participants as a condition of offering the TIAA Traditional Annuity", and then assert that the plaintiffs appear to have abandoned this claim. Defs.' Mem. at 33. However, it is apparent that the plaintiffs continue to claim that Yale "failed to follow a prudent process to . . . evaluate whether, given CREF Stock's severe underperformance, participants' interests were served by keeping CREF Stock locked into the Plan lineup regardless of whether it was a prudent option (Count I)." Pls.' Opp. at 32. The evidence on which the plaintiffs rely to create genuine issues of material fact as to

64

whether the defendants followed a prudent process is the same
evidence on which they rely with respect to the claim in Count
V. That is why the two claims are discussed together in Part IV
of the plaintiffs' memorandum. The plaintiffs submit evidence to
support their contention with respect to the "CREF Stock's
underperform[ance]". PSF ¶ 32 ("From 2005 until 2010, CREF Stock
underperformed its 10-year composite benchmark every year and
often by more than 38 basis points."); PSF ¶ 87 ("For example,
Aon Hewitt recommended terminating the CREF Stock . . . .
Similarly, numerous plans have removed CREF Stock . . . from
their lineup or frozen contributions to them.").

　　　　The defendants also argue that this claim is time-barred.
They contend that "Plaintiffs identified no evidence that Yale
made any bundling arrangement during the class period" and that
the plaintiffs cannot "seek to rely on agreements Yale entered
into prior to 2010" because "ERISA requires a plaintiff to sue
within six years of the 'last action which constituted part of
the breach or violation.'" Defs.' Mem. at 34 (quoting 29 U.S.C.
§ 1113(1)). However, the plaintiffs point out, correctly, that
the "'last action which constituted part of the breach'" was
Yale's "fail[ure] to evaluate the prudence of maintaining the
bundled arrangement" and that this "necessarily occurred within
the six-year limitations period." Pls.' Opp. at 32. As the Court
held in Tibble, "so long as the alleged breach of the continuing

duty occurred within six years of suit, the claim is timely."
Tibble v. Edison Int'l, 575 U.S. 523, 530 (2015). There the
Court found that the Ninth Circuit erred "by applying a 6-year
statutory bar based solely on the initial selection of the three
funds without considering the contours of the alleged breach of
fiduciary duty", namely, the "continuing duty to monitor []
investments and remove imprudent ones." Id. at 529. See Hughes
v. Northwestern Univ., 142 S. Ct. 737, 742 (2022) ("If the
fiduciaries fail to remove an imprudent investment from the plan
within a reasonable time, they breach their duty.").

Therefore, the motion for summary judgment is being denied
as to this claim.

### D. Counts II, IV, and VI: Prohibited Transactions

In Counts II, IV, and VI, the plaintiffs claim that the
defendants violated 29 U.S.C. § 1106(a), which prohibits plan
fiduciaries from engaging in various kinds of transactions with
a party in interest.

Except as provided in section 1108 of this title:

(1) A fiduciary with respect to a plan shall not
cause the plan to engage in a transaction, if he
knows or should know that such transaction
constitutes a direct or indirect—

(A) sale or exchange, or leasing, of any
property between the plan and a party in
interest;

. . .

66

> > (C) furnishing of goods, services, or facilities between the plan and a party in interest;
> >
> > (D) transfer to, or use by or for the benefit of a party in interest, of any assets of the plan;
>
> . . . .

29 U.S.C. § 1106(a).

The defendants make four arguments as to why they are entitled to summary judgment, one of which the court finds persuasive. The defendants argue that "[a]t the motion to dismiss stage, Plaintiffs cited cases like Braden v. Wal-Mart Stores, Inc., 588 F.3d 585, 601 (8th Cir. 2009), and Haddock v. Nationwide Fin. Servs., Inc., 419 F.Supp.2d 156, 170 (D. Conn. 2006), which treated transactions with third-parties as 'prohibited transactions' based on allegations of concealment or self-dealing." Defs.' Mem. at 35. "But Plaintiffs have not uncovered evidence of anything close to that in discovery." Id.

In ruling on the motion to dismiss, the court relied on Braden to a significant extent. See Vellali v. Yale, 308 F.Supp.3d 673, 690-91 (D. Conn. 2018). Braden did involve an arrangement where a party in interest "received undisclosed amounts of revenue sharing payments in exchange for services rendered to the Plan." Braden, 588 F.3d at 601. There the court observed that "[t]he transactions prohibited by § 1106 tend to be those in which a fiduciary might be inclined to favor [a

67

party in interest] at the expense of the plan's beneficiaries. .

. . In short, prohibited transactions [under § 1106 (a)(1)]

involve self-dealing . . . ." Braden, 588 F.3d at 602 (internal

quotation marks and citations omitted).

In Sweda v. Univ. of Pennsylvania, 923 F.3d 320 (3d Cir.

2019), the court undertook a comprehensive analysis of cases

interpreting § 1106(a)(1). Reasoning, inter alia, that Allen v.

GreatBank Trust Co., 835 F.3d 670, 676 (7th Cir. 2016), involved

a transaction of a variety that "is far removed from ordinary

recordkeeping arrangements", the court held that "factual

allegations that support an element of intent to benefit a party

in interest" are necessary to show that a prohibited transaction

has occurred. Sweda, 923 F.3d at 336, 338. Similarly, in

Cunningham the court concluded that "absent some evidence of

self-dealing or other disloyal conduct, allegations that the

Plans violated § 406(a) by paying [Fidelity] and TIAA-CREF for

recordkeeping services—even allegations that the Plans paid too

much for those services—do not, without more, state a claim."

Cunningham v. Cornell Univ., No. 16-CV-6525 (PKC), 2017 WL

4358769, at *10 (S.D.N.Y Sept. 29, 2017).

The court agrees with the defendants that the plaintiffs

have failed to create a genuine issue of material fact as to

whether the defendants engaged in self-dealing or other disloyal

conduct with intent to benefit a party of interest. While the

plaintiffs proffer evidence that "Penney was conflicted because of his relationships with TIAA", PSF ¶ 51, that evidence falls short of creating a genuine issue of material fact as to these claims.

Therefore, the motion for summary judgment is being granted as to Counts II, IV, and VI.

### E. Count VIII: The Failure-to-Monitor Claim

The parties agree that "[t]he Plan identifies Yale as the named fiduciary and gives Yale, acting through the Vice President for Human Resources and Administration, discretionary authority to administer and oversee the Plan." DSMF, PSF ¶ 2. They also agree that "[a]t the start of the class period (August 2010), Yale's Vice President for Human Resources and Administration was Michael Peel." Id. The defendants maintain that Peel delegated day-to-day Plan administration to Yale's Benefits Department, which was led by Penney. At this stage of the case, the plaintiffs' claim in Count VIII is that Yale and Peel breached their duty to monitor Penney.

The defendants argue that they are entitled to summary judgment on this claim because "Plaintiffs have no evidence to support a supposed failure to monitor." Defs.' Mem. at 36. While the moving party has the initial burden when seeking summary judgment to show that there is no genuine dispute as to any material fact, see Fed. R. Civ. P. 56(a), under Rule 56(c) a

party asserting that there is no genuine dispute as to a fact can rely on a showing that the adverse party cannot produce admissible evidence to support the fact. See Fed. R. Civ. P. 56(c)(1) & advisory committee's note to 2010 amendment, Subdivision (c)(1)(B) ("[A] party who does not have the trial burden of production may rely on a showing that a party who does have the trial burden cannot produce admissible evidence to carry its burden as to the fact.").

The plaintiffs' response to the defendants' assertion that the plaintiffs have no evidence is merely that "Defendants have presented no evidence that they ever monitored Penney's performance or determined whether he was sufficiently capable of overseeing the Plan's fees and investments." Pls.' Opp. at 11. Moreover, in their reply the defendants do cite to Peel's deposition testimony that he supervised Penney and had weekly meetings with him where they talked about what he was working on. See Peel Tr. 44:6-19, ECF No. 281-22. Peel also testified to having "quite a bit of playback from Hugh Penney." Peel Tr. 44:18-19. Thus, the plaintiffs have failed to create a genuine issue of material fact with respect to this claim.

Therefore, the motion for summary judgment is being granted as to Count VIII.

**IV.     CONCLUSION**

Accordingly, Defendants' Motion for Summary Judgment (ECF No. 267) is hereby GRANTED in part and DENIED in part. It is being granted with respect to the prohibited transaction claims (Counts II, IV, and VI) and the duty to monitor claim (Count VIII), and it is otherwise being denied.

It is so ordered.

Signed this 21st day of October 2022, at Hartford, Connecticut

```
                          _____
                                  /s/AWT
                          Alvin W. Thompson
                          United States District Judge
```