IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

| | |
|---|---|
| JOSEPH VELLALI *et al.*, <br><br> *Plaintiffs,* <br><br> v. <br><br> YALE UNIVERSITY *et al.*, <br><br> *Defendants.* | No. 3:16-cv-01345-AWT <br><br> Hon. Alvin W. Thompson |

**MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION TO PRECLUDE VARIABLE ANNUITY DAMAGES OPINIONS [DOC. 557]**

Defendants' latest effort to exclude the testimony of Plaintiffs' expert, Dr. Gerald Buetow, fares no better than their two previously failed attempts. Under Second Circuit precedent, ERISA plaintiffs victimized by a fiduciary breach are presumptively entitled to the *most profitable* loss measure; the burden is on the breaching fiduciary to disprove any part of the claimed damages. Accordingly, Dr. Buetow was not required to try to predict "a particular percentage of assets that would have moved" *out* of the Plan's variable annuities as Defendants contend (at 2)—it is *Defendants*' burden to show a particular percentage of assets that would have remained *in* the Plan's variable annuities, which is not a proper subject of expert testimony in any event.

Dr. Buetow's three alternative calculations—based upon either 60%, 80%, or 100% of variable annuity assets moving to alternative investments—simply account for the possibility that Defendants might come forward with evidence that some portion of Plan participants would have remained in the variable annuities despite warnings from their employer that those funds no longer complied with ERISA's

1

standards. Dr. Buetow's calculations are entirely consistent with well-established principles that a damages model need only provide a reasonable estimate of the harm, and experts may rely on reasonable assumptions in rendering their opinions. In short, Dr. Buetow's testimony will assist the trier of fact in determining the losses caused by Defendants' breaches of fiduciary duty. Defendant's motion, moreover, ignores that the essential testimony at issue—Mr. Minnich's opinion that an educational campaign directed to plan participants in order to move funds out TIAA annuities would be "successful"—was presented at trial. *Compare* Doc. 283-7, Minnich Rep. ¶ 82, *with* Doc. 557-2 at 11–12.  The Court should reject Defendants' third bite at the apple.

## I.     Background

On August 19, 2019, Plaintiffs served the reports of their experts, including Mr. Minnich, Ms. Dominguez, and Dr. Buetow. Mr. Minnich opined that in his experience, "education campaigns directed to plan participants in order to move funds out of TIAA products and into more prudent investment options have been successful" and that "[a]n effective, 'boots-on-the-ground' educational campaign focused on active participants will result in a majority moving their liquid retirement assets out of TIAA 'legacy' products and into superior investment options." Doc. 283-7, ¶82. Dr. Buetow calculated damages at 60%, 80%, and 100%, to account for the possibility that less than 100% of assets would move from the imprudent variable annuities to prudent replacement funds. Ms. Dominguez offered no opinion regarding the potential success of the educational campaigns referenced by Mr. Minnich, but recited in her report the results of the alternative damages

calculations performed by Dr. Buetow. *E.g.*, Doc. 283-5 at n. 324. Defendants took the depositions of each of Plaintiffs' experts, questioning them extensively regarding their opinions.

On December 4, 2020, Defendants moved to exclude Plaintiffs' experts. *See* Docs. 275 and 278. Defendants raised no argument challenging the basis for Dr. Buetow's variable annuity damages calculations, nor any argument regarding the basis for Mr. Minnich's opinions regarding the success of participant education campaigns designed to move imprudent assets. Docs. 277, 280, 340, 341.

On March 1, 2023, the Court ordered the parties to file motions *in limine* concerning any anticipated evidentiary problems contemporaneously with their joint trial memorandum. Doc. 436 at 4. Accordingly, on April 26, 2023, the parties filed their joint trial memorandum and motions *in limine*. In their omnibus motion *in limine*, Defendants renewed their argument that Plaintiffs' experts' opinions were "not reliable" and should have been excluded from trial. *See* Doc. 460 *and* Doc. 461 at 13–14. The Court denied this portion of Defendants' omnibus motion. Doc. 525 at 8. Defendants raised no challenges regarding the issues addressed in the instant motion. At trial, Mr. Minnich submitted into evidence his opinion that an educational campaign directed to plan participants to move funds out TIAA annuities would be "successful." Doc. 557-2 at 11–12; Trial Tr. at 325:6–326:19. Defendants cross-examined Mr. Minnich extensively regarding the bases for his opinions.

## II. Legal Standards

### A. Plaintiffs are entitled to the most profitable loss measure; it is Defendants' burden to disprove the claimed damages.

The seminal case regarding the proper measure of loss resulting from a breach of an ERISA fiduciary's duty is *Donovan v. Bierwirth*, 754 F.2d 1049 (2d Cir. 1985). An "appropriate remedy in cases of breach of fiduciary duty is the restoration of the trust beneficiaries to the position they would have occupied but for the breach of trust." *Id.* at 1056 (citing Restatement (2d) of Trusts § 205(c) (1959)). Given the established principle that uncertainties in fixing damages will be resolved against the wrongdoer, the beneficiaries are entitled to a presumption that the assets would have been invested "'in the most profitable' prudent fashion, and '[t]he burden of proving that the funds would have earned less than that amount is on the fiduciaries found to be in breach of their duty.'" *Sacerdote v. N.Y. Univ.*, 9 F.4th 95, 113 n.68 (2d Cir. 2021) (quoting *Bierwirth*, 754 F.2d at 1056). Thus, once Plaintiffs show that Defendants' breach caused the Plan to lose money compared to what it "would have earned" in a plausible alternative strategy, "the burden under ERISA shifts to the defendants to disprove any portion of potential damages." *Sacerdote*, 9 F.4th at 113 (citing *Bierwirth*, 754 F.2d at 1056).

Moreover, the very nature of an investment-loss computation "is of necessity somewhat arbitrary." *Bierwirth*, 754 F.2d at 1058. "Without the benefit of hindsight, it is indeed difficult to know" what would have occurred if Defendants had complied with their fiduciary obligations. *Id.* Thus, when the wrong "is of such a nature as to preclude the ascertainment of the amount of damages with certainty,

4

while the damages may not be determined by mere speculation or guess, it will be enough if the evidence show[s] the extent of the damages as a matter of just and reasonable inference, although the result be only approximate." *Anderson Grp., LLC v. City of Saratoga Springs*, 805 F.3d 34, 53 (2d Cir. 2015) (quoting *Story Parchment Co. v. Paterson Parchment Paper Co.*, 282 U.S. 555, 563 (1931)). The plaintiff need only provide the jury with "some relevant data" from which it "can make a reasonable estimated calculation of the harm suffered." *New York v. Julius Nasso Concrete Corp.*, 202 F.3d 82, 89 (2d Cir. 2000). To hold otherwise "'would be a perversion of fundamental principles of justice [and would] deny all relief to the injured person, and thereby relieve the wrongdoer from making any amend for his acts.'" *Id.* (quoting *New York v. Hendrickson Bros.*, 840 F.2d 1065, 1077 (2d Cir. 1988), in turn quoting *Story Parchment*, 282 U.S. at 563).

### B. Experts are permitted to rely on reasonable assumptions but must refrain from rendering "common sense" opinions.

"Although expert testimony should be excluded if it is speculative or conjectural, or if it is based on assumptions that *are so unrealistic and contradictory* as to suggest bad faith . . ., other contentions that the assumptions are unfounded go to the weight, not the admissibility, of the testimony." *Boucher v. United States Suzuki Motor Corp.*, 73 F.3d 18, 21 (2d Cir. 1996) (emphasis added, internal quotation marks and citations omitted). Thus, opinions based on realistic assumptions that are uncontradicted by the record are permissible. In formulating a damages opinion in an ERISA case, an expert may properly rely on reasonable assumptions adopted from another expert's report. *L.I. Head Start Child Dev. Servs.*

5

*v. Econ. Opportunity Comm'n of Nassau Cty., Inc.*, 820 F. Supp. 2d 410, 418 (E.D.N.Y. 2011) ("[T]he Court finds that Macaluso properly utilized some of the assumptions contained in the Sedgwick Report. He had a right to adopt the Sedgwick assumptions . . . in his determination of the amount of necessary contributions to adequately fund the Plan.").

Because expert testimony must be based upon "matters within the witness' scientific, technical, or specialized knowledge," opinions on "lay matters which a jury is capable of understanding and deciding without the expert's help" are neither necessary nor permissible. *Andrews v. Metro N. C. R. Co.*, 882 F.2d 705, 708 (2d Cir. 1989). "Testimony is properly characterized as 'expert' only if it concerns matters that the average juror is not capable of understanding on his or her own." *United States v. Mejia*, 545 F.3d 179, 194 (2d Cir. 2008). Therefore, it is error to allow expert testimony that "mirrors the testimony offered by fact witnesses" or testimony on a subject matter that "is not beyond the ken of the average juror." *Id.* (citing *United States v. Amuso*, 21 F.3d 1251, 1263 (2d Cir. 1994)). For instance, an "expert" opinion "that all else being equal, an employee would prefer the higher paying of two similar jobs, is a matter of common sense," which is "the antithesis of expert knowledge" and not helpful to a jury. *Chalmers v. City of N.Y.*, No. 20-3389, 2022 U.S. Dist. LEXIS 169111, at *25 (S.D.N.Y. Sept. 19, 2022) (quoting *Betances v. Fischer*, No. 11-3200, 2021 U.S. Dist. LEXIS 77310, at *10 (S.D.N.Y. Feb. 23, 2021)).

6

### III. Argument

#### A. Defendants' motion is untimely and repetitive.

The untimely and repetitive nature of Defendants' motion is reason alone to deny it. The current motion is no less than a *third* attempt to exclude Dr. Buetow's testimony. As the Court observed in rejecting the second attempt, Defendants' motion *in limine* regarding investment alternatives was "in substance a motion for reconsideration and one which would not be granted even if the court were to grant the Defendants leave to file it" after the deadline for such motions. Doc. 531 at 3. The current motion is yet another attempt "to plug gaps" in the first two motions and to present a third alternative argument that was available at the time of the previous motions. *Id.* (quoting *SPGGC, Inc. v. Blumenthal*, 408 F. Supp. 2d 87, 91 (D. Conn. 2006)).

Defendants have been fully aware of the basis for Dr. Buetow's variable annuity damages opinions since he issued his initial report in August 2019. *See* Pls.' Trial Exhibit 549 (100% TIAA calculations from August 19, 2019); Pls.' Trial Ex. 550 (60% TIAA calculations from August 18, 2019); Pls.'s Trial Ex. 552 (80% TIAA calculations from August 19, 2019). Defendants have also been fully aware since 2019 that neither Mr. Minnich nor Ms. Dominguez opined as to a specific percentage that would transfer. *See* Doc. 283-07 (Aug. 19, 2019 Expert Report of T. Minnich) at ¶¶ 80–82; Mot. at 3 (citing similar testimony from Ms. Dominguez).

Having failed to raise the issue for over three years, waiting until 2:00 a.m. on the day the witness is scheduled to take the stand is far too late. *See L.I. Head Start*, 820 F. Supp. 2d at 416 ("declin[ing] to reopen what has been decided" and

7

rejecting repeated challenge to ERISA damages opinions); *see also* D. Conn. L. Civ. R. 7(C)(1) ("Motions for reconsideration shall not be routinely filed and shall satisfy" a "strict standard"; such motions "will generally be denied unless the movant can point to controlling decisions or data that the court overlooked in the initial decision or order" and such motions "shall be filed . . . within seven (7) days of the filing of the decision or order[.]").

      **B.**     **Defendants' untimely objections are meritless.**

Dr. Buetow's opinions are fully consistent with the proper measure of loss under ERISA and based on reasonable assumptions. Defendants contend that Dr. Buetow's calculations—which provide a range of three possible outcomes that would have occurred "but for" Defendants' breaches of duty (*i.e.*, 60%, 80%, or 100% of participant assets would have exited the imprudent investments)—depend on impermissible speculation as to what "portion of assets . . . would have moved from frozen annuities." Mot. at 5, 7–8. According to Defendants, for Dr. Buetow to render such an opinion, another of Plaintiffs' experts (Ms. Dominguez or Mr. Minnich) would have had to testify as to a "particular percentage" of participants that would have moved from frozen annuities. *Id.* at 2–4

Defendants have it backwards. For the jury to reach the question of damages, it will necessarily have concluded that Defendants breached their fiduciary duty by not removing or freezing the variable annuities. Dr. Buetow's calculations are based on a *reasonable* assumption that if Defendants had fulfilled their fiduciary duties by freezing variable annuities and robustly informing participants that those options posed a threat to their valuable retirement assets, most, if not all, participants

8

would have made the rational financial decision to heed their employer's warning and exit the imprudent funds. The burden of proving otherwise—that some number of participants would have made the irrational choice to continue investing in imprudent funds—is on the *Defendants* who have been "found to be in breach of their duty." *Bierwirth*, 754 F.2d at 1056.

Accordingly, Defendants' contention that it was incumbent on Plaintiffs to develop a factual record about the "percentage of assets" that would have been *moved out* of the variable annuities is the opposite of what the law requires—it is the *breaching fiduciary's* burden to prove the percentage of assets that would have *remained in* funds that have been adjudged imprudent. By providing a range of alternative possibilities regarding the percentage of assets that would have exited the imprudent funds, Dr. Buetow went above and beyond what the law and Rule 702 required. Defendants have no valid objection to the alternative 80% and 60% calculations (that *favor* their position).

Dr. Buetow's model is entirely consistent with Second Circuit law. Again, before the jury can determine what "losses to the plan" resulted from a particular breach, 29 U.S.C. § 1109(a), it would have already found that a breach occurred. Once a breach is found, determining whether the breach caused a loss is measured by comparing what the Plan "actually earned" with what it "would have earned" had Defendants frozen the annuities in 2010. *Sacerdote*, 9 F.4th at 112 (quoting *Bierwirth*, 754 F.2d at 1056). If even 1% of assets would have moved to a more profitable investment, the Plan suffered a "loss." *See Bierwirth*, 754 F.2d at 1056

9

("If the latter amount is greater than the former, the loss is the difference between the two; if the former is greater, no loss was sustained.").

In computing the amount of Plaintiffs' damages, which is an issue "distinct from, and subsequent to, whether they have shown a loss," *Sacerdote*, 9 F.4th at 112, Plaintiffs are presumptively entitled to the "most profitable" among equally plausible alternatives, *Bierwirth*, 754 F.2d at 1056. Dr. Buetow's 100% asset-movement calculation reflects this presumption to which Plaintiffs are entitled by law, and accurately reflects the position the Plan would have occupied "but for" the breach. *Bierwirth*, 754 F.2d at 1056.

Defendants had a fiduciary obligation to "'systematic[ally] conside[r] *all the investments of the trust* at regular intervals' to ensure that they are appropriate." *Tibble v. Edison Int'l*, 575 U.S. 523, 529 (2015) (emphasis added, quoting Bogert, *The Law of Trusts & Trustees* § 684 (3d ed. 2009)). Had Defendants fulfilled that duty, they would have concluded that the variable annuities could no longer "be prudently included in the plan's menu of options," *Hughes v. Northwestern Univ.*, 142 S. Ct. 737, 742 (2022). To the extent Defendants could not unilaterally transfer assets without participant consent, Doc. 526, a prudent fiduciary under the circumstances would have frozen the imprudent annuities to new investments and engaged in a "robust[]" education campaign. *See* Mot. at 3 (quoting Dominguez's testimony); Trial Tr. at 326:4–19 (Minnich testifying that educational campaigns to move participants from legacy contracts had been "successful"); Trial Tr.1031:21–1032:3 (Sutherland testifying that fiduciaries had engaged in education campaigns

10

to move assets from individual annuities, and it was not prohibited by the annuity contracts).

A prudent fiduciary under the circumstances would have engaged "one-on-one with each of the plan participants showing them old, new, and what their opportunity and what the advantages were, as well as a full explanation of the due diligence process that was conducted to make the move to a different provider." Trial Tr. at 326:4–13 (Minnich testifying). Had Defendants taken those actions of a prudent fiduciary, the most plausible outcome for any given participant is that the participant would have listened to Yale's warnings and made the rational decision to protect his or her retirement assets by exiting the imprudent annuity and moving to a prudent alternative. There is no reason to expect that a particular individual would have opted to remain in an imprudent fund.

Because mapping is the most plausible alternative for all participants across the board, the fact finder should presume that the funds would have been mapped, which is also the "most profitable" alternative. *See Bierwirth*, 754 F.2d at 1056. Dr. Buetow's 100% movement calculation complies with this standard. As the fiduciary in breach of its duty, it is Defendants' burden to show that some lesser amount of assets would have been transferred. *Id.*

Presuming 100% asset movement does not require "speculation"—it is simply common sense. Just as it "is a matter of common sense" that "an employee would prefer the higher paying of two similar jobs," *Chalmers*, 2022 U.S. Dist. LEXIS 169111, at *25, it is likewise common sense that an investor saving for retirement

11

would prefer a prudent option over an imprudent option. Therefore, it is questionable whether an opinion attempting to predict how many participants would have acted a certain way in a but-for universe is even a proper subject of expert testimony. The question of whether a retirement investor would listen to a plan fiduciary's warnings to exit an imprudent investment "is not beyond the ken of the average juror." *United States v. Mejia*, 545 F.3d 179, 194 (2d Cir. 2008). And because Defendants admit (at 3) that "the facts and circumstances of every situation are different," attempting to answer the question of how many participants in Yale's Plan would have exited the imprudent funds would "mirror[] the testimony offered by fact witnesses." *Id*.

      Of course, it is undoubtedly true, as it would be in any group comprising thousands of people, that a few contrarians might have stubbornly insisted on remaining invested in imprudent annuities despite Yale's warnings to move to a safer haven. But as the employer and fiduciaries of the Plan, Defendants are in a better position to quantify that segment of the population by taking a survey of Plan participants. Plaintiffs, who themselves are merely Plan participants with no authority over the Plan, have no ability to obtain that information. That is exactly why the Second Circuit puts the burden on the breaching fiduciary to *disprove* damages and resolves any doubts or ambiguities against the imprudent defendant: "it makes little sense to have the plaintiff hazard a guess as to what the fiduciary would have done had it not breached its duty in selecting investment vehicles, only to be told [to] guess again." *Sacerdote*, 9 F.4th at 113 (quoting *Brotherston v.*

12

*Putnam Invs., LLC*, 907 F.3d 17, 38 (1st Cir. 2018)). "It makes much more sense for the fiduciary to say what it claims it would have done and for the plaintiff to then respond to that." *Id.*

Accordingly, if Defendants wish to rebut the reasonable presumption that 100% of Plan participants would have made a rational financial decision to transfer their retirement savings away from imprudent annuities, it is Defendants' burden to come forward with that evidence. Defendants, however, have identified no evidence that *any* of the Plan's more than 20,000 participants would have opted to remain in an imprudent fund in these circumstances, and they cannot show that Dr. Buetow's opinions are "based on assumptions that are so unrealistic and contradictory as to suggest bad faith." *Cf. Boucher*, 73 F.3d at 21. Thus, Defendants' disputes as to whether 100% of participants would have truly transferred their funds go to weight, not admissibility.

To the extent Defendants may muster some factual evidence that some portion of Plan participants would have remained in frozen annuities despite robust warnings that the options were no longer prudent, Dr. Buetow's alternative 80% and 60% calculations properly account for that possibility. These alternative calculations, reflecting a reasonable range of possibilities, are entirely consistent with Second Circuit precedent holding that a competent damages model need only provide a basis for the jury to "make a reasonable estimated calculation of the harm suffered," *Julius Nasso*, 202 F.3d at 89, particularly when the nature of the breach

13

"preclude[s] the ascertainment of the amount of damages with certainty," *Anderson Grp.*, 805 F.3d at 53.

To the extent Defendants may cite statistics to the effect that defined-contribution plan participants in general rarely alter their investment choices, such evidence would be irrelevant here, for two reasons. First, studies regarding voluntary investment choices under normal circumstances are not informative because they do not purport to gauge participant behavior under the critical circumstance here, *i.e.*, fiduciaries freezing investment options and robustly warning participants that they should exit the funds. Second, Defendants could have, and a prudent fiduciary acting for the exclusive purpose of enhancing participants' retirement benefits would have, reversed the effect of inertia by structuring the education program such that participants would be deemed to have consented to exiting the frozen option *unless* the participant *affirmatively* opted in to remaining in the imprudent annuity. *See, e.g.*, *Dorman v. Charles Schwab Corp.*, 780 F. App'x 510, 512 (9th Cir. 2019) (holding that a plan participant implicitly consented to a plan amendment by continuing to participate after the amendment).

Defendants' cases, many from distant jurisdictions, do not support exclusion. Defendants mostly rely on out-of-context snippets but fail to show that any of the cases involve similar facts. In *Boucher*, an expert's lost-earnings calculation relied on speculative and "unrealistic assumptions regarding the plaintiff's future employment prospects" that were *contradicted* by the record. The expert assumed that the plaintiff "would work 40 hours per week, 52 weeks per year, with fringe

14

benefits and regular pay increases, for the rest of his career," even though before the accident, the plaintiff's "sporadic employment had yielded fluctuating low levels of income, with long spells of no income whatsoever," and "few fringe benefits, if any." *Boucher*, 73 F.3d at 21–22. Similarly, an expert's opinion that a product defect caused a fire was excluded as speculative in part because it was contradicted by the expert's own testing which showed that the product "worked perfectly well." *ACE Am. Ins. Co. v. Eaton Elec., Inc.*, No. 3:11-cv-1741 (CSH), 2015 U.S. Dist. LEXIS 5262, at *32–34 (D. Conn. Jan. 16, 2015). Here, Defendants have no contradictory evidence of how participants would have reacted if Defendants had fulfilled their fiduciary obligation to freeze annuities and warn participants to exit the funds, precisely because Defendants failed to take those prudent actions.

*Puskarich* is also inapposite. There, the court struck "the category of future medical costs from Plaintiff's proposed verdict form" based on Tenth Circuit precedent requiring proof of the reasonable value of future medical expenses. *Puskarich v. BNSF Ry. Co.*, No. 19-150, 2022 U.S. Dist. LEXIS 181986, at *18 (D. Wyo. Aug. 31, 2022). Because testimony regarding the value of those costs was not elicited from one expert, there was no basis for another expert to provide an opinion predicated on the first expert's testimony. *Id.* at *18–19. Here, Dr. Buetow has provided a reasonable estimated calculation of the Plan's losses based on the comparative performance of the Plan's annuities and prudent alternatives during the relevant period. His calculations of what the damages would be if 60%, 80%, or 100% of assets had moved from the frozen annuities to the replacement funds is not

15

predicated on another expert's speculative prediction about asset movement. To the extent Defendants dispute Dr. Buetow's calculations, that is a matter for cross-examination. *Boucher*, 73 F.3d at 21. It is their burden to show that some lower amount of assets would have moved, and that the damages would have been less. *Bierwirth*, 754 F.2d at 1056.

Defendants' assertion that Dr. Buetow's "opinions would be immune from effective cross-examination" should be rejected. Defendants were able to address the basis for Dr. Buetow's 60%–100% figures by confronting him with evidence that a lower amount of assets would have moved. They also had the opportunity to cross-examine Ms. Dominguez and Mr. Minnich regarding their opinions about participant education campaigns. Defendants' failure to develop that evidence is theirs alone.

Finally, Defendants' argument that they are somehow immune from liability for their fiduciary breaches because the investments were in individual annuity contracts that cannot be mapped should be rejected. An ERISA fiduciary "has a continuing duty to monitor trust investments and *remove imprudent ones*." *Tibble*, 575 U.S. at 529 (emphasis added). Even when an investment lineup includes individual annuity contracts, a fiduciary must remove an imprudent investment within a "reasonable" amount of time. *Hughes*, 142 S. Ct. at 742. "[T]rust documents cannot excuse trustees from their duties under ERISA." *Fifth Third Bancorp v. Dudenhoeffer*, 573 U.S. 409, 422 (2014).

Defendants had an obligation to remove the TIAA-CREF variability annuities if they were imprudent. They cannot absolve themselves from their fiduciary duties by offering investments that contract away those duties and prevent them from transferring the assets. Under the law, Defendants are responsible for 100% of the losses that resulted from their decision to retain imprudent investment options in the Plan. Accordingly, the jury should be allowed to consider Dr. Buetow's 100% damages calculation for that reason alone.

## CONCLUSION

The Court should deny Defendants' Motion.

June 18, 2023                                                                 Respectfully submitted,

                                                                                           */s/ Nathan D. Stump*
                                                                                            Schlichter Bogard & Denton LLP
                                                                                            Nathan D. Stump (phv206992)
                                                                                            Joel D. Rohlf (phv09849)
                                                                                            Alexander L. Braitberg (phv09929)
                                                                                            100 South Fourth Street, Suite 1200

Ari J. Hoffman (ct22516)                    St. Louis, Missouri 63102
Cohen and Wolf, P.C.                       (314) 621-6115, (314) 621-7151 (fax)
1115 Broad Street                             nstump@uselaws.com
Bridgeport, CT 06604                       jrohlf@uselaws.com
Telephone: (203) 368-0211              abraitberg@uselaws.com
Facsimile: (203) 337-5505
arihoffman@cohenandwolf.com         Attorneys for Plaintiffs