IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

| | |
|---|---|
| JOSEPH VELLALI *et al.*, <br><br> *Plaintiffs*, <br><br> v. <br><br> YALE UNIVERSITY *et al.*, <br><br> *Defendants*. | Civil Action No. 3:16-cv-01345-AWT <br><br> Hon. Alvin W. Thompson |

**DEFENDANTS' REPLY IN SUPPORT OF THEIR MOTION TO PRECLUDE GERALD BUETOW FROM OFFERING OPINIONS ABOUT VARIABLE ANNUITY DAMAGES**

Plaintiffs' Opposition commits a series of legal and factual errors, confirming that Defendants' motion should be granted.

***First***, Plaintiffs make no serious effort to defend the factual assumptions that underlie Buetow's opinions. What is more, those efforts impermissibly rely on information *outside* the trial record. As Plaintiffs do not contest, however, what matters now is the trial record, and that record provides no support for Buetow's work. The Court need not and should not go any further in resolving Defendants' motion.

***Second***, Plaintiffs conflate the process for mutual funds, which can be unilaterally mapped by a plan, with the TIAA variable annuities, which cannot. Unlike mutual funds, participants must affirmatively choose to remove assets from variable annuities, even if those annuities are closed to new investment by Plan fiduciaries. This infects Buetow's damages calculation in two fundamental respects. Buetow assumes based upon numbers fed to him by Plaintiffs' counsel that plan participants would ***choose*** to remove between 60-100% of their assets from the variable annuities. Buetow also assumes that such choices would be made within 30 days of the choice to freeze assets. There is no evidence in the trial record supporting either of these assumptions. And

-1-

without such evidence, Buetow's opinions are of no value to the jury; they merely invite impermissible speculation.

**Third**, Plaintiffs focus much of their briefing on questions that have nothing to do with this motion. As this Court previously held, the requirement that expert opinion be "sufficiently tied to the facts of the case" is a necessary "aspect of relevancy" – the question is whether the opinion will "aid the jury in resolving a factual dispute." Dkt. 409 (internal quotations omitted). Because expert opinion must be tied to the facts, "[t]he admission of expert testimony based on speculative assumptions is an abuse of discretion." *Id*. Rather than tie Buetow's opinions to the facts, Plaintiffs attempt to create an ERISA exception, claiming that **Defendants** must show that Plaintiffs' arbitrary assumptions are incorrect. But the question in this motion is whether Buetow's opinions are admissible under the Federal Rules of Evidence. It is not whether Plaintiffs are entitled to damages absent Buetow's opinions.

## I. Plaintiffs ignore the trial-specific nature of this motion.

As the Court explained at the outset of trial, its previous rulings about experts were "with respect to reports, not with respect to testimony at trial. And that's different." Tr. 5:23-24. Ignoring this guidance, Plaintiffs complain Defendants' motion is an improper motion for reconsideration. Dtk. 559 at 7-8. But as Defendants' motion makes clear, the objection to Buetow's testimony about the variable annuities is predicated on the *trial record*. Dkt. 557 at 6 (collecting cases). Defendants could not have raised this objection before Buetow testified, because the trial record was still being developed until Buetow was called to the stand.

The Opposition relies upon pre-trial evidence to conceal the lack of foundation at trial for Buetow's 60-100% hypothetical scenarios. Before trial, there was evidence that Dominguez and Minnich would offer testimony that (a) Yale was obligated to conduct an educational campaign

...

and that if it had, (b) a "majority" of active Plan participants would choose to move their assets from the frozen variable annuities within a month. And, indeed, Defendants anticipated that Buetow would testify that he relied on such opinions in proffering his damage calculations. Had that testimony been offered, there would have been an arguable factual predicate upon which Plaintiffs could rest their hypotheticals. However, Defendants would also have been able to cross-examine Minnich and Dominguez, showing that those opinions were false and contradicted by both experts' out-of-litigation experience.[1]

Neither Minnich nor Dominguez offered testimony regarding how many Yale plan participants would choose to move assets from variable annuities, or how quickly. As such, Defendants could not cross-examine them on this point. In the absence of such testimony, the hypothetical scenarios posed by Plaintiffs are an attempt to back-door otherwise flimsy expert opinion and, thus, avoid scrutiny of those opinions. *See Daubert v. Merrell Dow Pharm., Inc.,* 509 U.S. 579, 596 (1993) ("Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence.").

When he was cross-examined at trial outside the presence of the jury, Buetow changed course and stated that the 60-80-100 scenarios laid out in his reports were given to him by Plaintiffs' counsel, not by other experts. Tr. 2344:21-2345:4. That does not change the analysis.

---

[1] Plaintiffs' suggestion that Defendants had "the opportunity to cross-examine Dominguez and Minnich regarding their opinions about participant education campaigns" is unavailing. To do so, Defendants would have had to elicit the incorrect opinion on cross-examination solely to rebut it, which would be extraordinarily unfair. Their claim that Defendants could have "address[ed] the basis for Buetow's 60%-100% figures" is similarly baseless in light of Buetow's concession that this was an attorney-created hypothetical. *See* Tr. 9:14-20 (Court noting that when evidence to support expert's assumptions "hasn't come in, then the defense doesn't have the opportunity" to "show or attempt to show that the evidence the expert is relying on is nowhere near as supportive of the witness's conclusion as the witness was trying to tell the jury it is").

Attorneys may ask their experts to make certain assumptions—but by the time those experts testify at trial, the record must contain evidence sufficient to lay a foundation for those assumptions. Dkt. 557 at 6. As Plaintiffs do not seriously dispute, the record here does not.[2]

The net effect is that if Buetow's opinions on the variable annuities are admitted, the jury will have to consider those opinions without the information necessary to rationally conclude that his opinions are anything more than rank speculation. This is not permissible. *See, e.g., Trademark Research Corp. v. Maxwell Online, Inc.*, 995 F.2d 326, 338 (2d Cir. 1993) (affirming trial court decision precluding expert testimony that verges on an area outside his expertise as it would "confuse the jury and invite speculation"); *Pacific Life Ins. Co. v. Bank of New York Mellon*, 2021 WL 673479, at *20 (S.D.N.Y. Feb. 22, 2021) (precluding expert opinion evidence that "gives the jury no guidance and invites wild speculation"); *Sec. and Exch. Comm. v. Lek Sec. Corp.*, 370 F. Supp. 3d 384, 412 (S.D.N.Y. 2019) (excluding expert testimony that "improperly invites the jury to speculate"). Since there is no record evidence supporting Buetow's assumption that at least 60% of these assets would have moved within a month of freezing, his introduction of this evidence is an express invitation to jury speculation.

## II. Plaintiffs disregard the fundamental distinction between mutual funds and annuities.

Both Buetow's testimony and the Opposition disregard the fundamental distinction between the 18 mutual funds at issue in this case and the 4 variable annuities – ***participant choice***.

---

[2] Plaintiffs assert that "the essential testimony at issue—Mr. Minnich's opinion that an educational campaign directed to plan participants in order to move funds out of TIAA annuities would be 'successful'—was presented at trial." Dkt. 559 at 2. They do not even assert, much less show, that any of Dominguez's opinions that Buetow relied on for these assumptions were presented at trial. As for Minnich, that testimony is not specific to Yale, and provides no basis for Buetow's assumption that at least 60% of assets would move in a single month. In addition, claiming that campaigns were "successful" according to customer "satisfaction surveys," Tr. 326:14-19, is a far cry from the specific quantitative threshold—a majority of assets held by active participants—presented in Minnich's report. Dkt. 283-7 at ¶ 82.

It is undisputed that a sponsor who wishes to eliminate a mutual fund from its lineup can take existing investments in that fund and move—or "map"—it to a new investment. For that reason, Dominguez expressly identified each of those 18 funds as a mutual fund at trial and indicated that her opinion would be to move assets out of them to her chosen alternatives. Furthermore, because only the plan sponsor's conduct is at issue, it is at least possible that this mapping could be done within 30 days—such that if the decision to freeze assets were made on September 1, 2010, the assets may have been mapped by September 30, 2010. This is why Yale has not moved to preclude Buetow's testimony as to the 18 mutual funds – his damage calculations for those funds do not need to account for participant choice.

TIAA's *variable annuities* are fundamentally different. The undisputed record evidence, including from Plaintiffs' own experts, is as follows:

- Dominguez testified that in her experience, she had "froze[n] all the annuities and variable annuities," not mapped them. Tr. 206:1-6. Dominguez was clear why she advised freezing: that was her recommendation for investments which "***can't be moved by the plan sponsor***." Tr. 146:21-24. As she put it, "it's not as simple as demanding that the assets that were in it move to a new option. It has to be frozen…and then new contributions can start in a—in a better investment." Tr. 282:14-23.

- Minnich testified regarding educational campaigns designed to get participants to move their assets – which are only necessary because the Plan cannot take unilateral action to move assets. Tr. 326:4-19. As he put it, "the retirement annuity contracts…they're individual contracts. And you can't move those contracts, per TIAA's view, at the plan level. So when you heard from the investment side, mapping, ***you can't map those assets at the plan level***." Tr. 325:15-23. Instead, he explained, it is "a participant's decision to move those assets if they so choose, to the new contract." Trial Tr. 325:24-25.

- Ms. Sutherland, a retired TIAA employee, explained that "[o]nce the money is in the individual legacy contracts [the variable annuities at issue in this motion], only the participant has rights to touch that money. Plan sponsor does not have any rights to go in there." Tr. 1061:7-12.

This fundamental distinction was recognized in both of this Court's pretrial decisions on mapping-related MILs. *See* Dkt. 526; Dkt. 534. For example, the Court granted Defendants'

Motion "precluding Plaintiffs from arguing that Yale was imprudent by not unilaterally transferring assets invested in the legacy versions of the TIAA Traditional annuities to different investment options." Dkt. 526 at 1. At the same time, the Court denied Plaintiffs' motion to exclude evidence regarding whether legacy TIAA annuities could be mapped, ruling that "[t]he Plan documents do not unambiguously give the defendants the authority to remove any investment option and transfer the funds invested in it to a different option." Dkt. 534 at 2. The Court cited favorably the pre-trial evidence that Plaintiffs' own experts could not identify any instance of unilateral mapping of legacy[3] annuity contracts by a plan sponsor. Dkt. 526 at 2. The Court rejected Plaintiffs' arguments that the contracts themselves permitted mapping. *Id.* at 2-3; *see also* Dkt. 534 at 3-4 (rejecting same arguments in context of variable annuities). As a result "the plaintiffs have failed to show that they have a basis for arguing, or attempting to introduce evidence in support of an argument, that the defendants were imprudent by not unilaterally transferring assets invested in the legacy version of the TIAA Traditional annuities to different investment options." Dkt. 526 at 3.

Just as Defendants could not unilaterally transfer TIAA Traditional annuities based upon the structure of the contracts directly between TIAA and the plan participants, Defendants could not unilaterally transfer TIAA variable annuities either. *See* Dkt. 534 at 4-5 (rejecting Plaintiffs' arguments under contract language and ERISA because that authority "does not address any authority of a plan sponsor to remove an investment option governed by a contract to which the plan sponsor is not a party and unilaterally transfer the funds").

---

[3] Once frozen, the variable annuities would become "legacy" annuity accounts.

### A. Yale cannot unilaterally transfer assets from the variable annuities.

Buetow's three damages calculations are predicated on three different assumptions about the movement of existing assets out of the variable annuities—either 100%, 80%, or 60% of the assets move. Buetow testified at trial that the first scenario, in which 100% of assets would move, was predicated upon the assumption that once the annuities are frozen, Defendants could choose to move assets from the now "legacy" accounts absent participant choice. Tr. 2344:16-20. But as explained above, the record (and this Court's prior orders) are clear that this assumption is wrong. Thus, there is no basis for presenting the 100% scenario to the jury.

### B. Expert testimony is required on likely movement of variable annuity assets.

Given that the undisputed record evidence is that Yale cannot unilaterally transfer plan assets, the underlying necessary factual predicate for Buetow's damages calculation is the percentage of plan participants who would choose to transfer assets. Despite Plaintiffs' assertions to the contrary, Dkt. 559 at 2, the extent to which thousands of individual plan participants would each decide to move the entirety of their retirement savings from these highly-popular investments is an issue that requires expert testimony.[4]

As the Second Circuit has recognized, "in complex cases involving the securities industry"—which an ERISA case about the prudent evaluation of mutual funds and variable annuities surely is—"expert testimony may help a jury understand unfamiliar terms and concepts." *United States v. Bilzerian*, 926 F.2d 1285, 1294 (2d Cir. 1991). In these complex cases, experts

---

[4] It is not entirely clear from Plaintiffs' opposition whether they think expert testimony is permitted on this question. *Compare* Dkt. 559 at 2 (claiming that the "essential testimony at issue" from Plaintiffs' expert Ty Minnich regarding how assets would move "was presented at trial") *with id.* at 12 (calling it "questionable" whether expert testimony "attempting to predict how many participants would have acted in a certain way in a but-for universe" is admissible because the issue is "not beyond the ken of the average juror") (quoting *United States v. Mejia*, 545 F.3d 179, 194 (2d Cir. 2008)). As explained in this brief, expert testimony on this issue is admissible, and Plaintiffs do not have it.

must opine on whether investors would find particular information material, meaning it likely would have altered their decision-making. *See, e.g.*, *United States v. Litvak*, 808 F.3d 160, 185 (2d Cir. 2015) (reversing exclusion of expert evidence "that minor price variances would not have mattered to sophisticated investors"); *S.E.C. v. ITT Educ. Servs., Inc.*, 311 F. Supp. 3d 977, 995 (S.D. Ind. 2018) (permitting expert testimony on "whether information that Defendants did not disclose (which is a factual question) would have been the type of information investors would have wanted to know").

Nor is there any suggestion that, if Plaintiffs had looked for relevant data about the historical flow of assets from frozen annuities, they would have been unable to find it. Buetow himself testified that if Plaintiffs' counsel had asked he would have done research and that empirical evidence on this issue may be available – he simply has not looked:

> Q. But you testified at your deposition that if you had been asked to opine on that, you would do research and you would cite literature that was available. Do you recall testifying to that?
>
> A. No, but that seems logical.
>
> Q. You don't have that number, that success, how successful [a campaign to educate participants into leaving the variable annuities] will be. You don't have that number available, correct?
>
> A. Correct.
>
> Q. You don't know if there even is a number available, correct?
>
> A. No. I don't know if there is or not. I would imagine there is some empirical evidence, but I don't know what it is.

Trial Tr. 2338:9-24.  If even Buetow – a serial expert in the area of retirement plans – needs additional research to determine the percentage of plan participants who would choose to remove funds from the TIAA variable annuities, it is improper to expect a lay jury to perform that same analysis.

## C. The factual record does not support Buetow's assumptions.

The evidence before the jury does not support any of Buetow's 60%, 80%, or 100% assumptions—instead, it shows that most assets would be kept in the TIAA variable annuities. Rather than confront this evidence, Plaintiffs' hand-wave away any requirement for factual support of Buetow's opinions – instead "*[p]resuming* 100% asset movement" as "simpl[e] common sense." Dkt. 559 at 11. Far from being "common sense," this assertion is directly contradicted by the evidence in this litigation. In fact, Plaintiffs' educational campaign expert does not even endorse their view, as he was willing to say before trial only that a "majority" of assets from active participants would move—and unwilling to go even that far at trial.

And as the testimony has shown, there are an abundance of reasons why plan participants might choose to maintain their investment in CREF Stock even after it is frozen. First, some participants, like Dr. Salovey, disagree with Plaintiffs' assessment of the funds, finding that the diversification provided by CREF Stock's foreign component (or its low fees when compared to a peer group) gave them value that justified losing a few basis points of absolute return. Tr. 2021:7-19.

Second, while Dominguez may not like variable annuities, the undisputed evidence at trial is that such annuities were overwhelmingly popular with plan participants. *E.g.* Tr. 681:8-21 (Penney); Tr. 1389:23-1390:20 (Peel); 1991:23-1992:13 (Salovey). Similarly, there is evidence that participants who intended to annuitize in the future valued the long-term stability of TIAA, one of the most respected and safe insurance companies in the world. Tr. 1092:11-20 (Penney); 1328:13-1329:3. Indeed, one of the named plaintiffs chose to keep assets within the CREF stock variable annuity *despite* having brought suit claiming such investment is imprudent. Tr. 2342:18-2343:20 (discussing Taschner deposition); *cf. Ramos v. Banner Health*, 461 F. Supp. 3d 1067, 1090 (D. Colo. 2020) (rejecting Buetow's damages opinions in another fiduciary duty case because

participants actively sought out the challenged options after they were eliminated, meaning Buetow "fail[ed] to account for the personal preference of Plan Participants.").

> D. **Plaintiffs bear the burden of establishing support for their expert's testimony.**

Lacking record support for Buetow's assumptions, Plaintiffs attempt to flip the script—arguing that it is Defendants' obligation to disprove their expert's speculative assumptions rather than their own obligation to provide a factual predicate. They are mistaken.

There is no ERISA exception to the Federal Rules of Evidence, which apply to all "civil cases and proceedings" in federal district court. Fed. R. Evid. 1101(b). And it is hornbook law that "the proponent of expert testimony 'has the burden of establishing by a preponderance of the evidence that the admissibility requirements of [FRE] 702 are satisfied.'" *Morgan v. Dep't of Motor Vehicles*, 2020 WL 1322834, at *7 (D. Conn. March 20, 2020) (quoting *United States v. Williams*, 506 F.3d 151, 160 (2d Cir. 2007); *Frederick v. Deco Salon Furniture Co.*, 2018 WL 2750319, at *2 (D. Conn. March 27, 2018) (same); *Perkins v. Origin Medsystems, Inc.*, 299 F. Supp. 2d 45, 52 (D. Conn. 2004). That includes establishing "an adequate factual basis for the expert opinion." *Morgan*, 2020 WL 1322834, at *7; *see also Perkins*, 299 F. Supp. 2d at 52 (noting that court must "determine 'whether the proffered testimony has a sufficiently reliable foundation to permit it to be considered' by the trier of fact") (quoting *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 265 (2d Cir. 2002)). Plaintiffs, as the ones proffering Buetow as an expert, were responsible for laying adequate foundation for his testimony. Because they failed to do so, Buetow's opinions with inadequate basis in the record are inadmissible.[5]

---

[5] If Plaintiffs were right that their expert need not have a basis in the record for his damages number, there would be no reason to stop at Buetow's outrageous figures. Why not have Plaintiffs' expert opine that participants would have moved, not to Dominguez's chosen fund, but to the single highest-performing fund on the market, creating damages of billions of dollars? The reason that opinion is impermissible is that a damages expert's opinion must be tethered to reality: There

**III. Plaintiffs' burden shifting arguments are irrelevant and incorrect.**

Plaintiffs spill much ink regarding the underlying substantive standard for their claims. But their critical concessions establish that Buetow's frozen variable annuity opinions would be inadmissible even if the law worked as they claimed. And while the Court need not reach the issue to decide *this* motion, it bears mention that Plaintiffs' view of that framework is incorrect, too.

**A.   Buetow's testimony is inadmissible even under Plaintiffs' theory of ERISA.**

Plaintiffs concede that they bear the burden of proving that "Defendants' breach caused the plan to lose money compared to what it 'would have earned' in a plausible alternative strategy." Dkt. 599 at 4 (claiming burden shifts "once Plaintiffs show" this element) (quoting *Sacerdote v. N.Y. Univ.*, 9 F. 4th 95, 113 n. 68 (2d Cir. 2021)). That is because, as Plaintiffs explain, if the amount "the Plan actually earned" was "greater" than "what the Plan would have earned had the funds been available for other Plan purposes," then "***no loss was sustained***." Dkt. 599 at 9-10 (quoting *Donovan v. Bierwirth*, 754 F.2d 1049, 1056 (2d Cir. 1985)) (emphasis added). Courts have repeatedly recognized that establishing fact of loss in an ERISA case requires expert testimony. *Munro v. Univ. S. Cal.*, 2023 WL 2558415, at *2 (C.D. Cal. Jan. 19, 2023) ("Moreover, the computation of Plan losses would likely involve the application of "mathematical, accounting, and interest principles to calculate [Plaintiffs'] damages" and thus require "testimony [that] falls squarely within Rule 702") (citation omitted); *Cunningham v. Cornell*, 2019 WL 4735876, at *17 (S.D.N.Y. Sept. 27, 2019) ("Nor is the determination of whether there was a fact of loss 'simple arithmetic' not requiring expert testimony.").

Here, that expert testimony comes from Buetow. Buetow's calculations are relevant to establishing whether Defendants' alleged breach caused loss – and in fact, Buetow's calculations

---

must be record evidence making it plausible to assume that the proffered alternative would be selected, and that doing so would have left the plan better off.

show that the plan suffered *no* loss unless one also adopts his unsupported assumption that 60-100% of variable annuity assets would have moved in a month after freezing.

That fact became clear when, in the midst of trial, Plaintiffs sought to fundamentally change Buetow's damages methodology because applying it to scenarios in which only 20 or 40 percent of assets are removed from the TIAA variable annuities results in negative damages—and therefore establishes that no loss was sustained by the Plan. Tr. 2324:19-24 (if Buetow "had used the original formula with his new 20 percent and 40 percent scenarios, it would have resulted in a negative damages number."). In fact, Plaintiffs' counsel **conceded** that "the methodology had to change in order to present [the 20% and 40% scenarios] …You have to adjust it to make it work. If you have negative numbers that propagate through [it] results in an invalid methodology." Tr. 2326:3-15.[6]

That is a binding admission regarding the fact that unless some threshold amount of assets would have moved, Buetow's model returns negative damages. *See, e.g.*, *Kregler v. City of New York*, 821 F. Supp. 2d 651, 656 (S.D.N.Y. 2011) (collecting cases and noting that "a clear and unambiguous admission of fact" will "bind the client"); *Gen. Ins. Co. of America v. Mezzacappa Bros., Inc.*, 2003 WL 22244964, at *5 (E.D.N.Y. Oct. 1, 2003) (collecting cases and noting that "[s]tatements made by an attorney during oral argument thus constitute binding judicial admissions"); *see also McCaskill v. SCI Management Corp.*, 298 F.3d 677, 680 (7th Cir. 2002)

---

[6] The reason for this result is that Buetow's analysis relies heavily on his imputed flow calculations, which are, for the variable annuities, "a negative number." Tr. 2325:17-19. Thus, if there was not enough asset movement in the first month to offset those imputed flows, Buetow's spreadsheet would return a negative number. And despite testifying before the jury that it was important to keep imputed cash flows the *same* "to try and take the actions of the Plan participant into consideration," Tr. 2173:23-2174:3, Buetow's new calculations applied "a pro rata approach" to the imputed flows. Tr. 2324:5-13. As a result, his new methodology would have yielded *higher* damages for the 60% and 80% scenarios than his original methodology. Tr. 2325:12-19.

(explaining that "[t]he verbal admission by [Defendant's] counsel at oral argument is a binding judicial admission, the same as any other formal concession made during the course of proceedings").

Thus, Plaintiffs have ***not*** established loss to the plan "[i]f even 1% of assets would have moved," because their own expert calculates negative damages at the 20% and 40% levels. Dkt. 599 at 9. Instead, their proof of the fact of loss requires showing that Buetow's threshold asset movement level would have been reached within a month after Yale froze the at-issue annuities on September 1, 2010. Accordingly, it is *their* burden to make that showing, and their failure to do so is sufficient basis to exclude Buetow's testimony.

### B. Plaintiffs misstate the law of ERISA.

Although it is not necessary to deciding this motion, Plaintiffs' reading of ERISA's substantive requirements is also incorrect.

First, Plaintiffs ignore the limited nature of the assumption they are permitted to make regarding damages. According to Plaintiffs, they need not guess "what *the fiduciary* would have done had it not breached its duty in selecting investment vehicles," and can presume *the fiduciary* would have made the best-performing investment. Dkt. 599 at 12 (quoting *Sacerdote*, 9 F.4th at 113) (emphasis added). Even if that were relevant to the admissibility of expert testimony, however, the question here is not what *the fiduciary* would have done. For Buetow's calculations to work, he needs an assumption about what plan participants would have done after the variable annuities had been frozen. Much as a fiduciary is better-placed than a plaintiff to establish what *it* would have done in the but-for world, plaintiffs have more basis than fiduciaries to establish what they "claim[]" they "would have done" in that world. *Sacerdote*, 9 F.4th at 113.

Second, Plaintiffs ignore that their cases—which address facts unrelated to frozen variable annuities—limit the assumption of most-profitable-investment to funds which are "available for

other Plan purposes." *Sacerdote*, 9 F.4th at 112 (quoting *Donovan v. Bierwirth*, 754 F.2d 1049, 1056 (2d Cir. 1985)). But if funds are kept by Plan participants in frozen annuities, then they cannot be deemed "available" to the fiduciary for re-investment. That is yet another reason why Plaintiffs cannot simply wave away their failure to present evidence regarding the percentage of funds which would have moved out of the frozen annuities.[7]

## CONCLUSION

The Court should grant Defendants' motion to preclude Buetow's variable annuity damages opinions.

---

[7] Plaintiffs complain that it would be contrary to ERISA's policies if they cannot recover damages based on frozen funds. That argument ignores the balance Congress struck in the statute, which includes a six-year "statute of repose." *Browe v. CTC Corp.*, 15 F.4th 175, 190 (2d Cir. 2021) (citing 29 U.S.C. § 1113(1)). Even if Defendants had moved to mappable contracts on the stroke of September 1, 2010, the Plan's preexisting assets would have remained in legacy contracts entered into during prior decades. Regardless, this is another argument based on the substantive law, which is entirely distinct from the evidentiary grounds for Defendants' motion.

Dated: June 19, 2023

   /s/ *Robyn E. Gallagher*
Robyn E. Gallagher (ct29596)
WIGGIN AND DANA LLP
20 Church Street
Hartford, Connecticut 06103
Telephone: (860) 297-3700
Facsimile: (860) 525-9380

Respectfully submitted,

Nancy G. Ross (ct14373)
Jed W. Glickstein (phv09543)
MAYER BROWN LLP
71 South Wacker Drive
Chicago, Illinois 60606-4637
Telephone: (312) 782-0600
Facsimile: (312) 701-7711

Reginald R. Goeke (ct19258)
E. Brantley Webb (phv20511)
Michelle N. Webster (phv08475)
MAYER BROWN LLP
1999 K Street NW
Washington, DC 20006-1101
Telephone: (202) 263-3000
Facsimile: (202) 263-3300

John Nadolenco (phv08483)
MAYER BROWN LLP
333 S. Grand Ave 47th Floor
Los Angeles, CA 90071
Telephone: (213) 229-9500

*Counsel for Defendants*

**CERTIFICATE OF SERVICE**

I hereby certify that, on June 19, 2023, a copy of the foregoing was filed electronically using the Court's CM/ECF system, which will provide notice of the filing to all counsel of record.

*/s/ Robyn E. Gallagher*
Robyn E. Gallagher