**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT**

| | |
|---|---|
| JOSEPH VELLALI *et al*., | |
| *Plaintiffs*, | Civil Action No. 3:16-cv-01345-AWT |
| v. | Hon. Alvin W. Thompson |
| YALE UNIVERSITY *et al*., | |
| *Defendants*. | |

**DEFENDANTS' SUPPLEMENTAL BRIEF IN SUPPORT OF THEIR RULE 50(a)
MOTION ADDRESSING VARIABLE ANNUITIES**

On June 20, 2023, the Court asked that the parties submit separate briefing on the specific issue of whether or not Plaintiffs have established loss as to the TIAA-CREF variable annuity accounts: the CREF Stock Account, TIAA Real Estate Account, CREF Global Equities Account, and CREF Inflation-Linked Bond Account. [1] As shown below, Plaintiffs cannot establish loss--either the fact or the amount—as to the variable annuities for two reasons.

**First**, Plaintiffs cannot prove loss without first identifying the amount of the funds "available for other [p]lan purposes." *See Donovan v. Bierwirth*, 754 F.2d 1049, 1056 (2d Cir. 1985); *Sacerdote v. N.Y. Univ.*, 9 F. 4th 95, 112 (2d Cir. 2021) , *cert. denied*, 142 S. Ct. 1112 (2022). Plaintiffs did not, and cannot, introduce evidence from which the jury could make that determination.

**Second**, Plaintiffs bear the burden of proof on establishing that the plan was harmed by the Defendants' conduct—the "fact" of loss. To do so, Plaintiffs must provide admissible expert testimony—and as this Court has already ruled, Plaintiffs have no such expert testimony because

---

[1] Along with Plaintiffs' other claims, Defendants' main brief discusses other reasons to grant their motion on this claim, such as the prudence of Defendants' investment monitoring process and the lack of adequate evidence suggesting any of the at-issue funds were imprudent. Consistent with the Court's guidance, Defendants do not repeat those arguments here.

they did not lay the proper foundation at trial. Regardless, even if Plaintiffs had presented this expert testimony, it would be insufficient to make the requisite showing.

## I. Plaintiffs bear the burden to demonstrate loss to the Plan.

In *Sacerdote v. New York University*, the Second Circuit distinguished between three elements of a breach-of-fiduciary duty claim: breach, loss, and causation (damages). 9 F.4th 95, 112-13 (2d Cir. 2021). The last two elements address: (1) whether a plaintiff has suffered *any* harm due to Defendants' misconduct (loss), and, (2) *how much* harm plaintiffs have suffered (damages). ERISA plaintiffs bear the burden to prove both breach and loss. *Id.* [2]

Under *Sacerdote*, "[l]oss is measured in this context by 'a comparison of what ***the [p]lan*** actually earned on the ... investment with what ***the [p]lan*** would have earned had the funds been ***available for other [p]lan purposes***.'" *Id.* (quoting *Donovan v. Bierwirth*, 754 F.2d 1049, 1056 (2d Cir. 1985)). The analysis is performed on the basis of the plan as a whole, as opposed to any specific plan participant. This makes sense because, as Plaintiffs themselves have put it, "Plaintiffs bring this action 'in a representative capacity' on behalf of the Plan under 29 U.S.C. § 1132(a)(2)." Dkt. 167 at 5 (quoting *Coan v. Kaufman*, 457 F.3d 250, 257 (2d Cir. 2006)). This Court certified Plaintiffs' claims for class treatment—including as to funds they did not personally invest in, and thus would not personally benefit from obtaining damages regarding—because they were bringing a "derivative action[]" that permitted recovery for plan-wide losses. Dkt. 202 at 6. Thus, the

---

[2] In *Sacerdote*, the Second Circuit held that once a plaintiff establishes breach and loss, "the burden under ERISA shifts to the defendants to *disprove* any portion of potential damages by showing that the loss was not caused by the breach of fiduciary duty." 9 F.4th at 112-13 (emphasis added). Defendants believe that this holding is incorrect and reserve the right to ask the Second Circuit to revisit it on appeal if necessary. However, burden-shifting is academic for purposes of this motion because Plaintiffs have not introduced evidence to satisfy either of the two principal elements of their claim. Because Plaintiffs have not met their burden as to breach or loss, the burden as to causation would not shift even under *Sacerdote*'s rule.

question is whether the Plan *as a whole* would be better off in Plaintiffs' alternative world than it is in this one.

## II.     To demonstrate loss, Plaintiffs needed to establish the funds "available for other [p]lan purposes" – i.e., the amount of assets which would leave frozen annuities.

Plaintiffs have failed to introduce evidence showing the amount of funds invested in the TIAA-CREF variable annuities that would have been "available for other plan purposes" within the class period, a necessary requisite to establishing both the fact and amount of loss. *See Donovan*, 754 F.2d at 1056; *Sacerdote*, 9 F. 4th at 112.

Ordinarily, when an ERISA plaintiff claims that an investment option was imprudent and should have been removed, the plaintiff's expert calculates damages on the grounds that the plan fiduciaries have the ability to unilaterally move (or "map") the funds in the challenged investment to an alternative investment that may have performed better. In such cases, it makes sense to assume that the entirety of the funds invested in the allegedly imprudent investments are "available for other [p]lan purposes" within the meaning of *Sacerdote*. 9 F. 4th at 112-13. The trial evidence shows that Plaintiffs made precisely that assumption with respect to the mutual funds they challenged. *See, e.g* ,Tr. 2202:22-25 (Buetow). Buetow calculated damages for the at-issue mutual funds by assuming that 100% of the Plan assets invested in the mutual funds were transferred to a different investment as of September 30, 2010. *Id.*; *see also* Trial Tr. 2203:18-25.

The investments at issue in this motion, however, are variable annuities rather than mutual funds. In contrast to mutual funds, the variable annuities Plaintiffs challenge are individual contracts between the participants and TIAA or CREF. As conceded by Plaintiffs' experts, the annuities are not mappable by the Plan sponsor and sponsors who wish to eliminate the variable annuities are therefore limited to "freezing" the annuities (*i.e.*, closing them to *new* investments without moving existing assets). In other words, sponsors cannot unilaterally map the investments

to an alternative, because, as Plaintiffs' experts recognized, that choice is up to the participant. *See* Trial Tr. 145:1-148:14 (Dominguez) (discussing her experience freezing legacy assets at University of Colorado and Regis); Trial Tr. 325:11-326:2 (Minnich) (agreeing that "you can't map [individual contracts] at the plan level" and "[t]hat decision is a participants decision to move those assets if they so chose, to the new contract"); *see also* Doc. No. 560 at 4-6 (Defs. Reply in Support of Their Motion to Preclude Gerald Buetow From Offering Opinions About Variable Annuity Damages).[3]

Because participants—rather than plan sponsors—control the disposition of frozen annuity assets, the assets invested in the TIAA-CREF variable annuities are not presumptively "available" to the plan for other plan purposes. Without some evidentiary basis for concluding that: (1) some or all of these assets would have flowed out of the annuities, thus becoming available for alternative investments (the "other plan purposes") and (2) that these new investments would have outperformed the variable annuities over the relevant time period, there is no basis for a determination of loss. As set forth herein, Plaintiffs can establish neither element.

Notably, Plaintiffs understood that the calculation of loss was predicated upon first determining the amount of funds available. Buetow testified that the 100% scenario was predicated upon the sort of unilateral mapping seen in the mutual fund arena. Trial Tr. 2344:5-8 (testifying that his "framework" was constructed "not to give the plan participants a choice" but instead for Yale "to replace [the investments] for them. That's underlying assumption of the entire framework. One of the assumptions."). He then explained that he was given the 60% and 80% scenarios in case the legal "mapping" argument with respect to the variable annuities was resolved against

---

[3] TIAA's Elizabeth Sutherland offered similar testimony. As she explained, "Once the money is in the individual legacy contracts, only the participant has rights to touch that money. [The] Plan sponsor does not have any rights to go in there."  Trial Tr. 1061:7-12.

Plaintiffs and movement was based, instead, on participant choice. Trial Tr. 2344:9-15 ("I built multiple scenarios in an effort to accommodate an eventual agreement, I guess, on that issue, that legal issue [the ability of the plan to unilaterally map funds]."). The 60% and 80% scenarios reflect estimates of the variable annuity funds he assumed would become "available" – and those assumptions necessarily served as an integral part of the loss calculation.

## III.    Plaintiffs lack the evidence needed to establish the amount of assets that would leave the frozen annuities.

Absent evidence establishing the funds were available for other plan purposes, the jury would be left to speculate as to the existence and quantification of loss. As noted above, Buetow calculated damages based on his assumptions regarding the amount of fund assets participants would choose to remove from the frozen annuities within a month if they were frozen on September 1, 2010. But the Court excluded Buetow's testimony and damages model as lacking the requisite evidentiary foundation in the trial record. Accordingly, there is no evidence in the record from which the jury could find that a loss occurred with respect to these funds under Buetow's models.[4]

Plaintiffs cannot rectify this gap with non-expert evidence. In the first place, as Defendants explained in their motion to preclude Buetow's testimony, there is no non-expert evidence on the movement of variable annuity funds in the record. *See* Dkt. 560 at 7-10 (summarizing evidence showing most assets would *not* move upon freezing). In the second place, expert testimony is required to help the jury make sense of this evidence and determine whether or not there has been

---

[4] Plaintiffs have provided no evidence regarding the amounts invested in the variable annuities *after* the date they allege that Yale should have frozen these funds.  Thus, there is no argument that damages can be calculated on the basis of investments in the variable annuities after the September 1, 2010 date. What is more, since Buetow calculates negative imputed flows for the entire time period, there appears to be no way for him—or any of Plaintiffs' experts—to rectify this defect, even through an untimely supplemental disclosure.

a loss to the Plan from the challenged conduct. In fact, this exact issue arose earlier this year, when plaintiffs in a university retirement plan ERISA case, *Munro v. University of Southern California*, had their damages expert excluded shortly before trial. 2022 WL 16955481, at *2 (C.D. Cal. Nov. 1, 2022). The *Munro* plaintiffs then tried to admit a new loss methodology based on "record evidence through the Plans' Form 5500 filings with the U.S. Department of Labor, through investment company filings with the U.S. Securities and Exchange Commission, and through evidence admitted at trial." 2023 WL 2558415, at *1 (C.D. Cal. Jan. 19, 2023). The *Munro* court held that this attempt at sidestepping the earlier order was unavailing, because "a theory of Plan losses" based even on "a comparison with 'comparable' index funds" may "not be made without expert testimony." *Id*. at *2. As the Court explained, "computation of Plan losses would likely involve the application of 'mathematical, accounting, and interest principles to calculate [Plaintiffs'] damages' and thus require 'testimony [that] falls squarely within Rule 702.'" *Id*.

The *Cunningham v. Cornell University* court reached the same conclusion. After excluding evidence from the plaintiffs' experts (Al Otto and Ty Minnich) as to loss from supposedly excessive recordkeeping fees, the court granted summary judgment on the claim. 2019 WL 4735876, at *10 (S.D.N.Y. Sept. 27, 2019). And with respect to Dominguez's share class damages, the court likewise agreed expert testimony was necessary. *See id*. at *17 ("Nor is the determination of whether there was a fact of loss 'simple arithmetic' not requiring expert testimony.").

Non-ERISA cases are in accord, finding that it would be improper to have a jury speculate on a topic requiring expertise if no expert testimony had, in fact, been put into evidence. *See, e.g.*, *Beyer v. Anchor Ins. Co.*, 238 F. Supp. 3d 270, 294-95 (D. Conn. 2017) (granting summary judgment after excluding experts because "[t]he complexity of the causal link between SPF and Plaintiffs' health problems necessitates expert testimony as to general causation"); *In re Mirena*

*IUD Prods. Liab. Litig.*, 202 F. Supp. 3d 304, 314 (S.D.N.Y. 2016) (collecting cases and applying "the widely held principle that expert testimony is required in cases involving a complex or technical question outside the ken of the average lay juror"); *Hackl Enterprises, Inc. v. Dresser Rand, Co.¸* 2004 WL 1745788, at *1 (W.D.N.Y. 2004) (denying reconsideration of dismissal during trial because "[w]ithout expert testimony in this case, the jury would not be in a position to determine the initial question of negligence or to apportion the negligence between the parties without resorting to speculation."). Determining whether the Plan as a whole would be better or worse off if Plaintiffs' preferences had been followed is a complicated question, requiring sophisticated cash flow analysis and assessing large sets of data. Without expert testimony, asking the jury to simply decide whether there has been a "loss" (and then shifting the burden to Defendants to show what portion of this unexplained "loss" was attributable to some other cause) would invite rampant confusion, speculation, and prejudice.

## IV.   Buetow's testimony would not have salvaged Plaintiffs' claim.

Even if Buetow had testified as to these investments, the result would be the same because his methodology does not yield a "loss" below certain thresholds. Put differently, Buetow's calculations yield positive damages (*i.e.*, loss) only once a certain unspecified threshold amount of funds are transferred out of the variable annuities to Dominguez's chosen alternatives within the first month after the annuities are frozen. That fact became clear when, in the midst of trial, Plaintiffs sought to fundamentally change Buetow's damages methodology because applying it to scenarios in which only 20 or 40 percent of assets are removed from the TIAA variable annuities results in negative damages—and therefore establishes that no loss was sustained by the Plan. Tr. 2324:19-24 (if Buetow "had used the original formula with his new 20 percent and 40 percent scenarios, it would have resulted in a negative damages number."). In fact, Plaintiffs' counsel ***conceded*** that "the methodology had to change in order to present [the 20% and 40% scenarios]

…You have to adjust it to make it work. If you have negative numbers that propagate through [it] results in an invalid methodology." Tr. 2326:3-15.[5]

Counsel's concession is a binding admission regarding the fact that unless the threshold amount of assets is moved, Buetow's model returns negative damages. *See, e.g.*, *Kregler v. City of New York*, 821 F. Supp. 2d 651, 656 (S.D.N.Y. 2011) ("a clear and unambiguous admission of fact" will "bind the client"); *Gen. Ins. Co. of America v. Mezzacappa Bros., Inc.*, 2003 WL 22244964, at *5 (E.D.N.Y. Oct. 1, 2003) ( "[s]tatements made by an attorney during oral argument thus constitute binding judicial admissions"); *see also McCaskill v. SCI Management Corp.* 298 F.3d 677, 680 (7th Cir. 2002) ( "[t]he verbal admission by [Defendant's] counsel at oral argument is a binding judicial admission, the same as any other formal concession made during the course of proceedings"). Because Plaintiffs admit that damages are negative if insufficient assets move within the first month, they have failed to meet their burden to establish the fact of loss.

## V.   Second Circuit precedent accords with this conclusion.

A finding of no loss based on insufficient evidence of asset movement is wholly consistent with the Second Circuit's reasoning in *Donovan v. Bierwirth*, 754 F.2d 1049 (2d Cir. 1985). Even assuming that case's reasoning on damages applies here—which, as Defendants explain in the main brief, it does not—its logic supports Defendants. In *Donovan* the Court analogized an imprudent investment made by a retirement plan fiduciary to a trustee's breach of its fiduciary duty to beneficiaries. *Id.* at 1056. It explained that "[o]ne appropriate remedy in cases of breach of

---

[5] The reason for this result is that Buetow's analysis relies heavily on his imputed flow calculations, which are, for the variable annuities, "a negative number." Tr. 2325:17-19. Thus, if there was not enough asset movement in the first month to offset those imputed flows, Buetow's spreadsheet would return a negative number as damages. And despite testifying before the jury that it was important to keep imputed cash flows the *same* "to try and take the actions of the Plan participant into consideration," Tr. 2173:23-2174:3, Buetow's new calculations applied "a pro rata approach" to the imputed flows. Tr. 2324:5-13. As a result, his new methodology would have yielded *higher* damages for the 60% and 80% scenarios than his original methodology. Tr. 2325:12-19.

fiduciary duty is the restoration of the trust beneficiaries to the position they ***would have occupied but for the breach of trust***." *Id.* (emphasis added). In *Donovan*, the plan trustees used plan assets to purchase stock in their parent company "at the prevailing market price" to defeat a tender offer, as opposed to using those same funds for other purposes. *Id.* at 1051. As such, there was no issue regarding the availability of the funds for other investments. *Id.*

Here, Defendants did not have control of the variable annuity assets; those were subject to participant control. As a result, Defendants could not have used the funds previously invested in the variable annuities for other purposes on the date of its alleged breach. Moreover, plan participants who had control over their variable annuity assets remained in the exact same position, with the exact same assets and rights, that they would have occupied absent the alleged breach.

*          *          *

In short, Plaintiffs and Defendants agree that it is Plaintiffs' burden to establish the fact of loss—that is, that the Plan as a whole would have more money if Plaintiffs' preferred course of conduct had been adopted instead of what Yale actually did. The Court has already ruled that Buetow effort to answer that question is inadmissible. And even if the Court had not made that ruling, Plaintiffs and Defendants agree that Buetow's calculations return a negative number— meaning no loss was suffered—unless sufficient assets had moved in the first month after freezing. Because Plaintiffs' evidence does not identify that threshold, much less provide a basis for the jury to find that it would have been exceeded, Plaintiffs cannot satisfy their burden of proof on this element as to the variable annuities.

**CONCLUSION**

The Court should grant judgment to Defendants as a matter of law regarding the at-issue variable annuities.

-9-

Dated: June 21, 2023

Robyn E. Gallagher (ct29596)
WIGGIN AND DANA LLP
20 Church Street
Hartford, Connecticut 06103
Telephone: (860) 297-3700
Facsimile: (860) 525-9380

Respectfully submitted,

*/s/ Nancy G. Ross*
Nancy G. Ross (ct14373)
Jed W. Glickstein (phv09543)
MAYER BROWN LLP
71 South Wacker Drive
Chicago, Illinois 60606-4637
Telephone: (312) 782-0600
Facsimile: (312) 701-7711

Reginald R. Goeke (ct19258)
E. Brantley Webb (phv20511)
Michelle N. Webster (phv08475)
MAYER BROWN LLP
1999 K Street NW
Washington, DC 20006-1101
Telephone: (202) 263-3000
Facsimile: (202) 263-3300

John Nadolenco (phv08483)
MAYER BROWN LLP
333 S. Grand Ave 47th Floor
Los Angeles, CA 90071
Telephone: (213) 229-9500

*Counsel for Defendants*

## **CERTIFICATE OF SERVICE**

I hereby certify that, on June 21, 2023, a copy of the foregoing was filed electronically using the Court's CM/ECF system, which will provide notice of the filing to all counsel of record.

/s/ *Nancy G. Ross*

_____

Nancy G. Ross