## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF CONNECTICUT

JOSEPH VELLALI *et al.*,

                   *Plaintiffs,*

v.

YALE UNIVERSITY *et al.*,

                   *Defendants.*

No. 3:16-cv-01345-AWT

Hon. Alvin W. Thompson

## MEMORANDUM IN OPPOSITION TO DEFENDANTS' SUPPLEMENTAL BRIEF REGARDING VARIABLE ANNUITIES [DOC. 564]

Defendants attempt to portray the question of "loss" as a highly complicated and technical matter requiring expert testimony, but the issue is quite simple: but for the breach of fiduciary duty, would the Plan have more money or less money? If an imprudent annuity performed worse than a prudent alternative during the relevant period, the Plan has incurred a "loss," full stop.

Quantifying the *amount* of the loss—*i.e.*, damages—is somewhat more complicated, as the factors involved in that computation (*e.g.*, percentage of assets that would have moved) are disputed. But as the Supreme Court and Second Circuit have long emphasized, when a wrongdoer has caused harm, as here, any doubts are resolved against it, to avoid the perverse and unjust result of denying compensation to the victim. *Story Parchment Co. v. Paterson Parchment Paper Co.*, 282 U.S. 555, 563 (1931); *Donovan v. Bierwirth*, 754 F.2d 1049, 1056 (2d Cir. 1985). Thus, while performing a damages computation requires specialized expertise, a final judgment need not be based on the expert's *original* opinion. If the party's original damages model is flawed, the proper route is not to enter judgment for the breaching

1

fiduciary, but to "determine what the measure of loss in this case ought to be." *Bierwirth*, 754 F.2d at 1055.

Once the jury determines what the measure of loss in this case ought to be by resolving the parties' dispute as to the amount of assets that would have moved, the final damages figure can then be computed by plugging those numbers into an equation and applying indisputable mathematical functions. *E.g.*, *Tibble v. Edison Int'l*, No. 07-5359, 2010 WL 2757153, at *37–38, 2010 U.S. Dist. LEXIS 69119, at *121–25 (C.D. Cal. July 8, 2010) (instructing parties' experts to compute the precise damages figure for final judgment based on factual findings regarding the proper inputs). Accordingly, even if Defendants' challenge to Dr. Buetow's original calculations is sustained, Defendants are not entitled to judgment on this claim.

## I.   Plaintiffs have made a prima facie showing of loss because the Plan's challenged annuities underperformed prudent alternatives; the extent of the loss is a separate question.

When a fiduciary has breached its duty under ERISA, the statute instructs that the fiduciary "shall" "make good to such plan any losses to the plan resulting from each such breach." 29 U.S.C. § 1109(a). Determining whether a "loss" occurred within the meaning of § 1109(a):

> requires a comparison of what the Plan actually earned on the [improper] investment with what the Plan would have earned had the funds been available for other Plan purposes. If the latter amount is greater than the former, the loss is the difference between the two; if the former is greater, no loss was sustained.

*Bierwirth*, 754 F.2d at 1056.

"Loss" and "damages" "are not interchangeable." *Sacerdote v. N.Y. Univ.*, 9 F.4th 95, 112 (2d Cir. 2021). "The question of how much money should be awarded to the plaintiffs in damages is distinct from, and subsequent to, whether they have shown a loss." *Id.* To show a loss, Plaintiffs need only show that "the [p]lan would have earned" more with "a prudent alternative." *Id.* at 112–13; *accord Brotherston v. Putnam Invs., LLC*, 907 F.3d 17, 33–34 (1st Cir. 2018) (holding that plaintiffs made a prima facie case of loss by showing that challenged options underperformed comparable index funds), cited by *Sacerdote*, 9 F.4th at 113 nn. 71–72; *Graden v. Conexant Sys. Inc.*, 496 F.3d 291, 301 (3d Cir. 2007) (stating that defined-contribution plan's loss is determined by comparing the performance of the imprudent option to the performance of plan's "prudent investment alternatives") (citing *Bierwirth*, 754 F.2d at 1056).

> Even in the context of the share-class claim, where plaintiffs have alleged the known cost-differentials between retail and institutional shares, "it makes little sense to have the plaintiff hazard a guess as to what the fiduciary would have done had it not breached its duty in selecting investment vehicles, only to be told [to] guess again." In considering the potential opportunity cost to the plaintiff of the investment, "[i]t makes much more sense for the fiduciary to say what it claims it would have done and for the plaintiff to then respond to that."

*Sacerdote*, 9 F.4th at 113.

Plaintiffs have made a prima facie loss showing. Plaintiffs' experts showed that each of the four TIAA-CREF variable annuity accounts underperformed a

prudent alternative fund during the relevant period.[1] For example, the CREF Stock Account underperformed the Vanguard Total Stock Market Index fund by 19.4% for calendar years 2011 through 2017. DX970 at 9, 23.[2] To simplify, if, but for Defendants' breach in failing to freeze the CREF Stock Account and warn participants that the fund did not meet ERISA standards, participants would have transferred $100 million in Plan assets to the Vanguard fund by December 31, 2010, then the Plan lost $19.4 million,[3] which is the difference between "what the Plan actually earned on the [CREF Stock] investment with what the Plan would have earned had the funds been available for other Plan purposes." *Bierwirth*, 754 F.2d at 1056.

---

[1] *See, e.g.*, Trial Tr. at 140:2–143:9 (discussing the underperformance of the CREF Stock Account); *id.* at 148:18–149:24 (discussing how an investor would have earned more on $10,000 if invested in a 70/30 mix of two Vanguard funds rather than the CREF Stock Account); *id.* at 178:2–21 (discussing the underperformance of the TIAA Real Estate Account); *id.* at 180:18–181:16 (discussing the underperformance of the TIAA Real Estate Account from 2009 until 2018).

[2] The references are to the PDF pages. The total performance used in this example is the sum of the calendar year returns shown on DX970:

| | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | Total returns |
|---|---|---|---|---|---|---|---|---|
| CREF Stock Account | -4.9% | 17.3% | 27.8% | 6.4% | -0.8% | 9.2% | 23.5% | 78.5% |
| Vanguard Total Stock Market Index | 1.1% | 16.4% | 33.5% | 12.6% | 0.4% | 12.7% | 21.2% | 97.9% |
| **Difference** | | | | | | | | **19.4%** |

[3] This is but one example showing loss. The record evidence shows that, during the time period at issue, the CREF Stock Account consistently underperformed the Vanguard Total Stock Market Index, the replacement recommended by Plaintiffs' expert Wendy Dominguez. For example, compare PX35 at 47 with PX38 at 18, showing that, as of March 31, 2012, the CREF Stock Account underperformed the Vanguard Total Stock Market Index during one-, three-, five-, and ten-year periods.

Defendants' assertions (at 1–4) that "Plaintiffs cannot prove loss without first identifying the amount of the funds 'available for other [p]lan purposes'" and "the amount of assets that would leave frozen annuities" are simply wrong. All that matters for loss purposes is that Plan assets earned 19.4% less in the imprudent CREF Stock Account than they would have earned in the prudent alternative Vanguard fund. *See Sacerdote*, 9 F.4th at 112–13. It makes no difference if $1.00 or $1 billion would have left the frozen annuities, or any number in between. At every dollar figure from one to infinity, that sum is now worth 19.4% less than it would have been but for the breach. The question of what percentage of assets would have left the frozen annuities purely affects "*how much* money should be awarded to the plaintiffs in damages," which is an issue "distinct from, and subsequent to, whether they have shown a loss," and an issue on which Defendants bear the burden of proof. *Id.* at 112–13 (emphasis added); *Bierwirth*, 754 F.2d at 1056.

Accordingly, if even *one* participant would have transferred *any portion* of her account balance from the CREF Stock Account to the Vanguard Total Stock Market Index, that establishes that the Plan suffered a "loss" within the meaning of ERISA § 409(a), 29 U.S.C. § 1109(a). *See LaRue v. DeWolff, Boberg & Assocs.*, 552 U.S. 248, 255–56 (2008) (holding that § 409 provides a remedy for "fiduciary breaches that impair the value of plan assets" held in a single "participant's individual account"). The jury need not speculate to draw the reasonable inference that if Defendants had frozen the variable annuities and properly warned participants that the annuities

were not prudent investment options, at least one of the many thousands of Plan participants would have transferred some part of his or her account balance.

Defendants' argument that Plaintiffs must show a specific percentage of assets that would have moved depends on the mistaken premise that no "loss" occurred below certain thresholds. Doc. 564 at 7–8. But Defendants' assertion (at 7) that if "20 or 40 percent of assets are removed from the TIAA variable annuities" then "no loss was sustained by the Plan" is based on a misunderstanding of comments by Plaintiffs' counsel. As explained above, for purposes of determining the *fact* of loss, it makes no difference if the transferred assets represent 1%, 20%, 40%, 60%, 80%, 100% or any other percentage of the Plan's variable annuity assets. Regardless of the percentage, those assets are now worth less than they would have been if the assets had been invested in a higher-performing alternative option. Defendants' position that Plaintiffs' counsel somehow made a binding judicial admission to the contrary is baseless. Even if counsel had made such a statement (counsel did no such thing), a party cannot bind a court to a ruling that defies immutable laws of math.

As Buetow explained at trial, his damages methodology began by computing imputed cash flows, *i.e.*, the amount of money participants were contributing and withdrawing from their investments.[4] To perform his calculation, he derived cash flows in the Plan based on known information regarding balances and returns.[5]

---

[4] Trial Tr. at 2172:11–17.

[5] *Id.*, 2172:18–2173:16.

Buetow's original methodology, in estimating damages when 60% or 80% of funds in variable annuities moved, was to scale *balances*, but not imputed flows.[6] This methodology does not work when the balances are scaled too low, because the computed flows (which are *not* scaled) overwhelm the scaled balances. In other words, the amounts *actually* withdrawn from the variable annuities become greater than the *hypothetical* smaller starting balances. As a result, the methodology is "invalid" when it is used to attempt to estimate damages if only 20% or 40% of assets move.[7]

This unequivocally does not mean that the model returns negative damages, and that is categorically *not* what counsel stated on the record. It simply means that the methodology must be refined if it is used to compute 20% or 40% scenarios. As a result, Buetow put forth an alternative methodology, that scaled *flows* as well as balances, in order to respond to Defendants' last-minute attack, and to provide the Court with a range of possible damages calculation alternatives. The indisputable fact remains: moving *any* amount of assets—1% to 100%, $1 to $100 billion—from a worse-performing investment to a better-performing investment shows a "loss" within the meaning of 29 U.S.C. § 1109(a). *Bierwirth*, 754 F.2d at 1056 ("If the latter amount is greater than the former, the loss is the difference between the two; if the former is greater, no loss was sustained.").

---

[6] *Id.*, 2330:3–17.

[7] *Id.*, 2326:3–15.

Of course, identifying a prudent alternative does not conclusively resolve the question of loss—it is still a question for the jury. Defendants can attempt to show that no loss occurred by presenting evidence that $0 would have moved out of frozen annuities or that some worse-performing alternative would have been a more plausible destination for the frozen assets than the alternatives cited by Plaintiffs' experts. *See Bierwirth*, 754 F.2d at 1056. But it is Defendants' burden to make that showing. *Id.*; *Sacerdote*, 9 F.4th at 113. And a fiduciary's arguments that other alternatives are more plausible than the plaintiffs' benchmarks raises "questions of fact" to be decided at trial, not a basis to find the evidence "insufficient as a matter of law . . . to support a finding of loss." *Brotherston*, 907 F.3d at 34.

## II.     The jury can determine the Plan's damages even without expert testimony quantifying frozen asset movement.

Defendants further contend that without an expert opinion quantifying how many participants would have moved out of frozen annuities, the jury would have to speculate as to "the quantification of loss." Doc. 564 at 5. According to Defendants, because the Court excluded Buetow's damages model based on assumptions regarding the amount of fund assets participants would have moved out of the frozen annuities by September 30, 2010, the jury would have no choice but to speculate. But Defendants are wrong. Even if Buetow's assumptions regarding the amount of assets that would have moved rendered the calculations inadmissible under Rule 702 (which Plaintiffs respectfully dispute), it does not follow that the jury should be barred from deciding the underlying question of what percentage of assets would have moved out of the frozen annuities.

8

Defendants' arguments that the jury cannot decide that question without the aid of expert testimony conflates distinct concepts. As previously discussed, expert testimony is unnecessary for the jury to make a reasonable estimate of the quantum of assets that would have moved, because it is a question that a juror is "capable of understanding on his or her own." *United States v. Mejia*, 545 F.3d 179, 194 (2d Cir. 2008). Before they can even reach questions of loss and damages, the jurors must first conclude that Defendants breached their fiduciary duties by not freezing the frozen annuities. The jury can reasonably conclude—and testimony has been elicited at trial—that a prudent fiduciary in Yale's shoes would have issued a stern warning to participants upon determining that a plan investment option was no longer prudent, much like the manufacturer of power tools or industrial machinery would prominently warn of known risks of serious injury or death.[8]

A prudent fiduciary in Yale's position would have informed participants that the variable annuities were no longer in compliance with the federal law designed to protect them and would have strongly encouraged participants to transfer their investments to alternative options for the benefit of their retirement security.[9] The jury does not have to speculate to understand how a typical person would have reacted to such a warning from their employer, and to "make a just and reasonable inference" as to an approximate percentage that would have opted to move to

---

[8] Trial Tr. at 325:6–326:19 (Minnich testifying that education campaigns have been successful); *id.* at 1031:21–1032:3 (Sutherland testifying that fiduciaries had engaged in education campaigns to move assets from individual annuities, and it was not prohibited by the annuity contracts).

[9] *See* supra n.3

alternative options. *New York v. Julius Nasso Concrete Corp.*, 202 F.3d 82, 89 (2d Cir. 2000).

To be sure, converting that percentage into a "computation of Plan losses would likely involve the application of 'mathematical, accounting, and interest principles to calculate [Plaintiffs'] damages' and thus require 'testimony [that] falls squarely within Rule 702.'" *Munro v. Univ. of S. Cal.*, No. 16-6191, 2023 U.S. Dist. LEXIS 9707, at *29 (C.D. Cal. Jan. 19, 2023). But the jury itself does not have to make the computation; the computation can be performed by an expert *after* the jury decides the percentage figure through a special interrogatory. *See Tibble*, 2010 U.S. Dist. LEXIS 69119, at *121–26.

In *Tibble*, the court found that fiduciaries breached their duty of prudence by providing higher-cost share classes of certain plan options. *Id.* at *98. However, "due to certain errors in the Plaintiffs' damages calculations and the fact that Defendants did not present damage calculations for these funds from July 2002 forward, the Court cannot calculate with accuracy the exact amount of damages at this time." *Id.* at *121. The court did not enter judgment for the fiduciaries based on a failure to prove damages; instead, it made findings of fact regarding the proper measure of damages and instructed the parties to make the necessary calculations through their experts. *Id.* at *121–25.

The same result would be appropriate here. Defendants have not challenged the reliability of Buetow's calculations from a mathematical perspective, they merely challenge the underlying assumption regarding asset movement. Once the

jury decides that question, computing the resulting damages figure would not be controversial.

That procedure would also be consistent with Second Circuit law. In *Bierwirth*, the Second Circuit did "not accept the [loss] measures proposed by the parties, nor that applied by the trial court." *Bierwirth*, 754 F.2d at 1054. Yet even though the court rejected the plaintiff's damages model, it did not affirm the judgment for the defendant. Instead, the court stated that "[s]ince we have rejected the three measures of loss proposed to us, our task is to determine what the measure of loss in this case ought to be." 754 F.2d at 1055. It then proceeded to determine the principles that should guide the loss calculation on remand. *Id.* at 1056–58.

When as here, the plaintiff has proven a breach and a related loss, determining the proper remedy despite a flawed initial damages model is consistent with the Second Circuit's preference for resolving damages uncertainties against the wrongdoer, *id.* at 1056, and preventing "a perversion of fundamental principles of justice" by "reliev[ing] the wrongdoer from making any amend for his acts," *Julius Nasso*, 202 F.3d at 89; *In re Beck Indus., Inc.*, 605 F.2d 624, 636 (2d Cir. 1979) (Friendly, J.) ("Courts do not take kindly to arguments by fiduciaries who have breached their obligations that, if they had not done this, everything would have been the same.").

Defendants' cases are inapposite, as they involved subjects that were beyond the understanding of a layperson. In *Munro* and *Cunningham*, the excluded

testimony pertained not to participant movement, but to the underlying benchmarks used to determine the fact and amount of loss. Without specialized testimony explaining why the chosen comparators were appropriate, there was no basis to compute losses based on those benchmarks. *Munro*, 2023 U.S. Dist. LEXIS 9707, at *29 (finding that a "theory of Plan losses based on a comparison with 'comparable' index funds" required expert testimony to explain why each fund was "a 'prudent' and 'comparable' alternative to some of the Plans' investment options"); *Cunningham v. Cornell Univ.*, No. 16-6525, 2019 U.S. Dist. LEXIS 167868, at *20 (S.D.N.Y. Sep. 27, 2019) (expert testimony needed to explain why benchmark data consisted of "relevant comparators"). Defendants' non-ERISA cases likewise deal with highly specialized subject matters that are beyond the understanding of a layperson, such as the causal link between a chemical and a medical condition. *Beyer v. Anchor Insulation Co.*, 238 F. Supp. 3d 270, 294 (D. Conn. 2017).

There is nothing like that here. The Court has not excluded the testimony of Plaintiffs' experts explaining why their loss comparisons are prudent and comparable alternatives to the variable annuities. Determining whether a rational investor would listen to a plan fiduciary's warnings to exit an imprudent investment "is not beyond the ken of the average juror." *Mejia*, 545 F.3d at 194. The fact that "empirical" research *may* exist on participant investment behaviors in a typical plan without frozen and imprudent investment options does not change the result. As a matter of common sense, the jury can determine that a rational retirement investor is more likely than not to leave an option upon receiving a warning from the plan's

fiduciary that the option is imprudent and poses a threat to the person's retirement account. Defendants, of course, are free to put in evidence that some percentage of participants would not have moved. It will then be up to the jury to determine whether such evidence is credible and to give it whatever weight it deserves. Accordingly, Defendants' suggestion (at 7) that allowing the jury to decide damages would "invite rampant confusion, speculation, and prejudice" is meritless.

## CONCLUSION

"By requiring the plaintiffs here to prove that the alternative fee ranges proposed by their expert were 'the only plausible or prudent ones,' the district court failed to shift the burden onto the defendant. Had plaintiffs been able to prove that the charged fees were imprudent, and had the plaintiffs shown a prudent alternative, the burden would have shifted to the defendant to disprove that the entire amount of loss should be awarded as damages. Put differently, if a plaintiff proved that it was imprudent to pay $100 for something but that it would have been prudent to pay $10, ***it is not the plaintiffs burden to prove*** that it would also have been imprudent to pay every price between $11 and $99. It is on the defendant to prove that there is some price higher than $10 that it would have been prudent to pay." *Sacerdote*, 9 F.4th at 113–14 (emphasis added).

The Court should deny Defendants' Motion.

13

June 22, 2023                         Respectfully submitted,


                                      _/s/ Nathan D. Stump_____
                                      Schlichter Bogard & Denton LLP
                                      Nathan D. Stump (phv206992)
                                      Joel D. Rohlf (phv09849)
                                      Alexander L. Braitberg (phv09929)
                                      Sean M. Milford (phv207278)
                                      100 South Fourth Street, Suite 1200
                                      St. Louis, Missouri 63102
Ari J. Hoffman (ct22516)              (314) 621-6115, (314) 621-7151 (fax)
Cohen and Wolf, P.C.                  nstump@uselaws.com
1115 Broad Street                     jrohlf@uselaws.com
Bridgeport, CT 06604                  abraitberg@uselaws.com
Telephone: (203) 368-0211             smilford@uselaws.com
Facsimile: (203) 337-5505
arihoffman@cohenandwolf.com           Attorneys for Plaintiffs