IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

| | |
|---|---|
| JOSEPH VELLALI *et al.*, <br><br> *Plaintiffs*, <br><br> v. <br><br> YALE UNIVERSITY *et al.*, <br><br> *Defendants*. | Civil Action No. 3:16-cv-01345-AWT <br><br> Hon. Alvin W. Thompson |

**DEFENDANTS' REPLY IN FURTHER SUPPORT OF THE
SUPPLEMENTAL BRIEF IN SUPPORT OF THEIR
RULE 50(a) MOTION ADDRESSING VARIABLE ANNUITIES**

Plaintiffs do not contest that they bear the burden to show loss as well as breach of fiduciary duty at trial. Nor do Plaintiffs contest that, as to the challenged variable annuities, the only theory of "loss" they have offered assumes that participants would have voluntarily moved assets in the challenged variable annuities to alternative funds chosen by Plaintiffs' experts if Defendants had frozen the variable annuities to new investment. Plaintiffs instead urge that the jury can apply its lay perspective to "find" that the Plan suffered a loss because *some* amount of assets—"from one [dollar] to infinity," Doc. No. 568 at 5—would have left the frozen annuities in this hypothetical world. Merely stating this theory demonstrates that there is no evidence in the record that would permit the jury to make a reasonable, non-speculative assessment of the "loss" claimed by Plaintiffs, much less that permit Defendants to "rebut" that unexplained showing in their own case.

In so urging, Plaintiffs seek to impose an additional duty on the Defendants – the duty to conduct an educational campaign. Plaintiffs cite nothing to support such a duty, factually or legally. This is unsurprising. Plaintiffs' "educational campaign" argument flies in the face of established law. Additionally, Plaintiffs continue to rely on caselaw developed outside of the

1

context of annuities that assumes full fiduciary control of the investment and at-issue monies, to pursue loss that does not flow from the alleged breach. For the reasons set forth herein, the Court should find that there is insufficient evidence for a jury to find liability as to the variable annuities.

I. **The Jury Lacks a Legally Sufficient Evidentiary Basis to Determine How Many Participants Would Transfer Funds From Frozen Variable Annuities**

Plaintiffs argue that the jury can determine "a reasonable estimate of the quantum of assets that would have moved" from the variable annuities because that is an issue that a juror "is capable of understanding on his or her own." Doc. No. 568 at 9. But that is self-evidently incorrect. Plaintiffs' theory of loss is not dependent merely on the idea that "assets would have moved" from the variable annuities to another investment option, but that participants would have moved those assets at a specific time, invested them in specific investment options, and held those options for particular periods resulting in larger returns. Plaintiffs have presented expert testimony on similar matters in the context of the mutual funds, but there is no equivalent evidence in the record as to the variable annuities. As *Cunningham* and *Munro* both recognize, issues of this sort require expert testimony. *See Cunningham v. Cornell Univ.*, 2019 WL 4735876, at *10 (S.D.N.Y. Sept. 27, 2019); *Munro v. USC*, 2022 WL 16955481, at *2 (C.D. Cal. Nov. 1, 2022). No more is needed to decide Defendants' motion.[1]

In any event, Plaintiffs conveniently ignore that all of the evidence on the issue of flows favors Defendants – the record shows that participants would choose *not* to move assets out of

---

[1] Plaintiffs' brief attempt at distinguishing these authorities does not hold water. Plaintiffs claim that expert testimony was necessary in *Cunningham* and *Munro* because those cases addressed "underlying benchmarks used to determine the fact and amount of loss." Dkt. 568 at 12. But that is exactly what is at issue here. Indeed, Plaintiffs admit just a few pages earlier that their expert's (excluded) methodology on this question requires still further "refine[ment]" to produce meaningful numbers for all but the most implausible of scenarios. *Id.* at 7. This underscores why lay jurors lack the capacity to address these issues.

2

frozen annuities. Plaintiffs instead invent an obligation for Defendants to conduct an educational campaign. This duty does not exist at law and would require the jury to speculate that Defendants would conduct an educational campaign absent any legal requirement to do so.

### A.     Plaintiffs' Request for Bifurcation Should be Rejected Out of Hand

Plaintiffs seek a last-minute bifurcation of liability and damages on this issue so that the jury can identify some percentage of assets that would move from the variable annuities before damages are calculated. Doc. No. 568 at 10-11. Plaintiffs could and should have made that request at the outset of trial, when the Court could have considered whether a reasonable bifurcation was even possible. "The decision to bifurcate a trial into phases is a matter that lies within the sound discretion of the trial court. In exercising that discretion, this Court begins its analysis with the Advisory Committee's admonition that 'separation of issues for trial is not to be routinely ordered.'" *Svege v. Mercedes-Benz Credit Co.*, 329 F. Supp. 2d 283, 284 (D. Conn. 2004) (internal citations omitted). There is no basis for eleventh-hour bifurcation here.

Every case cited by Plaintiff in support of its position was a bench, rather than a jury, trial of an equitable, rather than legal, claim. *See Tibble v. Edison Intern.*, 2010 WL 2757153 ("A bench trial in this action was held on October 20-22, 2009."); *Donovan v. Bierwirth*, 754 F.2d 1049, 1053 (2d Cir. 1985) ("Evidence was taken in a bench trial on December 19 and 20, 1983."). This is important because a bench trial provides significantly greater flexibility in the presentation of evidence. As such, in *Tibble*, the Court had the discretion to permit subsequent submissions regarding the calculation of damages. 2010 WL 2757153 at *37.

A jury, however, is not like the Court sitting in a bench trial. Once the jury is released, they are no longer available for further consideration of newly developed damages theories. Thus, Plaintiffs' request for further proceedings after a finding on a special interrogatory would

force the jury to remain empaneled while Buetow created a brand-new calculation (which may require further refinement). Not only would this process be inefficient, it would flagrantly violate Rule 26. Buetow has also represented that he is unavailable for the next few weeks.

Bifurcation would also be substantially unfair to Defendants. Plaintiffs did not seek bifurcation until they failed to lay a foundation for their expert's testimony in their own lengthy case-in-chief. It was Plaintiffs' responsibility to ensure that their experts had a valid evidentiary basis for their opinions. Having failed to do so, Plaintiffs should not be permitted to simply foist this issue on the jury in the hopes of a second bite at the apple.

### B.    Defendants Have No Obligation To Conduct An Educational Campaign

Plaintiffs' argue that no expert testimony is needed to determine the voluntary movement of plan assets out of variable annuities by plan participants because the jury can use their layperson's perspective to understand how a participant would respond to "a stern warning" issued by Yale. Doc. No. 568 at 9. Plaintiffs do not explain how a jury would even begin to evaluate this question without engaging in rampant speculation. But regardless, Plaintiffs cite no authority to show that Defendants would have been obliged to conduct an educational campaign. Both the facts and the law are to the contrary.

"ERISA does not require fiduciaries of an [individual account plan] to act as personal investment advisers to plan participants." *Albert v. Oshkosh Corp.*, 47 F.4th 570, 578-79 (7th Cir. 2022); *see also Schweitzer v. Inv. Comm. of Phillips 66 Savings Plan*, 960 F.3d 190, 198 (5th Cir. 2020) (even where plaintiffs "plausibly alleged that the ConocoPhillips Funds, by its resulting concentration of investment, became an imprudent investment with the spinoff," "it does not follow that the Fiduciaries were obligated to force Plan participants to divest from the Funds"). In *Schweitzer*, for example, the Fifth Circuit held that a fiduciary who "close[d] the

[challenged funds] to new investments" and "ensured that they were not offering participants an imprudent investment option" had no obligation to urge participants to sell existing holdings of the investment. 960 F.3d at 199. No law would require Defendants to urge Plan participants to eliminate holdings in CREF Stock or the other variable annuities had they been removed as investment options in 2010 either.

To the extent the subject of an educational campaign was discussed at trial at all, moreover, that evidence cuts against Plaintiffs. Aon Hewitt's Mr. Swallow "caution[ed]" plan sponsors from "encourage[ing] participants to move to a new investment or a new platform" because "there's a risk to that from a fiduciary perspective." Trial Tr. 961: 9-21. "[Y]ou could essentially be advising participants to move assets from an investment option that had specific benefits to it that may not necessarily be in their best interest." *Id.* TIAA's Ms. Sutherland was similarly wary. As she testified, "It might not be wise for a fiduciary to [encourage participants to move assets out of annuities]." Trial Tr. 1031:3-5.

Plaintiffs, meanwhile, did not ask any Yale personnel about an educational campaign to leave TIAA variable annuities, and the cursory testimony they elicited on these matters from their experts (Dominguez and Minnich) provided no details and bore no connection to Yale. Minnich merely testified that his education campaigns had been "successful," as measured by a satisfaction survey. That is an insufficient evidentiary basis for the jury to compute an asset movement amount, as the Court recognized in precluding Buetow's testimony. Even Buetow testified that he lacked sufficient information to gauge likely asset movement from educational campaigns.

> Q. You don't have any idea how success[ful] such an educational program would be, right?
> A. Well, if I haven't participated in one, obviously no.
> Q. Right. You have no way to quantify that, correct?

5

> A. Not with the information that was provided, no.

Trial Tr. 2337:23-2338:4. The jury is in no better position than Buetow – having never participated in an educational campaign, they have no way to quantify success.

### C. The Only Evidence Regarding Participant Movement is That Participants Would Not Move Assets

The evidence before the jury does not support any non-speculative finding that participants would remove assets from the variable annuities in response to "freezing" those annuities in 2010. As the testimony has shown, there are many reasons why plan participants might maintain their investment in CREF Stock even after it was frozen. First, some participants, like Dr. Salovey, disagree with Plaintiffs' assessment of the funds, finding that the diversification provided by CREF Stock's foreign component (or its low fees when compared to a peer group) gave them value that justified losing a few basis points of absolute return. Tr. 2021:7- 19. Second, while Dominguez may not like variable annuities, the undisputed evidence at trial is that such annuities were overwhelmingly popular with plan participants. E.g. Tr. 681:8-21 (Penney); Tr. 1389:23-1390:20 (Peel); 1991:23-1992:13 (Salovey). Similarly, there is evidence that participants who intended to annuitize in the future valued the long-term stability of TIAA, one of the most respected and safe insurance companies in the world. Tr. 1092:11-20 (Penney); 1328:13-1329:3. Indeed, one of the named plaintiffs chose to keep assets within the CREF stock variable annuity despite having brought suit claiming such investment is imprudent. Tr. 2342:18-2343:20 (discussing Taschner deposition).

Plaintiffs handwave this problem away, saying the jury can surely infer that *one* participant would have moved assets out of the frozen annuities, and was therefore harmed. Dkt. 568 at 5. That is wrong. As explained in Defendants' opening brief, the question here is whether Plaintiffs can proceed on the derivative, plan-wide claim they had the Court certify. The question

6

the jury must therefore answer is whether the Plan *as a whole* would be better or worse had Yale followed Plaintiffs' preferred course of action. But that requires looking at the collective impact of plan participants' decisions. That is particularly so because the at-issue annuities and Plaintiffs' alternatives experienced different returns at different times—there are times that the annuities did better and times when the alternatives did. Deciding whether the Plan as a whole suffered loss requires sophisticated cash flow analysis, of the kind Buetow did for the at-issue mutual funds, to determine whether the harms to participants with unfortunate timing outweigh the benefits to participants with fortunate timing. That is the evidence Plaintiffs lack.[2]

Given the dearth of evidence regarding whether, and to what extent, plan participants would voluntarily remove assets, the jury lacks "a legally sufficient evidentiary basis to find for the [Plaintiffs] on that issue," and the Court can "resolve the issue against" the Plaintiffs. Fed. R. Civ. P. 50(a)(1).

` **D.     Plaintiffs Understood They Needed Expert Testimony**

Plaintiffs continue to say that their current lack of evidence is Defendants' fault. *See, e.g.*, Doc. No. 568 at *7 (blaming Buetow's computational errors on "Defendants' last-minute attack"). To be clear, the absence of record evidence regarding movement of plan assets out of variable annuities is the responsibility of Plaintiffs. Neither the Court nor the jury should be forced to bear the burden of Plaintiffs' failure.

Plaintiffs knew that their "mapping" theory for the variable annuities, which the Court has twice rejected, was on thin ice—a federal district court rejected it five years ago, a year

---

[2] *LaRue v. DeWolff, Boberg, & Assocs.*, 552 U.S. 248 (2008), is not to the contrary. The Court was bound to assume at the motion to dismiss stage that respondents' breaches "had an adverse impact on the value of the Plan assets in petitioners' individual account," and there was no evidence that the complained-of breach (a failure to make investment changes requested by the plaintiff, *Id.* at 251) made any impact on other participants. Thus, the Court did not address evaluating Plan-wide losses when a fiduciary's decision benefits the plan as a whole despite potentially not benefiting a subset of participants.

before Plaintiffs' expert reports in this case were due. *Sacerdote v. New York Univ.*, 328 F. Supp. 3d 273, 303 (S.D.N.Y. 2018), *aff'd in relevant part*, 9 F.4th 95 (2d Cir. 2021). Plaintiffs understood that if they were to prevail on these annuity claims without their mapping theory, they needed expert testimony regarding the movement of assets out of the variable annuities. It was their decision to put a mere scintilla of such evidence into the pretrial record, and their decision not to subject their expert—whose testimony relates to Plaintiffs' other claims—to cross-examination on this issue at trial. Despite understanding their evidentiary burden, Plaintiffs failed to meet it. There is nothing inequitable about granting Defendants' Rule 50 motion.

## II.     The Damages Sought Do Not Flow From The Breach

Plaintiffs fail to recognize that even if they establish breach, their recover is limited to "losses to the plan resulting from each such breach." 29 U.S.C. § 1109. Defendants cannot say often enough that variable annuities are fundamentally and materially different from other forms of retirement investment options and yet Plaintiffs still fail to recognize and address this difference. Because Defendants lacked control over fund assets invested in variable annuities as of the date of the alleged breach losses arising from funds already invested in those annuities do not flow from the breach.

All of the cases regarding recognition and calculation of loss cited by Plaintiffs involve fund options in which participant choice is not a concern. *See, e.g., Brotherston v. Putnam Invest., LLC*, 907 F.3d 17, 31 (1st Cir. 2018) (citing expectations for "financial fiduciaries who have broad investment discretion"). As such, the plan sponsors retain complete control over where assets are invested – should they determine that a fund is imprudent, the plan sponsor has the ability to not only close the fund to new contributions but also to move (map) the assets to a different investment option. Thus, assets that remain in an imprudent fund are necessarily there

as a direct result of the plan sponsors failure to move them and any losses resulting therefrom are a result of the breach of fiduciary duty.

This principle is evident in *Donovan*. There, the *plan fiduciaries* used liquid plan assets to purchase stock of the parent company as part of an overall corporate strategy rather than in the best interests of plan participants. *Donovan*, 754 F.2d at 1051. The *plan fiduciaries* had the right and ability to put those same assets in a different investment. *Id.* at 1056. Thus, damages from the lost funds were a direct result of the *plan fiduciaries'* decisions and the Court assigned damages with the goal to restore "the trust beneficiaries to the position they would have occupied but for the breach of trust." *Id.*

*Brotherston* is similar. There the Defendant, Putnam Investments, LLC, created a fund lineup almost entirely comprised of its own actively managed mutual fund options "without regard to whether such funds were prudent investment options." 907 F.3d at 23. The First Circuit rejected the District Court's finding that there had been no loss. *Id.* at 32. The First Circuit adopted the Restatement (Third) of Trusts articulation of loss – "a defined-contribution plan, 'is chargeable with . . . the amount required to restore the values of the trust estate and trust distributions to what they would have been *if the portion of the trust affected by the breach had been properly administered.*" *Id.* (emphasis added). The plaintiffs expert identified alternative investments that the assets could have been invested in were they not in the Putnam mutual funds. *Id.* He then calculated the differential between the Putnam mutual funds and the alternative investments. *Id.* Because these investments were mutual funds, the plan fiduciaries could have removed the Putnam investments and substituted in the identified comparators.[3]

---

[3] The *Brotherston* court also emphasized the importance of the fact that the case was being heard as a bench trial, not a jury trial. *See* 907 F.3d at 38-39 ("because ERISA cases rarely involve jury instructions, it is likely that very few cases will actually leave the question of causation 'in evidentiary equipoise'"). While a judge can parse the finer details of the differences between loss, causation, damages, and burdens

9

Here, however, the Defendants' alleged breach is the failure to *freeze* the variable annuities as of September 1, 2010 – which would prevent new funds from being deposited but, unlike *Donovan* or *Brotherston*, would not give the fiduciaries control over assets already invested in these options. "Once the money is in the individual legacy contracts [the variable annuities at issue in this motion], only the participant has rights to touch that money. " Trial Tr. 1061:7-12 (Sutherland). Thus, an "alternative reality" in which the funds are not in the variable annuities as of September 1, 2010 would require ensuring they did not enter the annuities in the first instance. Given that CREF Stock became available in 1952, the Court would need to reach back almost 60 years before the alleged breach – well before the class period or the statute of repose. Trial Tr. 2699:25 (Chittenden). Since Defendants are only chargeable with loss based on "if the portion of the trust affected by the breach had been properly administered," there is no basis to include damages predicated on investments necessarily made prior to the start of the period over which Defendants no longer had any control.

**III.   Conclusion**

For the foregoing reasons, and as set forth in Defendants' Supplemental Brief in Support of Their Rule 50(a) Motion Addressing Variable Annuities, Doc. No. 564, the Court should find in Defendants' favor as to Count V for the CREF-TIAA variable annuities.

---

of proof, doing so is much more difficult for a jury. This makes the lack of non-speculative expert testimony about loss in Plaintiffs' case-in-chief even more problematic.

| | |
|---|---|
| Dated: June 23, 2023 | Respectfully submitted, |
| | |
| */s/ Robyn E. Gallagher* | Nancy G. Ross (ct14373) |
| Robyn E. Gallagher (ct29596) | Jed W. Glickstein (phv09543) |
| WIGGIN AND DANA LLP | MAYER BROWN LLP |
| 20 Church Street | 71 South Wacker Drive |
| Hartford, Connecticut 06103 | Chicago, Illinois 60606-4637 |
| Telephone: (860) 297-3700 | Telephone: (312) 782-0600 |
| Facsimile: (860) 525-9380 | Facsimile: (312) 701-7711 |
| | |
| | Reginald R. Goeke (ct19258) |
| | E. Brantley Webb (phv20511) |
| | Michelle N. Webster (phv08475) |
| | MAYER BROWN LLP |
| | 1999 K Street NW |
| | Washington, DC 20006-1101 |
| | Telephone: (202) 263-3000 |
| | Facsimile: (202) 263-3300 |
| | |
| | John Nadolenco (phv08483) |
| | MAYER BROWN LLP |
| | 333 S. Grand Ave 47th Floor |
| | Los Angeles, CA 90071 |
| | Telephone: (213) 229-9500 |

*Counsel for Defendants*

490\311\4874-3790-7052.v3