UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

```
-------------------------------- x
JOSEPH VELLALI, NANCY S. LOWERS, :
JAN M. TASCHNER, and JAMES       :
MANCINI, individually and as     :
representatives of a class of    :
participants and beneficiaries   :
on behalf of the Yale University :
Retirement Account Plan,         :
                                 :
          Plaintiffs,            :
                                 :
v.                               :    Civil No. 3:16-cv-1345(AWT)
                                 :
YALE UNIVERSITY, MICHAEL A.      :
PEEL, and THE RETIREMENT PLAN    :
FIDUCIARY COMMITTEE,             :
                                 :
          Defendants.            :
-------------------------------- X
```

**ORDER RE MOTION TO PRECLUDE BUETOW OPINION RE**
**<u>VARIABLE ANNUITY DAMAGES</u>**

**(ECF NO. 557)**

For the reasons set forth below, Defendants' Motion to Preclude Gerald Buetow from Offering Opinions About Variable Annuity Damages (ECF No. 557) was granted on June 20, 2023.

The plaintiffs' experts at trial included Wendy Dominguez, Ty Minnich, and Gerald Buetow. The defendants moved to preclude Gerald Buetow, the plaintiffs' investment damages expert, from presenting damages opinions regarding the following TIAA variable annuities: CREF Stock Account, TIAA Real Estate Account, CREF Global Equities Account, and CREF Inflation-Linked Bond Account. The defendants noted that "with respect to the

1

variable annuities, Buetow adopted Dominguez's assumption that Plan participants would choose to move 60% to 100% of the total assets in the variable annuities to Dominguez's investment alternative. Buetow's calculations further assume that these transfers would have occurred by September 30, 2010—within one month of the date that Dominguez claims the annuities should have been frozen." Defs.' Mot. Preclude (ECF No. 557) at 1-2 (footnote omitted).

Under Fed. R. Evid. 702(b), an expert witnesses' testimony must be "based on sufficient facts or data." Expert testimony is inadmissible under Rule 702 if it is "not accompanied by a sufficient factual foundation before it [is] submitted to the jury." Boucher v. U.S. Suzuki Motor Corp., 73 F.3d 18, 22 (2d Cir. 1996) (internal quotation marks omitted) (quoting Gumbs v. Int'l Harvester, Inc., 718 F.2d 88, 98 (3d Cir. 1983)). Buetow's proposed testimony with respect to damages related to the variable annuities did not satisfy these requirements.

In his expert report, Buetow states that he is "using the methodology specified in the expert report of Wendy Dominguez," stating: "I incorporate and adopt the Confidential Expert Report of Wendy Dominguez." Expert Report of Dr. Gerald Buetow at ¶ 1, ¶ 1 n. 1. In paragraph 247 of her expert report Dominguez states:

> Had Yale removed the CREF Stock Account from the Plan's platforms and mapped existing and future contributions to a 70%-30% mix between the Vanguard Institutional Index Fund and the Vanguard Total International Stock Index Fund as of September 1, 2010, the Plan's participants would have avoided losses of $50,048,933[324] in retirement savings returns.

Expert Report of Wendy Dominguez at ¶ 247. In footnote 324, Dominguez cites to the "Expert Report of Dr. Gerald Buetow, attached schedules" and she states: "Performance losses are calculated on the assumption that 60% - 100% of assets would move out of the annuity." Id. at n. 324. In the executive summary in her expert report, Dominguez states:

> Yale's failures to freeze contributions to the underperforming annuities identified below as of September 1, 2010, educate participants on the reasons for the need to freeze contributions, and re-direct future contributions to similar funds within the Plan caused the Plan's participants retirement savings losses in the ranges of $62,186,581[1] (60% movement), $85,599,890[2] (80% movement), to $370,286,755[3] (100% movement).[4]

Id. at ¶ 24. In the three footnotes, she cites to the "Expert Report of Dr. Gerald Buetow, attached schedules." Id. at n. 1, n. 2, n. 3. Her expert report does not identify the basis for the assumption that 60% to 100% of assets would move out of the variable annuities.

At her deposition Dominguez testified that she was relying on "Ty Minnich's experience" as the basis for that assumption. Defs.' Mot. Preclude at 2 (quoting Dep. Test. Wendy Dominguez Tr. at 177:14-178:1). She stated that she knew to rely on

3

Minnich's experience because "I just know generally of his experience and I know what he's said in other cases." Defs.' Mot. Preclude at 3 n.2 (quoting Dep. Test. Wendy Dominguez Tr. at 179:16-23). Dominguez conceded that Minnich had not offered a "particular percentage" of assets that would have moved. Id. at 2. She acknowledged that she had not even reviewed his report in preparing her opinion and that she had no data to "specifically" corroborate his testimony. Id. at 2-3.

> In Minnich's expert report, he stated:
>
> In my experience, educational campaigns directed to plan participants in order to move funds out of TIAA products and into more prudent investment options have been successful. An effective boots-on-the-ground educational campaign focused on active participants will result in a majority moving their liquid retirement assets out of TIAA legacy products and into superior investment options.

Expert Report of Ty Minnich at ¶ 82. As the defendants note, prior to trial, there were indications that Dominguez and Minnich "would offer testimony that (a) Yale was obligated to conduct an educational campaign and that if it had, (b) a majority of active Plan participants would choose to move their assets from the frozen variable annuities within a month. And, indeed, Defendants anticipated that Buetow would testify that he relied on such opinions in proffering his damage calculations." Defs.' Reply (ECF No. 560) at 2-3 (internal quotation marks omitted).

At trial however, the plaintiffs did not introduce such evidence, and in fact did not introduce any evidence about whether and if so, to what extent, participants in the Plan would have changed their investment allocations if the variable annuities were frozen.

Minnich and Dominguez were the first two witnesses to testify at trial, and neither gave testimony about whether and if so, to what extent, participants in the Plan would have changed their investment allocations if the variable annuities had been frozen. The only relevant trial testimony by Minnich was as follows:

> Q. Have you ever participated in a campaign in [an] attempt to convince individuals to move out of the old fund lineup into the new fund lineup?
>
> A. Yes. In all of the plans that we were migrating from TIAA, we had a transition team, we had a communication team, and we would go one-on-one with each of the plan participants showing them old, new, and what their opportunity and what the advantages were, as well as a full explanation of the due diligence process that was conducted to make the move to a different provider.
>
> Q. And what was your experience with the success of those educational campaigns?
>
> A. They were successful. And we did satisfaction surveys after the fact to determine whether or not they were happy, and we reported the satisfaction surveys on an annual basis.

Trial Tr. at 326:4-19. As the defendants point out, Minnich "did not quantify the percentage of plan participants who chose to move assets to a new contract. He did not discuss specific

5

variable annuities. He did not state how much time it took to conduct these educational campaigns. And, like Dominguez, he did not draw any connection between his experiences and Yale." Defs.' Mot. Preclude at 4.

At trial Dominguez did not give any testimony concerning her assumption that 60% to 100% of the assets would move out of the variable annuities. Buetow would have been unable to offer any testimony that supported such an assumption, having testified at his deposition that he had had no experience that "included the replacement if CREF variable annuities." Ex. C (ECF No. 557-3), Defs.' Mot. Preclude at 6; Buetow Dep. Tr. at 171:19.

At trial, when Buetow was cross-examined outside the presence of the jury, he testified as follows:

> A. Again the framework that was constructed was not to give the plan participants a choice was to replace it for them. That's underlying assumption of the entire framework. One of the assumptions.
>
> Q. You are assuming that the plan sponsor could map CREF Stock to a new fund, is that right?
>
> A. Yeah, and my understanding at the time I did the computation that distinction was still being sort of debated I suppose and so I proposed I built multiple scenarios in an effort to accommodate an eventual agreement, I guess, on that issue, that legal issue.
>
> Q. So if, in fact, participants had to choose to move their own money, you would agree that your 100 percent mapping scenario would not hold, right?

> A. You know, I have no evidence one way or the other but presumably.
>
> Q. When you said you constructed the different scenarios, that was the 100, 80, 60, is that right?
>
> A. That's right.
>
> Q. Those numbers were provided to you, right? You didn't choose those yourself?
>
> A. Yeah, through discussions we figured that was a wide enough spectrum to consider.
>
> Q. That's through discussions with the attorneys?
>
> A. Yes.
>
> Q. And, sir, if, in fact, participants had to voluntarily choose to move their money from CREF Stock into a new investment fund, you would agree that the 80 percent scenario is high, right, for that all to happen in one month?
>
> . . .
>
> A. I have no empirical evidence one way or the other what the level of feasibility is to the assumptions.

Trial Tr. at 2344:5-2345:17.

Finally, the plaintiffs point to testimony by Elizabeth Sutherland, a long-time TIAA employee, but she gave no testimony that had probative value with respect to the assumptions made by Dominguez and Buetow. She merely testified:

> Q. Are you aware of situations where clients went to a new recordkeeper and encouraged their participants to move Legacy assets to the new recordkeeper?
>
> A. Yes.

Trial Tr. at 1031:21-24.

7

Thus, Buetow sought to present to the jury a damages calculation with respect to the variable annuities which assumed first, that participants in the Plan would have chosen to move 60% to 100% of the assets in the variable annuities to another investment if the variable annuities were frozen, and second, that they would have done so with 30 days of Yale's decision to freeze the variable annuities. But Buetow was unable to provide any evidence as to the feasibility of that assumption. He simply arrived at those numbers during discussions with plaintiffs' counsel. In addition, there was no evidence in the trial record as to whether and if so, to what extent or when, participants in the Plan would have moved assets. Dominguez gave no testimony at all as to the assumption that 60% to 100% of the assets would be moved nor as to any underlying facts that could support a conclusion that they would be. Minnich and Sutherland gave only generalized testimony about educational campaigns for participants who might choose to move assets from variable annuities. They provided no information as to how successful any such campaign might be or how long it might take; nor was there any basis for concluding that their testimony could be applicable to participants in the Plan.

Consequently, there was no foundation in the trial record for expert testimony by Buetow concerning his damages

calculation with respect to the variable annuities, and such testimony was inadmissible under Fed. R. Evid. 702.

Dated this 30th day of June at Hartford, Connecticut.

/s/AWT
Alvin W. Thompson
United States District Judge
